IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :      Criminal No. 4:15-103
                            :
      vs.                   :
                            :
JESSE R. BENTON and         :      TRANSCRIPT OF TRIAL
DIMITRIOS N. KESARI,        :           VOLUME I
                            :
          Defendants.       :
- - - - - - - - - - - - - -X

                              Second Floor Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Tuesday, October 13, 2015
                              8:30 a.m.

BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.

                    Terri L. Martin, CSR, RPR, CRR
                     United States Court Reporter
                      Room 189, U.S. Courthouse
                       123 East Walnut Street
                       Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                JONATHAN I. KRAVIS, ESQ.
                                  U.S. Department of Justice
                                  Criminal Division
                                  10th and Constitution Avenue NW
                                  John C. Keeney Building
                                  Washington, D.C.  20530

                                  RICHARD CHRISTIAN PILGER, ESQ.
                                  U.S. Department of Justice
                                  1400 New York Avenue NW
                                  Suite 12100
                                  Washington, D.C.  20005

For Defendant Benton:             ROSCOE C. HOWARD, JR., ESQ.
                                  MEENA T. SINFELT, ESQ.
                                  Barnes & Thornburg
                                  1717 Pennsylvania Avenue NW
                                  Suite 500
                                  Washington, D.C.  20006

For Defendant Kesari:             JESSE RYAN BINNALL, ESQ.
                                  Harvey & Binnall
                                  717 King Street
                                  Suite 300
                                  Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Ty Joseph Lim | 58 (Kravis) | 60 (Sinfelt) | | |
| Jennifer Brown | 63 (Kravis) | 65 (Binnall) | | |
| Fernando Cortez-Lira | 67 (Pilger) | | | |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 59 - Cortes e-mail to Tate and Benton | 85 | 86 |
| 76 - 2/8/12 Kesari to Cortes | 82 | 83 |
| 77 - 2/8/12 Cortes e-mail for payment of ICT invoice | 75 | 76 |
| 84b - 4/3/12 e-mails | 88 | 89 |
| 85 - 4/3/12 e-mail | 92 | 92 |
| 88 - 5/2/12 Kesari e-mail to Cortes | 95 | 95 |

1       P R O C E E D I N G S

2            (In open court, with defendants present, First Floor

3   Courtroom.)

4            THE COURT:  Please be seated.

5            The record can reflect that we're here in the matter

6   of the United States of America versus Benton and Kesari.  We're

7   outside the presence of the jury on the first morning of trial.

8   I, frankly, don't have a lot this morning.  I just wanted --

9   every morning I'll give you that opportunity outside the

10  presence of the jury to raise things that might come up

11  throughout the course of the day.  I don't hold side-bar

12  conferences almost ever during the trial, and the idea is that

13  we'll take care of these matters to the best of our ability in

14  the morning before trial begins.                 When we were

15  together last week we discussed how the jury selection will go,

16  so I think that's something that we ordinarily cover.

17           So let's start with the government.  What do you have,

18  just to get us through jury selection and maybe opening

19  statements?  Any concerns?

20           MR. KRAVIS:  There were just two small matters.  One

21  was an issue that the government had e-mailed the parties about

22  yesterday, which is that there are a few witnesses -- or excuse

23  me, a few potential jurors whose jury questionnaires mention

24  serious violent crimes that have occurred within their families,

25  and the government's view is that those are matters that the

1  parties may want to explore with those witnesses, but that it

2  might be most appropriate to explore those issues at the bench

3  outside the presence of the other potential jurors.

4           THE COURT:  Yes.  You'll see when we get started that

5  I have a procedure that makes everybody comfortable saying that

6  they don't have to talk about it in front of other people.  Then

7  after all four of the voir dire examinations have been complete,

8  when we're at the side-bar, we'll call people over as needed or

9  as desired for follow-ups and things.  That will be very easy.

10           MR. KRAVIS:  Very well.  The only other question that

11  the government had was, I guess, just to confirm that the court

12  will make a final decision on the number of strikes allotted to

13  each party as we're going through the voir dire to see how we're

14  doing in terms of jurors excused for cause?

15           THE COURT:  Yes.

16           MR. KRAVIS:  Very well.  Thank you.

17           There will be eight for the government and twelve for

18  the defendants unless we get to the situation where there's just

19  not enough jurors, in which case I'll revert to six and ten.

20           Mr. Howard, on behalf of Mr. Benton?

21           MR. HOWARD:  Your Honor, for Mr. Benton at this time,

22  we have no issues to bring up with the court.

23           THE COURT:  Mr. Binnall?

24           MR. BINNALL:  You know, just mechanically from what

25  the court just said about trying to avoid side-bars, I

1  anticipate there is probably going to be times during trial

2  where there will be evidentiary objections that might be

3  prejudicial if the objections are argued in front of the jury.

4  How exactly would you like to handle that during trial?

5          THE COURT:  You'll know who's coming up during the

6  day, and I would like to visit at 8:30 in the morning about

7  those kinds of things and resolve every one that we possibly can

8  at 8:30.

9          MR. BINNALL:  Very well.  So in that case will we know

10  the government's witnesses the day before?

11          THE COURT:  Oh, yes.

12          MR. BINNALL:  For today's witnesses, they did tell us

13  who they were going to call.

14          MR. KRAVIS:  I'll do it every day.

15          MR. BINNALL:  Very well.  Excellent.

16          THE COURT:  And I expect you to extend the same

17  courtesy to them.

18          MR. BINNALL:  Thank you.

19          THE COURT:  All right.  So probably about ten to 9:00,

20  assuming the jurors are checked in, my clerk will be calling the

21  first 36 names.  That way when I come in at 9 o'clock the first

22  36 people are already seated.  You don't have to be there until

23  I'm there, but you can.  It's up to you.

24          Thanks.

25          MR. HOWARD:  Your Honor, and I apologize, misinfo.  We

1   understand Agent LoStracco is going to be testifying today, and

2   there was a filing this weekend about the use of Mr. Benton's

3   proffer statement and truthful statements in order to prove the

4   false statements.  We -- because of the flurry of motions that

5   we got, we never responded.  We will be objecting to that.

6   Obviously, we don't think it's proper.  I don't know if that

7   was -- and I apologize for not bringing this up until just a few

8   minutes ago.

9           THE COURT:  No, I understand.  We'll handle it as it

10  goes.

11          We're in recess.

12          (Recess at 8:36 a.m., until 9:00 a.m.)

13          (In open court, with defendants present.)

14          (A jury was impaneled and duly sworn.)

15          THE COURT:  All right.  In just a moment here we'll

16  recess for lunch and we'll come back promptly at 2 o'clock.  One

17  thing that you'll find about me is I start on time all the time.

18  I just believe in it.  I hope if you believe one thing at the

19  end of the trial it's that I value your time.  I recognize that

20  every one of you has someplace else they need to be, so we will

21  value your time while you're here.  So be ready to go promptly

22  at 2:00 p.m.

23          When you get back, I'm going to read some preliminary

24  instructions about the law and about your duties as jurors, and

25  then we'll hear the opening statements of the lawyers.  We'll

1   talk more about that later.

2          In those instructions there's more instructions about

3   being a good juror, so I'm going to give you the same admonition

4   that I did over the break.  Just don't talk to anybody amongst

5   yourselves or anyone about anything involved in this case.  If

6   you're in your car and you hear a story about this case -- and

7   there will be stories about this case -- please immediately turn

8   it off, turn to another channel.  Do not read any newspaper

9   article or listen to any television broadcast that might be

10  published about the case.  As I said, when you come back, you're

11  going to get more instructions about that.

12         All right.  So you're going to sit in these chairs

13  when you come back at 2 o'clock.  Mr. Crabbs and Ms. Rubel will

14  lead their rows in.  So if you would just take a look at the

15  person on your right, that's the person that you're going to

16  follow into the courtroom.  That way you don't stumble over each

17  other getting into the jury box.  So you're going to follow the

18  person to your right into the jury box, and Ms. Crabbs and

19  Ms. Rubel will lead their rows in.

20         If you feel like bringing a water out here, fine.  We

21  don't want the soft drinks and stuff because there's a lot of

22  things that we don't want it spilled on, but you can have a

23  water in here.

24         Throughout the course of the trial, if you have to go

25  to the bathroom, just raise your hands, say, can I have five

1  minutes, and that's just fine.  We don't have to wait for

2  ordinary breaks if you have such a situation.

3          So then throughout the course of the trial, Elizabeth

4  Archer -- she's my law clerk -- she's going to come and get you

5  before every session of court.  She'll help you out, and she's

6  going to see you now to that jury deliberation room.  That's the

7  room at which you gather before every session of court and it's

8  one that you'll see.  She'll tell you things like whether it

9  will be locked so you can leave purses and belongings in there.

10 But with anybody in the courthouse, please do not ask them any

11 questions touching on the merits, anyone whatsoever involved in

12 this case.  It just makes them uncomfortable, and, you know,

13 they can't answer those questions.  So they'll -- the CSOs are

14 great guys to find out where the best restaurants are but not

15 for information about this case.

16         So that's enough for now.  Like I said, when you come

17 back at 2 o'clock, I'll give you the preliminary instructions,

18 we'll hear the opening statements, and we'll get into the

19 evidence today hopefully.

20         See you ready to go at 2 o'clock.  Excused until then.

21         (Recess at 12:31 p.m., until 2:00 p.m.)

22

23

24

25

1           AFTERNOON SESSION    1:50 p.m.

2           (In open court, out of the presence of the jury.)

3           THE COURT:  The record can reflect we're outside the

4      presence of the jury.

5           Mr. Binnall.

6           MR. BINNALL:  Thank you, Your Honor.

7           First of all, we just want to make sure that the

8      motions that were made in the motion hearing last week for the

9      sequestration of witnesses that counts for trial and --

10          THE COURT:  It's mandatory.  Upon motion the court

11     shall exclude witnesses and the court will not exclude the case

12     agent or your clients.

13          MR. BINNALL:  Thank you.

14          THE COURT:  But you understand that I won't recognize

15     your witnesses when they come in, so you will have to tell me

16     when it happens.

17          MR. BINNALL:  I understand, Your Honor, and we'll do

18     the best we can as well.

19          Your Honor, as far as the conspiracy, Your Honor said

20     you planned to proceed under Bell as far as for laying the

21     foundation for conspiracy.  I don't know if the court is

22     planning on doing that through colloquy or exactly how the court

23     intends to do that.  We just wanted to see if we could get

24     clarification on that.

25          THE COURT:  Through colloquy?  No.

1           MR. BINNALL:  Okay.

2           THE COURT:  No.  I'm going to wait and listen to the

3    evidence and conditionally admit it.

4           MR. BINNALL:  In the presence of the jury?

5           THE COURT:  Yes.

6           MR. BINNALL:  Our objection, of course, to that is you

7    cannot unring that bell.

8           THE COURT:  Right.  And if you can't, then a mistrial

9    is appropriate.

10          MR. BINNALL:  I understand, Your Honor.

11          THE COURT:  Yeah, that's how it goes.

12          MR. BINNALL:  And then there are two pieces of

13   evidence from the government that may come in through their

14   witnesses this afternoon.  It's -- there's 78, 79.  And I may

15   have some other objections that don't have to be taken up

16   outside the presence of the jury; but looking at these, they

17   both refer to Matt Whitaker, both in Exhibit 78, how is Matt,

18   and Exhibit 79, curious how Matt is doing for your ticket.  That

19   clearly is not relevant to this case, and I think the court

20   probably knows that Matt Whitaker is a fairly well known

21   attorney in this area.  I don't want that as kind of being back

22   door to -- for back door evidence against Mr. Kesari.  And so we

23   would ask, regardless of our other objections, that

24   Mr. Whitaker's name, any mention to him be redacted.

25          MR. PILGER:  We'll make this easy, Your Honor.  We

1    will agree to redact those references.

2              THE COURT:  Very well.  Thanks.

3              MR. BINNALL:  The last thing, Your Honor, I'll bring

4    up just has to do with an e-mail that -- and I think I'm going

5    to have it right this time.  Is it "Kravis"?

6              MR. KRAVIS:  Kravis.

7              MR. BINNALL:  Kravis -- okay, that won't happen --

8    sent yesterday to the entire group, including the court,

9    regarding introducing the proffer evidence of Mr. Benton and

10   Mr. Kesari -- Mr. Benton and Mr. Tate against Mr. Kesari.  Your

11   Honor, it is our position that that is not allowed under the

12   confrontation clause under the Sixth Amendment.  Mr. Kesari had

13   no opportunity to cross-examine anyone in these proffer

14   statements.  He certainly cannot call them as witnesses now

15   because of their Fifth Amendment rights, and it would most

16   certainly be unduly prejudicial for what happened in a proffer

17   session that Mr. Kesari was not at and had no counsel present

18   not to be used against him at trial.

19             THE COURT:  Mr. Kravis.

20             MR. KRAVIS:  I think I can make this one easy for the

21   court as well.  The government's intention reading the

22   indictment to the jury at the start of this case was to remove

23   the overt acts from the conspiracy that referenced the proffer

24   agreement because the evidentiary issues associated with the

25   introduction of that evidence now are a little more complicated.

1    Otherwise, I think it's best to sort of proceed question by

2    question and statement by question here because the statements

3    that Mr. Benton made in the proffer session do not reference

4    Mr. Kesari --

5              THE COURT:  You don't have a Bruton problem, but you

6    still have a situation where those statements would only be

7    admissible against Mr. Benton and not co-conspirator evidence or

8    anything.

9              MR. KRAVIS:  No, no, exactly right, that's right.  The

10   statements from the proffer session are admissible as against --

11             THE COURT:  We can deal with that as it comes.  Good.

12             MR. KRAVIS:  May I on that subject?

13             THE COURT:  Briefly, yes.

14             MR. KRAVIS:  I just very quickly wanted to confirm how

15   the government is going to be reading the indictment to the

16   jury.  We had intended to substitute the real names of the

17   parties that were referenced by letter in the indictment.

18             THE COURT:  Everybody agreed to that, so you can go

19   ahead and do that.

20             MR. KRAVIS:  I intended to remove the references to

21   the proffer statements in the overt acts in furtherance of the

22   conspiracy, but otherwise to include the overt acts that mention

23   Mr. Benton and Mr. Tate on the theory that they are in this

24   trial indicted co-conspirators.

25             THE COURT:  Yes.

1              MR. KRAVIS:  Thank you.

2              THE COURT:  All right.  Call the jury, please.

3              (In open court, in the presence of the jury.)

4              THE COURT:  Please be seated.

5              Ms. Clerk, if you would hand out copies of the

6    preliminary instructions to the jurors, please.

7              So as I said, I have some preliminary jury

8    instructions about the case, and then we'll proceed to the

9    opening statements.  If you follow along and read silently in

10   your preliminary jury instructions as I read them out loud.  The

11   court reporter doesn't need to take down the reading of the

12   instructions, just follow along with your copy and report it

13   where I deviate from the written word.

14             (Instruction 1 was read by the court.)

15             THE COURT:  Instruction No. 2 is the indictment.  It's

16   what I read to you earlier today.  The government is going to

17   read the entire indictment this afternoon before they begin

18   presenting evidence, so I'm not going to repeat that one, but

19   it's there for you to refer to along the course of the trial.

20             (Instructions 3 through 6 were read by the court.)

21             THE COURT:  I want to say an extra special word about

22   reading any newspaper accounts or listening to any other

23   broadcasts about this case because you can expect that there

24   will be such in this case.  There's only a couple of things in

25   the law that can be used to impeach the integrity of a jury's

1  verdict, and almost every single instance I know of is where

2  outside influences are brought to bear on the jury, where people

3  acquire information some other place.  So we're asking you to be

4  very scrupulous about your desire to avoid learning anything

5  about this case outside the courtroom.

6          Second little caution, and that is about social media.

7  So many people use Facebook and Twitter and all the other social

8  media devices these days.  Please throughout the course of the

9  trial do not mention anything about this case on Facebook or

10  Twitter or other social media.  It is likely that people will

11  look at your Facebook accounts if they can or Facebook page to

12  see if you're saying anything about it and you just don't want

13  to.  And the reason is oftentimes when people post stuff on

14  Facebook about a trial they're in, sometimes even if it's not

15  intended, it appears that they look like advocates for one side

16  or the other, and that's, of course, just very inconsistent with

17  our role as neutral fact finders in the case.  So I appreciate

18  your concern for not only doing it but for why we do that.

19          Mr. Kravis, you may make the government's opening

20  statement.

21          Mr. Pilger.

22          MR. PILGER:  May it please the court.  Let me take a

23  moment to thank you and then I'm going to get right to work.  I

24  appreciate the time that you have now committed to these

25  proceedings very much but I'm not going to take anymore of it,

1  I'm going to get straight to work.

2           Ladies and gentlemen, this case is about a coverup.

3  This case is about a coverup that happened here in the Southern

4  District of Iowa.  Mr. Kravis and I will prove to you that these

5  two defendants right here, Mr. Kesari at this table (indicating)

6  and Mr. Benton at this table (indicating) committed that coverup

7  during the 2012 federal election.  They covered up their

8  payments to an Iowa State Senator.

9           Defendant Kesari conspired, lied, falsified records,

10  and attempted to obstruct justice in that coverup.  His boss,

11  defendant Benton, lied to the FBI, participated in the lying and

12  the falsifying of records.  That is not the crime he is charged

13  with today like Mr. Kesari.  He is charged today with telling

14  bald face lies to the FBI, and we will prove that he told the

15  FBI he knew nothing about the payments to the state senator at

16  the time, at the time of the payments.  We will prove that he

17  knew all about it, and we will prove that he flagrantly lied to

18  the FBI to cover up his important role.

19           You see, these defendants, Mr. Kesari and Mr. Benton,

20  they were senior officials of a presidential campaign.  They

21  came here knowing that winning in Iowa matters, and the evidence

22  will show they tried to win in Iowa by breaking the law.  Who

23  was their candidate?  Before we heard, it's Ron Paul.  Ron Paul

24  knew nothing about the coverup that brings us here today.  You

25  will see the defendants went behind his back and against his

1   wishes to show off what they could do in the business of winning

2   political campaigns, and these defendants were big enough in

3   that business to actually run the Paul Campaign.  They were the

4   bosses.

5           Actually Benton was the chairman of the campaign and

6   was married to Ron Paul's granddaughter, Kesari was the deputy

7   campaign manager under Benton, and someone not here today, John

8   Tate, was the campaign manager.  Benton and Tate were in charge

9   and Kesari reported to them.  In fact, you will learn that

10  Kesari didn't do much of anything without their approval.

11          So what did they do?  Here is what they did:  Running

12  up to the 2012 caucuses they decided to secretly pay Iowa State

13  Senator Kent Sorenson with campaign money and hide that from the

14  public and from the Federal Election Commission which makes

15  payments public.  I'll talk about it as the FEC.  You've heard

16  that already.  That's the agency that gets information about

17  campaign spending out to the public through the Internet.

18      Now, Sorenson has pled guilty.  You'll hear from him what

19  he did with these defendants to hide what they paid him.

20          Why did they do this?  Why did they do this?  Why

21  cover it up?  You will learn they did it because Ron Paul and

22  Michelle Bachmann were running against each other for the

23  nomination and at first Sorenson supported Bachmann, but the

24  defendants made a deal for him to switch, to switch his support

25  from Bachmann to Paul right before the caucuses, immediately

1   before the caucuses, and they got him to switch by promising to

2   pay.  Well, right after Sorenson switched, Michelle Bachmann

3   told the world that the Paul Campaign was paying Sorenson to

4   switch, and that brought public scrutiny.  That's when the

5   defendants decided they had to hide the Sorenson money.  And

6   they decided they would cover up what they did from anyone they

7   had to, and that included the media, that included their own

8   campaign staff, that included their candidate, the FEC, people

9   you're going to hear from in this trial.

10          And how did they do it?  How did they cover up the

11  Sorenson money?  Well, you will learn that Kesari, he executed

12  the details of the coverup and he did it with false invoices.

13  He did it with pass-through companies.  He did it with false

14  entries in the campaign's books that he caused.  He did it with

15  false reports to the FEC that he caused.  And he did it by going

16  to Sorenson and trying to get him to give back a check, which

17  you will see (indicating).  That showed just how badly they

18  wanted Sorenson to flip, a $25,000 check that they were about.

19  And you will learn that Benton, knowing about the coverup,

20  having approved it and participated in it, deliberately lied to

21  the FBI about it.  He even denied knowing that Sorenson was

22  being paid at the time.

23          Ladies and gentlemen, I'm going to tell you in detail

24  about the evidence of how they did this, but let me just be

25  clear, the defendants are not charged today with anything like

1  bribery.  That's not the charge.  They're charged with covering

2  up, with the coverup, and we will prove that coverup mostly in

3  their own e-mail, in their very own words, in their very own

4  e-mail, and it will also be an e-mail that they caused other

5  people to write, including their unsuspecting campaign workers,

6  they're unsuspecting family members.  Other people that they

7  caused to do things to make the scheme work didn't know what

8  they were up to.  We'll show you that e-mail.  We'll show you

9  exactly how they did it.

10        Headed into the 2012 caucus, the defendants all

11  believed that Sorenson would be valuable to their campaign.

12  There was just one problem.  He had already endorsed Michelle

13  Bachmann.  In fact, he was so important that he was the chair of

14  the Bachmann campaign in Iowa.  He was Michelle Bachmann's

15  chair.

16        So in the fall of 2011, these defendants right here,

17  they began courting Sorenson to leave Bachmann and go with them,

18  and you will see in the e-mail exactly what motivated them.  You

19  will see it was important to switch Sorenson from Bachmann to

20  Paul.  You will see that it was important to them.  Even after a

21  friend of Sorenson's offended them by making a proposal for what

22  should be paid to get the switch done, they still chased after

23  him.  They chased after him even though they, themselves,

24  defendant Benton in particular, called that proposal, quote,

25  unethical and illegal.  He did that in an e-mail on Halloween in

1  2011.  In that very same Halloween e-mail, the very same e-mail,

2  he offers to pay Sorenson $8,000 a month to make the switch.

3           The e-mails you're going to see are going to show you

4  something important.  Kesari was the main person in contact with

5  Sorenson, but Benton was calling the shots, Benton was the boss.

6  And, ladies and gentlemen, running up to the caucuses at

7  Christmas of 2011, these defendants were really excited because

8  they thought they had Sorenson ready to flip.  They were so

9  excited that Benton wrote in an e-mail that he could, quote, put

10  a fork, unquote, in Michelle Bachmann.  How badly did they want

11  that?  Here's how badly.  The next day, on Christmas Day itself,

12  Kesari sent Benton and others a draft statement about Sorenson

13  endorsing Ron Paul.  The defendants and the others then spent

14  the middle of Christmas Day, Christmas Day itself, editing that

15  statement.  That's how important it was.

16           Then the very next evening, the day after Christmas,

17  Kesari met Sorenson and his wife for dinner at a restaurant in

18  Altoona.  During that dinner Kesari gave Sorenson's wife the

19  check for $25,000.  It was payable to a company that was owned

20  by Sorenson.  It was not drawn on the campaign.  It was not

21  drawn on Kesari's personal account.  It was drawn on a private

22  jewelry company, private jewelry company.  And that very same

23  night that he passed the check Kesari e-mailed two campaign

24  press officials.  The subject line said, Kent, and the message

25  said, deal is done.

1           Ladies and gentlemen, that deal was not done.  Despite

2    the jewelry store check, Sorenson wasn't in yet, he wasn't in,

3    he hadn't agreed.  The next morning Kesari happened to e-mail

4    Benton and say, hold the release.  And the defendant spent the

5    rest of the day exchanging an angry e-mail about Sorenson.

6    Benton in particular said, F him, this is absurd, except he

7    didn't say F, he said the whole word, because he was angry.

8           A few minutes later Benton wrote, I am not interested

9    in this game anymore.  Dimitri, pull the offer.  It's Benton

10   calling the shots to Mr. Kesari.  But they were still

11   interested.  So on December 28, Sorenson came to a Paul event,

12   he got up on the stage and he endorsed Ron Paul for the party's

13   nomination for President.

14           What happened next?  Right after Sorenson's

15   endorsement, Kesari e-mailed the campaign's financial staff and

16   he copied Benton.  Kesari e-mails the financial staff and copies

17   Benton and he asks for a $25,000 wire first thing in the morning

18   and he said that Benton had approved it.  The evidence will show

19   that this wire was going to replace the jewelry store check.

20   Why?  The evidence will show that the defendants decided it was

21   too risky for Sorenson to deposit that check, he had told too

22   many people about it.  But then the $25,000 wire became too

23   risky.  First it was a check and Kesari starts a wire, and then

24   that's too risky.  Why is it too risky?  Because the other thing

25   that happened that night, Michelle Bachmann publicly accused the

1   Paul Campaign of paying Sorenson to switch.  So now the

2   defendants have a problem.  If the Paul Campaign just went ahead

3   and paid Sorenson openly, then the Bachmann accusation would be

4   proven and that would cause damage and public attention right

5   before the caucus.

6          So the defendants stopped the wire that Kesari

7   started.  Benton specifically ordered the staff to hold it,

8   specifically told them to hold it.  Kesari then explained they

9   were holding the wire so it would not appear in FEC filings, and

10  Tate, the campaign manager, who's not here today, said -- he

11  said, wipe it off the books.

12         You will see from this proof that Bachmann's

13  accusation had made the defendants jump and it made them jump

14  across an important line.  That was the line between openly and

15  legally paying Sorenson to work for the campaign, which is fine,

16  and causing the campaign to pay Sorenson in secret, which is

17  not.  When Michelle Bachmann publicly accused the Paul Campaign

18  of paying Sorenson for his endorsement, the defendants started

19  working with Sorenson to cover up his money and put an end to

20  negative public scrutiny.  And the evidence will show you that

21  the only way to do that, to succeed at that is to make sure that

22  the Sorenson money never got reported to the Federal Election

23  Commission.

24         So the campaign has to do filings with the FEC.

25  What's an FEC filing?  You will learn that federal campaigns

1  must report how they spend their money.  That's because the FEC

2  has an important job.  It posts the campaign spending right

3  there on the Internet so that the public can see what's going

4  on.

5          But the defendants, they began covering up the

6  Sorenson deal immediately.  There was no way they were going to

7  let the public see the Sorenson money.  On the very night of the

8  Bachmann accusation, on the very night, Benton flatly denied to

9  the media that Sorenson was being paid by the Paul Campaign.

10     On the morning of the next day, Sorenson attended a meeting

11  with Kesari and others to discuss what the campaign should do

12  about the Bachmann allegations.  Benton participated by phone.

13  Defendant Kesari was there.  And the defendants agreed with

14  Sorenson the campaign would say that he was not getting any

15  money.  They knew he had a deal.  He had a deal for $25,000 up

16  front and $8,000 a month; but they agreed that Sorenson should

17  say that the campaign's FEC filings would prove that he was

18  telling the truth, and they agreed they could get away with that

19  because the campaign would pay Sorenson not openly but secretly.

20  That way the name Sorenson and the name of his company would

21  never appear on the Internet when the FEC puts out to the public

22  what's going on with campaign spending.

23          Next, right after that, the campaign put out a false

24  statement.  They put it together, had Sorenson approve it, put

25  it out and said, quote, I was never offered money from the Ron

1   Paul Campaign or anyone associated with that and certainly would

2   never accept any.  Financial reports come out in just days which

3   will prove what I'm saying is true.

4          Benton reviewed and approved that statement and that

5   statement was a lie.  Benton knew full well as far back as the

6   Halloween e-mail that they were going to pay Sorenson $8,000 a

7   month and the evidence will show that he knew full well the

8   campaign would be paying Sorenson 25,000 up front plus the 8,000

9   well into 2012.

10          Then the same day, the same day, Sorenson gave an

11   interview with Megyn Kelly on Fox News and Sorenson told Megyn

12   Kelly that he had not been paid to switch.  He knew full well he

13   had just made a deal for money to switch his endorsement from

14   Michelle Bachmann to Ron Paul, but he was fully on board with

15   the coverup.  So he told Fox News the campaign's reports would

16   come out and they would show the campaign never paid it, and he

17   could say that because he was being paid in secret.

18          And how do you know that?  Well, Sorenson himself will

19   tell you that; but, more importantly, you can tell it by

20   following the money in the documents that you're going to see.

21   Follow the money, ladies and gentlemen.  If you follow the

22   evidence about the money which will come to you in pieces, from

23   different witnesses, you will see the whole coverup in black and

24   white.  Did Sorenson get paid the $25,000 in the jewelry company

25   check that Kesari gave him in Altoona?  No.  Did the Paul

1  Campaign pay him with a $25,000 wire in the open?  No.  The

2  e-mail, ladies and gentlemen, shows you that defendants came up

3  with a new plan.  The e-mails show that in 2012 Kesari first

4  asked his brother to pay Sorenson through his brother's film

5  production company, but the brother didn't want to do it.  Did

6  Kesari give up?  No.  He asked his brother to find someone else,

7  and his brother did find someone else at a different film

8  production company, not a political consulting company, a film

9  production company, and that company was called ICT, which

10  stands for Interactive Communication Technology, which you heard

11  about in voir dire.  And the owner of ICT agreed for a fee to

12  let the defendants use ICT as a pass-through company to pay

13  Sorenson.  And you will hear from Kesari's brother and from the

14  owner of ICT.  They will testify for you.  And you will see

15  their e-mail, and you will see that they had no idea what really

16  was going on; but the defendants used and manipulated them to

17  cover up the Sorenson money.

18        It worked like this.  Each month Sorenson's company

19  submitted an invoice to ICT to a company called Grassroots

20  Strategy.  The first invoice was for 33,000.  That was the

21  $25,000 upfront payment, plus the first $8,000 monthly payment,

22  the first $8,000 monthly payment first promised back on

23  Halloween.  By who?  Defendant Benton.

24        The Grassroots Strategy invoice to ICT was false.

25  Sorenson wasn't doing any work for ICT, wasn't doing any work

1   for them at all.  But ICT turned around and sent an invoice to

2   Kesari to send to the campaign to cover the Sorenson bills.  The

3   ICT invoices, they don't say Sorenson.  They don't say

4   Grassroots Strategy.  You can't say anything about him on there.

5   That's what goes into the campaign to unsuspecting people, and

6   they did this over and over again for months.

7             So what happens when these false invoices go into the

8   campaign?  Well, first the Paul Campaign, the unsuspecting

9   people, they pay ICT.  ICT turns around and pays Grassroots

10  Strategy, and then the money is in Sorenson's pocket.  Why are

11  the people in the campaign doing this?  Because they're getting

12  the invoices from the deputy campaign manager with approval from

13  the boss, Mr. Benton.  And so the staff trusted and the staff

14  paid and the money made its way from the campaign to Sorenson

15  because of false invoices from Grassroots Strategy and ICT,

16  invoices caused by these defendants.

17            Now, you'll also learn the staff used the ICT invoices

18  to create business records inside of the campaign, and those

19  records went up to the campaign's treasurer and assistant

20  treasurer, and they had billing codes on them which came from

21  the ICT invoices.  The ICT invoices were from a film production

22  company, so the codes go up for reporting to the FEC as

23  audiovisual expenses.  There are no audiovisual expenses.  It's

24  completely nonsense, completely false.  And the treasurer that

25  they went to was Ron Paul's daughter, Lori Pyeatt, and the

1    assistant treasurer was Deana Watts.  Neither of them really

2    knew what was going on with ICT.  They thought the money paid to

3    ICT was for audiovisual expenses.  So they did their job, they

4    filed reports with the FEC, which went online to the public with

5    false information so you couldn't see Sorenson getting paid.

6    All you could see is a film production company getting paid for

7    audiovisual expenses.

8            With this game the public can never find out the

9    campaign paid Sorenson; but when Bachmann called them on having

10   paid him to switch, she was right.  That's what they were doing.

11   They had that deal and they concealed that from the public by

12   lying to the FEC.

13           Doing this, they secretly paid Sorenson $73,000 off

14   the books, and ICT, the pass-through company, which did no work

15   for the Paul Campaign, none, it got over $82,000 for the

16   so-called audiovisual expenses or audiovisual services that

17   never happened.  And so $73,000 of Sorenson money was completely

18   hidden from the public inside the false campaign records and

19   false FEC filings.

20           Each defendant played their own important role in this

21   coverup scheme and so did John Tate, the campaign manager, whose

22   e-mails you will see.  Tate is not charged in this proceeding

23   today, but as a boss he worked with Benton to keep the money

24   flowing.

25           For example, Kesari e-mailed Tate, did Jesse get Kent

1 | paid?

2 |        Tate responded, no idea.  Ask him.

3 |        Kesari then e-mailed Benton, did you get Kent paid?

4 |        And Benton answered, you handle.

5 |        You can see from the e-mail they're well aware of what

6 | they're doing, and they each have their roles, and each time

7 | Kesari e-mailed the staff, the unwitting staff, he noted that

8 | defendant Benton had approved.

9 |        Now, the staff, they checked with Tate.  In June

10 | Kesari forwarded the last ICT invoice to the staff and the staff

11 | forwarded it to Tate for approval.  Tate was approving lots and

12 | lots of expenses.  Now, on this one he forgot the specifics of

13 | what ICT was, and he asked about it.  What is it?  What is it

14 | for?  And Kesari responded in an e-mail, this is the last

15 | payment for Kent Sorenson, the deal Jesse agreed to with Kent.

16 | Tate said, okay, thanks.  And then having just been reminded

17 | what ICT was for, he approved the payment.

18 |        Then after the payments to Sorenson ended, defendants

19 | each kept working to keep the whole thing concealed.

20 | Specifically, in September 2013, in the middle of an FBI

21 | investigation, Kesari flies out here.  He doesn't fly to

22 | Des Moines.  There's a perfectly good airport in Des Moines, but

23 | he goes to Nebraska and backtracks in a rental car.  He goes to

24 | see Kent Sorenson.  Why?  Because he wants Kent Sorenson to give

25 | him this (indicating) back.  He doesn't want Kent Sorenson to be

1   able to tell and be corroborated with any evidence.  Sorenson

2   wouldn't do it, so Kesari asked him could he change it, could he

3   swap it out for a check for 2,500.  Sorenson wouldn't do that.

4   So Kesari asks him, can I write loan on the memo line?  Sorenson

5   wouldn't go for that either.

6          I forgot to mention, right before that conversation --

7   Kesari has backtracked from Omaha to get here, to actually the

8   Indianola area -- Kesari says, pull up your shirt, I want to see

9   you're not wearing a wire.  And Sorenson had to pull up his

10  shirt and Kesari pulled up his shirt because they're worried

11  because there's an FBI investigation.

12         Later on July 21st and 22nd, defendant Benton

13  committed the crime he's charged with in this proceeding.

14  Remember, he's only charged here with lying to the FBI.  Here is

15  what happened.  Benton participated in a two-day session with

16  the FBI.  You will learn the FBI investigates fraud in the

17  Federal Election Commission.  It's part of their job,

18  investigates interfering with their function of getting that

19  information out to the public about spending and other things.

20  And during his session with the FBI, Benton repeatedly and

21  falsely stated that he did not know Sorenson was being paid by

22  the Paul Campaign either directly or through a third party.

23         So despite the fact that he had been offering Sorenson

24  money all the way back to Halloween 2011 and despite the fact

25  that he directly participated in making the payments happen, he

1  told the FBI he knew nothing about Sorenson actually getting

2  paid at that time.  He even said, quote, I'm not splitting

3  hairs, Sorenson is not getting paid.

4         That's willfully lying to the FBI, and that's actually

5  the only thing that we have to prove in this proceeding that

6  Mr. Benton did, and we are going to prove that to you.  So

7  that's the coverup.

8         You're going to see it in the defendants' e-mails in

9  their own words.  You're going to see it in false invoices.

10 You're going to hear witnesses that the defendants used or

11 manipulated and you're going to hear from Sorenson.  He was in

12 this.  He even lied under oath during proceedings by the Iowa

13 State Senate Ethics Committee.  But he pled guilty to it.  He

14 accepted responsibility for what he did.  He turned in the check

15 and he agreed to cooperate.

16        So when Sorenson is sentenced, he absolutely hopes

17 that the judge will give him a lighter sentence for cooperating,

18 but here is the thing about him.  You will find you have reasons

19 to rely on Sorenson's testimony because over and over again the

20 defendants' own words, their own e-mail shows what actually

21 happened and that you can rely on what he's telling you.

22        Another thing, you will hear from Ron Paul himself.

23 Ron Paul is going to testify that he never would have agreed to

24 pay Sorenson for his endorsement.  In fact, Ron Paul will say

25 that he would have found such a deal outrageous.  Ron Paul

1   wanted his campaign to be about ideas.  He basically hated the

2   whole idea of endorsements, let alone secret endorsements.  And

3   you'll learn that the only endorsement Ron Paul ever went after

4   in his political career that he can ever remember is Nolan

5   Ryan's, the famous baseball pitcher, and Ron Paul would not have

6   been happy one bit about what these defendants did.

7           Why is that important?  It's important because it

8   shows another reason why the defendants hid the Sorenson money.

9   After Michelle Bachmann accused the campaign of paying Sorenson,

10  after Benton started getting e-mails about it, after the

11  defendants realized the media and the public would look for

12  evidence that the campaign had paid Sorenson, they knew they had

13  to hide it not just from the public but from their own

14  candidate.  They were doing something he would never condone.

15          In the end the evidence will show that the defendants

16  committed crimes because they cared about winning more than they

17  cared about the law or even the values of their own candidate.

18  And as that evidence begins now, keep in mind the crime it

19  proves is not just paying Sorenson.  It's not a bribery case.

20  Kesari's crime in these proceedings is hiding the payments,

21  covering them up, causing the campaign to make false records and

22  to file false FEC reports, and that's what we will show you.

23  Benton's crime is lying to the FBI about even knowing that

24  Sorenson was being paid.

25          Now, you already know our burden is to prove guilt

1   beyond a reasonable doubt.  We ask you to hold us to every last

2   bit of that burden.  At the end of the case, after you hear all

3   of the evidence, we will be permitted to speak to you again.

4   And at that time we will ask you to find each defendant guilty

5   as charged.

6          Thank you.

7          THE COURT:  Mr. Howard, you may make Mr. Benton's

8   opening statement.

9          MR. HOWARD:  Thank you, Your Honor.  Ms. Sinfelt is

10  going to make the opening statement.

11         THE COURT:  Very well.

12         MS. SINFELT:  Okay.  Good afternoon.  How many of you

13  remember what you paid on your taxes two years ago?  How many of

14  you can remember how many checks you deposited into your bank

15  account in March of 2013?  How many of you can remember the

16  e-mail you got from your son's teacher two years ago?  And then

17  imagine that you're trying to recall those things in the busiest

18  time of your life and you're reading all of your e-mails on

19  something this small (indicating)?  Sometimes on a computer,

20  sometimes not, but mostly this small (indicating).  That's what

21  the government asked Mr. Benton to do.  That is why we're here

22  today.  That is why Mr. Benton is here today.

23         Before I get too much into this, let me reintroduce

24  myself.  I'm Meena Sinfelt.  I'm an attorney here for

25  Mr. Benton.  You've already met my colleague, Mr. Howard.

1  You'll hear from him later today.  This is my client, Mr. Jesse

2  Benton.  His wife is here today, Valerie.  You've heard about

3  her, the granddaughter of Ron Paul, and we have our paralegal

4  with us, Jennifer Wylie.

5          I would like you to put aside everything you just

6  heard from the government.  They're going to have plenty of time

7  to put a witness in the box and show you everything that they've

8  just talked about; but what I'm going to do is ask you to put

9  all of that aside and don't assume anything.  Make the

10 government prove to you exactly what they just said, make them

11 show you the evidence, and remember that the only evidence that

12 you can consider when you have to render a verdict comes from

13 right here (indicating), from this witness stand right here.

14 Lawyers will make arguments.  They may be helpful; they may not

15 be helpful.  That's for you to decide.  You'll have to weigh the

16 credibility of witnesses.  You'll have to weigh what a document

17 means, but the only evidence that can go into what your verdict

18 is comes right from here (indicating), not attorney arguments.

19          Let me tell you a little bit about Mr. Benton and his

20 involvement here.  Mr. Benton was the campaign chair.  You've

21 heard that.  He traveled with Dr. Paul almost all the time.  He

22 traveled to multiple states in multiple days.  They were going

23 to multiple cities around Iowa and other places to promote

24 Dr. Paul.  He was also the media and communications coordinator,

25 so he would handle the radio spots, TV spots, radio ads, media

1    buys, press releases, answered endless press information,

2    inquiries on his Blackberry.  This isn't a Blackberry here

3    (indicating); this is an iPhone.  And he received hundreds of

4    e-mails a day, hundreds of e-mails a day in a very fast-paced

5    environment where he was constantly on the go.

6            Part of his job was also to help recruit support for

7    Dr. Paul and for the campaign, and what you'll hear is indeed

8    that Mr. Benton was part of an effort and offered a job, he

9    offered employment to Kent Sorenson.  And I want you to hold the

10   government to what they just told you they would show you.  Go

11   look at what the offer was.  Don't listen to the lawyers.  Look

12   at what the offer was.  When the evidence comes in, look at what

13   the offer says.  You've heard about $8,000, you've heard about

14   $25,000.  Go look at what's in the offer.  Make sure you don't

15   assume anything.  Just because someone says or it says in a

16   document that someone approved something, think how did that

17   person know they approved it, how does anyone know something for

18   sure.

19           So you're going to hear a lot of other things, but

20   Mr. Benton is here because he is being charged with making false

21   statements to the FBI.  And as the government has already

22   previewed, there's a lot of other evidence that is going to be

23   coming in here, and no one is being charged with bribery.  It's

24   not illegal to pay a state senator to lend his support to a

25   campaign, to a presidential campaign.  That's not at issue here.

1   What is at issue here for Mr. Benton is did he make a false

2   statement to the FBI.

3          And so I would like you to keep in mind just a few

4   things during the course of this trial and actually two things

5   in particular, and I'm actually -- if I could ask the court to

6   turn on the Elmo, please.

7          This is the first thing I want you to remember.

8   Mr. Benton is accused of making false statements on July 21st

9   and 22nd, 2014, in a room here in Des Moines, Iowa.  So all of

10  the evidence that you're going to hear about, about things

11  happening across the country in e-mails, I want you to

12  concentrate on these two days with Mr. Benton because these two

13  days are extremely important.  What did Mr. Benton know on those

14  days when he made those statements?  And listen carefully, look

15  for the evidence and ask questions.  What did Mr. Benton say

16  that was false?  Did he know it was false when he said it?  Did

17  he make a mistake?  What question was Mr. Benton answering?  Was

18  the question vague?  Is the question capable of having more than

19  one answer that is truthful and correct?  Did Mr. Benton have an

20  opportunity to review his statement to the FBI after he left on

21  July 22nd?  And what was the context under which Mr. Benton gave

22  his answers to the FBI?  And, last, why isn't there a transcript

23  of his interview with the FBI?  And then I want you to come back

24  to July 21st and 22nd in that room and look at all of the

25  evidence that the government presents and that the defense

1  presents and think of all of these questions and you weigh it

2  with your own perception.

3          And then the second thing I want you to remember here

4  is, what questions were asked?  What question did the government

5  pose to Mr. Benton that allegedly caused him to make a false

6  statement?  Because, ladies and gentlemen, how can anyone be

7  prosecuted for making a false statement if you don't know what

8  question they were asked?

9          And then we're going to come back here at the end of

10  trial and we're going to ask you acquit Mr. Benton of Count 5.

11          Ladies and gentlemen, thank you for your service today

12  and thank you for your time.

13          THE COURT:  Mr. Binnall, you may make Mr. Kesari's

14  opening statement.

15          MR. BINNALL:  Thank you, Your Honor.

16          The government just got up and told you a story about

17  what happened back in 2011 and 2012, and they said that

18  Mr. Kesari was leading some plan -- implemented the plan is the

19  word I think they used -- to pull the wool over the eyes of the

20  Federal Election Commission, that he caused false reports to be

21  filed.  I'm here to tell you he didn't cause anything to be

22  filed.  The filing of reports to the Federal Election Commission

23  is not something that Mr. Kesari was ever responsible for during

24  his time as the deputy campaign manager of the 2012 Ron Paul

25  Campaign.  And the government is right, this is not a bribery

1  case.  If you look on television and you see Matthew McConaughey

2  talking about how much he prefers Lincolns, he's being paid for

3  that.  We're used to seeing celebrities and sports stars and

4  others endorsing products, cars, insurance plans, all sorts of

5  things, and we don't think twice about the fact that they're

6  being paid for that.  We're a little bit less familiar with the

7  idea of politicians being paid to support other politicians, but

8  there's nothing wrong with that.

9          So the government is right, we're not here on a

10 bribery case today.  We're here for some very specific charges

11 that the government has brought against my client, Dimitri

12 Kesari, saying that he somehow caused the false reports to be

13 filed with the Federal Election Commission and that he worked

14 with Mr. Benton, Mr. Tate, and Mr. Sorenson to cause those false

15 reports to be filed with the Federal Election Commission and,

16 again, that is not something that Mr. Kesari had anything to do

17 with, any report being filed with the Federal Election

18 Commission is not something people talk to him about, it's not

19 something that was in his area of responsibility.  It's not

20 something that he was even aware of.

21          Now, Mr. Kesari and Kent Sorenson were friends.  In

22 fact, Mr. Kesari was also one of Mr. Sorenson's political

23 advisors, and the evidence in this case is going to show that in

24 early 2011, Mr. Kesari decided to work on Ron Paul's 2012

25 presidential campaign, and he wanted his friend, Kent Sorenson,

1  to go to work with him, but the problem is Mr. Paul, Dr. Paul,

2  himself, hadn't actually decided to get in the presidential race

3  yet, and Mr. Sorenson wanted to find himself a presidential

4  campaign to work for, to get paid for early in the process.

5           So even though most of Mr. Sorenson's friends in

6  politics were going to work for the Paul Campaign, Mr. Sorenson

7  decided to go to work for Michelle Bachmann.  She got him first.

8  And Michelle Bachmann's campaign, through a series of

9  intermediaries, paid Mr. Sorenson, and the way that they set it

10  up is Kent Sorenson, as the government told you, had a company

11  called Grassroots Strategy.  That was his corporation.  But he

12  didn't want to be paid directly from any kind of political

13  committee that was associated with Michelle Bachmann.  So he was

14  paid through a middleman company, an intermediary called C & M

15  Strategies.  And when the political committees associated with

16  Michelle Bachmann's campaign made their reports to the Federal

17  Election Commission, they only showed the payments made to that

18  middleman company.  They didn't show any payments made directly

19  to Mr. Sorenson.

20           And Michelle Bachmann's campaign started off pretty

21  well, but by the fall of 2011 it was starting to falter a little

22  bit, and Mr. Sorenson began to become concerned about keeping

23  the money coming, so he started looking at changing horses, and

24  the Paul Campaign was certainly very willing to have him on

25  board.  He was at that point then a pretty well respected state

1 senator, a voice that was respected among Republicans in Iowa at

2 that point. There's no question that the Paul Campaign would

3 like to have someone like that supporting them, and so they did

4 talk to him, and they had no problem paying him to work for

5 their campaign. Mr. Sorenson wasn't sure what he was going to

6 do, but he got to the point where he was not sure that he was

7 going to continue receiving in the foreseeable future this money

8 from Michelle Bachmann's campaign, and he did begin to talk to

9 Mr. Kesari about that.

10          And in December of 2011, Kent Sorenson, his wife, and

11 Mr. Kesari went out for dinner, and Mr. Sorenson told Mr. Kesari

12 about his financial woes. Christmas had just happened. There

13 was a lot of bills stacking up. He had concerns financially.

14 And he told Mr. Kesari about that. You remember, these are

15 friends going back a good amount of time. And then Mr. Kesari

16 did take and write a check from a business that he owned with

17 his wife for $25,000, and he gave it to Mr. Sorenson. Now, at

18 that dinner they absolutely talked about Mr. Sorenson also going

19 to work for the Paul company. Now, he didn't actually give that

20 check to Kent Sorenson. He gave that check to Kent Sorenson's

21 wife when Mr. Sorenson was away from the table, and the evidence

22 is going to show after that happened there was no deal. Kent

23 Sorenson didn't think he had a deal to come over and work for

24 the Paul Campaign. And the evidence in this case is actually

25 going to show that when Kent Sorenson went to endorse Ron Paul

1  at a rally on December the 28th, he still didn't have a deal to

2  endorse the Paul Campaign; but at that point he knew that

3  Mr. Kesari had given that check to his wife.  We don't actually

4  know when Mr. Sorenson's wife ever showed him that check.

5  You're going to have to hear that from Mr. Sorenson when he

6  takes the stand.

7          Now, we don't know when exactly Mr. Sorenson thought

8  he actually had a deal to work with the Paul Campaign.  It's

9  somewhat inconsistent.  But when he endorsed Ron Paul on

10  December 28th, he didn't know if he had a deal or not, didn't

11  know what he was going to do.  The evidence is going to show

12  even after that he didn't know if he was going to work for Ron

13  Paul or sit out for the rest of the caucuses and the primaries

14  in the other states.

15          Well, he wanted to keep the money coming in, no doubt

16  about that.  So what he decided to do is use that $25,000 check,

17  $25,000 check that Mr. Pilger showed you earlier, as leverage

18  over Mr. Kesari to get a deal in the Paul Campaign, leverage,

19  that's going to be his words.  And that is what he did.  He

20  eventually at some point in January decided -- comes to an

21  agreement with the campaign that he would get paid for his

22  services to the campaign.

23          Now, the campaign paid him however they normally

24  would.  There's any number of different ways you can pay people

25  on a campaign, but Mr. Sorenson said, I want to use the same

1  setup that I had with the Bachmann campaign, I want to be paid

2  as an intermediate.  It's not unusual in a campaign to have

3  contractors and subcontractors.  Nobody was thinking about

4  whether this violated federal election law at the time.  He said

5  he wanted to get paid through an intermediary.

6        Now, it turns out the reason for this is not because

7  of any law.  Again, I want you to always remember it's not

8  against the law to pay somebody to support a campaign.  He did

9  it that way because there were rules in the Iowa State Senate,

10 ethics rules that prohibited him, not anyone else, but

11 prohibited any Iowa State Senator from taking money from a

12 campaign, and Mr. Sorenson didn't want to be kicked out of

13 office.  His political aspirations at that point were too

14 important to him.  So he asked to be paid through an

15 intermediary.  He actually told Mr. Kesari, this is how I was

16 getting paid from the Bachmann campaign and it's legal.  So no

17 one really thought anything about paying him through an

18 intermediary using the other company essentially as a staffing

19 agency.

20       And so as time went on, they went ahead and they kept

21 up their part of the deal and, obviously, Kent Sorenson kept up

22 a good amount of his.  He traveled on behalf of the campaign.

23 He traveled with Dr. Paul to different events throughout Iowa.

24 He actually traveled with Dr. Paul or traveled on behalf of the

25 Paul Campaign to South Carolina where there was another primary

1   after the caucuses in Iowa were over in 2012, and he

2   participated in those dreaded robo calls that we sometimes get

3   right before political elections, recorded some of those.  He

4   did work on behalf of the campaign.  He was paid for work he

5   performed.

6           Now, here is what I want you to remember through this

7   case.  You have to remember what is important, what isn't

8   important, what might make my client and other people in the

9   Paul Campaign sound bad because that's not the way we like to

10  come off, and what's actually important is did my client

11  intentionally cause any kind of inaccurate report, a very

12  technical violation that the government has charged Mr. Kesari

13  with.  And what you're going to hear is that Mr. Kesari was on

14  the political side of the campaign.  He was the deputy campaign

15  manager, and his area of responsibility included going out in

16  the field and getting as many supporters and votes for Ron Paul.

17  He wasn't on the finance side, sometimes called the compliance

18  side of the campaign, and that's the side of the campaign that

19  makes those reports, decides how things are classified, what

20  numerical code to use when reporting expenses to the Federal

21  Election Commission.  Mr. Kesari had nothing to do with that.

22  Mr. Kesari isn't an accountant.  He wasn't the campaign

23  treasurer, didn't work under the campaign treasurer.  He's

24  certainly not a lawyer.  There will be no evidence that he had

25  any training in federal campaign finance laws.  He did something

1  completely different for the campaign that had nothing to do

2  with the way things were reported to the campaign.  The only

3  evidence that he was thinking about anything that you're going

4  to hear in this case about the Federal Election Commission, the

5  most evidence is going to come to you from Mr. Sorenson when he

6  takes the stand.  And when you hear from Mr. Sorenson, you're

7  going to hear from someone that has a bit of a strained

8  relationship with the chair.  Mr. Pilger already told you that

9  he has pled guilty to lying about the facts in this case, but

10  they're going to ask you to take Kent Sorenson's word because

11  this time apparently he's telling the truth, and you're going to

12  find that you're not going to believe anything that comes from

13  Mr. Sorenson's mouth at the end of the day.  His credibility is

14  shot.

15       Likewise, the idea that Mr. Kesari attempted to tamper

16  with evidence is going to come completely based on the

17  credibility of Kent Sorenson, and what I would ask you to do

18  today is keep an open mind and keep the government to their

19  standard that they talked about, about beyond a reasonable

20  doubt, and remember that they have to prove that Mr. Kesari

21  knowingly and intentionally was trying to violate federal

22  election laws, campaign finance requirements about making those

23  reports to the Federal Election Commission, and they're not

24  going to be able to do that.

25       At the end I'm not asking you to say that Mr. Kesari's

1  tactics and politics are what you would support.  I'm not even

2  going to ask you to endorse his judgments, but that's not what

3  is at issue here.  That's not what is on trial.  My client is

4  here to put his freedom and future in your hands based only on

5  the charges brought by the government, not whether or not you

6  may like some of the things that he did in this campaign.  And

7  so at the end of the day, when we come back towards the end, I'm

8  going to ask you to find Mr. Kesari not guilty of all of the

9  charges brought by the government.

10         Thank you so much for your service.

11         THE COURT:  Okay.  Before we begin with the evidence,

12  there's one more portion of the trial, and that's the reading of

13  the indictment.

14         Mr. Kravis.

15         MR. KRAVIS:  Thank you, Your Honor.

16         THE COURT:  When I gave you in your preliminary

17  instructions the synopsis -- basically it's a synopsis of Count

18  1, it's just the actual words charging, there's quite a bit more

19  in this conspiracy indictment that's alleged, and the government

20  has the obligation to prove this agreement to commit crime, and

21  so they will have to show that two or more persons reached an

22  agreement or came to an understanding to violate the law.

23  They'll have to show that two or more persons -- or that the

24  defendant Kesari joined in that agreement or understanding and

25  knew the purpose of it.  Well, there's one other thing they have

1   to prove, and that's that someone took a substantial step

2   towards bringing that conspiracy to fruition.  Those are called

3   overt acts, and they'll have to prove at least one of those

4   during their case in chief.  And so the overt acts weren't

5   listed, for example, among other things, in your preliminary

6   instructions.

7              Mr. Kravis, go ahead.

8              Remember that this is an indictment.  It's an

9   accusation of guilt.  It's not evidence of anything yet.  We'll

10  start the evidence in a bit when he's done.

11             MR. KRAVIS:  General allegations.

12             At times relevant to this indictment, Michelle

13  Bachmann was a candidate for her political party's nomination to

14  the Office of President of the United States in the 2012

15  election cycle, including the Iowa Straw Poll and the Iowa

16  Caucuses.  Bachmann for President was Michelle Bachmann's

17  authorized campaign committee for the Office of President of the

18  United States.

19             Ron Paul was a candidate for nomination of the same

20  political party as Michelle Bachmann to the Office of President

21  of the United States in the 2012 election cycle, including the

22  Iowa Straw Poll and the Iowa Caucuses.

23             The Ron Paul 2012 presidential campaign or the Paul

24  Campaign was Ron Paul's authorized campaign committee for the

25  Office of President of the United States.  Defendant Jesse R.

1  Benton was a senior official at the Paul Campaign.  John F.

2  Tate was a senior official of the Paul Campaign.  Dimitrios N.

3  Kesari, also known as Dimitri Kesari, was a political operative

4  of the Paul Campaign.

5         Throughout the existence of the Paul Campaign, from in

6  or about May 2011 to in or about August 2012, defendant Kesari

7  reported to defendant Benton and to Mr. Tate while defendant

8  Benton and Mr. Tate ran the campaign operations of Ron Paul.

9         Kent Leroy Sorenson was an elected Iowa State Senator

10  in the same political party as Michelle Bachmann and Ron Paul.

11  The Federal Election Campaign Act of 1971, as amended, Title 52,

12  United States Code, Section 30101, et seg, the Election Act,

13  applied to the election of candidates for federal office,

14  including the Office of President of the United States as

15  follows:

16         A, the Election Act requires the authorized campaign

17  committee of a candidate for federal office to accurately report

18  certain expenditures by that committee to the Federal Election

19  Commission, the agency and department of the United States with

20  jurisdiction to enforce the election laws.

21         B, the Election Act required the FEC to publicly

22  report accurate information provided by campaign committees.

23  The Federal Bureau of Investigation, the FBI, was an agency and

24  department of the United States with jurisdiction to investigate

25  criminal violations in the Election Act.

1          Count 1, conspiracy.  From in or about October 2011 to

2   in or about August 2014, in the Southern District of Iowa and

3   elsewhere, the defendant Dimitrios N. Kesari conspired and

4   agreed with Iowa State Senator Kent Leroy Sorenson and with

5   others, known and unknown to the grand jury, to:

6          A, knowingly defraud the United States.

7          B, knowingly cause the concealing, covering up,

8   falsification, and making of false entries in the records,

9   documents, and tangible objects, with the intent to impede,

10  obstruct, and influence the investigation and proper

11  administration of a matter within the jurisdiction of a

12  department and agency of the United States, and in relation to

13  and contemplation of such matter and case.

14          C, willfully cause the submission of false expenditure

15  reports of an authorized campaign committee to the FEC, which

16  concerned no less than $25,000 in a calendar year.

17          And, D, knowingly and willfully falsify, conceal, and

18  cover up by a trick, scheme, and device a material fact in a

19  matter within the jurisdiction of the Executive Branch of the

20  government of the United States.

21          Purpose of the conspiracy.  The purpose of the

22  conspiracy was to defeat the lawful function of the FEC by

23  concealing and falsifying the records and reports of

24  expenditures of the Paul Campaign so that the FEC could not

25  reveal to the public that the Paul Campaign paid Senator

1  Sorenson after Senator Sorenson switched his political support

2  from Michelle Bachmann to Ron Paul and the purpose was further

3  to conceal the existence, purpose and acts of the conspiracy.

4          Manner and means.  The manner and means of the

5  conspiracy included the following:

6          A, the conspirators would and did negotiate with

7  Senator Sorenson and provided him with a thing of value and the

8  promise of further payments to secure his defection from

9  Michelle Bachmann to Ron Paul.

10          B, the conspirators would and did cause payments to

11  Senator Sorenson by the Paul Campaign totaling $73,000 for

12  Senator Sorenson's political support of Ron Paul and concealed

13  those payments from Ron Paul, the FEC, and the public.

14          C, the conspirators would and did use two intermediary

15  companies, Interactive Communication Technology, or ICT, and

16  Senator Sorenson's company, Grassroots Strategies, Inc., to

17  conceal the payments to Senator Sorenson by the Paul Campaign.

18          D, the conspirators would and did conceal the payments

19  to Senator Sorenson by the Paul Campaign by using false invoices

20  from Grassroots Strategy to ICT and from ICT to the Paul

21  Campaign.

22          E, the conspirators would and did cause the Paul

23  Campaign to keep false records and submit false reports to the

24  FEC.

25          F, the conspirators would and did cause, make, and

1  attempt to transmit false statements to the public to conceal

2  the conspiracy.

3        Overt acts.  In furtherance of the conspiracy and to

4  accomplish its purpose, the defendant, Dimitrios N. Kesari, and

5  Iowa State Senator Kent Leroy Sorenson, and others known and

6  unknown to the grand jury, committed the following overt acts,

7  among others, in the Southern District of Iowa and elsewhere:

8        A, on or about October 31, 2011, Benton e-mailed

9  Senator Sorenson and a representative of Senator Sorenson

10  offering to continue to pay Senator Sorenson the salary he had

11  been receiving from Bachmann for President if Senator Sorenson

12  would defect from Bachmann for President to the Paul Campaign by

13  withdrawing his endorsement of Michelle Bachmann for the Office

14  of President of the United States and endorsing Ron Paul instead.

15        B, between on or about November 15, 2011 and on or

16  about December 28, 2011, Kesari spoke several times with Senator

17  Sorenson in an effort to persuade Senator Sorenson to withdraw

18  his endorsement from Michelle Bachmann and to endorse Ron Paul.

19        C, on or about December 23, 2011, Kesari e-mailed

20  Senator Sorenson asking Senator Sorenson to send Kesari a draft

21  press release announcing Senator Sorenson's decision to endorse

22  Ron Paul.

23        D, on or about December 24, 2011, Kesari e-mailed

24  Senator Sorenson reminding him to send the draft press release.

25        E, on or about December 25, 2011, Benton, Tate, Kesari

1  and others edited a press release written by Senator Sorenson

2  announcing his decision to endorse Ron Paul.

3          F, on or about December 26, 2011, Kesari gave Senator

4  Sorenson a check in the amount of $25,000 drawn on the account

5  of Designer Goldsmiths, Inc., for which Kesari was a registered

6  agent, in an effort to persuade Senator Sorenson to endorse Ron

7  Paul.

8          G, on or about December 28, 2011, Senator Sorenson

9  appeared at a campaign event held by the Paul Campaign and

10 announced at that event that he was endorsing Ron Paul for the

11 office of President of the United States.

12         H, on or about December 28, 2011, Benton, Tate, and

13 Kesari began making arrangements for Senator Sorenson to be paid

14 $25,000 by wire transfer from the Paul Campaign to pay Senator

15 Sorenson without using the check that Kesari gave to Senator

16 Sorenson which Senator Sorenson held but never deposited.

17         I, on or about December 29, 2011, in response to a

18 public allegation from Michelle Bachmann that Senator Sorenson

19 was offered money by the Paul Campaign, Benton, Tate and Kesari

20 caused the Paul Campaign to issue a statement from Senator

21 Sorenson responding to Michelle Bachmann's allegation by denying

22 that the Paul Campaign paid Senator Sorenson and stating, quote,

23 financial reports come out in just days which will prove what

24 I'm saying is true.

25         J, on or about December 29, 2011, Benton e-mailed

1    Kesari, Tate, and a financial staffer of the Paul Campaign

2    telling them to hold, quote, for a couple of days the wire

3    transfer that had been requested to pay Senator Sorenson.

4           K, on or about December 29, 2011, Tate responded to

5    Benton's e-mail affirming Benton's decision to hold the wire

6    transfer to Senator Sorenson.

7           L, on or about December 29, 2011, Kesari responded to

8    Benton and Tate's e-mail temporarily holding the wire transfer

9    to Senator Sorenson explaining, quote, we are holding till after

10   the filing, end quote.

11          M, on or about December 29, 2011, a financial staffer

12   from the Paul Campaign noted in an e-mail report of expenses,

13   quote, $25K, Dimitri's mystery wire, to which Tate responded,

14   there will not be the 25K Dimitri wire for now.  Wipe it off the

15   books.

16          N, on or about December 29, 2011, Senator Sorenson

17   gave an interview with a national broadcast reporter in which

18   Senator Sorenson denied that he had been paid by the Paul

19   Campaign to endorse Ron Paul and stated that the Paul Campaign

20   disclosure of its expenditures on its financial reports would

21   show that Senator Sorenson was not paid by the Paul Campaign.

22          O, in or about January of 2012 and in or about

23   February of 2012, Benton, Tate, and Kesari made specific

24   arrangements for Senator Sorenson to be paid by the Paul Campaign.

25          P, on or about January 24th of 2012, Senator Sorenson

1  prepared an invoice from Grassroots Strategy to ICT in the

2  amount of $30,000.

3         Q, on or about February 5th of 2012, Kesari caused ICT

4  to send an invoice to the Paul Campaign in the amount of $38,125

5  to cover the payment of the invoice from Grassroots Strategy

6  plus other expenses.

7         R, on or about February 8, 2012, Kesari caused the

8  Paul Campaign to pay ICT $38,125 by e-mail to a financial

9  staffer of the Paul Campaign.

10        On or about February 9, 2012, Senator Sorenson's

11  company, Grassroots Strategy, received a payment from ICT in the

12  amount of $33,000.

13        On or about February 22, 2012, Benton, Tate, and

14  Kesari caused the Paul Campaign to list the February 8, 2012

15  expenditure of $38,125 on a campaign expense report under,

16  quote, audiovisual expenses rather than as a payment to Senator

17  Sorenson.

18        U, on or about April 20, 2012, Benton, Tate, and

19  Kesari caused the Paul Campaign to report the February 8, 2012

20  expenditure of $38,125 in a filing with the FEC as a payment to

21  ICT for, quote, audiovisual expenses, omitting any reference to

22  Senator Sorenson or Grassroots Strategy.

23        V, on or about March 4, 2012, Senator Sorenson sent

24  Kesari an invoice from Grassroots Strategy to ICT in the amount

25  of $8,000.

1          W, on or about March 21, 2012, Kesari caused ICT to

2    send an invoice to the Paul Campaign in the amount of $8,850.

3          X, on or about March 26, 2012, Senator Sorenson sent

4    Kesari an invoice from Grassroots Strategy to ICT in the amount

5    of $16,000.

6          Y, on or about March 26, 2012, Kesari caused ICT to

7    send an invoice to the Paul Campaign in the amount of $8,850.

8          Z, on or about April 3, 2012, Tate approved the

9    payment by the Paul Campaign of $16,000 to Senator Sorenson via

10   the March 21, 2012 and March 26, 2012 invoices from ICT.

11         AA, on or about April 3, 2012, Kesari caused the Paul

12   Campaign to pay ICT $17,700 by e-mail to a financial staffer of

13   the Paul Campaign.

14         BB, on or about July 18, 2012, Benton, Tate and Kesari

15   caused the Paul Campaign to report the April 3, 2012 expenditure

16   of $17,700 in a filing with the FEC as a payment to ICT for,

17   quote, audiovisual expenses, omitting any reference to Senator

18   Sorenson or Grassroots Strategy.

19         CC, on or about February 9, 2012, Senator Sorenson's

20   company, Grassroots Strategy, received a payment from ICT in the

21   amount of $16,000.

22         DD, on or about May 2, 2012, Senator Sorenson sent

23   Kesari and ICT an invoice from Grassroots Strategy to ICT for

24   $8,000.

25         EE, on or about May 2, 2012, Kesari caused ICT to send

1  an invoice to the Paul Campaign in the amount of $8,850.

2          FF, on or about May 2, 2012, Kesari forwarded the

3  invoice from ICT to Benton with a note reading, quote, Kent's

4  bill.  Pay?

5          GG, on or about May 2, 2012, Benton approved the

6  payment by the Paul Campaign of the May 2, 2012, invoice from

7  ICT.

8          HH, on or about May 2, 2012, Kesari caused the Paul

9  Campaign to pay ICT $8,250 by e-mail to a financial staffer of

10  the Paul Campaign.

11          II, on or about July 18, 2012, Benton, Tate, and

12  Kesari caused the Paul Campaign to report the May 2, 2012

13  expenditure of $8,850 in a filing with the FEC as a payment to

14  ICT for, quote, audiovisual expenses, omitting any reference to

15  Senator Sorenson or Grassroots Strategy.

16          JJ, on or about May 4, 2012, Senator Sorenson's

17  company, Grassroots Strategy, received a payment from ICT in the

18  amount of $8,000.

19          KK, on or about May 21, 2012, Senator Sorenson sent

20  invoices from Grassroots Strategy to ICT totaling $16,000.

21          LL, on or about May 24, 2012, Kesari caused ICT to

22  send an invoice to the Paul Campaign in the amount of $8,850.

23          MM, on or about May 29, 2012, Tate approved the

24  payment by the Paul Campaign of Senator Sorenson via ICT's

25  invoice in the amount of $8,850.

1        NN, on or about May 29, 2012, Kesari caused the Paul

2   Campaign to pay ICT $8,850 by e-mail to a financial staffer of

3   the Paul Campaign.

4        OO, on or about July 18, 2012, Benton, Tate, and

5   Kesari caused the Paul Campaign to report the expenditure on

6   May 29, 2012, of $8,850 in a filing with the FEC as a payment to

7   ICT for, quote, audiovisual expenses, omitting any reference to

8   Senator Sorenson or Grassroots Strategy.

9        PP, on or about June 12, 2012 Senator Sorenson's

10  company, Grassroots Strategy, received a payment from ICT in the

11  amount of $8,000.

12       QQ, on or about June 18, 2012, Kesari caused CT to

13  send an invoice to the Paul Campaign in the amount of $8,850.

14       RR, on or about June 25, 2012, Tate e-mailed Kesari

15  regarding ICT's invoice, quote, what is this?  What is it for?

16  Who is it?  Why do we keep paying them?  The last payment was

17  supposedly the last.

18       SS, on or about June 25, 2012, Kesari responded to

19  Tate's e-mail, quote, this is the last payment for Kent

20  Sorenson, the deal Jesse agreed to with Kent.

21       TT, on or about June 25, 2012, Kesari sent a second

22  response to Tate's e-mail, quote, it was for six months.

23       UU, on or about June 25, 2012, Tate approved the

24  payment of Senator Sorenson via ICT invoice.

25       VV, between on or about June 25, 2012 and on or about

1  June 27, 2012, Kesari caused the Paul Campaign to pay ICT $8,850

2  by e-mail to a financial staffer of the Paul Campaign.

3         WW, on or about September 5th of 2012, Benton, Tate,

4  and Kesari caused the Paul Campaign to report the June 27, 2012

5  expenditure of $8,850 in a filing with the FEC as a payment to

6  ICT for, quote, audiovisual expenses, omitting any reference to

7  Senator Sorenson or Grassroots Strategy.

8         XX, on or about July 27, 2012, Senator Sorenson's

9  company, Grassroots Strategy, received a payment from ICT in the

10  amount of $8,000.

11         YY, in or about September 2013, shortly after media

12  reports referencing ongoing investigations by the FBI and the

13  FEC of the payments to Sorenson by the Paul Campaign, Kesari

14  flew to Omaha, Nebraska, backtracked to Senator Sorenson's home

15  in Iowa, requiring that he and Senator Sorenson show each other

16  that neither was wearing a recording device and then asked that

17  Senator Sorenson either return to Kesari or alter the $25,000

18  check that Kesari previously gave to Senator Sorenson on or

19  about December 26, 2012, which Senator Sorenson refused to do.

20         ZZ, on or about September 19, 2013, at a deposition

21  taken in connection with an investigation by the Iowa State

22  Senate into the circumstances surrounding Senator Sorenson's

23  endorsement of Ron Paul and payment by the Paul Campaign,

24  Senator Sorenson falsely testified under oath that he had never

25  been paid by Bachmann for President or by the Paul Campaign.

1           THE COURT:  So that's the entirety of Count 1.  They

2    have Counts 2 through 6 in there.  I don't see the point of

3    re-reading that.  They've got that available to them.

4           Thank you.

5           MR. KRAVIS:  Thank you.

6           THE COURT:  So we're going to take our midafternoon

7    recess.  That nonstop talk by the lawyers is very hard on the

8    court reporter.  She needs a little break.  You could use 15

9    minutes, too.  We'll come back at 3:50.  We'll see you then, and

10   that's when we'll start the evidence.

11          (Recess at 3:33 p.m., until 3:48 p.m.)

12          THE COURT:  Please be seated.

13          Counsel for the government, call your first witness,

14   please.

15          MR. KRAVIS:  The government calls Mr. Ty Lim.

16          THE COURT:  Please come forward, sir.  If you would

17   approach here, she'll administer your oath.

18          THE CLERK:  Please raise your right hand.

19          TY JOSEPH LIM, GOVERNMENT'S WITNESS, SWORN

20          THE CLERK:  Please be seated.

21                   DIRECT EXAMINATION

22   BY MR. KRAVIS:

23   Q.  Good afternoon, sir.

24   A.  Good afternoon.

25   Q.  What is your name?

1    A.   Ty Joseph Lim.

2    Q.   How do you spell your last name?

3    A.   L-I-M as in Mary.

4    Q.   Mr. Lim, what do you do for a living?

5    A.   I'm custodian of records for Google, Inc.

6    Q.   What exactly does a custodian of records for Google, Inc.

7    do?

8    A.   We respond to legal requests from law enforcement for user

9    data.

10   Q.   And as a custodian of records for Google, are you familiar

11   with search warrants for e-mail accounts served on Google by the

12   FBI?

13   A.   Yes.

14   Q.   And did there come a time when Google received a search

15   warrant for the e-mail account jesserbenton@gmail.com?

16   A.   Yes.

17   Q.   Did Google provide the FBI with some documents for that

18   search warrant?

19   A.   We did.

20   Q.   And have you had a chance to review the documents that

21   Google provided the FBI in response to that warrant?

22   A.   Yes.

23   Q.   All right.  I'm showing defense counsel what has been marked

24   for identification as Government's Exhibits 29, 50, 61 and 62.

25            MR. KRAVIS:  May I approach the witness?

 1            THE COURT:  Yes.  You don't need to ask permission,

 2  but thank you.

 3  BY MR. KRAVIS:

 4  Q.  Mr. Lim, I am handing you what has been marked for

 5  identification as Government's Exhibits 29, 50, 61 and 62.

 6            Do you recognize these four documents?

 7  A.  Yes.

 8  Q.  What are they?

 9  A.  These are e-mails that were presented from the user's e-mail

10  box.

11  Q.  Did you have a chance to review these exhibits before you

12  testified here today?

13  A.  I did.

14  Q.  And are these Exhibits 29, 50, 61 and 62 e-mails that Google

15  produced to the FBI from the account jesserbenton@gmail.com?

16  A.  Yes.

17            MR. KRAVIS:  Thank you, Mr. Lim.

18            I have no further questions.

19            MR. HOWARD:  Your Honor, we need one minute?

20            THE COURT:  Yes.

21            (Pause.)

22                        CROSS-EXAMINATION

23  BY MS. SINFELT:

24  Q.  Good afternoon, Mr. Lim.  I just have one quick question for

25  you.

1          Were you asked to produce the metadata associated with

2    the Google -- Mr. Benton's Google account to the Department of

3    Justice?

4    A.  Can you clarify what metadata you're referring to?

5    Q.  That were associated with the e-mail that were -- excuse me,

6    that were delivered to the Department of Justice pursuant to the

7    search warrant?

8    A.  We produced the address book, we produced the subscriber

9    information and the e-mail boxes for the user account.  Metadata

10   is contained within the mailbox itself.

11   Q.  Okay.  And do you know how many e-mails or how much data was

12   produced to the government?

13   A.  There were multiple mailboxes.  Some of them were about two

14   gigs each.  We also produced a preserved copy of the mailboxes

15   as well.  I can't tell you the exact number of e-mails that were

16   in the mailbox when we produced the entire mailbox.

17   Q.  And for clarification, when you say "mailbox," are you

18   talking -- are you referring to a folder or multiple accounts,

19   or what do you mean by mailbox?

20   A.  The mailbox is the entire user's e-mail, and within it there

21   are folders and labels, so all of it.

22   Q.  So when you say you produced multiple mailboxes --

23   A.  We take snapshots of it.  We received preservation requests,

24   so we take snapshots of it, and the search warrant included

25   language that allowed for us to be able to produce the preserved

1  mailboxes as well.

2  Q.  And can you tell us what those preserved mailboxes were?

3  A.  They were from the same user account, just taken at a

4  different time period.  So when we get a preservation request,

5  for example, several months beforehand we'll take a snapshot of

6  the mailbox at that time of all of the contents in the user's

7  account, and then when we get a search warrant at a later time,

8  we will capture the snapshot back at that time that we're

9  processing the search warrant, and when we produce the search

10  warrant, we'll produce both the preserved snapshot as well as

11  the current snapshot.

12  Q.  And you're not testifying here today whether or not -- or

13  excuse me.  Strike that.

14        You're not testifying here today who wrote the e-mails

15  that you produced to the government, correct?

16  A.  No.

17  Q.  And you're not testifying who read those e-mails either,

18  correct?

19  A.  No.

20        MS. SINFELT:  Thank you.

21        No more questions, Your Honor.

22        THE COURT:  Anything else?  Did you have any

23  questions, Mr. Binnall?

24        MR. BINNALL:  No questions.

25        THE COURT:  Do you have anything else?

1              MR. KRAVIS:  No.  Thank you, Your Honor.

2              THE COURT:  Thank you, sir.  You're excused.

3                                  (Witness excused.)

4              MR. KRAVIS:  The government calls Ms. Jennifer Brown.

5              THE COURT:  Come forward, ma'am.  If you'll approach

6  her, she'll administer you your oath.

7              THE CLERK:  Please raise your right hand.

8              JENNIFER BROWN, GOVERNMENT'S WITNESS, SWORN

9              THE CLERK:  Please be seated.

10                        DIRECT EXAMINATION

11  BY MR. KRAVIS:

12  Q.  Good afternoon, ma'am.

13  A.  Hi.

14  Q.  What is your name?

15  A.  Jennifer Brown.

16  Q.  How do you spell your last name?

17  A.  B-R-O-W-N.

18  Q.  Miss Brown, what do you do for a living?

19  A.  I am a senior investigator for AOL.

20  Q.  And what are your responsibilities as a senior investigator

21  for AOL?

22  A.  I do legal process.  I respond to subpoenas, search

23  warrants, and then I'm a custodian of records.

24  Q.  And in that job, in that capacity, are you familiar with

25  search warrants for e-mail accounts that are served on AOL by

1  the FBI?

2  A.  Yes, I am.

3          THE COURT:  Can you get a little closer to the

4  microphone?  You can pull it towards you.

5          THE WITNESS:  Yes.

6  BY MR. KRAVIS:

7  Q.  And did there come a time when AOL received a search warrant

8  from the FBI for the e-mail account dkesari@aol.com?

9  A.  Yes, we did.

10  Q.  And did AOL provide the FBI with documents from the e-mail

11  account in response to that warrant?

12  A.  Yes, we did.

13  Q.  And did you have an opportunity to review those documents

14  produced by AOL to the FBI before you testified today?

15  A.  I did, yes.

16  Q.  Showing defense counsel now what's been marked for

17  identification as Government's Exhibits 76, 87b, 88 and 98.

18          THE COURT:  What was the last one; 90?  I'm sorry.

19          MR. KRAVIS:  98.

20          THE COURT:  98, thank you.

21  BY MR. KRAVIS:

22  Q.  Ms. Brown, I'm handing you now what has been marked for

23  identification as Government's Exhibits 76, 87b, 88 and 98.

24          Do you recognize those documents?

25  A.  I do, yes.

1    Q.  What are they?

2    A.  They are e-mails sent to and from the AOL account.

3    Q.  And are these documents, Government's Exhibits 76, 87b, 88

4    and 98, are these documents e-mails from the account

5    dkesari@aol.com produced by AOL to the FBI?

6    A.  Yes, they are.

7              MR. KRAVIS:  Thank you, Ms. Brown.

8              I have no further questions.

9              THE COURT:  Mr. Binnall.

10                        CROSS-EXAMINATION

11   BY MR. BINNALL:

12   Q.  Good afternoon, Ms. Brown.  My name is Jesse Binnall.  I

13   represent Mr. Kesari.

14             Did you produce any metadata associated with the

15   account as part of the response to the search warrant?

16   A.  I don't believe so.

17   Q.  And can you explain to the jury what metadata is?

18   A.  Are you referring to e-mail headers?

19   Q.  Correct.

20   A.  Okay.  Actually the e-mail headers are produced, yes.

21   Q.  So there are e-mail headers, but then there are other parts

22   of metadata that are also involved, correct?

23   A.  I'm not familiar with anything other than e-mail headers.

24   Q.  Okay.  And so the only metadata that was associated with

25   e-mails that were produced were the e-mail headers, correct?

1    A.   Correct.

2    Q.   Do you know how many e-mails were in Mr. Kesari's e-mail box

3    at the time it was produced?

4    A.   I don't know how many e-mails, but I know the size, about

5    the size of the e-mail box which --

6    Q.   And how much?

7    A.   About five to six hundred megabytes worth of e-mails.

8    Q.   And you don't know whether Mr. Kesari read any of his

9    e-mails in that e-mail box, do you?

10   A.   No, I have no --

11   Q.   And you don't know if he actually himself sent any e-mails

12   from that?

13   A.   No.

14            MR. BINNALL:  No further questions.

15            THE COURT:  Do you have anything, Ms. Sinfelt?

16            MS. SINFELT:  No, Your Honor.

17            THE COURT:  Anything else from the government?

18            MR. KRAVIS:  No.  Thank you, Your Honor.

19            THE COURT:  Thanks, ma'am.  You're excused.

20                                  (Witness excused.)

21            THE COURT:  Call your next witness, please.

22            MR. PILGER:  Yes.  May the witness be gone?

23            THE COURT:  Oh, yes.  Throughout the rest of the

24   trial, when we excuse a witness, they're gone unless somebody

25   speaks up and says they want them to remain available.

```
 1              MR. PILGER:  Thank you for clarifying, Your Honor.

 2              THE COURT:  Come forward, sir.  If you'll approach

 3   her, she'll administer your oath.

 4              THE CLERK:  Please raise your right hand.

 5        FERNANDO CORTEZ-LIRA GOVERNMENT'S WITNESS, SWORN

 6              THE CLERK:  Please be seated.

 7                         DIRECT EXAMINATION

 8   BY MR. PILGER:

 9   Q.  Good afternoon, sir.

10              Please state your name for the record.

11   A.  Good afternoon.  My name his Fernando Cortez-Lira.

12   Q.  Can you spell your last name for the reporter?

13   A.  C-O-R-T-E-Z dash L-I-R-A.

14   Q.  And so you're here today in voluntary compliance with a

15   trial subpoena; is that correct?

16   A.  That is correct.

17   Q.  I want to turn your attention to the spring of 2011 and

18   summer of 2012.  Where did you work?

19   A.  I worked for the Ron Paul 2012 Presidential Campaign

20   Committee.

21   Q.  And was that committee supporting the election of Ron Paul

22   for President of the United States?

23   A.  Sorry, I didn't hear you, sir.  Can you repeat the question?

24   Q.  Was that committee, was your employer supporting the

25   election of Ron Paul for President of the United States?
```

```
 1   A.  Yes.
 2   Q.  And in that time, in the spring -- starting in the spring of
 3   2011, what was your job?
 4   A.  My official title was Deputy Controller and National
 5   Hispanic Outreach Director.
 6   Q.  And through your job, were you familiar with Jesse R. Benton
 7   and whether he had a role in the campaign?
 8   A.  Yes.
 9   Q.  And what was Jesse R. Benton's role?
10   A.  Jesse was the chairman of the campaign.
11   Q.  Were you familiar with Dimitrios N. Kesari, also known as
12   Dimitri Kesari?
13   A.  Yes.
14   Q.  And what was his role in the campaign, if any?
15   A.  He was the deputy campaign manager.
16   Q.  Were you aware of someone named John F. Tate involved with
17   the campaign?
18   A.  Yes.
19   Q.  And what was Mr. Tate's role in the campaign?
20   A.  He was the campaign manager.
21   Q.  Were you familiar with a woman named Lori Pyeatt?
22   A.  Yes.
23   Q.  And what was Lori Pyeatt's job with the campaign?
24   A.  She was the treasurer.
25   Q.  Did Deana Watts have a job with the campaign?
```

1   A.   Yes.

2   Q.   What was her job?

3   A.   She was the controller.

4   Q.   And I believe you said you were the deputy controller?

5   A.   Yes.

6   Q.   Did you report to Ms. Watts and Ms. Pyeatt?

7   A.   Yes.

8   Q.   Did you have an assistant while you worked at the campaign?

9   A.   Yes.

10  Q.   What was her name?

11  A.   I had two, but they were Ann Fields and then Katie Koerber.

12  Q.   With the last, Ms. Koerber, I think we're going to look at

13  some e-mails with her name.  Just spell her name for the jury so

14  they know how to spell it.

15  A.   Last name -- first name Katie, K-A-T-I-E.  Last name

16  Koerber, K-O-E-B-E-R (sic).

17  Q.   And what were your duties as deputy controller of the Ron

18  Paul 2012 Presidential Campaign?

19  A.   I had several different hats.  My primary role was to

20  oversee the accounting aspects and bookkeeping, also H.R.

21  department, as well as managing the day-to-day operations of the

22  headquarters.

23  Q.   Let's talk about each of those a little bit.  In terms of --

24  A.   I'm sorry, also I was the -- as the Hispanic Outreach

25  Director, I headed the effort to do Hispanic coverage.

1  Q.  Very well.  So you had a role with outreach to the Hispanic

2  community, correct?

3  A.  Yes.

4  Q.  And then on the financial side of things for the campaign,

5  you worked both on accounting and HR, I think you said?

6  A.  That's correct.

7  Q.  Let's talk about HR for a second.  Would that include --

8  does that mean human resources?

9  A.  Human resources, correct.

10  Q.  And would that involve hiring?

11  A.  To some staff, yes.

12  Q.  Okay.  And were you aware of the campaign's practices when

13  they were hiring an employee or a contractor?

14  A.  Yes.

15  Q.  Tell the jury whether or not that would involve a

16  nondisclosure agreement.

17  A.  It would involve a nondisclosure agreement.

18  Q.  And I believe you also mentioned accounting, so would that

19  include tracking the expenses of the Ron Paul Campaign?

20  A.  Yes.

21  Q.  Now, the campaign that we're talking about is for election

22  in 2012, correct?

23  A.  Correct.

24  Q.  But you started working for them in 2011 and continued

25  working through into 2012; is that accurate?

1  A.  Yes.

2  Q.  Had you previously worked for Ron Paul in 2008?

3  A.  Yes.

4  Q.  And what was your title in that campaign, the 2008 campaign?

5  A.  I was the controller.

6  Q.  So in 2012 this was the second time you had worked in the

7  controller field, this time as the deputy, correct?

8  A.  Correct.

9  Q.  Where were you physically located to do this job?

10  A.  It was -- I was based out of Springfield, Virginia.

11  Q.  Now, tell the jury a little bit about how seriously the

12  campaign took accounting.  Was it important or not important to

13  keep track of the expenses of the campaign?

14  A.  It was very important.

15  Q.  And in tracking the expenses of the campaign, did you

16  generate records inside of the campaign for reporting them to

17  the treasurer or to the deputy treasurer?

18  A.  Yes.

19  Q.  And were those sometimes prepared by yourself?

20  A.  Sometimes, yes.

21  Q.  And were they sometimes prepared by Ms. Koerber?

22  A.  Correct.

23  Q.  When you reported expenses to the treasurer or deputy

24  treasurer, did you do that during the ordinary course of

25  business of the campaign?

1    A.  Yes.

2    Q.  Were you aware, Mr. Cortes that the campaign had a reporting

3    obligation to the Federal Election Commission?

4    A.  Yes.

5    Q.  Did that affect the timing of when your expense reporting

6    was due to the treasurer and the deputy treasurer?

7    A.  Yes.

8    Q.  And what was your understanding of how often the campaign

9    had to report to the Federal Election Commission in 2011?

10            MR. BINNALL:  I object to this as asking him to give a

11   legal conclusion as to what the reporting requirements are for

12   the Federal Election Commission.

13            THE COURT:  Overruled.

14            Answer the question.

15            THE WITNESS:  Can you repeat it?

16   BY MR. PILGER:

17   Q.  Certainly.  What was your understanding as you worked with

18   the expenditure reports about how often the campaign had to

19   report expenditures to the Federal Election Commission in 2011?

20   A.  It was my understanding that we had to report it after --

21   every quarter.

22   Q.  And would the quarter have run with the calendar year such

23   as the final quarter of 2011 ended in December?

24   A.  Yes.

25   Q.  Now, did you, yourself, push the button that sent the report

1  to the FEC?

2  A.  I did not.

3  Q.  Who did that?

4  A.  It was my understanding that it would be either the

5  treasurer or the controller.

6  Q.  In compiling the report and sending it off to the FEC, did

7  you have personal knowledge of where the treasurer or the deputy

8  treasurer got the information they would report to the FEC?

9  A.  I'm sorry.  Could you repeat the question?

10  Q.  Certainly.  Let's just focus on expenditures.

11          When the treasurer or deputy treasurer would report to

12  the FEC, where would they get the information about what the

13  campaign had spent money on?

14  A.  Through invoice records that the campaign -- that I would

15  send to them after being approved.

16  Q.  And to focus in on that, you would receive invoices from

17  other campaign people, correct?

18  A.  Correct.

19  Q.  And would you create e-mails that would include codes and

20  other information to transmit to the treasurer or deputy

21  treasurer?

22  A.  Yes.

23  Q.  Did you create those e-mails in the ordinary course of your

24  business?

25  A.  Yes.

1  Q.  Did you send them in the ordinary course of your business?

2  A.  Yes.

3  Q.  And was it your understanding that those e-mails would

4  result in information being transmitted to the FEC?

5  A.  Yes.

6           MR. PILGER:  Excuse me a moment, Your Honor.

7           (Pause.)

8           MR. PILGER:  May I confirm only the witness can see

9  this as well as counsel?

10          THE COURT:  Right.  We only want the witness to see it

11  if it hasn't been admitted.

12          THE CLERK:  Yes.

13 BY MR. PILGER:

14 Q.  Mr. Cortes please look at the monitor near you.

15          Do you know what this is, without reading aloud from

16 it?

17 A.  The screen is blank.

18          THE CLERK:  One second.

19          THE COURT:  Is it on?  Is that screen on?

20          THE CLERK:  His isn't.  We've been having trouble with

21 that.

22          THE COURT:  Just show him a physical copy until we

23 figure that out.

24          MR. PILGER:  Yes.

25 BY MR. PILGER:

1  Q.  Mr. Cortes showing you what's been marked for identification

2  as Government's Exhibit 77, do you know what that is?

3  A.  Yes.

4  Q.  And does it involve a record created concerning expenditures

5  of the campaign?

6  A.  Yes.

7  Q.  Was this made and kept in the ordinary course of the

8  business of the campaign?

9  A.  Yes.

10 Q.  And does it concern a transaction involving someone named

11 sonnyizon@aol.com?

12 A.  Yes.

13            MR. PILGER:  Your Honor, we offer 77 into evidence.

14                              (Government Exhibit 77 was

15                              offered in evidence.)

16            MR. BINNALL:  Your Honor, we do object as it creates

17 multiple levels of hearsay, whereas the top e-mail, that's the

18 Paul Campaign e-mail, may be a business record, there are other

19 e-mails that do not fit the business record exception since

20 there are multiple levels of hearsay, and we object on the

21 grounds of hearsay.

22            MR. PILGER:  Your Honor, the lower e-mails simply

23 inform what's communicated in the business record and are part

24 of the business record.

25            THE COURT:  Mr. Howard, any objection, Ms. Sinfelt?

```
 1              MR. HOWARD:  Your Honor, if I could have a moment?
 2         (Pause.)
 3              MR. HOWARD:  Your Honor, there are no objections from
 4    Mr. Benton.
 5              THE COURT:  Overruled.  77 is received.
 6                             (Government Exhibit 77 was
 7                             received in evidence.)
 8              MR. PILGER:  May I publish?
 9              THE COURT:  Yes.  Again, you don't have to ask
10    permission to publish anything that's in evidence.  You can do
11    it anytime you want.
12              MR. PILGER:  Yes, Your Honor.
13    BY MR. PILGER:
14    Q.  Now, starting from the bottom, Mr. Cortes where indicated,
15    can you please state to the jury the e-mail address that the
16    first e-mail on this chain came from?
17    A.  It is from sonnyizon@aol.com.
18    Q.  And what is the date?
19    A.  February 5, 2012.
20    Q.  What time?
21    A.  1:15:06 p.m. Central Time.
22    Q.  And who is it to?
23    A.  To d.kesari@aol.com.
24    Q.  Do you recognize the address d.kesari@aol.com from your
25    personal experience with the Ron Paul Campaign in 2012?
```

1   A.   Yes.

2   Q.   Who used that account?

3   A.   It would be Dimitri Kesari.

4   Q.   And, Mr. Cortes, please go ahead and read the body of the

5   e-mail.  Actually start with subject line and then please read

6   the body.

7   A.   Subject line:  Production Services Invoice.

8            "Hi Dimitri.

9            "Attached is the Production Services Invoice we

10  discussed.  Let me know if you need anything else.  By the way,

11  the web site for my latest Holocaust documentary is up.  Please

12  check it when you come up for air.  www.anopendoormovie.com."

13  Q.   When we reach a web site address, you can just say there's a

14  web site address unless one of the attorneys asks you to

15  specify.

16  A.   Yes, sir.

17  Q.   Thank you.

18           Moving up the e-mail, is the next e-mail from Dimitri

19  Kesari spelled out?

20  A.   Yes.

21  Q.   And what's the date?

22  A.   Wednesday, February 8, 2012.

23  Q.   And what is the subject of Mr. Dimitri Kesari's e-mail?

24  A.   It's a forward:  Production Services Invoice.

25  Q.   And who is that e-mail to?

1    A.  It would be to myself, Fernando Cortes.

2    Q.  And is there an e-mail address for yourself, Fernando

3    Cortes?

4    A.  Yes.

5    Q.  Is that, in fact, an e-mail address that you used during the

6    Ron Paul 2012 campaign?

7    A.  Yes.

8    Q.  Then moving up to the last e-mail, is that an e-mail between

9    yourself -- from yourself to Lori Pyeatt and Deana Watts?

10   A.  Yes.

11   Q.  Was it sent on February 8th at 11:08 a.m.?

12   A.  Yes.

13   Q.  Was it copied to Katie Koerber and Dimitri Kesari?

14   A.  Yes.

15   Q.  Are the e-mail addresses associated with Lori Pyeatt, Deana

16   Watts, Katie Koerber and Dimitri Kesari known to you as e-mail

17   addresses that each of those persons respectively used?

18   A.  For Lori Pyeatt, Katie Koerber and Dimitri, yes.  Deana

19   Watts, that is her address.  However, it's not -- this specific

20   address is not the one that she regularly used.

21   Q.  So she has another address?

22   A.  That is correct.

23   Q.  But she also uses this address, right?

24   A.  This is also hers.

25              MR. BINNALL:  Objection; leading.

1          THE COURT:  Overruled.

2    BY MR. PILGER:

3    Q.  You may answer.  Does she use this address, too?

4    A.  Yes.

5    Q.  Did you intend to send this e-mail to Deana Watts?

6    A.  Yes.

7    Q.  Okay.  Please read the body of the e-mail and leave out

8    reading routing and account numbers.  Just tell us if they're

9    there.

10   A.  The body states:

11              "This is for Ron Paul 2012 PCC.

12              "Lori and Deana, please wire the following to

13   Interactive Communication Technology, Inc., amount $38,125.

14   Code 60110.  Wire to bank information."

15   Q.  What is the account name for the bank information?

16   A.  ICT, Incorp.

17   Q.  And what's the branch?

18   A.  College Park, Maryland.

19   Q.  And without specifying it in the record, there is a routing

20   number and an account number in this bank information, correct?

21   A.  Yes.

22   Q.  Now, you said this is for Ron Paul 2012 PCC was the first

23   line.  What is PCC?

24   A.  PCC stands for Presidential Campaign Committee.

25   Q.  And there's a code number, 60110.  What is that?

1   A.  It's an internal code depicting the expense type.

2   Q.  And there's a second page to Government's Exhibit 77 which

3   has a signature line.  Do you recollect that second page?

4   A.  Yes, I do.

5           MR. PILGER:  So, Your Honor, that is part of Exhibit

6   77, but I will offer again 77 as a two-page document.

7           THE COURT:  Same objection is overruled.  77 is

8   received.  I have three pages here.  There's an invoice attached

9   to mine.  That's not part of it.

10          MR. PILGER:  So there's an attachment.  I'm just

11  dealing with the e-mail portion.  I will go over the attachment.

12          THE COURT:  Thank you.

13          MR. PILGER:  Let me do that now.

14  BY MR. PILGER:

15  Q.  Sir, do you recognize the attachment to the invoice -- I'm

16  sorry, to the e-mail?

17  A.  Yes.

18          MR. PILGER:  The government moves all three pages of

19  77 into evidence.

20          MR. BINNALL:  Same objection.

21          THE COURT:  Overruled.  77 is received, all three

22  pages.

23  BY MR. PILGER:

24  Q.  So on the first page of 77, the first e-mail you testified

25  about came from someone named sonnyizon@aol.com, correct?

1  A.  Yes.

2  Q.  And on the second page there's a further text and a

3  signature block, correct?

4  A.  Yes.

5  Q.  And read that text and the signature.

6  A.  It says:

7          "Let me know what you think.

8          "Thanks for the business.

9          "Sonny Izon."

10  Q.  And then there's your signature block at the end of the

11  e-mail, deputy controller?

12  A.  Correct.

13  Q.  Then the attachment you looked at was an invoice from

14  Interactive Communication Technology, Inc.; is that correct?

15  A.  Yes.

16  Q.  And who is Interactive -- or ICT I'll call it.  Who is ICT

17  billing?

18  A.  It says the customer name, Ron Paul PPC, Inc.  Attention:

19  Dimitri Kesari.

20  Q.  And if you look down into the description of the billing,

21  there's a quantity of one type of thing, and what is that type

22  of thing?

23  A.  Production services.

24  Q.  And there's also an amount billed for production services;

25  is that right?

1  A.  Yes.

2  Q.  And what is the amount?

3  A.  $38,125.

4  Q.  Now, Mr. Cortes showing you what's been marked as

5  Government's Exhibit 76, did you receive an e-mail concerning

6  Government's Exhibit 77 and the attachment?

7  A.  Yes.

8  Q.  And who was that e-mail from?

9  A.  From Dimitri Kesari.

10        MR. PILGER:  The government offers Exhibit 76, Your

11  Honor.

12                    (Government Exhibit 76 was

13                     offered in evidence.)

14        MR. HOWARD:  Objection, Your Honor.

15        THE COURT:  What's the objection?

16        MR. HOWARD:  The objection, Your Honor, is they have

17  an approval down here.  They're clearly going to try and

18  associate it with our client.  There is Mr. Cortes here who will

19  have no idea who did that, and we believe that --

20        MR. PILGER:  Your Honor, we object to the speaking

21  objection.

22        MR. HOWARD:  You asked me a question.

23        THE COURT:  Well, usually I just need hearsay or

24  foundation.

25        MR. HOWARD:  I'm sorry, Your Honor; hearsay.

1    THE COURT:  Thank you.

2    Anything?

3    MR. BINNALL:  Your Honor, we have the same objection

4  we had before.  We also agree this is hearsay.

5    THE COURT:  Overruled.  76 is received.

6                              (Government Exhibit 76 was

7                              received in evidence.)

8  BY MR. PILGER:

9  Q.  For the record, Mr. Cortes, 76 is a two-page exhibit with an

10  e-mail and an attached invoice; is that correct?

11  A.  Yes.

12  Q.  Reading from the bottom up, Mr. Cortes, is the first e-mail

13  in the chain from sonnyizon@aol.com?

14  A.  Yes.

15  Q.  Is it to Dimitri Kesari at the address you previously noted

16  was associated with him?

17  A.  Yes.

18  Q.  And is it the same e-mail saying, attached is the production

19  services invoice we discussed?

20  A.  Yes.

21  Q.  And did Dimitri Kesari in the next e-mail up the chain do

22  something in response to that e-mail?

23  A.  Yes.

24  Q.  What did he do?

25  A.  He sent me an e-mail saying to -- directing me to wire

1  tomorrow morning and that it was approved by Jesse.

2  Q.  Who do you understand Jesse to refer to?

3  A.  Jesse Benton.

4  Q.  And was this e-mail by Dimitri Kesari sent to you on

5  February 8, 2012 at 11:29 a.m.?

6  A.  Yes.

7  Q.  And it has an attachment listed in the attachment section,

8  correct?

9  A.  Correct.

10  Q.  And is the attachment the same invoice that we discussed

11  earlier?

12  A.  Yes.

13  Q.  And it's for the same amount, $38,125, correct?

14  A.  Yes.

15  Q.  Mr. Cortes, did you prepare within the financial side of the

16  Paul Campaign statements that broke out by category the amounts

17  of money the campaign was spending on various things?

18  A.  Did I prepare -- can you repeat the question one more time?

19  Q.  Sure.  Let me try a different question.

20        You were the deputy controller, right?

21  A.  Yes.

22  Q.  Were you familiar with the various records that the campaign

23  kept of its expenses and its income?

24  A.  Yes.

25  Q.  In your experience and your personal knowledge as the deputy

1    controller, did the campaign generate reports which broke out

2    itemized lists of the types of expenses and the persons paid by

3    the campaign?

4    A.  Yes.

5              MR. HOWARD:  Objection, Your Honor; leading.

6              THE COURT:  Well, he just asked for it.  It's

7    preliminary, too.

8              He said yes, but go ahead.

9    BY MR. PILGER:

10   Q.  Showing you an e-mail that's been marked as Government's

11   Exhibit 59 for identification, is this an e-mail involving

12   yourself, John Tate, and Jesse Benton?

13   A.  Yes.

14   Q.  And without reading this aloud, does it forward information

15   concerning an entity known as Interactive C-o-m-m-u cut off at

16   the second to the last line?

17   A.  Yes.

18   Q.  And did you forward this to Mr. Tate and to Mr. Benton?

19   A.  Yes.

20             MR. PILGER:  The government offers 59 into evidence,

21   Your Honor.

22                            (Government Exhibit 59 was

23                             offered in evidence.)

24             MR. HOWARD:  No objection, Your Honor.

25             MR. BINNALL:  No objection, Your Honor.

1          THE COURT:  Received.

2                              (Government Exhibit 59 was

3                              received in evidence.)

4    BY MR. PILGER:

5    Q.  So looking at the cover e-mail first, this shows that you

6    did send this e-mail and you sent it to John Tate and Jesse

7    Benton, correct?

8    A.  Correct.

9    Q.  When did you send it?

10   A.  Wednesday, February 22, 2012, 8:21 p.m.

11   Q.  The subject of the e-mail?

12   A.  Expenses since 1/1/12.

13   Q.  And was there an attachment?  You don't have to read the

14   entire attachment description, but was there an attachment?

15   A.  Yes.

16   Q.  Please read the body of the e-mail.

17   A.  "John and Jesse,

18          "Here is the full breakdown of the expenses since

19   1/1/12.

20          "The 8000 at the bottom ($1 mill in Amex-covers

21   events/car rentals/et cetera.)

22          "I can send the other breakdown if you want but I'll

23   be away from a comp until later tonight (11-on)."

24   Q.  And did you get away from your computer?

25   A.  I'm sorry?

1  Q.  In the last line, did you mean that you would be away from

2  your computer?

3  A.  Yes.

4  Q.  Sir, just look at me.  The attachment is a lengthy document,

5  correct?

6  A.  Yes.

7  Q.  We just talked about the first page so far, right?

8  A.  Yes.

9  Q.  What is the second-to-last entry on the first page?

10  A.  Check 2/8/2012 EFT Interactive Commu.

11  Q.  I know there's more.  We're going to get to it.

12      Tell the jury what EFT is.

13  A.  EFT would mean electronic file transfer.

14  Q.  Continuing to look at the second-to-last line, what else is

15  there for that entry?

16  A.  It's an amount.

17  Q.  First there's some coding; yes?

18  A.  Oh, yes.  There's a code.

19  Q.  And then there's an amount?

20  A.  Yes.

21  Q.  And what is the amount?

22  A.  38,125.

23  Q.  And then there's a further amount on the right, and is that

24  the balance after that 38,125?

25  A.  After the 38,125, yes.

1  Q.  Does that second-to-the-last line concerning Interactive

2  Commu occur in a category of expenses?

3  A.  Yes.

4  Q.  And what is the category of expenses on this particular

5  financial report within the campaign?

6  A.  60110, audiovisual expenses.

7  Q.  Thank you.

8          Showing you what's been marked for identification as

9  Government's Exhibit 84b.

10          Do you recognize this?

11  A.  Yes.

12  Q.  Is this an e-mail chain involving sonnyizon@aol.com, Dimitri

13  Kesari, John Tate, and yourself?

14  A.  Yes.

15  Q.  And does it concern approval of an invoice?

16  A.  Yes.

17          MR. PILGER:  Your Honor, we offer 84b into evidence.

18                          (Government Exhibit 84b was

19                          offered in evidence.)

20          MR. HOWARD:  I apologize, Your Honor.  I can't hear

21  from over at the side.  I didn't hear anything.

22          THE COURT:  84b was offered.

23          MR. HOWARD:  Okay.

24          MR. BINNALL:  Same objection.

25          MR. HOWARD:  Same objection, Your Honor, and it's

1   incomplete.  There's supposed to be an attachment to it.

2            MR. PILGER:  Your Honor, if I may?  The government's

3   proffer is there's no attachment in the way this was forwarded.

4   It just shows there was an attachment on the prior e-mail.

5            THE COURT:  The objection is overruled.  84b is

6   received.

7                                    (Government Exhibit 84b was

8                                     received in evidence.)

9   BY MR. PILGER:

10  Q.  Reading from the bottom up, Mr. Cortes, can you see that

11  text?

12  A.  Yes.

13  Q.  I'll try and get it a little bigger for you.

14           Is the first message from sonnyizon@aol.com?

15  A.  Yes.

16  Q.  Who is it to?

17  A.  Dkesari@aol.com.

18  Q.  And what's the subject?

19  A.  February invoice.

20  Q.  And what's the text?

21  A.  "Hey Dimitri,

22           "Attached is the invoice for services rendered in

23  February.  Let me know if you need anything else.

24           "Best,

25           "Sonny."

1  Q.  So moving up to the next e-mail above that one, who is the

2  next e-mail from?

3  A.  Dimitri Kesari.

4  Q.  And what date is the e-mail from Dimitri Kesari from?

5  A.  Tuesday, April 3, 2012, at 11:58 a.m.

6  Q.  And what is the subject?

7  A.  Forward:  February invoice.

8  Q.  And who is the recipient?

9  A.  I am.

10  Q.  And going to the next e-mail up, what happened next?

11  A.  I had sent an e-mail -- I forwarded the e-mail to John Tate.

12  Q.  And did you ask a question?

13  A.  Yes.

14  Q.  What did you ask?

15  A.  Approved, question mark.

16  Q.  And did Mr. Tate respond?

17  A.  Yes.

18  Q.  On what date did he respond?

19  A.  Tuesday April 3, 2012, at 12:03 p.m.

20  Q.  Did he respond to you?

21  A.  Yes.

22  Q.  Did he respond regarding the February invoice?

23  A.  Yes.

24  Q.  Did he say it was approved?

25  A.  Yes.

1    Q.  Just before we leave 84b, I think we missed an e-mail.

2        On April 3rd at 11:58 a.m., Dimitri Kesari wrote to

3    you, correct?

4    A.  Yes.

5    Q.  And in the text of the e-mail, did he say anything?

6    A.  Yes.

7    Q.  What did he say?

8    A.  "Approved by Jesse."

9    Q.  And then you checked that with John Tate, correct?

10       MR. HOWARD:  Objection, Your Honor;

11   mischaracterization.

12       THE COURT:  Overruled.

13   BY MR. PILGER:

14   Q.  Did you check that with John Tate?

15   A.  Yes.

16   Q.  And then he approved, correct?

17   A.  Correct.

18   Q.  Mr. Cortes, showing you what's marked for identification as

19   Government's Exhibit 85, is this another e-mail involving

20   sonnyizon@aol.com?

21   A.  Yes.

22   Q.  And is it an e-mail chain that also involves Dimitri Kesari?

23   A.  Yes.

24   Q.  And is it an e-mail chain that goes to John Tate?

25   A.  Yes.

1   Q.  Does it concern an invoice?

2   A.  Yes.

3           MR. PILGER:  The government offers 85 into evidence.

4                           (Government Exhibit 85 was

5                           offered in evidence.)

6           MR. HOWARD:  Your Honor, for the record, same hearsay

7   objection.

8           THE COURT:  Looks like the exact same document.  Is it

9   different?

10          MR. PILGER:  I believe it is, Your Honor.

11          THE COURT:  I'm sorry.  Overruled.  85 is received.

12                          (Government Exhibit 85 was

13                          received in evidence.)

14  BY MR. PILGER:

15  Q.  Mr. Cortes, this is a very similar e-mail, is it not, to the

16  last one, 84b?

17  A.  Yes.

18  Q.  But starting at the bottom, there's a message again from

19  sonnyizon@aol.com to Dimitri Kesari, correct?

20  A.  Yes.

21  Q.  What's the date?

22  A.  Monday, March 26, 2012, 5:13 p.m.

23  Q.  And what's the subject?

24  A.  March invoice.

25  Q.  And what does the body read?

1  A.  "Hi Dimitri.

2          "Here is the invoice for March.

3          "Peace.

4          "Sonny."

5  Q.  And just to go back for a second, Government's Exhibit 84b

6  starts with the subject line of February invoice, correct?

7  A.  Yes.

8  Q.  Returning to Government's 85, the next entry up after the

9  e-mail saying, here is the invoice for March, peace, Sonny, is

10  from whom?

11  A.  Dimitri Kesari.

12  Q.  On what date?

13  A.  Tuesday, April 3, 2012, at 11:58 a.m.

14  Q.  What's the subject line?

15  A.  Forward:  March invoice.

16  Q.  Who is the e-mail to?

17  A.  Myself.

18  Q.  What's the message you received from Dimitri Kesari?

19  A.  "Approved by Jesse."

20  Q.  And then what happened?  What's the next e-mail?

21  A.  It's a forward from me to John Tate.

22  Q.  And in that e-mail what was that date?

23  A.  April 3, 2012, at 12:00 p.m.

24  Q.  And that was from yourself to Jesse -- I'm sorry; to John

25  Tate?

1   A.   Yes.

2   Q.   Did you ask a question?

3   A.   Yes.

4   Q.   Was what the question?

5   A.   Approved, question mark.

6   Q.   Did you get a response from John Tate?

7   A.   Yes.

8   Q.   When?

9   A.   Tuesday April 3, 2012, 12:03 p.m.

10  Q.   To yourself?

11  A.   Yes.

12  Q.   What did the response state?

13  A.   "Approved."

14  Q.   Mr. Cortes, showing you Government's Exhibit 88 for

15  identification, is this an e-mail chain involving

16  sonnyizon@aol.com, Dimitri Kesari, and yourself?

17  A.   Yes.

18  Q.   Does it concern an invoice?

19  A.   Yes.

20  Q.   Is there an invoice attached to this e-mail?

21  A.   Yes.

22           MR. PILGER:   The government offers 88 into evidence,

23  Your Honor.

24                           (Government Exhibit 88 was

25                            offered in evidence.)

1          MR. BINNALL:  Same objection for Mr. Kesari.

2          THE COURT:  Overruled.  88 is received.

3          MR. HOWARD:  For the record, Your Honor, Mr. Benton

4    would have that same objection.

5          THE COURT:  All right.  Overruled.

6          MR. HOWARD:  Thank you.

7                              (Government Exhibit 88 was

8                               received in evidence.)

9    BY MR. PILGER:

10   Q.  Mr. Cortes, would you please read for the jury who the first

11   e-mail in the chain is from?

12   A.  Sonnyizon@aol.com.

13   Q.  And what's the date?

14   A.  May 2, 2012, 9:01:48 a.m. Eastern Time.

15   Q.  Who is it to?

16   A.  Dkesari@aol.com.

17   Q.  Who do you know uses that account?

18   A.  Dimitri Kesari.

19   Q.  What's the subject?

20   A.  April invoice.

21   Q.  What's the body read?

22   A.  "Hey Dimitri.

23          "Here's the production services invoice for April

24   2012.  Hope you are doing well."

25          Peace, Sonny Izon, telephone number --

1    Q.  And then there's a telephone number, right?

2    A.  Yes.

3    Q.  There's one more e-mail in this chain, correct?

4    A.  Yes.

5    Q.  Does that e-mail forward to you the e-mail that you just

6    read from Sonny Izon?

7    A.  I'm sorry, can you repeat that?

8    Q.  The next e-mail up in the chain, is it from Dimitri Kesari?

9    A.  Yes.

10   Q.  Is it to yourself?

11   A.  Yes.

12   Q.  Does it forward the first e-mail you read on this exhibit to

13   you?

14   A.  Yes, it does.

15   Q.  And what's the subject line?

16   A.  Forward:  April invoice.

17   Q.  And there's an attachment listed here, correct?

18   A.  Yes.

19   Q.  On this one there was an attachment which you just reviewed,

20   correct?

21   A.  Yes.

22   Q.  What is the attachment?

23   A.  It is an invoice.

24   Q.  Who is the invoice from?

25   A.  Interactive Communication Technology, Inc.

1  Q.  And who is billed in this invoice?

2  A.  Ron Paul PPC, Inc., attention:  Dimitri Kesari.

3  Q.  Is there one line item in the description of the billing in

4  this invoice?

5  A.  Yes.

6  Q.  Does it say there's a quantity of one thing?

7  A.  Yes.

8  Q.  And what is that one thing?

9  A.  Production services, April.

10  Q.  And is there a price listed, a unit price?

11  A.  Yes.

12  Q.  What's that price?

13  A.  $8,850.

14  Q.  Is there a total price?

15  A.  Yes.

16  Q.  Is it the same $8,850?

17  A.  Yes.

18  Q.  And the total bill is $8,850?

19  A.  Yes.

20  Q.  And who was supposed to receive this?

21  A.  I'm sorry?

22  Q.  I'm sorry, let me ask a better question.

23        How was payment to be made on this invoice?  Does it

24  say?

25  A.  Payment was meant to be made to account name ICT, Incorp.

1  Q.  At a particular bank, correct?

2  A.  Yes.

3  Q.  And the invoice provides a routing number and an account

4  number, correct?

5  A.  Yes.

6  Q.  And does it state a branch of the bank?

7  A.  Yes.

8  Q.  And what's that?

9  A.  College Park, Maryland.

10        THE COURT:  Is this a good place to quit for the day?

11        MR. PILGER:  Yes, Your Honor.

12        THE COURT:  Good.  You can step down, sir.

13        Thank you.

14        Members of the jury, we're just going to cut a little

15  bit short today, just a few minutes.  Ordinarily we'll start

16  right at 9:00 in the morning.  We'll take that 20-minute break

17  in the morning about 10:30.  We'll break usually an hour and 15

18  minutes for lunch.  We'll break 20 minutes in the afternoon and

19  quit at 5:00 each day.

20        So as you go home tonight -- first of all, leave your

21  notes on your chair.  I promise no one will look at those.  When

22  people take them home, two things happen sometimes.  No. 1,

23  people forget to bring them back; No. 2, they sometimes get in

24  the hands of people that don't need to see them.  So we ask you

25  leave them here with the promise that nobody will look at those.

1          Second, when you go home today, your family, your

2    friends are going to be very interested in what you're doing

3    here, and the more that you tell them, the more likely it is

4    that you're going to find out their opinion about how they think

5    this case should be decided or something that you really don't

6    need.  So tell them what you're doing here and then just tell

7    them that's it.  You can identify the case and you can say I

8    can't talk about it until the trial is over, and then you can

9    talk about it all you want.

10          Remember what I said about not watching television

11   broadcasts, reading newspapers, listening to radio broadcasts

12   about the case.  Remember what I said about social media and all

13   that.

14          And thank you for your service, and I look forward to

15   seeing you ready to go at 9 o'clock.

16          See you then.

17          Counsel, I would like you here at 8:30, just tell

18   Ms. Archer if there's something you need to talk to me about

19   before court.

20          See you in the morning.

21          (Recess at 4:50 p.m., until 8:30 a.m., Wednesday,

22   October 14, 2015.)

23

24

25