IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :
                             :
          Plaintiff,         :     Criminal No. 4:15-103
                             :
     vs.                     :
                             :
JESSE R. BENTON and          :     TRANSCRIPT OF TRIAL
DIMITRIOS N. KESARI,         :         VOLUME II
                             :
          Defendants.        :
- - - - - - - - - - - - - -X


                              Second Floor Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Wednesday, October 14, 2015
                              8:30 a.m.



BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.







                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                    Room 189, U.S. Courthouse
                    123 East Walnut Street
                    Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:          JONATHAN I. KRAVIS, ESQ.
                            U.S. Department of Justice
                            Criminal Division
                            10th and Constitution Avenue NW
                            John C. Keeney Building
                            Washington, D.C.  20530

                            RICHARD CHRISTIAN PILGER, ESQ.
                            U.S. Department of Justice
                            1400 New York Avenue NW
                            Suite 12100
                            Washington, D.C.  20005

For Defendant Benton:       ROSCOE C. HOWARD, JR., ESQ.
                            MEENA T. SINFELT, ESQ.
                            Barnes & Thornburg
                            1717 Pennsylvania Avenue NW
                            Suite 500
                            Washington, D.C.  20006

For Defendant Kesari:       JESSE RYAN BINNALL, ESQ.
                            Harvey & Binnall
                            717 King Street
                            Suite 300
                            Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For the Government:** | | | | |
| Fernando Cortez-Lira (Resumed) | 107 Pilger | 143 Howard | | |
| | | 159 Binnall | 185 Pilger | 196 Howard |
| Karen LoStracco (Resumed) | 198 Kravis 329 | | | |
| Lori Pyeatt | 285 Pilger | 301 Sinfelt | | |
| | | 303 Binnall | | |
| Ron Paul | 309 Kravis | 320 Howard | | |
| | | 326 Binnall | 328 Kravis | |
| **For the Defendant Benton:** | | | | |
| Deana Watts | 305 Sinfelt | 307 Binnall | | |
| | | 308 Pilger | | |

E X H I B I T S

GOVERNMENT'S EXHIBIT NUMBERS:                    OFFERED    RECEIVED

| | OFFERED | RECEIVED |
|---|---|---|
| 4 - | 330 | 331 |
| 5 - | 332 | 332 |
| 6 - | 333 | 334 |
| 11 - | 335 | 335 |
| 14 - | 337 | 337 |
| 16 - | 338 | 338 |
| 17 - | 340 | 340 |
| 18 - | 342 | 343 |
| 19 - | 344 | 345 |
| 20 - | 346 | 347 |
| 21 - | 348 | 348 |
| 24 - | 350 | 350 |
| 25 - | 352 | 352 |
| 26 - | 353 | 354 |
| 27 - | 355 | 356 |
| 28 - | 358 | 358 |
| 29 - | 359 | 360 |
| 30 - | 361 | 362 |
| 49 - | 264 | 265 |
| 50 - | 267 | 267 |
| 61 - | 133 | 134 |
| 62 - | 141 | 141 |
| 63 - | 262 | 263 |
| 64 - | 269 | 270 |
| 65 - | 272 | 273 |
| 67 - | 275 | 275 |
| 68 - | 213 | 214 |
| 69 - | 215 | 215 |
| 70 - | 220 | 220 |
| 71 - | 225 | 225 |
| 74 - | 206 | 207 |
| 75 - | 208 | 209 |
| 78 - | 224 | 224 |
| 79 - | 226 | 226 |
| 80 - | 228 | 228 |
| 81 - | 230 | 230 |
| 82 - | 232 | 233 |
| 83 - | 235 | 235 |
| 86 - | 238 | 238 |
| 87a - | 240 | 240 |
| 87b - | 210 | 211 |
| 87c - | 212 | 241 |
| 89 - | 109 | 109 |
| 90 - | 247 | 248 |
| 92 - | 249 | 249 |
| 93 - | 113 | 113 |

| GOVERNMENT EXHIBIT NUMBERS: (Continued) | OFFERED | RECEIVED |
|---|---|---|
| 95 - | 115 | 115 |
| 97 - | 252 | 252 |
| 98 - | 121 | 122 |
| 100 - | 125 | 125 |
| 101 - | 255 | 255 |
| 102 - | 257 | 257 |
| 103 - | 258 | 259 |
| 104 - | 127 | 127 |
| 143 through 148 - | | 293 |
| 153 - | 278 | 278 |
| 159 - | 261 | 262 |

1                    P R O C E E D I N G S

2            (In open court, out of the presence of the jury.)

3            THE COURT:  Be seated.

4            Thank you.

5            There was one matter that you wanted to take up this

6    morning.  It has to do with the notes concerning Mr. Benton's

7    proffer.  What do you say about that?

8            MS. SINFELT:  Your Honor, we would like to hand up a

9    case, Vitek Systems versus Abbott Laboratories from the Eighth

10   Circuit that says that's not allowed in the Eighth Circuit.

11           THE COURT:  What's the site on that?

12           MS. SINFELT:  It would be 675 F.2d 190.  The pin cite

13   I believe is 194.

14           THE COURT:  So, conceptually, how is it different than

15   if it was recorded by video recording or audio recording?

16           MS. SINFELT:  Because it's not an actual verbatim

17   transcript, Your Honor.  It would be the impressions of the

18   witness and her descriptions of what was going on and her

19   impressions, and it was selective based on what she chose to

20   write down.

21           THE COURT:  Okay.  I'll take a look at that case.

22           Anything else you want to discuss this morning before

23   we start?

24           MR. BINNALL:  Your Honor, Mr. Kesari also has a

25   position on this as well, and that is because that some of the

1  items in the proffer concern Mr. Kesari and to allow that to

2  come into this case, even if there's a limiting instruction that

3  it can't be considered against Mr. Kesari, which, of course, we

4  would ask for, would most certainly violate Mr. Kesari's --

5  first of all, it would be hearsay as to him still.  Second of

6  all, it would violate his rights of the confrontation clause

7  because this was a proffer session.  This is not something that

8  Mr. Kesari had the right to attend.  This isn't a -- he had no

9  opportunity to cross-examine the witnesses and, more important,

10  perhaps most importantly here, this is going to be so

11  prejudicial as to the things that were said there in those notes

12  that it is unfair prejudice and it substantially outweighs any

13  probative value that comes from that.

14       So as to Mr. Kesari, even with the limiting

15  instruction, we would object to those notes coming in at all.

16       THE COURT:  Are there Bruton problems associated with

17  this?

18       MR. KRAVIS:  No, Your Honor.  The note issue is the

19  hearsay within hearsay exception.  Obviously, anything in the

20  notes that Mr. Benton said are themselves admissible at the

21  trial.  There's nothing that we would introduce in the notes

22  that mentions Mr. Kesari and, of course, this evidence would

23  only be used against Mr. Benton and we would not oppose any

24  limiting instruction that the jury is not to consider it with

25  respect to Mr. Kesari.

1    THE COURT:  Okay.  I'll take a look at that.

2    Anything else before we begin?

3    All right.  Thank you.

4    (Recess at 8:35 a.m., until 9:00 a.m.)

5    (In open court, in the presence of the jury.)

6    THE COURT:  Please be seated.

7    Members of the jury, good morning.

8    We're continuing on in the matter of the United States

9    versus Jesse Benton and Dimitri Kesari.  You remember Mr. Cortes

10   was on direct examination as we left yesterday.  We'll continue

11   with that.

12   Mr. Pilger, go ahead.

13   MR. PILGER:  May it please the court.

14                   FERNANDO CORTEZ-LIRA,

15   resumed his testimony as follows:

16                   DIRECT EXAMINATION (Continued)

17   BY MR. PILGER:

18   Q.  Good morning, Mr. Cortes.

19   A.  Good morning.

20   Q.  You're still under oath; you understand that?

21   A.  Yes.

22   Q.  So we left off having talked about what's in evidence as

23   Government's Exhibit 88, and Government's Exhibit 88 is an

24   e-mail from Dimitri Kesari to yourself, correct?

25   A.  Correct.

1   Q.  And it attaches an e-mail from sonnyizon@aol.com to Dimitri

2   Kesari, correct?

3   A.  Correct.

4   Q.  And just before we leave this page, what was the body of the

5   message from Dimitri Kesari to yourself?

6   A.  "Approved by Jesse."

7   Q.  And then there is an invoice attached to that e-mail,

8   correct?

9   A.  Correct.

10  Q.  And the invoice has an invoice number; is that right?

11  A.  Correct.

12  Q.  And read that off for the jury, would you, please.

13  A.  It was No. 20120428.

14  Q.  Thank you.

15          MR. PILGER:  Ms. Archer, this is not in evidence yet.

16  BY MR. PILGER:

17  Q.  Now, Mr. Cortes, if you would look at the monitor, you can

18  see another e-mail chain that you've previously reviewed,

19  correct?

20  A.  Yes.

21  Q.  Is that large enough for you to see?

22  A.  Yes.

23  Q.  Now, is this an e-mail chain involving yourself; your

24  assistant, Katie Koerber; Dimitri Kesari and --

25  A.  Yes.

1   Q.  And that's it, right?

2   A.  I believe there's also another e-mail under

3   sonnyizon@aol.com.

4   Q.  Yes, as the attachment, that's right.

5           So those e-mail addresses are involved, correct?

6   A.  Yes.

7   Q.  And does this involve an invoice?

8   A.  Yes.

9   Q.  And does that invoice concern the April 2012 time period?

10  A.  Yes.

11          MR. PILGER:  Your Honor, the government offers Exhibit

12  89 into evidence.

13                              (Government Exhibit 89 was

14                                offered in evidence.)

15          MR. HOWARD:  Can you give me a minute, Your Honor?

16          MS. SINFELT:  Your Honor, Mr. Benton has a hearsay

17  objection just to the top portion of this, the April e-mail to

18  Dimitri Kesari from Fernando Cortes.

19          MR. BINNALL:  And Mr. Kesari has an objection as to

20  hearsay as to the e-mail message from Mr. Izon, the second

21  e-mail there.

22          THE COURT:  Overruled.  89 is received.

23                              (Government Exhibit 89 was

24                                received in evidence.)

25  BY MR. PILGER:

1  Q.  So, Mr. Cortes, starting at the bottom, there's an e-mail

2  from yourself on May 2nd at 2012, correct?

3  A.  Correct.

4  Q.  And who was that e-mail to?

5  A.  It is to Katie Koerber.

6  Q.  Remind the jury who Katie Koerber is.

7  A.  Katie Koerber is my assistant.

8  Q.  And in this e-mail what do you say to Ms. Koerber?

9  A.  "Please prepare for wire."

10  Q.  And on this e-mail chain, this is actually the last

11  e-mail -- this e-mail reads from the top to the bottom, correct?

12  A.  I'm sorry, can you repeat that?

13  Q.  So if you look at the whole e-mail, whereas the e-mails

14  we've read previously they go from the bottom up, this one goes

15  from the top down; is that accurate?

16  A.  Yes.

17  Q.  So the last thing that happened in this e-mail chain in this

18  exhibit is you asked Ms. Koerber to do what?

19  A.  I asked her to prepare for wire.

20  Q.  Prior to you asking Ms. Koerber to prepare for wire, what

21  happened?  Did someone e-mail you?

22  A.  Yes.

23  Q.  Who e-mailed you?

24  A.  Dimitri Kesari.

25  Q.  When did he e-mail you?

1   A.   It says Wednesday, May 2, 2012, 10:38 a.m.

2   Q.   And that's to you at your Ron Paul e-mail address, right?

3   A.   Correct.

4   Q.   And the body says what?

5   A.   "Approved by Jesse."

6   Q.   And, again, just remind the jury, who do you understand

7   Jesse to be?

8   A.   Jesse Benton.

9   Q.   Attached to that e-mail was an invoice, correct?

10  A.   Correct.

11  Q.   Is that the e-mail?  I'm sorry, is that the attachment to

12  the e-mail?

13  A.   Yes, sir.

14  Q.   And is that an invoice?

15  A.   Yes.

16  Q.   Who is the invoice from?

17  A.   Interactive Communication Technology, Inc.

18  Q.   And who is being billed by Interactive Communication

19  Technology, Inc.?

20  A.   Ron Paul PPC, Inc., attention:  Dimitri Kesari.

21  Q.   Attention?

22  A.   Attention:  Dimitri Kesari.

23  Q.   And what quantity of items are being billed?

24  A.   One.

25  Q.   And what is the description of that item?

1  A.  Production services, April.

2  Q.  And what is the cost of that item?

3  A.  $8,850.

4  Q.  And what is the total being billed on this invoice?

5  A.  $8,850.

6  Q.  Now, showing you the invoice that was attached to

7  Government's Exhibit 88 and the invoice attached to Government's

8  Exhibit 89 at the same time overlapping.

9       First showing you the invoice attached to Government's

10  Exhibit 88, then showing you the invoice attached to

11  Government's Exhibit 89, is the invoice number the same?

12  A.  Yes.

13       MR. PILGER:  Ms. Archer, this is not in evidence yet.

14  BY MR. PILGER:

15  Q.  Mr. Cortes, showing you what's been marked for

16  identification as Government's Exhibit 93 and has been provided

17  to the defense, is this an e-mail involving Dimitri Kesari and

18  yourself?

19  A.  Yes.

20  Q.  Is it from the time of May of 2012?

21  A.  Yes.

22  Q.  Does it involve an invoice?

23  A.  Yes.

24  Q.  Does it have an attached invoice?

25  A.  Yes.

 1          MR. PILGER:  Your Honor, the government offers Exhibit

 2   93 into evidence.

 3                          (Government Exhibit 93 was

 4                           offered in evidence.)

 5          MR. HOWARD:  No objection.

 6          MR. BINNALL:  No objection.

 7          THE COURT:  93 is received.

 8                          (Government Exhibit 93 was

 9                           received in evidence.)

10   BY MR. PILGER:

11   Q.  So, Mr. Cortes, who is this e-mail from?

12   A.  Dimitri Kesari.

13   Q.  What's the date?

14   A.  Thursday, May 24, 2012, 8:25 p.m.

15   Q.  Are you the recipient?

16   A.  Yes.

17   Q.  What's the subject?

18   A.  Forward:  May invoice.

19   Q.  Is there an attachment identification?

20   A.  Yes.

21   Q.  And what's the text?

22   A.  Of the attachment?

23   Q.  I'm sorry.  What does the body of the e-mail say?  What does

24   Dimitri Kesari say to you in this e-mail?

25   A.  "This should be the last one."

1  Q.  Then attached we have another invoice, correct?

2  A.  Yes.

3  Q.  Who is the invoice from?

4  A.  Interactive Communication Technology, Inc.

5  Q.  Who is the invoice to?

6  A.  Ron Paul PCC, Inc., attention:  Dimitri Kesari.

7  Q.  Is there a quantity of one item billed on this invoice?

8  A.  Yes.

9  Q.  What is the description of that item?

10  A.  Production services, May.

11  Q.  And what is the cost of that item?

12  A.  $8,850.

13  Q.  Turning your attention to the bottom of the invoice, what is

14  the total bill in this invoice?

15  A.  $8,850.

16  Q.  And as with the other invoices, is there information about

17  how the invoice should be paid?

18  A.  Yes.

19  Q.  Is there an account name for how the invoice should be paid?

20  A.  Yes.

21  Q.  What is the account name?

22  A.  ICT, Incorp.

23  Q.  And then is there banking information?

24  A.  Yes.

25  Q.  Does it include a branch of the bank?

1    A.   Yes.

2    Q.   Is that College Park, Maryland, like the others?

3    A.   Yes.

4    Q.   Before we leave that invoice, going back to the top, is

5    there an invoice number?

6    A.   Yes.

7    Q.   Just read that off to the jury?

8    A.   Invoice No. 20120528.

9            MR. PILGER:  It's a new exhibit, Ms. Archer.

10   BY MR. PILGER:

11   Q.   Mr. Cortes, showing you what's been marked as Government's

12   Exhibit 95 for identification and previously provided to the

13   defense, is this an e-mail involving John Tate, yourself, Katie

14   Koerber and concerning an ICT invoice?

15   A.   Yes.

16           MR. PILGER:  The government offers Exhibit 95 into

17   evidence.

18                          (Government Exhibit 95 was

19                            offered in evidence.)

20           MR. HOWARD:  Your Honor, same hearsay objection that

21   we've made previously.

22           MR. BINNALL:  Same for Mr. Kesari as well.

23           THE COURT:  Overruled.  95 is received.

24                          (Government Exhibit 95 was

25                            received in evidence.)

1    BY MR. PILGER:

2    Q.  So, Mr. Cortes, this is an e-mail chain, correct?

3    A.  Yes.

4    Q.  And it reads from the bottom up chronologically; is that

5    correct?

6    A.  Yes.

7    Q.  And the first part of the chain was from Katie Koerber; is

8    that right?

9    A.  Yes.

10   Q.  Your assistant?

11   A.  Correct.

12   Q.  And when did she send them?

13   A.  Tuesday, May 29, 2012, at 9:28 a.m.

14   Q.  Who did she send it to?

15   A.  To myself.

16   Q.  And what does the body of the e-mail say?

17   A.  "This is for Ron Paul 2012 PCC.

18           "Lori and Deana.

19           "Please wire the following to Interactive

20   Communication Technology, Inc.

21           "Amount $8,850.

22           "Code 60110.

23           "Invoice No. 20120528.

24           "Wire to bank information."

25   Q.  And the bank account information is for what company?

1  A.  ICT, Incorp.

2  Q.  And then there's banking information that's been redacted,

3  including the routing number and account number, correct?

4  A.  Correct.

5  Q.  And a branch, College Park, Maryland?

6  A.  Correct.

7  Q.  Okay.  Just focusing on the invoice number on Government's

8  Exhibit 95 and returning to the attachment to Government's

9  Exhibit 93, placing them next to each other, is that invoice

10  number the same?

11  A.  Yes.

12  Q.  Returning to Government's Exhibit 95 in evidence, the first

13  e-mail from Katie Koerber to yourself that you just read to the

14  jury, does this forward the information necessary to report

15  expenses in the normal way the campaign did that?

16          MR. HOWARD:  Objection, Your Honor; leading.

17          THE COURT:  It is leading.  Sustained.

18          Pose another question.

19  BY MR. PILGER:

20  Q.  Mr. Cortes, did the campaign have a way of making records

21  and forwarding them concerning expenditures?

22  A.  Yes.

23  Q.  Was that an ordinary and regular and routine way of doing

24  this?

25  A.  Yes.

1  Q.  And did the campaign make those records and use those

2  records in the ordinary course --

3          MR. HOWARD:  Your Honor, same objection.

4          THE COURT:  It's just for foundation.  Overruled.

5  BY MR. PILGER:

6  Q.  Did the campaign make those records and use those records in

7  the ordinary course of business?

8  A.  Yes.

9  Q.  And is Government's Exhibit 95 an example of a record made

10 and used in the ordinary course of business of the Ron Paul

11 Campaign?

12 A.  Yes.

13         MR. BINNALL:  Same objection.

14         THE COURT:  Overruled.

15 BY MR. PILGER:

16 Q.  So, Mr. Cortes, in the ordinary course of business, would

17 the expense here that's being reported for Ms. Koerber to

18 yourself be reported in this way with this code -- with a code

19 number?

20 A.  Once approved, yes.

21 Q.  And the code number, how would that be generated?  Would

22 that come from information that the campaign just created by

23 itself or would it rely on anything that the campaign had

24 received?

25 A.  It is my understanding there was an internal code.

1  Q.  I understand.  Can you explain how the campaign would create

2  a code number?  Would it depend on anything that the campaign

3  had received or not?

4         MR. BINNALL:  I'm objecting.  Based on his prior

5  answer, I think he's calling for hearsay right now.

6         THE COURT:  Overruled.

7         Answer the question if you can.

8  A.  Can you repeat the question, sir?

9  BY MR. PILGER:

10  Q.  Would the code number that you would generate to go in a

11  message like this, in the ordinary course of business, would you

12  invent that out of thin air or would you rely on something that

13  the campaign had received?

14  A.  It is my understanding the codes were attached to

15  expenditure -- expenditure based on the FEC reporting.

16  Q.  So you're saying -- is that the purpose of the coding?

17  A.  Correct.

18  Q.  But I'm asking about how do you get to the code.  Let me try

19  it this way.

20         In this instance Ms. Koerber created the e-mail with

21  the code, right?

22  A.  Correct.

23  Q.  And sometimes you would create the e-mail with the code,

24  correct?

25  A.  Correct.

1  Q.  If you created an e-mail with the code in the ordinary

2  course of business of making one of these e-mails, what would

3  you use to decide what the code would be?

4  A.  I would use the information on the invoice or rely on the

5  person handing me an invoice to tell me what the invoice was

6  for.

7  Q.  Thank you.

8        And in Government's Exhibit 95, after Ms. Koerber

9  reported to you the information concerning the invoice, an

10  invoice, what happened next?

11  A.  I forwarded to John Tate.

12  Q.  You sent an e-mail to John Tate; is that right?

13  A.  Correct.

14  Q.  And you forwarded the e-mail that Ms. Koerber had generated,

15  correct?

16  A.  Correct.

17  Q.  When did you do that?

18  A.  Tuesday, 29 May 2012, 9:38.

19  Q.  And what was the subject of the e-mail that you sent to

20  Mr. Tate?

21  A.  Forward:  Wire - Interactive Communication Technology, Inc.

22  Q.  And what was the body to Mr. Tate in that e-mail?

23  A.  "Approved?  Dimitri said it is the last one."

24  Q.  And who is Dimitri?

25  A.  Dimitri Kesari.

1  Q.  Turning your attention to the last e-mail at the top of the

2  page, what happened next?

3  A.  John Tate replied to me.

4  Q.  And when John Tate replied to you, when was that?

5  A.  Tuesday, May 29, 2012, 11:03 a.m.

6  Q.  And is the subject line the same as the e-mail you had sent

7  to him?

8  A.  Yeah, with an additional Re, regarding.

9  Q.  I see.  So with the regarding, it's the same as what you

10  sent to him?

11  A.  Correct.

12  Q.  And what did he say to you?

13  A.  "Approved."

14  Q.  Mr. Cortes, showing you what's been marked for

15  identification as Government's Exhibit 98, is this an e-mail

16  chain involving sonnyizon@aol.com, Dimitri Kesari, yourself --

17  A.  Yes.

18  Q.  -- in the period of June 2012?

19  A.  Yes.

20  Q.  Does it concern an invoice?

21  A.  Yes.

22        MR. PILGER:  Your Honor, the government offers 98 in

23  evidence.

24                        (Government Exhibit 98 was

25                          offered in evidence.)

1           MR. HOWARD:  For the record, same objection, Your

2    Honor.

3           MR. BINNALL:  For the record, same objection for

4    Mr. Kesari.

5           THE COURT:  The objection is overruled.  In the

6    statements I've noticed in each one of these from Sonny Izon are

7    not offered for the truth of the matter.  It just simply says,

8    hope things are well, I'm sending you the invoice.  So the

9    objection is overruled.  98 is received.

10                              (Government Exhibit 98 was

11                               received in evidence.)

12   BY MR. PILGER:

13   Q.  And there's an attachment which is an invoice, correct?

14   A.  Correct.

15   Q.  Who is the invoice from?

16   A.  Interactive Communication Technology, Inc.

17   Q.  Who is the invoice to?

18   A.  Ron Paul PCC Inc., attention:  Dimitri Kesari.

19   Q.  Is there a quantity of one item listed in the description?

20   A.  Yes.

21   Q.  And what is the item?

22   A.  Production services, June.

23   Q.  What is the cost of the item?

24   A.  $8,850.

25   Q.  What is the total bill on the invoice?

1  A.  $8,850.

2  Q.  Is there an invoice number on this invoice?

3  A.  Yes.

4  Q.  Returning to the first page covering that attachment, the

5  first e-mail reading from the bottom up, who is that from?  What

6  is the e-mail address it is from?

7  A.  Sonnyizon@aol.com.

8  Q.  Who is it to?

9  A.  Dimitri Kesari.

10  Q.  What was the date it was sent?

11  A.  Monday June 18, 2012, 4:57 p.m.

12  Q.  What's the subject?

13  A.  June invoice.

14  Q.  And what's the body say?

15  A.  "Hi Dimitri.

16        "Hope you are well.  Since I will be on travel for

17  most of the rest of the month, I'm sending you the June invoice.

18        "Good luck with the settlement of the Kennedy Street

19  house.

20        "Peace.

21        "Sonny."

22  Q.  And then does Sonny Izon send another e-mail in this chain

23  or rather someone at sonnyizon@aol.com?

24  A.  Yes.

25  Q.  What's the next e-mail from sonnyizon@aol.com -- I'm sorry,

1   when is the next e-mail from sonnyizon@aol.com?

2   A.   June 25, 2012, 5:05:49 Eastern Time.

3   Q.   Who is that e-mail from?

4   A.   Dimitri Kesari.

5   Q.   What is the subject?

6   A.   Forward:  June invoice.

7   Q.   And what does the body say?

8   A.   "Hey Dimitri.

9          "Here it is.  Thanks for everything.

10         "Sonny."

11  Q.   Moving to the last e-mail at the top of the page, who is

12  that e-mail from?

13  A.   Dimitri Kesari?

14  Q.   When did he send it?

15  A.   Monday, June 25, 2012, 5:24 p.m.

16  Q.   Who did he send it to?

17  A.   To me, myself.

18  Q.   What's the subject?

19  A.   Forward:  June invoice.

20  Q.   And then there's an identification of an attachment,

21  correct?

22  A.   Correct.

23  Q.   We already looked at the attachment, and it's the invoice,

24  right?

25  A.   Correct.

1   Q.   What's the body of the e-mail say?

2   A.   This is the last one.

3   Q.   Thank you.

4           Showing you what's been marked for identification and

5   provided to the defense as Government's Exhibit 100, is this an

6   e-mail chain involving the Katie Koerber e-mail to yourself that

7   we just talked about and involving a further e-mail between

8   yourself and Mr. Tate?

9   A.   Can you make it clearer?

10  Q.   Yes.

11  A.   Yes.

12          MR. PILGER:   The government offers 100 into evidence.

13                          (Government Exhibit 100 was

14                          offered in evidence.)

15          MR. BINNALL:   Mr. Kesari objects to the e-mail from

16  Mr. Tate on the grounds of hearsay as to Mr. Kesari.

17          MR. HOWARD:   No objection from Mr. Benton, Your Honor.

18          THE COURT:   Overruled.   100 is received.

19                          (Government Exhibit 100 was

20                          received in evidence.)

21  BY MR. PILGER:

22  Q.   So the e-mail chain starts with Ms. Koerber's rendition of

23  an invoice to yourself, correct?

24  A.   Yes.

25  Q.   And the invoice number is noted in her communication to you;

1  is that correct?

2  A.  Correct.

3  Q.  And juxtaposing Government's Exhibit 100 for the invoice

4  number, putting that next to the attachment, Government's

5  Exhibit 98, an invoice from ICT, are the invoice numbers the

6  same?

7  A.  Yes.

8  Q.  So Ms. Koerber' e-mail came to you, correct?

9  A.  Correct.

10  Q.  What happened next?

11  A.  I forwarded it to John Tate.

12  Q.  When you forwarded it to John Tate, did you say anything to

13  John Tate in your forwarding e-mail?

14  A.  Yes.

15  Q.  When was that?

16  A.  June 25, 2012, 5:49 p.m.

17  Q.  And what did you say to John Tate?

18  A.  "According to Dimitri this is the last one (again).

19          "Approved?  8k."

20  Q.  Turning to the last e-mail in this chain, did Mr. Tate

21  respond to you?

22  A.  Yes.

23  Q.  When did he respond to you?

24  A.  Monday, June 25, 2012, 6:00 p.m.

25  Q.  What was the subject of his response to you?

1  A.  Regarding:  Wire - Interactive Communication Technology,

2  Inc.

3  Q.  And what did he say to you in the body of that e-mail?

4  A.  I will find out what it is.

5  Q.  Turning your attention to Government's 104 for

6  identification.  Is this an e-mail chain concerning that invoice

7  between yourself and Mr. Tate later that day, the 25th of June,

8  2012?

9  A.  Yes.

10          MR. PILGER:  The government offers 104 in evidence,

11  Your Honor.

12                              (Government Exhibit 104 was

13                               offered in evidence.)

14          MR. BINNALL:  Same objection.

15          MR. HOWARD:  Your Honor, we will have a hearsay

16  objection.

17          THE COURT:  Overruled.  104 is received.

18                              (Government Exhibit 104 was

19                               received in evidence.)

20  BY MR. PILGER:

21  Q.  Now, Mr. Cortes, do you know what happened with Mr. Tate

22  between the time he said, I'll find out what it is and the time

23  he said approved to you?

24  A.  No.

25  Q.  If that happened in an e-mail, you didn't get it, right?

1    A.  Correct.

2    Q.  I do want to clear one thing up for the record.  When you

3    were sworn, you gave your name and you spelled it for the court

4    reporter?

5    A.  Correct.

6    Q.  And you gave your full hyphenated -- your full hyphenated

7    surname at that time, right?

8    A.  That is my legal name, right.

9    Q.  And you spelled it with a Z, right?

10   A.  That is correct.

11   Q.  In the e-mail your name appears with an S, right?

12   A.  Correct.  That's the name I go by.

13   Q.  And that's what the campaign used when they used your name,

14   right?

15   A.  That is correct.

16   Q.  Now, during the campaign when you were receiving invoices,

17   when you and Ms. Koerber were receiving invoices from ICT, were

18   you aware that the campaign had any relationship with someone

19   named Kent Sorenson?

20   A.  I had heard the name through press releases.

21   Q.  And other than the press releases where you had heard the

22   name, were you aware that the campaign had any financial

23   relationship with Mr. Kent Sorenson?

24   A.  No.

25   Q.  Did the name Kent Sorenson appear on any of the invoices you

1   received from ICT?

2   A.   No.

3   Q.   Did the company name Grassroots Strategy appear on any of

4   the invoices you received from ICT?

5   A.   No.

6   Q.   Did all of the invoices you received from ICT reference

7   production services?

8   A.   I believe so, yes.

9   Q.   Would it help to refresh your recollection to show you the

10  invoices again?

11  A.   Yes, please.

12  Q.   Okay.  So I'm going to go through and show you the invoices.

13  Just look at them silently to yourself.  Do not read them aloud.

14  Okay?

15         Mr. Cortes, does reviewing those documents refresh

16  your recollection?

17  A.   Yes.

18  Q.   Does every single one of those invoices reference production

19  services?

20  A.   Yes.

21  Q.   Did the campaign's coding of the expense come from the

22  information on the ICT invoice or not?

23  A.   Yes.

24  Q.   Yesterday you talked about how you had a couple of roles

25  with the campaign, you had Hispanic outreach, you had the

1  financial recordkeeping.  You also said you had human resource

2  responsibilities.

3          Do you remember that?

4  A.  Yes.

5  Q.  I believe you testified part of your responsibility was

6  hiring?

7  A.  Yes.

8  Q.  And as part of hiring, you mentioned people had to sign

9  nondisclosure agreements?

10 A.  Correct.

11 Q.  So you would interact with people that the campaign hired,

12 correct?

13 A.  Correct.

14 Q.  Did you ever interact with Kent Sorenson as someone who was

15 hired by the campaign?

16 A.  No.

17 Q.  Did you ever arrange a nondisclosure agreement with Kent

18 Sorenson?

19 A.  No.

20 Q.  Now, I'm going to turn your attention forward in time.  The

21 documents we've been looking at, what year were they?

22 A.  2012.

23 Q.  I'm going to turn your attention forward to 2013, okay.  In

24 the summer of 2013, do you remember anything about media

25 articles concerning Kent Sorenson?

1   A.  Yes.

2   Q.  What do you remember?

3          MR. BINNALL:  Objection.  That calls for hearsay, Your

4   Honor, what's in media articles.

5          THE COURT:  Makes me nervous when you ask such an

6   open-ended question like that.  I'm going to sustain it.

7   BY MR. PILGER:

8   Q.  Mr. Cortes, did reading those articles cause you to do

9   something?

10          THE COURT:  Thank you.

11   A.  Yes.

12   BY MR. PILGER:

13   Q.  What were the articles saying?

14          MR. BINNALL:  Your Honor, this is -- what the media

15   has said is so unfairly prejudicial.

16          THE COURT:  Yep.  Sustained.

17   BY MR. PILGER:

18   Q.  Very narrowly, did the articles concern allegations about

19   Kent Sorenson being paid by the campaign?

20          MR. HOWARD:  Objection.

21          THE COURT:  Overruled.

22          Answer the question.

23   A.  Yes.

24   BY MR. PILGER:

25   Q.  Did that cause you to do something?

1    A.    Yes.

2    Q.    What did it cause you to do?

3    A.    I went back to the records, the e-mail records of my account

4    from the campaign.

5    Q.    I'm sorry; your what?

6    A.    I went back to the e-mail records of the campaign that were

7    mine.

8    Q.    Okay.  And let's make a clear record here on your access to

9    the e-mail.  You were no longer employed by the campaign at that

10   time, correct?

11   A.    That is correct.

12   Q.    But you did have access to the e-mails; is that right?

13   A.    That is correct.

14   Q.    And you went back to the e-mail and you did what?

15   A.    I looked at -- I compared the allegations in the news

16   articles or Web posts and compared it to irregularities from --

17   some invoice irregularities that I found.

18   Q.    And did you do something after you had reviewed the e-mail?

19   A.    Yes.

20   Q.    What did you do?

21   A.    I compiled these irregularities and I sent them to three

22   individuals.

23   Q.    You sent them to three individuals; is that what you said?

24   A.    Correct.

25              MR. PILGER:  And a new exhibit, Ms. Archer.

1   BY MR. PILGER:

2   Q.  Showing you what's been marked for identification as

3   Government's Exhibit 61, is this a redacted version of the

4   e-mail you sent to the three individuals?

5   A.  Yes.

6   Q.  Did you attach multiple documents to the e-mail?

7   A.  Yes.

8   Q.  Are they listed on the first page of this e-mail?

9   A.  Yes.

10  Q.  And is some information blacked out; that is, redacted,

11  taken out of the e-mail for present purposes?

12  A.  Yes.

13  Q.  Do two of the attachments concern ICT?

14  A.  Yes.

15  Q.  When did you send this e-mail?

16  A.  Saturday, August 17, 2013, 11:57 a.m.

17  Q.  Who did you send it to?

18  A.  Jesse Benton, Lori Pyeatt, Deana Watts.

19          MR. PILGER:  The government offers 61 in evidence,

20  Your Honor.

21                          (Government Exhibit 61 was

22                           offered in evidence.)

23          MR. HOWARD:  Your Honor, there will be an objection,

24  first, to the redactions.  Second, it is not a business record.

25  Third, the attachments are all clearly hearsay.  They're e-mails

1   back and forth.  There's no exception.

2              MR. BINNALL:  On top of that, Your Honor, this has no

3   relevance as to Mr. Kesari.  It's hearsay as to Mr. Kesari.

4              THE COURT:  What is the exhibit number again?

5              MR. PILGER:  61, Your Honor.  And if it makes it

6   easier, we can offer an unredacted version.

7              And, Your Honor, this goes to defendant Benton's state

8   of mind at the time of the charged offense.

9              THE COURT:  The objection is overruled.  61 is

10  received.

11             MR. PILGER:  Your Honor, is that received redacted or

12  unredacted?

13             THE COURT:  He wants it unredacted.  It's against

14  defendant Benton only and it's not being offered against

15  defendant Kesari, and if he wants the unredacted one, that's

16  what he will get.  That is received.

17                                  (Government Exhibit 61 was

18                                   received in evidence.)

19             MR. BINNALL:  So we will get an instruction to the

20  jury they are not to consider it as to Mr. Kesari.

21             THE COURT:  I just did.  This is being offered against

22  Mr. Benton.

23             MR. BINNALL:  Thank you.

24  BY MR. PILGER:

25  Q.  So showing you, Mr. Cortes, what's now in evidence as

1  Government's Exhibit 61.  This is an unredacted version of the

2  same document we were just talking about, correct?

3  A.  Yes.

4  Q.  Let's just walk through this e-mail a little bit.  You sent

5  this to Jesse Benton at a Gmail account, correct?

6  A.  Correct.

7  Q.  And you sent this to Lori Pyeatt.  Please remind the jury

8  who Lori Pyeatt is.

9  A.  Lori Pyeatt is the treasurer of the campaign.

10  Q.  The treasurer of --

11  A.  The Ron Paul 2012 Campaign.

12  Q.  It may be just me, but I'm having trouble hearing you.

13  Please keep your voice up.

14          And you sent it to Deana Watts.  Who is Deana Watts

15  again?

16  A.  Deana Watts was the controller of the campaign for Ron Paul

17  2012.

18  Q.  When did you send this?

19  A.  Saturday, August 17, 2013, 11:57 a.m.

20  Q.  So you spent your Saturday on this, right?

21  A.  Correct.

22  Q.  And there's a number of attachments to this e-mail, right?

23  A.  That is correct.

24  Q.  And two of the attachments listed in the middle of the

25  attachment block concern ICT, right?

1   A.   Correct.

2   Q.   Just read off for the jury the names of those attachments.

3   A.   Ron Paul 2012 mail-wire-Interactive Communication

4   Technology, Inc. 2PDF.  Ron Paul 2012 mail-wire-Interactive

5   Communication Technology, Inc. PDF.

6   Q.   There's a number of other attachments concerning other

7   companies or other things; is that right?

8   A.   Correct.

9   Q.   Going to the body of the e-mail, how did you address the

10  group?

11  A.   Jesse, Lori and Deana.

12  Q.   Why did you list Jesse first?

13  A.   It was just same order as I sent the e-mails.

14  Q.   Okay.  What was Mr. -- is "Jesse" Jesse Benton, in your

15  mind?

16  A.   Yes.

17  Q.   And what was Mr. Benton's role in the campaign?

18  A.   He was the chair of the committee.

19  Q.   And so when you sent this e-mail to Jesse Benton, Lori

20  Pyeatt and Deana Watts, tell the jury what you said.

21  A.   "Given recent articles, attached are conversations/e-mail

22  chains you were left out of during the campaign (even though

23  Dimitri in some of them made it seem like you were - others were

24  big expenses without Jesse in the chain) and were inconsistent

25  to me."

1  Q.  Continue.

2  A.  "Dennis is not a good guy (he is hurting Ron, Jesse, and any

3  progress for the future of Liberty candidates) but neither is

4  Dimitri.  IMO" -- in my opinion -- "but then again I don't know

5  it all so I leave it to you.

6           "New cell for me is 571" --

7  Q.  Stop.  You don't have to put your cell phone in the record.

8  A.  New cell for me, phone number, if you have questions.

9           "The last attachment is an e-mail (sorry for the

10  lewdness) I got about a month ago - not sure who it's from - my

11  two guesses - Dennis or Dimitri using dummy accounts.

12           "Fernando."

13  Q.  Now, attached to that e-mail are 34 pages of the attachments

14  listed in the attachment block.

15           Do you remember that?

16  A.  It was lengthy.

17  Q.  It was what?

18  A.  It was lengthy, yes.

19  Q.  I would like you to review the document itself.

20           I'm not sure if you were counting those pages, but are

21  there approximately 30 pages attached?

22  A.  Yes.

23  Q.  In the attachments which were noted in the attachment block

24  of page 1, you included e-mail chains concerning ICT; is that

25  correct?

1  A.  Correct.

2  Q.  And you just reviewed them.  Are those lengthy chains that

3  duplicate a number of items over a number of pages?

4  A.  Yes.

5  Q.  All right.  I'm just going to ask you about a few of those.

6          Turning your attention to an e-mail chain in April of

7  2012, is there a chain at the top that has a March 21, 2012

8  e-mail from sonnyizon@aol.com to Dimitri Kesari?

9  A.  Yes.

10  Q.  What's the subject?

11  A.  February invoice.

12  Q.  What's the body say?

13  A.  "Hi Dimitri.

14          "Attached is the invoice for services rendered in

15  February.  Let me know if you need anything else.

16          "Best.

17          "Sonny."

18  Q.  Moving to the top of the page, is there an e-mail on

19  April 3, 2012?

20  A.  Yes.

21          MR. HOWARD:  Your Honor, objection.  These have all

22  been asked and answered.

23          THE COURT:  Overruled.

24  BY MR. PILGER:

25  Q.  And, again, this is -- these e-mails that we're talking

1  about right now are e-mails you collected and forwarded to

2  Mr. Benton in 2013, correct?

3  A.  Correct.

4  Q.  And in 2013 you forwarded him an e-mail chain from back in

5  2012 on April 3rd, right?

6  A.  Correct.

7  Q.  Who was that e-mail from?

8  A.  Dimitri Kesari.

9  Q.  Who was it to?

10  A.  Myself.

11  Q.  And what did it say?

12  A.  "Approved by Jesse."

13  Q.  Who is Jesse?

14  A.  Jesse Benton.

15  Q.  Showing you another page of the same exhibit, is there an

16  e-mail from March 21, 2012 from sonnyizon@aol.com to Dimitri

17  Kesari?

18  A.  Yes.

19  Q.  Does it concern the February invoice?

20  A.  Yes.

21  Q.  And turning to the next e-mail, is there a message from

22  Dimitri Kesari to Fernando Cortes?

23  A.  Yes.

24  Q.  What does it say?

25  A.  "Approved by Jesse."

1   Q.   Who is Jesse?

2   A.   Jesse Benton.

3   Q.   So we have two pages of this exhibit from 2013 so far that

4   reference approved by Jesse, correct?

5   A.   Correct.

6   Q.   The next e-mail I want to show you carries over from one

7   page to another.  So turning your attention to February 8, 2012,

8   did Dimitri Kesari send you an e-mail?

9   A.   Yes.

10  Q.   On February 8, 2012, what did Dimitri Kesari e-mail to you?

11  What was the message?

12  A.   "Please wire tomorrow morning.

13          "This is approved by Jesse."

14  Q.   Looking at a different part of the e-mail chain, did this

15  concern ICT invoicing?

16  A.   Yes.

17  Q.   Mr. Cortes, we did not go through every single e-mail and

18  all of the e-mails that we talked about before that may be

19  included in this chain, did we?

20  A.   No.

21  Q.   And there are other e-mails concerning other matters that we

22  have not talked about, correct?

23  A.   Correct.

24          MR. PILGER:  Pardon me, Your Honor.

25          (Pause.)

1   BY MR. PILGER:

2   Q.  Mr. Cortes, showing you what's been marked for

3   identification as Government's Exhibit 62, is this the e-mail

4   that you sent to Jesse Benton, Lori Pyeatt, and Deana Watts,

5   plus a response from somebody?

6   A.  Yes.

7              MR. PILGER:  Government offers 62 into evidence.

8                              (Government Exhibit 62 was

9                              offered in evidence.)

10             MR. BINNALL:  We have the same objection that this is

11  unfair and prejudicial as to Mr. Kesari.

12             MR. HOWARD:  And, Your Honor, I don't believe that --

13  it references an awful lot of things, and it's just hearsay.

14             THE COURT:  Thank you.

15             The objection is overruled.  61 and 62 are being

16  offered only against defendant Benton.

17                              (Government Exhibit 62 was

18                              received in evidence.)

19  BY MR. PILGER:

20  Q.  The person who sent you this e-mail was Jesse Benton,

21  correct?

22  A.  Correct.

23  Q.  And in response to the e-mail that we were just talking

24  about with the 30-some pages of attachments, what did Jesse

25  Benton say to you?

1   A.   "Thanks, Fernando."

2   Q.   When did he say that to you?

3   A.   Saturday, August 17, 2013, 1:28 p.m.

4   Q.   2013, not 2012, correct?

5   A.   Correct.

6   Q.   He didn't say anything else to you in that e-mail, correct?

7   A.   That is correct.

8   Q.   Did he have any other communication with you about it?

9   A.   About this e-mail?

10  Q.   About the e-mail you had sent him?

11  A.   No.

12  Q.   Did he ever tell you, I don't know what this is about?

13  A.   No.

14  Q.   Did he ever ask you more information?

15  A.   No.

16  Q.   Did he ever say, I didn't approve of these things?

17  A.   No.

18          MR. PILGER:  No further questions, Your Honor.

19          THE COURT:  Mr. Howard or Ms. Sinfelt?

20          MR. HOWARD:  I'm sorry?

21          MS. SINFELT:  Mr. Howard.

22          THE COURT:  Mr. Howard.

23          MR. HOWARD:  Oh, yes, I'm sorry.  I apologize, Your

24  Honor.

25

1                        CROSS-EXAMINATION

2   BY MR. HOWARD:

3   Q.  Good morning, Mr. Cortes.  How are you?

4   A.  Good morning.

5   Q.  These are a little out of order, so I'm going to apologize

6   to you.

7           Do you have the last document that Mr. Pilger showed

8   you?

9   A.  I do not.

10  Q.  Government's Exhibit 62?

11  A.  I do not have it in front of me.

12  Q.  I'm sorry.  Let me --

13          Did you leave the exhibits with him?

14          Do you have the exhibits in front of you?  No.  Let me

15  put it on the screen.  I'm sorry.  I'm a little old.  I'm used

16  to handing people documents, so I apologize.

17          Okay.  Does that look familiar?  You just looked at

18  that?

19  A.  That is correct.

20  Q.  And the date on this is, what, sir?  Sorry, August 17, 2013?

21  A.  Yes.

22  Q.  And Mr. Pilger read (sic) you a series of questions.  Did

23  Mr. Benton ever actually say that he read this?

24  A.  No.

25  Q.  He said thanks for sending it?

1   A.   He said, "Thanks, Fernando."

2   Q.   Okay.  And do you know where Mr. Benton was at the time?

3   A.   No.

4   Q.   When you knew him, he was a pretty busy guy, wasn't he?

5   A.   During the campaign he was very busy.

6   Q.   Do you remember that at this time in 2013 he was running the

7   senate campaign for Mitch McConnell in Kentucky?

8   A.   I was aware he had been hired.

9   Q.   And you've been on a bunch of campaigns, haven't you?

10  A.   I've been on two, yes.

11  Q.   You've been on two.  And the person who brought you into

12  those two is in this courtroom; isn't that correct?

13  A.   No.

14  Q.   Dimitri Kesari wasn't instrumental in getting you on the

15  campaign?

16  A.   On the second one, yes.

17  Q.   On the second one.  So just on the second one he brought you

18  in?

19  A.   He was the first contact.

20  Q.   And you're friendly with him; isn't that right?

21  A.   With who?

22  Q.   With Mr. Kesari.

23  A.   No.

24  Q.   Are you friendly with Mr. Benton?

25  A.   Yes.

1   Q.   You know his wife, Valerie?

2   A.   Yes.

3   Q.   You know she's here in the gallery, you recognize her; is

4   that correct?

5   A.   Yes.

6   Q.   And you also are familiar with other members of the family?

7   It's kind of a family organization these campaigns with

8   Dr. Paul; isn't that correct?

9   A.   I'm sorry, which question?

10  Q.   And I apologize.  Isn't it correct that Dr. Paul's campaigns

11  are kind of a family organization; isn't that correct?

12  A.   Yes.

13  Q.   Lori Pyeatt is who?

14  A.   Dr. Paul's daughter.

15  Q.   And Mr. Benton's mother-in-law; is that correct?

16  A.   Correct.

17  Q.   And you know the employees.  Do you know the employee Kent

18  Fite?

19  A.   No.

20  Q.   You don't.  Married to Lori's cousin, do you know that?  I'm

21  sorry; married to Valerie's cousin; did you know that?

22  A.   No.

23  Q.   Okay.  But did you know there was another Kent on the

24  campaign?

25  A.   No.

1   Q.  You didn't know that?

2            MR. PILGER:  Objection.

3            THE COURT:  What's the objection?

4            MR. PILGER:  Asked and answered.

5            THE COURT:  Overruled.

6   BY MR. HOWARD:

7   Q.  Mr. Pilger showed you -- and I'm going to go back over them,

8   but Mr. Pilger showed you a series of invoices that said

9   "approved by Jesse."  You saw that; isn't that right?

10           Do you remember those?

11  A.  Yes.

12  Q.  Okay.  And the end of the e-mail chain would say, "Approved

13  by Jesse," and that came from Dimitri Kesari.

14           Do you remember that?

15  A.  Yes.

16  Q.  And Mr. Pilger asked you a series of questions that said it

17  looks like essentially Mr. Benton approved these invoices.  Do

18  you remember that series of questions from Mr. Pilger?

19  A.  Yes.

20  Q.  But you sent him, you sent Mr. Benton -- I'm going to show

21  you Government's Exhibit 61, and I apologize for my first lapse

22  there.  This is Government's Exhibit 61.

23           This is Government's Exhibit 61.  Do you recognize

24  that?

25           MS. SINFELT:  Have to change it.

```
 1                THE COURT:  Did somebody freeze the --
 2                MR. PILGER:  If I may, Your Honor.
 3                MR. HOWARD:  Thank you, Mr. Pilger.
 4           Okay.  I have no idea what just went on.
 5                THE COURT:  My middle schoolers get out at 2:45.
 6  They'll come over and help you.
 7                (Laughter.)
 8  BY MR. HOWARD:
 9  Q.  Do you remember that exhibit?
10  A.  Um --
11  Q.  It's there, sir, in front of you.  I'm sorry.
12  A.  Can you make it smaller, please?
13  Q.  Oh, sure.  Yeah, right.
14                (Laughter.)
15  A.  Yes, I remember this.
16  Q.  Can you see it now?
17  A.  Yes.
18  Q.  You sent that to Mr. Benton because you didn't think he had
19  seen any of those other invoices; isn't that correct?
20  A.  That is correct.
21  Q.  And when someone suggests that he did see it, that would be
22  wrong; isn't that correct?
23  A.  I would think that that would be inaccurate.
24  Q.  Thank you.
25                And let me just ask you another question.  Let's talk
```

1  about the campaign itself, you know, what's involved.

2        Now, all of this is going on.  Dr. Paul is running for

3  arguably the most powerful position in the world.  He wants to

4  be President of the United States; isn't that correct?

5  A.  Dr. Paul was running for President.

6  Q.  And there are, what, about 145, 150 staffers and volunteers;

7  is that correct?

8  A.  In the campaign, correct.

9  Q.  And some of the campaign workers are actually getting paid;

10 isn't that correct?

11 A.  That is correct.

12 Q.  And as far as you know, there's nothing wrong with paying

13 someone who is actually working for Dr. Paul; is that correct?

14 A.  If they're employees of the campaign.

15 Q.  If they're employees, they get money?

16 A.  Yes.

17 Q.  And isn't it correct that this campaign of Dr. Paul's in

18 2011 and 2012 is spread all over the country; isn't that

19 correct?

20 A.  That is correct.

21 Q.  And you, yourself, you're in Alexandria, Virginia; isn't

22 that right?

23 A.  For most of the campaign, yes.

24 Q.  And you're there with Mr. Tate; isn't that correct?

25 A.  He was there most of the time as well.

1  Q.  And would it be fair to say that most of the time you have

2  no idea where Mr. Benton is; wouldn't that be fair?

3  A.  I would not know exactly where he was.

4  Q.  He traveled with the candidate; isn't that right?

5  A.  Sometimes he would.  I would not know when.

6  Q.  Is it your information that Mr. Benton was at the top of the

7  campaign staffers?  He was the -- he and Mr. Tate were the chair

8  of the campaign; was that your understanding?

9  A.  Jesse was the chairman, yes.

10  Q.  And it was your understanding that Mr. Benton actually

11  traveled with his grandfather-in-law, isn't that correct?

12  A.  Sometimes, yes.

13  Q.  And it was your understanding that Dr. Paul didn't even like

14  e-mail; isn't that right?

15  A.  He did not interact with e-mail.

16  Q.  Dr. Paul was somebody you wouldn't have been in touch with;

17  isn't that right?

18  A.  Not in the normal course.

19  Q.  And you were in touch with people about invoices because

20  you're the assistant controller; is that right?

21  A.  That is correct.

22  Q.  And you were in touch with people across this country, you

23  had operations -- and correct me if I'm wrong in anything I set

24  out; but you were in South Carolina right after everything going

25  on in Iowa; isn't that correct?

1  A.  I was never in South Carolina.

2  Q.  No, no, and I apologize.  Let me back up.  Poorly asked

3  question.

4         The campaign had workers in South Carolina; isn't that

5  right?

6  A.  At some point, yes.

7  Q.  And the campaign had workers here in the State of Iowa;

8  isn't that correct?

9  A.  That is correct.

10  Q.  And the campaign had workers in New Hampshire; isn't that

11  correct?

12  A.  Yes, sir.

13  Q.  And the campaign had workers in Minnesota; isn't that

14  correct?

15  A.  Yes.

16  Q.  And the campaign had workers in Nevada; isn't that correct?

17  A.  Yes.

18  Q.  And the campaign was following any state that was about to

19  vote on members of the convention?

20  A.  Yes.

21  Q.  The Republican Convention; isn't that correct?

22  A.  Yes.

23  Q.  It was a busy time; isn't that right?

24  A.  Correct.

25  Q.  And it was your sense that you weren't going to bother the

1   person walking next to the candidate on a regular basis with

2   what you thought was minor issues like these invoices; isn't

3   that correct?

4   A.   If the invoices were small amounts, correct.

5   Q.   You went to Mr. Tate; isn't that right?

6   A.   Yes.

7   Q.   And Mr. Tate sat in Alexandria with you?

8   A.   Sometimes, yes.

9   Q.   Now, during this period of the ICT invoices, you weren't

10  talking to Mr. Benton, were you?

11  A.   Not on a regular basis.

12  Q.   And so when you are asked by -- or when you are told by

13  Dimitri Kesari that an invoice has been approved by Mr. Benton,

14  you never called Mr. Benton, did you?

15  A.   I did not.

16  Q.   You did not e-mail Mr. Benton, did you?

17  A.   I did not.

18  Q.   And when you went to Mr. Tate, you went to Mr. Tate, not to

19  see if Jesse approved, but to get the check moving forward, just

20  to make sure the check could get approved; isn't that right?

21  A.   I would send it to John Tate for approval.

22  Q.   And John Tate was the one that you looked to for approval,

23  not to Mr. Benton; isn't that correct?

24  A.   Correct.

25  Q.   Now, after you got the approval, you found a code; is that

1   right?

2   A.   There was a code assigned to the invoices before they were

3   approved.

4   Q.   And these are the Federal Election codes; is that right?

5   A.   The codes were internal based off FEC expense categories.

6   Q.   And you're the person who came up with that; is that right?

7   A.   I am not.

8   Q.   You were not?

9   A.   I am not.

10  Q.   Who is the person who came up with the code?

11  A.   I was given them by Deana Watts.

12  Q.   So you're saying Deana Watts came up with the code?

13  A.   Came up with the chart of accounts, the codes that I would

14  use to assign invoices.

15  Q.   All right.  Did you pick one?  Were you the person who

16  picked one, picked the code to go on these invoices?

17  A.   Yes.

18  Q.   And did you have any training picking these codes?  Did

19  anybody tell you how to do it?

20  A.   No.  I was the one in charge of doing them.

21  Q.   You were essentially picking from a chart, but you had no

22  formal training?

23  A.   The training I was given was to assign invoices with codes

24  that matched the expense by Deana Watts.

25  Q.   Did anybody else in the campaign do this?

1   A.   Do what?

2   Q.   Help you pick the codes.

3   A.   My assistant sometimes would and employees or contractors

4   that sent invoices would also let me know what type of expense

5   it was so I could appropriately include a code with it.

6   Q.   Would you agree with me if I said it was difficult to do?

7   A.   Not that difficult.

8   Q.   Okay.  Did you ever train anyone else in the campaign to

9   help you with this?

10  A.   Yes; my assistants.

11  Q.   Your assistants.  Did you ever ask Mr. Benton?

12  A.   No.

13  Q.   Did you ever ask Mr. Kesari?

14  A.   About training?

15  Q.   Yes.

16  A.   No.

17  Q.   Did he know how to do it?  Did you ever ask Mr. Tate?

18  A.   About getting trained?

19  Q.   No; about him getting trained.  I apologize.  Maybe my

20  question wasn't clear.

21  A.   All employees were instructed to refer back to the chart of

22  accounts that we gave them regarding invoices and expense

23  reimbursements which they used on a regular basis.

24  Q.   Do you know if they actually were taught how to work the CFR

25  that shows where these codes come from?

1  A.  CFR?

2  Q.  I'm sorry; the Code of Federal Regulations.

3  A.  I don't believe so.  It was all internal.  It was all

4  internal instructions given for me.

5  Q.  You talked about not knowing what Grassroots Strategy is and

6  not knowing what the -- who Kent Sorenson was; is that correct?

7  A.  What's your question?

8  Q.  You had answered one of Mr. Pilger's questions by saying you

9  did not know who Grassroots Strategy was?

10  A.  That is correct.

11  Q.  Do you know --

12  A.  He asked me if they were included in these invoices.

13  Q.  Okay.  Let me ask you a question.  Do you know who

14  Grassroots Strategy is?

15  A.  I don't know who Grassroots Strategy is.

16  Q.  Do you know who Kent Sorenson is?

17  A.  I do now.

18  Q.  And did you know at the time in 2011, 2012 time frame?

19  A.  I only knew that he was a State Senator in Iowa based on

20  press releases that the campaign released.

21  Q.  Thank you.

22         And did you know that Kent Sorenson had actually sent

23  an invoice in January of 2012 to the Ron Paul Campaign?

24  A.  I do not recall this.

25  Q.  You don't?

1  A.  I do not recall this.

2  Q.  And you don't recall it because, what, it was a little while

3  ago?

4  A.  That may be the case.

5  Q.  I'm just asking.  I'm not accusing you of anything.

6  A.  I don't recall it.

7  Q.  You don't recall.  You went through an awful lot of

8  invoices, didn't you, sir?

9  A.  Yes.

10  Q.  And it's hard after you've gone through a bunch of invoices

11  to recall any particular invoice, certainly not the situation

12  like this; isn't that correct, sir?

13  A.  I -- it is difficult to recall every invoice.

14  Q.  Yeah, it's hard.  And one of the things that the government

15  showed you, if you will, is -- I'm going to take off the first

16  page.

17          Do you remember seeing Government's Exhibit 59?

18          MR. HOWARD:  This is in evidence.  Why don't you show

19  the middle of the page.

20  A.  Yes, I remember.

21  BY MR. HOWARD:

22  Q.  You remember this?  And I'm going to remove this page, and I

23  want to show you one thing on here.  These are a list of payees

24  and, I'm going to ask you a question I believe I know the answer

25  to, and I apologize, I marked on this; but I'm going to ask you

1  a question, do you know these people?

2  A.  I had to interact with most of them, if not all of them.

3  Q.  Okay.  Tell the members of the jury who James Forsythe is?

4  A.  To the best of my knowledge, Mr. Forsythe was a

5  contractor/employee that worked in New Hampshire for us.

6  Q.  Okay.  And James Forsythe was paid by the campaign; isn't

7  that correct?

8  A.  It is, sir.

9  Q.  And you wrote checks to him; isn't that correct?

10  A.  The campaign did, yes.

11  Q.  And would it help you if I told you that James Forsythe is a

12  State Senator from New Hampshire; isn't that correct?

13  A.  I recall something like that, yes.

14  Q.  And you were paying him; isn't that correct?

15  A.  The campaign was.

16  Q.  Okay.  Thank you.

17       When you were asked about the reporting requirements

18  for the Federal Election Commission and you mentioned that they

19  paid -- that you had to make reports on a quarterly basis, do

20  you remember that?

21  A.  I recall being asked that, yes.

22  Q.  And do you remember the quarter ending in 2011 at the end of

23  that calendar year?

24  A.  Yes.

25  Q.  And do you remember at the end of the -- would you just tell

1  the members of the jury, at the end of a calendar year in a

2  campaign, busy time?

3  A.  Not necessarily, but for our case it certainly was.

4  Q.  And it was busy because you all -- you had just started up

5  that year; is that correct?

6  A.  I would say it was more it was busy because the primaries

7  were about to start.

8  Q.  And you were dealing with an awful lot of invoices; is that

9  correct?

10  A.  As usual, yes.

11  Q.  I notice that with these invoices that Mr. Pilger has shown

12  you that you pay -- you send a wire with an invoice; is that

13  correct?

14  A.  When it's requested.

15  Q.  When you actually have an invoice, you send a wire; is that

16  the way it works?

17  A.  Not always.  Sometimes we cut checks.

18  Q.  Okay.  Sometimes you cut checks.  Would you send a wire

19  without an invoice while you were controller?

20  A.  I personally did not send wires, but --

21  Q.  I'm sorry.  Would you approve a wire to be sent?

22  A.  I would ask for approval for a wire to be sent.

23  Q.  Would you need an invoice to do it?

24  A.  Yes.

25  Q.  Would you do it without an invoice?

1  A.  Oftentimes if the invoice -- not oftentimes, I apologize,

2  but certain times if an invoice had to get out within, you know,

3  five minutes and time was running short, a wire would be sent on

4  the approval of either Jesse, John or Dimitri, full well knowing

5  that we needed an invoice that same day.

6         MR. HOWARD:  Okay.  Could I have one moment, Your

7  Honor?

8         (Pause.)

9         MR. HOWARD:  Give me one minute, Mr. Cortes.

10        (Pause.)

11 BY MR. HOWARD:

12 Q.  Mr. Cortez-Lira, I apologize, and congratulations.  When did

13 you get married, sir?

14 A.  I'm sorry?

15 Q.  You got married; is that correct?

16 A.  That is incorrect.

17 Q.  Okay.  My apologies.

18 A.  It's not that I'm aware of.

19 Q.  Mr. Cortez-Lira, do you ever remember Mr. Benton asking for

20 a wire?

21 A.  I'm not sure.  Sometimes there may have been a time when he

22 asked for a wire to be sent.

23 Q.  Do you ever remember him asking for a wire to be sent

24 without an invoice?

25 A.  There may have been a time, but I don't specifically recall

1   one.

2   Q.  His normal course was to ask for a wire with an invoice; is

3   that correct?

4   A.  That is correct.

5   Q.  And that seemed to be his normal practice; is that correct?

6   A.  Yes.

7          MR. HOWARD:  Your Honor, at this point we have no

8   other questions.

9          THE COURT:  Mr. Binnall.

10         MR. BINNALL:  Yes, Your Honor.

11                        CROSS-EXAMINATION

12  BY MR. BINNALL:

13  Q.  Good morning, Mr. Cortes.

14         You were on the finance side of the campaign, correct?

15  A.  Among one of my fields, yes.

16  Q.  And you've heard that referred to as the compliance side at

17  the time as well, correct?

18  A.  To some degree, yes.

19  Q.  And part of your role was to make sure that the Federal

20  Election Commission was notified of expenditures, right?

21  A.  That is not entirely correct.  I was in charge of making

22  sure that invoices had the correct information to send to the

23  controller and treasurer for them to report to the FEC.

24  Q.  And you knew that the way that -- the information that you

25  would give to the controller and treasurer would end up on

1  Federal Election Reports, correct?

2  A.  Fair.

3  Q.  And it was actually your job to compile the information and

4  pass it on to Ms. Watts in the Texas office, right?

5  A.  Correct.

6  Q.  And there was the Texas office and then there was the

7  Virginia office, right?

8  A.  Correct.

9  Q.  And Mr. Tate was with you in the Virginia office, right?

10  A.  Some of the time, yes.

11  Q.  Some of the time.  And Ms. Pyeatt and Ms. Watts, they were

12  both in Texas, right?

13  A.  That is right.

14  Q.  And so as expenses came in, you would code them and pass

15  them on to Ms. Watts, correct?

16  A.  If the employees had not coded them already, we would assign

17  the code and pass along to Ms. Watts and Ms. Pyeatt.

18  Q.  And by coding them, that's that numerical value we saw in

19  some of those e-mails, right?

20  A.  If you're referring to the codes, yes.

21  Q.  And Ms. Watts is the one who actually provided you with

22  those numbers?

23  A.  Correct.

24  Q.  I'm going to show you what's already in evidence as Exhibit

25  77.

```
 1              Do you see that e-mail?
 2   A.  Can you make it smaller, sir?
 3   Q.  Sure.
 4   A.  Smaller.
 5   Q.  Oh, smaller; I'm sorry.
 6   A.  Thank you.
 7   Q.  All right.  Do you see it there?
 8   A.  Exhibit 77, yes, sir.
 9   Q.  All right.  And this is an e-mail from February the 8th,
10   2012.  You were passing on an invoice to Ms. Pyeatt and
11   Ms. Watts in the Texas office; is that right?
12   A.  Yes.
13   Q.  And the code there is 60110; is that correct?
14   A.  That's correct.
15   Q.  And you're forwarding on an e-mail from Mr. Kesari, right?
16   A.  That is correct.
17   Q.  And Mr. Kesari doesn't suggest a code there, does he?
18   A.  Not in this e-mail, no.
19   Q.  And he doesn't tell you in this e-mail what the purpose of
20   this expense is for, correct?
21   A.  Not in this e-mail.
22   Q.  And previous to this e-mail on February the 8th, he had
23   never told you in any e-mail what this expense is for, correct?
24   A.  Yes, he did.
25   Q.  He told you in an e-mail?
```

1  A.  Yes.

2  Q.  Okay.  We'll come back to that.  Prior to February 8th?

3  A.  That is correct.

4  Q.  And in this e-mail, you're the one who put 60110, not

5  Mr. Kesari; isn't that right?

6  A.  That is correct.

7  Q.  Now, Mr. Kesari didn't work under you in that campaign, did

8  he?

9  A.  No, he didn't.

10 Q.  And he didn't work under Ms. Watts; he didn't work under

11 Ms. Pyeatt?

12 A.  That was not the direct line under the financial portion.

13 Q.  He was not in compliance in the campaign, correct?

14 A.  Not directly.  He would have been involved with the

15 financial reporting.

16 Q.  He was under the political side of the campaign; isn't that

17 correct?

18 A.  Yes.  But when it came to expenses, everybody had a

19 responsibility to make sure that any invoices or expenses turned

20 in had a proper code and explanation as to what those expenses

21 were.

22 Q.  We'll get to that.

23         For that January -- for the invoice on February 8,

24 2012 -- let me put that right back up here --

25         MR. PILGER:  May I inquire of the exhibit number?

1          MR. BINNALL:  We're back at Exhibit 77 again.

2          With the court's indulgence for one minute?

3          (Pause.)

4          THE COURT:  Probably a good time for a morning recess.

5    We'll come back at 10:45.  See you then.

6          (Recess at 10:26 a.m., until 10:44 a.m.)

7          THE COURT:  Please be seated.

8          Mr. Binnall, you may continue.

9    BY MR. BINNALL:

10   Q.  All right.  Mr. Cortes, on here is Exhibit 77.

11         Do you see that?

12   A.  Yes, yes.

13   Q.  All right.  Now, Mr. Cortes, you never talked with anyone

14   about this invoice or raised any questions about this invoice,

15   did you?

16   A.  This invoice had been previously authorized before this

17   e-mail.

18   Q.  And my specific question was, you never talked with anyone

19   about this invoice or raised any questions about it, did you?

20   A.  I did not raise any questions, correct.

21   Q.  And you didn't even talk to anyone about it, did you?

22   A.  It had been approved.  This invoice had been approved

23   before.

24   Q.  So you did talk to someone about it?

25   A.  There had been a series of communications that approved this

1  invoice.

2  Q.  Mr. Cortes, do you remember testifying in front of the grand

3  jury?

4  A.  I do.

5  Q.  You were under oath then, right?

6  A.  That is correct.

7  Q.  And there was a transcription made, wasn't there?

8  A.  Yes.

9      MR. PILGER:  Objection, Your Honor.  If he wants to

10  impeach him, I need to know what he's impeaching him on.

11      MR. BINNALL:  Page 64 of his grand jury testimony.

12      THE COURT:  The objection is overruled.  You have a

13  right to know page and line and that's it.

14  BY MR. BINNALL:

15  Q.  Mr. Cortes, on the screen do you see page 64 of your

16  testimony?

17  A.  Yes.

18  Q.  And that was on July 22nd of 2014, correct?

19  A.  I'm sorry?

20  Q.  It was about July the 22nd, 2014, correct?

21  A.  Correct.

22  Q.  And in this part you are talking about this specific bill,

23  the bill for $38,000 and change, correct?

24  A.  I would need to see more of that.

25  Q.  I tell you what, I'll let you refresh your recollection a

1  little more here real quick.

2          This is page 63.  Why don't you go ahead and read

3  this.  I will zoom out.  Let me know if this refreshes your

4  recollection.

5  A.  It does.

6  Q.  Is does refresh your recollection?

7  A.  Yes.

8  Q.  So you were talking about this invoice; is that correct?

9  A.  That is correct.

10 Q.  And when you were under oath and you testified to the grand

11 jury, you told the grand jury when you were asked, Have you ever

12 talked with anybody about this or raised any questions about

13 this, you answered, Not about this invoice.  General case on

14 invoices like this were that Jesse, John, Dimitri and several

15 other of the employees would make political decisions, and I was

16 not involved in those.  So the only time I know about expenses

17 is when they send invoices.

18          Correct?

19 A.  That is what it says, yes.

20 Q.  Thank you.

21          Do you know that part of that invoice that was on

22 February 8th that we talked about was for the rental of audio

23 video equipment?

24 A.  I do not specifically know.

25 Q.  Do you know if part of the invoice was specifically to pay

1  for rentals of audio video equipment?

2  A.  I don't recall.  I would need to see the invoice to refresh

3  my recollection.

4  Q.  You didn't raise -- now, I'm sorry, there was a second

5  invoice in -- well, there's a number of invoices that you talked

6  to the government about, right?

7  A.  Yes.

8  Q.  All right.  Now, the second invoice, you think you might

9  have asked Mr. Kesari about the invoice; isn't that right?

10  A.  Which invoice are you referring to?

11  Q.  I'm talking about the March invoice, the one after the

12  $38,000 one, the first eight thousand dollar and change invoice,

13  the 8850 I believe.

14  A.  The invoice came from Dimitri Kesari.

15  Q.  And you think you might have asked Mr. Kesari about that

16  invoice, correct?

17  A.  I think I may have, yes.

18  Q.  And you don't remember what he said the invoice was for, do

19  you?

20  A.  Not specifically, no.  The invoice already had production

21  services on it.

22  Q.  I understand, but you don't -- you remember asking

23  Mr. Kesari, that you might have asked Mr. Kesari about it, but

24  you don't remember anything that he said about it; isn't that

25  right?

1  A.  That is correct.  Well, not exactly, sir, not at the time.

2  I don't recall that specific conversation.  At some point

3  throughout the entire series of invoices I do recall the word

4  "video" being used from Mr. Kesari, but I do not recall when and

5  where that conversation took place.

6  Q.  You never told the grand jury that, did you?

7  A.  No, I did not.

8  Q.  In fact, the first time you remember talking with -- telling

9  anyone that is when you met with the government at the end of

10  September; isn't that right?

11  A.  My memory had been refreshed, that is correct.

12  Q.  Okay.  We'll come back to that, too; but you met with the

13  government at the end of September of this year, 2015, correct?

14  A.  That is correct.

15  Q.  And the testimony you gave the grand jury was July 22, 2014,

16  correct?

17  A.  That's correct.

18  Q.  And would you agree with me that July of 2014 is a little

19  bit closer to the time when these invoices were going forward

20  than September of 2015?

21  A.  That is correct.

22  Q.  You didn't raise any other concerns about the February 2012

23  invoice from ICT, did you?

24  A.  Which one again, sir?

25  Q.  You didn't raise any other concerns at all about the $38,000

1  invoice, isn't that correct, the first one?

2  A.  No, I didn't.

3  Q.  And then you didn't raise any other concerns about the March

4  invoice, the second one, did you?

5  A.  The issues I raised and concerns were from August 2013, I

6  raised the issue there.

7  Q.  And so until August 2013, you didn't raise any other

8  concerns about the March invoice, right?

9  A.  Correct.

10  Q.  You didn't raise any other concerns about the April invoice?

11  A.  Correct.

12  Q.  You didn't raise any concerns about the May invoice?

13  A.  Correct.

14  Q.  And you don't remember anything that Mr. Kesari might have

15  said to you about the June invoice; isn't that correct?

16  A.  Other than the e-mails, that's correct.

17  Q.  And those e-mails weren't to you, were they?

18  A.  There was an e-mail sent to me from Dimitri to me, yes.

19  Q.  Okay.  You remember Dimitri sending you the invoice about

20  the payment, and that's all you remember about that, correct?

21  A.  From what I was showed, yes, that's correct.

22  Q.  And on those invoices from ICT, there's an e-mail address

23  for ICT, correct?

24  A.  I believe so.  I can -- if you can refresh my memory.

25  Q.  Absolutely.  We're back at Exhibit 77, which is already in

1   evidence.

2            Now, Mr. Cortes, this is a forward from Mr. Kesari to

3   you, correct?

4   A.  Yes, the bottom, yes -- or middle.

5   Q.  All right.  And then the forwarded part has the e-mail from

6   Sonny Izon, correct?

7   A.  That is correct.

8   Q.  All right.  Now, you had Mr. Izon -- and Mr. Izon was, to

9   your knowledge, a part of ICT, right?

10  A.  Not to my knowledge, unless he was on the ICT,

11  Incorporation.  My assumption was that this e-mail was coming

12  from ICT and --

13  Q.  Okay.  Let me ask it to you this way.  The invoices that

14  were attached from Mr. Kesari, they were all coming from

15  Mr. Izon, right?

16  A.  They were being forwarded from Dimitri to me.

17  Q.  They were being forwarded from Dimitri to you and they all

18  included e-mails from Mr. Izon, correct?

19  A.  Most of them, yes.

20  Q.  And so you had an e-mail address for Mr. Izon, didn't you?

21  A.  The e-mail address was on these e-mails.

22  Q.  And you never e-mailed him a check with those invoices, did

23  you?

24  A.  Not to my recollection.

25  Q.  Now, Mr. Cortes --

```
 1              MR. BINNALL:  Exhibit 89, that is in evidence,
 2   correct?
 3              THE CLERK:  Yes.
 4   BY MR. BINNALL:
 5   Q.  You remember yesterday that you talked about Exhibit 89 with
 6   the government?
 7   A.  Can you make it smaller, sir?
 8   Q.  Yes.
 9   A.  Yes.
10   Q.  Okay.  Mr. Cortes, this is an e-mail on May the 2nd of 2012
11   from -- the top one is from Dimitri forwarding an invoice to
12   you, correct?  I'm sorry, Mr. Kesari forwarding the invoice to
13   you; is that correct?
14   A.  That is correct.
15   Q.  The e-mail he is forwarding is again from sonnyizon@aol.com,
16   correct?
17   A.  Yes, from Sonny Izon.
18   Q.  And then below that there's a phone number; is that right?
19   A.  That is correct.
20   Q.  You never called that phone number?
21   A.  That is correct, to the best of my recollection.
22   Q.  To the best of your recollection, you don't ever remember
23   checking with Mr. Izon as to what these payments are for; isn't
24   that right?
25   A.  Regarding what the payments were for, no.  I remember, if
```

1   anything, verifying routing numbers that were incorrect.

2   Q.   So you verified with Mr. Izon routing numbers that were

3   incorrect, but you don't remember verifying with him what the

4   payments were for and how they should be classified?

5   A.   No, I don't remember contacting Mr. Izon.   I remember

6   contacting somebody about the routing numbers.   I don't recall

7   who.

8   Q.   So you remember talking to somebody about the routing

9   numbers?

10  A.   Correct.

11  Q.   And then you didn't verify what those expenses were for at

12  that point?

13  A.   The invoices stated production services.

14  Q.   I'm sorry?

15  A.   The invoices stated production services.

16  Q.   All right.   And going back to Exhibit 59, which is in

17  evidence, and that is -- all right.   This is Government's

18  Exhibit 59, which is an e-mail from you to Mr. Tate and

19  Mr. Benton about the reports from the Ron Paul 2012 Presidential

20  Campaign Committee, correct?

21  A.   That is correct.

22  Q.   First of all, Mr. Kesari isn't on this, correct?

23  A.   That's correct.

24  Q.   And it wasn't common for you to send him any of these

25  reports?

1    A.   I'm sorry?

2    Q.   And you didn't commonly send him these reports, did you?

3    A.   I'm sorry, I have a hard time hearing.

4    Q.   I'm sorry, sir.  You didn't commonly send him those reports?

5    A.   Not commonly, not regularly.  It was on a case-by-case basis

6    if people asked for them.

7    Q.   And you certainly didn't send him this one, right?

8    A.   I did not send this one to him according to this e-mail,

9    this e-mail specifically.

10   Q.   All right.  Now, there is a number of different subjects for

11   how these -- is it fair to call them balance sheets?

12   A.   I'm sorry; what was that question?

13   Q.   We'll just call them statements that you were forwarding on.

14   Do you understand what I'm talking about if I refer to these as

15   statements?

16   A.   That was a --

17            MR. PILGER:  Your Honor, the government objects.  I

18   don't understand what he's referring to, which exhibit, which

19   part.

20   BY MR. BINNALL:

21   Q.   Okay.  It says that these are transaction detail by account

22   is the header.

23            Do you see that?

24   A.   It's a transaction detail by account.

25   Q.   Okay.  And then --

1          MR. BINNALL:  Oh, thank you.  This is in evidence.  We

2    can show it to the jury.

3          THE CLERK:  Okay.

4    BY MR. BINNALL:

5    Q.  All right.  Now, Mr. Cortes, this says 60110 audiovisual

6    expenses, right?

7    A.  That is correct.

8    Q.  All right.  That doesn't say production services, right?

9    A.  Production services meant audiovisual expenses when it came

10   from audiovisual companies such as ICT was purporting to send.

11   Q.  I understand.  But it doesn't say production services

12   anywhere there, right?

13   A.  No, it doesn't say that.

14   Q.  This is also in evidence.  And this is 60305, media

15   expenses, right?

16   A.  That is correct.

17   Q.  All right.  You didn't choose to label the invoices from ICT

18   as media expenses, though, did you?

19   A.  No, I did not.

20   Q.  And this says printing, copying, 60379?

21   A.  Right.

22   Q.  That doesn't say production services?

23   A.  That is correct.

24   Q.  But you didn't put it as printing and copying either?

25   A.  That is correct.

1  Q.  That wasn't your choice as to how to actually code these

2  invoices, right?

3  A.  I'm sorry.

4  Q.  That wasn't your choice as to how to code these invoices,

5  right?

6  A.  That is correct.

7  Q.  And, Mr. Cortes, this is 60390, campaign merchandise, right?

8  A.  That is right.

9  Q.  And it doesn't say production services there either, right?

10  A.  It doesn't.

11  Q.  But you didn't decide to characterize it as campaign

12  merchandise either; is that right?

13  A.  That is right.

14  Q.  It was common for the campaign to do business with -- or to

15  have vendors that were small businesses, right?

16  A.  It was not uncommon.

17  Q.  And sometimes there's appropriations or other legal

18  entities, correct?

19  A.  Correct.

20  Q.  And it wasn't uncommon for a particular consultant to be

21  paid through one of those companies, was it?

22  A.  I'm sorry?

23  Q.  It wasn't uncommon for one of the campaign consultants to be

24  paid through one of those companies, was it?

25  A.  If they were campaign consultants, we would pay them

1   directly.  If they would have been paid by the other companies,

2   I would not be aware of it.

3   Q.  Let me give you an example.  You know who Mike Rothfeld is,

4   right?

5   A.  I do.

6   Q.  Okay.  Mike Rothfeld, he was paid by a company called Saber

7   Communications, wasn't he?

8   A.  Saber Communications was paid.  If Mike Rothfeld received

9   money from Saber Communications, I don't know.

10  Q.  Excellent point.  Thank you, sir.  I appreciate that.

11          During the course of the campaign, it wasn't unusual

12  to hold invoices before invoices were paid, right?

13  A.  I'm sorry, can you repeat the question?

14  Q.  During the period of the campaign, sometimes the campaign

15  had more cash on hand than at other times, right?

16  A.  Yes, that's correct.

17  Q.  And it wasn't unusual to hold payment of invoices until

18  there was more cash on hand, right?

19  A.  Depending on several factors.  It would depend on if we had

20  money for it or we were expecting other expenses.

21  Q.  And so there were -- the answer to my question is yes, it

22  wasn't unusual to actually hold payments until there was more

23  money in the campaign?

24  A.  Correct.

25  Q.  Thank you.

1          And, in fact, it was also common sometimes at the end

2   of an accuracy reporting period, it was not uncommon to hold

3   payments until after the reporting period in order to

4   essentially make it appear that the campaign had more cash on

5   hand?

6   A.  No, that is incorrect.

7   Q.  The campaign never -- wasn't concerned about how much cash

8   on hand would be shown at the end of a quarter?

9   A.  Our main concern was making sure that all expenses incurred

10  during the FEC reporting period would be reported to the FEC and

11  paid for.

12  Q.  And it's also fair to say that you weren't the one who was

13  making the final decisions on whether or not to pay an invoice?

14  A.  That is correct.

15  Q.  You were on the finance and compliance side, right?

16  A.  Yes.

17  Q.  Okay.  So then if somebody on the political side of the

18  campaign like Mr. Tate, for instance, didn't approve an invoice,

19  for whatever reason he might have, the invoice didn't get paid,

20  right?

21  A.  Right.

22  Q.  Now, you did receive the expense reports about Mr. Kesari's

23  expenses from time to time, right?

24  A.  I received expense reimbursement forms, yes.

25  Q.  And those generally didn't come directly from him, did they;

1  they came from Jared Gamble?

2  A.  Generally they would be submitted by Jared.

3  Q.  And Jared was Dimitri's assistant on the campaign, right?

4  A.  That's right.

5  Q.  And you knew Jared was doing Mr. Kesari's expenses and

6  coding them, right?

7  A.  He was submitting them.  I don't know if he was the one

8  coding them.

9  Q.  All right.  And not every consultant on the campaign had an

10  NDA, right?

11  A.  Consultants or companies that we hired to pay we provided

12  nondisclosure agreements to.

13  Q.  All right.  They didn't all do nondisclosure agreements, did

14  they?

15  A.  Those that were brought to my attention were given

16  nondisclosure agreements.

17  Q.  But only those that were brought to your attention, right?

18  A.  That's correct.

19  Q.  So, for instance, you don't know -- maybe you do.  Do you

20  know if Kirk Shelley had a nondisclosure agreement?

21  A.  I don't believe he had one.  I believe the company that he

22  worked for did.

23  Q.  But Mr. Shelley himself didn't have a nondisclosure

24  agreement?

25  A.  I don't recall.  I don't remember.

1  Q.  And do you remember for sure if his company had one?

2  A.  His company should have one, but I don't remember for sure.

3  Q.  Because nobody brought it to your attention, right?

4  A.  It -- they did bring to my attention that they needed one.

5  Q.  All right.  Now, Mr. Cortes, there was an employee handbook

6  for the Paul Campaign, right?

7  A.  That is correct.

8  Q.  And you would commonly distribute that handbook to everyone

9  at the Paul Campaign; isn't that right?

10 A.  All employees, yes.

11 Q.  And you don't recall anything being in that handbook

12 covering anything regarding Federal Election Commission

13 requirements; isn't that right?

14 A.  I would need to be refreshed, I would need to be refreshed

15 with the handbook.

16 Q.  Well, let me refresh your recollection from what you told

17 the grand jury.

18         MR. BINNALL:  This is actually going to be on two

19 pages, and this is actually just to refresh his recollection.

20         Thank you.

21 BY MR. BINNALL:

22 Q.  All right.  Does this look like your grand jury testimony,

23 sir?

24 A.  Yes.

25         MR. KRAVIS:  Counsel, page number?

```
 1              MR. BINNALL:  This is page No. 97.

 2   BY MR. BINNALL:

 3   Q.  Let me know when you're done reading that and I can turn the

 4   page over.

 5   A.  Okay.  Yes.

 6   Q.  All right.  Is your recollection refreshed now?

 7   A.  Yes.

 8   Q.  You don't recall anything in the handbook covering anything

 9   regarding Federal Election Commission requirements, correct?

10   A.  No, I do not recall.

11   Q.  All right.  Now, one of your duties on the campaign was to

12   kind of serve as an intermediary with the campaign's lawyers,

13   right?

14   A.  That is correct.

15   Q.  And you actually sent out an e-mail to all employees

16   advising them not to go directly to the campaign lawyers with

17   their legal questions; isn't that right?

18   A.  That is correct.

19   Q.  And you told them to go directly to you?

20   A.  That is correct.

21   Q.  Now, Mr. Cortes, you met with the prosecutors and the FBI a

22   couple of times in this case, didn't you?

23   A.  I met with them once for -- and in order to be here in the

24   courtroom, correct.

25   Q.  I'll just be a little more specific.  You met with them
```

1  before you went in and talked to the grand jury, right?

2  A.  Yes, it is.

3  Q.  And then you met again with them -- and we'll talk about

4  this a little bit more -- late last month to get ready for this

5  trial, too, right?

6  A.  That's correct.

7  Q.  And you were represented by different lawyers -- I'm not

8  going to ask you anything you talked about, but you were

9  represented by different lawyers in each of those meetings,

10  correct?

11  A.  That's correct.

12  Q.  On the first occasion you were represented by a gentleman by

13  the name of David Warrington, right?

14  A.  That's correct.

15  Q.  And on the first occasion Mr. Warrington --

16          MR. PILGER:  Objection; getting into what counsel had

17  to say.

18          MR. BINNALL:  Your Honor, this goes directly to his

19  bias, not being offered for the truth of the matter asserted.

20  Also goes to his credibility.

21          THE COURT:  Overruled.

22  BY MR. BINNALL:

23  Q.  On the first occasion Mr. Warrington got into a fight with

24  Mr. Pilger because he said Mr. Pilger was trying to put words in

25  your mouth?

```
 1              MR. PILGER:  Objection.
 2   BY MR. BINNALL:
 3   Q.  Isn't that correct?
 4              MR. PILGER:  Objection.
 5              THE COURT:  The objection is sustained.
 6   BY MR. BINNALL:
 7   Q.  All right.  I'll put it this way.
 8              MR. BINNALL:  Your Honor, I would like to be heard on
 9   this if possible actually.
10              THE COURT:  I know what you're doing, but that
11   question was just objectionable.
12              MR. BINNALL:  Okay.
13   BY MR. BINNALL:
14   Q.  Was there any disagreement between your lawyer and
15   Mr. Pilger --
16              MR. PILGER:  Objection to what the lawyer says.
17              THE COURT:  Yeah.  Ask him for what he was thinking,
18   not what Mr. Warrington was thinking.
19   BY MR. BINNALL:
20   Q.  All right.  At that meeting Mr. Pilger was asking you very
21   pointed and direct questions; isn't that correct?
22   A.  He was asking me questions.
23   Q.  And when you wouldn't say -- they were pointed and they were
24   direct, weren't they?
25   A.  Some would argue that they would be.  I didn't consider them
```

1  unfair.

2  Q.  And if he -- if you said something that he disagreed with,

3  he would be pretty aggressive at that point about trying to get

4  you to answer the way he wanted you to answer; isn't that right?

5          MR. PILGER:  Objection to anything that the witness

6  knows and has to say about the events.

7          THE COURT:  Overruled.

8          Answer the question.

9  A.  Can you repeat the question?

10  BY MR. BINNALL:

11  Q.  At that meeting Mr. Pilger would become -- would -- if you

12  gave Mr. Pilger an answer and he -- there was times that you

13  gave Mr. Pilger an answer and he was not comfortable with the

14  answer; isn't that correct?

15  A.  I'm not sure what may have made Mr. Pilger uncomfortable.

16  Q.  Okay.  But he seemed like he wanted a different answer;

17  isn't that right?

18  A.  He asked different questions.

19  Q.  And he asked different questions because he seemed like he

20  didn't ask -- he didn't like the answer to your specific

21  question; isn't that right?

22  A.  I don't know why he would ask more, but he asked more.

23  Q.  All right.  And at times he seemed agitated about your

24  answers, didn't he?

25  A.  I don't know whether Mr. Pilger was agitated.

1  Q.  I didn't ask you whether he was.  I asked you if he seemed
2  agitated about your answers.
3  A.  Again, I don't know what makes Mr. Pilger agitated, so I
4  don't know if that is Mr. Pilger agitated or not.
5  Q.  All right.  On the second occasion you had a different
6  lawyer, right?
7  A.  That is correct.
8  Q.  And on that occasion Mr. Pilger tried to get you to answer
9  questions and told you that the Paul Campaign had waived the
10  attorney-client privilege; isn't that correct?
11 A.  I'm sorry?
12 Q.  Mr. Pilger told you that the Paul Campaign, that the Ron
13 Paul for President Campaign had waived the attorney-client
14 privilege when he was asking you those questions?
15        MR. PILGER:  Objection.  The government proffers this
16 was a conversation between counsel and it's objectionable, and
17 Mr. Binnall knows that.
18        THE COURT:  The objection is sustained.  I don't get
19 what the waiver of their privilege matters.  He's got his own.
20        MR. BINNALL:  Your Honor, the relevance here is that
21 Mr. Pilger is being very aggressive --
22        THE COURT:  No, no.  Hold it.  You can ask questions
23 about that all you want.  The question was about the Ron Paul
24 Campaign waiving the attorney-client privilege, and I find that
25 that's irrelevant.

1          MR. BINNALL:  I understand that.

2   BY MR. BINNALL:

3   Q.  Then I'll ask this.  There came a time when your attorney

4   during the questioning asked you to go outside of the room with

5   him; isn't that right?

6   A.  That is correct.

7   Q.  And when you came back in, you didn't answer the

8   government's questions about what you were previously talking to

9   them about; isn't that correct?

10  A.  I answered the question.

11  Q.  You answered all of the questions?

12  A.  I answered the question with an answer.

13  Q.  With an answer?

14  A.  Yes.

15  Q.  And that answer was what?  Do you remember what your answer

16  was?

17  A.  That I would not answer it.

18          MR. BINNALL:  Thank you, sir.

19          One moment, Your Honor.  I think I might be done.

20          (Pause.)

21          MR. BINNALL:  No further questions.

22          THE COURT:  Mr. Pilger?

23          MR. PILGER:  Yes, Your Honor.

24

25

REDIRECT EXAMINATION

BY MR. PILGER:

Q.  Mr. Cortes, I think you said to Mr. Binnall that when you met with the government, you thought you were treated fairly; is that right?

A.  That is correct.

Q.  Did anyone tell you what to say?

A.  No, no.

Q.  And as a part of that, did anyone ever ask you to say anything untruthful?

A.  That isn't -- I'm sorry.  Can you rephrase the question or repeat it?

Q.  When you met with the government, what were you told about whether you should tell the truth or not?

A.  To tell the truth.

Q.  Now, there's a number of topics here.  I think we'll start with who brought things to your attention.  You were talking to Mr. Binnall about who brought certain things to your attention.  Who brought the ICT invoices to your attention?

A.  Dimitri Kesari.

Q.  And that was unusual because I think you told Mr. Binnall that Dimitri Kesari usually brought expenses to you through his assistant, Jared Gamble, right?

A.  That is correct.

Q.  So this was something unusual for Dimitri Kesari to bring

1  the ICT invoices directly to your attention?

2  A.  Yes.

3  Q.  I'm not sure which counsel but somebody asked you about

4  training with regard to coding.  Was coding particularly

5  difficult once you had the coding list?

6  A.  No, it was not.

7  Q.  I mean, in fairness, sometimes you have a lot of things to

8  code and that would be difficult, right?

9  A.  Correct.

10  Q.  But the actual coding determinations, you made those from

11  the face of the invoices, right?

12  A.  Yes, unless it was provided by the employees themselves.

13  Q.  And this wasn't your first rodeo, was it?

14  A.  As far as a campaign?

15  Q.  You worked on the 2008 campaign as well?

16  A.  That is correct.

17  Q.  And you were the controller in that one, correct?

18  A.  Yes, that is correct.

19  Q.  You were also working in 2012 dealing with the same types of

20  issues?

21  A.  That's correct.

22  Q.  The ICT invoices that came to you, were they hard to code?

23  A.  No, they were not.

24  Q.  Mr. Binnall was talking to you about how Mr. Izon's phone

25  number was contained in some of the e-mails that came to you.

1      Do you remember that?

2  A.  Yes.

3  Q.  Was it your job to call up vendors who had sent you invoices

4  and investigate the invoices in some way?

5  A.  If the banking information -- if information on it was

6  incorrect.

7  Q.  And the information being incorrect, you would be concerned

8  only with the banking and payment information or with something

9  else?

10          MR. HOWARD:  Objection, Your Honor.  He is leading.

11          THE COURT:  Sustained.

12          Pose a new question.

13 BY MR. PILGER:

14 Q.  What kinds of things would you be concerned with if you had

15 to make a call?

16 A.  Normally it would be if the amount was off or the banking

17 information was wrong, if a wire had kicked back or the e-mail

18 was missing information.

19 Q.  If on the face of an invoice the numbers did not conflict

20 with something else you had, would you have a reason in the

21 normal course of your duties to contact the vendor about the

22 amount?

23 A.  No, not at all.

24 Q.  If the payment went through in the form of a wire or a check

25 or otherwise, would you have any reason to contact the vendor

1  about the payment method?

2  A.  Sometimes if we requested to let the vendor know if the wire

3  had gone through.

4  Q.  And aside from dealing with vendors about payments or with

5  things that happened wrong on the face of the invoice, was it

6  your job to investigate invoices?

7  A.  It was not my job to investigate invoices.

8  Q.  Was it Ms. Pyeatt's job to investigate invoices?

9  A.  No, it was not.

10  Q.  Was it Ms. Watts' job to investigate invoices?

11  A.  No, it was not.

12  Q.  In your role as controller, did you rely on the campaign

13  people who submitted the invoices to know that they were valid?

14  A.  Yes.

15  Q.  Mr. Binnall spent some time with you on the grand jury

16  transcript, and he started off doing that by asking about

17  Government's Exhibit 77 and one of the ICT invoices and whether

18  it had been previously approved.

19          Do you recall that?

20  A.  I recall it.

21  Q.  Where did all of the ICT invoices come to you from?

22  A.  From Dimitri Kesari.

23          MR. HOWARD:  Your Honor, asked and answered.  We've

24  been through this.

25          THE COURT:  Overruled.

1   A.   From Dimitri Kesari.

2   BY MR. PILGER:

3   Q.   And what was Dimitri Kesari's role in the campaign?

4   A.   He was the deputy campaign manager.

5   Q.   Mr. Binnall asked you about Exhibit 77, if Dimitri Kesari

6   had provided the code that you should use.  And he didn't, did

7   he?

8   A.   No, he did not.

9   Q.   Whose job was it to put the coding on it?

10  A.   If the employee did not provide it, then it was mine.

11  Q.   And the decision on how to code was based on what, what

12  information?

13  A.   The decision to code was based on the information on the

14  invoices.

15  Q.   Who did you get the invoices from for ICT?

16  A.   Dimitri Kesari.

17  Q.   In the e-mails that Dimitri Kesari sent to you concerning

18  ICT, were there subject lines about production services?

19  A.   Some of them had it, yes.

20  Q.   Some of those e-mails said production services in the

21  subject line that Dimitri Kesari sent you, correct?

22  A.   That is correct.

23  Q.   And was that term "production services" part of your

24  decision on whether to code the expense one way or another?

25  A.   Yes.

1  Q.  Mr. Binnall talked to you about how Ms. Watts and Ms. Pyeatt

2  worked in Texas and you were based in Virginia, right?

3  A.  Correct.

4  Q.  And this was a national campaign?  The Ron Paul Campaign was

5  a national presidential campaign, right?

6  A.  Yes.

7  Q.  So your office, you and Ms. Koerber, you're in Virginia, and

8  the treasurer and Ms. Watts, they're in Texas, right?

9  A.  Correct.

10  Q.  And so as information moves in to the finance operation in

11  Virginia and out to Texas, who ultimately are you and the people

12  in Texas relying on about the validity of invoices you receive?

13          MR. BINNALL:  Your Honor, I object if he's going to

14  testify as to what other people are relying on.

15          THE COURT:  Sustained.

16  BY MR. PILGER:

17  Q.  What sources would you or the people in Texas rely on?

18          MR. BINNALL:  Same objection.

19          THE COURT:  Overruled.

20          Answer the question.

21  A.  I'm sorry, could you repeat it?

22  BY MR. PILGER:

23  Q.  What source was available to you and then the people in

24  Texas to rely on about the nature of the expenses?

25  A.  The invoices and the employees who submitted them.

1  Q.  So Mr. Howard got up and talked to you about Exhibit 76.

2  Let's put that back up, Exhibit 76, which is in evidence.

3          And Exhibit 76 has Dimitri Kesari saying something to

4  you about who approved the expense, right?

5  A.  Correct.

6  Q.  And who approved the expense?

7          MR. HOWARD:  Your Honor, this is redirect.  This is

8  all asked and answered.

9          THE COURT:  Overruled.

10          MR. HOWARD:  This has all been gone over.

11          THE COURT:  Overruled.  This goes to the scope of the

12  cross-examination.

13          MR. BINNALL:  I object, Your Honor.

14          THE COURT:  Okay.  Pose a new question.

15  BY MR. PILGER:

16  Q.  You made a statement in the e-mail -- I'm sorry, Dimitri

17  Kesari made a statement in the e-mail concerning who had

18  approved the expense, correct?

19  A.  Correct.

20  Q.  And Mr. Howard asked you about that, correct?

21  A.  Correct.

22  Q.  And you said you don't know one way or the other whether or

23  not Mr. Benton actually approved that, right?

24  A.  Approved this specific one, no.

25  Q.  And you don't?  You only know what Mr. Kesari told you,

1  correct?

2  A.  Correct.

3  Q.  If Mr. Benton did approve an expense to ICT, you don't know

4  about that?

5       MR. HOWARD:  Objection, Your Honor.

6       THE COURT:  Overruled.

7       Answer the question.

8  A.  This specific e-mail, no.

9  BY MR. PILGER:

10  Q.  If it ever happened, you were not in the loop, correct?

11  A.  Unless it was sent to me directly, that is correct.

12  Q.  Okay.  You do not recall him ever doing that?  In fairness

13  to him, you did not get from Mr. Benton directly an approval for

14  an ICT invoice, correct?

15  A.  I believe for the first one I did.  I would need to be

16  refreshed on that.  But for the invoices for $8,850, that is

17  correct.

18  Q.  You do know, though, that sometimes Mr. Benton did approve

19  expenses?  You said that to Mr. Howard, right?

20  A.  Yes.

21  Q.  And when he did he used an invoice; is that what you're

22  talking about?

23  A.  Correct, sometimes he did.

24  Q.  Okay.  Sometimes he would use an invoice.

25       Now, as to the ICT invoices, after they became a

1  regular payment, after you -- there was a time where you noticed

2  they were turned in regularly; is that correct?

3  A.  Correct, every month.

4  Q.  And did that cause you to do something?

5  A.  At the time nothing out of the ordinary in the sense that I

6  would send them up for approval.

7  Q.  So you would send them up for approval.  When would you send

8  them up for approval?

9  A.  Every time.

10  Q.  Okay.  And who did you send them to?

11  A.  John Tate.

12  Q.  And you included the messages or did you not include the

13  messages that had come to you from Dimitri Kesari?

14  A.  Sometimes they would be included and forwarded.

15  Q.  Now, Mr. Binnall talked to you about never having raised

16  issues, and I believe you said there was a time where you did

17  raise issues concerning the ICT invoices.  To be clear, when did

18  you raise that issue?

19  A.  Regarding these invoices, I raised an issue with one of them

20  in the sense that I found it to be a repeat invoice of sorts;

21  but that would have been June of 2012 and then the other time I

22  raised the issue was in August 2013.

23  Q.  So in June 2012 you raised the issue of an invoice and

24  whether it was a repeat; is that what you said?

25  A.  Regarding it being a repeat, yes.

1  Q.  And did that or did that not have to do with whether it was

2  supposed to be the last one?

3  A.  That is correct.

4  Q.  And you may have said it.  I didn't hear you.  Who did you

5  raise that with?

6  A.  That would be with John Tate who needed to approve it.

7  Q.  Thank you.

8          And then later there was a time in 2013 that you

9  raised issues with the ICT invoices, right?

10  A.  That is correct.

11  Q.  And how did you do that?

12  A.  I compiled a list of e-mails and irregular invoices that I

13  found to be irregular with concern to the news articles I had

14  seen and sent them to Jesse, Lori, and Deana.

15  Q.  And did Mr. Benton or anyone else respond to that e-mail and

16  say, we don't know what this is about?

17  A.  Responding with those specific words, no.

18  Q.  Did Mr. Benton respond with anything other than the e-mail

19  that we saw saying thank you, Fernando?

20  A.  Not to me.

21  Q.  When you sent those to him, did you send them to him because

22  you had a particular concern that he should see them?

23  A.  Yes.

24  Q.  And he did not write back expressing any concern about them,

25  did he?

1  A.  He did not write anything other than thank you, thanks,

2  Fernando.

3          MR. PILGER:  One moment, Your Honor.

4          (Pause.)

5  BY MR. PILGER:

6  Q.  Counsel were asking you about when people get a lot of

7  e-mail it's hard to remember it or a lot of invoices.

8          Do you remember that?

9  A.  Yes.

10 Q.  Sometimes things happen, though, that do make you focus on

11 and remember particular invoices, right?

12 A.  That is correct.

13 Q.  Did something happen in August of 2013 that made you focus

14 on some particular invoices?

15 A.  Yes.

16 Q.  What was that?

17 A.  News articles came out with allegations that the campaign

18 had --

19          MR. HOWARD:  Objection, Your Honor.

20          THE COURT:  Sustained.

21 BY MR. PILGER:

22 Q.  And did you sit down, and as both counsel -- or as

23 Mr. Binnall talked to you about, did you sit down with the FBI

24 and the government and talk about particular invoices, not what

25 was said, but just did you sit down and talk about it?

1   A.   Yes.

2   Q.   And did you go over a lot of particular invoices?

3   A.   Yes.

4   Q.   And did that focus your attention on those invoices?

5   A.   Yes.

6   Q.   And did you remember them as you talked about them?

7   A.   Yes.

8          MR. PILGER:  Nothing further, Your Honor.

9          THE COURT:  Mr. Howard?

10         MR. HOWARD:  Yes, Your Honor.

11                    RECROSS-EXAMINATION

12  BY MR. HOWARD:

13  Q.   Mr. Cortes, August 2013, the date you were just talking

14  about --

15  A.   Yes.

16  Q.   -- you read some articles?

17  A.   Yes.

18  Q.   About this investigation?

19  A.   Not about the investigation.  About an allegation.

20  Q.   An allegation.  Did you know that there was an investigation

21  going on?

22  A.   I did not.

23  Q.   Did you suspect there was an investigation going on?

24  A.   I did not.

25  Q.   You knew there were problems?

1  A.  Define problems.

2  Q.  Well, did you know that there was an issue that was severe

3  enough that you had to e-mail Mr. Benton?  You did e-mail

4  Mr. Benton, didn't you?

5  A.  I e-mailed Mr. Benton.

6  Q.  And you wanted to make sure that he saw some invoices that

7  you were certain he had approved; isn't that correct?

8  A.  I was not certain he had approved those.  I was certain he

9  had not been involved in the e-mail chain.

10 Q.  And wouldn't you agree, sir -- do you know if he was advised

11 by anybody not to talk to people about this?

12 A.  I would not know that.

13 Q.  It wouldn't surprise you if he was, would it?

14 A.  If -- I wouldn't know.

15          MR. HOWARD:  Okay.  All right.

16          Nothing else, Your Honor.

17          THE COURT:  Mr. Binnall, anything else?

18          MR. BINNALL:  No, Your Honor.

19          THE COURT:  Anything else?

20          MR. PILGER:  No, Your Honor.

21          May the witness be finally excused?

22          THE COURT:  Yes.  Thank you.  You're excused.

23                              (Witness excused.)

24          THE COURT:  Call your next witness, please.

25          MR. KRAVIS:  The government calls FBI Special Agent

1   Karen LoStracco.

2           THE COURT:  Come forward, please.  Stop there to be

3   sworn in.

4           THE CLERK:  Please raise your right hand and say I do.

5           KAREN LOSTRACCO, GOVERNMENT'S WITNESS, SWORN

6           THE CLERK:  Please be seated.

7                       DIRECT EXAMINATION

8   BY MR. KRAVIS:

9   Q.  Good morning.

10  A.  Good morning.

11  Q.  What is your name?

12  A.  Karen LoStracco.

13  Q.  How do you spell your last name?

14  A.  L-O capital S-T-R-A-C-C-O.

15  Q.  What do you do for a living?

16  A.  I'm a special agent with the FBI.

17  Q.  How long have you been a special agent with the FBI?

18  A.  I joined in March 2004.

19  Q.  And what is your current assignment with the FBI?

20  A.  I'm a supervisory special agent in the Boston field office

21  and associate division counsel there.

22  Q.  How about in 2013 and 2014, what was your assignment then?

23  A.  I was a special agent assigned to the public corruption and

24  government fraud squad in the Washington field office.

25  Q.  And in the course of your work with the public corruption

1  squad, did you participate in an investigation into some

2  allegations regarding payments made by the Ron Paul 2012

3  Presidential Campaign?

4  A.  Yes.

5  Q.  What was your role in that investigation?

6  A.  I was the case agent in that investigation.

7  Q.  And what were your responsibilities as the case agent in

8  that investigation?

9  A.  As a case agent, I took the lead on the investigation, which

10  means that I would have received the evidence pertaining to the

11  investigation, interviewed witnesses.  Then that would lead to

12  talking to the government prosecutors about the investigation

13  and how it was going.

14  Q.  When did that investigation begin, approximately?

15  A.  Approximately late winter, early spring of 2013.

16  Q.  Now, did there come a time in your role as the case agent on

17  this investigation when you received some documents from the Ron

18  Paul 2012 Presidential Campaign in response to a grand jury

19  subpoena?

20  A.  Yes.

21  Q.  Just briefly, for the benefit of the jury, what is a grand

22  jury subpoena?

23  A.  Well, a grand jury can issue a document asking an individual

24  or a business, for example, to come in and testify before them

25  to provide evidence.  It can also request documents from that

1    individual or company.

2    Q.  The grand jury subpoena that was sent in this investigation

3    to the Ron Paul Campaign, was that a subpoena for testimony or

4    it was a subpoena for documents?

5    A.  That was for documents.

6    Q.  And did you receive documents from the campaign in response

7    to the subpoena?

8    A.  I did.

9    Q.  Did you have an opportunity as the case agent to review

10   those documents?

11   A.  I did.

12   Q.  Now, did there also come a time during the course of this

13   investigation when the FBI received documents in response to a

14   grand jury subpoena of the defendant Jesse Benton?

15   A.  Yes.

16   Q.  By the way, do you see Mr. Benton here in the courtroom

17   today?

18   A.  I do.

19   Q.  Would you identify him, please, by where he's seated and

20   what he's wearing?

21   A.  Yes.  Mr. Benton is sitting --

22           MR. HOWARD:  Your Honor, we'll stipulate it's

23   Mr. Benton.

24           THE COURT:  No, you can do it if you want unless you

25   want to accept the stipulation.

1          MR. KRAVIS:  I would ask the identification in court

2    of the defendant Jesse Benton.

3          THE COURT:  Yes.  He was going to stipulate that's the

4    same Jesse Benton that we're talking about here.

5          MR. KRAVIS:  Yes.

6    BY MR. KRAVIS:

7    Q.  Did you have the opportunity as the case agent to review the

8    documents provided by Mr. Benton in response to that grand jury

9    subpoena?

10   A.  Yes.

11   Q.  Now, did there come a time when you interviewed the

12   defendant Dimitri Kesari in January of 2014?

13   A.  Yes, that's correct.

14   Q.  And do you see Mr. Kesari here in the courtroom?

15   A.  I do.

16   Q.  Would you identify him, please, by where he's sitting.

17          MR. BINNALL:  We'll stipulate.

18          THE COURT:  Fair enough.

19          Identity isn't an issue in this case, members of the

20   jury.  Ordinarily its an obligation of the government to prove

21   that the person sitting in that chair is the person they're

22   talking about, but that's not an issue here.

23          Go ahead.

24          MR. KRAVIS:  Thank you, Your Honor.

25   BY MR. KRAVIS:

1  Q.  During that interview did you ask Mr. Kesari to give you the

2  computer that he was using during the 2012 campaign?

3  A.  We asked Mr. Kesari about the computer that he was using

4  during the Ron Paul 2012 Campaign.  Mr. Kesari told us that he

5  did not have -- or I'm sorry; Mr. Kesari told us that he was no

6  longer using that particular computer.  He wasn't sure if he

7  still had that computer but that he had transferred most of the

8  information from that old computer over to his new computer that

9  he was currently using.

10 Q.  And did there come a time in the investigation where

11 Mr. Kesari's lawyer gave you that computer?

12 A.  Yes.

13 Q.  And did the computer that Mr. Kesari's lawyer gave you, did

14 that computer have a serial number on it?

15 A.  It did.

16 Q.  Do you remember the serial number off the top of your head

17 as you sit here today?

18 A.  No, I do not.

19 Q.  Did you write it down somewhere?

20 A.  I did.

21 Q.  Where would you have written it down?

22 A.  I wrote it down on what's called receipt of government

23 property.  Basically we go out to an individual and I will give

24 you a receipt, and it's a way for us to keep track of what we

25 obtain from somebody and also for you to have a note of what the

1  government obtained.

2  Q.  Was the computer serial number accurate when you wrote it on

3  the receipt of property form?

4  A.  It was.

5  Q.  Showing defense counsel what has been marked for

6  identification and previously produced as Government's Exhibit

7  135.

8           Special Agent LoStracco, handing you what has been

9  marked for identification as Government's Exhibit 135, do you

10  recognize that exhibit?

11  A.  I do.

12  Q.  What is Government's Exhibit 135?

13  A.  This is an FBI receipt of property.  It can also be used

14  when we return property.

15  Q.  Is this the receipt of property form for the computer that

16  Mr. Kesari's lawyer provided to the FBI that you have been

17  describing a moment ago?

18  A.  Yes, and a phone.

19  Q.  And directing your attention to the second item on the

20  receipt of property form, do you see the serial number of the

21  computer?

22  A.  I do.

23  Q.  And could you read it out loud, please?

24  A.  Yes.  C02JG3N6DKQ2.

25  Q.  Thank you.

1    Now, did there come a time later when you reviewed an

2 image of the contents of Mr. Kesari's -- the computer provided

3 by Mr. Kesari's counsel on the FBI's network?

4 A.  Yes.

5 Q.  And how exactly did you do that?

6 A.  So, when we obtain computer evidence or electronic evidence,

7 we can submit that into our evidence system, and then we have

8 computer forensics people who take that item, make an image of

9 it and can put it into a Forensic Tool Kit, and that allows the

10 case agent like myself to be able to view what's on the computer

11 in the system from my desktop.

12 Q.  And in this particular investigation, did you, yourself,

13 review the image of the computer provided by Mr. Kesari's

14 counsel using that Forensic Tool Kit program that you described?

15 A.  Yes.

16 Q.  By the way, at the time that Mr. Kesari's lawyer provided

17 the FBI with the computer, did he also provide the FBI with a

18 cell phone?

19 A.  He did.

20 Q.  Did that cell phone have a serial number on it?

21 A.  It did.

22 Q.  As you're sitting here today, do you remember the serial

23 number off the top of your head?

24 A.  No, I do not.

25 Q.  Any chance you wrote it down on the receipt of property

1  form?

2  A.  Yes.

3  Q.  Showing you again Government's Exhibit 135.  Do you see the

4  serial number of the cell phone that Mr. Kesari's counsel

5  provided you on Government's Exhibit 135?

6  A.  I do.

7  Q.  Would you read it out loud, please.

8  A.  C39HL2SNDTC1.

9  Q.  Thank you very much.

10         Now, Special Agent LoStracco, let me ask you a few

11  questions now about some of the particular documents that you

12  gathered in the course of the investigation from these various

13  sources.  When I do that in some cases I'll be asking you to

14  read the document out loud, like you will read it as it appears

15  on the screen, typos and all, okay?

16  A.  Yes.

17         MR. HOWARD:  Your Honor, Mr. Benton is going to object

18  to that.  The document speaks for itself.  This is an attempt to

19  get Agent LoStracco to testify to something that --

20         THE COURT:  We'll see.  Sometimes it's helpful;

21  sometimes it's not.

22         MR. KRAVIS:  All right.  We can use Sanctions for this

23  part; is that okay?  Yes.

24  BY MR. KRAVIS:

25  Q.  Okay.  I'm going to start, Special Agent LoStracco, about

1  some e-mails with Mr. Tate and Mr. Benton during the 2012 time

2  period, and I'm going to start with what has been marked for

3  identification and not yet admitted as Government's Exhibit 74.

4           Do you see Government's Exhibit 74?

5  A.  I do.

6  Q.  Do you recognize it?

7  A.  Yes.

8  Q.  What is Government's Exhibit 74?

9  A.  This is an e-mail exchange between Dimitri Kesari and John

10  Tate.

11  Q.  What is the date of the e-mail exchange?

12  A.  February 7, 2012.

13  Q.  Where did this document come from?

14  A.  Can I see the entire document?  I'm sorry.

15           This document came from the Ron Paul Presidential

16  Campaign.

17           MR. KRAVIS:  At this time the government moves Exhibit

18  74 into evidence.

19                               (Government Exhibit 74 was

20                                offered in evidence.)

21           MR. HOWARD:  Your Honor, objection.  This is, one, not

22  a business record.  Two, this is hearsay.  This is clearly

23  Mr. Tate's statement.  He's not here.  We're not able to

24  cross-examine him.

25           THE COURT:  Overruled.  74 is received.

1          MR. BINNALL:  I just want to get on the record that we

2   have the same objection.  I understand that part of this is for

3   Mr. Kesari, part of it is not for Mr. Kesari, and we would

4   object to the part that's not Mr. Kesari and it's improperly

5   authenticated and we would go ahead and renew our objections

6   that were already decided by the court on the motions in limine.

7          THE COURT:  And this is offered pursuant to subsection

8   (E)?

9          MR. KRAVIS:  Yes, Your Honor.

10         THE COURT:  The exhibit is received, the objection is

11  overruled.

12                              (Government Exhibit 74 was

13                               received in evidence.)

14  BY MR. KRAVIS:

15  Q.  As the document comes up on the screen, Special Agent

16  LoStracco, can I ask you to start with the bottom e-mail, the

17  February 7, 2012, 5:19 p.m. e-mail and read up from there to the

18  top.

19         MR. HOWARD:  Objection, Your Honor.  The document

20  speaks for itself.

21         THE COURT:  Sometimes it's hard to see from this

22  distance.  It's okay.  It's short.

23  A.  On February 7, 2012, at 5:19 p.m., Dimitri Kesari wrote:

24  "Did Jesse get Kent paid?  He said he would handle it and Kent

25  is texting today."

1  Q.  And was there a response from John Tate?

2  A.  Yes.

3  Q.  Can you read that to us?

4  A.  From John Tate.  Sent Tuesday, February 7, 2012, 7:22 p.m.

5  To Dimitri Kesari.  Subject:  Re:.

6          "No idea.  Ask him."

7  Q.  Ma'am, can I turn your attention now to what has been marked

8  and not yet admitted as Government's Exhibit 75.

9          Do you recognize Government's Exhibit 75?

10 A.  Yes.

11 Q.  What is Government's Exhibit 75?

12 A.  This is an e-mail exchange between Dimitri Kesari and Jesse

13 Benton.

14 Q.  What is the date of the e-mail exchange?

15 A.  February 7, 2012.

16 Q.  Where did this document come from?

17 A.  This document came from the Ron Paul Presidential Campaign.

18          MR. KRAVIS:  At this time the government moves 75 into

19 evidence.

20                          (Government Exhibit 75 was

21                           offered in evidence.)

22          MR. HOWARD:  Your Honor, same objection.  These are

23 hearsay documents.  We're not going to have a chance --

24          MR. BINNALL:  Same objection for Mr. Kesari, simply as

25 to the response from Mr. Benton as to him is hearsay.  Also, if

1    the court will allow me, I just want to put a continuing

2    objection as to the authentication issue.

3             THE COURT:  The objection is overruled.  75 is

4    received.

5                              (Government Exhibit 75 was

6                              received in evidence.)

7    BY MR. KRAVIS:

8    Q.  And, Special Agent LoStracco, once Exhibit 75 comes up on

9    the screen, starting with the bottom e-mail, February 7, 2012,

10   6:31 p.m. e-mail, would you read this one from the bottom to the

11   top, please?

12   A.  Yes.  On February 7, 2012, at 6:31 p.m., Dimitri Kesari

13   wrote:

14             "Did you get Kent paid?

15             "Or should I submit the payment and pay him?"

16   Q.  And was there a response from Mr. Benton?

17   A.  Yes.

18   Q.  Can you read the response?  Why don't you start and read the

19   header first and then the body of the message.

20   A.  From Jesse Benton, sent Tuesday, February 7, 2012, 7:36

21   p.m., to Dimitri Kesari.

22             "Yo handle."

23   Q.  Turning your attention now to another e-mail exchange, this

24   document has already been marked and identified but not yet

25   admitted.  It's Government's Exhibit 87b.

1          Do you recognize Government's Exhibit 87b?

2   A.  Yes.

3   Q.  What is Government's Exhibit 87b?

4   A.  This is an e-mail exchange between Dimitri Kesari, Jesse

5   Benton, and sonnyizon@aol.com.

6   Q.  What is the date of this e-mail exchange?

7   A.  May 2, 2012.

8   Q.  Does the e-mail exchange have an attachment with it?  Turn

9   to the second page.

10  A.  Yes.

11          MR. KRAVIS:  At this time the government moves both

12  pages of Exhibit 87b into evidence.

13                              (Government Exhibit 87b was

14                               offered in evidence.)

15          MS. SINFELT:  Your Honor, Mr. Benton objects.  We have

16  authentication questions about this document.

17          MR. BINNALL:  We join in the authentication objection,

18  Your Honor.  We also object based on hearsay.  It's not been

19  authenticated as to Mr. Kesari.

20          THE COURT:  This was the subject of the Google

21  custodian's custody?

22          MR. KRAVIS:  AOL.

23          THE COURT:  And the AOL.  The objection is overruled.

24  87b is received.

25                              (Government Exhibit 87b was

1                               received in evidence.)

2    BY MR. KRAVIS:

3    Q.  And as the document is published on the screen, Special

4    Agent LoStracco, I'm going to ask you to start with the first

5    page of the exhibit with the e-mail at the bottom and read up

6    from there, okay.

7    A.  From sonnyizon@aol.com.  Dated May 2, 2012, 9:01 a.m.  To

8    dkesari@aol.com.  Subject:  April invoice.

9            "Hey Dimitri.

10           "Here's the production services invoice for April

11   2012.  Hope you are doing well.

12           "Peace.

13           "Sonny Izon."

14   Q.  And then can you read the next e-mail?

15   A.  From Dimitri Kesari.  Sent Wednesday, May 2, 2012, 9:43 a.m.

16   To Jesse Benton.  Subject:  Forward:  April invoice,

17   attachments.  There's an attachment.

18           "Kent's bill.

19           "Pay?"

20   Q.  And then turning to the second page of Government's Exhibit

21   87b, can you briefly describe the attachment?

22   A.  This is an invoice from Interactive Communication

23   Technology, Inc. in Hyattsville, Maryland.  It's directed to the

24   Ron Paul PPC, Inc., attention:  Dimitri Kesari in Springfield,

25   Virginia.  The date is May 1, 2012.  The description is

1   production services April, and it's in the amount of $8,850.

2   Q.  I want to turn your attention now to Government's Exhibit

3   87c, which has not yet been admitted into evidence.

4           Do you recognize Government's Exhibit 87c?

5   A.  Yes.

6   Q.  What is it?

7   A.  This is an e-mail exchange between Dimitri Kesari, Jesse

8   Benton, and sonnyizon@aol.com.

9   Q.  What's the date of this e-mail exchange?

10  A.  May 2, 2012.

11  Q.  Where did this document come from?

12  A.  This document came from Dimitri Kesari's computer.

13          MR. KRAVIS:  At this time the government moves

14  Government's Exhibit 87c into evidence.

15                          (Government Exhibit 87c was

16                          offered in evidence.)

17          MS. SINFELT:  Mr. Benton objects.  I apologize, Your

18  Honor.  This is the document that we have an authentication

19  argument about and --

20          THE COURT:  I can't hear you.

21          MS. SINFELT:  We would like to have voir dire on this

22  document if possible on authentication.

23          THE COURT:  We'll put this off until lunch hour.

24          Go ahead.

25          MR. BINNALL:  Is it admitted, Your Honor?

1          THE COURT:  No, no.

2          MR. BINNALL:  Got it.  Thank you.

3          THE COURT:  I want to hear more about it after the

4   jury leaves for lunch.

5   BY MR. KRAVIS:

6   Q.  Now, I want to ask you now about some e-mails from the time

7   period of 2012 concerning some invoices for January of 2012,

8   okay.  I'm going to start with what's been marked for

9   identification as Government's Exhibit 68.

10          Do you recognize Government's Exhibit 68?

11  A.  Yes.

12  Q.  What is Government's Exhibit 68?

13  A.  This is an e-mail from Kent Sorenson to Dimitri Kesari.

14  Q.  What's the date of the e-mail exchange?

15  A.  January 24, 2012.

16  Q.  Where did this document come from?

17  A.  This document came from the Ron Paul Presidential Campaign.

18          MR. KRAVIS:  At this time the government moves Exhibit

19  68 into evidence.

20                              (Government Exhibit 68 was

21                               offered in evidence.)

22          MR. BINNALL:  Objection to hearsay.

23          MR. HOWARD:  Could I have one minute, please?

24          (Pause.)

25          MR. HOWARD:  No objection, Your Honor.

1          THE COURT:  Overruled.  Exhibit 68 is received.

2                         (Government Exhibit 68 was

3                         received in evidence.)

4   BY MR. KRAVIS:

5   Q.  And as Government's Exhibit 68 comes up on the screen, I'm

6   going to ask you to start with the first page of the exhibit and

7   read the brief e-mail exchange that appears at the top.

8   A.  From Kent Sorenson.  Sent Tuesday, January 24, 2012, 9:19

9   p.m.  To Dimitri Kesari and Dimitri Kesari.  Subject:  Invoice.

10  And there's an attachment.

11          Dimitri, I really need to get this taken care of ASAP.

12  Hope you understand, smiley face.  Thanks, Kent.

13  Q.  Now, turning to the second page of Government's Exhibit 68,

14  the attachment, can you briefly describe that attachment?

15  A.  This is an invoice from Grassroots Strategy, Inc.,

16  attention:  ICT, Inc. in Hyattsville, Maryland.  The date is

17  July 22, 2011.  The project title is Consulting Services, and

18  the project description is Provided Consulting Services.  The

19  description is retainer to provide services, $25,000, and

20  provides monthly services for month of January 2012 for $8,000,

21  for a total of $33,000.  And it's signed sincerely yours, Kent

22  Sorenson.

23  Q.  Does this attachment anywhere mention the Ron Paul

24  Presidential Campaign?

25          MR. HOWARD:  Your Honor, again objection.  The

1   document speaks for itself.

2   　　　　　THE COURT:  Overruled.

3   　　　　　Answer the question.

4   A.  No, it does not.

5   BY MR. KRAVIS:

6   Q.  Turning your attention now to Government's Exhibit 69, which

7   has not yet been admitted into evidence.

8   　　　　　Do you recognize Government's Exhibit 69?

9   A.  Yes.

10  Q.  What is Government's Exhibit 69?

11  A.  This is an e-mail from Dimitri Kesari to pkesari@msn.com.

12  Q.  What's the date of the e-mail exchange?

13  A.  January 24, 2012.

14  Q.  Where did this document come from?

15  A.  This document came from the Ron Paul Presidential Campaign.

16  　　　　　MR. KRAVIS:  At this time the government moves Exhibit

17  69 into evidence.

18  　　　　　　　　　　(Government Exhibit 69 was

19  　　　　　　　　　　offered in evidence.)

20  　　　　　MR. BINNALL:  No objection.

21  　　　　　MR. HOWARD:  No objection.

22  　　　　　THE COURT:  All right.  69 is received.

23  　　　　　　　　　　(Government Exhibit 69 was

24  　　　　　　　　　　received in evidence.)

25  　　　　　MR. BINNALL:  Your Honor, I apologize.  I just wanted

1  to make sure that I did say that we were -- we did have our

2  authentication issue preserved on these e-mails, and I just want

3  to make sure that we have t preserved the authentication

4  specifically on this exhibit.

5          THE COURT:  Okay.  The authentication objection is

6  overruled.

7          MR. BINNALL:  Thank you.

8  BY MR. KRAVIS:

9  Q.  As the document Government Exhibit 69 is coming up on the

10  screen, I would ask you to start with the e-mail that appears at

11  the top of the first page and read that aloud.

12  A.  From Dimitri Kesari, sent Tuesday, January 24, 2012, 9:30

13  p.m., to pkesari@msn.com.  Subject:  Invoice.  There's an

14  attached invoice.

15          "Here is the invoice that needs to be taken care of.

16          "Send me an invoice for video services.  33k plus."

17  Q.  By the way, in the course of your investigation, did you

18  learn who was using the e-mail address pkesari@msn.com at this

19  time?

20  A.  Yes.

21  Q.  Who was it?

22  A.  Pavlo Kesari.  He also goes by the name of Paul Kesari.

23  Q.  Let me ask you now to turn to the second page of this

24  exhibit, the attachment.  And my question is just, is this

25  attachment the same invoice that we just saw a moment ago from

1  the previous exhibit?

2  A.  Yes.

3          THE COURT:  Okay.  We're going to break for lunch.

4  Members of the jury, we'll take a lunch hour and we'll start

5  again at 1:15.

6          We'll see you then.

7          (In open court, out of the presence of the jury.)

8          THE COURT:  Please be seated.

9          So what's the issue on 87c, Mr. Binnall?

10         MS. SINFELT:  Your Honor, this document says that the

11  e-mail message was sent from the iPad, and the government has

12  just proffered that Agent LoStracco only looked at the Mac Pro

13  and not the iPad.  It's not clear that the FBI actually looked

14  at the iPad that this e-mail came from.

15         MR. KRAVIS:  I mean, we have noticed an expert

16  witness, Gunnar Demarco, who is going to testify later today or

17  tomorrow who's going to explain that e-mail servers can sync

18  with multiple devices.  So we all have this experience, you get

19  your e-mail on your phone, your iPad, your computer, it's all

20  the same e-mail.  The special agent testified that she reviewed

21  the contents of the computer.  This e-mail was in there.  If the

22  defense wants to bring out on cross-examination that there could

23  have been another device involved, I'm not sure what relevance

24  that has; but I think that would go at most to the weight not

25  the admissibility of the evidence.

1          MS. SINFELT:  And the issue here is this was not found

2    anywhere else.  It was not found on the Ron Paul server.  It was

3    not found in Mr. Benton's e-mail account.  It wasn't found on

4    Mr. Kesari's AOL account.  It was only found on his personal

5    computer which was not the computer that he used when he was

6    active during the campaign which we just heard from the FBI

7    agent.

8          THE COURT:  Thank you.  I appreciate that.

9          We'll see you at 1:15.

10          (Recess at 12:02 p.m., until 1:15 p.m.)

```
 1                  AFTERNOON SESSION  1:14 p.m.

 2            (In open court, in the presence of the jury.)

 3            THE COURT:  Please be seated.

 4                         KAREN LOSTRACCO,

 5   resumed her testimony as follows:

 6                    DIRECT EXAMINATION (Continued)

 7   BY MR. KRAVIS:

 8   Q.  Good afternoon, Special Agent.

 9   A.  Good afternoon.

10   Q.  You're still under oath, you understand that, right?

11   A.  Yes.

12   Q.  Before the break we were talking about some e-mails related

13   to invoices from January of 2012.  I want to pick up there and

14   start with what has been marked but not yet admitted as

15   Government's Exhibit 70.

16            Do you recognize Government's Exhibit 70?

17   A.  Yes.

18   Q.  What is Government's Exhibit 70?

19   A.  This is an e-mail from Kent Sorenson to Dimitri Kesari.

20   Q.  What is the date of the e-mail?

21   A.  January 26, 2012.

22   Q.  Where did this document come from?

23   A.  The Ron Paul Presidential Campaign.

24            MR. KRAVIS:  At this time the government moves Exhibit

25   70 into evidence.
```

1              (Government Exhibit 70 was

2              offered in evidence.)

3         MR. BINNALL:  Objection; hearsay, authentication.

4         MR. HOWARD:  Objection, Your Honor.

5         THE COURT:  Overruled.  70 is received.

6              (Government Exhibit 70 was

7              received in evidence.)

8    BY MR. KRAVIS:

9    Q.  Now as Exhibit 70 comes up on the screen, the first thing

10   I'm going to ask you to do is read the short e-mail that appears

11   at the top of the first page of Government's Exhibit 70.

12   A.  From Kent Sorenson, sent Thursday, January 26, 2012, 11:39

13   p.m., to Dimitri Kesari and Dimitri Kesari.  Subject:  Re:

14   Invoice, and there's an attachment.

15        "Dimitri.

16        "I am attaching an invoice that contains my EIN.  My

17   address is included in the bill.

18        "Thanks.

19        "Kent."

20   Q.  Now what I'm going to ask you to do is compare the

21   attachment that appeared in Government's Exhibit 68, that's the

22   second page of 68, with the attachment that appeared in

23   Government's Exhibit 70.  That's the second page of Government's

24   Exhibit 70.  We'll get the second page of 68 and the second page

25   of 70?

1      What, if any, difference is there between the

2  attachment to Government's Exhibit 68 and the attachment to

3  Government's Exhibit 70?

4  A.  I'm not sure how they're laid out on the screen, which one

5  is on which side.

6  Q.  I believe that Government's Exhibit 70 should bear the stamp

7  RP0006?

8  A.  Government's Exhibit 70 appears to have an EIN number and

9  the other exhibit does not.

10 Q.  So they're the same invoice, one with the EIN number, one

11 without?

12 A.  Yes.

13 Q.  I'm going to direct your attention now to what's being

14 marked but not yet entered into evidence as Government's Exhibit

15 71.

16      Do you recognize Government's Exhibit 71?

17 A.  Yes.

18 Q.  What is it?

19 A.  This is an e-mail exchange between Kent Sorenson, Dimitri

20 Kesari, and pkesari@msn.com.

21 Q.  Where did this document come from?

22 A.  The Ron Paul Presidential Campaign.

23      MR. KRAVIS:  At this time the government moves Exhibit

24 71 into evidence.

25

1               (Government Exhibit 71 was

2               offered in evidence.)

3        MR. BINNALL:  Same objection.

4        MR. HOWARD:  Your Honor, again, hearsay objection.

5        THE COURT:  Overruled.  71 is received.

6               (Government Exhibit 71 was

7               received in evidence.)

8   BY MR. KRAVIS:

9   Q.  Now, looking at the first page of Government's Exhibit 71,

10  do you see the e-mail that we just saw in Government's Exhibit

11  70?  Do you see that in Government's Exhibit 71?

12  A.  I do.

13  Q.  And what happens above that e-mail, that is above the e-mail

14  that we saw from 70?

15  A.  That is an e-mail from Dimitri Kesari to pkesari@msn.com

16  forwarding the bottom e-mail.

17  Q.  And who again was using the address pkesari@msn.com at this

18  time?

19  A.  That was Pavlo Kesari or Paul Kesari.

20  Q.  Turning to the second page of Government Exhibit 71, the

21  invoice, is that the same attachment that we just saw for

22  Government's Exhibit 70?

23  A.  Yes.

24  Q.  I'm going to show you now what has been marked and entered

25  into evidence as Government's Exhibit 76, and what I'm going to

1   do is actually put Government's Exhibit 76 and Government's

2   Exhibit 71 side by side, the first pages of each.

3           So Government's Exhibit 71 is the e-mail from Dimitri

4   Kesari to pkesari@msn.com that you just reviewed?

5   A.   Correct.

6   Q.   Do you see that there?

7   A.   Yes.

8   Q.   And Government's Exhibit 76 is the e-mail exchange that's

9   been admitted into evidence among sonnyizon@aol.com,

10  dkesari@aol.com and pkesari@msn.com.

11          Do you see that?

12  A.   Yes.

13  Q.   Can you compare for me the date of the e-mail on

14  Government's Exhibit 71 as it relates to the dates on the

15  e-mails on Government's Exhibit 76?

16  A.   Yes.   The date on Government Exhibit 71 is January 27, 2012.

17  The date on Government Exhibit 76 is February 5, 2012, so a few

18  days later, about a week later.

19  Q.   Thank you.

20          I want to turn your attention now to some e-mails

21  regarding invoices for the month of February, 2012, okay?

22  A.   Yes.

23  Q.   And I'm going to start with what has been marked but not yet

24  entered into evidence as Government's Exhibit 78, and this is a

25  redacted exhibit.

1            Do you have Government's Exhibit 78 in front of you?

2   A.  I do.

3   Q.  What is it?

4   A.  This is an e-mail between Kent Sorenson and Dimitri Kesari.

5   Q.  What's the date of the e-mail?

6   A.  March 4, 2012.

7   Q.  And where did this document come from?

8   A.  This document came from the Ron Paul Presidential Campaign.

9            MR. KRAVIS:  At this time the government moves Exhibit

10  78 into evidence.

11                            (Government Exhibit 78 was

12                            offered in evidence.)

13           MR. HOWARD:  No objection.

14           MR. BINNALL:  Same objection.

15           THE COURT:  Overruled.  78 is received.

16                            (Government Exhibit 78 was

17                            received in evidence.)

18  BY MR. KRAVIS:

19  Q.  Now, as Government's Exhibit 78 comes up on the screen, I'm

20  going to ask you to start with the e-mail that appears at the

21  top of the first page.  Can you read that e-mail for us?

22  A.  From Kent Sorenson, sent Sunday March 4, 2012, 11:23 p.m.,

23  to Dimitri Kesari and Dimitri Kesari.  Subject:  Invoice for

24  February.  Attachment.

25           "Hey Dimitri hope all is well.

1          "I have attached the invoice for February.

2          "Thanks.

3          "Kent."

4  Q.   Now I'm going to ask you to turn to the second page of

5  Government's Exhibit 78, the invoice.  Can you briefly describe

6  this attachment?

7  A.   This is an invoice from Grassroots Strategy, Inc.,

8  attention:  ICT, Inc., in Hyattsville, Maryland.  The date is

9  March 1, 2012.  The project title is Consulting Services.  The

10  project description is Provided Consulting Services.  The

11  description, provides monthly service for the month of February

12  2012 in the amount of $8,000.  There's an EIN number, and the

13  total is $8,000 and it's signed sincerely yours, Kent Sorenson.

14  Q.   Do you see the Ron Paul Presidential Campaign reference

15  anywhere on this invoice?

16  A.   No.

17  Q.   Turn your attention now to what has been marked but not yet

18  entered into evidence as Government's Exhibit 79.  This is also

19  a redacted exhibit.

20          Do you recognize Government's Exhibit 79?

21  A.   Yes.

22  Q.   What is Government's Exhibit 79?

23  A.   This is an e-mail exchange between Kent Sorenson and Dimitri

24  Kesari.

25  Q.   And what's the date of the e-mail exchange?

1  A.   March 18, 2012 and March 4, 2012.

2  Q.   Where did this document come from?

3  A.   This document came from the Ron Paul Presidential Campaign.

4           MR. KRAVIS:  At this time the government moves Exhibit

5  79 into evidence --

6           MR. HOWARD:  Ah --

7           MR. KRAVIS:  -- as redacted.

8                               (Government Exhibit 79 was

9                                offered in evidence.)

10          MR. HOWARD:  Your Honor, understanding our prior

11 objections, we understand your ruling.  Just for the record we

12 do have the same objections.

13          MR. BINNALL:  Same thing from us, Your Honor.

14          THE COURT:  79 is received.  The objections are

15 overruled.

16                              (Government Exhibit 79 was

17                               received in evidence.)

18 BY MR. KRAVIS:

19 Q.   As for the documents, the exhibit is coming up on the

20 screen, Special Agent.  I'm going to ask you to --

21          MR. HOWARD:  I'm sorry, Mr. Kravis.  Your Honor, if I

22 can ask -- say something to Mr. Kravis real quick?

23          THE COURT:  Yeah.  Go ahead.

24          MR. HOWARD:  I apologize.

25          (Counsel conferring.)

1    MR. HOWARD:  I apologize.

2  BY MR. KRAVIS:

3  Q.  The e-mail that appears at the bottom of Exhibit 79, is that

4  the same e-mail we were just looking at for Exhibit 78?

5  A.  Yes.

6  Q.  Can you read up from there the e-mail that appears above it?

7  A.  From Kent Sorenson, sent Sunday, March 18, 2012, 9:46 a.m.,

8  to Dimitri Kesari.  Subject:  Forward: Invoice for February.

9  Attachment.

10    "Dimitri, I've tried checking in a few time your VM is

11  full.  Would like to check on payment for February.  I am unsure

12  what I am going to do so please stay in touch and don't go dark

13  on me," smiley face.  "Hope you are doing well.

14    "Thanks, Kent.

15    "PS.  Do I need to send this to Sonny since he was the

16  one that wired the funds last time?"

17  Q.  The next thing I'm going to ask you to do is compare the

18  attachment from Government's Exhibit 78, the attachment from

19  Government's Exhibit 79.  We will put on the screen before you

20  the second page of Government's Exhibit 78 and the second page

21  of Government's Exhibit 79.

22    Once they're up there, let me ask you to look at them

23  and tell me whether the attachments to Government's Exhibits 78,

24  79, those two invoices are the same or different.

25  A.  They're the same.

1  Q.  Then turn your attention now to what has been marked but not

2  yet admitted as Government's Exhibit 80.

3          Do you recognize Government's Exhibit 80?

4  A.  Yes.

5  Q.  What is Government's Exhibit 80?

6  A.  This is an e-mail from Dimitri Kesari to Paul Kesari.

7  Q.  What is the date of the e-mail?

8  A.  Sunday, March 18, 2012.

9  Q.  Where did this document come from?

10  A.  The Ron Paul Presidential Campaign.

11          MR. KRAVIS:  At this time the government moves Exhibit

12  80 into evidence.

13                              (Government Exhibit 80 was

14                                offered in evidence.)

15          MR. BINNALL:  No objection, Your Honor.

16          MR. HOWARD:  Just a minute, Your Honor.

17          MR. BINNALL:  Except for the authentication issue

18  already preserved.

19          (Pause.)

20          MR. HOWARD:  For the record, the same objection.

21          THE COURT:  Overruled.  80 is received.

22                              (Government Exhibit 80 was

23                                received in evidence.)

24  BY MR. KRAVIS:

25  Q.  As the exhibit comes up on the screen, I'm going to ask you

1  to begin at the top of the first page of Government's Exhibit

2  80.  I'm going to ask you to read the short e-mail that appears

3  at the top of that page.

4  A.  From Dimitri Kesari sent Sunday, March 18, 2012, 12:38 p.m.,

5  to Paul Kesari.  Subject:  Forward: Invoice for February.

6  Attachment.

7          "Can you send me a bill?"

8  Q.  Now I'm going to ask you to compare the attachment for

9  Government's Exhibit 79, the attachment for Government's Exhibit

10  80.  I will put on the screen in front of you the second page of

11  Government's Exhibit 79 and the second page of Government's

12  Exhibit 80.  When you have them on the screen in front of you,

13  would you look at them and tell me, is this the same invoice or

14  different?

15  A.  It's the same invoice.

16  Q.  So the invoice that was forwarded with the invoice that was

17  sent in Government's Exhibit 79 from Kent Sorenson to Dimitri

18  Kesari is the same invoice that was sent in Government's Exhibit

19  80 from Dimitri Kesari to Paul Kesari?

20  A.  Correct.

21  Q.  Turn your attention now to what has been marked but not yet

22  admitted as Government's Exhibit 81.

23          Do you recognize Government's Exhibit 81?

24  A.  Yes.

25  Q.  What is Government's Exhibit 81?

1   A.   This is an e-mail from sonnyizon@aol.com to dkesari@aol.com.

2   Q.   What is the date of this e-mail exchange?

3   A.   March 21, 2012.

4   Q.   Where did this document come from?

5   A.   Dimitri Kesari's computer.

6          MR. KRAVIS:  At this time the government moves Exhibit

7   81 into evidence.

8                          (Government Exhibit 81 was

9                          offered in evidence.)

10         MS. SINFELT:  Your Honor, we would just like to

11  preserve our authentication objection.

12         MR. BINNALL:  The same with authentication, and also

13  coming from Mr. Izon, we object to hearsay.

14         THE COURT:  Overruled.  81 is received.

15                         (Government Exhibit 81 was

16                         received in evidence.)

17  BY MR. KRAVIS:

18  Q.   Okay.  As 81 is coming up on the screen, I'm going to ask

19  you to direct your attention to the brief e-mail that appears at

20  the top of Government's Exhibit 81.  You don't have to worry

21  about all of the text that comes below.

22         Can you read that e-mail for us?

23  A.   From sonnyizon@aol.com to dkesari@aol.com.  Subject:

24  February invoice, sent Wednesday, the 21st of March 2012, at

25  19:35.

1          "Hey Dimitri.

2          "Attached is the invoice for services rendered in

3     February.  Let me know if you need anything else.

4          "Best.

5          "Sonny."

6     Q.  I'm going to ask you to turn your attention to the third

7     page of Government's Exhibit 81.  And is that one of the ICT

8     invoices that we've seen already?

9     A.  Correct.

10    Q.  All right.  I'm going to briefly turn your attention to what

11    has already been marked and entered into evidence as

12    Government's Exhibit 84b.  I'm going to ask you to look at the

13    bottom -- well, first, let me ask you, what is Government's

14    Exhibit 84b?

15    A.  This is an e-mail exchange between sonnyizon@aol.com,

16    dkesari@aol.com, Fernando Cortes, and John Tate.

17    Q.  Okay.  Now, do you see the e-mail from Sonny Izon on

18    Wednesday March 21, 2012, at 7:36 p.m. that appears at the

19    bottom of Government's Exhibit 84b, the bottom e-mail there?

20    A.  Yes.

21    Q.  Is that e-mail at the bottom the same or different from the

22    e-mail that we just saw in Government's Exhibit 81?

23    A.  That's the same e-mail.

24    Q.  Same e-mail?

25    A.  Yes.

1  Q.  I want to ask you now about some e-mails related to some

2  invoices for the month of March 2012.  I want to start with what

3  has been marked but not yet entered into evidence as

4  Government's Exhibit 82.

5          Do you recognize Government's Exhibit 82?

6  A.  Yes.

7  Q.  What is it?

8  A.  This is an e-mail from Kent Sorenson.

9  Q.  Now, is there anyone listed in the "to" line in the header

10  of the e-mail?

11  A.  There is not.

12  Q.  Is there anyone listed in the body of the e-mail as

13  recipient?

14  A.  Yes.

15  Q.  Who is listed as a recipient in the body of the e-mail?

16  A.  Dimitri and Sonny.

17  Q.  And what is the date of this e-mail?

18  A.  March 26, 2012.

19  Q.  And where did this e-mail come from?

20  A.  The Ron Paul Presidential Campaign.

21          MR. KRAVIS:  At this time the government moves Exhibit

22  82 into evidence.

23                          (Government Exhibit 82 was

24                          offered in evidence.)

25          MR. BINNALL:  Same objection as we previously had.

1          MS. SINFELT:  One second.

2          (Pause.)

3          MS. SINFELT:  Your Honor, we would like to have some

4    voir dire on this document as well.

5          THE COURT:  Go ahead right now.

6                    VOIR DIRE EXAMINATION

7    BY MS. SINFELT:

8    Q.  Good afternoon, Agent LoStracco.  Just a few quick questions

9    about this document.

10   A.  Sure.

11   Q.  Can you tell us if you know why there would not be an

12   address listed in the "to" field?

13   A.  I do not.

14         MS. SINFELT:  Thank you.

15         Your Honor, we have an objection to this document as

16   to authenticity.

17         THE COURT:  Overruled.  82 is received.

18                              (Government Exhibit 82 was

19                              received in evidence.)

20               DIRECT EXAMINATION (Continued)

21   BY MR. KRAVIS:

22   Q.  As document 82 comes up on the screen, I'm going to ask you

23   to start by reading the header that appears at the top of

24   Government's Exhibit 82.

25   A.  From Kent Sorenson, sent Monday, March 26, 2012, 12:38 a.m.

1  Subject:  "Invoiving," and there's an attachment.

2  Q.  And the first line reads?

3  A.  "Dimitri/Sonny."

4  Q.  Now I'm going to ask you to turn to the third page of this

5  exhibit, and on the third page -- I'm sorry, one more, one more

6  page.

7           And on the third page, can you read where the text

8  continues at the top?

9  A.  "I am sending a new invoice that now includes March as well.

10  Please let me know when this will be paid.

11           "Sincerely,

12           "Kent Sorenson."

13  Q.  Now I'm going to ask you to turn back to the second page and

14  take a look at the attachment that appears there.  And when it

15  comes up, I'm going to ask you to briefly describe it.

16  A.  This is an invoice from Grassroots Strategy, Inc.,

17  attention" ICT, Inc., Hyattsville, Maryland.  The date is

18  March 25, 2012.  Project title:  Consulting Services.  Project

19  Description:  Provided Consulting Services.  The description is,

20  provides monthly service for month of February 2012 in the

21  amount of $8,000 and provides monthly service for month of March

22  2012 in the amount of $8,000 for a total of $16,000, and it's

23  signed, sincerely yours, Kent Sorenson.

24  Q.  Does the name of the Ron Paul Presidential Campaign appear

25  anywhere in this invoice?

1  A.  No.

2  Q.  I want to turn your attention now to what has been marked

3  but not yet entered into evidence as Government's Exhibit 83.

4          Do you recognize Government's Exhibit 83?

5  A.  Yes.

6  Q.  What is it?

7  A.  This is an e-mail from sonnyizon@aol.com to dkesari@aol.com.

8  Q.  What is the date of the e-mail?

9  A.  March 26, 2012.

10  Q.  Where did this document come from?

11  A.  This document came from Dimitri Kesari's computer.

12          MR. KRAVIS:  At this time of the government moves

13  Exhibit 83 into evidence.

14                                (Government Exhibit 83 was

15                                 offered in evidence.)

16          MR. HOWARD:  Your Honor, for the record just the same

17  objections.

18          MR. BINNALL:  For the record the same objections for

19  Mr. Kesari as well.

20          THE COURT:  Overruled.  83 is received.

21                                (Government Exhibit 83 was

22                                 received in evidence.)

23  BY MR. KRAVIS:

24  Q.  As Exhibit 83 comes up on the screen, I'm going to direct

25  your attention to the e-mail that appears at the top of the

1  first page.  I would like you to read that e-mail for us.

2  A.  From sonnyizon@aol.com to dkesari@aol.com.  Subject:  March

3  invoice.  Sent Monday, 26th of March 2012, at 17:12.

4          "Hi Dimitri.

5          "Here is the invoice for March.

6          "Peace.

7          "Sonny."

8  Q.  And now just briefly looking at the attachment that appears,

9  the second page of Government's Exhibit 83, is this one of the

10 ICT invoices that we saw earlier today?

11 A.  Yes.

12 Q.  I'm going to direct your attention now to what has been

13 marked and entered into evidence as Government's Exhibit 85.

14          What is Government's Exhibit 85?

15 A.  This is an e-mail exchange between John Tate, Fernando

16 Cortes, Dimitri Kesari, and sonnyizon@aol.com.

17 Q.  We saw this e-mail earlier this morning.  I'm just going to

18 focus your attention on the bottom e-mail of Government's

19 Exhibit 85.

20          MR. BINNALL:  Your Honor, I'm going to object that the

21 document speaks for itself just because of the fact that that is

22 not exactly what is shown on the header at the top of the e-mail

23 there.

24          THE COURT:  Overruled.

25 BY MR. KRAVIS:

1    Q.  I'm going to direct your attention to the e-mail that

2    appears at the bottom of the chain of Government's Exhibit 85,

3    the one that begins from sonnyizon@aol.com.

4    A.  Okay.

5    Q.  Is that e-mail the same e-mail or a different e-mail from

6    the one we just saw in Government's Exhibit 83?

7    A.  That is the same.

8    Q.  So it's the same e-mail as the one we just saw?

9    A.  Yes.

10   Q.  I'm going to turn now to some e-mails about invoices for the

11   month of April 2012.  Now, I'm going to start with what has been

12   marked but not yet entered into evidence as Government's Exhibit

13   86.

14           Do you recognize Government's Exhibit 86?

15   A.  Yes.

16   Q.  What is Government's Exhibit 86?

17   A.  This is an e-mail exchange between Sonny Izon, Kent

18   Sorenson, and Dimitri Kesari.

19   Q.  What is the date of this e-mail exchange?

20   A.  February 10, 2012 and May 1, 2012 and May 2, 2012.

21   Q.  Where did this document come from?

22   A.  The Ron Paul Presidential Campaign.

23           MR. KRAVIS:  At this time the government moves Exhibit

24   86 into evidence.

25

 1                         (Government Exhibit 86 was

 2                         offered in evidence.)

 3           MR. HOWARD:  For the record same objections.

 4           MR. BINNALL:  Authentication, same objections.

 5           THE COURT:  Overruled.  86 is received.

 6                         (Government Exhibit 86 was

 7                         received in evidence.)

 8  BY MR. KRAVIS:

 9  Q.  Now, as Exhibit 86 comes up on the screen, I'm going to ask

10  you to direct your attention starting in the middle of the page

11  with the e-mail that's dated May 1, 2012 at 10:07 p.m. from

12  sonnyizon@aol.com.

13           Do you see that e-mail?

14  A.  Yes.

15  Q.  Can you read that e-mail and then go up from there?

16  A.  Yes.  On May 1, 2012, at 10:07 p.m., sonnyizon@aol.com

17  wrote:

18           "Hi Kent.

19           "Just checking in to see if you will be forwarding

20  invoices for April and beyond.  Hope you are well.

21           "Cheers.

22           "Sonny."

23  Q.  And the next e-mail, if you can start with the header and

24  then read the body of the message.

25  A.  From Kent Sorenson sent Wednesday, May 2, 2012, 1:55 a.m.,

1  to sonnyizon@aol.com and Dimitri Kesari.  Subject:  Re:

2  Additional invoices?  Attachment.

3  Q.  And now can you read the body of the message?

4  A.  Part of the message is cut off on the right.  Can you zoom

5  out?

6          "Hey Sonny.

7          "I am attaching the invoice for April.  I have been

8  caught up trying to wrap up a few things with session and just

9  have not had time to submit it.  And so that you know, we're

10  doing great.  I hope you are as well.

11          "Blessings, Kent."

12  Q.  Now I'm going to have you turn to the second page, the

13  attachment of Government's Exhibit 86.

14          Can you briefly describe that attachment?

15  A.  Yes.  It's an invoice from Grassroots Strategy, Inc.,

16  attention:  ICT, Inc., in Hyattsville, Maryland.  The date is

17  May 1, 2012.  Project title:  Consulting Services.  Project

18  description:  Provided Consulting Services.  The description is,

19  provides monthly service for month of April 2012 in the amount

20  of $8,000.  There's an EIN number.  The total on the bill -- or

21  the invoice, sorry, is $8,000, and it's signed, sincerely yours,

22  Kent Sorenson.

23  Q.  Now, this invoice from Grassroots Strategy to ICT signed by

24  Kent Sorenson, does it mention the Ron Paul 2012 Presidential

25  Campaign?

1   A.  No.

2   Q.  I will turn your attention now to what has been marked but

3   not yet entered into evidence as Government's Exhibit 87a.

4           Do you recognize Government's Exhibit 87a?

5   A.  Yes.

6   Q.  What is it?

7   A.  This is an e-mail from sonnyizon@aol.com to dkesari@aol.com.

8   Q.  What is the date of this e-mail exchange?

9   A.  May 2, 2012.

10  Q.  And where did this document come from?

11  A.  Dimitri Kesari's computer.

12          MR. KRAVIS:  At this time the government moves Exhibit

13  87a into evidence.

14                          (Government Exhibit 87a was

15                           offered in evidence.)

16          MR. HOWARD:  For the record same objections, Your

17  Honor.

18          MR. BINNALL:  Same objections for Mr. Kesari as well.

19          THE COURT:  Overruled.  87a is received.

20                          (Government Exhibit 87a was

21                           received in evidence.)

22  BY MR. KRAVIS:

23  Q.  And as Exhibit 87a comes up on the screen, I'm going to

24  direct your attention to the e-mail that appears at the top of

25  the first page and ask you to read that e-mail aloud.

1  A.  From sonnyizon@aol.com to dkesari@aol.com.  Subject:  April

2  invoice, sent Wednesday, 2nd of May, 2012, 9:01.

3        "Hey Dimitri.

4        "Here's the production services invoice for April

5  2012.  Hope you are doing well.

6        "Peace.

7        "Sonny Izon."

8  Q.  Now I'm going to have you look at the attachment of

9  Government's Exhibit 87a, second page of the exhibit.  Is this

10  one of the ICT invoices we saw this morning?

11  A.  Yes.

12  Q.  I'm going to go back to Government's Exhibit 87c that's been

13  marked but not yet admitted into evidence.

14        MR. KRAVIS:  And the government renews its motion to

15  admit 87c.

16        THE COURT:  The objections were previously made.

17  They're overruled.  87c is received.

18                              (Government Exhibit 87c was

19                              received in evidence.)

20  BY MR. KRAVIS:

21  Q.  Now, as Exhibit 87c comes up on the screen, I'm going to ask

22  you to start at the bottom of the e-mail exchange.  It appears

23  at the bottom of the first page, the e-mail that begins from

24  sonnyizon@aol.com and read the e-mails up from there.

25  A.  From sonnyizon@aol.com, dated May 2, 2012, 9:01 a.m. to

1  dkesari@aol.com.  Subject:  April invoice.

2          "Hey Dimitri.

3          "Here's the production services invoice for April

4  2012.  Hope you are doing well.

5          "Peace.

6          "Sonny Izon."

7          On May 2, 2012, at 9:42 a.m., Dimitri Kesari wrote:

8          "Kent's bill.

9          "Pay?"

10 Q.  And is there a response to Mr. Kesari's e-mail?

11 A.  Yes.  On May 2, 2012, at 10:30 a.m., Jesse Benton wrote:

12          "Yes - last time."

13          MR. HOWARD:  Your Honor, we're just going to object to

14 the answer.  This e-mail was never found in Mr. Benton's -- I

15 understand what this says, I understand your ruling, but to make

16 sure this isn't Mr. Benton's --

17          THE COURT:  Overruled.

18 A.  "Yes - last time."

19 BY MR. KRAVIS:

20 Q.  And there was a response from Mr. Kesari?

21 A.  From Dimitri Kesari.  To Jesse Benton.  Subject:  Re: April

22 invoice, sent Wednesday, 2nd of May, 2012 at 10:30.

23          "Ok."

24 Q.  Now, in the course of your work during this investigation,

25 did you have the opportunity to interview Mr. Benton?

1   A.  I did.

2   Q.  When was that interview?

3   A.  It was in July of 2014.

4          MR. HOWARD:  Objection, objection; improper statement,

5   Your Honor.

6          THE COURT:  Okay.  Overruled.

7   BY MR. KRAVIS:

8   Q.  Where did that interview take place?

9   A.  The interview took place here in Des Moines at the U.S.

10  Attorney's office.

11  Q.  Was the interview just one day or did it go over more than

12  one day?

13  A.  It went over two days.

14  Q.  Were you the only FBI agent at that interview?

15  A.  I was not.  It was myself and Special Agent Manik Sahaghian.

16  Q.  What was your role in this interview?

17         MR. BINNALL:  Your Honor, at this point I'm just going

18  to get our objection on the record that none of this can come in

19  as to Mr. Kesari and again our objection that anything in this

20  proffer session would be unfairly prejudicial.  It can't come in

21  as to Mr. Kesari as it violates his -- it's both hearsay to him.

22  It also violates his Sixth Amendment rights.

23         THE COURT:  The testimony concerning this event is

24  only offered against defendant Benton.  You cannot use it in any

25  way against defendant Kesari.

1          MR. KRAVIS:  Thank you, Your Honor.

2    BY MR. KRAVIS:

3    Q.  What was your role in this interview?

4    A.  As the lead case agent, my role in this interview was to ask

5    the questions, to lead the interview and to also show Mr. Benton

6    documents.

7    Q.  How about Special Agent Sahaghian, what was her role in this

8    interview?

9    A.  Special Agent Sahaghian was there to take notes of the

10   interview and to ask any follow-up questions that she saw fit if

11   she needed to.

12   Q.  Now, at the start of this interview with Mr. Benton, what,

13   if anything, did you tell Mr. Benton about the ground rules for

14   the interview?

15   A.  I told Mr. Benton that the interview was voluntary, that it

16   was not a requirement for Mr. Benton to speak to us pursuant to

17   his grand jury subpoena to testify before the grand jury, that

18   he could take breaks at any time, whether it be for something to

19   drink, to go to the bathroom or to speak with his attorney.

20   Q.  So Mr. Benton had an attorney there?

21   A.  Yes.

22   Q.  And during the course of this two-day interview, did

23   Mr. Benton, in fact, from time to time take breaks to speak

24   privately with his attorney?

25   A.  Yes.

1   Q.  Now, during the interview, did you ask Mr. Benton questions

2   about whether during the time of the 2012 Ron Paul Presidential

3   Campaign Mr. Benton was aware of the campaign's payments to

4   Senator Sorenson?

5   A.  Yes.

6   Q.  Tell us about those questions and Mr. Benton's answers.

7   A.  I asked Mr. Benton whether at the time that he was working

8   on the campaign he knew about payments from the campaign to

9   Senator Kent Sorenson, and Mr. Benton said no.

10          I asked Mr. Benton whether he was saying no because at

11  the time he was working on the campaign the campaign didn't pay

12  Mr. Sorenson directly.  And Mr. Benton said, I'm not splitting

13  hairs.  The campaign did not pay Mr. Sorenson directly or

14  indirectly.

15          I asked Mr. Benton whether he knew of any payments to

16  Mr. Kent Sorenson indirectly through a third party on behalf of

17  the campaign, and Mr. Benton said no.

18          I asked Mr. Benton whether he knew of any payments

19  from ICT, Interactive Communication Technology, Noel Izon or

20  Sonny Izon on behalf of the Ron Paul Campaign to Mr. Sorenson,

21  and he said no.

22  Q.  Now, just to be clear, was your focus on these questions on

23  Mr. Benton's knowledge at the time of the campaign or on

24  something else?

25  A.  At the time of the campaign.

1  Q.  And did Mr. Benton say in the interview that at the time of

2  the campaign he was not aware of the payments to Kent Sorenson

3  once or did he say it more than once over the course of the

4  two-day period?

5  A.  He said it several times over both days.

6  Q.  Did Mr. Benton when he was giving those answers tell you

7  that he was confused about the questions you were asking?

8  A.  No.

9  Q.  As a general matter, as a special agent with the FBI, what

10  is your practice during an interview when the person you're

11  interviewing tells you they're confused about the question?

12  A.  I reformulate the question.

13  Q.  Can we have Exhibit 87c again.

14       During the course of the interview, did you show

15  Mr. Benton some documents?

16  A.  Yes.

17  Q.  And in particular, did you show Mr. Benton this e-mail

18  exchange that appears in Government's Exhibit 87c?

19  A.  Yes.

20  Q.  After you showed this e-mail to Mr. Benton, did you give him

21  an opportunity to change his answers?

22  A.  Yes.

23  Q.  Did he change any of his answers?

24  A.  No, he did not.

25  Q.  I'm going to ask you now about some e-mails related to

1   invoices for the month of May 2012.  I'm going to start with

2   what has been marked but not yet entered into evidence as

3   Government's Exhibit 90.

4            Do you recognize Government's Exhibit 90?

5   A.  Yes.

6   Q.  What is Government's Exhibit 90?

7   A.  This is an e-mail exchange between Kent Sorenson and

8   sonnyizon@aol.com and Dimitri Kesari.

9   Q.  What is the date of the e-mail exchange?

10  A.  May 2 -- I'm sorry, May -- do you want me to read the

11  bottom, the very bottom part that's cut off as well?

12  Q.  Yes.  The e-mails are from more than one day.

13  A.  Right.

14  Q.  What are the dates?

15  A.  February 10, 2012; May 1, 2012, May 2, 2012; May 17, 2012.

16  I think I got all of them.

17  Q.  Where did this document come from?

18  A.  This document -- can I see the second page?  I'm sorry.

19            This document came from Dimitri Kesari's computer.

20            MR. KRAVIS:  At this time the government moves Exhibit

21  90 into evidence.

22                              (Government Exhibit 90 was

23                               offered in evidence.)

24            MR. HOWARD:  Same objection.

25            MR. BINNALL:  Same objection.

1          THE COURT:  The objection is overruled.  90 is

2   received.

3                              (Government Exhibit 90 was

4                              offered in evidence.)

5   BY MR. KRAVIS:

6   Q.  As Government's Exhibit 90 comes up on the screen, I want to

7   direct your attention to the e-mail in the middle of the page

8   that begins on May 17, 2012 -- excuse me, it was sent on May 17,

9   2012, at 9:11 p.m. from sonnyizon@aol.com.

10          Do you see that e-mail?

11  A.  Yes.

12  Q.  Can you read that e-mail out loud, please, and the one that

13  appears above it.

14  A.  On May 17, 2012, at 9:11 p.m., sonnyizon@aol.com wrote:

15          "Hi Kent.

16          "I know you are wrapping up work on the campaign.  I

17  was wondering if you will be sending a full or partial invoice

18  for May.  Please advise.

19          "Peace.

20          "Sonny."

21  Q.  And the e-mail above it.

22  A.  From Kent Sorenson.  To sonnyizon@aol.com and Dimitri

23  Kesari.  Subject:  Regarding May invoice?  Sent Thursday, 17th

24  of May 2012, 21:24.

25          "I ha an agreement with Dimitri that went thru the

1   month of June.

2          "Thanks.

3          "Kent."

4   Q.  I'm going to direct your attention to what has now been

5   marked but not entered into evidence as Government's Exhibit 92.

6          Do you recognize Government's Exhibit 92?

7   A.  Yes.

8   Q.  What is Government's Exhibit 92?

9   A.  This is an e-mail from sonnyizon@aol.com to dkesari@aol.com.

10  Q.  What is the date of this e-mail?

11  A.  May 24, 2012.

12  Q.  Where did this document come from?

13  A.  The Ron Paul Presidential Campaign.

14          MR. KRAVIS:  At this time the government moves Exhibit

15  92 into evidence.

16                                  (Government Exhibit 92 was

17                                  offered in evidence.)

18          MR. BINNALL:  Objection on hearsay and authentication.

19          MR. HOWARD:  Same objection.

20          THE COURT:  Overruled.  92 is received.

21                                  (Government Exhibit 92 was

22                                  received in evidence.)

23  BY MR. KRAVIS:

24  Q.  As Government's Exhibit 92 is coming up on the screen, I'm

25  going to start by asking you to read the e-mail that appears at

1  the top of this exhibit.

2  A.  From sonnyizon@aol.com.  Sent Thursday, May 24, 2012, 6:02

3  p.m.  To dkesari@aol.com.  Subject:  May invoice.  Attachment.

4       "Hi Dimitri.

5       "I hope this finds you well and not too crazy as you

6  wind down your operations for Ron.  I don't know when you guys

7  are going into closeout mode so I though I'd better send this

8  sooner than later.  I will have one last one to send for June

9  which I can also send ahead of time if that is helpful.  Please

10  advise.

11       "Peace.

12       "Sonny."

13  Q.  And now take a look at the second page of Government's

14  Exhibit 92, the attachment.  Is this one of the ICT invoices

15  that we saw earlier this morning?

16  A.  Yes.

17  Q.  I'm going to turn your attention now to what has been marked

18  and already entered into evidence as Government's Exhibit 93.

19  What is Government's Exhibit 93?

20  A.  This is an e-mail from Dimitri Kesari to Fernando Cortes.

21  Q.  What's the date?

22  A.  May 24, 2012.

23  Q.  Now I'm going to ask you to compare the attachment in

24  Government's Exhibit 92, so the attachment in the May 24, 2012

25  e-mail from sonnyizon@aol.com to dkesari@aol.com, compare that

1   attachment with the attachment to the May 24, 2012 e-mail from

2   Dimitri Kesari to Fernando Cortes in Government's Exhibit 93.

3   Same invoice or different invoices?

4   A.  It's the same invoice.

5   Q.  The last set of invoice e-mails that I'm going to ask you

6   about concerns some e-mails regarding invoices for the month of

7   June, 2012.  I'm going to start with Government's Exhibit 97,

8   which has been marked but not yet entered, and this is a

9   redacted exhibit.

10   A.  Mr. Kravis, do you mind handing me my water?  Can I get my

11   water, please?  It's a lot of reading.

12           Yes, thank you.

13   Q.  There you go.

14           Do you recognize Government's Exhibit 97?

15   A.  I do.

16   Q.  What is Government's Exhibit 97?

17   A.  This is an e-mail between Sonny Izon and dkesari@aol.com --

18   sorry; sonnyizon@aol.com and dkesari@aol.com.

19   Q.  What is the date of this -- what are the dates of the two

20   e-mails that appear in this exhibit?

21   A.  June 18, 2012 and June 25, 2012.

22   Q.  And where did this document come from?

23   A.  Dimitri Kesari's computer.

24           MR. KRAVIS:  At this time the government moves Exhibit

25   97 into evidence.

```
 1                              (Government Exhibit 97 was

 2                              offered in evidence.)

 3          MR. BINNALL:  That's going to be the same;

 4   authentication and hearsay.

 5          MR. HOWARD:  One moment.

 6          (Pause.)

 7          MR. HOWARD:  Same objection, Your Honor.

 8          THE COURT:  Overruled.  97 is received.

 9                              (Government Exhibit 97 was

10                              received in evidence.)

11   BY MR. KRAVIS:

12   Q.  As Government's Exhibit 97 that's coming up on the screen,

13   I'm going to direct your attention to the two e-mails that

14   appear at the top of the first page, and once it's up, I'm going

15   to ask you to read those two e-mails out loud from the bottom

16   up.

17   A.  From Sonny Izon to D. Kesari.  Sent Monday, June 18, 2012,

18   4:57 p.m.  Subject:  June invoice.

19          "Hi Dimitri.

20          "Hope you are well.  Since I will be on travel for

21   most of the rest of the month, I'm sending you the June invoice.

22          "Peace.

23          "Sonny."

24          From sonnyizon@aol.com to dkesari@aol.com.  Subject:

25   Forward:  June invoice.  Sent Monday, 25th of June, 2012 at
```

1   17:05.

2           "Hey Dimitri.

3           "Here it is.  Thanks for everything.

4           "Sonny."

5   Q.  And turning to page 3 of Government's Exhibit 97, is this

6   another one of the ICT invoices that we saw this morning?

7   A.  Yes.

8   Q.  I'm going to turn your attention now to what has been marked

9   and entered into evidence as Government's Exhibit 98.  This is

10  an e-mail exchange between Dimitri Kesari and Fernando Cortes

11  from June 25, 2012.  I'm going to ask you to compare the

12  attachment that appears in Government's Exhibit 98, that is the

13  second page of Government's Exhibit 98, with the attachment that

14  appears on the third page of Government's Exhibit 97, so the

15  second page of Government's Exhibit 98 and the third page of

16  Government's Exhibit 97.

17          Do you have those in front of you?

18  A.  Yes.

19  Q.  My question for you is this:  The attachment to the e-mail

20  that sonnyizon@aol.com sent to dkesari@aol.com on June 25, 2012,

21  the attachment to Government's Exhibit 97, is that the same as

22  or is it different than the attachment to the e-mail that

23  Dimitri Kesari sent to Fernando Cortes on June 25, 2012,

24  Government's Exhibit 98?

25  A.  It's the same invoice.

1   Q.   Same invoice?

2   A.   Yes.

3   Q.   I'm now going to turn your attention very briefly to what

4   has been marked and entered into evidence as Government's

5   Exhibit 100.

6          We saw this this morning.  I'm not going to ask you to

7   read the whole exhibit again.  I'm just going to ask you to read

8   the top e-mail from John Tate to Fernando Cortes on Monday,

9   June 25, 2012, at 6:00 p.m.

10  A.   From John Tate.  Sent Monday, June 25, 2012, 6:00 p.m.  To

11  Fernando Cortes.  Subject:  Re:  Wire-Interactive Communication

12  Technology, Inc.

13          "I will find out what it is."

14  Q.   Now I'm going to show you a document that has been marked

15  but not yet admitted, not admitted yet, Government's Exhibit

16  101.

17          Do you recognize Government's Exhibit 101?

18  A.   Yes.

19  Q.   What is Government's Exhibit 101?

20  A.   This is an e-mail exchange between Katie Koerber, Fernando

21  Cortes, John Tate, and Dimitri Kesari.

22  Q.   What is the date of this e-mail exchange?

23  A.   June 25, 2012.

24  Q.   Where did this document come from?

25  A.   The Ron Paul Presidential Campaign.

1              MR. KRAVIS:  All right.  At this time the government

2       moves Exhibit 101 into evidence.

3                                    (Government Exhibit 101 was

4                                     offered in evidence.)

5              MR. HOWARD:  Hearsay objection, Your Honor.

6              MR. BINNALL:  Hearsay objection as well as

7       authentication.

8              THE COURT:  Overruled.  101 is received.

9                                    (Government Exhibit 101 was

10                                    received in evidence.)

11      BY MR. KRAVIS:

12      Q.  Now what I'm going to ask you to do is compare the first

13      page of Government's Exhibit 101 with the exhibit that we just

14      saw, Government's Exhibit 100.  And when you have them both up

15      in front of you, I'm going to ask you to look at it.  On

16      Government's Exhibit 100, do you see the June 25, 2012, 5:49

17      p.m., e-mail from Fernando Cortes, according to Dimitri is this

18      the last one again?  And the e-mail below it from Katie Koerber

19      dated Monday, June 25, 2012.  Do you see those in Government's

20      Exhibit 100?

21      A.  I do.

22      Q.  Do those two e-mails, the e-mail from Fernando Cortes and

23      the e-mail from Katie Koerber in Government's Exhibit 100, do

24      they also appear in Government's Exhibit 101?

25      A.  Yes.

1  Q.  Okay.  I want you to now read up from those e-mails, not the

2  ones we already read.  Just read up from those e-mails in 101.

3           No, sorry; just the top e-mail.  There.  Thank you.

4  A.  From John Tate.  Sent Monday, June 25, 2012, 6:00 p.m.  To

5  Dimitri Kesari.  Subject:  Forward:  Wire-Interactive

6  Communication Technology, Inc.  Attachment.

7           "What is this?  What is it for, who is it?  Why do we

8  keep paying them?  The last payment was supposedly the last.

9           "John."

10  Q.  Now I want you to turn to the attachment on Government's

11  Exhibit 101, the third page of Government's Exhibit 101.

12           Now, the attachment to the June 25, 2012 e-mail from

13  John Tate to Dimitri Kesari, is that one of the invoices that we

14  saw this morning?

15  A.  Yes.

16  Q.  Now I'm going to direct your attention to what has been

17  marked but not yet entered into evidence as Government's Exhibit

18  102.

19           Do you recognize Government's Exhibit 102?

20  A.  Yes.

21  Q.  What is Government's Exhibit 102?

22  A.  This is an e-mail exchange between Dimitri Kesari, John

23  Tate, and Fernando Cortes, as well as Katie Koerber.

24  Q.  What is the date of this e-mail exchange?

25  A.  June 25, 2012.

1   Q.   Where did this document come from?

2   A.   Dimitri Kesari's computer.

3            MR. KRAVIS:   At this time the government moves Exhibit

4   102 into evidence.

5                             (Government Exhibit 102 was

6                              offered in evidence.)

7            MS. SINFELT:   Your Honor, we've previously made the

8   government aware that we have the authentication objection to

9   this document, so we would like to preserve that.

10           MR. BINNALL:   Same objection, as well as the parts

11  that are not from Mr. Kesari, the same objection, Your Honor.

12           THE COURT:   Overruled.   102 is received.

13                            (Government Exhibit 102 was

14                             received in evidence.)

15  BY MR. KRAVIS:

16  Q.   Now, as Government's Exhibit 102 is coming up on the screen,

17  I'm going to ask you to focus your attention on the top two

18  e-mails at the top of the first page, the two e-mails at the top

19  of the first page.

20           Now, the bottom e-mail, the one dated June 25, 2012,

21  at 5:59 p.m., the e-mail from John Tate that begins, "What is

22  this," is that the e-mail we just saw in Government's Exhibit

23  101?

24  A.   Yes.

25  Q.   Now, I would like you to read the next e-mail up.

1    A.   From Dimitri Kesari to John Tate.   Subject:   Re:

2    Wire-Interactive Communication Technology, Inc.   Sent Monday,

3    25th of June, 2012, at 18:22.

4            "This is the last payment for Kent Sorenson.

5            "The deal Jesse agreed to with Kent."

6    Q.   Turn your attention now to Government's Exhibit 103.

7            Do you recognize Government's Exhibit 103?

8    A.   Yes.

9    Q.   What is it?

10   A.   This is an e-mail exchange between Katie Koerber, Fernando

11   Cortes, John Tate, and Dimitri Kesari.

12   Q.   What's the date of the e-mail exchange?

13   A.   June 25, 2012.

14   Q.   Where did this document come from?

15   A.   The Ron Paul Presidential Campaign.

16           MR. KRAVIS:   At this time the government moves Exhibit

17   103 into evidence.

18                           (Government Exhibit 103 was

19                            offered in evidence.)

20           MR. BINNALL:   Hearsay and authentication, Your Honor.

21           MR. HOWARD:   Your Honor, again, we thought another

22   agent was going to authenticate this.   The agent can't; but

23   anyway, authentication issue, objection.

24           THE COURT:   Overruled.   103 is received.

25

1                        (Government Exhibit 101 was

2                        offered in evidence.)

3   BY MR. KRAVIS:

4   Q.   Okay.  As 103 is coming up on the screen, I'm going to ask

5   you to turn your attention to the top three e-mails.

6            In that group, the middle e-mail on June 25, 2012, at

7   5:59 p.m. from John Tate, is that the same e-mail we saw in

8   Government's Exhibit 101 of "What is this?  What is it for?"

9   A.   Yes.

10  Q.   I would like you to read the next two e-mails up from there.

11  A.   From Dimitri Kesari.  Date Monday, 25th of June, 2012, at

12  18:23.  To John Tate.  Subject:  Regarding wire-Interactive

13  Communication Technology, Inc.

14            "It was for 6 months."

15            From johnt@ronpaul2012.com.  Sent on June 25, 2012, at

16  6:24 p.m.  To Dimitri Kesari.  Subject:  Re:  Wire-Interactive

17  Communication Technology, Inc.

18            "Ok.  Thanks."

19  Q.   What was the time from John Tate on Monday, June 25, 2012,

20  the one that read, "It was for 6 months"?

21  A.   18:23, so 6:23.

22  Q.   What time was the e-mail from johnt@ronpaul2012.com to

23  Dimitri Kesari?

24  A.   At 6:24 p.m.

25  Q.   Now I'm going to show you what has been marked and entered

1  into evidence as Government's Exhibit 104.

2          This was an e-mail exchange we saw this morning.  I'm

3  not going to ask you to read the whole thing.  I'm just going to

4  direct your attention to the top e-mail in this chain -- well,

5  actually the top two e-mails; I'm sorry.

6          Okay.  Now, the bottom of these e-mails, the one from

7  Fernando Cortes to John Tate, is this the one we saw a moment

8  ago in a previous exhibit, "According to Dimitri, is this the

9  last one (again)?"

10  A.  Yes.

11  Q.  What is the response from johnt@ronpaul2012.com in

12  Government's Exhibit 104?

13  A.  You want me to read the entire e-mail?

14  Q.  Just the top e-mail from johnt@ronpaul2012.com to Fernando

15  Cortes?

16  A.  From johnt@ronpaul2012.com.  Sent Monday, June 25, 2012,

17  6:24 p.m.  To Fernando Cortes.  Subject:  Re:  Forward:

18  Wire-Interactive Communication Technology, Inc.

19          "Approved."

20  Q.  When did johnt@ronpaul2012 write that e-mail approving?

21  A.  At 6:24 p.m.

22  Q.  The same time as the last e-mail we just saw?

23  A.  Correct.

24  Q.  I'm going to turn your attention -- oh, before I do that,

25  I'm going to show defense counsel what has been marked for

1  identification and previously provided as Government's Exhibit

2  159.

3          Special Agent LoStracco, I'm handing you what has been

4  marked for identification as Government's Exhibit 159.  Do you

5  recognize Government's Exhibit 159?

6  A.  Yes.

7  Q.  Is this the same e-mail exchange we've just been looking at

8  from June 25, 2012, that ends with Mr. Kesari's e-mail, "It was

9  for 6 months"?

10  A.  Yes.

11  Q.  Where did this version of this e-mail exchange come from?

12  A.  This came from Dimitri Kesari's computer.

13          MR. KRAVIS:  All right.  At this time the government

14  moves Exhibit 159 into evidence.

15                          (Government Exhibit 159 was

16                           offered in evidence.)

17          MS. SINFELT:  Your Honor, we're aware that another

18  special agent will be testifying about this later, so we would

19  like to preserve our authentication objection.

20          MR. BINNALL:  On the same issue we would also like to

21  reserve that and also state that it's not referring to

22  Mr. Kesari.

23          THE COURT:  159 is received.

24          MR. KRAVIS:  Thank you.

25

1                          (Government Exhibit 159 was

2                          received in evidence.)

3  BY MR. KRAVIS:

4  Q.  Special Agent LoStracco, we're going to turn your attention

5  now to some e-mails on a different topic, some e-mails from

6  December 28th and 29th of 2011.  I'm going to start with what

7  has been marked but not yet entered into evidence as

8  Government's Exhibit 63.

9          Do you recognize Government's Exhibit 63?

10  A.  I do.

11  Q.  What is Government's Exhibit 63?

12  A.  This is an e-mail exchange between Dimitri Kesari,

13  fernandoc@ronpaul2012.com, Jesse Benton and John Tate.

14  Q.  Where did this document come from?

15  A.  This document came from Dimitri Kesari's computer.

16  Q.  And what are the dates of the e-mails that appear in this

17  exhibit?

18  A.  December 28, 2011 and December 29, 2011.

19          MR. KRAVIS:  At this time the government moves

20  Government's Exhibit 63 into evidence.

21                          (Government Exhibit 63 was

22                          offered in evidence.)

23          MR. BINNALL:  Objection as to the hearsay as to the

24  part not about Mr. Kesari.

25          MR. HOWARD:  Your Honor, at this point our objection

1   is a little different.  These are a whole series of wires.

2   They're from Fernando Cortes.  Mr. Cortes was here.  He's

3   released.  Now we're denied an opportunity to --

4           MR. KRAVIS:  I'm sorry, at this point I'm going to

5   object to speaking objections.

6           THE COURT:  That's all right.  63 isn't a wire.  It's

7   about a wire.

8           MR. HOWARD:  It's about a wire, Your Honor.  The

9   person who delivered them was just here and released and now

10  they're trying to get it in through an agent.

11          THE COURT:  Overruled.  Exhibit 63 is received.

12                           (Government Exhibit 63 was

13                            received in evidence.)

14  BY MR. KRAVIS:

15  Q.  As Government Exhibit 63 is coming up on the screen, I'm

16  going to direct your attention to the two e-mails that appear at

17  the top of the first page.

18          Okay.  Starting with the e-mail from Dimitri Kesari on

19  December 28, 2011, at 7:36 p.m., can you read up from the top --

20  or up from the bottom to the top?

21  A.  From Dimitri Kesari to fernandoc@ronpaul2012.com, cc Benton,

22  Jesse, cc John Tate.  Subject:  Wire needed.  Sent December 28,

23  2011, 7:36 p.m.

24          "I will need a wire for 25,000 first thing in the

25  morning.  Jesse has approved.

```
1              "I will get you the wire info tonight.

2              "Could you send me the form?"

3   Q.  And could you now read the e-mail that appears above that?

4   A.  From johnt@ronpaul2012.com to Dimitri Kesari and

5   fernandoc@ronpaul2012.com, cc Benton, Jesse.  Subject:  Re:

6   Wire needed.  Sent Thursday, the 29th of December 2011, at 1:38.

7              "Yep approved."

8   Q.  Okay.  Going back down for a minute, what was the time of

9   the e-mail from Dimitri Kesari to fernandoc requesting the wire,

10  moving down a little bit, a little farther.

11             There we go.

12  A.  That was at 7:36 p.m. the night of the 28th.

13  Q.  Now I'm going to turn your attention to what has been marked

14  but not yet entered into evidence as Government's Exhibit 49.

15             Do you recognize Government's Exhibit 49?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is an e-mail exchange between Rachel Weiner and Jesse

19  Benton.

20  Q.  What's the date of the e-mail exchange?

21  A.  December 28, 2011.

22             MR. KRAVIS:  At this time the government moves Exhibit

23  49 into evidence.

24                              (Government Exhibit 49 was

25                               offered in evidence.)
```

1          MR. BINNALL:  Objection; hearsay and -- yeah,

2    objection; hearsay.

3          MR. HOWARD:  Your Honor, we're objecting.  This is

4    hearsay.  We believe it's irrelevant.

5          THE COURT:  So what are you offering this pursuant to?

6    Is this an admission of a party opponent or subsection (E) case?

7          MR. KRAVIS:  Both.

8          THE COURT:  I'm going to reserve ruling on that.

9    We'll visit about that over the next break.

10          MR. KRAVIS:  May we admit it as an admission of a

11    party opponent now?

12          THE COURT:  Certainly as to Jesse Benton, yes.

13          MR. KRAVIS:  Fine.  We'll move it into evidence as an

14    admission of a party opponent now.

15          THE COURT:  Then it's only admissible as to

16    Mr. Benton, not to Mr. Kesari.

17          MR. BINNALL:  We would also then make a rule 403

18    unfair prejudice objection at this time.

19          THE COURT:  That is overruled.

20          Thank you.

21                              (Government Exhibit 49 was

22                              received in evidence.)

23    BY MR. KRAVIS:

24    Q.  As Government's Exhibit 49 is coming up on your screen, I'm

25    going to ask you to read the two e-mails that appear, two brief

1   e-mails that appear on the first page of Government's Exhibit

2   49.

3   A.  On December 28, 2011, at 9:12 p.m., Rachel Weiner wrote:

4   Per your response to the Bachmann charges regarding money

5   offered to Sorenson.  And it's signed Rachel Weiner of the

6   Washington Post.

7           From Jesse Benton.  Sent Wednesday, December 28, 2011,

8   10:29 p.m.  To Rachel Weiner.  Subject:  Re: Should have also

9   asked.

10          "We are not paying Senator Sorenson.  He has realized

11  that Dr. Paul is the only viable conservative alternative to

12  establishment, status quo Mitt Romney, and is now working to

13  help us succeed in Iowa."

14  Q.  At what time on December 28, 2011, did Mr. Benton send that

15  e-mail to Ms. Weiner?

16  A.  10:29 p.m.

17  Q.  So a few hours after the last e-mail we just showed you from

18  Mr. Kesari?

19  A.  Correct.

20  Q.  I'm going to show you what has been marked but not yet in

21  evidence as Government's Exhibit 50 -- I should say it has been

22  marked and identified by a previous witness but not yet entered,

23  Government's Exhibit 50.

24          What is Government's Exhibit 50?

25  A.  This is an e-mail exchange between Linda Feldmann and Jesse

1  Benton.

2  Q.  What's the date of the e-mail exchange?

3  A.  December 29, 2011.

4          MR. KRAVIS:  At this time the government moves Exhibit

5  50 into evidence as an admission of a party opponent reserving

6  the right to admit under (d)(2)(E).

7                              (Government Exhibit 50 was

8                              offered in evidence.)

9          MR. BINNALL:  I have the same objection, and I

10 understand the court will probably rule the same way.  I have

11 one more objection and I think to the last one, too, that

12 they're relying on time stamps, and that's a different hearsay

13 issue because that's not something that these particular

14 individuals are writing up, that it's coming up from a time

15 stamp on a server someplace, and I don't think that time stamp

16 has been properly authenticated.

17         THE COURT:  Mr. Howard, do you object?

18         MR. HOWARD:  Your Honor, we'll join in that objection

19 and our previous ones.

20         THE COURT:  Overruled.  It's being admitted against

21 defendant Benton only, not defendant Kesari.  The objection is

22 overruled.

23                              (Government Exhibit 50 was

24                              received in evidence.)

25 BY MR. KRAVIS:

1  Q.  As Government's Exhibit 50 is coming up on the screen, I'm

2  going to ask you to read from the bottom the two e-mails that

3  appear on the top of the first page of Government's Exhibit 50.

4  A.  On December 29th of 2011, at 8:53 a.m., Feldmann, Linda

5  wrote:

6          "Jesse -

7          "Will Kent Sorenson be getting a salary from the Paul

8  campaign?

9          "Best.

10         "Linda Feldmann, CS Monitor."

11 Q.  Can you read the next e-mail up.

12 A.  To Feldmann, Linda, from Jesse Benton.  Sent Thursday,

13 December 29, 2011, at 2:53 p.m.  Subject:  Re:  Question.

14         "No, he will not."

15 Q.  And when did -- what day did Mr. Benton respond to Linda

16 Feldmann, "no, he will not"?

17 A.  December 29, 2011.

18 Q.  So the afternoon after the e-mail we saw from Mr. Kesari

19 requesting the wire?

20 A.  Correct.

21 Q.  Now I'm going to turn your attention to Government's Exhibit

22 64, which has been marked but not yet admitted.

23         Do you recognize Government's Exhibit 64?

24 A.  Yes.

25 Q.  What is Government's Exhibit 64?

1   A.  This is an e-mail exchange between Jesse Benton, Fernando

2   Cortes, Dimitri Kesari, and John Tate.

3   Q.  What is the date of the e-mail exchange?

4   A.  December 29, 2011.

5   Q.  And where did this document come from?

6   A.  I believe it was the Dimitri Kesari computer.  I just need a

7   second page to tell you.

8   Q.  Oh, sorry.

9   A.  Yes, Dimitri Kesari's computer.

10          MR. KRAVIS:  All right.  At this time the government

11  moves Exhibit 64 into evidence.

12                          (Government Exhibit 64 was

13                           offered in evidence.)

14          MR. HOWARD:  Your Honor, at this point the government

15  has a relevance objection --

16          MS. SINFELT:  Defendant.

17          MR. HOWARD:  I apologize; Mr. Benton has a relevance

18  objection.  The government has yet to show anyone to connect

19  this request, this e-mail to anything that has to do with

20  Mr. Benton, Mr. Sorenson, or Mr. Kesari.  This e-mail isn't

21  attached to any invoice, just says the wire, not talking

22  about --

23          THE COURT:  I get it.

24          MR. BINNALL:  We join in that objection and as well

25  ask that the parts that are not from Mr. Kesari not be entered

1    against him especially with the dates that are at issue now.  I

2    think that's important.  And to the extent any of the time

3    stamps are being offered for the truth, we object to those as

4    hearsay as well.

5              THE COURT:  Overruled.  64 is received.

6                          (Government Exhibit 64 was

7                          received in evidence.)

8    BY MR. KRAVIS:

9    Q.  Okay.  As Government's Exhibit 64 comes up on the screen,

10   I'm going to ask you to read the e-mail exchange from the bottom

11   up.  I believe the first e-mail sort of starts at the bottom of

12   page 1, Thursday, December 29, 2011, 12:28 p.m. e-mail.  That

13   carries on to the second page and then it goes up from there.

14   A.  On Thursday, December 29, 2011, at 12:28 p.m., Fernando

15   Cortes wrote:

16            "Dimitri."

17   Q.  And now if we could get page 2.

18   A.  "Is this invoice still on for today?  Please send when you

19   get.

20            "Wire window closes at 3:00 p.m. Central/4:00 p.m.

21   Eastern.

22            "Thanks.

23            "Fernando."

24   Q.  If we could go back to page 1 and look at the next e-mail

25   up, which is the December 29, 2011, 2:20 p.m. e-mail, again from

1  Fernando Cortes.

2  A.  On December 29, 2011, at 2:20 p.m. Fernando Cortes wrote:

3       "40 min left in the window if we need to get this out

4  today."

5  Q.  Can we see the next e-mail above that?

6  A.  From Jesse Benton.  Dated Thursday, December 29, 2011, at

7  14:30.  To Fernando Cortes.  Cc Dimitri Kesari, Jesse Benton,

8  and John Tate.  Subject:  Regarding 25k wire.

9  Q.  And if you can -- no need to go down and see the text.

10  Thank you.

11  A.  "Hold for a couple days."

12  Q.  And the e-mail from Mr. Benton saying, "Hold for a couple of

13  days," when was that sent?  If you go up, when was that sent?

14  A.  Thursday, December 29, 2011.

15  Q.  At what time?

16  A.  14:30, 2:30.

17  Q.  Okay.  Can you read up from there?

18  A.  From johnt@ronpaul2012.com.  Sent Thursday, December 29,

19  2011, at 2:32 p.m. to Benton, Jesse and Fernando Cortes.  Cc

20  Dimitri Kesari and Jesse Benton.

21       Subject:  Regarding 25k wire.

22       "Yep.  We are going to."

23  Q.  And finally the top e-mail.

24  A.  From Dimitri Kesari to johnt@ronpaul2012.com, Benton, Jesse,

25  Fernando Cortes.  Cc Dimitri Kesari and Jesse Benton.  Subject:

1  Regarding 25k wire.  Sent Thursday, 29th of December, 2011 at

2  16:03.

3          "We are holding till after the filing."

4  Q.  I'm going to turn your attention now to what's been marked

5  but not yet entered into evidence as Government's Exhibit 65.

6          Do you recognize Government's Exhibit 65?

7  A.  Yes.

8  Q.  What is Government's Exhibit 65?

9  A.  This is an e-mail exchange between Fernando Cortes, Dimitri

10 Kesari, Jesse Benton, and John Tate.

11 Q.  What is the date of the e-mail exchange?

12 A.  December 29, 2011.

13 Q.  Where did this document come from?

14 A.  This document came from Dimitri Kesari's computer.

15         MR. KRAVIS:  At this time the government moves Exhibit

16 65 into evidence.

17                         (Government Exhibit 65 was

18                          offered in evidence.)

19         MR. HOWARD:  Your Honor, three of the people are here,

20 one that could have been cross-examined.  They didn't.  They're

21 taking this from an agent.  We believe this is prejudicial,

22 hearsay.  We still don't believe it's relevant, they haven't

23 tied it up except for Agent LoStracco just testifying.

24         THE COURT:  Thank you.

25         Mr. Binnall?

1          MR. BINNALL:  The hearsay objection to the statements

2   not coming in as to Mr. Kesari again especially the time frame

3   that we're at, the 29th of December.

4          THE COURT:  Overruled.  65 is received.

5                            (Government Exhibit 65 was

6                            received in evidence.)

7   BY MR. KRAVIS:

8   Q.  Now, as Government Exhibit --

9          MR. HOWARD:  Excuse me, Mr. Kravis.  I apologize.

10         Your Honor, if we could correct, these e-mails don't

11  always include Mr. Benton.  They make the characterization that

12  Mr. Benton is part of this, but the last one he clearly isn't.

13         THE COURT:  They're self-explanatory in that regard.

14  BY MR. KRAVIS:

15  Q.  Now, I'm not going to ask you to read this whole exchange.

16  I'm going to ask you to first look at the e-mail that appears at

17  the bottom of the first page of Government's Exhibit 65, the

18  e-mail from Fernando Cortes, Thursday, December 29, 2011, at

19  11:29 a.m. that begins, "Dimitri, is this invoice still on for

20  today?"  Is that the same e-mail that we saw at the bottom of

21  the previous exhibit, Government's Exhibit 64?

22  A.  Yes.

23  Q.  Okay.  Now I'm going to ask you to move up to the top, and

24  I'm going to ask you to read just the top e-mail from Dimitri

25  Kesari to Fernando Cortes.

1  A.  From Dimitri Kesari to Fernando Cortes.  Subject:  Regarding

2  25k wire.  Sent Thursday, 29th of December, 2011, 16:01.

3       "I don't want it showing up on this quarter filings.

4       "Can we program it in for the 2nd?

5       What was the day, time when Dimitri Kesari wrote

6  Fernando Cortes, "I don't want it showing up on this quarter

7  filings."

8       Thursday --

9       MR. BINNALL:  Just to make sure I preserve it, the

10  objection to the time stamp again, Your Honor.

11       THE COURT:  Overruled.

12  A.  Thursday, 29th of December 2011, at 16:01.

13  BY MR. KRAVIS:

14  Q.  The final exhibit I would show you on this subject is

15  Government's Exhibit 67, which is a redacted exhibit which has

16  been marked but not yet admitted.

17       Do you recognize Government's Exhibit 67?

18  A.  Yes.

19  Q.  What is Government's Exhibit 67?

20  A.  This is an e-mail from John Tate to Fernando Cortes.

21  Q.  What's the date of the e-mail?

22  A.  The date is Thursday, December 29, 2011.

23       MR. KRAVIS:  At this time the government moves Exhibit

24  67 into evidence.

25

 1                          (Government Exhibit 67 was

 2                          offered in evidence.)

 3           MR. BINNALL:  Your Honor, this is most certainly

 4    hearsay and especially again on the time frame.  That's our

 5    objection.

 6           Your Honor, we also oppose the redaction in this one.

 7           THE COURT:  I couldn't hear that.

 8           MR. BINNALL:  Under the rule of completeness, we

 9    oppose the redaction.

10           THE COURT:  I don't have a copy of the unredacted.

11    Maybe someone has that.

12           MR. BINNALL:  We have a copy.

13           MR. KRAVIS:  And the government redacted the exhibit

14    because I believe the bottom e-mail from Mr. Cortes is hearsay.

15           THE COURT:  The objection to 67 is overruled.  It is

16    received.

17                          (Government Exhibit 67 was

18                          received in evidence.)

19           MR. HOWARD:  And, Your Honor, we have an objection as

20    to co-conspirator statements.  Mr. Benton isn't charged with

21    co-conspirator statements.

22           THE COURT:  Thanks.

23    BY MR. KRAVIS:

24    Q.  Turn your attention to the e-mail that appears at the top of

25    Government's Exhibit 67.  It's short.  Would you just read it

1  for us?

2  A.  From John Tate.  Sent Thursday, December 29, 2011, at 6:41

3  p.m.  To Fernando Cortes.  Subject:  Regarding COH.

4      "Thanks.  There will not be the 25k Dimitri wire for

5  now.  Wipe it off the books."

6  Q.  Now, in the interview that you conducted with Mr. Benton in

7  July of 2014, did you ask Mr. Benton about these e-mails about

8  the $25,000 wire?

9  A.  Yes.

10  Q.  And what, if anything, did Mr. Benton say about those

11  e-mails?

12  A.  Mr. Benton said he knew the $25,000 wire was intended for

13  then Senator Kent Sorenson.

14      MR. HOWARD:  Objection, Your Honor.

15      MS. SINFELT:  Objection, Your Honor.

16      THE COURT:  Overruled.

17  A.  Mr. Benton said that he said hold for a couple of days

18  because he, quote, wanted to screw Kent Sorenson and that

19  Mr. Benton had already gone to the press and told the press that

20  Kent Sorenson was not being paid by the campaign, that he could

21  not lie to the media because it would show up on the FEC

22  reports.

23      MR. BINNALL:  Your Honor, we would ask for a limiting

24  instruction on that.

25      THE COURT:  Yeah.  And, again, anything that was said

```
 1   at that interview only applies to defendant Benton.

 2            MR. HOWARD:  Your Honor, we've asked for the

 3   statements that were false.  This we have never heard before.

 4            THE COURT:  You can cross-examine on that then.

 5   That's cross-examination.  That's not grounds for objecting now.

 6   BY MR. KRAVIS:

 7   Q.  Special Agent LoStracco, I'm going to give you just a

 8   temporary break from reading e-mails.  I'm going to show defense

 9   counsel and then you what has been marked for identification as

10   Government's Exhibits 143, 144, 145, 146, 147, 148 --

11            MR. BINNALL:  Your Honor, while we're looking at that,

12   just because I kind of know what's coming up here and I know we

13   have a pretty substantive objection on this, I don't know if the

14   court wants to hear the basics of it now or maybe after the

15   afternoon recess; but there's a pretty substantive objection on

16   this one.

17            THE COURT:  So if we need to, we might take a little

18   early recess today.

19            What else have you got for 15 minutes?  Back to the

20   e-mail or something that you could go back to for 15 minutes

21   with and then we'll take our break and then take this up over

22   the break?

23            MR. KRAVIS:  Absolutely.

24   BY MR. KRAVIS:

25   Q.  I promised you a break from the e-mails.  I misled you.
```

1          I'm going to show you what's been marked for

2  identification as Government's Exhibit 153.  Showing this

3  document to defense counsel.

4          MR. BINNALL:  This is going to be the same issue.

5          MR. KRAVIS:  153.

6  BY MR. KRAVIS:

7  Q.  Special Agent LoStracco, in the course of the investigation,

8  did the FBI subpoena some bank records for Mr. Sorenson's

9  company, Grassroots Strategy, Inc.?

10  A.  Yes.

11  Q.  I'm showing you what's been marked for identification as

12  Government's Exhibit 153.

13          Do you recognize Government's Exhibit 153?

14  A.  Yes.

15  Q.  What is Government's Exhibit 153?

16  A.  These are bank statements obtained from Mr. Sorenson's bank.

17  Q.  And just to be clear, is Government's Exhibit 153 all of the

18  records the FBI got from the bank or just an excerpt of those

19  records?

20  A.  No.  It's an excerpt from those records.

21          MR. KRAVIS:  At this time the government moves Exhibit

22  153 into evidence.

23                              (Government Exhibit 153 was

24                               offered in evidence.)

25          MR. BINNALL:  This is going to be part of that same

1    objection I was talking about and substantive.  Maybe we better

2    handle it now.

3              THE COURT:  Yes, I think it's time for our

4    midafternoon recess.  I'm going to visit with the lawyers about

5    this.  Let's do that.  We'll take about 20 minutes now.  If it's

6    going to be any longer, I'll let you know.

7              (In open court, out of the presence of the jury.)

8              THE COURT:  Please be seated.

9              Why don't you use the microphone too, Mr. Binnall.

10   Sometimes I have a hard time hearing you.

11             MR. BINNALL:  Very well.  Your Honor, I believe they

12   are going to try and authenticate these bank records and the

13   absentee records with essentially an affidavit on both of those,

14   Your Honor.  I cannot cross-examine an affidavit.  When you look

15   at the cases, specifically the case of Melendez-Diaz versus

16   Massachusetts from 2009 from the Supreme Court, it talks about

17   that.  The confrontation clause of the Constitution makes it so

18   you don't have trial by affidavit, and that's what they're

19   attempting to do here through documentation and putting these

20   particular records in through an affidavit where I can't -- and

21   it's primarily -- I'm primarily concerned with the FEC records

22   because these are records that have to be filed by law.  And the

23   authentication of FEC records is kind of an interesting issue

24   because you can tamper with FEC records legally.  It's called

25   salting, for instance.  And so authentication to make sure that

1  these are actually the correct records is very important, and to

2  have this done only by an affidavit violates Melendez-Diaz,

3  violates the Sixth Amendment of the Constitution, and it is

4  improper in this case, Your Honor.  And we do object to them

5  coming in that way, and for the very similar issues with the

6  banking records as well.

7         THE COURT:  Are you saying for confrontation purposes

8  that these are testimonial in nature?

9         MR. BINNALL:  Yes, Your Honor.

10        THE COURT:  How?

11        MR. BINNALL:  Well, first of all, you have the

12  affidavit saying that they are what they are, and that's

13  testimonial.  And then the records themselves are also testimony

14  in this case because it's something that is anticipated to be

15  used in a criminal investigation.  They have to be followed by

16  law.  It's a statement directly --

17        THE COURT:  Hold it.  You're not saying these are

18  filed for use in a criminal investigation.  They're filed in the

19  routine course of Federal Election Commission business, right?

20        MR. BINNALL:  Yes, Your Honor.

21        THE COURT:  They're often used in criminal cases, I

22  assume they could be, but --

23        MR. BINNALL:  They are, Your Honor, and it comes with

24  that penalty that you have to actually report that information,

25  the very reason that we're here today.  And it's a statement

1   that I think it is very analogous to somebody having their blood

2   taken for a DUI or a drug test and then you actually go for the

3   affidavit itself, which is most certainly testimonial in nature,

4   and in this case it's material for the affidavit with the

5   absentee records because of the fact, like I said, that FEC

6   records can be changed by law.

7           THE COURT:  Which exhibit is the affidavit?

8           MR. BINNALL:  Each and every one of them have a stamp

9   on them saying it's a true and accurate copy.

10          THE COURT:  Thank you.  I get it.

11          MR. BINNALL:  See that?

12          THE COURT:  Yep.

13          MR. BINNALL:  So that's our problem, our objection

14  with them coming in that way.

15          MR. HOWARD:  Your Honor, we join.

16          I wanted to bring up the proffer again.  As I

17  understood your ruling, certainly false statements they can

18  prosecute, and they can use those false statements in

19  prosecution, as I understood it from you, under two conditions

20  precedent.  They wanted -- what they're using now are statements

21  they are deeming truthful statements.  Those remain protected.

22  As far as the proffer agreement is concerned, nobody has made a

23  decision that anything is false.

24          THE COURT:  The proffer agreement doesn't make any

25  distinction between statements that the government contends are

1   true and statements that they contend are false.  The proffer

2   agreement simply says these, the statements from the proffer can

3   be used in a proffer for false statements, obstruction of

4   justice in the current investigation and/or perjury.  And so I

5   don't see there being a distinction between whether the

6   government claims the statements are true or false as it relates

7   to any language from the proffer agreement.

8          MR. HOWARD:  Except for the preamble seems to indicate

9   that the statements that will be contested are the false

10  statements.  You know, in essence, in a situation like that, the

11  entire proffer agreement gets opened up for examination simply

12  based on a decision by the government as opposed to a decision

13  by the jury.

14         THE COURT:  I don't think the preamble makes that

15  implication.  So your objection is overruled.  I understood

16  that.  You filed that this weekend -- or before this weekend in

17  the motion where you said the government, in your opinion, could

18  not use statements that it believed were true, but I disagree.

19  I think the proffer agreement just identifies the circumstance

20  under which the proffer statements can be made and not any

21  delineation as to whether the government contends those

22  statements are true or false.

23         MR. HOWARD:  And, obviously, we join in Mr. Binnall's

24  objection.

25         THE COURT:  Okay.

1            MR. KRAVIS:  Your Honor, the bank records and the FEC

2    records are handled under two different rules.  With respect to

3    the bank records, Federal Rule of Evidence 902(11) says that a

4    certified business record is self-authenticating as long as the

5    proponent provides the opposing party with the documents and the

6    certification and a reasonable opportunity, a fair opportunity

7    to challenge.

8            So this was all produced in discovery.  And two weeks

9    ago I sent defense counsel the certification and the excerpts of

10   the records that we intended to use and told them that we would

11   be moving them into evidence under this provision, and no one

12   exercised their fair opportunity to challenge.  So the records

13   are admitted as business records under 803(6) and 902(11).

14           The FEC documents are governed by Federal Rule of

15   Evidence 902(1).  Federal Rule of Evidence 902(1) says that

16   domestic public documents are self-authenticating and do not

17   require any extrinsic evidence of authenticity to be admitted as

18   long as the document bears a seal that purports to be that of

19   political subdivision of the United States and a signature

20   purporting to be an execution or attestation.  I have in my hand

21   certified copies from the FEC with raised seals and a signature

22   purporting to be an execution or attestation.

23           Again, we gave the defendants plenty of notice that

24   this was our intention to admit these documents.  The Rules of

25   Evidence does not require any extrinsic evidence, and the court

1  has already I think made pretty clear these are not testimonial

2  documents for purposes of the confrontation clause.

3          THE COURT:  And will Mr. Sorenson also be testifying

4  as to these bank records?

5          MR. PILGER:  Yes, Your Honor, Mr. Sorenson will

6  testify with the bank records.

7          THE COURT:  Okay.  The FEC documents for sure will be

8  admitted.  I'll reserve ruling on the bank records.

9          We'll be back -- we're going to take 20 minutes.  And

10 tell the jury we'll be back at 3:00.

11          (Recess at 2:40 p.m., until 2:58 p.m.)

12          (In open court, in the presence of the jury.)

13          THE COURT:  Please be seated.

14          So, members of the jury, we're going to suspend the

15 testimony of Agent LoStracco for a little bit here to

16 accommodate some people from out of town.  So we'll just kind of

17 put that one on hold for a minute.  And we do this mostly for

18 the convenience of out-of-town witnesses.

19          So the government tells me that they've got some

20 out-of-town folks that they're trying to get in and out today

21 and the defendants don't object, so we're going to do that.

22          Call your next witness, please.

23          MR. PILGER:  The United States calls Lori Pyeatt, Your

24 Honor.

25          THE COURT:  Come forward, and she'll administer your

1    oath.

2              THE CLERK:  Raise your right hand.

3              LORI PYEATT, GOVERNMENT'S WITNESS, SWORN

4              THE CLERK:  Please be seated.

5                     DIRECT EXAMINATION

6    BY MR. PILGER:

7    Q.  Good afternoon, Ms. Pyeatt.

8    A.  Good afternoon.

9    Q.  You have some water there that's yours from before.

10   A.  Yeah.

11   Q.  Now, Ms. Pyeatt, you're related to one of the defendants

12   here today; is that right?

13   A.  I am.

14   Q.  And who is that?

15   A.  Jesse Benton, my son-in-law.

16   Q.  And so he's married to one of your children?

17   A.  He is.

18   Q.  Now, Ms. Pyeatt, have you worked for your father in the

19   past?

20   A.  Yes, I have.

21   Q.  And who's your father?

22   A.  Ron Paul.

23   Q.  And specifically turning your attention to the 2012 election

24   campaign, did you work for your father's campaign in the years

25   2011 and 2012?

1    A.   Yes.

2    Q.   And what was your job for the campaign?

3    A.   My title was treasurer.

4    Q.   And as the treasurer, where did you work?

5    A.   At an office in Clute, Texas.

6    Q.   Clute, is that near Houston?

7    A.   Yes, about 50 miles south.

8    Q.   And as the treasurer, what were your duties for the

9    campaign?

10   A.   Well, I had a lot of duties, but I ultimately wrote checks

11   to people that needed to get checks written to, and I helped

12   prepare FEC reports.

13   Q.   So the checks that you would write people, were they checks

14   paying expenditures of the campaign?

15   A.   Paid expenditures of the campaign, yes.

16   Q.   And was that one of your primary duties?

17   A.   Yes.

18   Q.   And what would be the basis for your decision whether or not

19   to pay an expense of the campaign?

20   A.   Well, it usually came from authority above us, and Fernando

21   would get it and he would code it, and then we would pay it via

22   e-mail.

23   Q.   Very well.  So there's a couple of things in there.  Let's

24   pull them apart a little bit.

25            You talked about there were people who could decide to

1  make an expenditure, right?

2  A.  Yes.

3  Q.  Can you hear me okay?

4  A.  Uh-huh.

5  Q.  And who were the people who were approved to make decisions

6  on whether an expenditure should happen?  Who were those people?

7  A.  I don't know if there's an actual list of people that were

8  okayed to do checks, but for sure like John Tate would approve

9  checks and Jesse and Dimitri had approved checks, but I don't

10  know that there really was -- you know, that I knew that, okay,

11  four people were allowed to approve checks.  It wasn't really

12  like that.  It seemed like once it got to Fernando, it was

13  approved by whoever it needed to be approved by.

14  Q.  Yes, ma'am.  And I'm going to ask you some questions about

15  Mr. Cortes in a second; but from your personal knowledge, is

16  your testimony that Mr. Tate, Mr. Benton, and Mr. Kesari could

17  approve the expenditure of funds by the campaign?

18  A.  Yes.

19  Q.  And then you mentioned Mr. Cortes.  Did he have a role in

20  communicating to you about the expenditures?

21  A.  Fernando Cortes?

22  Q.  Yes, ma'am.

23  A.  Is that what you're asking?

24  Q.  Yes.

25  A.  Yes, he would then send them to us.

1  Q.  How would he do that; write you a letter, e-mail you, call

2  you?

3  A.  Most of them were e-mail.

4  Q.  Would the e-mails come to you directly?

5  A.  Usually they were forwarded to Deana and I, Deana Watts and

6  I.

7  Q.  And who is Deana Watts?

8  A.  She is the -- I think her title was the assistant treasurer,

9  but she's a CPA.

10  Q.  And when the information came in from Mr. Cortes, was that

11  the basis for deciding whether to pay or was there some other

12  basis involving other people?

13  A.  No.  Once Fernando Cortes submitted it, it was assumed that

14  he had gone through all of the channels and he coded it where it

15  needed to be coded and then we paid it.

16  Q.  And was it your job to question Mr. Cortes's e-mails to you?

17  A.  No.

18  Q.  So if Mr. Cortes e-mailed you an expense to be paid, would

19  you pay it?

20  A.  Yes.

21  Q.  And the codes that were on there, were they codes that

22  Mr. Cortes entered or that you entered?

23  A.  They would have been codes that Deana Watts made a chart of

24  accounts of all of the departments and the codes, you know, that

25  needed to be done, and then Fernando would pick which codes and

1  he would code it, and then we would just enter it that way.

2  Q.  I think I understand.  So there was a list of codes?

3  A.  There was a list, a chart of accounts.

4  Q.  Yes, ma'am.  And who made the list?

5  A.  Deana Watts.

6  Q.  And did Deana Watts give that to other people?

7  A.  To other people?  Well, Fernando had it, you know.

8  Q.  That's what I --

9  A.  So she would have given that to Fernando.

10        MR. BINNALL:  I'm going to object on foundation, see

11  if she has foundation whether it went to anyone else.

12        THE COURT:  Overruled.

13  BY MR. PILGER:

14  Q.  I was just getting at, did you know if Fernando Cortes had

15  that list?

16  A.  Say it one more time.

17  Q.  Did Fernando Cortes use codes from that list?

18  A.  Yes.

19  Q.  Now, you mentioned -- I think you mentioned the FEC earlier.

20  Did you have a role regarding the Federal Election Commission as

21  treasurer of the campaign?

22  A.  Well, my name was on them, I signed them, but I didn't

23  actually prepare them.  Deana did.  And I just helped her in any

24  way she needed.

25  Q.  I understand.  So as the treasurer, you are the person

1  officially signing off on the forms, right?

2  A.  Correct.

3  Q.  And during the 2012 campaign, you did your job as you signed

4  off on FEC forms; is that right?

5  A.  Correct.

6  Q.  And, Ms. Pyeatt, you told me you have a little trouble

7  hearing me if I turn away, so I'm going to approach and I'm

8  going to talk to you up there with these documents, okay?

9  A.  Okay.

10  Q.  Showing you what's in evidence as Government's Exhibit 143,

11  is this a form FEC form 1, statement of organization, for the

12  Ron Paul Campaign in 2012?

13  A.  Yes.

14  Q.  And is this a statement of organization for an exploratory

15  committee?

16  A.  Yes.

17  Q.  And could you just tell the jury when this was filed,

18  directing your attention to the middle of the page?

19  A.  April 26, 2011.

20  Q.  And, ma'am, showing you what's in evidence as Government's

21  Exhibit 144, is this another statement of organization, FEC form

22  1, for the Ron Paul Campaign in 2012?

23  A.  Yes.

24  Q.  And what is this -- is this for the actual campaign

25  committee as opposed to the exploratory committee?

```
 1  A.  Right.
 2  Q.  What is the date of this form?
 3  A.  May 13th of 2011.
 4  Q.  Now, is your signature or electronic signature on both of
 5  144 and 143?
 6  A.  Yes.
 7  Q.  Back on 143, I'm going to turn your attention to page 4.
 8  Does the form list a designated agent for the campaign?
 9  A.  Yes, Deana Watts.
10  Q.  And who -- you said Deana Watts?
11  A.  Yes.
12  Q.  So she was the designated agent for the exploratory
13  committee, correct?
14  A.  Right.
15  Q.  Turning back to 144, looking at page 4, who was the
16  designated agent for the actual committee?
17  A.  Deana Watts.
18  Q.  And, Ms. Pyeatt, turning your attention to Government's
19  Exhibit 145 in evidence, is this a form 3P from the FEC, a
20  report of receipts and disbursements?
21  A.  Yes.
22  Q.  And do you recognize this as the type of form that you would
23  use in part to report the expenditures of the campaign?
24  A.  Yes.
25  Q.  And is your signature, your electronic signature on
```

1   Government's Exhibit 145?

2   A.  Yes.

3   Q.  Showing you Government's Exhibit 146, is this another report

4   of receipts and disbursements?

5   A.  Yes.

6   Q.  And did you electronically sign this document?

7   A.  Yes.

8   Q.  Is 147, Government's 147, a receipt -- I'm sorry, a report

9   of receipt and disbursements again with your electronic

10  signature?

11  A.  Correct.

12  Q.  And is Government's Exhibit 148 also a report of receipts

13  and disbursements with your electronic signature?

14  A.  Yes.

15  Q.  And are all of those reports of receipts and disbursements,

16  all of the four that we've talked about, from the Ron Paul 2012

17  Campaign?

18  A.  Yes.

19  Q.  Okay.  Now I'm going to try and work with the projector with

20  you.  You tell me if you can't hear me.

21  A.  Okay.

22          THE COURT:  When the jury was on recess, I said I

23  would admit these exhibits.  Just for the record, 143 through

24  148 are received.

25          MR. PILGER:  Thank you, Judge.

```
 1                      (Government Exhibits 143 through

 2                      148 were received in evidence.)

 3           MR. BINNALL:  Your Honor, just one more additional

 4   quick thing on that is they were not given to us more than two

 5   weeks in advance of trial.

 6           THE COURT:  Thank you.

 7           Well, we have not only authentication by the

 8   certification, but authentication by the author as well.

 9           MR. HOWARD:  Your Honor, just for the record, I don't

10   believe that's the basis of the objection under the law.  It's

11   supposed to be about a government witness.

12           THE COURT:  The advance warning is only on the

13   authentication by certification.

14           MR. HOWARD:  Yes.

15           MR. BINNALL:  And I'm very, very sorry, Your Honor.  I

16   just want to make sure that everything here is preserved.  The

17   way it was preserved is that her electronic signature was on

18   there, I do not believe that's enough to say that all of the

19   pages that may be contained within it are necessarily authentic.

20   So I am objecting to authentication this way as well.

21           THE COURT:  Thank you.  It's overruled.

22   BY MR. PILGER:

23   Q.  Ms. Pyeatt, I'm going to go to the reports of disbursements,

24   reports of receipts and disbursements.  And these are in

25   evidence.
```

1        So starting with Government's Exhibit 145, can you see

2   the period covered by this report on the form?

3   A.   I didn't get that.  Do I see what?

4   Q.   I'm sorry, ma'am.  I'm going to indicate to you with my pen

5   and you tell me if what we're looking at is an indication of the

6   period covered by the report or not.

7   A.   Okay.

8   Q.   On the form it says March 20th?

9   A.   Correct.

10  Q.   What does that mean?

11  A.   What does that mean?

12  Q.   Yes, ma'am.

13  A.   Um --

14        MR. BINNALL:  Object.  The document speaks for itself.

15  A.   When the report was done, due --

16        MR. PILGER:  I'm not sure there was an objection.

17  Just wait.

18        THE COURT:  Overruled.

19        Go ahead.

20  BY MR. PILGER:

21  Q.   I'm sorry.  Are you not sure what it means?

22  A.   Monthly reports, it's evidently when a report was done.

23  Q.   Yes, ma'am.

24  A.   Okay.

25  Q.   And can you tell the jury what period was covered by the

1  report?

2  A.  February 1st through February 29th.

3  Q.  Of what year?

4  A.  2012.

5  Q.  Now, ma'am, these actual reports are thousands of pages or

6  hundreds of pages long, correct?

7  A.  Thousands of pages, yes.

8  Q.  And we're just looking at a couple of pages of the report,

9  right?

10  A.  We are looking at a page --

11  Q.  The documents that I showed you that are in evidence, they

12  are just excerpts of the report.

13  A.  Okay.

14  Q.  Do you understand the question?

15  A.  If it's a question, no.

16  Q.  So, for example, for Government's Exhibit 145, we were just

17  talking about the first page, and the actual report would be

18  much bigger, right?

19  A.  Correct.

20  Q.  And then when I was talking to you up at the stand, we

21  talked about a specific other page that was there, all right?

22  A.  Okay.

23  Q.  There was only another page or two as to each one, correct?

24  A.  I'm not understanding the question.

25  Q.  Let's try and do it this way.  If you look at the second

1  page of Government's Exhibit 145, does it indicate what page

2  number that is?

3  A.  23?  I'm not sure what you're asking.

4  Q.  That's okay, ma'am.  I'll ask a better question.

5          Do you see where it says page?

6  A.  Page 5,858 out of 6,676?

7  Q.  I see page 5858/6676.

8  A.  Correct.

9  Q.  Does that indicate to you how long the document actually

10 was?

11 A.  Yes.

12 Q.  How long was the document?

13 A.  How long was it?

14 Q.  Yes.

15 A.  6,676 pages.

16 Q.  Thank you, ma'am.

17         And we're just looking at this one page right now.

18 A.  Okay.

19 Q.  Now, turning your attention to block C of that page, can you

20 read to the jury who the campaign reported a disbursement to?

21 A.  Interactive Communications, Inc.

22 Q.  And does it say where Interactive Communications, Inc. is

23 located?

24 A.  4316 Hamilton Street in Hyattsville, Maryland 20781.

25 Q.  Does it say the purpose of the disbursement?

1  A.  Audio/visual expenses.

2  Q.  And does it report the date of the disbursement?

3  A.  February 8, 2012.

4  Q.  And does it report the amount of the disbursement?

5  A.  $38,125.

6  Q.  Thank you, ma'am.

7          Bear with me.  We're going to do this just a few more

8  times.  Okay.  Now I'm showing you what's in evidence as

9  Government's Exhibit 146, which we talked about up there, and

10  this is page 1.

11          Do you recall that?

12  A.  (Witness nodded her hear affirmatively.)

13  Q.  You have to say out loud for the reporter.

14  A.  Yes.

15  Q.  And by looking at the section labeled monthly reports, can

16  you tell what month this is for?

17  A.  May 20th.

18  Q.  And this is May 2012.  And so the report in May, what period

19  did it cover?

20  A.  April 1st through April 30th, 2012.

21  Q.  Thank you.

22          Looking at the next page of Government Exhibit 146 at

23  block C, is there a report of a disbursement?

24  A.  Yes.

25  Q.  Who is the disbursement to?

1  A.  Interactive Communications, Inc.

2  Q.  And does it report where that corporation is?

3  A.  Yes.

4  Q.  Where?

5  A.  Where are they located?

6  Q.  Yes, ma'am.

7  A.  4316 Hamilton Street, Hyattsville, Maryland 20781.

8  Q.  Does it report the purpose of the disbursement?

9  A.  Audio/visual expenses.

10  Q.  Does it report the date of the disbursement?

11  A.  April 3, 2012.

12  Q.  Does it report the amount of the disbursement?

13  A.  You will have to move it a little bit.

14  Q.  I'm sorry.

15  A.  17,000 -- I can't see the cents.

16          17,700.

17  Q.  Thank you, ma'am.

18          Showing you what's in evidence as -- pardon me --

19  Government's Exhibit 147, which we talked about before.

20          Is this another report of receipts and disbursements?

21  A.  Yes, for June 20, 2012.

22  Q.  Thank you, ma'am.

23          And can you see what was the period covered by this

24  report?

25  A.  The time period?

1  Q.  Yes, ma'am.

2  A.  May 1, 2012 to May 31, 2012.

3  Q.  Thank you.

4         Looking at the next page, is there a report of a

5  disbursement at block B?

6  A.  Yes.

7  Q.  And who is that disbursement to?

8  A.  Interactive Communications, Incorporated, 4316 Hamilton

9  Street, Hyattsville, Maryland 20781.

10  Q.  What's the date of the disbursement?

11  A.  May 2, 2012.

12  Q.  What is the amount of the disbursement?

13  A.  $8,850.

14  Q.  Looking at the next page of this excerpt of this same report

15  at block A, is there another report of a disbursement to

16  Interactive Communications, Incorporated?

17  A.  Yes.

18  Q.  Is that at the same address you've referenced several times?

19  A.  Yes.

20  Q.  And what is the purpose of the disbursement?

21  A.  Audio/visual expenses.

22  Q.  And what is the amount of the disbursement?

23  A.  $8,850.

24  Q.  Thank you.

25         Lastly, showing you Government's Exhibit 148, which is

1  in evidence, is that the final report of receipts and

2  disbursements that we talked about when I was at the stand with

3  you?

4  A.  Yes, July 20, 2012.

5  Q.  I'm sorry, I didn't hear you that time.

6  A.  July 20, 2012.

7  Q.  Thank you, ma'am.

8       And what period did it cover?

9  A.  June 1, 2012 to June 30, 2012.

10 Q.  Thank you.

11      Looking at the next page of the excerpt at block C, is

12 there another disbursement to Interactive Communications, Inc.?

13 A.  Yes.

14 Q.  Is it at the same address you have read before?

15 A.  Yes.

16 Q.  And what is the purpose of the disbursement?

17 A.  Audio/visual expenses.

18 Q.  What is the date of the disbursement?

19 A.  June 27, 2012.

20 Q.  And what is the amount of the disbursement?

21 A.  $8,850.

22      MR. PILGER:  One moment, Your Honor.

23      (Pause.)

24 BY MR. PILGER:

25 Q.  And, finally, Ms. Pyeatt, when these reports were submitted

1   under your name, did you have any reason to think there was

2   anything inaccurate or untruthful about them?

3   A.   No.

4          MR. PILGER:  No further questions.

5          THE COURT:  Ms. Sinfelt?

6          MS. SINFELT:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8   BY MR. SINFELT:

9   Q.   Good afternoon Ms. Pyeatt.  How are you?

10  A.   Good.

11  Q.   Do you need a drink of water or anything?

12  A.   I'm fine.

13  Q.   Thank you for coming.  I know this is difficult for you.

14         I just have a few questions for you, okay?

15  A.   Okay.

16  Q.   You said earlier you worked for your father's campaign; is

17  that correct?

18  A.   My father's campaign?

19  Q.   Yes.

20  A.   Yes.

21  Q.   Have you worked for any other committees for your father?

22  A.   Yes, I have.

23  Q.   And which committees are those?

24  A.   Committee to Re-Elect.  All of his committees to Re-Elect.

25  Q.   So it's kind of like a family business then?

1   A.   Well, yeah.

2   Q.   How many children do you have?

3   A.   I have five children.

4   Q.   Do any of them work on the campaigns as well?

5   A.   Oh, yeah.  We all volunteered.

6   Q.   So it really is a family business then?

7   A.   Yes.

8   Q.   And on the other campaigns that you worked on, did you hold

9   a similar position?

10  A.   Yes.

11  Q.   And how many staff were you in charge of in 2012 for this

12  presidential campaign committee?

13  A.   How many --

14  Q.   Staff.

15  A.   I wouldn't say that I was really in charge of staff.  You

16  know, we had people that are in charge of staff, and we would

17  just kind of be the accounting department and took care of all

18  of the money.

19  Q.   So was the accounting department then just you and Deana?

20  A.   Yes.

21  Q.   Okay.  That's what I was trying to get at.  And were you and

22  Deana the only people who could authorize -- not authorize; make

23  a wire transfer?

24  A.   Yes.

25  Q.   That's correct, okay.  And would you authorize and make a

1  wire transfer without receiving an invoice?

2  A.  No.

3          MS. SINFELT:  I have no other questions.

4          Thank you, Ms. Pyeatt.

5          THE COURT:  Mr. Binnall, do you have any questions?

6          MR. BINNALL:  Very briefly, Your Honor.

7                      CROSS-EXAMINATION

8  BY MR. BINNALL:

9  Q.  Good afternoon, Ms. Pyeatt.

10         Thank you also on behalf of Mr. Kesari for coming

11  today.

12         Do I understand correctly that it was Mr. Cortes who's

13  responsible for coding the expenses?

14  A.  That's correct.

15  Q.  And then he sent it on to you?

16  A.  Correct.

17  Q.  It wasn't Mr. Kesari's job to code any expenses, right?

18  A.  No.

19  Q.  And Mr. Kesari didn't work for you under the treasurer of

20  the campaign, right?

21  A.  He worked for me?

22  Q.  He didn't work for you?

23  A.  No.

24  Q.  And you never consulted -- I'm sorry.  You never consulted

25  with Mr. Kesari about how to code any expenses, right?

1  A.  No.

2          MR. BINNALL:  Thank you very much.  That's all of my

3  questions.

4          THE COURT:  Anything else, Mr. Pilger?

5          MR. PILGER:  No, Your Honor.

6          May the witness be excused?

7          THE COURT:  Yes.  Thank you, ma'am.  You're excused.

8                                    (Witness excused.)

9          THE COURT:  Call your next witness, please.

10          MR. PILGER:  Your Honor, we may be able to omit one

11  witness if I have one second with the witness.

12          THE COURT:  Go ahead.

13          MR. HOWARD:  And, Your Honor, I think Ms. Pyeatt would

14  like to sit in the gallery if that's all right.

15          THE COURT:  That's fine with me.

16          MR. KRAVIS:  No objection.

17          (Counsel conferring.)

18          MR. PILGER:  May we approach?

19          THE COURT:  Yes.  Do you need the court reporter?

20          MR. PILGER:  No, sir.

21          (Side-bar conference, not reported.)

22          THE COURT:  So, members of the jury, not only are we

23  suspending Agent LoStracco's testimony, but now we're going to

24  suspend the government's case so the defense can call an

25  out-of-town witness.  It's okay.  We're just taking it a little

1  bit out of order there.

2          Ms. Sinfelt, call your next witness, please.

3          MS. SINFELT:  Ms. Deana Watts.

4          THE COURT:  Is she present in the courtroom?

5          MR. PILGER:  She's in the hallway, Your Honor.

6          THE COURT:  Come forward, ma'am.  If you'll just

7  approach the clerk here, she'll administer your oath.

8          THE CLERK:  Please raise your right hand.

9          DEANA WATTS, DEFENDANT BENTON'S WITNESS, SWORN

10         THE CLERK:  Please be seated.

11         THE WITNESS:  Right there?

12         THE COURT:  Yes.

13                   DIRECT EXAMINATION

14  BY MS. SINFELT:

15  Q.  Good afternoon, Ms. Watts.  My name is Meena Sinfelt.  I'm

16  one of the attorneys for Mr. Benton.  I know we have not met

17  before, so nice to meet you.

18  A.  Uh-huh.

19  Q.  Could you please give me your background and your role in

20  the 2012 Presidential Campaign for Ron Paul?

21  A.  I'm an accountant, I'm a CPA, and I was the assistant

22  treasurer for that campaign.

23  Q.  As the assistant treasurer, what duties did you perform?

24  A.  In our office we performed gathering the donations, writing

25  expenditures, putting them in accounting software for

1  preparation of the FEC reports and submitting the FEC reports.

2  Q.  So then you did submit FEC reports; is that correct?

3  A.  Yes.

4  Q.  Thank you.

5       And did you consult Mr. Benton when you completed FEC

6  reports?

7  A.  No.

8  Q.  Have you ever had any training in completing the FEC

9  reports?

10  A.  Outside training?

11  Q.  Yes, ma'am.

12  A.  No.

13  Q.  It sounds like you may have had some inside training.  Did

14  you have some inside training?

15  A.  I trained myself.  I'm self taught.

16  Q.  How did that go; complicated or easy, or how did you feel

17  about that?

18  A.  Somewhere between easy and complicated.

19  Q.  Okay.

20  A.  It's a lot of information.

21  Q.  Do you know if the FEC requires that you report payments to

22  sub vendors?

23  A.  Yes.

24  Q.  You do know it or, yes, they do require it?

25  A.  For example, like if you paid American Express, then we

1  would report the sub vendors that American -- you know, if you

2  charged to American Express, say, Dillards, then you would have

3  a payment to American Express and Dillards would show underneath

4  that, if it met the $200 threshold.

5        MR. BINNALL:  Your Honor, I'm going to object that it

6  calls for a legal conclusion.

7        THE COURT:  So we're not going to get into her

8  impression of the law, but her understanding of what her

9  obligation was to do is all she's looking for here, and that's

10 the point here.

11       MS. SINFELT:  Right, okay.

12       And thank you.  That was all I had.  Thank you very

13 much.

14       THE COURT:  Oh, that's it.

15       Any other questions?  Mr. Binnall, do you have some?

16       MR. BINNALL:  Yes, briefly, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. BINNALL:

19 Q.  Good afternoon, Ms. Watts.

20 A.  Hi.

21 Q.  My name is Jesse Binnall.  I represent Mr. Kesari.

22       If you had a question about the way an expense was

23 coded, was there someone in the Paul Campaign that you would

24 seek clarification from?

25 A.  Fernando Cortes out of the Virginia office would send the

1  expenditures to us with the code.

2  Q.  So if there were any questions on that, would you go back to

3  Mr. Cortes?

4  A.  Yes.

5  Q.  Did you ever go to Mr. Kesari to find out how things should

6  be properly coded according to the FEC?

7  A.  I do not recall ever asking him.

8          MR. BINNALL:  No further questions.

9          THE COURT:  Mr. Pilger, Mr. Kravis, do you have

10  questions?

11          MR. PILGER:  Just one question.

12                      CROSS-EXAMINATION

13  BY MR. PILGER:

14  Q.  Did you rely on the information that came to you from

15  Mr. Cortes when making your reports to the FEC?

16  A.  Yes.

17          MR. PILGER:  Nothing further.

18          THE COURT:  Anything else?

19          MS. SINFELT:  Nothing, Your Honor.

20          THE COURT:  Thank you, ma'am.  You're excused.

21                              (Witness excused.)

22          THE COURT:  Back to the government's case, call your

23  next witness.

24          MR. KRAVIS:  The government calls Ron Paul.

25          THE COURT:  Sir, please come forward and approach this

1   woman, and she'll administer your oath.

2          THE CLERK:  Please raise your right hand.

3             RON PAUL, GOVERNMENT'S WITNESS, SWORN

4          THE CLERK:  Please be seated.

5                      DIRECT EXAMINATION

6   BY MR. KRAVIS:

7   Q.  Good afternoon, sir.

8   A.  Good afternoon.

9   Q.  What is your name?

10  A.  Ron Paul.

11  Q.  How do you spell your last name?

12  A.  P-A-U-L.

13  Q.  What do you do for a living?

14  A.  A lot of things.  I am on a speaking tour and I do an

15  Internet broadcasting and I do some newsletters and I do some

16  educational projects.  I'm very much into educational

17  activities.

18  Q.  Were you at one time a member of Congress?

19  A.  I was.

20  Q.  When were you a member of Congress?

21  A.  Well, I had three different periods of time.  In 1976 I was

22  there for less than a year, and then I was back there in '78 to

23  '84 for three more terms, and then I was out for 12 years.  I

24  went back to my medical practice.  And then I went back into

25  Congress in 1997 until 2013.

1  Q.  Did you ever run for the Office of President of the United

2  States?

3  A.  I did.

4  Q.  How many times did you run for President?

5  A.  Three times.

6  Q.  What were the years when you ran for president?

7  A.  '88, 1988, 2008, and 2012.

8  Q.  I want to ask you some questions now about your 2012 run for

9  President of the United States.  Who were the people who ran

10  that presidential campaign?

11  A.  Well, there were a lot of people.  The campaign manager was

12  John Tate.

13  Q.  Who hired Mr. Tate to be the campaign manager?

14  A.  I did.

15  Q.  And what was Mr. Tate's job as the campaign manager?

16  A.  To manage the campaign.

17  Q.  Who did Mr. Tate report to?

18  A.  He reported essentially to me.

19  Q.  And where did Mr. Tate spend most of his time while he was

20  working on the campaign?

21  A.  Well, I didn't keep a diary.  I think it was mostly at the

22  headquarters, which would have been -- I think it was in

23  Alexandria, and he would travel, I would see him occasionally on

24  the tour.

25  Q.  And that headquarters is in Alexandria, Virginia?

1   A.   Yes.

2   Q.   How about Jesse Benton, did Jesse Benton work on your 2012

3   presidential campaign?

4   A.   He did.

5   Q.   What did Jesse Benton do on the campaign?

6   A.   In a lot of ways he was my right-hand man because he did

7   travel with me and he was in charge of a lot of the political

8   events, organizing them and getting on the college campuses, and

9   he interceded for me with John Tate and answered a lot of my

10  questions dealing in particular a lot of times with the media.

11  Q.   Did someone named Dimitri Kesari work on your campaign?

12  A.   He did.

13  Q.   And what did Mr. Kesari do?

14  A.   I'm not positive of the title and I didn't have a lot of

15  close associations with him, but I always had a friendly

16  relationship with him, and I remember probably more seeing him

17  at the times of our debates.  Didn't see him on a routine basis.

18  Q.   Who did Mr. Kesari report to on the campaign?

19  A.   I'm not sure who he would report to.

20  Q.   Do you remember if he served as an assistant to anyone on

21  the campaign?

22  A.   As an assistant?

23  Q.   Yes.

24  A.   I'm not sure I understand your question.  Assistant to whom?

25  As an assistant?

1  Q.  Doctor, do you remember testifying in the grand jury about

2  this matter?

3  A.  Pardon me?

4  Q.  Do you remember testifying in the grand jury?

5  A.  Yes.

6  Q.  I'm showing defense counsel what's been marked for

7  identification as Government's Exhibit 162.  And, Doctor, I'm

8  going to show you what's been marked for identification as

9  Government's Exhibit 162.

10          Do you see that there?

11  A.  Not yet.

12  Q.  What is Government's Exhibit 162?

13  A.  Yeah, I see it.

14  Q.  What is Government's Exhibit 162?

15  A.  What did the government --

16  Q.  I'm sorry?

17  A.  -- do?

18  Q.  No, I'm sorry.  This document right here --

19  A.  All right.

20  Q.  -- do you recognize this document?

21  A.  Not offhand.  I saw it.  I don't remember it.  No, I don't

22  recognize it as I see this document.

23  Q.  Doctor, this is a copy of your grand jury transcript, isn't

24  it?

25  A.  I don't know.  If it says it is --

1   Q.  Can you read what appears on the --

2   A.  It says, Testimony of Ron Paul.

3   Q.  And can you read what appears in the top left?

4   A.  In regards to grand jury proceedings.

5   Q.  Okay.  Now, Doctor, I'm going to ask you to turn with me to

6   page 11.

7           Are you with me on page 11?

8   A.  Got it, yeah.

9   Q.  Doctor, I'm going to ask you to start with me on page 11,

10  line 22.

11          Are you there?

12  A.  Yes.

13  Q.        "Q.  Was there someone who worked on the campaign

14      named Dimitri Kesari?

15          "A.  Yes.

16          "Q.  And what was Mr. Kesari's role on the campaign?"

17          To the next page.

18          "A.  I don't know his title, but he was an assistant

19      to John and Jesse."

20          Did I read that right?

21  A.  Well, yes, that is there.  If I could comment on that, I

22  would.

23  Q.  And when you said assistant to John and Jesse, you meant

24  assistant to John Tate and Jesse Benton, right?

25  A.  Yeah.  I didn't understand your question before, but that

1   would be obvious to me that somebody down the ladder.  Everybody

2   worked for John and Jesse.  You know they were running the

3   campaign, so --

4   Q.  Absolutely.

5   A.  -- it's just a --

6   Q.  Doctor, you can put the transcript down now.  Thank you.

7          I want to ask you now about the money on the campaign.

8   What was the 2012 Presidential Campaign setup for keeping track

9   of money contributions going in and expenditures going out?

10  A.  I don't know the details of that.  I wasn't involved on

11  day-to-day activity nor do I understand the arrangements.  I

12  trusted the people that were running the campaign to account for

13  all of the funds.

14  Q.  Where would bills to the campaign go for approval?

15  A.  I think basically through the office in Clute, Texas.

16  Q.  Who would approve bills for the campaign?

17  A.  I'm not positive, but it could be several, but I don't know

18  that -- I don't believe there was just one person, but it was

19  something that didn't cross my desk and I didn't know exactly

20  who did what when and who approved which bills.

21  Q.  Doctor, I'm going to ask you to pick up the grand jury

22  transcript in front of you and I'm going to ask you to turn with

23  me to page 13.

24          Are you with me on page 13?

25  A.  Yes.

1    Q.  I'm going to direct your attention to page 13, line 9.

2              "Q.  And who were those people, the people who were in

3         charge of keeping track of money coming in and money going

4         out for the campaign?

5              "A.  Well, there was a procedure in Washington, that

6         if somebody spent money for ads or whatever, those bills

7         would go through John and Jesse."

8              Did I read that right?

9    A.  Right, at least they had the responsibility.

10   Q.  Now, what would happen to the bills after they were approved

11   by John and Jesse?  Where would they go from there?

12   A.  I don't know whether there was another step for further

13   approval on coding, but they eventually ended up in Clute.  I

14   don't know the process.  I never detailed it and walked it

15   through, but I assume they went through the process and the

16   bills were sent to Clute.

17   Q.  Let me ask you to look back at page 13 and start with me

18   again on line 9.

19             "Q.  And who were those people, the people who were in

20        charge of keeping track of money coming in and money going

21        out for the campaign?

22             "A.  Well, there was a procedure in Washington that if

23        somebody spent money for ads or whatever, those bills would

24        go through John and Jesse and then there was another

25        gentleman that would review this for coding and sending.

1      The payment actually occurred in Texas, and after that was

2      done and the coding was done, it would be sent to Texas and

3      the two individuals responsible for getting the checks and

4      getting the money out were Lori Pyeatt and Deana Watts, and

5      they kept the books and they did the FEC reports."

6      Did I read that right?

7  A.  You read it correctly.

8  Q.  Now, Doctor, do you know someone named Kent Sorenson?

9  A.  I've heard the name.

10  Q.  Have you met Kent Sorenson?

11  A.  I probably have.  We have crossed paths, but there was never

12  a close association, and I may have met him at times over the

13  years because he was in public and politics and I very well

14  could have met him at times that I don't remember, as I have met

15  many.

16  Q.  Did there come a time when you met Kent Sorenson during the

17  2012 Presidential Campaign here in Iowa?

18  A.  Was there a time?

19  Q.  Yes.

20  A.  Yes.

21  Q.  When was that?

22  A.  Well, the time I remember was when there was a press

23  conference to be held and --

24  Q.  And what happened at that press conference?

25  A.  He showed up and wanted to endorse me I was told.

1  Q.  Now, he was endorsing you for President, is that right?

2  A.  That is my understanding.

3  Q.  Were you the first candidate that Kent Sorenson endorsed for

4  President in 2012?

5  A.  Well, to my knowledge, he may have, at least it's been said

6  in the media that he endorsed Michelle Bachmann, but I don't

7  know that as a fact.

8  Q.  Do you know how it came to be that Mr. Sorenson switched

9  from endorsing Michelle Bachmann to endorsing you for the Office

10  of President?

11  A.  The details of how he came, that was pretty surprising to

12  me.  He just showed up.

13  Q.  How did you feel when Mr. Sorenson endorsed you at this

14  event in Iowa?

15  A.  It was a lot of mixed feelings.  First was, you know,

16  politicians -- it's the sort of thing -- there's some benefit

17  from getting endorsements, but I had a different philosophic

18  opinion about endorsements.  But I was annoyed, not with

19  Sorenson because it was nothing personal about it.  I was

20  annoyed because I was caught off balance.  Here I am getting

21  ready to give a speech and press conference and I like to be

22  prepared when all of a sudden, I may have been told three

23  minutes before or five minutes before or something, and they

24  said that somebody -- there was a state senator that wanted to

25  endorse me.

1  Q.  Now, you said that you have a different philosophical view

2  about political endorsements.  What is your view about the value

3  of political endorsements?

4  A.  I don't think they're very valuable.  I downplay them a

5  whole lot.  But we all go through it because a lot of people

6  want to associate with a candidate and endorse one, and there's

7  some benefit to this, and you certainly don't want to offend

8  anybody who wants to endorse you, so -- but my experience came

9  in 1990 -- dealing with endorsements, in 1996 I had been out of

10  office, I was running again, it was a tough race, I was running

11  against a Republican, and the Republicans told me I was way too

12  independent and so -- because I had a voting record and they --

13  sometimes parties don't like Independents, so I -- they started

14  a rash of endorsements, you know, a couple of Bushes and a

15  couple of senators, state senators, I mean Texas senators, and a

16  slew of 65 I think congressman, all Republicans.  And Newt

17  Ginrich came and campaigned against me.  And I thought, holy

18  man, what does all of this mean?

19        Well, I won the election, so my conclusion was those

20  endorsements aren't worth much.  And there was the story, of

21  course, that I've told which I find a little bit entertaining is

22  that I thought, well, maybe I ought to have somebody out there,

23  you know, that endorsed me.  So I went to my friend, Nolan Ryan,

24  and he said, yeah, I'll endorse you.  So I guess Nolan Ryan

25  against 72 Republicans, we know who won.

1   Q.  And that's Nolan Ryan, the baseball pitcher?

2   A.  Yeah, that's the guy.

3   Q.  And how did you do in that campaign when Nolan Ryan endorsed

4   you?

5   A.  Well, I won that campaign.

6   Q.  Now, what do you think or how do you feel about paying money

7   for political endorsements?

8   A.  Well, I didn't know that ever happened.

9   Q.  But I'm just asking you generally your view about it.

10  A.  Well, I mean, I don't even believe in endorsements.  Do you

11  think I would want to pay money for it?  No.  But there's always

12  been -- there's a lot of shifting from one campaign to another.

13  I think in the current campaign that's going on they say, oh,

14  this is going down, he's going over to this campaign, he might

15  get more money, so it goes -- it shifts a whole lot.  So getting

16  paid, that isn't getting paid to give an endorsement, no.  I

17  don't think anybody would think that was a very good idea.

18  Q.  Did you on the 2012 campaign make clear to your staff how

19  you felt about paying for political endorsements?

20  A.  I assumed it went without saying.  I didn't have a memo or

21  anything like that.  The people who knew me knew that I wasn't

22  too excited about endorsements.

23  Q.  Did anyone at that event in Iowa say anything to you about

24  Senator Sorenson getting paid by your campaign to endorse you?

25  A.  No.

1  Q.  What would you have said if someone on your staff had asked

2  you permission to pay Senator Sorenson to endorse you?

3  A.  Well, I can't conceive of that happening.  If they said we

4  want to give so and so some money so they would endorse you, I

5  mean, that's just too much out of the reality.  But if they said

6  that so and so was leaving a campaign and he's a credible person

7  and he wants to work for the campaign, I would have been open to

8  that.

9  Q.  Why did you say a moment ago that you could not conceive of

10  someone asking -- someone in your campaign asking you to pay

11  Senator Sorenson for his endorsement?  Why did you say that?

12  A.  Well, I just don't think people do those sort of things or

13  are supposed to do those things.  I don't think that's a good

14  idea.  I mean, I don't think much of endorsements.  I didn't pay

15  Nolan Ryan, let me tell you that, but it meant more than

16  anything else.  So, no, the money seems to be -- that's too big

17  of a problem to even consider.

18          MR. KRAVIS:  Thank you, Doctor.

19          I have no further questions.

20          THE COURT:  Mr. Howard?

21          MR. HOWARD:  Thank you, Your Honor.

22                      CROSS-EXAMINATION

23  BY MR. HOWARD:

24  Q.  Hello, Dr. Paul.  How are you?

25  A.  Hey.

1   Q.  In 2011 and 2012, as you were traveling, Jesse Benton was

2   your right-hand man?

3   A.  Right.

4   Q.  Can you tell the jury, if you wouldn't mind, your feeling

5   about e-mail?

6   A.  About what?

7   Q.  E-mail.

8   A.  E-mail?

9   Q.  E-mail, yes, electronic, e-mail and texts.

10  A.  My personal understanding of e-mail, my use of e-mail?

11  Q.  Yes, your use of e-mail.

12  A.  Well, I'm evolving and progressing, and since I've lost a

13  lot of staff from campaigns and congressional offices, I do a

14  little e-mail now.  I'm pretty clumsy with texting and stuff,

15  but back then I probably e-mailed on a rare occasion.  But when

16  it came to the campaign, I would think it would be pretty safe

17  to say zero because I want verbal communication, and that's why

18  Jesse worked closely with me, and I could ask him immediately

19  and I'll say, well, what's going on?  And we could go over the

20  business.  Or if I had to talk to John, he would make sure I

21  could, and occasionally there would be other people in

22  advertising, not so much, but I didn't use e-mail and I was just

23  taught over the years to do it through personal communication.

24  Q.  And as you and Mr. Benton traveled, can you give the members

25  of the jury an idea of your travel schedule during the

1  2011-2012 campaign?

2  A.  One thing I'm a little sorry about over the years is I

3  didn't keep a diary because it would be very interesting.  The

4  schedule was very, very busy.  It was on and off airplanes and

5  we would be gone a whole lot.  So all I can say is -- and it

6  just all ran together, and sometimes when I think about it, the

7  campaign in 2008 ran together with the one in 2012.

8  Q.  Fair enough.

9  A.  So seemed to be on the road all the time.

10  Q.  And do you remember being on the road between April of 2011

11  and January 2012, in Iowa for 40 days and New Hampshire for 40

12  days?

13  A.  Yeah.  I guess that would be with the straw vote and things

14  going on.

15  Q.  Yes, sir.

16  A.  Yes, sir, I'm sure I was here plenty of times.

17  Q.  And during the course of travel during that time, do you

18  remember Mr. Benton being hospitalized in Lake Jackson, Texas?

19  A.  That who was hospitalized?

20  Q.  Mr. Benton, the man married to your granddaughter.

21  A.  Oh, yes, I do.

22  Q.  Do you remember that being for exhaustion?

23  A.  Pardon me?

24  Q.  Do you remember that being for exhaustion, Mr. Benton being

25  exhausted?

1  A.  Yeah.

2  Q.  And do you remember trips to -- I'm just going to give you

3  some states -- Vermont, New Hampshire, South Carolina, Kansas,

4  Florida, Nevada?  How am I doing?

5  A.  I wouldn't argue with you.

6  Q.  Okay.

7  A.  I don't have -- I mean, there was just too many; but

8  basically as a general rule Jesse would go with me.

9  Q.  Now, you were asked about endorsements, and is it my

10  understanding you will take endorsements; is that correct?

11  A.  Sure, sure.  It would be an insult not to.

12  Q.  And it's fair to say that your campaign had no policy

13  against endorsements; is that correct?

14  A.  Policies?

15  Q.  No policy against endorsements; your campaign?  Let me start

16  over.

17  A.  I'm sorry.

18  Q.  That's all right.  It's my fault.  Is it fair to say that

19  your campaign, your presidential campaign, had no policy against

20  endorsements?

21  A.  Oh, yes, I understand that.  And, no, I didn't -- I didn't

22  have a written policy, probably never discussed it with anybody;

23  but it was never implied that, you know, get out there, guys,

24  the more endorsements, the more votes we're going to win.

25  Matter of fact, the discussion I just had indicated that I came

1    to the conclusion from experience that the endorsements are way

2    overblown.

3    Q.   Okay.  But your 2011-2012 campaign did have a senator on

4    your payroll by the name of James Forsythe?

5    A.   Right.

6    Q.   Do you remember Mr. Forsythe?

7    A.   Right.

8    Q.   And I think you mentioned he was with the Air Force; is that

9    correct?

10   A.   Right, he was Air Force.

11   Q.   And can you tell the members of the jury what Mr. Forsythe

12   was doing for your campaign?

13   A.   In the campaign?

14   Q.   Yes.

15   A.   He was coordinator, but I don't remember the details.

16   Q.   Okay.

17   A.   All I -- I was very impressed.  He was an Air Force pilot, I

18   had been a flight surgeon, and we got along; but he had an

19   enlightenment about the uselessness of the wars and bombs that

20   he had been required to drop.  So he was very interested in my

21   foreign policy, and he was a volunteer and he helped a whole lot

22   in New Hampshire, and then I think he became a senator after

23   that.

24   Q.   Okay.

25   A.   I don't think that he was a senator at the time.  Somebody

1  would have to check it.

2  Q.  And that's fine.  You paid him because he worked; is that

3  correct?  You were fine -- I'm sorry, I'll walk over here.

4  A.  I'm sorry.

5  Q.  You and I talked, but I want you to talk to the grand jury

6  (sic).  You were okay with Senator Forsythe as long as he was

7  working; is that correct?

8  A.  Oh, sure, sure, because the guy was brilliant, too, and he

9  agreed with the ideas that I had been working on, so he was a

10  real asset.  So paying him was just -- and I don't even know how

11  much we paid him.  Maybe we were just paying his expenses for

12  all I know.

13  Q.  Now, as we sit here today -- and you know that this is a lot

14  for Mr. Benton, your grandson-in-law.  Do you still support

15  Mr. Benton?

16  A.  Absolutely.

17  Q.  Fine.

18  A.  He has -- as far as I'm concerned, nothing has changed.

19  Q.  Good.  I want to thank you.

20  A.  Pardon me?

21  Q.  I want to thank you.

22  A.  Oh, thank you.

23          THE COURT:  Mr. Binnall, do you have questions?

24          MR. BINNALL:  Briefly, Your Honor.

25

1                    CROSS-EXAMINATION

2  BY MR. BINNALL:

3  Q.  Dr. Paul, do you feel like you're a victim in this case?

4  A.  I'm sorry, I missed that word when your foot hit the --

5  Q.  I'm sorry.  Dr. Paul, do you feel like you're a victim in

6  this case?

7  A.  A victim?

8  Q.  Yes.

9  A.  I saw in print that I was a victim of things my staff had

10  done, and when I got to thinking about this, I didn't know

11  anybody knew exactly what the staff did.  I thought that's what

12  people were trying to find out.  So how could I be a victim of

13  something that's not been determined?  So, no, I don't feel a

14  victim in that sense because I feel victimized a whole lot.  You

15  know, before I left Texas a couple of days ago, there was on the

16  Internet I read that Ron Paul has to go to Iowa and testify

17  against his family member.  So I feel like a victim when it's

18  broadcast out there for some reason Ron Paul is going to go up

19  there and he's going to testify against somebody.  I feel

20  victimized when my daughter has to go through what she's going

21  through.  She's getting treated for cancer, and we've got to get

22  on airplanes and wait and struggle through this.  I feel

23  victimized when this whole thing broke.  You know, it's been

24  going on, what, in January -- I think I first heard of it, it

25  was January '12, and here it is four years later and a lot of

1  time span, a lot of money spent.  And there was the anticipation

2  that there would be indictments a long time ago; but, no, it

3  didn't occur until the day before the debate where my son, Rand,

4  was involved, and I don't consider that a coincidence.  I

5  consider that more than seeking justice.

6  Q.  And do you blame the defendants for that?

7  A.  Blame who?

8  Q.  Do you blame the defendants for that?

9  A.  The defendants?

10  Q.  Mr. Benton or Mr. Kesari, do you blame them for that?

11  A.  Oh, the defendants?  No, no.  I believe the government, you

12  know, it's the government.  It's the process.  It's what is

13  going on.  So the victims are there, but how can I be a victim

14  of my staff and the people are on the defense now because nobody

15  knows exactly what went on.  I certainly don't know, and it's

16  supposed to be sorted out so I've not been victimized.  Maybe

17  that attitude could change, but right now I haven't been

18  victimized.

19          The real victimization for me is me and my family and,

20  you know, it's been a heavy burden for us, and it's a -- the

21  whole thing is, I didn't even know it was legal that you could

22  be compelled to testify against family members, and I'm not

23  testifying for the defense.  I'm testifying for the prosecution,

24  and that is a heavy burden.  It's been a heavy burden for our

25  family, for me personally, my wife, my daughter, my

1  grandchildren, and that is something that is very, very tough.

2  And when you see all of this mess out there, I -- the defendants

3  didn't victimize me.  I mean, I think that is a stretch.

4  Q.  And, sir, did you ever put Dimitri Kesari in charge of

5  financial reporting of your campaigns?

6  A.  No, I did not.

7  Q.  Was he ever responsible for coding expenses to go to the

8  Federal Election Commission?

9  A.  Well, if he was and John or Jesse or somebody appointed him,

10  I don't know, but I wouldn't have assumed that.  I think in this

11  testimony his name did pop in because I don't even know what his

12  title was when he was in the campaign.

13  Q.  So as far as you know, Mr. Kesari didn't have any

14  responsibilities with the Federal Election Commission?

15  A.  No, none that I know of.

16       MR. BINNALL:  No further questions.

17       THE COURT:  Mr. Kravis?

18       MR. KRAVIS:  Very briefly.

19              REDIRECT EXAMINATION.

20  BY MR. KRAVIS:

21  Q.  Thank you, Doctor.

22       To your knowledge, did your 2012 Presidential Campaign

23  pay Senator Kent Sorenson in exchange for him endorsing you for

24  President?

25  A.  Did you say did I know that he got paid to do that?

1   Q.  Yes.

2   A.  Well, I --

3   Q.  Let me repeat the question.  To your knowledge, did your

4   2012 Presidential Campaign pay Senator Kent Sorenson in exchange

5   for him endorsing you for President?

6   A.  Not to my knowledge.

7               MR. KRAVIS:  Thank you.

8               I have no further questions.

9               THE COURT:  Anything else?

10              MR. HOWARD:  No, Your Honor.

11              MR. BINNALL:  No, Your Honor.

12              THE COURT:  Thank you, sir.  You're excused.

13              Dr. Paul, you're excused.

14                                      (Witness excused.)

15              THE COURT:  Call your next witness.  Or will you have

16  Agent LoStracco back?

17              MR. KRAVIS:  We'll have Agent LoStracco back.

18              THE COURT:  Very well.  Come forward, ma'am.

19                          KAREN LOSTRACCO,

20  resumed her testimony as follows:

21                  DIRECT EXAMINATION (Continued)

22  BY MR. KRAVIS:

23  Q.  Where were we?  Agent LoStracco, I would remind you that you

24  are still under oath.  You know that, right?

25  A.  Yes.

1   Q.   I want to talk with you now about e-mails from the 2011 time

2   period, and I want to bring your attention first to what has

3   been marked but not yet entered into evidence as Government's

4   Exhibit 4.

5           Do you recognize Government's Exhibit 4?

6   A.   Yes.

7   Q.   What is Government's Exhibit 4?

8   A.   This is an e-mail exchange between Jesse Benton, John Tate,

9   and Dimitri Kesari.

10  Q.   What is the date of the e-mail exchange?

11  A.   June 15, 2011.

12  Q.   And where did this document come from?

13  A.   Jesse Benton.

14          MR. KRAVIS:   At this time the government moves Exhibit

15  4 into evidence.

16                              (Government Exhibit 4 was

17                              offered in evidence.)

18          MR. BINNALL:   Your Honor, this is going to be a

19  hearsay objection especially with the date being June 15, 2011.

20  This very clearly does not fall within 801(d), and there's no

21  other hearsay rule applicable without the exception.  So we

22  would ask that it not be admitted.

23          MR. HOWARD:   And, Your Honor, this does nothing for

24  this conversation between two people.  It's got nothing to do

25  with an alleged conspiracy period or anything.  It's just

1    chitchat.

2              THE COURT:  Overruled.  4 is received.

3                           (Government Exhibit 4 was

4                           received in evidence.)

5    BY MR. KRAVIS:

6    Q.  This is another very brief e-mail exchange.  As it comes up

7    on the screen, I'm going to ask you to start with the bottom

8    e-mail, the one from Dimitri Kesari on June 15, 2011, at 7:06

9    p.m. and then read up from there.

10   A.  From Dimitri Kesari to Benton Jesse, to John Tate.  Reply to

11   dimitri@ronpaul2012.com.  Subject:  Iowa.  Sent June 15, 2011,

12   7:06 p.m.

13             "We may be able to get Kent Sorenson to jump ship and

14   join us.

15             "What do you think?

16             "Any thoughts and conditions?"

17   Q.  And is there a reply?

18   A.  From John Tate.  Sent Wednesday, June 15, 2011, 8:15 p.m. to

19   dimitri@ronpaul2012.com, and Benton, Jesse.  Subject:  Regarding

20   Iowa.

21             "Why will he switch?  Are you sure about this?  Let's

22   talk tomorrow."

23   Q.  I want to now jump ahead with you to October of 2011, and I

24   want to show you what's been marked but not yet entered into

25   evidence as Government's Exhibit 5.

1              Do you recognize Government's Exhibit 5?

2    A.   Yes.

3    Q.   What is Government's Exhibit 5?

4    A.   This is an e-mail exchange between Jesse Benton, John Tate,

5    and Jedd Coburn.

6    Q.   What is the date of this e-mail exchange?

7    A.   October 28, 2011.

8    Q.   Where did this document come from?

9    A.   The Ron Paul Presidential Campaign.

10             MR. KRAVIS:  At this time the government moves

11   Exhibit 5 into evidence.

12                           (Government Exhibit 5 was

13                            offered in evidence.)

14             MR. HOWARD:  Same objection, Your Honor.

15             MR. BINNALL:  Same objection, Your Honor.

16             THE COURT:  Overruled.  5 is received.

17                           (Government Exhibit 5 was

18                            received in evidence.)

19   BY MR. KRAVIS:

20   Q.   And as Government's Exhibit 5 comes up on the screen, this

21   is another short e-mail exchange.  I would ask you to start with

22   the bottom e-mail from Benton, Jesse and read up to the top.

23   A.   From Benton, Jesse to John Tate to Jedd Coburn.  Subject:

24   Thought.  Sent October 28, 2011, at 10:54 a.m.

25             "If we worked out things with Kent fast enough we

1  could do a press conference tomorrow in Des Moines with Ron."

2  Q.  And is there a response?

3  A.  From johnt@ronpaul2012.com.  Sent Friday, October 28, 2011,

4  10:57 a.m.  To Benton, Jesse and Jedd Coburn.  Subject:

5  Regarding thought.

6           "Ok.  I will work on."

7  Q.  And who is Jedd Coburn?

8  A.  Jedd Coburn was a writer for the Ron Paul 2012 Campaign,

9  Presidential Campaign.

10 Q.  I want to show you another e-mail from that same day.  This

11 is Government's Exhibit 6.  This has been marked but not

12 admitted.

13          Do you recognize Government's Exhibit 6?

14 A.  Yes.

15 Q.  What is Government's Exhibit 6?

16 A.  This is an e-mail exchange between John Tate and Dimitri

17 Kesari.

18 Q.  What is the date of the e-mail exchange?

19 A.  October 28, 2011.

20 Q.  Where did this document come from?

21 A.  The Ron Paul Presidential Campaign.

22          MR. KRAVIS:  At this time the government moves

23 Exhibit 6 into evidence.

24                              (Government Exhibit 6 was

25                               offered in evidence.)

1          MR. BINNALL:  Same objection, as well as the

2    authentication objection that was previously talked about.

3          MR. HOWARD:  Your Honor, again, we'll object as

4    Mr. Benton is not on this e-mail at all.

5          THE COURT:  Overruled.  6 is received.

6                                (Government Exhibit 6 was

7                                received in evidence.)

8    BY MR. KRAVIS:

9    Q.  This is another e-mail exchange.  As it comes up on the

10   screen, it's a short e-mail exchange.  I'll ask you to start

11   with the bottom e-mail, the October 28, 2011, 10:46 p.m. e-mail

12   and read up for us.

13   A.  On October 28, 2011, at 10:46 p.m., johnt@ronpaul2012.com

14   wrote:

15          "Please stop immediately any effort to contact Kent

16   and set up a meeting.  No more tries.  No more attempts.  Will

17   explain in more detail at a later time.  Thanks."

18   Q.  And is there a response?

19   A.  From Dimitri Kesari.  Sent Friday, October 28, 2011, 11:52

20   p.m.  To johnt@ronpaul2012.com.  Subject:  Regarding Kent.

21          "Ok."

22   Q.  I want to turn your attention now to an e-mail that was

23   marked but not yet admitted as Government Exhibit 11.

24          Do you recognize Government's Exhibit 11?

25   A.  Yes.

1  Q.  What is Government's Exhibit 11?

2  A.  This is an e-mail exchange between Dimitri Kesari and John

3  Tate.

4  Q.  What's the date of the e-mail exchange?

5  A.  October 31, 2011.

6  Q.  And where did this document come from?

7  A.  The Ron Paul Presidential Campaign.

8          MR. KRAVIS:  At this time the government moves Exhibit

9  11 into evidence.

10                          (Government Exhibit 11 was

11                           offered in evidence.)

12          MS. SINFELT:  Same objection with Mr. Benton, Your

13  Honor.

14          MR. BINNALL:  And objection as to the part that is not

15  from Mr. Kesari for hearsay and objection to authentication.

16          THE COURT:  Overruled.  11 is received.

17                          (Government Exhibit 11 was

18                           received in evidence.)

19  BY MR. KRAVIS:

20  Q.  This is another short e-mail exchange.  Starting with the

21  bottom e-mail, the October 3l, 2011, 7:58 p.m. e-mail and

22  reading up, would you read this one for us, please?

23  A.  From Dimitri Kesari to John Tate.  Subject:  Kent.  Sent

24  October 31, 2011, 7:58 p.m.

25          "Kent texted me tonight apologizing for not meet for

1  dinner last week but wants to have me over next week when I come

2  back to Des Moines.  I said okay.

3        "No other conversation."

4  Q.  Was there a response from johnt@ronpaul2012.com?

5  A.  On October 31, 2011, at 8:05 p.m. johnt@ronpaul2012.com

6  wrote:

7        "Okay.  Don't firm up anything yet."

8  Q.  And was there a response to that from Mr. Kesari?

9  A.  From Dimitri Kesari.  Sent Monday, October 31, 2011, 9:23

10 p.m.  To johnt@ronpaul2012.com.  Subject:  Regarding Kent.

11       "I won't."

12 Q.  I want to turn your attention now to some e-mails from a few

13 weeks later in the middle of November of 2011 starting with

14 Government Exhibit 14 which has been marked but not admitted.

15       Do you recognize Government's Exhibit 14?

16 A.  Yes.

17 Q.  What is Government's Exhibit 14?

18 A.  This is an e-mail exchange between John Tate, Jesse Benton,

19 and Dimitri Kesari.

20 Q.  What is the date of the e-mail exchange?

21 A.  November 13, 2011.

22 Q.  Where did this document come from?

23 A.  The Ron Paul Presidential Campaign.

24       MR. KRAVIS:  At this time the government moves Exhibit

25 14 into evidence.

```
 1                        (Government Exhibit 14 was
 2                        offered in evidence.)
 3          MR. HOWARD:  Same objection, Your Honor.
 4          MR. BINNALL:  Same objection.
 5          THE COURT:  Overruled.  14 is received.
 6                        (Government Exhibit 14 was
 7                        received in evidence.)
 8  BY MR. KRAVIS:
 9  Q.  This is, as it's coming up on a screen, another short e-mail
10  exchange.  Starting with the bottom e-mail, the November 13,
11  2011, 8:57 p.m. e-mail, could you read this one up from bottom
12  to top for us?
13  A.  On November 13, 2011, at 8:57 p.m., Jesse Benton wrote:
14          "Since Michelle decided to take a cheap shot at Ron on
15  Saturday night, I'm seriously considering dropping the Aaron
16  Dorr shakedown e-mail to Politico on Tuesday.
17          "Thoughts?"
18  Q.  And is there a response?
19  A.  From John Tate.  Sent Sunday, November 13, 2011, at 9:42
20  p.m.  To Jesse Benton, cc Dimitri Kesari.  Subject:  Regarding
21  Sorenson.
22          "You should contact Aaron first and see if a decision
23  is forthcoming from Kent.  Ask how the leadership vote went.
24  Seems to me we would still want to get a Sorenson endorsement."
25  Q.  Now, turning your attention --
```

1   A.   Sorry.  It says, "John."

2   Q.   Thank you.

3          Now turn your attention to another e-mail in this

4   exchange.  This is Government's Exhibit 16 which has been marked

5   but not yet admitted.

6          Do you recognize Government's Exhibit 16?

7   A.   Yes.

8   Q.   What is Government's Exhibit 16?

9   A.   This is an e-mail exchange between Jesse Benton, John Tate,

10  and Dimitri Kesari.

11  Q.   What is the date of the e-mail exchange?

12  A.   November 13, 2011 and November 14, 2011.

13  Q.   Where did this document come from?

14  A.   The Ron Paul Presidential Campaign.

15          MR. KRAVIS:  At this time the government moves Exhibit

16  16 into evidence.

17                          (Government Exhibit 16 was

18                           offered in evidence.)

19          MR. HOWARD:  Same objection, Your Honor.

20          MR. BINNALL:  Same authentication and hearsay

21  objection, Your Honor.

22          THE COURT:  Overruled.  16 is received.

23                          (Government Exhibit 16 was

24                           received in evidence.)

25  BY MR. KRAVIS:

1  Q.  Now, as Government's Exhibit 16 is coming up on the screen,

2  I want to direct your attention to the bottom of Government's

3  Exhibit 16.  On the bottom of Government's Exhibit 16, do you

4  see the same November 13, 2011, 8:57 p.m. e-mail we saw on the

5  last exhibit, the one that begins, "Since Michelle decided to

6  take a cheap shot at Ron"?

7  A.  Yes.

8  Q.  I'm going to ask you -- you don't have to read that one

9  again.  You already did it.  Can you read up from there?

10  A.  From Dimitri Kesari to Benton Jesse, cc John Tate.  Subject:

11  Regarding Sorenson.  Sent November 13, 2011, 9:48 p.m.

12      "Before we do it let me try Kent and his wife one last

13  time."

14  Q.  And is there a response from John Tate?

15  A.  On Sunday, November 13, 2011, at 8:51 p.m., John Tate wrote:

16      "No.  Should be Jesse contacting Aaron.  Not you

17  contacting Kent."

18  Q.  And is there a response from Mr. Benton?

19  A.  From Jesse Benton.  Sent Sunday November 13, 2011, 9:52 p.m.

20  To tfc02@aol.com, cc Dimitri Kesari.  Subject:  Regarding

21  Sorenson.

22      "Ok, I'll e-mail him again."

23  Q.  And, finally, did Dimitri Kesari respond to that e-mail?

24  A.  From Dimitri Kesari.  Sent Monday, November 14, 2011, 1:14

25  p.m.  To Jesse Benton and tfc02@aol.com.  Subject:  Regarding

1  Sorenson.

2          "Any news?"

3  Q.  Now I want to show you an e-mail exchange from the next day.

4  This is Government's Exhibit 17 which has been marked but not

5  admitted.

6          Do you recognize Government's Exhibit 17?

7  A.  Yes.

8  Q.  What is Government's Exhibit 17?

9  A.  This is an e-mail exchange between Jesse Benton, Dimitri

10  Kesari, and John Tate.

11  Q.  And what is the date of this e-mail exchange?

12  A.  November 15, 2011.

13  Q.  And where did this document come from?

14  A.  The Ron Paul Presidential Campaign.

15          MR. KRAVIS:  At this time the government moves Exhibit

16  17 into evidence.

17                              (Government Exhibit 17 was

18                               offered in evidence.)

19          MR. HOWARD:  Same objections, Your Honor.

20          MR. BINNALL:  Same objections.

21          THE COURT:  Overruled.  17 is received.

22                              (Government Exhibit 17 was

23                               received in evidence.)

24  BY MR. KRAVIS:

25  Q.  And as Government Exhibit 17 is coming up on the screen,

1  this is a one-page series of short e-mails.  Beginning at the

2  bottom, the November 15, 2011, 2:58 p.m. e-mail, can you start

3  there and read up to the top?

4  A.  On November 15, 2011, at 2:58 p.m., Dimitri Kesari wrote:

5          "Any word on Sorenson?"

6  Q.  And did Mr. Benton respond?

7  A.  From Jesse Benton.  Sent Tuesday, November 15, 2011, 2:59

8  p.m.  To Dimitri Kesari.  Subject:  Regarding.

9          "No response."

10  Q.  And what did Dimitri Kesari write back?

11  A.  On November 15, 2011, at 3:05 p.m., Dimitri Kesari wrote:

12          "Am I free to meet him and his wife?"

13  Q.  And did Mr. Benton respond to that question?

14  A.  On November 15, 2011, at 3:11 p.m., Jesse Benton wrote:

15          "Yes."

16  Q.  And did John Tate respond to Jesse Benton's e-mail?

17  A.  On November 15, 2011, at 5:03 p.m., John Tate wrote:

18          "Dimitri.  Make sure you talk to Jesse about how we

19  want to do this and what you are supposed to say.  We need to be

20  very careful.

21          "John."

22  Q.  And did Dimitri Kesari respond to John Tate's e-mail saying,

23  we need to be very careful?

24  A.  From Dimitri Kesari.  Sent Tuesday, November 15, 2011, 5:17

25  p.m. to John Tate, cc Jesse Benton.

1             "Okay."

2    Q.   Now I want to show you another e-mail from the same day.

3    This is Government's Exhibit 18, which has also been marked but

4    not yet admitted.

5             Do you recognize Government's Exhibit 18?

6    A.   Yes.

7    Q.   What is Government's Exhibit 18?

8    A.   This is an e-mail exchange between Dimitri Kesari and

9    kent@kentsorenson.com.

10   Q.   What is the date of the e-mail exchange?

11   A.   November 15, 2011.

12   Q.   The same day as the last e-mail exchange we were looking at?

13   A.   Yes, that's correct.

14   Q.   Where did this document come from?

15   A.   This document came from Dimitri Kesari's computer.

16           MR. KRAVIS:  At this time the government moves Exhibit

17   18 into evidence.

18                               (Government Exhibit 18 was

19                                offered in evidence.)

20           MR. HOWARD:  Your Honor, again, the same

21   authentication issue.  This was pulled from Mr. Kesari's

22   computer.  Ms. LoStracco is not able to authenticate it to

23   Mr. Benton.

24           MR. BINNALL:  Same objection as before.

25           THE COURT:  Overruled.  18 is received.

1               (Government Exhibit 18 was

2               received in evidence.)

3  BY MR. KRAVIS:

4  Q.  And as Government's Exhibit 18 is coming up on the monitor,

5  I'm going to direct your attention to, there's just one e-mail

6  at the top of the page, short e-mail.  Can you read that one for

7  us?

8  A.  From Dimitri Kesari to kent@kentsorenson.com.  Subject:

9  Dinner?

10          Sent Tuesday, 15 November 2011, at 23:11.

11          "We doing dinner this week?

12          "Let me know what night and I will cook for the

13  family.

14          "Dimitri."

15  Q.  And who during this time period was using the e-mail address

16  kent@kentsorenson.com?

17  A.  Kent Sorenson.

18  Q.  I now want to direct your attention to an e-mail exchange

19  from the next day.  This is Government's Exhibit 19.  It's been

20  marked but not admitted.  This is a redacted version.

21          Do you recognize Government's Exhibit 19?

22  A.  Yes.

23  Q.  What is Government's Exhibit 19?

24  A.  This is an e-mail exchange between Jesse Benton and Dimitri

25  Kesari.

344

1   Q.  What is the date of the e-mail exchange?

2   A.  November 16, 2011.

3   Q.  Where did this document come from?

4   A.  This document came from Dimitri Kesari's computer.

5           MR. KRAVIS:  At this time the government moves Exhibit

6   19 into evidence as redacted.

7                           (Government Exhibit 19 was

8                            offered in evidence.)

9           MR. BINNALL:  One moment, Your Honor.

10          (Pause.)

11          MR. BINNALL:  Same objection regarding authentication.

12          MR. HOWARD:  Your Honor, again, we're going to object

13  to the redaction.  I'm not understanding the reason for it.  You

14  can see my copy here.

15          MR. KRAVIS:  Relevance.

16          THE COURT:  I've got it here.

17          MR. HOWARD:  And our other objections.

18          THE COURT:  It's coming in.  Would you prefer it with

19  or without the redaction?

20          MR. HOWARD:  Without the redaction.

21          THE COURT:  You, too?

22          MR. BINNALL:  We have no problem with that, Your

23  Honor.

24          THE COURT:  So we'll let it in, 19 unredacted.

25

1              (Government Exhibit 19 was

2              received in evidence.)

3         THE COURT:  It strikes me, members of the jury, that

4  you must be wondering is like every single exhibit they're

5  objecting to, I'm overruling every exhibit.  There's a procedure

6  going on here that you don't know about.  I'll tell you about it

7  at the end; but they're under an obligation to object to each of

8  these exhibits, and the procedure isn't done yet.  And so I'll

9  tell you about it when it's all over, but you shouldn't take

10  anything from the fact that they object to every exhibit because

11  they're obligated to do that under this procedure that we're

12  using.

13  BY MR. KRAVIS:

14  Q.  And so as Government's Exhibit 19 comes up on the screen,

15  I'm going to ask you to direct your attention to the middle of

16  the first page, the e-mail exchange, the e-mail that is sent

17  from Jesse Benton on Wednesday, November 16, 2011, at 8:05 p.m.

18  I'm going to ask you to start with that e-mail and then read up

19  from there if you would.

20  A.  From Jesse Benton.  Sent Wednesday, November 16, 2011, 8:05

21  p.m. to Dimitri Kesari.

22              "What up with Sorenson?"

23              From Dimitri Kesari to Jesse Benton.  Sent Wednesday,

24  16 November 2011, 20:08.

25              "We talked for a min today.  He was with others and

1   could not talk.

2           "He is going to give me a call later tonight after a

3   fellow senator's fundraiser.

4           "I will send you an e-mail after we talk."

5   Q.  Turn your attention now to an e-mail from the next day.

6   This is Government's Exhibit 20 which has been marked but not

7   yet admitted.

8           Do you recognize Government's Exhibit 20?

9   A.  Yes.

10  Q.  What is Government's Exhibit 20?

11  A.  This is an e-mail exchange between Dimitri Kesari, Jesse

12  Benton, and John Tate.

13  Q.  What is the date of the e-mail exchange?

14  A.  November 17, 2011.

15          MR. KRAVIS:  At this time the government moves Exhibit

16  20 into evidence.

17                          (Government Exhibit 20 was

18                           offered in evidence.)

19          MR. BINNALL:  The authentication objection from

20  Mr. Kesari.

21          MR. HOWARD:  Same objections.

22          THE COURT:  I'm sorry, I missed it.  Where did this

23  exhibit come from?

24          THE WITNESS:  The Ron Paul 2012 Presidential Campaign.

25          THE COURT:  Overruled.  20 is received.

```
 1                    (Government Exhibit 20 was

 2                    received in evidence.)

 3   BY MR. KRAVIS:

 4   Q.  And as Government's Exhibit 20 is coming up on the screen, I

 5   believe it's just one e-mail at the top of the page, if you

 6   could read that e-mail for us.

 7   A.  From Dimitri Kesari.  Sent Thursday, November 17, 2011,

 8   11:58 a.m.  To Jesse Benton and John Tate.  Subject:  Kent

 9   Sorenson.

10            "I talked with Kent briefly last night.  He was almost

11   home when we connected.

12            "Looks like his time with Bachmann is ending by

13   January since he is meeting with Chuck Launder, former Iowa GOP

14   Ed and Steve King about raising money for his PAC.

15            "He is going to call me back today about going to

16   dinner tonight or tomorrow night.  It will either be tonight or

17   tomorrow night with his family."

18   Q.  I'm going to turn your attention now to an e-mail from a few

19   days later.

20            And, Counsel, this is a shortened version of the

21   e-mail that appears in the binders you received.  This is

22   Government's Exhibit 21.

23            Special Agent, do you recognize Government's Exhibit

24   21?

25   A.  Yes.
```

1  Q.  What is Government's Exhibit 21?

2  A.  This is an e-mail exchange between Dimitri Kesari, John

3  Tate, and Jesse Benton.

4  Q.  What is the date of the e-mail exchange?

5  A.  November 21, 2011.

6  Q.  Where did this document come from?

7  A.  Jesse Benton.

8          MR. KRAVIS:  At this time the government moves Exhibit

9  21 into evidence.

10                              (Government Exhibit 21 was

11                               offered in evidence.)

12          MR. BINNALL:  Objection as to hearsay from what is

13  coming from Mr. Tate and otherwise the authentication.

14          MR. HOWARD:  Your Honor, our previous objections.

15          THE COURT:  Overruled.  21 is received.

16                              (Government Exhibit 21 was

17                               received in evidence.)

18  BY MR. KRAVIS:

19  Q.  Okay.  Special Agent, as Exhibit 21 is coming up on the

20  screen, this is two e-mails.  The first one at the bottom was

21  sent on Monday, November 21, 2011, at 11:52 a.m.  I'm going to

22  ask you to start with that e-mail and then read up from there.

23  A.  From Dimitri Kesari.  Sent Monday, November 21, 2011, 11:52

24  a.m.  To johnt@ronpaul2012.com and Jesse Benton.  Subject:

25  Kent.

1          "I had dinner with Kent, his wife and his family last

2    night.  He does want to come over but wants to do it in a way

3    that is the least mean to Bachmann.  He also does not want to

4    look disloyal but kept reiterating all of his friends are with

5    Ron.  Not just hacks but their close personal friends.

6          "The three of us had a long talk.  I got back around

7    11:30 last night.

8          "He is now looking for his future and not just for the

9    next few months.  Bachmann has offered to him to be her chief of

10   staff.  His wife does not want to move and Bachmann might not

11   run again.  King asked him to raise money for the PAC but he is

12   not too excited about King.  RTW asked him if he was interested

13   in doing tour.  I gave him some info about that.

14         "I will be talking with him later tonight or tomorrow

15   about their conversation."

16   Q.  Can you read John Tate's response?

17   A.  From John Tate.  Sent Monday, November 21, 2011, 12:01 p.m.

18   To Dimitri Kesari and Jesse Benton.  Subject:  Regarding Kent.

19         "Seems to me, next step is to make him an offer

20   (in person, not in writing) and give him a firm polite deadline.

21         "In my view we would want it to occur after Christmas,

22   a few days before caucus.

23         "John."

24   Q.  I'm going to skip ahead with you now to the beginning of

25   December, 2011 and turn your attention to what's been marked

1  for identification but not yet admitted as Government's

2  Exhibit 24.

3          Do you recognize Government's Exhibit 24?

4  A.  Yes.

5  Q.  What is Government's Exhibit 24?

6  A.  This is an e-mail exchange between Jesse Benton and John

7  Tate.

8  Q.  What is the date of the e-mail exchange?

9  A.  December 7, 2011.

10  Q.  And where did this document come from?

11  A.  The Ron Paul Presidential Campaign.

12         MR. KRAVIS:  At this time the government moves Exhibit

13  24 into evidence.

14                      (Government Exhibit 24 was

15                      offered in evidence.)

16         MR. BINNALL:  Your Honor, it's hearsay as to

17  Mr. Kesari since he's not on either of these e-mails and the

18  time frame is such that in no way would the 801(d) exception

19  apply, and then also the authentication objection.

20         MR. HOWARD:  Your Honor, I'll join in those

21  objections.

22         THE COURT:  Overruled.  24 is received.

23                      (Government Exhibit 24 was

24                      received in evidence.)

25  BY MR. KRAVIS:

1  Q.  And this is -- as it's coming up on the screen, this is

2  again two short e-mails.  I'm going to ask you to start with the

3  e-mail from Jesse Benton, December 7, 2011, at 5:14 p.m. and

4  read up from there.

5  A.  From Jesse Benton.  Sent Wednesday, December 7, 2011, 5:14

6  p.m.  To John Tate.  Subject:  Kent.

7          "What's up?  Any chance he'll come over Friday?"

8  Q.  And what was Mr. Tate's response?

9  A.  From John Tate.  Sent Wednesday, December 7, 2011, 5:46 p.m.

10  To Jesse Benton.  Subject:  Regarding Kent.

11          "Dimitri left him two messages, will try again

12  tonight.  We should have an answer tonight or tomorrow morning I

13  think.

14          "I tried to take from Dimitri but he really wanted to

15  handle and will get Kent in touch with you or me if needed.

16          "John."

17  Q.  I want to direct your attention now to another e-mail

18  exchange from the same day.  This is Government's Exhibit 25

19  which has also been marked but not yet admitted.

20          Do you recognize Government's Exhibit 25?

21  A.  Yes.

22  Q.  What is Government's Exhibit 25?

23  A.  This is an e-mail exchange between John Tate and Dimitri

24  Kesari.

25  Q.  What's the date of the e-mail exchange?

1    A.   December 7, 2011.

2    Q.   Where did this document come from?

3    A.   The Ron Paul Presidential Campaign.

4              MR. KRAVIS:  At this time the government moves to

5    admit Exhibit 25 into evidence.

6                                  (Government Exhibit 25 was

7                                   offered in evidence.)

8              MR. HOWARD:  Your Honor, once again, Mr. Benton is not

9    on this e-mail in any way, shape, or form and our objection is

10   to hearsay and authentication.

11             MR. BINNALL:  Hearsay and authentication, Your Honor.

12             THE COURT:  Overruled.  Exhibit 25 is received.

13                                  (Government Exhibit 25 was

14                                   received in evidence.)

15   BY MR. KRAVIS:

16   Q.   And as it's coming up on the screen, I'm going to ask you

17   again to start at the bottom with the December 7, 2011, 5:36

18   p.m. e-mail and read upward from there.

19   A.   On December 7, 2011, at 5:36 p.m., John Tate wrote:

20             "When are you going to talk to Kent?  Jesse is

21   chomping at the bit.  He actually wants to try and do Friday.

22             "John."

23   Q.   And what was Mr. Kesari's response?

24   A.   From Dimitri Kesari.  Sent Wednesday, December 7, 2011, 5:42

25   p.m.  To John Tate.  Subject:  Regarding Kent.

1          "I left him 2 messages today.  I will talk with him

2   tonight."

3   Q.  And what was Mr. Tate's response to Mr. Kesari?

4   A.  From John Tate.  Sent Wednesday, December 7, 2011, at 5:55

5   p.m.  To Dimitri Kesari.  Subject:  Regarding Kent.

6          "Thanks.  Keep me posted."

7   Q.  I want to turn your attention now to an e-mail two days

8   later.  This is Government's Exhibit 26, also marked but not

9   admitted.

10         Do you recognize Government's Exhibit 26?

11  A.  Yes.

12  Q.  What is Government's Exhibit 26?

13  A.  This is an e-mail between John Tate and Dimitri Kesari.

14  Q.  What is the date of the e-mail exchange?

15  A.  December 9, 2011.

16  Q.  And where did this document come from?

17  A.  The Ron Paul Presidential Campaign.

18         MR. KRAVIS:  At this time the government moves Exhibit

19  26 into evidence.

20                         (Government Exhibit 26 was

21                          offered in evidence.)

22         MR. HOWARD:  Same objection, Your Honor.  Mr. Benton

23  is not on this e-mail.

24         MR. BINNALL:  Hearsay and authentication, Your Honor.

25         THE COURT:  Overruled.  26 is received.

1                          (Government Exhibit 26 was

2                          received in evidence:

3    BY MR. KRAVIS:

4    Q.  And as 26 is coming up on the screen, this is just one short

5    e-mail, but I'm going to ask you to read the one e-mail at the

6    top of the page.

7    A.  From John Tate.  Sent Friday, December 7 (sic), 2011, 8:50

8    a.m.  To Dimitri Kesari.  Subject:  Kent.

9              "Did you talk to him again last night?

10             "What is status?  Can we get him before the debate or

11   not?

12             "Thanks.

13             "John."

14   Q.  I'm sorry, can you read the date for me again, please?

15   A.  Yes.  Friday December 9, 2011.

16   Q.  Thank you.

17             I'm going to turn your attention to an e-mail exchange

18   from a few weeks earlier.  This is Government's Exhibit 27.

19             And, Counsel, this is again a shortened version of the

20   exhibit in the binder.

21             Special Agent, do you recognize Government's Exhibit

22   27?

23   A.  Yes.

24   Q.  What is Government's Exhibit 27?

25   A.  This is an e-mail exchange between Jedd Coburn, John Tate,

1  Dimitri Kesari, and Jesse Benton.

2  Q.  What's the date of the e-mail exchange?

3  A.  December 20, 2011.

4  Q.  And where did this document come from?

5  A.  Jesse Benton.

6          MR. KRAVIS:  At this time the government moves Exhibit

7  27 into evidence.

8                              (Government Exhibit 27 was

9                              offered in evidence.)

10          MR. BINNALL:  Your Honor, I'm a little confused

11  because we have a different exhibit than what's up there that's

12  marked as Government's Exhibit 27.  Maybe if we can figure it

13  out.

14          THE COURT:  Why don't you compare notes there and see

15  what you've got.

16          (Counsel conferring.)

17          THE COURT:  Mine is just formatted different.

18          (Counsel conferring.)

19          MR. BINNALL:  One minute, Your Honor, since we had a

20  different version.

21          (Pause.)

22          MR. BINNALL:  Your Honor, it appears we have multiple

23  layers of hearsay, and I'm counting up to possibly three layers

24  of hearsay in the cover right now, and just the cover e-mail

25  itself is hearsay.  This certainly wasn't produced as to

1   Mr. Kesari --

2            THE COURT:  I'm going to reserve ruling on this one.

3   We'll take this one up after the jury goes.  We'll talk about it

4   later.

5            MR. KRAVIS:  Your Honor, we'll agree to redact the

6   bottom e-mail, the one from Jedd Coburn if that's the objection.

7   I think everything about that is admissible as an admission of a

8   party opponent.

9            THE COURT:  Who is the one from Tate sent to at 4:25?

10           MR. KRAVIS:  I'm sorry?

11           THE COURT:  Who's the e-mail that Tate sent at 4:25

12   p.m., who is that to?

13           MR. KRAVIS:  Well, I think all we have is the response

14   which is from Mr. Benton.  Like some of the other e-mails we've

15   seen, the intermediate e-mails, the chain, some of them don't

16   have the full header.

17           THE COURT:  Okay.  Hang on.

18           Yeah, that's the way to do it, all right.  So if

19   you'll redact the Jedd Coburn and the beginning and then 27 is

20   received subject to the same objections that we heard earlier.

21           MR. BINNALL:  Thank you.

22                                (Government Exhibit 27 was

23                                 received in evidence.)

24           MR. KRAVIS:  Yes, that's it.

25           All right.  Then the government moves the exhibit as

1    redacted into evidence.

2            THE COURT:  I said I would receive that.

3    BY MR. KRAVIS:

4    Q.  Special Agent, as the exhibit is coming up on the screen,

5    these are two short e-mails.  If you could begin with the

6    December 20, 2011, 4:25 p.m. e-mail from John Tate and go up

7    from there.

8    A.  On December 20, 2011, at 4:25 p.m., John Tate wrote:

9            "Do we even want Kent's endorsement?"

10   Q.  And did Jesse Benton even reply to that question?

11   A.  From Jesse Benton.  Sent Tuesday, December 20, 2011, 5:45

12   p.m.  To John Tate, cc to Dimitri Kesari.  Subject" regarding

13   Kent Sorenson.

14           "Yes, we still do."

15   Q.  I'm going to turn your attention now to some e-mails from a

16   few days later.  We'll start with Government's Exhibit 28 which

17   has been marked but not yet admitted.

18           Do you recognize Government's Exhibit 28?

19   A.  Yes.

20   Q.  What is Government's Exhibit 28?

21   A.  This is an e-mail from Dimitri Kesari to

22   kent@kentsorenson.com.

23   Q.  What is the date of the e-mail?

24   A.  December 23, 2011.

25   Q.  And where did this document come from?

 1   A.   Dimitri Kesari's computer.

 2           MR. KRAVIS:   At this time the government moves Exhibit

 3   28 into evidence.

 4                               (Government Exhibit 28 was

 5                                offered in evidence.)

 6           MR. HOWARD:   Your Honor, I mean, we object.   We have

 7   no idea what connection it has to the conspiracy.   It's hearsay.

 8   We understand what the government is trying to do, but this has

 9   no connection or no proof that it comes in under any clean

10   theory.

11           MR. KRAVIS:   I believe to the extent it's offered,

12   it's an exhibit offered as statement of a party opponent as to

13   Mr. Kesari.   No objection that it not be considered against

14   Mr. Benton.

15           MR. BINNALL:   And we have a relevance objection to

16   this.

17           THE COURT:   Overruled.   It will be admitted only as to

18   defendant Kesari.   28 is received in evidence.

19                               (Government Exhibit 28 was

20                                received in evidence.)

21   BY MR. KRAVIS:

22   Q.   And as Government Exhibit 28 is coming up in front of you,

23   you're going to see one e-mail at the top of the page.   Can you

24   read that one short e-mail for us?

25   A.   From Dimitri Kesari to kent@kentsorenson.com.   Subject:   So

1    what did your wife say?  Sent Friday, 23 December 2011, at 8:50.

2            "Can you send over the draft press release?"

3    Q.  And who was using the e-mail address kent@kentsorenson.com

4    at this time?

5    A.  Kent Sorenson.

6    Q.  I'm going to turn your attention now to an e-mail from the

7    same day.  This is Government's Exhibit 29.  This is a redacted

8    exhibit.

9            Do you recognize Government's Exhibit 29 as redacted?

10   A.  Yes.

11   Q.  What is Government's Exhibit 29?

12   A.  This is an e-mail exchange between John Tate, Trygvie Olsen,

13   Doug Stafford, mir@saberinc.net, and Jesse Benton.

14   Q.  Who's the e-mail from?

15   A.  Jesse Benton.

16   Q.  What's the date on the e-mail?

17   A.  December 23, 2011.

18           MR. KRAVIS:  And I should have mentioned this e-mail

19   has already been identified.

20           At this time the government moves Exhibit 29 into

21   evidence.

22                            (Government Exhibit 29 was

23                             offered in evidence.)

24           MR. BINNALL:  Your Honor, we ask that it not be

25   admitted as to Mr. Kesari.  He's not on this and hearsay as to

```
 1   him and the same authentication objection.
 2           MR. KRAVIS:  The government offers it as an admission
 3   of a party opponent as to Mr. Benton, relevance, state of mind
 4   and no objection to it just being offered as to him.
 5           MR. HOWARD:  Your Honor, if we could have just a
 6   minute.
 7           (Pause.)
 8           MR. HOWARD:  Your Honor, same objection; hearsay and
 9   authentication.
10           THE COURT:  Overruled.  29 is received.
11                             (Government Exhibit 29 was
12                             received in evidence.)
13           MR. BINNALL:  I'm sorry the government offered it only
14   as to Mr. Benton.  Can we get a little instruction on it?
15           THE COURT:  Is that it?
16           MR. KRAVIS:  Yes.
17           THE COURT:  All right.  So 29 is only admissible
18   against Mr. Benton and not Mr. Kesari.
19   BY MR. KRAVIS:
20   Q.  There is, Special Agent, just one e-mail at the top of the
21   page.  Can you read that e-mail for us?
22   A.  Cc John Tate, Trygvie Olsen, Doug Stafford.  To
23   mir@saberinc.net from Jesse Benton.  Sent Friday, December 23,
24   2011, at 3:51 p.m.  Subject:  Regarding Virginia - could be
25   important.
```

1          "Stick a fork in Michelle BTW.  Sorenson is endorsing

2    Ron on Monday.  We have his statement already."

3    Q.  Turning your attention now to an e-mail from a day earlier.

4    I would ask you to take a look at Government's Exhibit 30 which

5    has been marked but not yet admitted.

6          Do you recognize Government's Exhibit 30?

7    A.  Yes.

8    Q.  What is Government's Exhibit 30?

9    A.  This is an e-mail from Dimitri Kesari to

10   kent@kentsorenson.com.

11   Q.  What is the date of the e-mail?

12   A.  December 24, 2011.

13   Q.  Where did this document come from?

14   A.  Dimitri Kesari's computer.

15          MR. KRAVIS:  At this time the government moves Exhibit

16   30 into evidence.

17                         (Government Exhibit 30 was

18                          offered in evidence.)

19          MR. HOWARD:  Your Honor, relevance.  Again, this is

20   from Mr. Kesari's computer, and our authentication and hearsay

21   objection.

22          MR. BINNALL:  And authentication and relevance to

23   Mr. Kesari.

24          THE COURT:  Overruled.  30 is received.  This will be

25   our last one.

1          (Government Exhibit 30 was

2          received in evidence.)

3  BY MR. KRAVIS:

4  Q.  And as Government's Exhibit 30 is coming up on the screen,

5  you'll see there's just one e-mail that appears at the top of

6  the page.  It's a short e-mail.  Could I ask you to read it for

7  us.

8  A.  From Dimitri Kesari.  To kent@kentsorenson.com.  Subject:

9  Merry Christmas.  Sent Saturday, 24 December, 2011, at 22:43.

10          "And don't forget the press release."

11          THE COURT:  That's it for the day.

12          MR. KRAVIS:  Thank you.

13          THE COURT:  That's enough.  It's 4:45.  Let's go home.

14  Come back ready to go at 9:00 a.m.

15          Remember the cautions I've earlier given you.  They're

16  important.  Do not listen to any radio broadcasts, view any

17  television broadcasts or read any newspaper account that might

18  be published about it.  You know they're going to be published.

19  Don't look at them.  Have your friends save them, look at them

20  after the trial.  But I told you the importance about why we

21  don't do this, and I trust that you'll follow the court's

22  instructions in that regard because of the importance of it.

23          Have a wonderful evening.  See you again tomorrow

24  morning at 9:00 a.m.

25          (In open court, out of the presence of the jury.)

1          Terri, you don't need to take this down.

2          (Discussion off the record.)

3          THE COURT:  Okay.  Thanks.

4          See you tomorrow morning at 8:30 if anyone wants me.

5          Thank you.

6          MR. KRAVIS:  Thank you, Your Honor.

7          (Recess at 4:46 p.m., until 8:30 a.m., Thursday,

8    October 15, 2015.)