IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :
                             :
          Plaintiff,         :     Criminal No. 4:15-103
                             :
     vs.                     :
                             :
JESSE R. BENTON and          :     TRANSCRIPT OF TRIAL
DIMITRIOS N. KESARI,         :        VOLUME III
                             :
          Defendants.        :
- - - - - - - - - - - - - -X


                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Thursday, October 15, 2015
                         8:28 a.m.


BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.


                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                    Room 189, U.S. Courthouse
                    123 East Walnut Street
                    Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:              JONATHAN I. KRAVIS, ESQ.
                                U.S. Department of Justice
                                Criminal Division
                                10th and Constitution Avenue NW
                                John C. Keeney Building
                                Washington, D.C.  20530

                                RICHARD CHRISTIAN PILGER, ESQ.
                                U.S. Department of Justice
                                1400 New York Avenue NW
                                Suite 12100
                                Washington, D.C.  20005

For Defendant Benton:           ROSCOE C. HOWARD, JR., ESQ.
                                MEENA T. SINFELT, ESQ.
                                Barnes & Thornburg
                                1717 Pennsylvania Avenue NW
                                Suite 500
                                Washington, D.C.  20006

For Defendant Kesari:           JESSE RYAN BINNALL, ESQ.
                                Harvey & Binnall
                                717 King Street
                                Suite 300
                                Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Karen LoStracco (Resumed) | 371 Kravis | 420 Howard | | |
| | | 493 Binnall | 502 Kravis | 508 Howard |
| Wesley Yoo (Via video deposition) | 512 | | | |
| Gunnar Demarco | 513 Kravis | 525 Sinfelt 526 Binnall | | |
| Aaron Dorr | 527 Pilger | 553 Sinfelt 555 Binnall | | |
| Kent Sorenson | 557 Pilger | | | |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 7 - | 532 | 532 |
| 10 - | 538 | 538 |
| 12 - | 541 | 541 |
| 13 - | 545 | 545 |
| 23 - | 548 | 548 |
| 31 - | 374 | 374 |
| 32 - | 376 | 377 |
| 33 - | 378 | 378 |
| 34 - | 381 | 381 |
| 35 - | 382 | 382 |
| 36 - | 384 | 384 |
| 37 - | 386 | 386 |
| 38 - | 387 | 388 |
| 39 - | 389 | 389 |
| 40 - | 390 | 390 |
| 41 - | 392 | 392 |
| 42 - | 393 | 393 |
| 43 - | 394 | 395 |
| 44 - | 397 | 398 |
| 45 - | 399 | 400 |
| 46 - | 401 | 401 |
| 47 - | 403 | 404 |
| 48 - | 409 | |
| 51 - | 414 | 416 |
| 52 - | 415 | 416 |
| 56 - | 408 | 408 |
| 57 - | 410 | 411 |
| 60 - | 406 | |
| 91 - | 407 | |
| 105 through 132 - | 372 | |
| 133 - | 380 | 577 |
| 150 - | 552 | |

1                     P R O C E E D I N G S

2               (In open court, out of the presence of the jury.)

3               THE COURT:  It's all right.  Be seated.

4               There's three matters that you identified.  First is

5     the bank records of Grassroots Strategy.  I'm satisfied that

6     they're admissible, on the assumption that Mr. Sorenson will

7     recognize those as his bank records as well.

8               On the issue of the proffer and identifying the

9     lawyers, the cross-examination of Mr. Cortes really did have

10    that moment where it seemed like Mr. Pilger's credibility was at

11    issue.  I agree with the government here that we can identify

12    how many lawyers and whose lawyer, but I don't think we should

13    identify names of lawyers at the proffer session and

14    cross-examination.

15              You had a question about a witness issue?

16              MR. HOWARD:  I'm sorry, Your Honor, I guess I --

17    during cross-examination you don't want me to mention that I was

18    there?

19              THE COURT:  You can refer to your client as having an

20    attorney there but not you, yourself.  All right?

21              MR. HOWARD:  Yes, sir.

22              THE COURT:  Ms. Sinfelt, you had something?

23              MS. SINFELT:  Yes, Your Honor.  We just wanted to

24    bring to the court's attention two issues.  One is we are having

25    troubles scheduling a flight with a witness, so we're trying to

1   work with the government on a potential stipulation, so she may

2   or may not be called after all.  It would be Ms. Tonya Hester.

3          The others, we had two gentlemen on the witness list

4   for the defense, Michael Rothfeld and Jedd Coburn, and they both

5   went to the grand jury and gave testimony, asked them to give

6   further testimony, and they have been reading in the media about

7   this case apparently and now are afraid to testify because

8   they're afraid they're going to be prosecuted by the government

9   and they have told us that they will now be taking their Fifth

10  Amendment right likely if we call them.

11         So we would like to make a motion to at least move in

12  some parts of their grand jury testimony, and we will identify

13  it ahead of time to the government.  Obviously, it would be to

14  our prejudice since we didn't have a chance to cross-examine

15  them on that; but at this point that's probably the best we can

16  do.

17         MR. PILGER:  Your Honor, that's just hearsay.  That's

18  not impeachment and the government will not be offering them at

19  any of these proceedings.

20         THE COURT:  Do you object to them reading grand jury

21  testimony?

22         MR. PILGER:  Yes, Your Honor.  We have an unavailable

23  witness, Your Honor.

24         THE COURT:  Yeah, that's the point.  I'm missing

25  something here.  It's an unavailable witness and, therefore, she

1    wants to read their grand jury testimony instead.

2         MR. KRAVIS:  Can we think about this?  We didn't have

3    any advance notice.  We'll think about it and give them plenty

4    of time to make whatever arrangements they need.

5         THE COURT:  Yes.  And identify for them which portions

6    you would like read.

7         MR. BINNALL:  Your Honor, we would also like to ask

8    the government to consider extending the immunity they've

9    already offered for grand jury testimony and also trial

10   testimony because they're saying it's important to Mr. Kesari

11   that the witness was not in the grand jury testimony.

12   Mr. Kesari, through no fault of his own, is not going to be able

13   to get that out of these witnesses.

14        THE COURT:  I've been down this road before and I'm

15   sure, as you know, the court's ability to force the government

16   to grant immunity is very, very narrow.

17        MR. BINNALL:  I understand, Your Honor.

18        THE COURT:  And I don't see need for that so far.

19        Anything else?

20        MR. PILGER:  I did not hear the first part of your

21   ruling on the bank records.

22        THE COURT:  They're admissible, assuming that

23   Mr. Sorenson also is going to ultimately recognize them as well.

24        MR. PILGER:  So they're not in evidence, but they will

25   be while he's testifying?

```
 1                THE COURT:  Yes.

 2                MR. PILGER:  Without foundational evidence from him?

 3                THE COURT:  Yes.

 4                MR. PILGER:  Thank you, Your Honor.

 5                (Recess at 8:33 a.m., until 8:59 a.m.)

 6                (In open court, in the presence of the jury.)

 7                THE COURT:  Please be seated.

 8                Members of the jury, good morning.

 9                We'll continue on.

10                Mr. Kravis, you may continue.

11                MR. KRAVIS:  Thank you, Your Honor.

12                            KAREN LOSTRACCO,

13   resumed her testimony as follows:

14                      DIRECT EXAMINATION (Continued)

15   BY MR. KRAVIS:

16   Q.  Good morning, Special Agent LoStracco.

17   A.  Good morning.

18   Q.  As you testify this morning, you're still under oath.  You

19   get that, right?

20   A.  Right.

21   Q.  If you need a refill on the water at any time, just let me

22   know.

23   A.  Thank you.

24   Q.  As we left off yesterday, we were looking at some e-mails

25   from December 23rd and 24th of 2011.
```

1           Do you remember those e-mails?

2   A.   Yes.

3   Q.   By the way, we have maybe 30 minutes to go or so on the

4   e-mails.

5           I want to start this morning by turning your attention

6   to some e-mails from Christmas Day on 2011.  I'm going to hand

7   you what has been marked for identification but not yet entered

8   into evidence as Government's Exhibits 105 through 132.  I'm not

9   going to ask you to read every one of these e-mails.

10          Do you recognize these exhibits?

11  A.   Yes.

12  Q.   What are they?

13  A.   These are a series of e-mails that took place, like you

14  said, on Christmas Day of 2011.

15  Q.   And where did these documents come from?

16  A.   These documents came from the Ron Paul Campaign.

17  Q.   Did you have a chance to review these exhibits, 105 through

18  132, before you came in to testify this morning?

19  A.   Yes.

20          MR. KRAVIS:  Okay.  At this time the government moves

21  into evidence, subject to further redaction, Exhibits 105 to

22  132.  I'm not going to ask to publish them today.

23                          (Government Exhibits 105 through

24                           132 were offered in evidence.)

25          MR. BINNALL:  Your Honor, we're going to have to go

1  one by one through these.

2         MS. SINFELT:  Yes, Your Honor.

3         MR. BINNALL:  Different levels of hearsay in these.

4  Of course, we don't mind just putting on the record our

5  authentication objection to all of them that the government just

6  read, but we are going to have to go one by one because there's

7  different evidentiary issues in each one of these.

8         THE COURT:  There are.  Since you're not going to

9  publish them today, we'll take them one by one outside the

10 presence of the jury.

11 BY MR. KRAVIS:

12 Q.  Briefly, Special Agent LoStracco, what is the subject of the

13 e-mails, Government's Exhibits 105 through 132?

14        MR. BINNALL:  Your Honor --

15        THE COURT:  He's just asking for subject matter.  He

16 didn't ask for contents of them.

17        MR. BINNALL:  Okay.

18        THE COURT:  Go ahead.

19 A.  The subject is Kent Sorenson's switched statement -- the

20 statement of switching from the Bachmann Campaign to the Paul

21 Campaign.

22 BY MR. KRAVIS:

23 Q.  Moving past Christmas Day, I want to talk to you now, ask

24 you some questions about some e-mails from the end of December

25 of 2011.  Let's start with Government's Exhibit 31, which has

1    been marked but not yet admitted into evidence.

2            Do you recognize Government's Exhibit 31?

3    A.  Yes.

4    Q.  What is Government's Exhibit 31?

5    A.  This is an e-mail exchange between Dimitri Kesari, John

6    Tate, Jesse Benton, Matt Haws, Jedd Coburn.

7    Q.  What is the date of the e-mail exchange?

8    A.  December 26, 2011.

9    Q.  And where did this document come from?

10   A.  The Ron Paul Campaign.

11           MR. KRAVIS:  At this time the government moves Exhibit

12   31 into evidence.

13                              (Government Exhibit 31 was

14                               offered in evidence.)

15           MR. BINNALL:  Authentication objection and the parts

16   that are not from Mr. Kesari hearsay from Mr. Kesari.

17           MS. SINFELT:  Mr. Benton objects on hearsay grounds.

18           THE COURT:  Overruled.  31 is received.

19                              (Government Exhibit 31 was

20                               received in evidence.)

21   BY MR. KRAVIS:

22   Q.  Now, as Exhibit 31 is coming up on the screen, I'm going to

23   direct your attention to the bottom of the page.  This is a

24   one-page exhibit that has a series of short e-mails.  Beginning

25   at the bottom with the e-mail sent on December 26, 2011, at 8:28

1  a.m. from John Tate, could you start there and read upward?

2  A.  On December 26, 2011, at 8:28 a.m., John Tate wrote:

3         "What is status of Sorenson statement?  Did Kent

4  approve new version yet?

5         "John."

6  Q.  And did Mr. Benton respond to that message?

7  A.  On December 26, 2011, at 11:19 a.m., Jesse Benton wrote:

8         "Dimitri, was let me know."

9  Q.  And did Mr. Tate then respond?

10 A.  On December 26, 2011, at 10:44 a.m., John Tate wrote:

11        "Dimitri?"

12 Q.  And did Dimitri Kesari respond to that message?

13 A.  From Dimitri Kesari to John Tate, Benton Jesse, Matt Haws,

14 Jedd Coburn.  Subject: Re: Sorenson.  Sent December 26, 2011,

15 11:47 a.m.

16        "I just landed in Chicago.

17        "Kent wants to talk with me first.

18        "Will update as soon as I know something."

19 Q.  And did johnt@ronpaul2012.com respond to that e-mail?

20 A.  On December 26, 2011, at 10:48 a.m., johnt@ronpaul2012.com

21 wrote:

22        "Well, hurry.  This is supposed to go today, right?"

23 Q.  Finally, the top e-mail, did Dimitri Kesari respond?

24 A.  From Dimitri Kesari sent Monday, December 26, 2011, at 12:08

25 p.m.  To johnt@ronpaul2012.com.  Cc Benton Jesse, Matt Haws and

1   Jedd Coburn.  Subject:  Re: Sorenson.

2            "I just spoke with him.  He wants to meet with me when

3   I land.  I get in at 1:30 CT.

4            "He would like his reason for switching put back in

5   the statement.

6            "He just needs a little hand holding.  I will make

7   this happen.

8            "Sorry for the delay.  He took yesterday off to be

9   with his family.

10           "Will keep you up to date."

11  Q.  I want to ask you now about an e-mail that was sent on that

12  same day, a few hours later.  This is Government's Exhibit 32,

13  which has been marked but not yet admitted.

14           Do you recognize Government's Exhibit 32?

15  A.  Yes.

16  Q.  What is Government's Exhibit 32?

17  A.  This is an e-mail exchange between Dimitri Kesari, Matt

18  Haws, John Tate.

19  Q.  What is the date of the e-mail?

20  A.  December 26, 2011.

21  Q.  Where did this document come from?

22  A.  The Ron Paul Campaign.

23           MR. KRAVIS:  At this time the government moves Exhibit

24  32 into evidence.

25

1            (Government Exhibit 32 was

2            offered in evidence.)

3        MS. SINFELT:  The same objection, Your Honor, for

4   Mr. Benton.

5        MR. BINNALL:  Authentication, hearsay for Mr. Kesari.

6        THE COURT:  Overruled.  Exhibit 32 is received.

7            (Government Exhibit 32 was

8            received in evidence.)

9   BY MR. KRAVIS:

10  Q.  As Government Exhibit 32 is coming up on the screen, this is

11  a short e-mail exchange.  Beginning with the bottom e-mail, the

12  December 26, 2011, 3:44 p.m. e-mail, could you start there and

13  read up the chain?

14  A.  On December 26, 2011, at 3:44 p.m., Matt Haws wrote:

15          "Any update?  Curious to know what happened."

16          From Dimitri Kesari, Matt Haws.  Cc John Tate.

17  Subject:  Re: Sorenson.  Sent December 26, 2011, 4:05 p.m.

18          "Still working on it.  Meeting now."

19          From johnt@ronpaul2012.com.  Sent Monday, December 26,

20  2011, at 5:05 p.m.  To Dimitri Kesari and Matt Haws.  Subject:

21  Re: Sorenson.

22          "I will be flying for next few hours.  Please keep

23  Jesse updated and get a final statement done that both he and we

24  can accept."

25  Q.  And the date of this e-mail exchange was December 26, 2011?

1  A.  Correct.

2  Q.  And I would ask you now about an e-mail sent a little bit

3  later that evening.  This is Government's Exhibit 33 which has

4  not yet been admitted into evidence.

5         Do you recognize Government's Exhibit 33?

6  A.  Yes.

7  Q.  What is Government's Exhibit 33?

8  A.  This is an e-mail exchange between Jedd Coburn, Dimitri

9  Kesari, James Barcia, and a Gary H.

10  Q.  What is the date of the e-mail exchange?

11  A.  December 26, 2011.

12  Q.  And where did this document come from?

13  A.  The Ron Paul Presidential Campaign.

14         MR. KRAVIS:  At this time the government moves Exhibit

15  33 into evidence.

16                              (Government Exhibit 33 was

17                               offered in evidence.)

18         MS. SINFELT:  Same objection, Your Honor, as to

19  Mr. Benton.

20         MR. BINNALL:  Hearsay and authentication from

21  Mr. Kesari.

22         THE COURT:  Overruled.  33 is received.

23                              (Government Exhibit 33 was

24                               received in evidence.)

25  BY MR. KRAVIS:

1   Q.  Now, 33 is -- Government's Exhibit 33 is three pages long,

2   and I would ask you to start on the first page, the e-mail

3   exchange at the bottom, when it begins with an e-mail on

4   December 26, 2011, at 7:19 p.m.

5         Can you read that e-mail and then read up from there?

6   A.  From Jedd Coburn.  Date December 26, 2017, 7:19 p.m.  To

7   Dimitri Kesari.  Subject:  Sorenson statement.

8         "I repeated one line in the beginning and the end,

9   which I've fixed.  Please have him use this version."

10  Q.  And then can you read the e-mail from Dimitri Kesari that

11  appears right above that one?

12  A.  From Dimitri Kesari.  Sent Monday, December 26, 2011, 8:56

13  p.m.  To James Barcia and garyh@ronpaul2012.com.  Subject:

14  Forward:  Sorenson statement.  Attachment.

15        "The deal is done.

16        "Please draft a press release and send it to me and

17  Jesse."

18  Q.  Does this document, Government's Exhibit 33, have an

19  attachment that goes with it?

20  A.  Yes.

21  Q.  I'm not going to ask you to read the whole attachment.  Can

22  you just tell the jury what the attachment is?

23  A.  The attachment is a draft statement from Senator Kent

24  Sorenson.

25  Q.  Showing defense counsel now what's been marked for

1   identification as Government's Exhibit 133.

2           Special Agent, do you recognize Government's Exhibit

3   133.

4   A.  Yes.

5   Q.  What is Government's Exhibit 133?

6   A.  This is a check from Designer Goldsmiths, Inc. to Grassroots

7   Strategy in the amount of $25,000 written on December 26, 2011.

8           MR. KRAVIS:  At this time the government moves Exhibit

9   133 into evidence.

10                          (Government Exhibit 133 was

11                           offered in evidence.)

12          MR. BINNALL:  I'm going to object based on foundation

13  as to they haven't laid the foundational basis for this at this

14  point.

15          THE COURT:  Don't display that.

16          MS. SINFELT:  Hearsay.

17          THE COURT:  Sustained.

18  BY MR. KRAVIS:

19  Q.  Setting aside Government's Exhibit 133, I'm going to turn

20  your attention now to Government's Exhibit 34, an e-mail from

21  the next day.

22          Do you recognize Government's Exhibit 34?

23  A.  Yes.

24  Q.  What is Government's Exhibit 34?

25  A.  This is an e-mail from Dimitri Kesari to

1  johnt@ronpaul2012.com, Jesse Benton, jared@ronpaul2012.com, and

2  Gary Howard.

3  Q.  What is the date of the e-mail?

4  A.  December 27, 2011.

5  Q.  Where did this document come from?

6  A.  The Ron Paul Presidential Campaign.

7       MR. KRAVIS:  At this time the government moves Exhibit

8  34 into evidence.

9                         (Government Exhibit 34 was

10                        offered in evidence.)

11      MS. SINFELT:  Same objection for Mr. Benton.

12      MR. BINNALL:  Same objection as to Mr. Kesari.

13      THE COURT:  Overruled.  Exhibit 34 is received.

14                        (Government Exhibit 34 was

15                        received in evidence.)

16  BY MR. KRAVIS:

17  Q.  As Government Exhibit 34 is coming up on the screen, let me

18  ask you to take a look at the top of the first page.  This is

19  just one e-mail.  Read it aloud for us.

20  A.  From Dimitri Kesari.  Sent Tuesday, December 27, 2011, at

21  8:37 a.m.  To johnt@ronpaul2012.com, Jesse Benton,

22  jared@ronpaul2012.com, and Gary Howard.  Subject:  Kent is

23  getting cold feet.

24           "Hold the release.

25           "Kent is getting cold feet.  He wants to meet with me

1  in about 2 hours.  Any advice?

2          Damn I was afraid of this."

3  Q.  And who wrote this?

4  A.  Dimitri Kesari.

5  Q.  Let's turn your attention to an e-mail exchange a few

6  moments later from that morning.  This is Government's Exhibit

7  35, which has not yet been entered into evidence.

8          Do you recognize Government's Exhibit 35?

9  A.  Yes.

10  Q.  What is Government's Exhibit 35?

11  A.  This is an e-mail exchange between Dimitri Kesari, John

12  Tate, Jesse Benton, and Gary Howard.

13  Q.  What is the date of the e-mail exchange?

14  A.  December 27, 2011.

15  Q.  Where did this document come from?

16  A.  Jesse Benton.

17          MR. KRAVIS:  At this time the government moves Exhibit

18  35 into evidence.

19                          (Government Exhibit 35 was

20                           offered in evidence.)

21          MS. SINFELT:  No objection from Mr. Benton.

22          MR. BINNALL:  Your Honor, objection from Mr. Kesari.

23  Everything that would not be hearsay as to Mr. Kesari is already

24  in evidence, so we would have the same objection for Mr. Kesari.

25          THE COURT:  Overruled.  Exhibit 35 is received.

1                         (Government Exhibit 35 was

2                         received in evidence.)

3    BY MR. KRAVIS:

4    Q.  Now, as Government's Exhibit 35 is up on the screen, I'm

5    going to ask you to look at the bottom, the bottom e-mail in the

6    chain, the December 27, 2011, 7:37 a.m. e-mail from Dimitri

7    Kesari.  Is that the same e-mail we just saw in Government's

8    Exhibit 34?

9    A.  Yes.

10   Q.  Okay.  I'm going to ask you to start with the next e-mail

11   up, December 27, 2011, at 8:40 a.m. and read up from there.

12   A.  On December 27, 2011, at 8:40 a.m., John Tate wrote:

13           "Why is he getting cold feet?  What can we do, say to

14   help him?  What time are you meeting him, and where?"

15   Q.  And did Mr. Benton respond to that e-mail?

16   A.  From Jesse Benton.  Sent Tuesday, December 27, 2011, 10:30

17   a.m.  To John Tate.  Cc Dimitri Kesari, jared@ronpaul2012.com,

18   and Gary Howard.  Subject:  Re: Kent is getting cold feet.

19           "Fuck him.  This is absurd."

20   Q.  Let's turn your attention now to an e-mail from a few

21   moments later that same day.  This is Government's Exhibit 36,

22   which has not yet been admitted into evidence.

23           Do you recognize Government's Exhibit 36?

24   A.  Yes.

25   Q.  What is Government's Exhibit 36?

1   A.   An e-mail exchange between Dimitri Kesari, John Tate, Jesse

2   Benton.

3   Q.   What is the date of the e-mail exchange?

4   A.   December 27, 2011.

5   Q.   And where did this document come from?

6   A.   The Ron Paul Presidential Campaign.

7           MR. KRAVIS:  At this time the government moves Exhibit

8   36 into evidence.

9                               (Government Exhibit 36 was

10                              offered in evidence.)

11          MR. BINNALL:  The authenticity and hearsay objection

12  on behalf of Mr. Kesari.  Again, this is before the period when

13  even in the government's case 801(d) would apply and everything

14  that would not be hearsay as to Mr. Kesari has already been

15  admitted.

16          MS. SINFELT:  Hearsay objection as to Mr. Benton, Your

17  Honor.

18          THE COURT:  Overruled.  36 is received.

19                              (Government Exhibit 36 was

20                              received in evidence.)

21  BY MR. KRAVIS:

22  Q.   Now, as Government's Exhibit 36 is coming up on the screens,

23  I'm going to ask you to look to the middle of the page, the

24  e-mail exchange that begins -- the e-mail chain that begins in

25  the middle on December 27, 2011, at 9:30 a.m. from Jesse Benton

1    and goes down from there.

2              Are those the same e-mails we just saw in Government's

3    Exhibit 35?

4    A.  Yes.

5    Q.  I'm going to ask you to read up from there, so just the top

6    e-mail from John Tate sent on December 27, 2011 at 10:32 a.m.

7    A.  From John Tate.  Sent Tuesday, December 27, 2011, 10:32 a.m.

8    To Jesse Benton.  Subject:  Re: Kent is getting cold feet.

9              "Yep.  I am going to tell Dimitri to very nicely tell

10   Kent it's a yes or no today.  We are not going to keep doing

11   this, no good for anyone.

12             "Unless you disagree of course.

13             "John."

14   Q.  I'm going to direct your attention now to another e-mail

15   that was sent a few moments later that same day.  This is

16   Government's Exhibit 37, which has not yet been admitted into

17   evidence.

18             Do you recognize Government's Exhibit 37?

19   A.  Yes.

20   Q.  What is Government's Exhibit 37?

21   A.  An e-mail exchange between Dimitri Kesari and Jesse Benton,

22   johnt@ronpaul2012.com, jared@ronpaul2012.com, and Gary Howard.

23   Q.  What is the date of the e-mail exchange?

24   A.  December 27, 2011.

25   Q.  Where did this document come from?

1  A.  The Ron Paul Presidential Campaign.

2          MR. KRAVIS:  At this time the government moves Exhibit

3  37 into evidence.

4                              (Government Exhibit 37 was

5                               offered in evidence.)

6          MR. BINNALL:  The authenticity objection and, again,

7  hearsay as to everything from Mr. Kesari as not being hearsay is

8  already in.

9          MS. SINFELT:  No objection as to Mr. Benton.

10          THE COURT:  37 is received.  The objection is

11  overruled.

12                              (Government Exhibit 37 was

13                               received in evidence.)

14  BY MR. KRAVIS:

15  Q.  Now, as Exhibit 37 is coming up on the screen, I would ask

16  you first to direct your attention to the bottom e-mail in this

17  exchange, December 27, 2011, at 7:37 a.m. from Dimitri Kesari.

18          Is that the same e-mail that we saw a few moments ago

19  in Government's Exhibit, I believe it was 34, the hold the

20  release e-mail?

21  A.  Yes.

22  Q.  I'm just going to ask you to read up from there the next

23  e-mail from Jesse Benton on Tuesday, December 27, 2011, at 10:38

24  a.m.

25  A.  From Jesse Benton.  Sent Tuesday, December 27, 2011, 10:38

1  a.m.  To Dimitri Kesari.  Cc johnt@ronpaul2012.com,

2  jared@ronpaul2012.com, and Gary Howard.  Subject:  Re: Kent is

3  getting cold feet.

4          "I am not interested in this game anymore.  Dimitri,

5  pull the offer.  If we can't depend on him, I don't want him

6  involved."

7  Q.  And what was the date and time of the e-mail from Jesse

8  Benton that you just read?

9  A.  Tuesday, December 27, 2011, at 10:38 a.m.

10  Q.  I want to ask you now about an e-mail that was sent a few

11  hours later.  This is Government's Exhibit 38, which has not yet

12  been admitted into evidence.

13          Do you recognize Government's Exhibit 38?

14  A.  Yes.

15  Q.  What is Government's Exhibit 38?

16  A.  An e-mail from Jesse Benton to Dimitri Kesari and John Tate.

17  Q.  What is the date of this e-mail exchange?

18  A.  December 27, 2011.

19  Q.  Where did this document come from?

20  A.  Jesse Benton.

21        MR. KRAVIS:  At this time of the government moves

22  Exhibit 38 into evidence.

23                    (Government Exhibit 38 was

24                    offered in evidence.)

25        MS. SINFELT:  No objection as to Mr. Benton.

1            MR. BINNALL:  Hearsay for Mr. Kesari.

2            THE COURT:  38 is received.  The objection is

3    overruled.

4                              (Government Exhibit 38 was

5                              received in evidence.)

6    BY MR. KRAVIS:

7    Q.  Now, as Government's Exhibit 38 is coming up on the screen,

8    I'm going to direct your attention to the top of the page.  This

9    exhibit is just one e-mail.  Can you read that e-mail aloud for

10   us?

11   A.  From Jesse Benton.  Sent Tuesday, December 27, 2011, 12:38

12   p.m.  To Dimitri Kesari and John Tate.  Subject:  Kent.

13           "In all seriousness, I am nto sure what to do about

14   this.  The DMR has his statement, I sent last night since Kent

15   said H wads comfortable.  Mary Stegmier won't check e-mail until

16   12/28, but she has it."

17   Q.  Turning your attention to an e-mail sent later, this is

18   Government's Exhibit 39, which has not yet been admitted into

19   evidence.

20           Do you recognize Government's Exhibit 39?

21   A.  Yes.

22   Q.  What is Government's Exhibit 39?

23   A.  This is an e-mail exchange between Jesse Benton, Dimitri

24   Kesari, and John Tate.

25   Q.  What is the date of this e-mail exchange?

1  A.   December 27, 2011.

2  Q.   Where did this document come from?

3  A.   Jesse Benton.

4        MR. KRAVIS:  At this time the government moves Exhibit

5  39 into evidence.

6                            (Government Exhibit 39 was

7                             offered in evidence.)

8        MS. SINFELT:  No objection as to Mr. Benton.

9        MR. BINNALL:  Hearsay for Mr. Kesari.

10       THE COURT:  Overruled.  39 is received.

11                           (Government Exhibit 39 was

12                            received in evidence.)

13 BY MR. KRAVIS:

14 Q.   As Government's Exhibit 39 is coming up on the screen, I'm

15 going to direct your attention to the bottom e-mail,

16 December 27, 2011, at 12:37 p.m.

17       Is that the same e-mail that we just saw in the

18 previous exhibit, the in all seriousness e-mail?

19 A.   Yes.

20 Q.   I'm going to ask you to read up from there, so just the top

21 e-mail in this exhibit.

22 A.   From Jesse Benton, sent Tuesday, December 27, 2011, 12:39

23 p.m.   To Dimitri Kesari, John Tate.  Subject:  Regarding Kent.

24       "I am tempted to say this is a hardball tie.  Either

25 he honors his commitment or we have to expose him as the

1  money-grubbing shakedown artist that he is."

2  Q.  Turning your attention now to another e-mail sent a little

3  bit later that same day, this is Government's Exhibit 40, which

4  has not been admitted into evidence.

5          Do you recognize Government's Exhibit 40?

6  A.  Yes.

7  Q.  What is Government's Exhibit 40?

8  A.  This is an e-mail from Dimitri Kesari to

9  kent@kentsorenson.com.

10  Q.  What is the date of this e-mail?

11  A.  December 27, 2011.

12  Q.  Where did this document come from?

13  A.  This document came from Dimitri Kesari's computer.

14          MR. KRAVIS:  At this time the government moves Exhibit

15  40 into evidence.

16                              (Government Exhibit 40 was

17                              offered in evidence.)

18          MS. SINFELT:  Hearsay objection as to Mr. Benton.

19          MR. BINNALL:  No objection as to Mr. Kesari.

20          THE COURT:  Overruled.  40 is received.

21                              (Government Exhibit 40 was

22                              received in evidence.)

23  BY MR. KRAVIS:

24  Q.  As this exhibit is coming up on the screen, I'm just going

25  to direct your attention to the single e-mail that appears at

1  the top of the page.  Don't worry about the stuff underneath it.

2  Can you read that one e-mail for us?

3  A.  From Dimitri Kesari to kent@kentsorenson.com.  Sent Tuesday,

4  27 December 2011, at 15:38.

5       "It's now 3:36.

6       "I have not talked with you since this morning and you

7  have talked with many others since then.

8       "I have tried to give you space but come on not

9  calling back is not right.

10      "What are you going to tell Mary from the Des Moines

11  Register?

12      "Jesse gave her the story last night after we talked

13  about you talking with her.

14      "Call me."

15 Q.  And what was the date and time of this e-mail?

16 A.  December 27, 2011 at 15:38, 3:38.

17 Q.  I'm going to turn your attention now to another e-mail

18 exchange from a little bit later that day.  This is Government's

19 Exhibit 41, which has not yet been admitted into evidence.

20      Do you recognize Government's Exhibit 41?

21 A.  Yes.

22 Q.  What is Government's Exhibit 41?

23 A.  This is an e-mail exchange between Jesse Benton, John Tate,

24 and Dimitri Kesari.

25 Q.  What is the date of the e-mail exchange?

 1  A.   December 27, 2011.

 2  Q.   Where did this document come from?

 3  A.   The Ron Paul Presidential Campaign.

 4          MR. KRAVIS:  At this time the government moves Exhibit

 5  41 into evidence.

 6                              (Government Exhibit 41 was

 7                              offered in evidence.)

 8          MS. SINFELT:  Same objection for Mr. Benton.

 9          MR. BINNALL:  Authenticity and hearsay for Mr. Kesari.

10          THE COURT:  41 is received.  The objection is

11  overruled.

12                              (Government Exhibit 41 was

13                              received in evidence.)

14  BY MR. KRAVIS:

15  Q.   As this document is coming up on the screen, I would direct

16  your attention to the bottom e-mail, two short e-mails.  The one

17  sent on December 27, 2011 at 6:06 p.m., starting with that

18  e-mail, can you read off the chain for us?

19  A.   On December 27, 2011, at 6:06 p.m. Jesse Benton wrote:

20          "I can put them off for a dew hours, but that is it.

21  My story will have to be that he wanted too much money."

22          From John Tate.  Sent Tuesday, December 27, 2011,

23  8:49 p.m.  To Jesse Benton.  Cc Dimitri Kesari.  Subject:  Re:

24  DMR just called me on Kent.

25          "Status?"

1  Q.  Referring your attention now to another e-mail sent later

2  that same day, the same day as all of these e-mails we've

3  covered.  It's Government's Exhibit 42, which has not yet been

4  admitted into evidence.

5          Do you recognize Government's Exhibit 42?

6  A.  Yes.

7  Q.  What is Government's Exhibit 42?

8  A.  This is an e-mail from Dimitri Kesari to

9  kent@kentsorenson.com.

10 Q.  What is the date of this e-mail exchange?

11 A.  December 27, 2011.

12 Q.  And during this time period, who was using the e-mail

13 address kent@kentsorenson.com?

14 A.  Kent Sorenson.

15 Q.  Where did this document come from?

16 A.  Dimitri Kesari's computer.

17         MR. KRAVIS:  At this time the government moves Exhibit

18 42 into evidence.

19                              (Government Exhibit 42 was

20                               offered in evidence.)

21         MS. SINFELT:  Mr. Benton objects on hearsay.  This is

22 mere chitchat, Your Honor.

23         MR. BINNALL:  Relevance from Mr. Kesari.

24         THE COURT:  Overruled.  42 is received.

25

1              (Government Exhibit 42 was

2              received in evidence.)

3  BY MR. KRAVIS:

4  Q.  Now, as Government's Exhibit 42 is coming up on the screen,

5  I direct your attention to the one e-mail that appears in this

6  exhibit at the top of the first page, very short e-mail.

7         Can you read this one for us?

8  A.  From Dimitri Kesari to kent@kentsorenson.com.  Sent Tuesday,

9  27 December 2011, at 21:21.

10         "Call me ASAP.

11         "Need to talk NOW."

12  Q.  I want to turn your attention to another e-mail from this

13  same night.  This is Government's Exhibit 43, which has not yet

14  been admitted into evidence.

15         Do you recognize Government's Exhibit 43?

16  A.  Yes.

17  Q.  What is Government's Exhibit 43?

18  A.  An e-mail exchange between Jesse Benton, Dimitri Kesari, and

19  John Tate.

20  Q.  What is the date of the e-mail exchange?

21  A.  December 27, 2011.

22  Q.  Where did this document come from?

23  A.  The Ron Paul Presidential Campaign.

24         MR. KRAVIS:  At this time the government moves Exhibit

25  43 into evidence.

1                            (Government Exhibit 43 was

2                            offered in evidence.)

3          MR. BINNALL:  Objection to the authenticity for

4    Mr. Kesari and also to hearsay.

5          MS. SINFELT:  Could we just ask the government under

6    what rule they're offering this, the exception?

7          MR. KRAVIS:  This is -- the top e-mail in this

8    exchange is an admission of a party opponent.  It's a statement

9    of future intention.  It's relevant to motive.  The middle

10   e-mail does not contain any factual assertion.  The government

11   is not offering for its truth.  And the bottom e-mail has

12   already been admitted.

13          THE COURT:  And the bottom is what?

14          MR. KRAVIS:  Already been admitted.

15          THE COURT:  Thank you.

16          MR. BINNALL:  Just to be clear, Your Honor, if they're

17   offering it as an admission of a party opponent for the top one,

18   that's not a statement of Mr. Kesari.

19          MS. SINFELT:  And Mr. Benton also objects, Your Honor.

20          THE COURT:  43 is admitted only as against defendant

21   Benton.

22                            (Government Exhibit 43 was

23                            received in evidence.)

24   BY MR. KRAVIS:

25   Q.  And as Government's Exhibit 43 is coming up on the screen, I

1   would ask you first to look at the bottom e-mail.  This is from

2   Benton, Jesse, December 27, 2011, 6:06 p.m.

3        Is that e-mail the same e-mail as the one we saw a few

4   exhibits back, the e-mail from Mr. Benton saying, "I can put

5   them off for a dew hours"?

6   A.  Yes.

7   Q.  I'm just going to ask you to read up from there, beginning

8   with the e-mail on December 27, 2011, at 6:26 p.m.  Read that

9   and then the one above it.

10  A.  On December 27, 2011, at 6:26 p.m., johnt@ronpaul2012.com

11  wrote:

12        "Lol."

13        From Jesse Benton.  Sent Tuesday, December 27, 2011,

14  at 10:18 p.m.  To johnt@ronpaul2012.com.  Cc Dimitri Kesari.

15  Subject:  Re: DMR just called me on Kent.

16        "Time is up.  I am calling the register back in 15

17  minutes."

18  Q.  Turning your attention now to another e-mail exchange from

19  that -- this is Government's Exhibit 44, which has not yet been

20  admitted into evidence.

21        Do you recognize Government's Exhibit 44?

22  A.  Yes.

23  Q.  What is Government's Exhibit 44?

24  A.  This is an e-mail exchange between Jesse Benton, John Tate,

25  Dimitri Kesari, and Jedd Coburn.

1   Q.   What's the date of the e-mail exchange?

2   A.   December 27, 2011.

3   Q.   Where did this document come from?

4   A.   The Ron Paul Presidential Campaign.

5           MR. KRAVIS:   At this time the government moves Exhibit

6   44 into evidence.

7                                   (Government Exhibit 44 was

8                                    offered in evidence.)

9           MR. BINNALL:   The authenticity objection, and we would

10  at this point seek under what hearsay exception the government

11  is seeking to enter this one.

12          THE COURT:   Mr. Kravis?

13          MR. KRAVIS:   The e-mails in the chain from Mr. Benton

14  and Kesari are admissions of party opponent.  All of the e-mails

15  in the chain are relevant to the state of mind, future intention

16  and motive of the authors, and the state of mind, future

17  intention and motive of the authors is relevant under the

18  government's theory that these are alleged soon-to-be

19  co-conspirators.

20          MR. BINNALL:   Soon to be?  That doesn't get them to

21  where they need to be, Your Honor.  The top e-mail specifically

22  coming from Mr. Tate is just hearsay.  What Mr. Tate's state of

23  mind is in there is not relevant to this case.  This is not a

24  hearsay exception, and the hearsay exception should be the same.

25  Of course, we have our authenticity objection as well.

1            MS. SINFELT:  And Mr. Benton would have a hearsay

2    objection to everything but his statement.

3            THE COURT:  Overruled.  44 is received.

4                              (Government Exhibit 44 was

5                              received in evidence.)

6    BY MR. KRAVIS:

7    Q.  Now, as Government's Exhibit 44 is coming up on the screen,

8    this is a series of short e-mails from the night of December 27,

9    2011, starting with the bottom e-mail, the one on December 27,

10   2011, at 9:20 p.m.

11           Could you start there and read upwards for us?

12   A.  On December 27, 2011, at 9:20 p.m., Jesse Benton wrote:

13           "I assume he forwarded a draft of his statement to

14   ya'all from his e-mail account.  Please forward that e-mail to

15   me right away.

16           "Thanks."

17           On December 27, 2011, at 10:03 p.m., John Tate wrote:

18           "I never got it from him.  Where are we on this,

19   Dimitri?"

20           On December 27, 2011, at 10:08 p.m., Dimitri Kesari

21   wrote:

22           "It was from a ghost e-mail account.

23           'He is sitting in the Bachmann office waiting to talk

24   with her.  He has been texting me from there."

25           From John Tate.  Sent Tuesday, December 27, 2011,

1   11:11 p.m.   To Dimitri Kesari.   Cc Jesse Benton and Jedd Coburn.

2   Subject:  Re: Sorenson.

3          "Okay.  But Jesse is talking to the press now.  So

4   Kent needs to say yes or no, right now.  We are done.  No more

5   waiting.  Jesse will either tell them Kent has changed, or

6   explain why it didn't happen.

7          "Now.  Not 5 minutes from now, now.

8          "John."

9   Q.  I'm going to ask you now about an e-mail exchange from that

10  night and the next morning.  This is Government's Exhibit 45,

11  which has not jet been entered into evidence.

12          Do you recognize Government's Exhibit 45?

13  A.  Yes.

14  Q.  What is Government's Exhibit 45?

15  A.  This is an e-mail exchange between A.J. Spiker, John Tate,

16  Jesse Benton, and Dimitri Kesari.

17  Q.  What are the dates of the e-mails that appear in this

18  document?

19  A.  December 27, 2011 and December 28, 2011.

20  Q.  Where did this document come from?

21  A.  The Ron Paul Presidential Campaign.

22          MR. KRAVIS:  At this time the government moves Exhibit

23  45 into evidence.

24                              (Government Exhibit 45 was

25                               offered in evidence.)

1    MS. SINFELT:  Hearsay objection as to Mr. Benton, Your

2  Honor.

3    MR. BINNALL:  Hearsay and authenticity for Mr. Kesari.

4    THE COURT:  It's not hearsay.  There's no truth of the

5  matter asserted here.  The objection is overruled.  45 is

6  received.

7                              (Government Exhibit 45 was

8                               received in evidence.)

9  BY MR. KRAVIS:

10  Q.  As Government's Exhibit 45 is coming up on the screen, I'm

11  going to ask you to turn your attention first to the bottom

12  e-mail, two short e-mails.  The first e-mail from A.J. Spiker,

13  ajs@ronpaul2012.com, December 27, 2011.

14        Do you see that one?

15  A.  Yes.

16  Q.  I'm going to ask you to start with that e-mail, read that

17  one and then the one above that.

18  A.  From A.J. Spiker.  Date December 27, 2011, 11:43 p.m. to

19  tfc02@aol.com.  Subject:  Question mark.

20        "Any news on Kent?"

21        From John Tate.  Sent Wednesday, December 28, 2011,

22  12:45 a.m.  To Benton, Jesse and Dimitri Kesari.  Subject:

23  Forward:  Question mark.

24        "So, what was the outcome?"

25  Q.  I'm going to turn your attention now to an e-mail exchange

1   from that same day, December 28, 2011.  This is Government's

2   Exhibit 46, which has not yet been entered into evidence.

3           Do you recognize Government's Exhibit 46?

4   A.  Yes.

5   Q.  What is Government's Exhibit 46?

6   A.  An e-mail exchange between John Tate, Dimitri Kesari, and

7   Jesse Benton.

8   Q.  What is the date of the e-mail exchange?

9   A.  December 28, 2011.

10  Q.  Where did this document come from?

11  A.  The Ron Paul Presidential Campaign.

12          MR. KRAVIS:  At this time the government moves Exhibit

13  46 into evidence.

14                              (Government Exhibit 46 was

15                              offered in evidence.)

16          MR. BINNALL:  Hearsay as to parts not from Mr. Kesari,

17  and authenticity.

18          MS. SINFELT:  Hearsay objection for Mr. Benton, Your

19  Honor.

20          THE COURT:  Overruled.  46 is received.

21                              (Government Exhibit 46 was

22                              received in evidence.)

23  BY MR. KRAVIS:

24  Q.  As Government Exhibit 46 is coming up on the screens, this

25  one is a series of short e-mails from the morning of

 1   December 28, 2011.  I'm going to ask you to start at the bottom

 2   of the e-mail chain with the e-mail on December 28, 2011, at

 3   8:05 a.m. from John Tate and read upwards from there.

 4   A.  On December 28, 2011, at 8:05 a.m., John Tate wrote:

 5           "What was final exult with Kent?"

 6           On December 28, 2011, at 8:07 a.m., Dimitri Kesari

 7   wrote:

 8           "No answer from."

 9           On December 28, 2011, at 8:10 a.m., John Tate wrote:

10           "So, we are done then?  Jesse did you talk to

11   Des Moines Register?"

12           From Dimitri Kesari.  Sent Wednesday, December 28,

13   2011, 9:16 a.m.  To John Tate.  Cc Benton, Jesse.  Subject:

14   Regarding Kent?

15           "I presume we are done.

16           I did shoot a text over to him this morning.  But now

17   back to the real work."

18   Q.  And what was the date and time of Mr. Kesari's e-mail, "I

19   presume we are done"?

20   A.  December 28, 2011, at 9:16 a.m.

21   Q.  And then fast forward to that evening now and show you what

22   has been marked but not entered into evidence Government's

23   Exhibit 47.

24           Do you recognize Government's Exhibit 47?

25   A.  Yes.

1  Q.  What is Government's Exhibit 47?

2  A.  This is an e-mail from Gary Howard to drewi@ronpaul2012.com.

3  Q.  What's the subject of the e-mail?

4  A.  Iowa State Senator Kent Sorenson endorses Ron Paul for

5  President.

6  Q.  What's the date and time of the e-mail?

7  A.  December 28, 2011 at 8:31 p.m.

8  Q.  Where did this document come from?

9  A.  The Ron Paul Presidential Campaign.

10        MR. KRAVIS:  At this time the government moves Exhibit

11  47 into evidence.

12                        (Government Exhibit 47 was

13                        offered in evidence.)

14        MS. SINFELT:  The basis, Your Honor?

15        THE COURT:  I assume this is not for the truth of the

16  matter asserted?

17        MR. KRAVIS:  Correct.

18        MS. SINFELT:  Mr. Benton objects to relevance then.

19        MR. BINNALL:  We would object to relevance and also

20  the authenticity.  If it's not being offered -- if our objection

21  is going to be overruled, we would ask for a limiting

22  instruction that it's not as to Dimitri Kesari.

23        THE COURT:  Sure.  So along the way, members of the

24  jury, we've been discussing and they've been objecting to

25  hearsay.  Ordinarily we don't allow statements in court that

1  were made at some other time out of court unless the person

2  comes in and is able to be cross-examined; but there's a bunch

3  of exceptions to the hearsay rule.

4          And then you've heard me say it's not offered for the

5  truth of the matter asserted.  Basically this is a press release

6  where Mr. Sorenson -- or the Ron Paul Campaign is saying that

7  Kent Sorenson is now endorsing Ron Paul and not Michelle

8  Bachmann.  We don't care if anything in here is true or not, and

9  so that's why this one isn't hearsay.  We just don't care.  What

10 it's being offered to do is to show when it was that Kent

11 Sorenson publicly announced -- or when the Ron Paul Campaign

12 publicly announced that Kent Sorenson would now be endorsing Ron

13 Paul.

14          It's received.

15                              (Government Exhibit 47 was

16                               received in evidence.)

17 BY MR. KRAVIS:

18 Q.  And as Government's Exhibit 47 is coming up on the monitor,

19 Special Agent, I'm going to direct your attention -- I'm not

20 going to ask you to read the whole thing.  I'm going to direct

21 your attention to the third paragraph which appears on the first

22 page, the one that begins, quote, Congressman Paul.

23          Do you see that there?

24 A.  Yes.

25 Q.  I'm going to ask you to read just that paragraph out loud

1  for the jury.

2  A.  "'Congressman Paul is delighted to accept the endorsement of

3  Senator Kent Sorenson, whose blessing and assistance carry a

4  great deal of weight in Iowa.  The fact that he doesn't take

5  this decision lightly tells a great deal about the Senator and

6  Ron Paul.  This endorsement is a rare find and we hope it pushes

7  us nearer to our goal of a strong top-three finish in the

8  January caucus,' said Ron Paul 2012 National Campaign Chairman

9  Jesse Benton."

10           THE COURT:  Okay.  Let me interrupt there.  So the

11  point of my last comment is to say, look at the first sentence,

12  "Congressman Paul is delighted to accept the endorsement."  It's

13  not offered to show that he was delighted that day.  That's not

14  the point of admitting this.  It's just to show when the

15  endorsement was made.

16  BY MR. KRAVIS:

17  Q.  Special Agent LoStracco, I just have a few quick

18  housekeeping matters for you.  These are exhibits that I'm not

19  going to ask you to read aloud now.  I'm just going to ask you

20  to identify them.

21           We're going to start with Government's Exhibit 60.

22           Do you recognize Government's Exhibit 60?

23  A.  Yes.

24  Q.  What is Government's Exhibit 60?

25  A.  This is an e-mail from Kent Sorenson to Dimitri Kesari.

1    Q.  What is the date of the e-mail?

2    A.  August 7, 2013.

3    Q.  And where did this document come from?

4    A.  This document came from Dimitri Kesari's computer.

5            MR. KRAVIS:  At this time the government moves Exhibit

6    60 into evidence.

7                              (Government Exhibit 60 was

8                               offered in evidence.)

9            MR. BINNALL:  Objection as to relevance to Mr. Kesari.

10           MS. SINFELT:  Hearsay and relevance, Your Honor, for

11   Mr. Benton.  And --

12           THE COURT:  Help me with this, Mr. Kravis.  What's the

13   point here?

14           MR. KRAVIS:  This document is used for impeachment,

15   prior inconsistent statement of Kent Sorenson who will be

16   testifying as a witness.

17           MS. SINFELT:  Mr. Benton also has a 403 grounds

18   objection.

19           THE COURT:  The objection is sustained.

20   BY MR. KRAVIS:

21   Q.  Let me show you now what's been marked for identification as

22   Government's Exhibit 91.

23           Do you recognize Government's Exhibit 91?

24   A.  Yes.

25   Q.  What is Government's Exhibit 91?

1  A.  This is an e-mail from Kent Sorenson to sonnyizon@aol.com.

2  Q.  What is the date of the e-mail?

3  A.  May 21, 2012.

4  Q.  And where did this document come from?

5  A.  This document came from Sonny or Noelle Izon.

6  Q.  Was it provided to the FBI pursuant to a grand jury

7  subpoena?

8  A.  Yes.

9        MR. KRAVIS:  At this time the government moves Exhibit

10  91 into evidence.

11                        (Government Exhibit 91 was

12                        offered in evidence.)

13        MR. BINNALL:  Authenticity and hearsay for Mr. Kesari.

14        MS. SINFELT:  Relevance, authenticity, hearsay as to

15  Mr. Benton.

16        THE COURT:  Sustained.

17  BY MR. KRAVIS:

18  Q.  I want to draw your attention back to the e-mails.  I'm

19  going to start with Government's Exhibit 56, looking at some

20  e-mails from the time period in the weeks after -- days and

21  weeks after the e-mails we were looking at a moment ago.

22  Government's Exhibit 56 has not yet been admitted into evidence.

23        Do you recognize Government's Exhibit 56?

24  A.  Yes.

25  Q.  What is Government's Exhibit 56?

1    A.   This is an e-mail exchange between Dimitri Kesari and Jesse

2    Benton.

3    Q.   And what is the date of the e-mail exchange?

4    A.   January 16, 2012.

5    Q.   Where did this document come from?

6    A.   Jesse Benton.

7              MR. KRAVIS:  At this time the government offers

8    Exhibit 56 into evidence.

9                             (Government Exhibit 56 was

10                             offered in evidence.)

11             MS. SINFELT:  No objection from Mr. Benton, Your

12   Honor.

13             MR. BINNALL:  Hearsay from Mr. Kesari.

14             THE COURT:  Overruled.  56 is received.

15                             (Government Exhibit 56 was

16                             received in evidence.)

17   BY MR. KRAVIS:

18   Q.   Now, as Government's Exhibit 56 is coming up on the screen,

19   I'm going to ask you to start with the bottom e-mail in the

20   chain, the January 16, 2012, 12:50 a.m. e-mail, and read up from

21   there.

22   A.   On January 16, 2012, at 12:50 a.m., Dimitri Kesari wrote:

23             "You want Kent to come down to South Carolina?

24             "He can be there Wednesday night through the weekend."

25   Q.   Can you read the e-mail above that one from Mr. Benton?

1   A.  From Jesse Benton.  Sent Monday, January 16, 2012, 9:48 a.m.

2   To Dimitri Kesari.  Subject:  Re: Kent Sorenson.

3           "What would he do?"

4   Q.  The last set of questions I have for you concerns some

5   e-mails related to -- some e-mails from the time period after

6   the endorsement statement that we looked at a moment ago.  I'm

7   going to begin with Government's Exhibit 48, which is a redacted

8   exhibit.

9           Do you recognize Government's Exhibit 48?

10  A.  Yes.

11  Q.  What is Government's Exhibit 48?

12  A.  This is an e-mail exchange between Beth Flouhy,

13  trygvie@vikingstrategies.com, John Tate, garyh@fonpaul2012.com,

14  Jesse Benton and John Tate.

15  Q.  And what is the date of this e-mail exchange?

16  A.  December 28, 2011.

17  Q.  And where did this document come from?

18  A.  The Ron Paul Presidential Campaign.

19          MR. KRAVIS:  Okay.  I mistakenly referred to this as a

20  redacted exhibit.  The government is offering the unredacted.

21  The government offers Exhibit 48 into evidence.

22                          (Government Exhibit 48 was

23                           offered in evidence.)

24          MS. SINFELT:  Hearsay objection as to Mr. Benton, Your

25  Honor.

1          MR. BINNALL:  Hearsay and authenticity from

2   Mr. Kesari.

3          MR. KRAVIS:  Okay.  If the defendants are objecting,

4   then we'll withdraw the exhibit.

5          THE COURT:  Very well.

6   BY MR. KRAVIS:

7   Q.  Let's move on to Government's Exhibit 57.

8          Do you recognize Government's Exhibit 57?

9   A.  Yes.

10  Q.  What is Government's Exhibit 57?

11  A.  This is an e-mail exchange between Gary Barrett,

12  megans@ronpaul2012.com, Gary Howard, John Tate, and Dimitri

13  Kesari.

14  Q.  What is the date of the e-mail exchange?

15  A.  January 20, 2012.

16  Q.  Where did this document come from?

17  A.  The Ron Paul Presidential Campaign.

18          MR. KRAVIS:  At this time the government moves Exhibit

19  57 into evidence.

20                              (Government Exhibit 57 was

21                               offered in evidence.)

22          MR. BINNALL:  One moment, Your Honor.

23          MS. SINFELT:  Hearsay objection, Your Honor.

24          MR. BINNALL:  Hearsay and authentication from

25  Mr. Kesari.

1          THE COURT:  Overruled.  57 is received.

2                              (Government Exhibit 57 was

3                              received in evidence.)

4    BY MR. KRAVIS:

5    Q.  Now, as Government's Exhibit 57 is coming up on the screen,

6    I'm going to ask you to start at the bottom, the bottom e-mail,

7    the one from Barrett, Gary, dated January 20, 2012, and read up

8    from there.

9    A.  From Barrett Gary.  Date January 20, 2012, 5:38 p.m.

10   Subject:  Kent Sorenson.  To megans@ronpaul2012.com.

11          "Sorry to bug you about this but you're the only

12   e-mail contact that I have.

13          "I understand that Iowa State Senator Kent Sorenson

14   has been in South Carolina campaigning for Representative Paul.

15   I need to speak to someone who can confirm or deny that he's

16   being paid for this work on behalf of the Ron Paul Campaign by

17   the campaign itself.

18          "Thanks!

19          "Gary Barrett.

20          "Anchor/Reporter WHO Radio/Iowa Radio Network/Clear

21   Channel Communications, Des Moines, Iowa."

22          From Megan Stiles dated Friday, January 20, 2012, at

23   5:43 p.m.  Subject:  Forward:  Kent Sorenson.  To Gary Howard.

24          On January 20, 2012, at 7:18 p.m., Gary Howard wrote:

25          "Is Sorenson being paid?"

1          From John Tate sent Friday, January 20, 2012, 7:22

2   p.m.  To Gary Howard.  Cc Dimitri Kesari.  Subject:  Re:  Kent

3   Sorenson.

4          "No, he is not.  He is volunteering as I understand

5   it.

6          "John."

7   Q.  Okay.  Now what was the date and time of John Tate's e-mail

8   regarding Kent Sorenson in response to the question is Sorenson

9   being paid, saying no he is not, he is volunteering as I

10  understand it?

11         MS. SINFELT:  Objection, Your Honor.

12  BY MR. KRAVIS:

13  Q.  What was the date and time of that e-mail?

14         MS. SINFELT:  We have an objection as to the

15  authenticity of the date and time that the government is trying

16  to establish a certain time line and that Mr. Benton again is

17  not on this e-mail.

18         MR. BINNALL:  Same objection from Mr. Kesari.

19         THE COURT:  Overruled.

20  A.  Friday, January 20, 2012, at 7:22 p.m.

21  BY MS. KRAVIS:

22  Q.  And now I'm going to turn your attention back to

23  Government's Exhibit 74, which has been marked and entered into

24  evidence.  This is two e-mails.  You read them earlier

25  yesterday.

1    What date and time did John Tate respond to Dimitri

2  Kesari's e-mail, did Jesse get Kent paid, with the answer, no

3  idea, ask him?  What was the date and time of that e-mail?

4    MR. BINNALL:  Same objection for Mr. Kesari.

5    THE COURT:  Overruled.

6  A.  Tuesday, February 7, 2012, at 7:22 p.m. -- oh, I'm sorry,

7  the bottom e-mail?

8  BY MR. KESARI:

9  Q.  No.  You were right.

10  A.  Okay.

11  Q.  So a few weeks after the e-mail that we just saw?

12  A.  Can you show me the e-mail that we saw?  I'm sorry.

13  Q.  Yes.  Could we have up Government's Exhibit 57?

14  A.  Yes, a few weeks after this e-mail.

15  Q.  Last set of questions.  Turning your attention to

16  Government's Exhibit 51, which has not yet been entered into

17  evidence.

18    Do you recognize Government's Exhibit 51?

19  A.  Yes.

20  Q.  What is Government's Exhibit 51?

21  A.  This is an e-mail exchange between Eric Hanson,

22  kent.sorenson@legis.ia.gov, Megan S -- or sorry, Megan Stiles,

23  Jedd Coburn, Gary Howard, and Jesse Benton, and John Tate.

24  Q.  What is the date of this e-mail exchange?

25  A.  December 29, 2011.

1          MR. KRAVIS:  All right.  At this time the government

2    would move Exhibit 51 into evidence.

3                              (Government Exhibit 51 was

4                               offered in evidence.)

5          MS. SINFELT:  Hearsay objection, Your Honor, and 403.

6          MR. BINNALL:  Hearsay, prejudice, and authentication.

7          THE COURT:  I'll reserve ruling on 51 until after --

8    or during Mr. Sorenson's testimony.

9    BY MR. KRAVIS:

10   Q.  Let me move on then to Government's Exhibit 52, which has

11   been marked but not admitted into evidence.

12          Do you see Government's Exhibit 52?

13   A.  Yes.

14   Q.  What is Government's Exhibit 52?

15   A.  This is an e-mail exchange between Eric Hanson,

16   kent.sorenson@legis.ia.gov, Megan Stiles, Jedd Coburn, Gary

17   Howard, Jesse Benton, and John Tate.

18   Q.  What is the date of the e-mail exchange?

19   A.  December 29, 2011.

20   Q.  Now, I'm going to ask you to compare for a moment

21   Government's Exhibits 51 and 52.

22          First of all, does Government's Exhibit 51 have an

23   attachment behind it, turning your attention to the second page

24   of Government's Exhibit 51?

25   A.  Yes.

1  Q.  Okay.  Now, looking at the first pages of Exhibits 51 and

2  52, do you see the e-mail exchange that appears on the first

3  page of Government's Exhibit 51 that was from the bottom e-mail

4  on December 29, 2011, 12:06 p.m. to the top e-mail December 29,

5  2011, 3:07 p.m.?

6  A.  Yes.

7  Q.  Okay.  Did those e-mails in Government's Exhibit 51 also

8  appear in Government's Exhibit 52?

9  A.  Yes.

10  Q.  And is the top --

11         MR. BINNALL:  Your Honor, I object to her testifying

12  as to the content of an e-mail that has not been received into

13  evidence because the court hasn't ruled whether or not it's

14  admissible yet.

15         THE COURT:  Right.  But all she's doing is she's being

16  asked to compare the text, not to describe it, so that's fine.

17  Overruled.

18  BY MR. KRAVIS:

19  Q.  Is the top e-mail in Government's Exhibit 52 an e-mail from

20  Mr. Benton?

21  A.  Yes.

22         MR. KRAVIS:  The government offers Exhibits 51 and 52

23  into evidence an admission of party opponent with respect to

24  Mr. Benton.

25                         (Government Exhibits 51 and 52

1                             were offered in evidence.)

2          MS. SINFELT:  Mr. Benton would object to the

3   statements that are not his as hearsay.

4          MR. KRAVIS:  That's fine.  We're offering the

5   attachment to Government's Exhibit 51 and the top e-mail from

6   Mr. Benton as an adopted admission of a party opponent.

7          THE COURT:  Mr. Kravis is right.  Go ahead.  It's an

8   adopted admission.

9          MR. BINNALL:  And I understand it's only being offered

10  as to Mr. Benton, but we still have a 403 objection from

11  Mr. Kesari.

12         THE COURT:  That's overruled, and it is just against

13  Mr. Benton.  51 and 52 are received.

14         MS. SINFELT:  And, Your Honor, is the entire e-mail

15  coming in right now?

16         THE COURT:  Yes.

17                             (Government Exhibits 51 and 52

18                             were received in evidence.)

19  BY MR. KRAVIS:

20  Q.  Okay.  Now I want you to -- I'm putting up on the screen

21  just the second page of Government's Exhibit 51, the attachment,

22  just the second page for now.

23         This is a single page attachment.  I'm going to --

24  first of all, what is the title of the attachment?

25  A.  Sorenson statement on money.

1  Q.  I'm going to direct your attention now to the fourth

2  paragraph, the one that begins, "As for the ridiculous

3  allegations."  I'm going to ask you to read that paragraph out

4  loud.

5  A.  "As for the ridiculous allegations that Congresswoman

6  Bachmann and her surrogates have made, I was never offered money

7  from the Ron Paul Campaign or anyone associated with them and

8  certainly would never accept any."

9  Q.  Now I'm going to ask you to turn your attention to

10  Government's Exhibit 52, the first page of 52.

11         I believe you testified a moment ago that the middle

12  of Government's Exhibit 52 are the same e-mails that appear in

13  the first page of Government's Exhibit 51.

14         Do I have that right?

15  A.  Right.

16  Q.  Now I'm going to direct your attention just to the top

17  e-mail, the top of Government's Exhibit 52.  Would you read that

18  e-mail?

19  A.  From Jesse Benton.  Sent Thursday, December 29, 2011, 3:54

20  p.m.  To Jedd Coburn.  Cc Gary Howard, John Tate, and Megan

21  Stiles.  Subject:  Re:  KCCI request-12/29 at noon.

22         "Approved but I can't edit."

23  Q.  Okay.  Now I'm going to turn your attention to what has been

24  marked but not admitted as Government's Exhibit 54.

25         Do you see Government's Exhibit 54?

1   A.   Yes.

2   Q.   What is Government's Exhibit 54?

3   A.   This is an e-mail from Gary Howard sent to

4   dimitri@ronpaul2012.com.

5   Q.   What is the date of the e-mail?

6   A.   December 29, 2011.

7   Q.   Where did the document come from?

8   A.   The Ron Paul Presidential Campaign.

9   Q.   Okay.  Now, I'm approaching you with a hard copy of

10   Government's Exhibit 41 -- 51.  I'm going to turn your attention

11   to the second page, the attachment that we were looking at a

12   moment ago.  I want you to look at the attachment, the line to

13   the attachment of Government's Exhibit 51 and tell me whether

14   those lines also appear in Government's Exhibit 54.  Don't read

15   anything aloud.

16          (Pause.)

17   A.   Can you go on to page 2, please.

18          (Pause.)

19          Yes.

20   Q.   Now, for my final set of questions for you, Special Agent,

21   I'm going to ask you to go back to the interview that you did

22   with Mr. Benton back in July of 2014.

23          Do you remember that?

24   A.   Yes.

25   Q.   During that interview did you ask Mr. Benton about the

1   statements from the Ron Paul Campaign denying Representative

2   Bachmann's allegations that Senator Sorenson was paid for his

3   endorsement?  Did you ask him about those statements?

4           MR. BINNALL:  Objection as to anything from the

5   proffer statements coming in as to Mr. Kesari, also the 403

6   objection of Mr. Kesari on that.  It's both hearsay and

7   confrontation clauses to Mr. Kesari, as well as 403.

8           THE COURT:  All right.  So we have the statements

9   allegedly made by defendant Benton in the August 2014 interview

10  are only admissible against him.  The rest of the objections are

11  overruled.

12  BY MR. KRAVIS:

13  Q.  Did you ask him those questions about those statements?

14  A.  Yes.

15  Q.  What did Mr. Benton say?

16  A.  Mr. Benton said that he had to tell the media that

17  Mr. Sorenson was not offered money from the Ron Paul Campaign,

18  was not being paid money by the Ron Paul Campaign; that he was

19  worried about his reputation with the press and then after he

20  had told the media that Mr. Sorenson wasn't getting paid, he

21  couldn't then lie because it would show up on the FEC reports.

22  Q.  Finally, turning your attention back to Exhibit 45, which

23  has been marked and entered in evidence.  This is the e-mail

24  exchange we saw yesterday between Mr. Kesari and Mr. Benton from

25  February 7, 2012.  In the interview did you show Mr. Benton this

1   e-mail?

2   A.  Yes.

3   Q.  When you showed Mr. Benton this e-mail, did he change any of

4   his answers about whether he was aware of payments from the

5   campaign to Mr. Sorenson at the time of the campaign?  Did he

6   change any of those answers?

7   A.  No, he did not.

8           MR. KRAVIS:  May I have just a moment, please?

9           THE COURT:  You may.

10          (Pause.)

11          MR. KRAVIS:  Thank you.

12          I have no other questions.

13          THE COURT:  Mr. Howard.

14          MR. HOWARD:  Your Honor, if I could, I just need a

15   couple of minutes to get set up.

16          THE COURT:  Take your time.  Go ahead.

17          (Pause.)

18                    CROSS-EXAMINATION

19   BY MR. HOWARD:

20   Q.  Good morning, Agent LoStracco.

21   A.  Good morning.

22   Q.  And I apologize I'm going to be doing a little back and

23   forth.

24   A.  Okay.

25   Q.  Do you remember contacting counsel for Mr. Benton about

1  appearing in Des Moines for a grand jury?

2  A.  I remember contacting counsel with regard to serving a grand

3  jury subpoena on Mr. Benton, yes.

4  Q.  And you had contacted counsel and asked counsel to appear

5  early to be prepared for the grand jury.

6         Do you remember that?

7  A.  Yes.  I discussed with counsel that if Mr. Benton was

8  willing to, he could meet with the government prior to his grand

9  jury testimony.

10 Q.  And do you remember counsel asking you then what was going

11 to happen during this session?

12 A.  What was going to happen?

13 Q.  Yeah, right, during -- what Mr. Benton needed to do as he

14 came out, before he came out during the meeting before the grand

15 jury.

16 A.  I don't recall discussing specifics about what Mr. Benton

17 needed to do before the grand jury testimony, no.

18 Q.  But this was a grand jury preparation session, was it not?

19 A.  That's correct.

20 Q.  And you wanted to make sure that Mr. Benton was prepared?

21 A.  We wanted to talk to Mr. Benton before he went in the grand

22 jury.

23 Q.  And before he went in the grand jury, did you share any

24 documents with Mr. Benton?

25 A.  Yes.

1  Q.  You sent Mr. Benton documents to review --

2  A.  No.

3  Q.  -- before he got to --

4  A.  No.  Before he went to the grand jury Mr. Benton was shown

5  documents.

6  Q.  I apologize.  I didn't mean to cut you off.

7  A.  That's okay.

8  Q.  Did you send Mr. Benton any documents before he got to

9  Des Moines, Iowa?

10  A.  No, I did not.

11  Q.  Did you share any documents with his counsel before he got

12  to Des Moines, Iowa?

13  A.  I did not.

14  Q.  And during the time you've been an agent -- how long have

15  you been an agent, by the way?

16  A.  Since March of 2004.

17  Q.  And during the time you've been an agent, you have prepared

18  a number of witnesses; would that be correct?

19  A.  Yes.

20  Q.  And you have gotten witnesses oriented during their first

21  session; is that correct?

22  A.  I'm not sure I understand the question.

23  Q.  Have you gotten witnesses to understand what you expect from

24  them?

25  A.  We explain to witnesses what we --

1  Q.  Grand jury witnesses, people like Mr. Benton who are coming

2  out to testify before the grand jury.

3  A.  I talk to grand jury witnesses who are going before the

4  grand jury, yes.

5  Q.  And you work with grand jury witnesses to make sure when

6  they go in they understand what is going on and understand what

7  the truth is; is that correct?

8  A.  My job usually in the sessions is to ask the witnesses

9  questions and to show them documents as in this case.  Typically

10  the government will explain to them what to expect in terms of

11  how the courtroom is set up and that kind of thing.

12  Q.  And it's not unusual for witnesses to forget things; is that

13  correct?

14  A.  Not unusual.  It does happen, yes.

15  Q.  And it's not unusual for witnesses to indicate once

16  presented documents that they don't remember things; is that

17  correct?

18  A.  That's correct.

19  Q.  And usually when somebody says they don't remember things,

20  do you work with them to help them remember?

21  A.  Yes.

22  Q.  Just describe to the jury what it is you do to help them

23  remember.

24  A.  Well, when I'm interviewing a witness, I usually start by

25  asking them questions to see what they recollect from their own

1   memory.  If the witness is having difficulty or there are things

2   that we have, documents that they're not remembering, I will

3   then show them documents to help them refresh their

4   recollection.

5   Q.  When you -- during the course of this investigation, you had

6   asked Mr. Benton for documents, is that correct, for documents

7   from his e-mail account, is that correct?

8   A.  I'm not sure if that request was made.

9   Q.  Okay.  Do you have copies of Mr. Benton's Gmail account, the

10  Google account?  Do you have e-mails from the Google account?

11  A.  We served the subpoena on Google to --

12  Q.  I'm sorry.  The question is easier than that.

13  A.  I'm sorry.

14  Q.  Do you have Mr. Benton's Google account?  Do you have the

15  contents of that?

16  A.  Yes.

17  Q.  And when you got the contents of that, you received some of

18  that from Mr. Benton; isn't that correct?

19  A.  We received some e-mails from Mr. Benton.

20  Q.  And when you say some e-mails, would the -- do you remember

21  Mr. Benton's counsel providing you a log of the e-mails that

22  were not responsive to your grand jury subpoena?  Do you

23  remember that?

24  A.  I don't recall the logs specifically, no.

25  Q.  Log, L-O-G.

1  A.  Yes, I do not recall the log specifically.

2  Q.  Okay.  You do remember calling Mr. Benton's counsel and

3  asking questions about the log; isn't that correct?

4  A.  Yes, I do.

5  Q.  You were a little confused about how the log was put

6  together; is that correct?

7  A.  I had some questions about some documents, yes.

8  Q.  And the logs were sent to you -- the log itself was sent to

9  you on a disk; is that correct?

10  A.  I believe that's correct.

11  Q.  And do you remember the -- and when I'm talking about a log

12  page -- and I apologize for this, but when I'm talking about a

13  log page, each page has a line -- has a number of lines that

14  describes the e-mail that's being held back; is that correct?

15  A.  Correct.

16  Q.  And on each one of those pages, there's about 25 to 30

17  e-mails listed; does that sound correct?

18  A.  I don't recall.  I would have to look at the log.

19  Q.  Would you trust me if I told you it was about 25 to 30

20  e-mails?

21  A.  I would look at the log.

22  Q.  A different question.  Would you trust me if I told you it

23  was about 25 to 30 e-mails?

24          MR. KRAVIS:  Objection; asked and answered.

25          THE COURT:  Overruled.

1          Answer the question.

2  A.  Again, I would look at the log.

3  BY MR. HOWARD:

4  Q.  The question is, would you trust me, Agent --

5          THE COURT:  Hold it, hold it, hold it.  Whether she

6  trusts you or not, that puts your credibility in issue.

7          MR. HOWARD:  And I apologize, Your Honor.

8  BY MR. HOWARD:

9  Q.  Do the 25 to 30 e-mails sound correct as you sit there

10  today?

11  A.  I cannot say that, sir.  I recall that there was a log.  I

12  don't recall spending a great deal of time looking at it.

13  Q.  Okay.  You didn't look at it -- you didn't spend a great

14  amount of time looking at it.  You do remember there were

15  several e-mails listed on there; is that correct?

16  A.  I remember there was e-mails listed on there, yes.

17  Q.  And do you remember that the size of the log from

18  Mr. Benton's Gmail account, do you remember that having 55,000

19  pages of log?  Do you remember that?

20  A.  You're referring to the documents received from Gmail?

21  Q.  Yes -- or, no.  These are the documents that were received

22  from Mr. Benton, Mr. Benton's counsel.

23  A.  I do not recall that.

24  Q.  Okay.  And when you talk -- and this was a period -- you had

25  asked for documents between January 1st -- I'm sorry, January 1,

1  2010 and June 2014.  Do you remember that being the time frame

2  you were asking for the documents?

3  A.  Again, I would have to look at the subpoena that was served

4  to Mr. Benton.

5  Q.  Do you have the subpoena?

6  A.  Not in front of me, no.

7         MR. HOWARD:  Sorry.

8         (Pause.)

9  A.  Yes.  I'm sorry.  What was your question?

10 BY MR. HOWARD:

11 Q.  The question was the time frame.  Do you remember the time

12 frame for the documents that were -- that you requested in that

13 subpoena to Mr. Benton?  What was the time frame for the

14 documents?

15 A.  Well, the grand jury requested documents from January 1,

16 2010 to the present time.

17 Q.  Okay.  To the -- and what's the date on the subpoena when

18 you say present time?

19 A.  The date of the grand jury subpoena is listed as June 11,

20 2014, is when it was issued.

21 Q.  Out of the documents requested, do you recall that out of

22 55,000 pages of log e-mails, do you remember about 500 being

23 responsive to that grand jury subpoena?

24 A.  500 out of the amount --

25 Q.  Out of the amount total that you received, I'll just put it

1  that way.

2  A.  Again, I would have to see.  I don't remember Bates stamps

3  numbers and exactly how many documents we received on

4  Mr. Benton.  I'm sorry.

5  Q.  All right.  Mr. Benton arrived in Des Moines -- well,

6  arrived in the U.S. Attorney's office here in Iowa on

7  December 21st?

8  A.  I believe it was July 21st.

9  Q.  I'm sorry, and I apologize.

10  A.  That's okay.

11  Q.  July 21, 2014; is that correct?

12  A.  Correct.

13  Q.  And when he arrived, he signed a proffer agreement; is that

14  correct?

15  A.  That is correct.

16  Q.  And were you -- and during the session, there was -- you

17  were there; is that correct?

18  A.  Yes.

19  Q.  There were two government attorneys; is that correct?

20  A.  That is correct.

21  Q.  There was a second agent; is that correct?

22  A.  Yes.

23  Q.  Her name is --

24  A.  Special Agent Manik Sahaghian.

25  Q.  Sahaghian?

1   A.   Sahaghian.

2   Q.   And I've asked you that because I'm sure I've been

3   mispronouncing it.  So thank you for that.

4   A.   That's okay.

5   Q.   And you were -- and you had a stack of documents; is that

6   correct?

7   A.   I had documents with me, yes.

8   Q.   And you were going to show those to Mr. Benton; is that

9   right?

10  A.   I'm sorry?

11  Q.   You were going to show those to Mr. Benton; is that right?

12  A.   Yes.

13  Q.   And Mr. Benton had counsel there; is that correct?

14  A.   Yes.

15  Q.   As Mr. Benton was shown the documents, do you recall him

16  saying that he had not seen many of these documents in years; is

17  that correct?

18  A.   I do not recall his exact statement.

19  Q.   And do you remember him saying that he was struggling to

20  remember some of the documents as you were showing them to him?

21  Do you remember that?

22  A.   Again, I don't remember the exact statement.  I could look

23  at the 302.

24  Q.   Okay.  We'll do that.  All right.

25           Oh, you have it.  I apologize.

1  A.  Oh, sorry.

2  Q.  It's in there.

3          MR. HOWARD:  Your Honor, as an exhibit, we're not

4  going to publish it.

5  BY MR. HOWARD:

6  Q.  If you will, these look like your notes --

7  A.  Is that a question?

8  Q.  I'm sorry.  Actually it's a statement.

9  A.  Yes.

10          THE COURT:  Are we on the record?

11          MR. HOWARD:  Yes.  I'm sorry.  I apologize, Your

12  Honor.

13  BY MR. HOWARD:

14  Q.  These are Ms. Sahaghian's notes?

15  A.  Those look like Special Agent Sahaghian's notes, yes.

16          MR. HOWARD:  Your Honor, I left with Agent LoStracco

17  her notes, Agent Sahaghian's notes and the 302 she prepared for

18  the two days of the interview.  I was not going to publish them.

19  I'll allow her to refer to them.

20          THE COURT:  Tell us what a 302 is.  The jury doesn't

21  know that.

22          THE WITNESS:  A 302 is a write-up basically of the

23  interview that the FBI does with a witness.

24  BY MR. HOWARD:

25  Q.  And the two sets of notes that I left with you are, in fact,

1  your notes and Agent Sahaghian's notes; is that correct?

2  A.  I see notes belonging to myself and both Special Agent

3  Sahaghian, but I'm not certain on the number of pages or --

4  Q.  That's fine.

5  A.  Okay.

6  Q.  And the question I have for you is, as you're preparing the

7  302, which you've referred to a few times, that 302 you're using

8  your notes and your co-agent's notes to prepare them; is that

9  correct?

10  A.  I did not write Mr. Benton's 302s.

11  Q.  All right.  And who did?

12  A.  Special Agent Sahaghian.

13  Q.  But she's using your notes to write the 302?

14  A.  Again, Special Agent Sahaghian prepared the 302.  That is

15  standard practice in the FBI to use your notes when you prepare

16  a 302.

17  Q.  And my question is, she used both of your notes; is that

18  correct?

19  A.  Again, you would have to ask Special Agent Sahaghian that

20  question.  I apologize.

21  Q.  And I apologize, but you provided you her notes; is that

22  right?

23  A.  I did provide her my notes, yes.

24  Q.  And there was no video of this interview with Mr. Benton?

25  A.  No.

1  Q.  And there was no transcription of it, was there?

2  A.  Other than our notes from that session, no.

3  Q.  Okay.  And you're saying that that's transcription?

4  A.  No.

5  Q.  Or are those just your notes like kids in high school?

6  A.  I would not describe it as kids in high school.  FBI special

7  agents take notes during an interview.  It's not meant to be an

8  exact transcription, but it's not our impression of the

9  interview.  It's the statements of the witness.

10 Q.  And you would agree with me if I said that what you had in

11 your notes are not an exact transcription?

12 A.  That's right.  It's not like a court reporter.

13 Q.  And there's a lot of things in there that you missed; is

14 that right?

15 A.  No, I would not say that that's right.

16 Q.  Well, during the course of the interview with Mr. Benton, do

17 you remember there being times when Mr. Benton would look at a

18 document for as long as two or three minutes trying to determine

19 what it was?

20 A.  Yes.

21 Q.  Is that reflected in your notes?

22 A.  In my notes?

23 Q.  Or anybody's notes.  Is it reflected in the 302?

24 A.  Well, I can't testify as to what is in Special Agent

25 Sahaghian's notes, but --

1  Q.  Would you take a look?

2          MR. KRAVIS:  Objection.  It's improper impeachment.

3          THE COURT:  We're not going to spend -- she's not

4  going to pore over her notes to look for that thing, no.  The

5  objection is sustained.

6          MR. HOWARD:  All right.

7  BY MR. HOWARD:

8  Q.  During the course of your testimony with Mr. Kravis --

9          Did I pronounce it right?  I apologize for getting it

10 wrong before.

11         In the course of your questioning by Mr. Kravis, you

12 indicated that you had handled the questioning; is that correct?

13 A.  That --

14 Q.  I'm sorry.  That you had handled the questioning of

15 Mr. Benton; is that correct?

16 A.  Yes.  During the interview, yes.

17 Q.  But you didn't handle all of the questioning, did you?

18 A.  Not always, no.

19 Q.  And would it be fair to say that about a third of the way

20 through the first day you were replaced by one of the government

21 attorneys; is that correct?

22 A.  No.  I would not say that is fair, no.

23 Q.  When did the government attorney replace you?

24 A.  There were various times during the two days that we

25 interviewed Mr. Benton that a government attorney would ask a

1  few questions or Special Agent Sahaghian would ask a question if

2  she needed to.

3  Q.  Okay.  But the bulk of the questioning was done by the

4  government attorney; isn't that right?

5  A.  No, that isn't right.

6  Q.  And the second government attorney there asked no questions;

7  isn't that correct?

8  A.  Actually no, that's not correct.  The second government

9  attorney in the proffer session specifically asked questions of

10  Mr. Benton.

11  Q.  And I apologize, Your Honor.  Please cut me off if I'm

12  improper.

13         But can you go through there and tell us what

14  questions you asked?

15         MR. KRAVIS:  I have the same objection.

16         THE COURT:  Are you able to determine from your notes

17  the questions that you asked?

18         THE WITNESS:  No.  I mean, I could go through and look

19  at my notes and recall I remember specifically asking Mr. Benton

20  that question or I recall this individual asking that question.

21  I probably could not do that with every single statement in the

22  notes, no.

23  BY MR. HOWARD:

24  Q.  In your notes can you tell -- you mentioned all four of the

25  government prosecution team there.  You said they all asked

1  questions.  Are you able to look at the 302 or your notes and

2  tell the members of the jury who asked what questions?

3  A.  Well, there were two members from the government for

4  prosecutors and two FBI special agents.  I cannot go through the

5  notes in the 302 to determine who asked each question

6  specifically of Mr. Benton.

7  Q.  You were asked a question about Government's Exhibit 87c,

8  which I believe is in evidence, Your Honor?

9       THE COURT:  Yes.

10  BY MR. HOWARD:

11  Q.  I'm just going to show you 87c.

12       Do you remember that document, Agent?

13  A.  Yes.

14  Q.  And you were asked by Mr. Kravis yesterday if that document

15  was shown to Mr. Benton; is that right?

16  A.  Yes.

17  Q.  Would you -- and you were asked did Mr. -- did you give

18  Mr. Benton an opportunity to change his answers to your

19  questions about that document.

20       Do you remember that question being asked?

21  A.  I remember a question being asked about Mr. Benton being

22  shown a document and whether he changed his statement on the one

23  thing asked today about that.  I'm not a hundred percent sure

24  about this document.

25  Q.  Okay.  As you look at --

1          And, Agent LoStracco, again, I apologize.

2  A.  No, it's okay.

3  Q.  If you would look on page 15 of the 302.

4  A.  Which 302; the one from the 21st or the 22nd?

5  Q.  The 302 on the 21st, July 21, 2014.

6          Now, would I be correct in saying that this document

7  that you're looking at now, 87c, was shown to him at the end of

8  that interview session?  Is that the way it looks to you?

9  A.  Yes, he was.

10  Q.  And as you look at the 302 -- and please refer to your

11  notes -- would you tell the members of the jury here exactly

12  when Mr. Benton answers -- he states that he did not recall this

13  e-mail.  What question was he asked?

14  A.  Mr. Benton was shown this e-mail and then his response was

15  that he did not recall the e-mail.

16  Q.  Was he asked any question?

17  A.  I don't recall that.

18  Q.  Did he indicate he did not recall the e-mail?

19  A.  He did indicate he did not recall the e-mail.

20  Q.  Okay.  Did you indicate to Mr. Benton that you were unable

21  to find that e-mail on his -- in his Gmail account?

22  A.  I don't recall saying that, no.

23  Q.  You weren't able to find that -- this e-mail in his Gmail

24  account, were you?

25          MR. KRAVIS:  Objection; lack of foundation.

1          THE COURT:  Overruled.

2          Answer the question if you can.

3    A.  I'm sorry, can you just ask the question again?

4    BY MR. HOWARD:

5    Q.  As you look at that e-mail right there, 87c, you showed it

6    to him; but my question was, were you able to find it in his

7    Gmail account?

8    A.  Well, I was on this investigation when we received documents

9    from Mr. Benton.  I, however, had to transfer to the Boston

10   office prior to receiving the full production pursuant to the

11   warrant from Google, so I cannot say whether this was received

12   from his Gmail account or not.  I'm sorry.

13   Q.  You're the case agent on this?

14   A.  I was the case agent, correct.

15   Q.  You're the case agent now?  You're sitting here, right?

16   A.  Yes, correct.

17   Q.  And do you know the evidence that the government has found

18   in this case?

19   A.  I have looked at all of the evidence, correct.

20   Q.  And you're familiar with all of the evidence that the

21   government has in this case; is that correct?

22   A.  Yes.

23   Q.  And as you're familiar with the evidence that the government

24   has in this case, can you tell the jury that this e-mail was

25   found in Mr. Benton's Gmail account?

1  A.  I can't tell you that.

2  Q.  And that's because --

3  A.  That's a piece of evidence that I don't know whether it was

4  received from his Gmail account or --

5  Q.  And the reason you can't find it in his Gmail account,

6  Agent, is because it's not there; is that correct?

7  A.  No, I would not say that.  I don't recall it being there in

8  the Gmail production, I'm sorry.

9  Q.  Can you find it on the Ron Paul for President AOL server?

10  A.  I did not have access to the Ron Paul AOL server.

11  Q.  You got a search warrant for the Ron Paul server?

12  A.  We issued a grand jury subpoena to the Ron Paul Presidential

13  Campaign for documents.

14  Q.  And you got a response from the Ron Paul for President

15  Committee, didn't you?

16  A.  Yes.  We got several responses.

17  Q.  And in that response, were you able to find that document?

18  A.  I do not recall getting this from the Ron Paul Presidential

19  Campaign, no.

20  Q.  And the reason you can't recall is because it wasn't there?

21  A.  I would not say that.  I just can't recall whether it came

22  from the Ron Paul Presidential Campaign.  This specific

23  document, Government's Exhibit 87c, came from Dimitri Kesari's

24  computer.

25  Q.  Oh, we know where it came from.  What I'm asking you is

1  where else it was found, and the answer to that, ma'am, would be

2  nowhere; isn't that correct?

3  A.  I do not recall it coming from the Ron Paul Presidential

4  Campaign.

5  Q.  What did you do to prepare to testify here today?

6  A.  I went through a lot of documents, some I had already seen

7  before, and went through others that I had seen previously that

8  I needed to refresh on.

9  Q.  Did you talk to counsel here?

10  A.  Yes.

11  Q.  Did you talk to the -- I assume these are agents sitting

12  behind you?

13  A.  No, those are not agents.  They're with the Department of

14  Justice.

15  Q.  And you talked with other agents that worked for the FBI; is

16  that correct?

17  A.  Yes, that's correct.

18  Q.  Big organization; isn't that correct?

19  A.  The FBI is a big organization, yes.

20  Q.  Great leader, Jim Comey; isn't that correct?

21  A.  Yes.

22  Q.  I know you know his name.  I just had to check.

23       And you did not check to see what documents you

24  actually pulled off of which server?  You did not check to see

25  what documents were pulled off of what server; is that correct?

1   A.  I did not take this document and go back to what I had

2   received from the Ron Paul Presidential Campaign or what was

3   received from Mr. Benton to see whether it was received in those

4   documents as well.

5   Q.  If you would --

6           THE COURT:  Let's take our mid-morning recess.

7           MR. HOWARD:  Yes, sir.

8           THE COURT:  We'll come back at 10:55.  We'll see you

9   then.

10          (Recess at 10:34 a.m., until 10:55 a.m.)

11          THE COURT:  Please be seated.

12          Mr. Howard, you may continue.

13          MR. HOWARD:  Thank you, Your Honor.

14  BY MR. HOWARD:

15  Q.  Agent LoStracco, we've used a couple of terms that have to

16  do with your job, and I was just hoping that you could explain

17  to the jury at least one of those terms.

18          And you are the case agent on this investigation; is

19  that correct?

20  A.  I was the lead case agent on the investigation, correct.

21  Q.  And you and I kind of bantied that term back and forth.  Can

22  you tell the members of the jury for the FBI and for this

23  prosecution what that means?

24  A.  As lead case agent on a case, typically is the first person

25  who opens the investigation or received the initial complaint or

1    discovered something that led them to believe there was a

2    violation of criminal law, so they open up the investigation.

3    You are in charge of coordinating other agents that might be

4    assigned to the case, whether it might be co-agents or

5    otherwise, intelligence analysts, financial analysts with the

6    FBI, computer forensics people who may be helping out on your

7    investigation.  You are also typically the person that speaks

8    with the Department of Justice about what was going on in the

9    investigation along with the other agents and also receive the

10   evidence, whether it be through grand jury subpoena, voluntary

11   production, or something that you have discovered through

12   talking with witnesses.

13   Q.  And would it be fair to say the other agents that the jury

14   will see would have at some point during the investigation

15   worked under you; would that be fair?

16   A.  I don't say that they work under me.  I was not a

17   supervisor.

18   Q.  Okay.  All right.  I'll stop there.

19          We were talking about Exhibit 87c.  You had said that

20   you had gone through a lot of documents in preparing for this;

21   is that correct?

22   A.  That's correct.

23   Q.  And how long have you been -- I believe you said up in

24   Boston, is that what you said?

25   A.  Yes I transferred to the Boston office in April of this

1  year.

2  Q.  Of this year?

3  A.  That's correct.

4  Q.  So, what, four, six months ago that you transferred, and you

5  haven't seen a document since then?

6  A.  No.  I have seen a document since then.

7  Q.  But I'm just asking you, you said you went through a lot of

8  documents; is that correct?

9  A.  Yes, that's right.

10  Q.  And it's a little hard to recall things after you've been

11  through a lot of documents trying to prepare for something;

12  isn't that correct?

13  A.  It depends on what it is.

14  Q.  In this case, you've had a hard time recalling some of the

15  things; is that correct?

16  A.  Some of the things, yes; other things, no.

17  Q.  All right.  Fair enough.

18        You were -- if you could turn to in your -- in the

19  302.  You have that there.  Do you have that?

20        Mr. Benton during his session on the 22nd of July was

21  shown another version of the, if you will, yes, last time.  Can

22  you find that in your notes?

23  A.  Are you asking me to find it in my notes or in the 302?

24  Q.  In the 302.  I apologize.

25  A.  Can you point me to where in the 302, please?

1  Q.  Sure.  Look in the very first paragraph.

2  A.  Are you talking about the first paragraph after the

3  introductory paragraph; is that correct?

4  Q.  I'm sorry.  Are you on page 4 of the 302?

5  A.  No.

6  Q.  I apologize.  Okay.  Look at page 4 of the 302.

7  A.  And your question?

8  Q.  The question is, do you remember showing Mr. Benton -- as

9  the questioner, do you remember showing Mr. Benton another

10  e-mail titled "Yes, last time."  It's a version of 87c that I

11  just showed you.

12  A.  I don't believe it was titled yes, last time, but that is

13  within the document, correct.

14  Q.  Right.  And if you will look at the 302, would you tell the

15  members of the jury, according to 302, what was the date on that

16  e-mail?

17  A.  March 26, 2014.

18  Q.  Okay.  Now, this interview was on February (sic) 22, 2014?

19  A.  Correct.

20  Q.  Is the date of this e-mail a little off?

21  A.  There's a typo in the 302, yes.  It should read March 26,

22  2012.

23  Q.  So people do make mistakes; is that right?

24  A.  Yes.

25  Q.  And in this on page 4, Mr. -- does it indicate that

1   Mr. Benton is -- if you look at the end of that paragraph, if

2   Mr. Benton is changing his answers to questions, similar

3   questions from the previous day?

4   A.   I would call it clarification.

5   Q.   I'm sorry?

6   A.   A clarification maybe.

7   Q.   Yeah.  So you were asked yesterday if Mr. -- by Mr. Kravis

8   if Mr. Benton changed any of his answers, and you answered no?

9   A.   That's correct.

10  Q.   This isn't a change for you?

11  A.   It still is a no.

12  Q.   Well, let's see.  A no that he didn't change his answers?

13  A.   That is correct, with regard to whether Mr. Benton was aware

14  of payments from the Ron Paul Campaign or through another party,

15  Mr. Benton did not change his answer to that question.

16  Q.   So when the notes say it clearly looks like I was

17  authorizing payment but maybe I was sloppy, maybe I did not

18  realize I was approving an invoice, that's not a change in

19  answer?

20  A.   He's still saying he was not aware at the time that the Ron

21  Paul Campaign was paying Mr. Sorenson.

22  Q.   I'm going to show you what's been marked as Government's

23  Exhibit 17.

24            I believe that's in evidence, Your Honor.

25            THE COURT:  I don't remember right off the top of my

1  head.

2          It is.

3          MR. HOWARD:  Thank you.

4  BY MR. HOWARD:

5  Q.  And, Agent LoStracco, if you would take a look at that.

6  A.  Yes.

7  Q.  Do you remember that document?

8  A.  Yes.

9  Q.  And if you'll look at page 8 of the interview notes.

10  A.  I'm sorry --

11  Q.  I'm sorry, of the 302.

12  A.  Of the 21st or the 22nd?

13  Q.  Of the 21st.  I apologize.

14  A.  Yes.

15  Q.  And this was one of the documents shown to you or you were

16  asked about yesterday by Mr. Kravis; is that correct?

17  A.  That's correct.

18  Q.  And in it Mr. Benton says, when you asked about it, you say

19  that -- well, the 302 indicates that the response was, I didn't

20  know what to make out of the sentence.  I hate to go back to

21  this, but the volume of e-mails that I was dealing with, I don't

22  recall this e-mail, I don't recall taking action on that.

23          Do you remember that answer?

24  A.  I remember it as I'm looking at the 302, correct.

25  Q.  Okay.  But you don't remember it from the interview; is that

1  correct?

2  A.  It doesn't stand out in particular, no.

3  Q.  Okay.  Did you want to look at your notes to make sure

4  that's correct, your notes -- Ms. Sahaghian's?

5  A.  I would not look at Ms. Sahaghian's notes.

6  Q.  But that is -- is that not an indication that Mr. Benton was

7  trying to answer that question as truthful as he could?

8          MR. KRAVIS:  Objection.

9          THE COURT:  You can't comment on the state of the mind

10  of another.

11  BY MR. HOWARD:

12  Q.  Did it appear -- and I apologize.

13          Does it appear that Mr. Benton is attempting to answer

14  the question; is that correct?  Would you agree with that?

15  A.  Yes.

16  Q.  And would you agree that Mr. Benton is still trying to

17  provide you and the other ones, other individuals in the room

18  details to make himself helpful?

19          MR. KRAVIS:  Objection; state of mind as to whether

20  trying to be helpful.

21          THE COURT:  Sustained.

22  BY MR. HOWARD:

23  Q.  Does it look like Mr. Benton is attempting to answer the

24  questions to the best of his ability?

25          MR. KRAVIS:  Objection.

1          THE COURT:  Same thing.  Sustained.

2  BY MR. HOWARD:

3  Q.  Did you indicate this answer yesterday when you were asked

4  about Mr. Benton and whether he was giving false statements, did

5  you indicate to the jury that this was part of his answer?

6          MR. KRAVIS:  Objection; mischaracterizes the prior

7  testimony.  No one was ever asked about false statement.

8          THE COURT:  Overruled.

9          Answer the question if you can.

10  A.  Can you ask me in particular what -- as to this statement

11  here where he says, I hate to go back to this, that is what

12  you're referring to?

13  BY MR. HOWARD:

14  Q.  I am asking about the statement that Mr. Kravis was

15  referring to and that the Justice Department refers to in their

16  indictment when they say Mr. Benton is giving false statements.

17  Here when you're asked about the statement, did you indicate the

18  completion of this paragraph?

19          MR. KRAVIS:  Objection.  The indictment is not

20  evidence.

21          THE COURT:  I didn't hear that objection.

22          MR. KRAVIS:  Object.  The question -- the prelude to

23  the question references the indictment.  The indictment is not

24  evidence in the case.

25          THE COURT:  We know that, yeah.  Overruled.

1   A.   I'm sorry.   Could you ask your question again?

2   BY MR. HOWARD:

3   Q.   Sure.

4   A.   Thank you.

5   Q.   Agent LoStracco, Mr. Benton you understand is on trial for

6   giving a false statement in the July 21st and 22nd session that

7   you conducted; is that correct?

8   A.   That is correct.

9   Q.   And you answered questions here yesterday that Mr. -- that

10  some of Mr. Benton's questions -- some of his answers were

11  provided and were never changed; is that correct?

12  A.   That is correct.

13  Q.   And in answering Mr. Kravis in terms of statements that he

14  or the Justice Department is pointing out, did you indicate when

15  Mr. Benton apparently originally said Benton was not aware of

16  Sorenson getting paid by RPPCC, that was one of the statements

17  that you were referring to yesterday in answering Mr. Kravis's

18  questions.

19          Do you remember that?

20          MR. KRAVIS:   Objection.

21          THE COURT:   Overruled.

22          Answer the question.

23  A.   It was one of several of Mr. Benton's statements, yes.

24  BY MR. HOWARD:

25  Q.   But that was one of them, wasn't it?

1    A.   Yes.

2    Q.   And in answering the question, Mr. Benton is saying to you

3    that given the volume of e-mails he was getting, he can't recall

4    taking action on the e-mail.

5              Do you remember not saying that yesterday?

6    A.   I did not say that yesterday with regard to this particular

7    e-mail.  Mr. Benton was shown several e-mails.

8    Q.   And you did not share that with the jury, did you?

9    A.   I did not share what?  I'm sorry.

10   Q.   You did not share this statement by Mr. Benton with the

11   jury, did you?

12   A.   This particular statement about him not recalling this

13   e-mail, no.

14   Q.   Right.  Kind of hard to recall statements that you've

15   transferred -- you've taken down, what, a year ago?

16   A.   I don't know if I took down this particular statement or

17   whether Special Agent Sahaghian took it down; but it depends on

18   the statement.  Some statements stand out more than others.

19   Q.   Check your notes if you wouldn't mind.

20   A.   Sure.

21             (Pause.)

22             Okay.

23   Q.   Is it there?

24   A.   I have a note in my notes that shows that we showed him that

25   document and it has the date of the document.  It doesn't have

1  anything next to it.

2  Q.  But you don't -- in answering the question yesterday -- you

3  got notes, but in answering the question yesterday, you did not

4  indicate that maybe Mr. Benton was sloppy?  You did not indicate

5  that he said that, did you?

6  A.  I did not say that Mr. Benton said --

7  Q.  And you did not -- I'm sorry.  I didn't mean to cut you off.

8  A.  I did not say Mr. Benton said he was sloppy.

9  Q.  You didn't say that.  You didn't say given the volume of

10  e-mails he was getting, he could not recall taking action on

11  this e-mail?  You didn't mention that to the jury either

12  yesterday, did you?

13  A.  No.

14  Q.  And you did not mention that he was -- it looked like to you

15  that he was still trying to answer your questions to the best of

16  his ability; wouldn't that be fair?

17          MR. KRAVIS:  Objection; to the best of his ability,

18  state of mind of another person.

19          THE COURT:  The only question was, did she say it

20  yesterday.

21          You can answer that question.

22  A.  Did I say it yesterday whether he was trying to answer the

23  questions to the best of his ability?

24  BY MR. HOWARD:

25  Q.  Did it appear that way to you, to the best of his ability?

1    MR. KRAVIS:  Objection; state of mind.

2    MR. HOWARD:  To Agent LoStracco, I apologize.

3    MR. KRAVIS:  I believe the question now calls for

4  speculation about the state of mind of another person, not a

5  statement but speculation about the state of mind.

6    THE COURT:  Overruled.  Just answer the question.

7  Let's move on.

8    MR. HOWARD:  Yes, sir.

9    THE COURT:  Go ahead.  Answer that.

10  A.  I did not state that for the jury.

11  BY MR. HOWARD:

12  Q.  Now, during the course of this interview with Mr. Benton,

13  you did not indicate that he was struggling to remember.  Do you

14  remember writing that down anywhere?

15  A.  If he was having difficulty recalling anything?

16  Q.  Yes.

17  A.  Typically that would be reported in the notes.

18  Q.  I'm sorry?

19  A.  If Mr. Benton did not recall or Mr. Benton did not seem to

20  recall, that would be written in the notes.

21  Q.  But did you write down when he looked at a document and

22  looked at it for more than two or three minutes?  Did you write

23  that down?

24  A.  As far as the time of how long he looked at the document?  I

25  did not, no.

1    Q.  Did your co-agent write that down, Mrs. Sahaghian?

2    A.  I don't know.  Do you want me to go back through her --

3    Q.  Do you remember?

4    A.  Do I remember from looking at her notes?

5    Q.  Did you look at her notes?

6    A.  I have looked at her notes, yes.

7    Q.  After you've looked at her notes, do you remember from

8    looking at them whether she had written that down?

9    A.  I don't recall anything in Special Agent Sahaghian's notes

10   indicating the length of time other than the breaks that we

11   would have taken.

12   Q.  Okay.  And that's because as we sit here in 2015, it's been

13   a while since you've looked at her notes; is that correct?

14   A.  No.  It's because they're very lengthy.

15   Q.  I'm sorry?

16   A.  It's because they're very lengthy and they're not my notes.

17   It's difficult to be reading somebody else's handwriting.

18   Q.  If you can look at -- I'm sorry.  Did I cut you off?

19   A.  No.

20   Q.  If you could look back at page 6 of the 302.

21   A.  This is from the 21st?

22   Q.  Yeah.  I apologize.  Yeah, July 21st.

23   A.  Yes.

24   Q.  Okay.  If you would look at the -- I'm just going to say the

25   second full paragraph.  It starts, "Benton was not aware."

1  A.  Yes.

2  Q.  And as you look at that answer, "Benton was not aware of

3  Sorenson getting paid by the RPPCC or another entity," tell the

4  members of the jury, as you sit there now, what was the question

5  he was asked?

6  A.  He was asked whether he was ever aware of Mr. Sorenson being

7  paid by the Ron Paul Presidential Campaign directly or

8  indirectly.

9  Q.  Are you recalling that as you sit here now?

10 A.  Yes.

11 Q.  Is it written down anywhere?

12 A.  The question?

13 Q.  Yes.

14 A.  Not in the 302.

15 Q.  Is it written down in your notes?

16 A.  The question was not.  Mr. Benton's response is about

17 Sorenson not being paid directly or indirectly.

18 Q.  So now you remember the question as you sit here?

19 A.  Yes.

20 Q.  Is that right?

21 A.  Yes.

22 Q.  You remember the question, but you can't remember documents

23 that you saw a year ago; is that correct?

24 A.  What documents are you referring to?

25 Q.  The documents that you said that you don't recall, that we

1  talked about quite a few.  Your memory is excellent now as to

2  that question?

3  A.  My memory is very clear as to that question.  As to the

4  documents, I believe the question was whether they were found in

5  other productions.

6  Q.  Well, if you will look at that sentence, look at that

7  paragraph, look at the very next sentence.  Do you see quote

8  marks around that sentence?

9  A.  Yes.

10  Q.  And quote marks indicate that that is Mr. Benton's

11  statement; isn't that correct?

12  A.  That is correct.

13  Q.  And if you look at the sentence I asked you about, it says,

14  "Benton was not aware."  That is not his statement, is it?

15  A.  Yes.

16  Q.  There are no quote marks around it?

17  A.  Again, it's not a transcription, so if he's asked whether he

18  was aware of payments and he says no, we write "Benton was not

19  aware of the payments."

20  Q.  So you embellish?

21  A.  No.

22  Q.  You said if he says no, you add words to it.  Isn't that

23  embellishment, ma'am?

24  A.  No.  The question was asked, are you aware of Sorenson

25  getting paid by the Ron Paul Presidential Campaign or another

1  entity?  And Mr. Benton says, no.  So the way it is written is,

2  Benton was not aware of Sorenson getting paid by the Ron Paul

3  Presidential Campaign or another entity.

4  Q.  So that sentence is that agent's summary; isn't that

5  correct?

6  A.  I don't know if it's a summary.  It's meant to capture what

7  the witness is saying.

8  Q.  You didn't capture Mr. Benton's words here, though, did you?

9  A.  There's not an exact quote around that statement.

10  Q.  Thank you.

11          Did you have something else to say?

12  A.  I'm sorry?

13  Q.  I didn't mean to cut you off.  Did you have anything else to

14  add to that?

15  A.  No.

16  Q.  Okay.  If you'll turn to page 13 of your notes --

17  A.  Of the 302?

18  Q.  I'm sorry, I apologize; the 302.

19  A.  That's okay.

20  Q.  If you'll turn to page 13, and I'm going to show you a

21  document that's been marked Exhibit -- this is JRB exhibit,

22  defense Exhibit 16.

23          Your Honor, I'm just going to show this to her.  I'm

24  not going to publish it.

25          When we asked the Department of Justice to identify

1  the statements that were the subject of Count 5, one of the

2  statements they identified was out of the 302 that says, we are

3  not paying him.  And what I want to ask you, it says -- it's on

4  page 13.  Do you see what I'm referring to?

5  A.  I'm sorry, where in the document that you --

6  Q.  And I --

7  A.  That's okay.

8  Q.  I apologize.

9          (Counsel conferring with the witness.)

10 BY MR. HOWARD:

11 Q.  On page -- do you see where one of the responses is on page

12 13 of the 302, it is indicated that Mr. Benton indicated, we are

13 not paying him.

14         Do you see that?

15         MR. KRAVIS:  Objection.  May we approach?

16         THE COURT:  Yes.  We'll need the court reporter.  This

17 will just be a moment, ladies and gentlemen of the jury.

18         (Side-bar, out of the presence of the jury.)

19         MR. KRAVIS:  The document that is before the witness

20 now, Defendant Benton Exhibit 16, is a letter that I wrote to

21 defense counsel in response to a request for bill of

22 particulars.  I do not believe that my response is relevant to

23 the witness's testimony.  To the extent that my response

24 regarding the legal charges against Mr. Benton have any

25 relevance at all, its relevance is to the questions of law for

1   the court regarding the nature of the charges and the

2   government's proof, not to questions about this witness's

3   recollection.

4          THE COURT:  Yeah.  It's real clear that you can't

5   impeach one witness with the statements of another.  But as I

6   understand, all he is trying to do is focus in on what it is and

7   some place that says what it is the exact statements are that

8   are false so that he can go after that.  If we can just agree as

9   to what the statements allegedly false are and she can respond

10  to those, I don't think we would have any problem.

11         MR. KRAVIS:  That's fine.

12         THE COURT:  Is that what the point is?

13         MS. SINFELT:  Yes.

14         MR. HOWARD:  That's all.  We've been trying to figure

15  out what they were.  We've gotten it from different sources

16  yesterday and Mr. Kravis's letter.

17         THE COURT:  And that thing is not coming into

18  evidence, but it's a nice statement of exactly the statements

19  you claim are also false.  So if she's on board with that and we

20  can just get to that as those are the false statements, then we

21  won't go any further with that.

22         MR. KRAVIS:  Fine.  Thank you.

23         (In open court, in the presence of the jury.)

24         THE COURT:  Okay.

25         MR. KRAVIS:  In light of the colloquy, I'll withdraw

1    the objection.

2             THE COURT:  Okay.  Thank you.

3    BY MR. HOWARD:

4    Q.  Agent, again we were on -- and I apologize -- page 13, and

5    I'm sorry, I just got a little disoriented.

6    A.  That's okay.

7    Q.  I asked you to look at the letter.

8    A.  Yes.

9    Q.  And do you see where one of the indications is from the

10   Justice Department that on page 13, one of the sentences or one

11   of the phrases is, "We are not paying him"?

12             Do you see that?

13   A.  We are not paying him, in parentheses Sorenson.

14   Q.  Right.  On page 13 of your 302, correct?

15   A.  Correct.

16   Q.  I'm just asking --

17   A.  If it's in the 302?

18   Q.  Yes.  Did you find it?

19   A.  Yes.

20   Q.  And where it's found, does it -- and if you'll read along

21   with me and tell me if I'm correct.  It says, "Benton further

22   states 'I kind of remember thinking we are not paying him and

23   there is no agreement to pay him.'"

24             Did I read that correctly?

25   A.  Yes, that's correct.

1  Q.  And -- but in the Justice Department letter identifying a

2  statement that is part of the charges, that entire sentence is

3  not included, is it?

4  A.  Not on that first page, right.

5  Q.  I'm sorry?

6  A.  Not here where you pointed out, no.

7  Q.  Okay.  Why don't you take your time and look at the second

8  page.

9          (Pause.)

10  A.  That's correct.

11  Q.  Okay.  If you'll look at -- if you'll keep reading the

12  letter and see if you can find a response to -- an indication

13  that on page 14 there is a reference to not splitting hairs and

14  if you can tell the members of the jury what that statement is

15  supposed to be.

16  A.  Ah --

17  Q.  From -- and I apologize.

18  A.  From the 302?

19  Q.  No; from the Government's Exhibit 16.

20  A.  You want me to read from this?

21  Q.  Yeah; just what the statement is they say.

22  A.  Benton is not splitting hair.  In parenthesis there's an S.

23  Sorenson was not getting paid by the RPPCC or through a third

24  party.

25  Q.  And that statement came on what date, ma'am, according to

1 | the letter; on the 21st?

2 | A.  Yes, according to the letter, on the 21st.

3 | Q.  All right.  And then if you will look at your 302 -- the 302

4 | for the 22nd.  And if you'll read the last paragraph, the last

5 | full paragraph and the first full paragraph on the next page, if

6 | you'll just read that to yourself.

7 | A.  On what page, I'm sorry?

8 | Q.  Oh, I'm sorry.  I am on July 22nd, that 302, if you will

9 | turn to pages 1 and 2, please.

10 |         You have it?  I'm sorry.  And in it Mr. Benton

11 | indicates exactly what he thinks the wire is for in those two

12 | paragraphs; isn't that correct?

13 | A.  I'm sorry.  I thought you said the last paragraph on that

14 | page.

15 | Q.  The one -- I'm sorry, the last full paragraph, the portion

16 | of that, it looks like agent's notes and then the first full

17 | paragraph on the next page.

18 |         (Pause.)

19 | A.  Yes.

20 | Q.  And what you read, didn't you refer to that in your

21 | testimony yesterday?

22 | A.  I did, a portion of this, yes.

23 | Q.  A portion of that?

24 | A.  Yeah, uh-huh.

25 | Q.  And didn't you refer to a portion of that because you

 1  thought those statements were correct?

 2          MR. KRAVIS:  Objection.

 3          THE COURT:  The objection is sustained.

 4  BY MR. HOWARD:

 5  Q.  Did you refer to those statements because in your testimony

 6  yesterday because you thought those statements bolstered what

 7  you were trying to convey to the jury?

 8          MR. KRAVIS:  Objection.

 9          THE COURT:  Sustained.  No witness can ever testify

10  about the truthfulness of another witness's statements.  You put

11  the statements out there.  The jury needs to decide whether it's

12  true or not.

13  BY MR. HOWARD:

14  Q.  Okay.  You did use those statements yesterday; isn't that

15  correct?

16  A.  One of the statements.

17  Q.  One of the statements?

18  A.  There's one in particular I recall.

19  Q.  I'm sorry?

20  A.  There's one in particular that I recall saying, yes --

21  actually two; I apologize.  There's at least two.

22  Q.  Two statements that you used yesterday, that you referred

23  to?

24  A.  Right.

25  Q.  We started to talk about the actual interview process in

1  Des Moines, across the street; is that correct?

2  A.  It's not across the street.  It's in the back of this

3  building, correct.

4  Q.  All right.  In the back of this building.  That was at the

5  U.S. Attorney's office?

6  A.  That's correct.

7  Q.  And at some point one of the government attorneys asked the

8  bulk of the questions; isn't that correct?

9  A.  No, that's not correct.

10  Q.  And when that attorney asked questions, he stood standing

11  for a long time; is that correct?

12  A.  I'm sorry?

13  Q.  When that attorney did ask his questions, he stood standing

14  for much of the time; is that correct?

15  A.  I don't recall an attorney standing for any length of time

16  during the proffer session, no.

17  Q.  Well, let me ask you this.  Do you recall the attorney

18  asking questions of Mr. Benton while standing and then turning

19  to you and pointing at your sheet and saying, write that down?

20          Do you remember that?

21  A.  I do not recall that.

22  Q.  And do you remember that Mr. Benton was told that there are

23  things that he should remember -- he's told by this attorney --

24  government attorney, that there are things that he should

25  remember because Michelle Bachmann was prominent in the press

1   about this time.

2           Do you remember that comment?

3   A.  I recall a comment about this being a big press event about

4   the switch.

5   Q.  Right.

6   A.  And, therefore, it would likely make it more easy to recall

7   than something else.

8   Q.  And do you remember the attorney indicating -- Mr. Benton

9   indicating one of the reasons he did not recall things is

10  because he had more pressing issues during that time?  Do you

11  recall that?

12  A.  I don't recall that being said about the press surrounding

13  the event; but maybe with some other activities that we were

14  asking him about or e-mails.

15  Q.  And do you remember Mr. Benton being asked at the time that

16  he's answering questions to assume that his answers are from the

17  date of the actual events?

18          Do you remember that?

19  A.  I'm sorry, can you rephrase that?

20  Q.  And I apologize.

21  A.  That's okay.

22  Q.  Do you remember Mr. Benton being told to answer questions as

23  if they were on the date of the actual document that is being

24  shown to him?

25  A.  We asked Mr. Benton to recall what happened during that

1   time.  If it was something that he recalled since that time, he

2   was told to tell us that so we would be able to make a note.

3   Q.  And do you recall Mr. Benton being told to assume some

4   things in a question?

5           Do you remember that?

6   A.  Absolutely not.

7   Q.  Okay.  If you would give me a minute.

8           (Pause.)

9           If you could look at page 18 of Agent Sahaghian's

10  handwritten notes, and I believe that's going to be on the --

11  the handwritten notes from the 21st.

12          MR. KRAVIS:  While Mr. Howard is looking, I'm going to

13  object that the witness can't be impeached with another person's

14  statements or notes.

15          THE COURT:  Nor has she expressed a failure of

16  recollection either, so I don't know why the other agent's notes

17  are being examined right now.

18          MR. HOWARD:  Well, Your Honor, if you will, the other

19  agent's notes were being used to write the 302.  As we've

20  already established, not everything has made it in, and there's

21  a fairly clear note that at least says that -- well, I won't say

22  it out in front, but we know what it says.  I don't know why the

23  agent can't read it.  She is the case agent.  The 302 is

24  supposed --

25          THE COURT:  You can't impeach one witness with another

```
 1  statement.  That's why.

 2              MR. HOWARD:  Okay.  I'm going to need a minute.

 3              THE COURT:  You can certainly ask her any question

 4  about her recollection of what was said that day.

 5              MR. HOWARD:  Your Honor, we could ask her that, and

 6  I'm happy to.

 7              Your Honor, we'll move on.  We'll wait for Agent

 8  Sahaghian to be called.

 9              THE COURT:  Okay.  Thank you.

10  BY MR. HOWARD:

11  Q.  Agent, if you would again look at the 302.

12  A.  Again, from which date?

13  Q.  Oh, I keep doing that.  July 21st, if you'll look at the

14  302.

15  A.  Okay.

16  Q.  And if you will look at page 11 and if you will look at the

17  next-to-last paragraph.

18  A.  When you say "the next-to-last," you mean the next-to-last

19  full paragraph?

20  Q.  Next-to-last full paragraph.  It starts with, "If the

21  check."

22              Do you see where I've gone?

23  A.  Yes.

24  Q.  Okay.  There is a sentence at the end there.  Would you read

25  that sentence, please.  It starts with "when."
```

1  A.  When asked to assume the DGI check was to get Sorenson to

2  join the campaign, Benton stated he, quote, would at least go to

3  Tate and talk about it, end quote.

4  Q.  And as I ask you again, do you remember Mr. Benton being

5  asked to assume things when he was being questioned by you, the

6  other agent and the two government attorneys?

7  A.  That was just a very broad statement.  I think with regard

8  to this check --

9  Q.  And I apologize for cutting you off.  The question was, now

10  as you see this, do you now remember Mr. Benton being asked to

11  assume?  That's a "yes" or "no" question, ma'am.

12  A.  Yes.  With regard to the specific check, yes.

13  Q.  Okay.  And do you remember Mr. Benton being asked to

14  speculate about things?

15  A.  Did we ask him to speculate?

16  Q.  Yes, ask him to speculate about some of his answers.

17  A.  I mean, again, when we're asking a witness questions, if

18  they are assuming something, guessing something, speculating

19  about something, we always tell them to tell us that so we can

20  note that.

21  Q.  All right.  And sometimes they're asked to put -- never

22  mind.

23        Let me just take you back, if you will, to the

24  July 22nd 302.  And you remember I asked you there at the bottom

25  of pages 1 and 2, were those statements that you used in your

1   examination yesterday with Mr. Kravis.  Do you remember I asked

2   you that question?

3   A.  Yes, that's correct.

4   Q.  And you said these were the statements; isn't that correct?

5   A.  There are a few of these statements, correct.

6   Q.  And do you remember those statements coming out after

7   Mr. Benton's attorney at the beginning of that -- of the proffer

8   session on the 22nd of July indicating to the government

9   prosecutors and to the agents that Mr. Benton would not be going

10  in to the grand jury?

11  A.  I recall a conversation about Mr. Benton not going in the

12  grand jury.  I do not recall exactly when that occurred.

13  Q.  Okay.  And do you remember Mr. Benton's attorney saying that

14  the attorney wanted to work with Mr. Benton on preparing him for

15  the grand jury on the documents?

16          Do you remember?

17          MR. KRAVIS:  Objection.  The relevance of the

18  attorney's statements also leave -- I believe the attorney's

19  statements call for hearsay.

20          THE COURT:  Overruled.

21          Answer the question if you know.

22  A.  I recall that statement being made at the end of day 1.

23  BY MR. HOWARD:

24  Q.  Right.

25  A.  That there was more to be done, correct.

1   Q.   Okay.  You don't remember it being at the beginning of day

2   2?

3   A.   I don't recall that, no.

4   Q.   Okay.  And do you remember Mr. Benton and his attorney being

5   absent from the start of the proffer session?

6          Do you remember that?

7   A.   Benton and his attorney?

8   Q.   And his attorney, Mr. Benton and Mr. Benton's attorney.

9   A.   Being absent from the start of the proffer?

10  Q.   Of the proffer session on July 22nd, the second day.

11  A.   I would say the proffer session didn't start until

12  Mr. Benton and his attorney were present, but I remember a

13  period of time in which Mr. Benton had arrived at the U.S.

14  Attorney's office and was speaking with his attorney.

15  Q.   And do you remember when Mr. Benton and his attorney

16  returned to the room where the proffer session was being held,

17  Mr. Benton's attorney had in his hand documents?

18          Do you remember that?

19  A.   I don't recall specifically whether the attorney had

20  documents in his hand or not.

21  Q.   Do you remember Mr. Benton's attorney handing the documents

22  to you and the government attorney asking you to check to make

23  sure none of the documents were missing?  I'm just trying to see

24  if you recall the start.

25  A.   I recall that in between the first day of the proffer

1  session and the second day that Mr. Benton was given the

2  opportunity to go through some documents.  That does sound

3  correct.

4  Q.  Okay.  And did you find that on the second day of the

5  proffer session some of the answers that Mr. Benton provided

6  were at least a little more, I'll just say fulsome?

7  A.  I'm not real sure what that means.

8  Q.  Okay.

9  A.  I'm sorry.

10  Q.  Let me put it this way.

11  A.  I know what the word "fulsome" means.  I'm just not really

12  sure what you're asking.

13  Q.  Okay.  I'm just asking you did Mr. Benton on the second day

14  appear to you to be a little better prepared?

15  A.  Mr. Benton had had the opportunity the previous night to go

16  through documents that we had shown him with his attorney.  He

17  had some time that morning to discuss whatever he needed to with

18  his attorney.  So, yes, I would say Mr. Benton was more

19  prepared.

20  Q.  And do you remember the 21st, the session on the 21st -- I'm

21  just going to ask you, do you remember it being a little tense

22  between Mr. Benton's attorney and the government attorney?

23        Do you remember that at all?

24  A.  I guess --

25  Q.  I'm trying to ask you if you remember anything about the

1  atmosphere that day, and I'm trying to have the jury understand

2  through you exactly what Mr. Benton was going through.

3          MR. KRAVIS:  Objection.

4          THE COURT:  So ask a question.

5          MR. HOWARD:  I'm sorry?

6          THE COURT:  So ask a question.

7  BY MR. HOWARD:

8  Q.  Do you remember if the session was tense between

9  Mr. Benton's attorney and the -- not you; the government

10  prosecutor, the government attorney?

11  A.  Whether it was tense between Mr. Benton's attorney and the

12  government's attorney?

13  Q.  Yes.

14  A.  I recall it being a little tense between Mr. Benton and one

15  of the government's attorneys at one point.

16  Q.  And when you say it was a little tense between Mr. Benton

17  and the government's attorney, can you describe for the jury

18  what you remember, what it is that made it appear tense to you?

19  A.  I remember one of the government's attorneys challenging

20  Mr. Benton about his recollection in light of him seeing the

21  e-mails and in light of his previous statements that were very

22  definitive about whether he knew about whether the Ron Paul

23  Campaign had paid Mr. Sorenson directly or indirectly, and

24  Mr. Benton I guess didn't react very well.  He was not happy

25  with that, I guess, was my impression.

1   Q.  I'm just going to ask you, do you remember Mr. Benton and

2   the government attorney at one point sort of staring at each

3   other?

4   A.  Yes.

5   Q.  And do you remember Mr. Benton and the government attorney

6   at some point Mr. Benton being excused from the room with the

7   government attorney slapping his hands (indicating) and saying,

8   I'm through with you?

9           Do you remember that?

10  A.  I remember Mr. Benton being excused at the end of day 2 when

11  his attorney said he would not go before the grand jury.  The

12  government attorney slapping his hands, I don't recall that.

13  I'm sorry.

14  Q.  You don't remember him slapping his hands and turning his

15  back on him and walking away?  You don't remember that at all?

16  A.  I do not.

17  Q.  And do you remember during this entire time Mr. Benton

18  struggling to recall things and provide answers?

19          Do you remember that?

20  A.  I remember there were a few occasions where Mr. Benton

21  was -- had difficulty recalling things when he was looking at

22  the e-mail, at least he said he was having difficulty recalling

23  things.

24  Q.  And now I just want to ask you this.  You know, we've talked

25  about the situation and that sort of thing.  Are those reflected

1   in your notes?

2   A.   At times when he said he did not recall?

3   Q.   The times he said he didn't recall, the times that things

4   were tense, the times that Mr. Benton took awhile to look at

5   documents and remember them; is any of that in your notes?

6   A.   The times that Mr. Benton didn't recall something, that

7   would be in the notes.  How long he took to look at a document

8   wouldn't necessarily be -- put in the notes.  And then, I'm

9   sorry, what was the third part?  Whether it was tense?

10   Q.   Yes.

11   A.   Whether it was tense during the proffer session again

12   wouldn't necessarily be reflected in the agent's notes unless

13   there was some particular reason to do so.

14   Q.   All right.  I'm going to show you -- I'm going to ask you,

15   if you will, on the 7/21 memo -- 302 if you will look at the --

16   look at page 3, and if you will look at the last paragraph.

17   It's not complete.  And if you will read the second sentence

18   that starts with "Benton did not know."

19   A.   "Benton did not know the purpose of the incentive/retainer

20   for Sorenson" -- I'm sorry, I apologize.

21   Q.   Go ahead.

22   A.   I apologize.

23   Q.   You don't need to.

24   A.   "Benton did not know the purpose of the $25,000 that was

25   mentioned in Aaron Dorr's memo."

1  Q.  Okay.  I'm going to show you the memo, the Aaron Dorr memo

2  that you showed to Mr. Benton.

3          Do you remember this?

4  A.  Yes.

5  Q.  And in there, according to this 302, Mr. Benton did not know

6  the purpose of the $25,000 that was mentioned in this memo.

7  Would you just look through that?  The Aaron Dorr memo is

8  actually the second one, if you would flip the page.

9  A.  Uh-huh.

10  Q.  Can you find a reference to $25,000, please?

11  A.  No.

12  Q.  There is money referenced; is that right?

13  A.  Yes, that's correct.

14  Q.  And another typo or just not understanding, do you know?

15  A.  I don't know.

16  Q.  And you can leave that there, ma'am.

17          And if you will look again on July 21st, if you will

18  look at page 4 -- if you will look at the -- I'm talking full

19  paragraphs now -- first, second full paragraph, the full

20  paragraph starts "Kesari has known Tate."

21          Do you see that?

22  A.  Yes, in the middle of the page.

23  Q.  The very last sentence, can you read that, please?

24  A.  Benton further described Kesari as a, quote -- or I'm sorry;

25  as quote, a straight dog who follows you home, end quote.

1   Q.  Okay.

2          MR. BINNALL:  At this point we are going to object to

3   anything coming in about Mr. Kesari from the proffer session.

4          MR. HOWARD:  Your Honor, I -- this is just another --

5   we're not going to describe Mr. Kesari any further.  I just

6   wanted to point that out.

7          THE COURT:  The objection is sustained.

8   BY MR. HOWARD:

9   Q.  Ma'am, if you will, if you'll look at that sentence and just

10  say -- if you'll leave out the name in there.  And there's a

11  name that begins with K --

12          Is it all right if she reads --

13          THE COURT:  No, no.  We're going to go on to something

14  new now.

15          MR. HOWARD:  If I --

16          THE COURT:  It's a violation of Bruton.

17          MR. HOWARD:  I understand, Your Honor.

18          THE COURT:  So we're not going to go there.

19          MR. HOWARD:  Okay.  I don't have to go there.

20  BY MR. HOWARD:

21  Q.  Do you see the term -- is this okay -- straight dog?  Do you

22  see that?

23  A.  I do.

24  Q.  Do you remember -- I mean, do you remember this portion of

25  the interview as you sit there now?

1              Do you remember?

2    A.  I don't remember the specific statement, no.

3    Q.  Okay.  Do you remember the statement being stray dog?

4    A.  Again, I don't remember the specific quote.

5    Q.  Okay.  And if you would turn to page 7, if you will look at

6    the last full paragraph there -- just checking, no names in

7    here -- and if you'll look in the middle of that paragraph, it

8    says, "They are."  Do you see that?  It's about one, two, three,

9    four, five, six lines down.  The sentence starts in the middle

10   of that line?

11   A.  Yes.

12   Q.  And would you read that?  "They are" --

13   A.  They are, quote, hard wire Christians, end quote, and they

14   think they are, quote, the God and the law, end quote.

15   Q.  Okay.  All right.  Thank you.

16              Do you remember that statement that instead of hard

17   wire, do you remember the statement being hard core?

18   A.  I don't remember that distinction between hard wire or hard

19   core.

20   Q.  Okay.  And instead of they think they are the God and the

21   law, do you remember the statement and they follow God's law?

22              Do you remember that?

23   A.  Again, this 302 was written by Special Agent Manik

24   Sahaghian.

25   Q.  Uh-huh.

1  A.  So if that quote was in her notes, that's why that was in

2  the 302.

3  Q.  Okay.  Is Agent Sahaghian, is she a native English speaker?

4  A.  Special Agent Manik Sahaghian has been speaking English

5  since she was the age of five, I believe.

6  Q.  Agent, I'm going to ask you again.

7  A.  I don't know personally.  I don't remember all of her

8  background.  I know she was -- I'm sorry.

9  Q.  Do you know her original language or fluent language, do you

10 know?

11 A.  I believe it's Armenian.

12 Q.  And English is her second language?

13 A.  Yes.

14 Q.  I don't know if she's multilingual beyond --

15 A.  Actually -- no, I do not.  I believe that Special Agent

16 Manik Sahaghian learned to speak Armenian first but learned to

17 write in English first.

18 Q.  Let me just ask you, Agent, what did you do to prepare for

19 your testimony here?  What did you do?

20 A.  Several things.  I went through documents, notes, 302s I've

21 written or been involved with, looked through again evidence

22 that we had received, other items.

23 Q.  And did you -- and you sat down and talked with the

24 prosecutors; is that right?

25 A.  Yes.

1   Q.  You sat down and talked with the other agents; is that

2   correct?

3   A.  I don't know that it was a formal sit-down session but yeah,

4   I've had conversations with other agents.

5   Q.  You were trying to reintroduce yourself to the evidence in

6   this case; isn't that right?

7   A.  I didn't need much reintroduction but, yes, in some sense.

8   Q.  All right.  As you talked to Mr. Benton about the money that

9   was at issue during the interview, the money that went to Kent

10  Sorenson, as you talked, do you remember ever asking him about

11  the different amounts of money that were being bantied about

12  during the course of the interview?  As you asked questions, did

13  you talk to him about what amounts of money you were talking

14  about, where they came from, the origin or anything like that?

15  A.  Yes.

16  Q.  You did.  And so did you speak to -- do you remember

17  speaking to him about the $100,000 mentioned in the Dorr memo?

18  A.  Yes.

19  Q.  Specifically and when you talked to him, do you remember

20  talking to him about the $8,000 mentioned in the Dorr memo?

21  A.  Yes.

22  Q.  And do you remember talking to him about the $5,000

23  mentioned in the Dorr memo?

24  A.  That I don't specifically recall.  I would have to look at

25  the 302.

1  Q.  Uh-huh.  Do you want to take a look at that?  I think that

2  was an amount that was proposed for Mr. Christian Dorr.  You

3  have the Dorr memo in front of you?

4  A.  Yes.  I know that was the amount in the Dorr memo proposed

5  for Mr. Chris Dorr.  I'm just not sure where in Mr. Benton's 302

6  it reflects that we specifically talked to him about the amount

7  for Chris Dorr.

8  Q.  And did you talk to him specifically about the amount, the

9  $25,000 written on the jewelry store check?

10          Do you remember that?

11  A.  We talked to him about the check drawn on the jewelry store

12  account, correct.

13  Q.  And as you have talked yesterday about the different amounts

14  of money that were supposedly at the center of the allegations

15  here, as you talked about the false statements, did you write

16  down in your -- in either the 302 or your notes exactly which of

17  these different amounts were in play or did you just roll it all

18  in one ball?

19  A.  No.  They would be noted when we were asking about the

20  $25,000 check or when we were asking about Mr. Sorenson's

21  salary.

22  Q.  So when I go back over the false statements that were

23  indicated here, they will indicate that Mr. Benton is talking

24  about one of these four amounts or does the statement reflect

25  all of those amounts I'm asking?

1          MR. KRAVIS:  Objection; vague.  Go back over what?

2          THE COURT:  We're going to take our noon recess and

3    come back at 1:20.  See you then.

4          Ask a new question then.

5          (Recess at 11:59 a.m., until 1:20 p.m.)

1               AFTERNOON SESSION  1:20 p.m.

2          (In open court, in the presence of the jury.)

3          THE COURT:  Please be seated.

4          Mr. Howard, you may continue.

5          MR. HOWARD:  Thank you, Your Honor.

6                    KAREN LOSTRACCO,

7  resumed her testimony as follows:

8               CROSS-EXAMINATION (Continued)

9  BY MR. HOWARD:

10  Q.  Just before the break, Agent, you had mentioned documents

11  being -- you had a set of documents, a stack of documents that

12  you showed Mr. Benton.

13          Do you remember?

14  A.  I'm sorry; I was what?

15  Q.  I'm sorry.  You had a stack of documents that you showed

16  Mr. Benton during the interview session on July 21st and 22nd;

17  is that correct?

18  A.  Is that something you handed to me?

19  Q.  I'm sorry?

20  A.  Is that something you handed to me?

21  Q.  No, no, no.  Let me back up.

22          On the July 21, 2014, grand jury prep session --

23  A.  Yes.

24  Q.  -- you had a stack of documents that you showed Mr. Benton?

25  A.  Yes, that's correct.

1  Q.  And you had mentioned that during the sessions Mr. Benton

2  actually and his counsel took those documents home with them.

3         Do you recall saying that?

4  A.  I don't recall specifically whether Mr. Benton and his

5  counsel had the documents or whether we allowed time for

6  Mr. Benton's counsel to take specific notes and then left the

7  documents with us.

8  Q.  Okay.  All right.

9  A.  I don't remember that.

10 Q.  And as you look at the interview notes, did you -- did you

11 notice that the sessions were on July 21st and 22nd, but the

12 notes were not typed up until February 27, 2015 and April 7,

13 2015 -- did you learn what took so long to have those typed up?

14 A.  Actually, that's incorrect.  The notes were typed up within

15 a day or two of the actual proffer session.

16 Q.  Okay.

17 A.  They were not loaded into our system until that February

18 date.  That's two different dates.

19 Q.  Okay.  And what does that mean; they weren't loaded into the

20 system?

21 A.  So the FBI now has a computerized system for our records,

22 and when an agent goes in to type a 302, we have a database that

23 we go in, we can pull up a standard form, start typing our

24 report.  If there are other people who are at the interview, you

25 can collaborate on the document through that system.  So each

1  agent can have access to it and make changes along with the

2  other agent, and then when it becomes finalized to the point

3  where they want to submit that to the supervisor, that is done,

4  and then the supervisor reviews it and approves it, and it is

5  uploaded into our system.

6  Q.  Can you tell the jury when the notes were actually typed up?

7  Can you tell from that?

8  A.  I can look --

9  Q.  Is that date on there?

10  A.  So the 7/21/2014 proffer session was drafted on 7/22/2014.

11          And the 7/22/2014 proffer session was drafted on

12  7/25/2014.

13  Q.  Now, after those sessions were over, Mr. Benton was not

14  afforded any time to either review the 302s or to change them,

15  was he?

16  A.  No.

17  Q.  Is that something the FBI refuses to do or does not do?

18  A.  That's not a policy that the FBI has to show a witness a 302

19  and allow them to change.

20  Q.  And there's no exception to that?

21  A.  I have not ever heard that happening.  I'm not saying

22  there's not an exception.  I have not had that happen in my

23  experience.

24  Q.  I'm going to show you a document.  I'm going to have you

25  read the highlighted portion.  This is a document that says it's

1  written by you --

2  A.  Okay.

3  Q.  -- dated 11/28.

4        Your Honor, I'm not moving this into evidence.

5  A.  Okay.

6  Q.  Do you stand by your answer --

7  A.  Yes.

8  Q.  -- that you never allow it?

9  A.  Yes.  We don't edit the document as it's written.  Those

10 previous 302s that I'm referring to in this document were not

11 edited.  They were clarifications made in this follow-up

12 document.

13 Q.  But you didn't give that opportunity to Mr. Benton; is that

14 right?

15 A.  No.

16 Q.  But you did give it to Mr. Sorenson; is that correct?

17 A.  In that instance, yes.

18 Q.  Is there a -- do you have a policy that the world should

19 know about how that is decided?

20 A.  No, there's no FBI policy on how that's decided.  It's

21 decided on a case-by-case basis, depending on the witness,

22 depending on the proffer session, where the witness stood with

23 whether they were willing to have conversations or whether they

24 were supposed to be going to the grand jury, not going to the

25 grand jury.  A lot of factors went into that.

1   Q.  Is it your decision or somebody else's whether to allow a

2   clarification?

3   A.  That would be a decision that would be made with the entire

4   team, so it would be among the FBI agents and the government

5   attorneys.

6   Q.  With Mr. Sorenson, who made that decision?

7   A.  I do not recall who made that decision.  It would have been

8   a collaborative decision among the FBI agents and the

9   government's attorneys.

10  Q.  This was a meeting -- this is a decision that apparently was

11  made on September 24th.

12          Do you want to see this again?

13  A.  Yes.

14          MR. KRAVIS:  I'm sorry.  May I approach to see it as

15  well?

16          MR. HOWARD:  Sure.

17          (Pause.)

18  A.  Yes.  So I remember this specifically.  This was something

19  that we asked for Mr. Sorenson's clarification because there was

20  some question as to whether we received the right answer or

21  reflected something improperly that he said.

22  BY MR. HOWARD:

23  Q.  Okay.  And who made the decision -- well, in this instance,

24  who made the decision to allow Mr. Sorenson to revisit, if I can

25  use that word, some of his answers?

1  A.  Again, I don't know specifically with regard to this, but it

2  would have been something that would be discussed between the

3  agents, including myself, and the government attorneys.

4  Q.  But you don't remember in this instance who those persons

5  were?

6  A.  I don't remember specifically the participants, no.

7  Q.  Do you remember what it was about his proffer session that

8  you wanted clarified?  Is that supposed to be reflected here?

9  A.  Yes, correct.  Anything reflected in here from that

10  paragraph would be something that we specifically -- like this

11  one paragraph here is with regard to this clarification, and

12  then I believe there's a follow -- one more -- this is a

13  separate 302.

14  Q.  That's a different --

15  A.  That's a different page.  I don't have the second page to

16  this, but I would say generally this statement here about him

17  clarifying, what followed that would be his specific

18  clarification --

19  Q.  All right.

20  A.  -- on that question.

21  Q.  Now, do you remember yesterday you were shown some documents

22  by Mr. Kravis?

23  A.  Yes.

24  Q.  And you were asked by Mr. Kravis -- let me back up.  And I

25  apologize.  I'm going to put this up on the Elmo.

1          Your Honor, this is Government Exhibit 67.  I believe

2   it's in evidence.

3          Can you see that?

4   A.  Yes.

5   Q.  Do you remember that document?

6   A.  Yes.

7   Q.  And do you remember that being shown to you yesterday by

8   Mr. Kravis?

9   A.  Yes.

10  Q.  And do you remember yesterday Mr. Kravis asked you in the

11  interview that you conducted with Mr. Benton in July of 2014,

12  did you ask Mr. Benton about the -- the question is, these

13  documents.

14         Do you remember that?

15  A.  Well, I would have to know specifically what Mr. Kravis was

16  asking the question to know about, what these documents refer

17  to.

18  Q.  Let me read it again because you answered it yesterday.

19  A.  Okay.

20  Q.  It says, Now, in the interview that you conducted with

21  Mr. Benton in July of 2014, did you ask Mr. Benton about these

22  e-mails about the $25,000 wire?

23  A.  We did ask Mr. Benton about e-mails regarding the $25,000

24  wire, yes.

25  Q.  And he said "these e-mails."  And this was one of them.

1            Do you remember that?

2   A.  No, I don't remember that.

3   Q.  Let me back up.  You do remember this document?

4   A.  I do remember this document.  This was not a document that

5   we asked Mr. Benton about.  We did not have this document at the

6   time that we were questioning Mr. Benton.

7   Q.  So it's your understanding that when you asked Mr. -- when

8   you answered Mr. Kravis yesterday about these e-mails, did you

9   understand that this was one of these e-mails?

10  A.  No.  Mr. Kravis had asked me to read this e-mail.  I don't

11  believe this was the e-mails that he was asking when he said,

12  did you show Mr. Benton these e-mails about the $25,000 wire.

13  Q.  So you meant every other e-mail except this one; is that

14  what you're saying?

15  A.  Again, I would have to go back through one by one the

16  specific e-mails about a $25,000 wire, but this was not one of

17  the e-mails.

18  Q.  Well, the e-mails that you showed Mr. Benton are there in

19  the notebook.  If you can look under -- yes, look under 14, I

20  believe.

21            Do you see the yellow sheet?  Yes.  Look at that.  No.

22  Do you want me to find it for you?

23  A.  Sure.

24  Q.  Did you look and see if you showed him -- or you know you

25  didn't show him that?

1    A.  Yes.  I can look through.

2    Q.  Yes.

3                (Pause.)

4                Have you finished looking through, Agent LoStracco?

5    A.  Yes.

6    Q.  And Government Exhibit 67 I trust is not there; is that

7    correct?

8    A.  No, it is not.

9    Q.  And yesterday when you answered Mr. Kravis's question, the

10   jury was at least misled; would that be correct?

11   A.  No.

12   Q.  I'm going to show you what's been marked as Government

13   Exhibit 61.  Give me a minute here.

14               (Pause.)

15               I'll show it to you -- do you remember this exhibit?

16               MR. BINNALL:  Your Honor, I'm going to renew my

17   objection about this exhibit being offered, 403 as to

18   Mr. Kesari.

19               THE COURT:  Is this exhibit in?  I don't remember 61.

20               MR. BINNALL:  It is in evidence.

21               MR. HOWARD:  It is in.

22               THE COURT:  All right.  The objection is overruled.

23   BY MR. HOWARD:

24   Q.  Do you remember that exhibit?

25   A.  I remember this exhibit.

1   Q.  Is this an exhibit -- you just looked through the documents.

2   Is this an exhibit that you showed Mr. Benton during his grand

3   jury prep session?

4   A.  No.

5   Q.  I'm going to show you what's been marked as Government's

6   Exhibit 75.

7           MR. HOWARD:  Your Honor, I believe this is in

8   evidence.

9           Isn't it?

10          THE CLERK:  Yes.

11          MR. HOWARD:  Your Honor, this is in evidence.

12  BY MR. HOWARD:

13  Q.  Do you recognize that?

14  A.  Yes.

15  Q.  And you had been asked yesterday by Mr. Kravis if on this

16  exhibit and some others whether Mr. Benton had changed his

17  answers.

18          Do you remember that?

19  A.  Yes.

20  Q.  And you answered no; is that correct?

21  A.  That's correct.

22  Q.  Would you take a look at the July 22nd 302.

23  A.  Yes.

24  Q.  Would you look at the bottom of page 4.

25  A.  Yes.

1  Q.  As you look at the bottom of page 4, do you see a reference

2  to this exhibit?

3  A.  Yes.

4  Q.  And Mr. Benton answers your question -- or let me ask you

5  this.

6          Do you see a question there?  I guess you do.

7  A.  Um --

8  Q.  Just -- without mentioning any names, do you see a question

9  there?  Looking at the sentence --

10 A.  It just says, Benton was shown an e-mail chain, uh-huh.

11 Q.  All right.  And this exhibit was shown to Mr. Benton on

12 July 22nd, and if you'll turn to the next page, would it be fair

13 to say that you showed him this at the end of your -- at the end

14 of the session on July 22nd?

15 A.  Of day 2, yes.

16 Q.  Of day 2.  And Mr. Benton did not return?

17 A.  Mr. Benton did not --

18 Q.  He did not go in to the grand jury?

19 A.  Correct.

20 Q.  He did not return for an interview with the FBI and the

21 government agents; is that correct?

22 A.  Correct.

23 Q.  This was shown to him at the end of the session on July

24 22nd?

25 A.  Yes.

1  Q.  And after that the session ended?  You remember that, right?

2  A.  It ended shortly after this.  There was some discussion

3  about whether or not Mr. Benton would testify before the grand

4  jury the following day.

5  Q.  But Mr. Benton was never given an opportunity to change or

6  amend his answers; isn't that correct?

7  A.  I would say if Mr. Benton had reached out to the FBI --

8  Q.  Ma'am, I'm asking you, did you give him -- did you give him

9  a chance to change or amend his answers in the session?

10  A.  In this session?

11  Q.  Right, on July 22nd.

12  A.  I asked him the question, we showed him the document, he

13  answered the document.

14  Q.  Right.

15  A.  If Mr. Benton had further clarification, he could have

16  contacted us through his attorney.

17  Q.  Ma'am, is there any place in this document that shows that

18  you had given him a second chance to change or amend his

19  answers?  That's a "yes" or "no" answer.  Is there something or

20  is there not something?

21  A.  In this document?

22  Q.  Yeah.

23  A.  I would say between the two days there was ample opportunity

24  for Mr. Benton to respond to the questions and to give a

25  different answer.

1    Q.  You know, and I really appreciate your training, you're

2    pretty good at this, but I would like you to answer the question

3    I asked.

4              MR. KRAVIS:  Objection.

5              THE COURT:  The question was, is that recorded

6    anywhere in those two documents?

7              MR. HOWARD:  Yes.

8    BY MR. HOWARD:

9    Q.  Yes or no, when you look at that document, you gave -- you

10   showed it to him at the end of the session; is that correct?

11   A.  That is correct.

12   Q.  And at the end of the session, you apparently asked him

13   questions about that document; is that correct?

14   A.  Yes.  We showed him the document and asked him to read it

15   and give us an explanation.

16   Q.  And is that a "yes"?

17   A.  Yes.

18   Q.  And at the end of that session, you asked no other questions

19   about it; isn't that correct?

20   A.  That document, no.

21   Q.  Isn't that correct, ma'am?

22   A.  We asked him other questions, not about that document.

23   Q.  You did not ask him anything else about that document; is

24   that correct?

25   A.  That's correct.

1   Q.  And at the end of the -- and you made a representation that

2   Mr. Benton did not change his answers as if he was refusing to

3   change his answers; isn't that correct?

4   A.  I made the representation that Mr. Benton did not change his

5   answers through the two days of the proffer session, correct.

6   Q.  But you didn't ask -- I'm not going to argue with you about

7   that, and I apologize, But you only showed it to him at the end

8   of the second day; isn't that right?

9   A.  That particular document, correct.

10            MR. HOWARD:  Thank you.

11            Your Honor, if I could have one second?

12            THE COURT:  Yes.

13            (Pause.)

14            MR. HOWARD:  Your Honor, thank you.

15            We're finished with our questioning.

16            THE COURT:  Mr. Binnall?

17            MR. BINNALL:  Thank you.

18                        CROSS-EXAMINATION

19   BY MR. BINNALL:

20   Q.  Good afternoon, Agent LoStracco.

21   A.  Good afternoon.

22   Q.  You looked through the e-mails on Mr. Kesari's computer,

23   correct?

24   A.  I did.

25   Q.  And do you know how many e-mails were from his Ron Paul for

1  President e-mail account?

2  A.  I do not, no.

3  Q.  Do you have any reason to disagree with me if I said there

4  were over 31,000 e-mails in his Ron Paul for President account

5  alone?

6  A.  There was several different e-mail accounts in the laptop.

7  I do not know the number of documents for each e-mail account.

8  Q.  Okay.  Do you know how many e-mails he received on

9  December 26, 2011?

10 A.  No, I do not.

11 Q.  Would you have any reason to disagree if I said it was about

12 196?

13 A.  Again, I would have to look to identify that.

14 Q.  And for December 27th, would you have any reason to disagree

15 with me if I told you that there were 352 e-mails in his e-mail

16 account from December 27, 2011?

17 A.  Again, I would have to look back at the computer and see how

18 many e-mails there were on that day.

19 Q.  But if I told you, you wouldn't disagree with me, correct?

20         MR. KRAVIS:  Objection.

21         THE COURT:  Overruled.  Is it a big number, do you

22 know that?

23 BY MR. BINNALL:

24 Q.  Is it a big number?

25 A.  There were several e-mails in the computer, yes.  Again, I

1  don't know whether there were 80 e-mails that day or 300 e-mails

2  that day.  I did not look per day to see how many e-mails there

3  were.

4  BY MR. BINNALL:

5  Q.  But these were days that you were investigating, correct?

6  A.  They were days that I was looking at, yes, among others.

7  Q.  And you didn't check to see how many other e-mails he had

8  gotten throughout the day?

9  A.  It depended on the day and depended on what we were looking

10  at.

11  Q.  But for these particular days, around December 26th through,

12  say, the 29th, you didn't check?

13  A.  I remember looking in general and seeing that there were a

14  lot of e-mails sent around that time period.  I do recall that.

15  Q.  There were a lot of e-mails?

16  A.  Yes.

17  Q.  Okay.

18  A.  Again, I don't know if it was a hundred or whatever.  I

19  don't know the exact number or approximation.

20  Q.  Would you have any reason to disagree with me on

21  December 28th that there was about 276 e-mails?

22  A.  Again, I don't know exactly.

23  Q.  How about December 29th, about 254, any reason to disagree

24  with that?

25  A.  Again, I don't know.  I'm sorry.

1   Q.  I have a very good paralegal and she brought something to my

2   attention that I want to bring to yours.

3   A.  Okay.

4   Q.  This is Government's Exhibit 31 that's already in evidence.

5           All right.  So this is an e-mail chain that we looked

6   at earlier.  Do you remember looking at this e-mail chain

7   earlier?

8   A.  Yes.  Do you mind just expanding it so I can see the entire

9   document for a moment?

10  Q.  Absolutely.

11  A.  Wow, that's tiny.

12  Q.  I understand.  Let me know if there's a particular area if

13  it would help if I enlarge it.

14  A.  If you could just enlarge on the top portion.  Sorry.

15          Yes.

16  Q.  Do you remember this one?

17  A.  Yes.

18  Q.  Okay.  We're going to look at a part in the chain below.

19          This is an e-mail chain from December 26, 2011,

20  correct?

21  A.  Yes, correct.

22  Q.  And the first e-mail on this chain on this page is

23  December 26th, sent at 8:28 a.m.?

24  A.  Yes, correct.

25  Q.  And then Mr. Kesari -- I'm sorry, Mr. Benton responds at

1  11:19 a.m.?

2  A.  Correct.

3  Q.  And then Mr. Tate responds to that 11:19 a.m. e-mail at

4  10:44 a.m.?

5  A.  Yes, correct.

6  Q.  Do you have any idea how someone could respond to an 11:19

7  a.m. e-mail at 10:44 a.m.?

8  A.  Possibly Mr. Tate lived in a different time zone.

9  Q.  Suffice it to say, you don't know exactly how time stamps

10  work on e-mail servers?

11  A.  No.  I'm not an expert on time stamps on e-mail servers.

12  Q.  You investigated this case as the case agent for most of the

13  investigation, correct?

14  A.  Yes, that's correct.

15  Q.  In fact, as we've already discussed, you're here as the case

16  agent today?

17  A.  Yes, that's correct.

18  Q.  And the facts you investigated, your investigation was

19  thorough, correct?

20  A.  Yes.

21  Q.  And you knew as a result of your investigation that

22  Mr. Sorenson worked on behalf of Michelle Bachmann's effort in

23  2011, correct?

24          MR. KRAVIS:  Objection; calls for hearsay.

25          THE COURT:  Overruled.

```
 1              Answer the question if you can.
 2  A.  I knew that Mr. Sorenson had worked on behalf of the
 3  Michelle Bachmann Presidential Campaign, yes.
 4  BY MR. BINNALL:
 5  Q.  And you knew that he was being paid on behalf of
 6  Ms. Bachmann during 2011, too, correct?
 7              MR. KRAVIS:  Objection; calls for hearsay.
 8              THE COURT:  Overruled.
 9              Answer the question.
10  A.  Yes.
11  BY MR. BINNALL:
12  Q.  And you knew that he was not being paid directly by the
13  Bachmann Campaign as well, correct?
14              MR. KRAVIS:  Objection; calls for hearsay.
15              THE COURT:  Overruled.
16              Answer the question.
17  A.  Yes.
18  BY MR. BINNALL:
19  Q.  And you knew that Mr. Sorenson had a company called
20  Grassroots Strategy during that time period, right?
21  A.  Yes, that's correct.
22  Q.  And you knew that during his time on the Bachmann Campaign
23  there was a gentleman named Guy Short that was involved with
24  Mr. Sorenson?
25  A.  There was a gentleman named Guy Short.  He was the
```

1  consultant for the Michelle Bachmann Presidential Campaign,

2  correct.

3  Q.  Thank you.

4        And Mr. Short, his consulting company was called

5  C & M Strategies, correct?

6  A.  Yes.

7  Q.  And C & M Strategies is the one that paid Mr. Sorenson for

8  his work on behalf of Mr. Bachmann, correct -- I'm sorry; of

9  Congressman Bachmann, correct?

10        MR. KRAVIS:  Objection; lack of foundation, calls for

11  hearsay.

12        THE COURT:  Overruled.

13        Answer the question.

14  A.  Yes, Mr. Sorenson was paid through C & M Strategies.

15  BY MR. BINNALL:

16  Q.  And you knew that the Bachmann Campaign never forwarded any

17  payments to Mr. Sorenson or his company, Grassroots Strategy,

18  correct?

19        MR. KRAVIS:  Objection; lack of foundation, calls for

20  hearsay.

21        THE COURT:  Overruled.

22        Answer the question.

23  A.  That is correct.

24  BY MR. BINNALL:

25  Q.  And in the course of your investigation, you learned that

1   the Bachmann Campaign received a legal opinion about whether

2   that payment arrangement was authorized by law, correct?

3           MR. KRAVIS:  Objection; lack of foundation, relevance,

4   calls for hearsay.

5           MR. BINNALL:  Not offering it for the truth of the

6   matter asserted.

7           THE COURT:  Sustained.

8   BY MR. BINNALL:

9   Q.  In the course of your investigation, did you investigate

10  whether payments through intermediaries was a normal part of

11  political campaigns?

12  A.  Yes.  I mean, it's something that we looked into, I looked

13  into, whether a subcontractor is normally paid by a presidential

14  campaign, yes.

15  Q.  And what did you find?

16  A.  That there are often contractors who are paid by

17  presidential campaigns and sometimes they subcontract out work

18  to other people.

19  Q.  And you discovered that there are many times, they call them

20  super vendors that will be paid large amounts of money through

21  campaigns and then many of the campaign vendors are paid through

22  those sub vendors so they're not reported directly on the FEC

23  reports?

24  A.  That's a multifaceted question.  I don't know what super

25  vendor is necessarily; but there are times when there is a group

1  paid by a presidential campaign or another campaign and that

2  group hires out a sub vendor to do some of the work.

3  Q.  Did you look specifically into -- in the 2012 Presidential

4  Campaign whether the Romney Campaign did that?

5  A.  I'm sorry; whether the --

6  Q.  -- Romney Campaign did that?

7  A.  No, I did not.

8  Q.  Did you look into whether the Romney Campaign paid over 200

9  million dollars to some of these super vendors?

10  A.  I did not.  I did not have any allegations to do so.

11  Q.  Did you look into whether the Obama Campaign participated in

12  such an arrangement?

13  A.  Again, no.  I didn't have any allegations to do that.

14  Q.  Do you look into whether the Obama Campaign paid a company

15  called Bully Pulpit Interactive, one of the super vendors, over

16  72.6 million dollars as, again, an umbrella under?

17  A.  Once again, no, I didn't receive any specific allegations

18  against the company that you just said.

19  Q.  And for the Romney Campaign, you didn't look into a company

20  called American Rambler that did the same thing?

21  A.  No.  Again, I didn't receive any specific allegations.

22  Q.  In the 2012 campaign, did you look into whether former

23  Speaker of the House Newt Ginrich's Campaign paid former

24  Congressman J. C. Watts as a -- to endorse his 2012 campaign?

25  A.  Again, no, I didn't receive any specific allegations about

1  that.

2  Q.  And how about New Hampshire Mayor Ray -- I'm not even going

3  to try and say it; I'm going to spell it -- W-I-E-C-Z-O-R-E-K to

4  endorse Mr. Ginrich's 2012 Campaign?

5  A.  Again, no.  I didn't have any specific allegation that there

6  was any impropriety.

7  Q.  So you wouldn't know if the Ginrich Campaign paid them

8  through other entities so that never showed up on FEC reports?

9  A.  I wouldn't have any justification to look into that without

10  having specific allegations.

11          MR. BINNALL:  One moment.

12          (Pause.)

13          MR. BINNALL:  No further questions.

14          THE COURT:  Mr. Kravis?

15          MR. KRAVIS:  Thank you, Your Honor.  Briefly.

16                  REDIRECT EXAMINATION

17  BY MR. KRAVIS:

18  Q.  Special Agent LoStracco, I just have a few final questions

19  for you.  I want to begin with what's been marked and entered

20  into evidence as Government's Exhibit 87c, if we could get that

21  up on the screen.

22          You were asked some questions on cross-examination by

23  Mr. Howard about this document and where you came across it in

24  the course of your investigation.

25          Do you remember those questions?

1   A.   Yes.

2   Q.   Okay.  First of all, this version of the document that we

3   see, Government's Exhibit 87c, where did this come from?

4   A.   This came from Dimitri Kesari's computer.

5   Q.   This e-mail exchange in Government's Exhibit 87c, the May 2,

6   2012 exchange between Dimitri Kesari and Jesse Benton, did you

7   come across it anywhere else in your investigation?

8   A.   Yes.

9   Q.   Where?

10  A.   It is also within the production from AOL pursuant to a

11  warrant for dimitrikesari@aol.com -- or dkesari, I apologize.

12  Q.   I'm going to ask you now about Government's Exhibit 75.

13           Mr. Howard concluded his cross-examination by asking

14  you about the circumstances under which Mr. Benton was shown

15  this document, this e-mail exchange in his FBI interview.

16           Do you remember those questions?

17  A.   Yes.

18  Q.   Okay.  Do you remember, was Mr. Benton shown this document,

19  this e-mail on just one day of the session or both days, or do

20  you not remember now?

21  A.   I don't remember now.

22  Q.   Is there anything that would refresh your recollection?

23  A.   Yes, if I could look back at the 302 from both the 21st and

24  the 22nd of July.

25  Q.   I'm going to show you what's been marked as Government's

1  Exhibit 164.  I'm going to ask you to turn to the last page --

2  first of all, what is Government's Exhibit 164?

3  A.  This is the 302 of the proffer session done of Jesse Benton

4  on July 21, 2014.

5  Q.  I'm going to ask you -- I'm going to direct your attention

6  to page 15 of the exhibit to the third paragraph from the

7  bottom.  I'm just going to ask you to read that to yourself.

8  Don't read anything out loud.  Look up at me when you've had a

9  chance to review it.

10         (Pause.)

11         Does that exhibit refresh your recollection about

12  whether Mr. Benton was shown this e-mail, the February 7, 2012

13  e-mail exchange with Dimitri Kesari in the first day of his

14  proffer session?

15  A.  He was.

16  Q.  I show you now what's been marked for identification as

17  Government's Exhibit 165.

18         What is Government's Exhibit 165?

19  A.  This is the 302 written of the proffer session of Mr. Jesse

20  Benton on July 22, 2014.

21  Q.  I'm going to turn your attention to page 4 of the exhibit

22  and turn your attention to the last full paragraph.  Read it to

23  yourself.  Don't read anything out loud.  Look up at me when

24  you've had a chance to review it.

25         Does that document refresh your recollection about

1    whether Mr. Benton was shown this e-mail on the second day of

2    his proffer session?

3    A.   Yes.  He was shown the e-mail the second day of the proffer

4    session, on that occasion and also on the occasion that

5    Mr. Howard pointed out.

6    Q.   So he was shown that February 7th e-mail on both days; is

7    that right?

8    A.   Yes, that's correct.

9    Q.   You were asked some questions on cross-examination about

10   things that you learned about Guy Short and the Bachmann

11   Campaign during the course of your investigation.

12           Do you remember those questions?

13   A.   Yes.

14   Q.   Is Guy Short the subject of an ongoing federal criminal

15   investigation?

16   A.   Yes.

17   Q.   You were asked some questions about your investigation into

18   the practices of other campaigns during the 2012 Presidential

19   Election.

20           Do you remember those questions?

21   A.   Yes.

22   Q.   Other than the instances we've been discussing here, did you

23   come across any allegations of a presidential campaign

24   attempting to conceal the true recipient of an expenditure by

25   routing it through a third party?

1  A.  I did not.

2  Q.  You were asked on cross-examination some questions about

3  Special Agent Sahaghian's linguistic skills.  You work with

4  Special Agent Sahaghian?

5  A.  Yes.

6  Q.  For about how long?

7  A.  We worked together for I believe four or five years.

8  Q.  Does Special Agent Sahaghian speak English?

9  A.  Yes.

10  Q.  Has she ever in your dealings with her had trouble doing her

11  job because of her ability to speak English?

12  A.  No, she has not.

13  Q.  When you speak to Special Agent Sahaghian, do you speak in

14  English?

15  A.  Yes.

16  Q.  She understands you okay?

17  A.  Absolutely.

18  Q.  You were asked on cross-examination about whether Mr. Benton

19  appeared to be more prepared on the second day of his interview.

20          Do you remember those questions?

21  A.  Yes.

22  Q.  Did it seem to you like Mr. Benton was more prepared on the

23  second day of the interview?

24  A.  Yes.  He had had time to review documents and speak with his

25  attorney.

1  Q.  And seeming more prepared, having the opportunity to have

2  reviewed the documents, what, if anything, did Mr. Benton tell

3  you on the second day of the interview about whether or not he

4  was aware of payments to Senator Sorenson through the Ron

5  Paul -- from the Ron Paul Campaign, either directly or through a

6  third party?

7  A.  Mr. Benton said that he was not aware of Mr. Sorenson being

8  paid directly or indirectly by the Ron Paul Presidential

9  Campaign.

10 Q.  He said that on day 2?

11 A.  Yes.

12 Q.  You were asked some questions on cross-examination about

13 witnesses being given the opportunity to clarify their

14 statements to the FBI.

15         Do you remember those questions?

16 A.  Yes.

17 Q.  Has Mr. Benton ever asked for an opportunity to clarify his

18 statements from the July 21st, 22nd, 2014 interview?

19 A.  No, he has not.

20 Q.  Finally, you were asked some questions about who exactly was

21 asking which questions at what point in the 2014 interview.

22         Do you remember that line of questioning?

23 A.  Yes.

24 Q.  Who was it that asked Mr. Benton whether he was aware of the

25 payments from the campaign to Senator Sorenson?  Who asked that

1  question?

2  A.  I did.

3  Q.  Who was it that showed Mr. Benton those documents, the

4  February 7, 2012 e-mail, the May 2, 2012 e-mail, and his e-mail

5  about the $25,000 wire?  Who showed him those documents?

6  A.  I showed him the documents.

7  Q.  As you sit here today, do you remember the answers to the

8  questions that you asked Mr. Benton about whether he was aware

9  of the payments from the campaign to Senator Sorenson?

10         Do you remember Mr. Benton's answers to your

11  questions?

12  A.  Yes.

13  Q.  And why is it that you are able, as you sit here today, to

14  remember Mr. Benton's answers to those particular questions?

15  A.  Because I asked very direct questions.  I remember exact

16  wording that he used, in some cases, to answer those questions.

17  I asked him several times throughout day 1 and day 2 of the

18  proffer session.  I also had notes and we have a 302.

19         MR. KRAVIS:  No further questions.

20         THE COURT:  Mr. Howard?

21         MR. HOWARD:  One second, Your Honor.

22         (Pause.)

23                    RECROSS-EXAMINATION

24  BY MR. HOWARD:

25  Q.  Agent LoStracco, you just said to Mr. Kravis that you're

1  able to answer the questions -- you're able to answer

2  Mr. Kravis's questions because you asked very direct questions,

3  you had notes and you had your 302.  Did I summarize that

4  correctly?

5  A.  Mr. Kravis had asked whether I was able to recall what

6  Mr. Benton said in response to my questions, yes.

7  Q.  All right.  And if I am -- if I could, I believe you still

8  have the documents up there, if you could look at the 7/22 302,

9  looks like it's on page 1.  And if you could look at the second

10  paragraph where it says, Mr. Benton was not aware, and there's

11  no mystery there, that Benton was not aware of payments to the

12  Ron Paul Campaign.

13         You didn't write down those questions, did you?  You

14  didn't write down the question --

15  A.  If you could give me a moment to review that.

16  Q.  Sure.  I apologize.  Go ahead.

17         (Pause.)

18  A.  The question is not written into the 302.

19  Q.  Okay.  Thank you.

20         And the question is not in your notes, is it?

21  A.  The question is not.  The question is framed into the

22  answer.

23  Q.  I'm sorry?

24  A.  The question is framed into the way the answer is written in

25  the 302.

1  Q.  You did not write the question down in your notes, did you?

2  A.  I did not write --

3  Q.  That's a question.

4  A.  I did not write the question with a question mark, no.

5  Q.  And you also said to Mr. Kravis that we did not ask to --

6  and I apologize, Your Honor -- that counsel did not ask to

7  clarify any answers.

8          Do I have that correct?

9  A.  After the proffer session ended, I did not hear from

10  Mr. Benton or his attorney about wanting to clarify any of the

11  answers.

12  Q.  Do you remember Mr. Benton and his counsel asking for an

13  opportunity to return to finish working with documents so they

14  could go into grand jury?

15          Do you remember that?

16  A.  I'm sorry, when would that have occurred?  During the

17  proffer session?

18  Q.  That would have -- do you remember that at the very end of

19  the proffer session when everybody was in the room?

20          Do you remember that?

21  A.  Again, I remember a general discussion about whether

22  Mr. Benton would go before the grand jury to provide testimony.

23  Specifically whether Mr. Benton's attorney requested for

24  Mr. Benton to review more documents and come back to give more

25  answers, I don't recall that.

1  Q.  You don't recall that?

2  A.  Not specifically, no.

3  Q.  I'm sorry?

4  A.  Not specifically, no.

5  Q.  Did you ever talk to any of the government attorneys about

6  whether that request was made?

7  A.  I did not.

8          MR. HOWARD:  Okay.  No other questions, Your Honor.

9          THE COURT:  Anything else, Mr. Binnall?

10         MR. BINNALL:  No, Your Honor.

11         THE COURT:  Anything else, Mr. Kravis?

12         MR. KRAVIS:  No thank you, Your Honor.

13         THE COURT:  You're excused.

14         Thank you.

15                              (Witness excused.)

16         THE COURT:  Call your next witness, please.

17         MR. KRAVIS:  Your Honor, at this time, with the

18  court's permission, the government would like to play the

19  testimony of Special Agent Wesley Yoo.

20         THE COURT:  Members of the jury, we have a deposition

21  to play for you now.  A deposition is testimony taken down prior

22  to trial and preserved in writing or videotape.  This one is

23  preserved on videotape for you to watch.  It's really rare to do

24  that in criminal cases, but you'll see immediately why.

25         So the lawyers sent me a transcript of this a week ago

1    or two weeks ago.  I ruled on all of the objections.  As I

2    understand, there might be a couple objections still that

3    haven't been edited out.  So if you wonder why they object and I

4    don't rule, it's because I've already ruled on them and I've

5    overruled those objections.  So you'll just hear a couple of

6    objections that probably won't make a lot of sense, and don't

7    worry about that.

8            So you are to view testimony by deposition to the best

9    of your ability as if it was given here live in open court.

10           Did you have anything else, Mr. Binnall?

11           MR. BINNALL:  I'm sorry, Your Honor.  I just wanted to

12   point out, I think we've cleared it with the government, but due

13   to the way that trial is progressing, we are going to forego the

14   cross-examination part of this for both defendants.

15           THE COURT:  Okay, fine.  So we'll hear whatever the

16   lawyers want to present of this deposition.

17           Go ahead.  You can play that now.

18           (The direct examination from the video deposition of

19   Wesley J. Yoo was played.)

20           MR. BINNALL:  That's all.

21           THE COURT:  So the record can reflect that the direct

22   examination of Wesley Yoo was played.

23           Counsel for the government?

24           MR. KRAVIS:  Your Honor, at this time the government

25   calls Special Agent Gunnar Demarco.

1        THE COURT:  Come forward, sir.  Approach here.  She'll

2   administer your oath.

3        THE CLERK:  Please raise your right hand.

4        GUNNAR DEMARCO, GOVERNMENT'S WITNESS, SWORN

5        THE CLERK:  Please be seated.

6                   DIRECT EXAMINATION

7   BY MR. KRAVIS:

8   Q.  Good afternoon, sir.

9   A.  Good afternoon.

10  Q.  What is your name?

11  A.  Gunnar Thor Demarco.

12  Q.  How do you spell your last name?

13  A.  D-E-M-A-R-C-O.

14  Q.  What do you do for a living?

15  A.  I'm a special agent, forensic examiner for the Federal

16  Bureau of Investigation.

17  Q.  How long have you been a forensic examiner with the Federal

18  Bureau of Investigation?

19  A.  I've been a forensic examiner for approximately five years

20  certified, but I've been doing forensics for another two years

21  prior to that, on-the-job training.

22  Q.  And what did you do before you were a forensic examiner with

23  the FBI?

24  A.  Special agent investigating cyber crimes, as well as working

25  on the joint terrorism task force working international

1  terrorism cases.

2  Q.  What exactly does a forensic examiner with the FBI do?

3  A.  Forensic examiner for the FBI essentially ensures the

4  procedures are in place to obtain digital data or digital

5  information from various devices in a way that nothing is

6  compromised or changed on the device.  We create images of these

7  devices, which is basically a container that contains everything

8  that's on, let's say, a computer.  We have a way of verifying

9  nothing is changed from the beginning to the end.  We also

10  extract information from these containers and provide them for

11  review for case agents to look through the data.

12  Q.  And did you go through a certification process with the FBI

13  to become certified forensic examiner?

14  A.  Yes, I did.

15  Q.  And what did that certification process involve?

16  A.  It involves taking several courses on tools and technologies

17  that we use.  Primarily, we learn the Wintel standard, which is

18  Windows Intel certification learning all about Windows.  Most

19  people know what Windows is.  We go through about approximately

20  a 9- to 18-month course of study, including a filed research

21  paper, mock court testimony, a competency test where we go

22  through and make sure that we are able to competently use the

23  tools to extract data from digital devices.

24  Q.  And at the end of that process, were you certified by the

25  FBI as a forensic examiner?

1  A.  Yes, I was.

2  Q.  Since the time that you were first certified, what have you

3  been doing to keep up with developments in your field?

4  A.  The FBI requires us to maintain our training, continue to

5  progress in the forensics field.  Since I've been Wintel

6  certified, I've also obtained the McIntosh certification, cell

7  phone and GPS certifications, memory forensics certifications,

8  as well as some external certifications from Sans Disk, too.

9  Q.  Do you have to undergo proficiency testing every so often?

10 A.  Yes.  We have annual proficiency testing, and I've passed

11 every annual proficiency test within the bureau.

12 Q.  Have you received any awards from the FBI for your work?

13 A.  Yes, I have.

14 Q.  And about how many electronic devices would you say you've

15 examined in your career with the FBI?

16 A.  Anywhere between two to five hundred devices.

17 Q.  Have you ever been qualified in court before as an expert

18 witness in the field of digital forensics?

19 A.  Yes, I have.

20         MR. KRAVIS:  At this time the government offers

21 Special Agent Gunnar Demarco as an expert in the field of

22 digital forensics.

23         THE COURT:  It's not my practice to comment on the

24 qualifications.  I know that in many jurisdiction you're

25 required to offer someone as an expert.  I believe that that's

1   an issue the jury can determine.  They can object whenever he

2   gives an opinion if they believe the foundation isn't there.

3        MR. KRAVIS:  Thank you, Your Honor.

4   BY MR. KRAVIS:

5   Q.  Special Agent Demarco, I want to start by asking you some

6   questions about the information that you gather from computer

7   data, and to do that I want to turn to what's been marked and

8   entered into evidence as Government's Exhibit 102.

9        Now, we had a chance to read this exhibit earlier, the

10  text of the e-mails in this exhibit earlier today, but I want to

11  ask you about something a little different.  I want to turn to

12  page 2, to the second page of this exhibit, and I want to draw

13  your attention to the information that appears in the bottom

14  third or so of the second page of the exhibit, the information

15  that starts with the words "return-path" on the left-hand side.

16       Do you see the information I'm talking about?

17  A.  Yes, I do.

18  Q.  What is the term that you would use to describe this

19  information?

20  A.  This would normally be called e-mail header information,

21  extended header information.  It can also be considered

22  metadata.

23  Q.  And what is it?

24  A.  This is basically the information that the e-mail uses in

25  order for the e-mail server to send a message across the

1    Internet.  The e-mail header basically puts in all of the spots

2    that the e-mail traverses through the network, kind of like

3    leaving like little bread crumbs so it can return back to where

4    it was sent from and where it was received.

5            Usually an e-mail server -- you know, if a user sends

6    an e-mail from their computer, it gets handed off to their local

7    Internet service provider, let's say Comcast, Verizon, which

8    then coordinates with the mail server.  As you can see in this

9    particular header here, the e-mail message went from the

10   person's local computer, which is signified by that 192.168

11   address there, which is a Comcast address, and it got sent to a

12   mail exchange server with Google, very direct path, very limited

13   header.

14   Q.  So I'm just going to back up and ask you some questions

15   about all of the stuff you just said.

16   A.  Okay.

17   Q.  So just by way of background, when I send an e-mail, type up

18   an e-mail on my computer and press send, e-mail to you, let's

19   say, what is the path that the e-mail takes to get from my

20   computer to you?

21   A.  Okay.  Well, the computer -- every computer device normally

22   has an e-mail client, which is the sending and receiving side of

23   the e-mail.  What happens is you would hit send.  Something is

24   updated in the header saying, okay, you pushed the button that

25   says send.  That will then go to your local service provider,

1   Comcast or Verizon, and that will read the delivery information

2   as to where it needs to go.  It will take whatever route it

3   needs to go in order to get to the e-mail server.  So there can

4   be multiple paths or what they call hops that an e-mail can take

5   to go from point A to point B.  In this case there were very few

6   hops, so it gets to the e-mail server, the e-mail server says,

7   okay, I got the message from Comcast, where is it going?  In

8   this case it's going straight to another address in the same

9   network and then it delivers it to that computer.

10  Q.  Now, is it possible when I type up an e-mail on my

11  computer -- I mean, I write the e-mail and press send, but the

12  message never gets delivered?  Is it possible for that to

13  happen?

14  A.  Yes, it's possible.

15  Q.  What are some reasons why that might happen, why I might

16  type an e-mail on my computer, press send but the message never

17  actually gets routed to the recipient?

18  A.  If you have a network connectivity issue, let's say your

19  local service provider is down or your hardware inside your

20  house is down, like your router, it would not be able to get

21  delivered.

22        Another possible reason is maybe you entered the

23  e-mail address wrong, but then you would get some type of a

24  bounceback message.

25  Q.  Now, in turning to your work on this particular case, were

1    you actually asked to analyze the header information or metadata

2    that appears in this exhibit, the second page of Government's

3    Exhibit 102?

4    A.  Yes, I was.

5    Q.  And in order to do that analysis, did you look at the header

6    or metadata information for any other e-mails associated with

7    this case?

8    A.  Yes.  I looked at the examination from Special Agent Yoo and

9    looked at the e-mails surrounding this.  There were about four

10   or five e-mails that were sent around the same period of time as

11   this particular e-mail.

12   Q.  And I would show defense counsel what's been marked and

13   entered into evidence as Government's Exhibit 159.

14           Special Agent Demarco, I'm going to show you what's

15   been marked and entered into evidence as Government's Exhibit

16   159.

17           And if we could keep 102 up on that screen.

18           Do you recognize Government's Exhibit 159?

19   A.  Yes.

20   Q.  What is Government's Exhibit 159?

21   A.  It's an e-mail found on Kesari's computer.

22   Q.  What is the date of the e-mail?

23   A.  Monday, the 25th of June, 2012.

24   Q.  And that e-mail that's in front of you, Government's Exhibit

25   159, who is the e-mail from?

1   A.   Dimitri Kesari.

2   Q.   Who is the e-mail to?

3   A.   John Tate.

4   Q.   And what is the body of the message?

5          MS. SINFELT:  Excuse me, Your Honor.  I'm sorry, this

6   is 102, and you keep saying Government 159.

7          MR. KRAVIS:  Right.  So he has 159 in front of him on

8   hard copy.  102 is on the screen.  I'll be back to it in a

9   minute.

10          Go ahead.

11   A.   Okay.  It says, "Is was for 6 months.  Sent from my iPhone."

12   Q.   Now I'm going to ask you to turn the document to the second

13   page of Government Exhibit 102, turn again to the return-path,

14   the bottom third.  Yep, there you go, got it.

15          By the way, the exhibit that you have in hard copy in

16   front of you, Government's Exhibit 159, does that exhibit have

17   the same kind of information on it that we see here on the

18   second page of Government's Exhibit 102?

19   A.   Yes.  It has header information as well.

20   Q.   Okay.  Now, I want to ask you just a few questions about

21   your conclusions based on your analysis of this information in

22   these exhibits.  We were talking a moment ago about whether it's

23   possible for me to send an e-mail and press send and have the

24   e-mail, for one reason or another, not actually get delivered to

25   the e-mail server.

1          Do you remember that?

2    A.  Correct, uh-huh.

3    Q.  Are you able to tell by looking at the header information

4    for Government's Exhibit 102, the header information on the

5    screen here, whether that's what happened with this e-mail; that

6    is, whether this e-mail was typed up and sent but never actually

7    delivered?

8    A.  Yes.

9    Q.  And what can you conclude about that?

10   A.  I can conclude that this message was delivered to Mail

11   Exchange operated by Google.

12   Q.  How can you tell that?

13   A.  It's right in the received header up at the top there where

14   you can see that it was sent from Comcast at the local address

15   and was received by the MX.Google.com, which is the mail

16   exchange at Google.

17   Q.  Is there anything about the comparison of the e-mail here on

18   the screen, Government's Exhibit 102, and the e-mail you have in

19   front of you, Government's Exhibit 159, that helps you reach

20   that conclusion about whether this e-mail, 102, was actually

21   sent and delivered to the e-mail server?

22   A.  Yeah.  They were sent within a fairly close proximity of

23   each other.  And the headers -- they were sent so closely

24   together that the IP information or the address information for

25   the local computer, as well as the addresses that are assigned

1  by Google, did not change.  So everything is synched up in terms

2  of header information.

3  Q.  And if this e-mail, Government's Exhibit 102, had been sent,

4  someone would press send but it actually never got -- the e-mail

5  never actually got delivered to the e-mail server, would you

6  expect to see this kind of data that you see in Government's

7  Exhibit 102?

8  A.  No.

9  Q.  Finally -- well, just to be clear, does this header

10  information tell you whether the recipient of the e-mail

11  actually opened or read it?

12  A.  In this particular case, no.

13  Q.  So there's no way to tell from this information whether the

14  recipient opened the e-mail or whether he or she just deleted it

15  without reading it, right?

16  A.  Right.

17  Q.  Finally, I want to ask you about how e-mails get deleted or

18  not deleted from particular electronic devices.

19          Is it possible for a person to have more than one

20  electronic device that's synchronized with the same e-mail

21  account, like a Smartphone and a computer that both use the same

22  e-mail?

23  A.  Yes, absolutely.

24  Q.  And how exactly does that work?  How is it that the

25  different devices are able to keep in synchronization with the

1  same e-mail account?

2  A.  Okay.  They use a technology called in this case IMAP, which

3  is internet messaging access protocol.  It was developed in

4  order to provide an easy way for people to manage multiple

5  devices, laptop, computers, Smartphones.  You want to check

6  e-mail from all those different devices.  You don't necessarily

7  want to be bound by one.  So IMAP was developed as an efficient

8  way to reconcile process between the e-mail server and all your

9  devices.

10         So basically when you send a message with your

11  Smartphone, it gets synchronized with the server, which then

12  synchronizes with whatever other device it accesses.  So if you

13  delete it on one, it will eventually, when the other device

14  talks, it will delete it on the other, and it keeps it all

15  synchronized.

16  Q.  Now, what happens if I have two different electronic

17  devices, like a Smartphone and a computer, that are both

18  synchronized to the same e-mail account, but then I stop using

19  one of the devices, like I get a new computer and stop using the

20  computer say.  What happens to my e-mails then?

21  A.  Well, if you stop using a computer, whatever the state of

22  the e-mails were at the time that you stopped using them would

23  be basically frozen in time.

24  Q.  That's because my computer is no longer synchronizing with

25  the e-mail server, so it's not getting the updates from my

1  phone?

2  A.  Correct.

3  Q.  So, for example, if I had a Smartphone and a computer that

4  were both synchronized with the same e-mail account and then I

5  stopped using the computer, didn't synchronize the e-mail server

6  anymore --

7  A.  Uh-huh.

8  Q.  -- and I deleted an e-mail from my cell phone, is the e-mail

9  still going to be in the computer?

10 A.  Absolutely.

11          MR. KRAVIS:  Thank you.

12          I have no other questions.

13          THE COURT:  We're going to take our mid afternoon

14 recess.

15          We'll come back at 3:15.  See you then.

16          (Recess at 2:55 p.m., until 3:15 p.m.)

17          THE COURT:  Please be seated.

18          So I told you during -- just before Wesley Yoo's

19 testimony that a deposition is testimony taken down under oath

20 prior to trial and preserved like that on videotape.  When the

21 video was cued up, it was cued up after his oath was given.  But

22 he did receive an oath just like the witnesses received it in

23 court here today.  You just didn't see it.

24          Continue with the examination.

25          MR. KRAVIS:  I have no further questions.

1          Thank you.

2          THE COURT:  Mr. -- or Ms. Sinfelt.

3          MS. SINFELT:  Briefly, Your Honor.  Thank you.

4                    CROSS-EXAMINATION

5  BY MS. SINFELT:

6  Q.  Good afternoon, Special Agent Demarco.  How are you?

7  A.  Good.

8  Q.  I'm going to show you what's previously been marked and

9  entered as Government's Exhibit 82.

10          Have you previously been shown this e-mail?

11  A.  No, I have not.

12  Q.  Given that I understand that, could you tell us why there

13  would -- how an e-mail message would be delivered without a

14  recipient?

15  A.  There's ways to deliver e-mails using a blind copy field,

16  bcc.

17  Q.  Okay.

18  A.  So you can have recipients in that way.  But normally you

19  would have somebody in the to field.

20  Q.  And there's no bcc here; is that correct?

21  A.  Not that you can see here.

22  Q.  And is that normally reflected when documents are produced,

23  to your knowledge?

24  A.  Bcc field, it could be in the extended header information.

25  Sometimes the e-mail client only shows the brief headers and

1   then you can expand it depending on what client you use.

2   Q.  So then in order to determine who this went to or if there

3   was a bcc, we would need extended header information; is that

4   correct?

5   A.  Yeah.  You would have to review the additional header

6   information.

7   Q.  And that would also have the metadata of the return-path in

8   the e-mail?

9   A.  Yes.

10          MS. SINFELT:  Thank you.

11          No further questions.

12          THE COURT:  Mr. Binnall?

13                     CROSS-EXAMINATION

14  BY MR. BINNALL:

15  Q.  Good afternoon, Agent Demarco.

16  A.  Good afternoon.

17  Q.  My name is Jesse Binnall.  I represent Mr. Kesari.

18          You talked about how the e-mail was synched with

19  different devices.  But there's also -- there's no way to know

20  from that metadata if it was sent automatically to a particular

21  folder within someone's e-mail box; isn't that correct?

22  A.  That's correct.

23  Q.  So, for instance, there's nothing there to show that it

24  might have just been sent to a spam folder, correct?

25  A.  There's nothing in the e-mail to indicate that.

1         MR. BINNALL:  Thank you so much.

2         THE COURT:  Do you have anything else?

3         MR. KRAVIS:  No.  Thank you, Your Honor.

4         THE COURT:  Thank you, sir.  You're excused.

5         THE WITNESS:  Thank you.

6                                   (Witness excused.)

7         THE COURT:  Call your next witness, please.

8         MR. PILGER:  The United States calls Aaron Dorr, Your

9    Honor.

10         THE CLERK:  Please raise your right hand.

11          AARON DORR, GOVERNMENT'S WITNESS, SWORN

12         THE CLERK:  Please be seated.

13                    DIRECT EXAMINATION

14    BY MR. PILGER:

15    Q.  Good afternoon, sir.

16    A.  Good afternoon.

17    Q.  Please state your name for the record.

18    A.  Aaron Dorr.

19    Q.  Do you spell your first name A-A-R-O-N?

20    A.  I do.

21    Q.  And your last name?

22    A.  D-O-R-R.

23    Q.  Sir, how are you employed?

24    A.  I work for a gun rights organization based in Des Moines.

25    Q.  What's the name of that organization?

1   A.   Iowa Gun Owners.

2   Q.   And do you have a family, sir?

3   A.   I do.

4   Q.   And do you have siblings?

5   A.   I do.

6   Q.   Is one of your siblings Christopher Dorr?

7   A.   Yes, he is.

8   Q.   Do you have children as well?

9   A.   I do.

10  Q.   Now, do you know a person named Kent Sorenson?

11  A.   Yes, I do.

12  Q.   How do you know Kent Sorenson?

13  A.   Kent was a state senator.  When we worked in the Capitol, he

14  was a bill sponsor of our organization and introduced our

15  legislative goals in the Capitol.

16  Q.   When you say we worked in the Capitol, who are you referring

17  to?

18  A.   I'm sorry, the organization I'm employed by.

19  Q.   And when your organization worked with Kent Sorenson as a

20  bill sponsor, what does a bill sponsor do?

21  A.   He would introduce legislation for us.  He would sign, you

22  know, updates to our members, that kind of thing, so work

23  closely with legislative projects.

24  Q.   And are you familiar with the legislative positions that

25  Kent Sorenson held?

1    A.   Yes.

2    Q.   And what were they and when were they?

3    A.   I'm sorry; when were they?

4    Q.   What positions did he hold at what times?

5    A.   He's a very conservative legislator when it came to the

6    Second Amendment, and that was during his time in the Iowa House

7    and then for the Iowa Senate for the years he was in office.

8    Q.   If you know, tell the jurors when Mr. Sorenson served in the

9    Iowa House.

10   A.   2009, 2010.

11   Q.   So that would have been an election in what year?

12   A.   He was elected in 2008, and then his Senate campaign was in

13   2010.

14   Q.   And did he win election to the Senate?

15   A.   Yes, he did.

16   Q.   To your knowledge, when did he serve in the Senate?

17   A.   2011 to when he left the Senate in 2013.

18   Q.   Was Kent Sorenson a friend of yours?

19   A.   Yes, he was.

20   Q.   You mentioned you have a brother, Christopher Dorr, correct?

21   A.   Yes, I do.

22   Q.   Did Christopher Dorr have any particular employment

23   relationship with Mr. Sorenson?

24   A.   Yes, he did.

25   Q.   Please explain that.

1  A.  He was his legislative clerk.  He was his aide who would

2  help him with communications with his district and errands of

3  all sorts.

4  Q.  And was that a paid position that Christopher Dorr held when

5  he was working for Mr. Sorenson?

6  A.  Yes, it was.

7  Q.  Now, turning your attention to the time period of 2011 and

8  2012, was there a campaign for President of the United States

9  going on in Iowa and the rest of the nation at that time?

10  A.  Yes, there was.

11  Q.  Do you know who Kent Sorenson was supporting initially for

12  President of the United States in that election period?

13  A.  Yes, I do.

14  Q.  And who was he supporting initially?

15  A.  Michelle Bachmann.

16  Q.  Do you know whether or not Kent Sorenson held a position

17  with Michelle Bachmann's campaign?

18  A.  Yes, I do.

19  Q.  And do you know what that was?

20  A.  I believe it was chairman of her Iowa Campaign Committee, I

21  believe, was the title.

22  Q.  And during the period that Kent Sorenson was working for the

23  election of Michelle Bachmann and serving as her chair, did you

24  engage in conversations with him about whether he should support

25  a different candidate?  Without saying what was said, did you

1  have those conversations?

2  A.  Yes.

3  Q.  Now, did there come a time where you acted as an

4  intermediary to make a proposal to a campaign involving Kent

5  Sorenson switching his support from Michelle Bachmann?

6  A.  Yes.

7  Q.  And when was that?

8  A.  It was in the fall of 2011.

9  Q.  Is there any document that would refresh your recollection

10  about the exact date you might have communicated with another

11  candidate?

12  A.  Yes.  There would be e-mails that would help refresh my

13  exact dates of that.

14  Q.  Showing the witness an item not in evidence, Government's

15  Exhibit 7.

16          Without reading aloud from this document yet, does

17  this refresh your recollection on when you communicated with

18  another candidate about Kent Sorenson switching his support?

19  A.  Yes.

20  Q.  And now tell the jury, what is this document?  What kind of

21  thing is it?

22  A.  May I reflect from the document?

23  Q.  Yes.

24  A.  This is an e-mail that I sent to John Tate and Jedd Coburn

25  on October 29, 2011 with a proposal.

1   Q.  And who is John Tate?

2   A.  He was one of the top members in the Ron Paul Campaign at

3   that time.

4   Q.  And who is Jedd Coburn?

5   A.  He was a lower level staffer in the campaign.

6   Q.  And did you attach to this e-mail a proposal that runs for

7   three pages following this page?

8   A.  Yes, I did.

9   Q.  And did you send that proposal to those men at the Paul

10  Campaign?

11  A.  Yes.

12  Q.  And did you receive a response from the Paul Campaign?

13  A.  Yes, I did.

14  Q.  And who was that response from?

15  A.  Jesse Benton.

16          MR. PILGER:  At this time the government offers

17  Exhibit 7 in evidence, Your Honor.

18                              (Government Exhibit 7 was

19                              offered in evidence.)              .

20          MR. BINNALL:  Hearsay and relevance for Mr. Kesari.

21          MS. SINFELT:  No objection as to Mr. Benton, Your

22  Honor.

23          THE COURT:  Overruled.  7 is received.

24                              (Government Exhibit 7 was

25                              received in evidence.)

1          MR. PILGER:  So if we could just zoom in on the header

2   at the top of this e-mail.

3          Could we switch to Sanctions?

4          THE CLERK:  So Sanctions, okay.

5   BY MR. PILGER:

6   Q.  Can you see that, Mr. Dorr?

7   A.  Yes, I can.

8   Q.  Again, who is this e-mail from?

9   A.  It's from myself.

10  Q.  And there's an address of freedomenterprisellc, and what's

11  that?

12  A.  That's my e-mail address.

13  Q.  And what's the date?

14  A.  October 29, 2011.

15  Q.  And you sent this to tfc02@aol.com.  To who do you know to

16  use that address?

17  A.  John Tate.

18  Q.  And jeddcoburn@gmail.com, who do you know to use that e-mail

19  address?

20  A.  Jedd Coburn.

21  Q.  What was the subject?

22  A.  Proposal.

23  Q.  And was there an attachment?

24  A.  Yes, there was.

25  Q.  And turning to the second page of the exhibit, was the

1  attachment -- looking at the first paragraph, if we could zoom

2  in.

3         Was it concerning someone named K.S.?

4  A.  Yes.

5  Q.  Who is K.S.?

6  A.  Kent Sorenson.

7  Q.  Please read the first paragraph to the jury.

8  A.  "Kent Sorenson is considering the offer that was first

9  brought to his attention by a national campaign staffer."

10         THE COURT:  Let me stop you there.  A little slower.

11         THE WITNESS:  Yes, sir.  Should I start over?

12         THE COURT:  No.

13  A.  "As Kent Sorenson considers this, he needs to look at what

14  he would need to replace should he leave the Michelle Bachmann

15  campaign.  The following financial requirements are things that

16  he'd be giving up and would need to have matched if he leaves

17  Michelle Bachmann."

18  BY MR. PILGER:

19  Q.  Now, in that paragraph --

20         MR. BINNALL:  Your Honor, just an objection if he's

21  going to read from it, I ask that he not fill in the blanks

22  between the initials.

23         THE COURT:  Well, the jury is watching and they can

24  tell that the initials M.B. were there, and if he asked what

25  M.B. meant, he would have just told you that.  So the objection

1    is overruled.

2    BY MR. PILGER:

3    Q.  Mr. Dorr, in the first paragraph, the second sentence -- I'm

4    sorry; the first sentence, you mentioned an offer that was first

5    brought to his attention by a national campaign staffer.

6              What campaign was that?

7    A.  That was with the Ron Paul Campaign.

8    Q.  And what staffer was that?

9    A.  Dimitri Kesari.

10   Q.  Okay.  Turning your attention to the next paragraph, could

11   you quote for me that whole paragraph, which is about a third of

12   the page.  Could you please start at the beginning and read the

13   caption of the paragraph.

14   A.  "Salary requirements and other financial requirements."

15   Q.  Please proceed.

16   A.  "Kent Sorenson needs to match his current salary of 8,000 a

17   month.  This has been promised to him, even after Michelle

18   Bachmann drops out of the race, for the majority of 2012.  As a

19   result, Kent Sorenson would need to be on payroll into the fall

20   of 2012."

21   Q.  Just wait for the scroll.

22              Please proceed.

23   A.  "Chris Dorr works for and with Kent Sorenson and would leave

24   the Michelle Bachmann Campaign with him.  He would have to have

25   his salary matched (5,000 monthly) through April of 2012, when

536

1   he was currently scheduled to quit the Michelle Bachmann

2   Campaign.  He would need to remain in Iowa.  He would perhaps be

3   able to handle some minor travel out of state, but not much."

4   Q.  And please scroll down.

5         And finish reading that paragraph.

6   A.  "We have established the Iowa Conservatives Fund PAC as an

7   entity that Kent Sorenson will be using to recruit and elect

8   good candidates to the Iowa General Assembly.  (C4 will follow

9   after next legislative session.)  It's Kent Sorenson's

10  leadership PAC.  He would need a donation of $100,000 into this

11  PAC prior to this action."

12  Q.  Okay.  Let's talk about a couple of things in this

13  paragraph.

14        You mentioned -- or you read that your brother, Chris

15  Dorr, would be leaving the Michelle Bachmann Campaign as part of

16  the proposal, correct?

17  A.  Yes.

18  Q.  And so what was Christopher Dorr's role in the Michelle

19  Bachmann Campaign?

20  A.  He was a field staffer -- I don't know the exact title --

21  some sort of field staffer for the campaign.

22  Q.  And to be clear, you're asking for something for your

23  brother in this proposal; is that right?

24  A.  Yes.

25  Q.  And what are you asking for?

1  A.  $5,000 a month as a salary.

2  Q.  And if you would scroll to the top of that paragraph, a

3  little bit higher, there.

4        What did you propose that Kent Sorenson would receive

5  if he made a switch?

6  A.  $8,000 a month.

7  Q.  Okay.  Now, there were more items in this proposal than

8  we're talking about right now; is that right?

9  A.  Yes.

10  Q.  Did you receive a response to this proposal?

11  A.  Yes, I did.

12  Q.  Who was that from?

13  A.  Jesse Benton.

14  Q.  Showing you an item that's not in evidence -- actually it's

15  Exhibit 10.

16        Do you see that on your screen, Mr. Dorr?

17  A.  I do.

18  Q.  What is this document, without saying what it says?

19  A.  This is an e-mail response from Jesse Benton to myself.

20  Q.  And is there anyone copied on it?

21  A.  Yes, there is, John Tate, Jedd Coburn, and Kent Sorenson as

22  well.

23  Q.  And does it concern the proposal we just talked about as

24  reflected in Exhibit 7?

25  A.  Yes.

```
 1              MR. PILGER:  The United States moves Government's

 2    Exhibit 10 into evidence.

 3                             (Government Exhibit 10 was

 4                              offered in evidence.)

 5              MR. BINNALL:  Objection; hearsay as to Mr. Kesari.

 6              MS. SINFELT:  No objection, Your Honor.

 7              THE COURT:  Overruled.  10 is received.

 8                             (Government Exhibit 10 was

 9                              received in evidence.)

10    BY MR. PILGER:

11    Q.  So as we're waiting for that to come up on the monitor, what

12    was the date of this e-mail from Jesse Benton?

13    A.  October 31, 2011.

14    Q.  And what happens on October 31st every year?

15    A.  Halloween.

16    Q.  So on Halloween Jesse Benton wrote you an e-mail.  Did it

17    have a subject?

18    A.  Yes, it did.

19    Q.  And what was the subject?

20    A.  Dr. Paul endorsement.

21    Q.  And the e-mail is addressed first to someone else.  Who is

22    that?

23    A.  Kent Sorenson.

24    Q.  And then the next address in the to line doesn't have a

25    name.  Is that your e-mail address?
```

1   A.  Yes, it is.

2   Q.  And please read this e-mail to the jury in it's entirety.

3          And, Ms. Draughn, if you would zoom in so they can see

4   that and if you can scroll down to the text.  There we go.

5   A.  "Dear Aaron, Kent and Chris,

6          "We are glad to hear you are no longer happy

7   supporting Michelle Bachmann and are considering throwing your

8   support behind Dr. Paul.

9          "Dr. Paul, John and I would all welcome your support

10  and the considerable talent it brings.

11         "The proposal you sent us was, however, surprising.

12  It appeared that you were trying to sell Kent's endorsement for

13  hundreds of thousands of dollars and other in-kind support for

14  future political ventures.  That would be unethical and illegal.

15  Dr. Paul, John and I, would never engage in such dealings.

16         "We have no interest in hurting any of you and plan to

17  keep your proposal confidential, but if details were to get out

18  it would no doubt be damaging to all three of you.

19         "That said, we would be pleased to have your support.

20  If you join our team and lend your efforts to our campaign, we

21  would be happy to employ you at fair market value.  Michelle

22  Bachmann has set that value at 8,000 per month for Kent and

23  5,000 per month for Chris Dorr.  We would plan to keep you on

24  retainer for the duration of the Paul Campaign, however long

25  that may be.  We would expect you both to lend your considerable

1  talents to our winning team in Iowa and, post caucus, in other

2  states across the country.

3        "As for list sharing and future endorsements, we

4  cannot make any quid-pro-quo arrangements.  I can say, however,

5  that your joining our team would solidify our friendship for now

6  and the future and we always try to help our friends.

7        "I hope you will find this agreeable and very much

8  hope you come aboard.

9        "Please respond by COB Wednesday, November 2, and let

10 us know your plans.

11        "Best,

12        "Jesse Benton.

13        "Chairman.

14        "Ron Paul 2012 PCC."

15 Q.  And did you open and read this on Halloween?

16 A.  Yes, I did.

17 Q.  And did you want to respond to it?

18 A.  Yes, I did.

19 Q.  Did you, in fact, respond to it?

20 A.  Yes, I did.

21 Q.  Showing you an item that's not yet in evidence, Government

22 Exhibit 12.

23        Is that your response?

24 A.  Yes, it is.

25 Q.  Who is it to?

541

1   A.  To Jesse Benton and John Tate.

2   Q.  And what form of communication is this?

3   A.  This is an e-mail I sent to them.

4   Q.  And in this response did you direct information at Jesse

5   Benton and John Tate about the Jesse Benton response to you?

6   A.  Yes, I did.

7           MR. PILGER:  The government offers 12 in evidence,

8   Your Honor.

9                           (Government Exhibit 12 was

10                           offered in evidence.)

11          MS. SINFELT:  No objection from Mr. Benton.

12          MR. BINNALL:  Hearsay from Mr. Kesari.

13          THE COURT:  12 is received.

14                          (Government Exhibit 12 was

15                          received in evidence.)

16  BY MR. PILGER:

17  Q.  So we'll just wait for that to come up on the monitor,

18  Mr. Dorr.

19          We won't read all of this, but we'll start at the

20  header, please.

21          This comes from an e-mail address that actually states

22  your name; is that right?

23  A.  Yes, it does.

24  Q.  When did you send it?

25  A.  November 2, 2011.

1  Q.  Who did you send it to?

2  A.  Jesse Benton and John Tate.

3  Q.  And what was the subject line?

4  A.  Dr. Paul endorsement.

5  Q.  Is the subject line referencing whether there's a forwarding

6  or not?

7  A.  Yes.  This is a response to the original e-mail that had

8  that title, Dr. Paul endorsement.

9  Q.  The original e-mail chain starting with Government's Exhibit

10  7 going through 12 and coming now to -- I'm sorry, starting with

11  7, going to 10 and coming out to 12, correct?

12  A.  Yes.

13  Q.  If we could zoom in on the fifth paragraph, please.

14        A little bit further down, please, Ms. Draughn.

15  Starting "I was surprised."

16        Can you read that, Mr. Dorr?

17  A.  Yes.

18  Q.  Please read that paragraph to the jury.

19  A.  "I was surprised at your response.  I certainly didn't

20  intend anything to come across as unethical or immoral.  Please,

21  for my edification, let me know what I said that was illegal so

22  I don't do that in the future."

23  Q.  And continue, please.

24  A.  "Regarding the money, I was simply ascertaining wages for my

25  friends.

1             "Regarding the PAC, that was an idea that I thought

2    would pay long term benefits to many that we all want to see

3    succeed.  Clearly you don't agree, which is fine, but certainly

4    it wasn't done in an attempt to break the rules (as I've had no

5    experience in presidential campaigns, please let me know what

6    part of this was in violation of the rules/law so that I cannot

7    make this mistake in the future).  Neither Kent Sorenson, my

8    brother, or myself would engage in such dealings either - you

9    know my father."

10            "Regarding your time-line of close of business today,

11   I don't believe that's possible.  As was mentioned in the

12   initial communication, Kent Sorenson has a possible Senate

13   leadership vote on November 8 (as I recall) and couldn't do

14   something on this issue until after that."

15   Q.  Just to be clear, at the end of the first paragraph you

16   read, it has a smiley face emoticon, correct?

17   A.  That's correct.

18   Q.  Now, you received an e-mail from Jesse Benton calling your

19   proposal illegal?

20   A.  Yes.

21   Q.  And you had responded with this communication questioning

22   why it was illegal; is that right?

23   A.  Yes.

24   Q.  Did the first e-mail from Jesse Benton on Halloween calling

25   the proposal illegal nevertheless propose a specific deal for

1  the switch of Kent Sorenson's support to Ron Paul?

2  A.  Yes.

3          MS. SINFELT:  It's leading, Your Honor.

4          THE COURT:  It is.  Sustained.

5          Pose a new question.

6  BY MR. PILGER:

7  Q.  What did Mr. Benton say in his response to you in response

8  to the proposal about Kent Sorenson and the Ron Paul Campaign?

9  A.  He had laid out the fact that the market wages having been

10  established by the Michelle Bachmann Campaign for Kent Sorenson

11  was $8,000 a month, and he agreed to pay Christopher Dorr $5,000

12  a month in his e-mail response to me.

13  Q.  And that was the same e-mail response in which he had said

14  to you that the proposal you have is illegal?

15  A.  Yes.

16  Q.  Turning your attention to Government's 13, which is not yet

17  in evidence, Mr. Dorr, do you know what this is?

18  A.  Yes, I do.

19  Q.  Is this a response to the last exhibit that you received

20  from Jesse Benton?

21  A.  Yes, it is.

22  Q.  And when was that response?

23  A.  November 3, 2011.

24  Q.  So a day later?

25  A.  Yes.

1  Q.  And is it addressed to you?

2  A.  Yes, it is.

3  Q.  Is it addressed to anyone else?

4  A.  It's copied to John Tate.

5  Q.  And what's the subject line?

6  A.  Regarding Dr. Paul endorsement.

7          MR. PILGER:  The government offers 13 in evidence,

8  Your Honor.

9                           (Government Exhibit 13 was

10                           offered in evidence.)

11         MS. SINFELT:  No objection as to Mr. Benton.

12         MR. BINNALL:  Same objections as to Mr. Kesari.

13         THE COURT:  Overruled.  13 is received.

14                          (Government Exhibit 13 was

15                          received in evidence.)

16 BY MR. PILGER:

17 Q.  So you have the e-mail string in front of you, and the

18 bottom part of the string is the prior exhibit which you've

19 already read from, correct?

20 A.  Yes.

21 Q.  So just focusing on the text in the very top e-mail that

22 begins Aaron comma, if we could zoom in on that.

23         Can you read that, sir?

24 A.  Yes.  "Aaron,

25         "Thanks for getting back to us.

1          "We'd still be very pleased to have Kent and Chris

2   join our team at the terms we laid out.  We're all friends

3   fighting for the same cause and your senator and your brother

4   would be huge assets.

5          "We are putting together some final touches to our

6   organization, so if we are to add Kent and Chris, we would need

7   to do so rather soon.  We can give it through the weekend for

8   Kent to mull things over, but we'll need to make a final

9   decision on Monday.  Please tell him if he has any other

10  questions he can call Dimitri directly, or you can give him my

11  cell phone.

12         "We're big fans of IGO and plan to work with you often

13  in the future.  We are also interested in pursuing partnership

14  with the Iowa Conservatives Fund, and look forward to discussing

15  this more with you after the primary season.

16         "Best,

17         "Jesse."

18  Q.  And who is Jesse?

19  A.  Jesse Benton.

20  Q.  What is IGO?

21  A.  Iowa Gun Owners.

22  Q.  Is that your organization?

23  A.  Yes, sir.

24  Q.  Who is Dimitri?

25  A.  Mr. Kesari, a Ron Paul staffer.

1   Q.   Do you see Mr. Kesari in the courtroom today?

2   A.   Can you slide over, sir?

3           I see him back there, yes.

4   Q.   And the date of this e-mail again was November 3rd, correct?

5   A.   Yes.

6   Q.   Between November 3rd and November 21st, without saying

7   anything that anyone said to anyone else, did you become aware

8   that there were communications between anyone at the Ron Paul

9   Campaign and Kent Sorenson?

10  A.   Yes.

11  Q.   And were you part of these communications?

12  A.   No.

13  Q.   Who was the person from the Ron Paul Campaign involved in

14  those communications?

15  A.   Dimitri Kesari.

16  Q.   And did that lead you to send an e-mail to Jesse Benton?

17  A.   Yes.

18  Q.   Did that e-mail concern what your role would be going

19  forward and how the campaign should communicate with

20  Mr. Sorenson?

21  A.   Yes.

22  Q.   Turning your attention to what's not yet into evidence,

23  Government's Exhibit 23.

24          Is this an e-mail chain that begins with an e-mail to

25  you from Jesse Benton?

1    A.  Yes.

2    Q.  And does it end with a communication from you back to Jesse

3    Benton copying John Tate and Jedd Coburn?

4    A.  Yes.

5    Q.  And does it address the issue of how the campaign -- does

6    your e-mail address the issue of how the campaign should

7    interact with Kent Sorenson?

8    A.  Yes.

9            MR. PILGER:  The government offers 23 into evidence,

10   Your Honor.

11                              (Government Exhibit 23 was

12                               offered in evidence.)

13           MR. BINNALL:  Hearsay objection for Mr. Kesari.

14           MS. SINFELT:  No objection from Mr. Benton.

15           THE COURT:  Overruled.  23 is received.

16                              (Government Exhibit 23 was

17                               received in evidence.)

18           MR. PILGER:  So as it comes up, Ms. Draughn, if you

19   would focus on the bottom e-mail first.

20   BY MR. PILGER:

21   Q.  Mr. Dorr, can you see that?

22   A.  Yes.

23   Q.  Would you please read it to the jury?

24   A.  Yes.  "Hi Aaron.

25           "Hope you are well.

1           "And, I hope the Senate leadership meetings went well

2    for Senator Sorenson.  With those meetings in the rearview

3    mirror, I thought now might be a good time to revisit Kent and

4    your brother joining our team.  The window is still open, but it

5    will close in the next few days.  We are building for a top

6    finish in the caucus and we'd love to get them on board to help

7    push us over the top.

8           "Please let me know.

9           "Jesse."

10   Q.  And is that a message that you actually received on

11   November 14th?

12   A.  Yes.

13   Q.  And if we could scroll up, is the top e-mail and the last

14   e-mail in this chain your response to that e-mail?

15   A.  Yes.

16   Q.  And it's from yourself on what date?

17   A.  November 21st.

18   Q.  So that's approximately a week later?

19   A.  Yes.

20   Q.  And who did you send the message to?

21   A.  To Jesse Benton.

22   Q.  Who did you copy?

23   A.  John Tate and Jedd Coburn.

24   Q.  What was the subject?

25   A.  Touching base.

550

1   Q.  Could you please read this e-mail to the jury.

2   A.  Yes.  "Jesse,

3          "Pardon my delay, our extended family had a

4   Thanksgiving celebration over this past weekend due to family

5   schedules and I was away from work for a while.

6          "I've tried to pull these sides together without

7   success for some time.

8          "Considering that Dimitri had dinner with Kent at his

9   home over the weekend, I'll assume that you guys are taking a

10  more direct role in this process.  As I'm no longer needed to

11  facilitate a conversation at this point, I'll bow out and let

12  you, John, Dimitri and Kent work this out.

13         "Perhaps you" -- I'm sorry.

14  Q.  I'm sorry.

15         Go ahead.

16  A.  "Perhaps you and I can talk sometime after January 3 about

17  plans for the future.

18         "Aaron."

19  Q.  And who is John?

20  A.  John Tate.

21  Q.  Who is Dimitri?

22  A.  Dimitri Kesari.

23  Q.  Who is Kent?

24  A.  Kent Sorenson.

25  Q.  After the date of this e-mail, were you involved in any

1  negotiations between Mr. Sorenson and the Paul Campaign about

2  him switching his support?

3  A.  No, I was not.

4  Q.  Did there come a time when you knew that Mr. Sorenson had

5  switched his support?

6  A.  Yes.

7  Q.  And when was that?

8  A.  It was all in the news.  Sometime in December of that year.

9  Q.  Do you not remember the exact date right now?

10 A.  I do not.

11 Q.  Was it before or after Christmas?

12 A.  I believe it was after Christmas.

13 Q.  Okay.  And did you see a television report with Megyn Kelly

14 interviewing Kent Sorenson?

15 A.  Yes, I did.

16 Q.  Did you see that in real-time?

17 A.  Yes, I did.

18 Q.  Showing you what's previously been marked as Government's

19 150, have you reviewed the video on this disk?

20 A.  Yes, I have.

21 Q.  Is that a true and accurate copy of the television broadcast

22 you saw with Megyn Kelly and Kent Sorenson?

23 A.  Yes, it is.

24         MR. PILGER:  The government offers 150, Your Honor.

25

```
 1                    (Government Exhibit 150 was

 2                    offered in evidence.)

 3              MR. HOWARD:  Your Honor, there is an objection.

 4   Obviously, Mr. Dorr was not part of this.  He's not going to be

 5   able to, I don't believe, authenticate it.  We think it's the

 6   wrong witness and hearsay.

 7              MR. BINNALL:  We join in those, especially hearsay.

 8              MR. PILGER:  Your Honor, we'll pause and just ask for

 9   a ruling that it's been authenticated and just use it with a

10   different witness if you wish.

11              THE COURT:  Right.  It makes more sense that it would

12   be played during the testimony of Kent Sorenson.

13              Thank you.

14              MR. PILGER:  Could we have a ruling on authenticating?

15              THE COURT:  I'm going to reserve ruling on it.

16              MR. PILGER:  Yes, Your Honor.

17   BY MR. PILGER:

18   Q.  When you found out that Kent Sorenson had switched his

19   support from Michelle Bachmann to Ron Paul, were you surprised?

20   A.  Yes.

21   Q.  And during the Ron Paul Campaign in 2012, did you ever know

22   whether or not Kent Sorenson was being paid by the Paul

23   Campaign?

24   A.  No.

25              MR. PILGER:  One moment, Your Honor.
```

```
 1              (Pause.)

 2              MR. PILGER:  Nothing further, Your Honor.

 3              THE COURT:  Ms. Sinfelt?

 4              MS. SINFELT:  Yes.  Thank you, Your Honor.

 5                        CROSS-EXAMINATION

 6   BY MS. SINFELT:

 7   Q.  Good afternoon, Mr. Dorr.

 8   A.  Good afternoon.

 9   Q.  I have a few questions for you, sir.

10              Do you know who A.J. Spiker is?

11   A.  I do.

12   Q.  And can you tell us who he is?

13   A.  He was involved with the Ron Paul Campaign at that time.  He

14   lives up in Story County and he was involved with the campaign

15   at that time.

16   Q.  And do you know what his role was for the campaign during

17   2011?

18   A.  I don't.

19   Q.  And are you aware that Mr. Sorenson approached Mr. Spiker to

20   see if he could get a job with the Paul Campaign in February of

21   2011?

22   A.  I was aware of phone calls he had made to the campaign

23   apparatus.  I never knew who those people were seeking a job.  I

24   never knew who he actually spoke to at that time.

25   Q.  If I can direct you to the e-mail, your proposal that was
```

 1   sent to John Tate.  It's been entered as Government Exhibit 7.

 2           The $8,000 that you were requesting for Mr. Sorenson,

 3   that would be for a salary; is that correct?

 4   A.  Yes.

 5   Q.  And the $5,000 a month, that would be a salary for your

 6   brother, Chris; is that correct?

 7   A.  Yes.

 8   Q.  And then the $100,000, what was that for again?

 9   A.  That was to fund the Iowa Conservatives Fund PAC.

10   Q.  Thank you.

11           I would show you Government Exhibit 12, another

12   exhibit in evidence, an e-mail from yourself to Mr. Benton and

13   Mr. Tate.  If I can direct you to this --

14           THE COURT:  Ms. Sinfelt, I don't know how much you

15   have left, but I'm going to ask you to use the lavaliere mic.

16           MS. SINFELT:  I'm sorry.

17           THE COURT:  It's hard to hear you when you step away.

18           MS. SINFELT:  I apologize.

19   BY MS. SINFELT:

20   Q.  This paragraph here regarding the money, after that it says

21   wages?

22   A.  Yes.

23   Q.  And that would be a salary, Christopher's salary?

24   A.  Yes.

25   Q.  Thank you.

1             I'm going to now show you Government's Exhibit 13,

2    which is also entered in evidence.  I believe earlier you said

3    it is reflected here that Mr. Benton asked you if there were any

4    questions from Mr. Sorenson to call Dimitri directly.  Is that

5    accurate?

6    A.   Yes.

7    Q.   And do you know what Mr. Kesari's position was in the

8    campaign at that time?

9    A.   I know he was higher up in the campaign.  The exact title I

10   do not know, no.

11   Q.   Do you know if he was running the Iowa operations here for

12   the Paul Campaign?

13   A.   That would be what his job was.  The title I don't have, but

14   yes, that would be about right, I believe.

15   Q.   So then Mr. Benton was directing you to the head of the Iowa

16   campaign; is that right?

17   A.   Yes.

18             MS. SINFELT:  No further questions, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. BINNALL:

21   Q.   Good afternoon, Mr. Dorr.  My name is Jesse Binnall.  I

22   represent Dimitri Kesari.

23   A.   Good afternoon.

24   Q.   Mr. Dorr, do you know whether Mr. Sorenson knew that you

25   were going to make that proposal on his behalf?

1   A.   Yes.

2   Q.   Did he?

3   A.   Yes, he did.

4   Q.   How do you know?

5   A.   We discussed the terms of the proposal prior to me firing

6   off the e-mail.

7   Q.   And do you remember after Mr. Sorenson changed his --

8   changed over to endorsing Ron Paul, did you have a conference

9   call with Mr. Sorenson?

10  A.   I think it was right before the switch, but I remember a

11  conference call, yes.

12  Q.   Right before the switch.  Thank you for reminding me of

13  that.

14            And who was on that conference call?

15  A.   Myself, Kent Sorenson, Dennis Fusaro, Christopher Dorr, and

16  Paul Dorr.

17  Q.   And Paul Dorr is your father?

18  A.   Yes, he is.

19            MR. BINNALL:  One moment, please.

20            (Pause.)

21            MR. BINNALL:  No further questions.

22            MR. PILGER:  No questions, Your Honor.

23            THE COURT:  Thank you, sir.

24            You're excused.

25                                    (Witness excused.)

1          MR. PILGER:  The government calls Kent Sorenson.

2          THE COURT:  Sir, please come forward and approach her

3    and she'll administer your oath.

4          THE CLERK:  Please raise your right hand.

5          KENT SORENSON, GOVERNMENT'S WITNESS, SWORN

6          THE CLERK:  Please be seated.

7          MR. BINNALL:  Your Honor, I do apologize.  I meant to

8    bring this up to the court beforehand.

9          Can we approach briefly?

10          THE COURT:  Yes.  I need you, Terri.

11          (Side-bar conference, outside the presence of the

12    jury.)

13          MR. BINNALL:  Your Honor, we believe that Mr. Sorenson

14    is likely to perjure himself, so we think it's proper to give

15    him an opportunity to consult with counsel about his testimony

16    and make sure he's consulted about that because it's likely he's

17    going to perjure himself.

18          THE COURT:  He's got a lawyer.

19          MR. BINNALL:  I just wanted to bring it to the court's

20    attention though.

21          THE COURT:  Yeah.  Thanks.

22          (In open court, in the presence of the jury.)

23                          DIRECT EXAMINATION

24    BY MR. PILGER:

25    Q.  Please state your name, sir.

```
 1   A.   Kent Sorenson.

 2   Q.   And Kent with the common spelling?

 3   A.   Pardon me?

 4   Q.   K-E-N-T?

 5   A.   Yes, sir.

 6   Q.   And spell your last name, please, for the court reporter.

 7   A.   S-O-R-E-N-S-O-N.

 8   Q.   We can't talk over each other.  You've got to wait for me to

 9   finish and then answer so we can get it down.

10            How are you employed right now?

11   A.   Self-employed.

12   Q.   What do you do?

13   A.   I'm part owner of a small car lot.

14   Q.   I can't hear you, sir.

15   A.   Part owner of a small car lot.

16   Q.   And do you have a family?

17   A.   Yes.

18   Q.   Are you married?

19   A.   Yes.

20   Q.   Do you have children?

21   A.   Six.

22   Q.   How old are they?

23   A.   25, 22, 16 today, 14, 11, and 10.

24   Q.   Now, there was a time when you weren't self-employed, right?

25   A.   Yes.
```

1   Q.  You had a position with the State of Iowa; is that correct?

2   A.  Correct.

3   Q.  And when did you first have a position with the State of

4   Iowa?

5   A.  I ran for election and won and became a State Representative

6   in 2008.

7   Q.  You became a State Representative, correct?

8   A.  Yes, sir.

9   Q.  And you represented a District of Iowa; is that correct?

10  A.  Yes.

11  Q.  And what year did you run?

12  A.  I was elected in 2008.

13  Q.  And did you serve full term in the Iowa House?

14  A.  Yes.

15  Q.  And did you run for another office after that?

16  A.  Yes.

17  Q.  What office was that?

18  A.  I ran for State Senate.

19  Q.  And what year was that?

20  A.  2010.

21  Q.  Were you elected?

22  A.  Yes.

23  Q.  Okay.  As you got involved in politics, did you come to know

24  people associated with the Ron Paul campaigns that had existed

25  in 2008 and subsequently?

1  A.  Yes.

2  Q.  Did you come to know in particular who Dimitri Kesari was?

3  A.  Yes, I did.

4  Q.  Did you come to know who Jesse Benton was?

5  A.  In 2008 I did not know Jesse, but I eventually came to know

6  who he was.

7  Q.  At a later date you came to know who Jesse Benton was?

8  A.  Yes.

9  Q.  And did you know him as part of the Paul Campaign or in some

10 other way?

11 A.  Yes, part of the Paul Campaign.

12 Q.  Did you come to know who John Tate was?

13 A.  Yes.

14 Q.  Was he part of the Paul Campaign or did you meet him some

15 other way?

16 A.  I'm not sure if Mr. Tate was part of the Paul Campaign when

17 I first met him or if he was part of Right to Work.

18 Q.  And Right to Work is an organization, correct?

19 A.  Yes.

20 Q.  It has an advocacy position concerning unions; is that

21 right?

22 A.  Correct.

23 Q.  And did you work with the Right to Work organization as a

24 legislator?

25 A.  Yes, I did.

1  Q.  Did any of the people we just talked about also work with

2  the Right to Work organization?

3  A.  Yes.

4  Q.  Who?

5  A.  Dimitri Kesari, and I'm not -- like I said, I'm not sure

6  about Mr. Tate.

7  Q.  Okay.  Don't guess.

8        Now, when were you aware of Mr. Kesari working with

9  the Right to Work organization?

10 A.  Early in my Statehouse race.

11 Q.  And is that how you got to know him?

12 A.  Yes.

13 Q.  What kind of relationship did you have with him?  Start at

14 the beginning.  Were you just business acquaintances?  Were you

15 friends?  What were you?

16 A.  In the beginning I was interviewed by somebody that worked

17 for Mr. Kesari, and I was referred to him as a potential

18 candidate that they should support, and that's how I developed a

19 relationship with him.

20 Q.  And did that relationship change over time?

21 A.  Yes.  I considered him a friend over time.

22 Q.  Did the relationship have its ups and downs?

23 A.  Absolutely.

24 Q.  How close of friends were you?  Were you the kind of friends

25 who would only meet at the workplace or would you meet at other

1  places?

2              MR. HOWARD:  Objection; leading, Your Honor.

3              THE COURT:  Overruled.

4              Answer that question.  Go ahead.

5  A.  We met both socially and with work.  I mean, he would come

6  to my house and we would go out to dinner together.  When he

7  lived in Des Moines, I went to his apartment before.

8  BY MR. PILGER:

9  Q.  Did you ever visit him at his home?

10 A.  I did not visit him at his home.  I did visit him in his

11 home area.

12 Q.  Do you know where his home area is then?

13 A.  Yes; Virginia.

14 Q.  Just wait for the question.

15 A.  Sorry.

16 Q.  And when did you visit him in Virginia?

17 A.  I believe it was in 2000 -- I can't remember the year.  It

18 was 2012 or 2013.  I went to D.C. to speak at a Campaign for

19 Liberty event, and at that time I went to Dimitri's wife's

20 business, and we went out to eat in the area.

21 Q.  You mentioned Dimitri's wife's business.  Is that Dimitri

22 Kesari's wife's business?

23 A.  Yes.

24 Q.  And, by the way, is Dimitri Kesari in the courtroom today?

25 A.  Yes, he is.

1   Q.  And where is he?

2   A.  Directly behind you.

3   Q.  And did you actually go to the business?

4   A.  Yes.

5   Q.  Did you go inside?

6   A.  Yes.

7   Q.  Did you notice the name of the business?

8   A.  Yes.

9   Q.  Do you remember the name of the business?

10  A.  Yes.

11  Q.  And what's the name of the business?

12  A.  Designer Goldsmiths, Inc.

13  Q.  When Mr. Kesari would come to your house, would you dine

14  together sometimes?

15  A.  Yes.

16  Q.  Who would prepare meals?

17  A.  Well, Dimitri would because he's a much better cook than I

18  am.

19  Q.  I want to turn your attention now to the year 2011.  Did

20  there come a time in 2011 where you became associated with a

21  presidential campaign in the State of Iowa?

22  A.  Yes.

23  Q.  And in 2011, who was the first presidential candidate that

24  you supported in the State of Iowa?

25  A.  Michelle Bachmann.

1  Q.  Did you come to have a title in her campaign in the State of

2  Iowa?

3  A.  Yes.

4  Q.  What was your title?

5  A.  Campaign chair, state chair.

6  Q.  Was Michelle Bachmann running in opposition to other

7  candidates, including Ron Paul?

8  A.  Yes.

9  Q.  While you were working for Michelle Bachmann, did you or did

10  you not keep in touch with the people you knew in the Ron Paul

11  Campaign?

12  A.  Yeah, I stayed in touch with the people in the Ron Paul

13  Campaign.

14  Q.  Did you specifically stay in touch with Dimitri Kesari?

15  A.  Yes.

16  Q.  Was the competition -- what was the nature of the

17  competition between Michelle Bachmann and Ron Paul?

18  A.  Um, they were competing for similar votes.  Some people --

19  they both had their own demographics, but there was areas where

20  they crossed over.

21  Q.  Let me ask you a more basic question, and maybe it's

22  obvious, but let's get it on the record.

23          Were they running in the same party?

24  A.  Yes, they were.

25  Q.  So they were running against each other for the nomination

1  of their party; is that correct?

2  A.  Yes.

3  Q.  And what's the first major political event that happened in

4  the State of Iowa in 2011 in the presidential race?

5  A.  The first major event, I'm not sure if you're looking for --

6  there's announcements or if you're looking at the straw poll,

7  but both of those were major events, depending upon who you

8  supported.  There was -- you know, the first major event that I

9  remember being a part of was helping plan Michelle Bachmann's

10 Presidential Announcement.

11 Q.  Fair enough.  So there's an announcement and then you

12 mentioned a poll.  Tell us about that.

13 A.  It was the Straw Poll in Ames.  Iowa is famously known for

14 it, something that existed in a previous presidential race.

15 Q.  So the Ames Straw Poll happened for the 2012 election cycle,

16 and it happened in 2011; is that right?

17 A.  Yes.  It happened in August 2011.

18 Q.  So it didn't happen this year, but it did happen then; is

19 that right?

20 A.  Yes.  That was the last straw poll.

21 Q.  Okay.  Who came in first and second in that race?

22 A.  Michelle Bachmann came in first, and Ron Paul came in

23 second.

24 Q.  Now, did there come a time where you were aware that Aaron

25 Dorr was communicating with the Paul people about you

1  potentially switching your support to Ron Paul?

2  A.  Yes.  There was a time when I became aware of that, but --

3  Q.  Just wait for the questions.

4        MR. PILGER:  Just a moment, Your Honor.

5        (Pause.)

6  BY MR. PILGER:

7  Q.  Did you become aware of a proposal that a friend of yours

8  had sent to the Paul Campaign concerning your switching your

9  endorsement to Dr. Paul?

10  A.  Yes.

11  Q.  Who was that friend?

12  A.  Pardon me?

13  Q.  Who sent that proposal?

14  A.  Aaron Dorr.

15  Q.  Were you aware that that proposal contained a provision for

16  you to receive money in exchange for working for the Paul

17  Campaign?

18  A.  Yes.

19  Q.  Turning your attention to Government's Exhibit 10, which is

20  in evidence, did you receive a communication from the Ron Paul

21  Campaign about that proposal?

22  A.  Yes.

23  Q.  And is this the communication you received?

24  A.  Yes, it is.

25  Q.  And just focusing for a moment on the header, is this an

1  e-mail directed, first of all, to you?

2  A.  Yes, it is.

3  Q.  And is that the e-mail address that you used?

4  A.  Yes.

5  Q.  And did you receive this message?

6  A.  Yes.

7  Q.  And did you receive it on Halloween of 2011?

8  A.  I believe so.

9  Q.  Is that the date on the e-mail?

10  A.  Yes.

11  Q.  Are you not sure which day you opened it?

12  A.  I'm not sure on the day I opened it.

13  Q.  Did you open it on or near this date?

14  A.  Yes.

15  Q.  Do you recall this e-mail?

16  A.  I do.

17  Q.  And does this e-mail have a reaction from the Paul Campaign,

18  and Jesse Benton in particular, about the Aaron Dorr proposal?

19  A.  Yes, it did.

20  Q.  And do you recall, without looking further at the document,

21  what the reaction was?

22  A.  Um, I remember by reading the document that Jesse seemed

23  upset with Aaron and the proposal, but -- because of some of the

24  provisions that Aaron asked for; but I do remember reading and

25  also knowing that I was welcome to come on board with the Paul

1  team --

2  Q.  Did you --

3  A.  -- and receive payment.

4  Q.  That was my next question.  Please wait for my question and

5  please do the same for other counsel.

6         So you understood from this Halloween message that

7  Jesse Benton was upset about something, correct?

8  A.  Yes.

9  Q.  And also something about payment.  What did you understand

10 about payment?

11 A.  If my memory serves me right, without looking at the e-mail,

12 it was that he was willing to pay me my fair market value, which

13 Michelle determined that fair market value at $8,000 a month.

14 Q.  Okay.  Was that actually the salary that you were getting

15 from Michelle Bachmann?

16 A.  No.

17 Q.  You were getting a payment from Michelle Bachmann, right?

18 A.  Yes.

19 Q.  And what was that payment?

20 A.  $7,500 a month and out-of-pocket expenses.

21 Q.  And that was 7,500 at the time of this e-mail, and it may

22 have varied over time or not?

23 A.  Yes.

24 Q.  Yes what?  Did it vary or not?

25 A.  Well, if you figure in out-of-pocket expenses.  My base

1   salary was $7,500 a month, and that did not vary.

2            MR. PILGER:  Bear with me one moment, Your Honor.

3            (Pause.)

4   BY MR. PILGER:

5   Q.  You mentioned that Jesse Benton was upset with the Aaron

6   Dorr proposal and also willing to talk about you coming on board

7   for a payment, correct?

8   A.  Yes.

9   Q.  Did discussions continue between the Paul Campaign and

10  yourself and others about your coming over to the Paul Campaign

11  from Michelle Bachmann?

12  A.  Yes, they continued past October 31st.

13  Q.  Did they continue up into the Christmas period of 2011?

14  A.  Yes.

15  Q.  And who was your primary contact at the Paul Campaign to

16  discuss switching your support from Michelle Bachmann to Ron

17  Paul?

18  A.  Dimitri Kesari.

19  Q.  And how often did you talk about that?

20  A.  I can't give you an accurate estimate, but it was

21  frequently.  I mean, there were days where Dimitri would call me

22  20 times in a day and there were days where I wouldn't hear from

23  him for two or three days.

24  Q.  And in those discussions did he reference the fact that you

25  would be paid or did he not reference the fact that you would be

1   paid?

2   A.  It was very clear that I would be paid.

3   Q.  I want you to be very clear with this jury.  Did he say the

4   words out loud to you that you would be paid?

5   A.  Yes.

6   Q.  I want to turn your attention to Christmas Day of 2011.  How

7   did you spend Christmas Day of 2011, if you remember?

8   A.  Well, I have a hard time remembering specifically what I did

9   that day, but as a rule of thumb, normally during my time in

10  politics, I was always on the phone, regardless of when it was,

11  and that was a frustration for my family, and I'm sure on that

12  day I was also on the phone.

13  Q.  Okay.  Tell the jury whether or not you recall participating

14  in any conversations about the switch that day.

15  A.  I believe that was the day, on the 25th -- I believe that

16  was the day that I had a conference call with the Dorrs.

17  Q.  So don't say anything about what you said to other people

18  until you have permission from the court.

19  A.  Okay.

20  Q.  So I'm not asking you what was said with the Dorrs.  Did you

21  have conversations on Christmas Day with the Paul Campaign?

22  A.  I don't recall if I directly had conversations with the Paul

23  Campaign on Christmas Day.

24  Q.  Fair enough.  The next day, which would be December 26th,

25  the day after Christmas, do you remember if you had contact with

1  the Paul Campaign?

2  A.  I remember having a -- talking to Dimitri that day and

3  having dinner with him that night.

4  Q.  When you had dinner with him, where did you have dinner?

5  A.  I believe the name of it was Claxton's.  It's in Altoona.

6  Q.  And who was there?

7  A.  Myself, my wife, and Dimitri.

8  Q.  And did you talk about various things?

9  A.  Yes.

10  Q.  Among those things, did you talk about potentially switching

11  to the Paul Campaign?

12  A.  Yes.  Dimitri consistently throughout the entire year of

13  2011 talked to me about switching to the Paul Campaign from the

14  time I started, but specifically that night he was working me

15  pretty hard to switch.

16  Q.  And during the conversation that night, did he reference

17  anything about payment in regard to the switch?

18  A.  Yes.  Yeah, he made it very clear that I would be

19  compensated for my time and for switching.  I remember being

20  concerned because I had an outstanding invoice with the Bachmann

21  Campaign and I wasn't sure if I was going to be paid by them.

22  Q.  And let's be clear with this jury.  Did you have a concern

23  about whether or not you were going to get paid by the Bachmann

24  campaign?

25  A.  Yes.

1  Q.  Why?

2  A.  Because there was people in the campaign that had not been

3  paid.  There was a lot of writing staff that was going without

4  pay, and I questioned the person that was responsible for paying

5  me, which was Guy Short, and he assured me that I would be paid,

6  but I wasn't -- I wasn't -- you know, everybody had been assured

7  they would be paid, and you hear war stories about campaigns

8  leaving town and not paying the staff.

9  Q.  And without talking about what anyone told you, did you see

10 and experience with personal knowledge the condition of the

11 campaign at the end of December 2011?  And by "the campaign," I

12 mean the Michelle Bachmann Campaign?

13 A.  Yes, yes.

14 Q.  And what did you observe about the viability of the Michelle

15 Bachmann Campaign at that time?

16 A.  I knew she wasn't going to make it past Iowa.  We were doing

17 internal polling and we were finishing fourth or fifth at the

18 very best.

19 Q.  And did you know that at the time that you had dinner in

20 Altoona on December 26th, the day after Christmas?

21 A.  Yes.

22 Q.  And when you were talking to Dimitri Kesari, did you know

23 that you might not get paid by the Bachmann campaign?

24 A.  Yes.

25 Q.  And were you concerned about your personal finances?

1  A.  Um, I was concerned about not getting paid, but I wasn't --

2  we weren't really having severe financial problems.  I was

3  concerned about what may come.

4  Q.  Sir, you were being paid $7,500 a month by the Bachmann

5  Campaign, right?

6  A.  Yes.

7  Q.  Tell this jury whether or not you were worried about losing

8  that income.

9  A.  Yes, of course, I was.

10  Q.  And was the possibility of being paid by the Paul Campaign

11  attractive to you or not?

12  A.  Yeah.  I knew he was much more viable and fund-raising was

13  not an issue for him.

14  Q.  Now, in fairness to you, tell the jury whether or not you

15  liked Ron Paul or Michelle Bachmann better as a political

16  person.

17  A.  Between the two of them or versus other candidates?

18  Q.  Between the two of them.

19  A.  When I first got involved with Michelle, I was very

20  supportive of her, but over time, particularly in October, there

21  was an instance where I grew weary and I realized that she had

22  no business running for President, and Ron Paul was something

23  that I aligned with on a lot of those issues.

24        So to be fair, those people were people I would

25  support, but, idealogically, by December I was leaning more

1   towards -- if I was going to go caucus, I would have -- even if

2   I was still working for Michelle, I would have caucused for Ron

3   Paul.

4   Q.  Okay.  Fair enough.

5         Now let's cover the other side then.  The Ron Paul

6   people had been supporting you financially since 2008; isn't

7   that right?

8   A.  With my campaign, not personally.

9   Q.  Yes, with your campaign.

10  A.  Yes, yes.

11  Q.  Okay.  So the Ron Paul people had been there as your

12  financial friends politically since 2008?

13  A.  Yes.  People associated with the Ron Paul Campaign and Ron

14  Paul's campaign himself issued PAC money to me, and then most of

15  the people on that Paul Campaign worked for a group called Right

16  to Work, which we discussed earlier, and they were very

17  supportive of me.  I wouldn't have won that first election

18  without them.

19  Q.  So let's be very clear with this jury.  You're telling them

20  that politically you liked Ron Paul better than Michelle

21  Bachmann, right?

22  A.  Yes.

23  Q.  But you're also telling this jury that the Paul entities,

24  going back to the 2008 campaign, had supported you with

25  political money for a very long time, right?

1   A.   Yes; not just money, but boots on the ground as well.

2   Q.   And is that part of the reason why you were attracted to the

3   Paul people?

4   A.   Yes.  But the bulk of the people that I was friends with in

5   Iowa were Paul supporters.

6   Q.   Okay.  Wait for the question.  Please do the same with other

7   counsel.

8          After -- how did the dinner in Altoona end, do you

9   remember?

10  A.   I remember us joking about which campaign would be able to

11  pay for dinner, and Dimitri covered the expenses of the dinner.

12  We both at that time had a campaign credit card.  I had one for

13  Michelle, but, obviously, I wouldn't use it for a dinner because

14  we were having such financial difficulties.  And so we were

15  laughing about that.  Dimitri offered to pay for dinner for my

16  wife and I, and while he was paying, I went to the rest room.

17  Q.   Okay.  Now, a minute ago I thought you said you weren't in

18  any financial difficulty.  Just now you admitted you were.  Do

19  you admit to this jury that you had financial concerns at this

20  time?

21  A.   Yeah, and I did have financial concerns.

22  Q.   Okay.  And getting paid after the Michelle Bachmann money

23  folded was very important to you, wasn't it?

24  A.   Yes.

25  Q.   Okay.  So after the dinner ended and Dimitri Kesari paid for

 1  it, what happened next?

 2  A.   I went to the bathroom and we left the restaurant.

 3  Q.   And then what happened?

 4  A.   When we got in the car, my wife told me --

 5          MR. BINNALL:  Objection; hearsay.

 6          MR. PILGER:  No.

 7          THE WITNESS:  Okay.

 8          MR. PILGER:  I'll rephrase, Your Honor.

 9          THE COURT:  Go ahead.

10  BY MR. PILGER:

11  Q.   Listen to the question.  Did something happen in the car,

12  other than people talking?

13  A.   Yes.

14  Q.   What happened?

15  A.   My wife showed me a check.

16  Q.   Showing you what's not yet been admitted, Government's

17  Exhibit 133, is that the check your wife showed you?

18  A.   Yes.

19  Q.   Does it have a signature on it?

20  A.   Yes.

21  Q.   Is that the signature of someone that you worked with?

22  A.   Yes, it is.

23  Q.   Is that the signature of someone you worked with in a

24  particular context?

25  A.   In a political context, yes.

1  Q.  Okay.  Is that a signature that you saw many times while you

2  were working together?

3  A.  Yes.

4  Q.  Do you recognize that signature?

5  A.  I do.

6  Q.  Whose signature is that?

7  A.  Dimitri Kesari's.

8          MR. PILGER:  We would offer Government's Exhibit 133

9  into evidence, Your Honor.

10                              (Government Exhibit 133 was

11                                offered in evidence.)

12         MS. SINFELT:  Objection as to hearsay and relevance,

13  Your Honor.

14         MR. BINNALL:  Objection as to relevance for

15  Mr. Kesari.

16         THE COURT:  Overruled.  133 is received.

17                              (Government Exhibit 133 was

18                                received in evidence.)

19 BY MR. PILGER:

20 Q.  So what we're seeing on the monitors, Mr. Sorenson, is that

21 an original or a copy?

22 A.  Pardon me?

23 Q.  Is that a copy?

24 A.  Yes, it's a copy.

25 Q.  Okay.  Approaching you and showing you a heat-sealed

1    evidence envelope containing an item, is that the original of

2    the check that we can see on the monitors?

3    A.   Yes.

4    Q.   And tell the jury, how much is this check for?

5            If we can zoom in a little bit.

6            Tell the jury how much it's for.

7    A.   $25,000.

8    Q.   And who is the check made out to?

9    A.   Grassroots Strategies.

10   Q.   Tell the jury what Grassroots Strategies is.

11   A.   It's a corporation I held.

12   Q.   And what account name is this check drawn on?

13   A.   Designer Goldsmiths, Inc.

14   Q.   And, again, what's your personal knowledge of who owns

15   Designer Goldsmiths, Inc.?

16   A.   It's owned by the Kesari family.  I'm not sure if it's his

17   wife or him.

18   Q.   Fair enough.  Did you visit that very business with

19   Mr. Kesari?

20   A.   Yes.

21   Q.   At the time that you got this check, had you decided to

22   switch your support from Michelle Bachmann to Ron Paul?

23   A.   No.

24   Q.   Did you, in fact, switch your support on the night of the

25   26th from Michelle Bachmann to Ron Paul?

1  A.  No.

2  Q.  Did you switch the next day?

3  A.  No.

4  Q.  Did you let Mr. Kesari know that you weren't going to switch

5  the next day?

6  A.  Yeah.

7  Q.  Let me finish the question.

8       On the 27th, the day after the dinner in Altoona, the

9  day after you got this check, did you tell Mr. Kesari that you

10  would or would not switch?

11  A.  I'm not sure if it was on the night of the 26th or if it was

12  on the morning of the 27th or if it was in the afternoon of the

13  27th, but I do remember telling Dimitri that I would not switch.

14  Q.  Did you, however, consider switching after you told that to

15  Mr. Kesari?

16  A.  Yes.

17  Q.  And what happened next?

18  A.  I was just very emotional at that time and I was struggling

19  with the decision of making the switch.

20  Q.  Okay.  You were struggling inside your head?

21  A.  Yeah, I was struggling inside my head.  I was frustrated

22  with friends and family.  Me and my wife were talking about it,

23  and it was just a point of frustration in my life.

24  Q.  Were you worried about money?

25  A.  I was concerned about my future.

1  Q.  Will you answer my question.  Were you worried about money?

2  A.  Yes.

3  Q.  Okay.  And what happened next?

4  A.  I remember on the -- I don't remember if it was the night of

5  the 26th or the 27th, I told Dimitri I was not going to switch;

6  but I was having this internal struggle, and I remember going to

7  the Bachmann campaign office, and I was really emotional and I

8  was having just a lot of stuff going on inside my head, and just

9  as a -- just the meaning of what I was doing and the purpose of

10  it.  And I remember sharing that I had been offered a check or

11  that my wife had been offered a check with some people at the

12  Bachmann office.

13  Q.  Okay.  So you told some people at the Bachmann office,

14  right?

15  A.  Yes.

16  Q.  More than one?

17  A.  Yes.

18  Q.  And did you also tell people like the Dorrs?

19  A.  Yes.  I believe we had a conference call about the check.

20  Q.  Okay.  Let's move very slowly.

21  A.  Okay.

22  Q.  I'm going to ask you, did you tell people about the check?

23  A.  Yes.  I know I told two people about the check.

24  Q.  Did you tell people at the campaign about the check?

25  A.  Yes.

1  Q.  Did you tell the Dorrs about the check?

2  A.  I don't recall specifically the Dorrs, but I believe I did.

3  I can't give you a definite answer, but I believe I did.

4  Q.  Okay.  Only tell what you can definitely remember.

5  A.  Okay.

6  Q.  Who did you tell at the Bachmann Campaign?

7  A.  Guy Short.

8  Q.  And who did you tell -- who else did you tell that you can

9  actually remember?

10 A.  Derek Wilson.

11 Q.  And you told those people that you had gotten this check,

12 correct?

13 A.  Yes.

14 Q.  That's Government's Exhibit 133, the check drawn on Designer

15 Goldsmiths?

16 A.  Yes.

17 Q.  Is it possible you told other people and don't recall it at

18 this time?

19 A.  Yes.  But if something was to refresh my memory, I might

20 recall it.

21 Q.  What happened next?

22 A.  I remember struggling, dealing with the Bachmann people on

23 the date of the 27th.  I was arguing with my wife about

24 switching.  It was a point of contention between us.  She wanted

25 me to switch and I didn't.  I remember going to the Bachmann

1  office and spending the day there on the 27th and talking to

2  Eric Woolson, and at some point in time, I don't believe Guy

3  Short was in town, I spoke to him over the phone, and as the day

4  progressed, I told the Bachmann people that I was not going to

5  leave their campaign and I was going to stay with them.

6  Q.   Did you pick anybody up at an airport that day?

7  A.   That was -- no, not on the 27th.

8  Q.   I stand corrected.  What day was that?

9  A.   The 28th.

10  Q.   Okay.  Is that the next event that happened, you picked

11  somebody up at an airport?

12  A.   No, no.  I actually -- on the morning of the 28th, I went to

13  the dentist and I had some prep work done on a tooth.  I believe

14  I was going to have a root canal.  I don't recall for sure what

15  was done on my tooth, but I remember going to the dentist on the

16  morning of the 28th before a Michelle Bachmann Rally in

17  Indianola, and that's how I started my day on the 28th is I went

18  to a Michelle Bachmann Rally at a Pizza Ranch in Indianola, my

19  hometown.

20  Q.   Okay.  And then what happened?

21  A.   They asked me to speak, and I refused to speak.  There was a

22  blowup with the Bachmann Campaign.  One of my frustrations with

23  the Bachmann Campaign is we traveled the entire state, and she

24  would ask for me to speak for her rather than speak to the crowd

25  herself, and it was a frustration because the people didn't show

1  up to hear me, they showed up to hear Michelle, and that was

2  just -- so that added to that that day.  And then I got in an

3  argument with her campaign manager and her speech writer and her

4  communications director, and I remember them being really upset

5  with me about that I was contemplating leaving on the 27th.  I

6  got very frustrated with how they treated me, and I left that

7  event very distraught because I had sacrificed a year of my life

8  helping them, and that's how it ended.

9  Q.  You just said that you were arguing with these people.  Were

10  you arguing with the possibility of you leaving the campaign?

11  A.  At that time I had no intentions of leaving the campaign.

12  It was more that they couldn't trust me now, and the best way to

13  describe it is I felt like I could see the campaign wanting to

14  distance themselves from me.  At the time it was very hard for

15  me.  Looking back, I understand that now.

16  Q.  Okay.  What happened next?

17  A.  I left there and went to pick up Guy from the airport.

18  Q.  Who is Guy?

19  A.  Guy Short.  He's the person that I worked with at the

20  Michelle Bachmann Campaign.

21  Q.  When you say worked with, you actually got your payments

22  through him, correct?

23  A.  Yes.

24  Q.  You picked him up at the airport?

25  A.  Yes, and then I took him to his hotel.

1    Q.  You took him to his hotel, okay.  Did you tell him about the

2    check?

3    A.  Yes.

4    Q.  And --

5    A.  Actually can I correct myself?

6    Q.  Wait a minute.  Don't say what anybody said.

7    A.  No, I'm not.  I told him the day before on the phone, and

8    then I reaffirmed it that day.

9    Q.  Okay.  Fair enough.  So you talked to him on the way to the

10   airport, having previously told him the day before?

11   A.  Yes.

12   Q.  And did you discuss it on the way to the hotel?  Don't say

13   what you said.  I'm just asking, did you discuss it?

14   A.  The check itself, I don't know if it was discussed.  It was

15   more about my frustration with the campaign, and when I dropped

16   him off, I told him that I was sorry about what I was going to

17   do, and that was the moment that I made the decision.

18   Q.  The decision to do what?

19   A.  To support Ron Paul and leave the Bachmann Campaign.

20   Q.  So when you dropped off Guy Short on the 28th at his hotel,

21   that's when you decided you would make the switch?

22   A.  Yes, yes.  I told Guy that I was sorry for what I was about

23   to do.

24   Q.  Okay.  Then what happened?

25   A.  I drove around.  I don't -- I can't recall the time.  I

1   drove around Des Moines.  I shut my phone off.  I didn't answer

2   the phone.  People were trying to get ahold of me from the

3   Bachmann Campaign, and my wife was trying to get ahold of me,

4   and I just shut my phone off and drove around for a period of

5   time.  And I ended up at the fairgrounds, which was where Ron

6   Paul was having a rally.

7            And to be honest with you, the time period from

8   there -- from the time I dropped Guy off to the time I showed up

9   at the fairgrounds, I can't recall how long it was.  I remember

10  being very distraught, very confused in my head and -- because I

11  was really worked up about what was going on, so I'm not sure

12  how much time passed.

13  Q.  Fair enough.  Were you confused about whether or not there

14  was money waiting for you at the Paul Campaign if you made the

15  switch?

16  A.  No.

17  Q.  What happened next?

18  A.  I showed up at the fairgrounds.  I called Dimitri.  Turned

19  on my cell phone, called Dimitri and asked him if he still

20  wanted me.

21  Q.  What did he say?

22  A.  He said yes, and he asked where I was at.

23  Q.  And then what happened?

24  A.  I told him I was in the parking lot, and he came running out

25  and looked for me in the parking lot, and he asked me that -- I

1  think I flashed my lights in the car and he was waving and he

2  came to my car.

3  Q.  Then what happened?

4  A.  We proceeded inside.  I asked him, I said, are you sure that

5  you still want me?  And he said, yes.  I said -- and I

6  specifically asked him if John and Jesse were on board with it

7  because I knew that they had to have his approval, and he said,

8  yes, they were --

9           MS. SINFELT:  Objection, Your Honor; hearsay.

10          THE COURT:  Who is the speaker we're referring to

11  here?

12          MR. PILGER:  So I heard a statement from the witness

13  about John and Jesse's approval and then --

14          THE COURT:  Pose a new question.

15          MR. PILGER:  Sorry, Your Honor?

16          THE COURT:  Pose a new question.

17          MR. PILGER:  Yes, Your Honor.

18  BY MR. PILGER:

19  Q.  When you went inside, who was present?

20  A.  It was a room full of people.  Dimitri took me to the back

21  stage area and everyone from the Paul Campaign really was there,

22  including --

23  Q.  Hold on.  Was Jesse Benton there?

24  A.  Yes.

25  Q.  Do you remember if John Tate was there?

1  A.  Yes.

2  Q.  Was Ron Paul there?

3  A.  Yes.

4  Q.  Was Dimitri Kesari with you the whole time?

5  A.  Yes.

6  Q.  Okay.  Did you talk with Jesse Benton when you arrived

7  there?

8  A.  Yes.

9  Q.  Okay.  What did you say to him and what did he say to you?

10  A.  I walked up -- Dimitri took me to him, and everybody was

11  shaking my hand, telling me they were glad to have me, and I

12  remember specifically asking Jesse, I said, are you guys going

13  to take care of me?  And Jesse said, you're bleeding for us,

14  we'll take care of you.

15  Q.  Was Dimitri Kesari there when Jesse Benton said that?

16  A.  Yes.

17  Q.  Do you know whether or not John Tate was there when that

18  happened?

19  A.  I'm not sure if John Tate was part of that conversation, but

20  John was there and he shook my hand.

21  Q.  Was Ron Paul part of that conversation?

22  A.  No.

23  Q.  Then what happened?

24  A.  They wanted me to be on stage right away and to have me

25  endorse Ron, I'm thinking probably before I backed out because

1  they probably weren't sure I was going to follow through, even

2  at that moment.

3  Q.  Did you go ahead with it or not?

4  A.  Yes, I did.

5  Q.  So what happened next?

6  A.  I went on stage and publicly endorsed Ron Paul and resigned,

7  basically announced my resignation from the Bachmann Campaign.

8  Q.  Okay.  Bear with me for a second.

9          (Pause.)

10          Turning your attention to an item not in evidence,

11  Government's Exhibit 47 -- I'm sorry, Your Honor.  This is in

12  evidence.

13          Do you recognize this document?  Take a moment to look

14  at it.

15  A.  Yes, I do.

16  Q.  You previously reviewed it for today, correct?

17  A.  Yes, I did.

18  Q.  What is this document?

19  A.  It's a press release announcing my endorsement of Ron Paul.

20  Q.  And just for the record, let's be very clear, it's a press

21  release from whom?

22  A.  The Paul Campaign.

23  Q.  And let's focus in on the first part of the body, the very

24  small print, if we could enlarge that, which says "For immediate

25  release."

1          So at the top of this document, you can see that it's

2   been e-mailed, correct?

3   A.  Yes.

4   Q.  If you just proceed past that and it says, "For immediate

5   release."

6          Do you see that?

7   A.  Yes.

8   Q.  Is that big enough for you to read, sir?

9   A.  Yes, it is.

10  Q.  Okay.  What's the date for the immediate release?

11  A.  December 28, 2011.

12  Q.  And then there's a logo, correct?

13  A.  Yes.

14  Q.  And what's that logo?

15  A.  It was Ron Paul's presidential logo.

16  Q.  For what year?

17  A.  2012.

18  Q.  And then, please, let's scroll down to the headline.

19          Can you read the headline and the italics underneath

20  it?

21  A.  Yes.  Do you want me to read it out loud?

22  Q.  Please read it to the jury.

23  A.  "Iowa State Senator Kent Sorenson endorses Ron Paul for

24  President.  Former Iowa chairman for U.S. Representative

25  Michelle Bachmann pivots to Paul camp citing, 'Ron Paul has

1  established himself as the clear choice.'"

2  Q.  If we can scroll down a little further, there's a by line,

3  location.

4        Would you start reading from there and read that

5  paragraph?

6  A.  Starting with "Ankeny"?

7  Q.  Yes.

8  A.  "Ankeny, Iowa - 2012 Republican Presidential candidate Ron

9  Paul was endorsed today by Iowa State Senator Kent Sorenson

10 (Indianola) in a major pivot that promises to give Paul extra

11 momentum in the run-up to the January 3, 2012 Iowa Caucus.

12        "In making this endorsement Senator Sorenson is

13 leaving his post as Iowa Chairman for U.S. Representative

14 Michelle Bachmann's presidential campaign here.  The resignation

15 and endorsement take effect immediately."

16 Q.  Now, this came out the very night you endorsed Ron Paul?

17 A.  Yes.

18 Q.  Were you aware that was going to happen?

19 A.  I can't answer that.  I mean I was -- I mean, I assumed they

20 would do a press release.  That was the point of their

21 announcement.

22 Q.  Okay.  Did you approve of this particular text?

23 A.  I don't recall.

24 Q.  Did you object to this text being released?

25 A.  No.

1  Q.  Did you know whether or not the campaign -- the Paul

2  Campaign intended to publicize your switch?

3  A.  Absolutely.

4  Q.  Did you talk about that with Dimitri Kesari?

5  A.  On the night of the 28th?

6  Q.  Yes.

7  A.  Yes.  He actually had me, I believe, talk to somebody from

8  MSNBC.

9  Q.  And did you or did you not talk to Jesse Benton about

10  whether you would publicize it that night?

11  A.  I don't recall having that conversation with Jesse Benton on

12  the 28th.

13  Q.  Fair enough.  What was the next thing that happened that you

14  recall on the 28th after you endorsed Ron Paul?

15  A.  I remember we went to the campaign headquarters.  I'm not

16  sure -- I don't even remember how I got there.  I just remember

17  showing up at the campaign headquarters.  I'm not sure if I

18  drove myself or somebody drove me, and I remember Dimitri wanted

19  me to go in and shake hands and interact with the volunteers.

20  Q.  Did you do that?

21  A.  Yes.

22  Q.  And at the time following the endorsement that you made of

23  Ron Paul, did you feel secure that you were going to be paid?

24  A.  Yes.

25  Q.  And what amounts of money did you believe you were going to

1  be paid?

2  A.  The $25,000 and the $8,000 a month.

3  Q.  The $25,000, was that reflecting -- I'm sorry, strike that.

4       The $25,000, was that related to the money that came

5  in the check, in your mind?

6  A.  Yes.

7  Q.  Okay.  Was that related to anything in particular, that

8  number?

9  A.  No.  I'm not sure how we came up with the $25,000 number.

10  Q.  That came from Dimitri Kesari as a check, though, right?

11  A.  Correct.

12  Q.  And did you believe that you would receive that $25,000?

13  A.  Yes.

14  Q.  The $8,000 a month, did you believe you would receive that?

15  A.  Yes.

16  Q.  And is that the same 8,000 that had been on the table since

17  Halloween?

18  A.  Yes.

19  Q.  And did you believe that was going to happen when you went

20  into the headquarters that night?

21  A.  No.  I mean, did I believe I was going to get paid that

22  night?

23  Q.  I'm sorry, let me ask another question.

24       Were you feeling secure that that would happen?

25  A.  Yes.  Yes, absolutely.

1  Q.  And what else happened that night, if anything?

2  A.  When I showed up at the headquarters, I shook hands.  I

3  don't recall specific conversations that night.  I do remember

4  posing for a picture with a volunteer for the Des Moines

5  Register, and then Dimitri took my phone that night.

6  Q.  Do you know why Dimitri took -- Dimitri Kesari took your

7  phone that night?

8  A.  He was concerned about talking to the media or having -- I

9  was a wreck, and he knew it, and I think he was concerned about

10  what I would say or what I would do, and I was inundated with

11  calls from the Bachmann Campaign, and so he took my phone and

12  gave me a -- I'm not sure what it's called; one of those

13  temporary phones you buy, a Trac phone.

14  Q.  Okay.  And then what happened?

15  A.  I went home that night.  I'm not sure what time, and I came

16  back to the office the next morning.

17  Q.  Okay.  When you came back to the office the next morning,

18  did you learn whether something had happened the prior night?

19  A.  Yes, yes.  That's -- Michelle Bachmann went on the offensive

20  and started sharing with the media that they knew I had been

21  offered money.

22  Q.  Was that a big deal, a small deal?  How important was that

23  inside the Ron Paul Campaign?

24  A.  It was a very big deal.

25  Q.  Why?

1          MR. HOWARD:  Objection.

2          THE COURT:  What's the objection?

3          MR. HOWARD:  Your Honor, he has no foundation for

4  knowing what's going on in the Paul Campaign.

5          MR. BINNALL:  Calls for speculation.

6          THE COURT:  Overruled.

7          Answer the question.

8  BY MR. PILGER:

9  Q.  What was your understanding of why it was a big deal?

10  A.  Because immediately that morning we had a powwow about it in

11  the campaign office.

12  Q.  Okay.  Now let's move slowly.  You said we had a powwow.

13  Who exactly -- well, let's start slowly.

14          The campaign office, what kind of environment is that?

15  A.  When you walked in the front door, there's multiple desks.

16  There's a private office off to the right.  I believe there was

17  a little kitchenette in back, and then there was an attached

18  building to the left from when you walked in the front door that

19  was filled with phone banks.

20  Q.  Okay.  And was it empty?  Did it have a couple of people, a

21  lot of people, what?

22  A.  There was a lot of people there all the time.

23  Q.  Okay.  And when you came in, were there a lot of people

24  there at that time?

25  A.  Yes.

1   Q.  Okay.  And you talked about a powwow.  Was there a powwow

2   with everyone there or only some people there?

3   A.  I remember having a conversation in the open room.  The

4   event was quickly pulled into a private room to the right of the

5   office.

6   Q.  So there was a select group involved?

7   A.  Yes.

8   Q.  Were people coming and going from that group?

9   A.  Yeah.  I mean, there was times where people would walk in

10  and out of the office, yes.

11  Q.  Okay.  Was Dimitri Kesari there?

12  A.  Yes.

13  Q.  Was he there the whole time or only part of the time?

14  A.  Dimitri was pretty much with me the whole day that day, or

15  that morning.

16  Q.  Okay.  Who else was there?

17  A.  Jedd Coburn.

18  Q.  Do you remember anyone else at this time?

19  A.  Brian Gentry I believe was there.  There was a Jared Gamble.

20  There was another person that was -- I'm not sure what his name

21  was, he was there.  He was a Greek guy from out East.  And then

22  there was also Sonny Spanos was there, and then Dimitri was on

23  the telephone.

24  Q.  Okay.  We'll hold off on the telephone for a second.  You

25  said Dimitri was pretty much with you all day or was with you

1   all day; is that right?

2   A.   I mean, I can't honestly say he was with me the whole day,

3   but that morning he was with me until they sent me out.

4   Q.   Okay.  The other people that you mentioned, were they there

5   with you the whole time, or were they in and out?

6   A.   They were in and out, but they were primarily in that

7   meeting where we were talking about how we were going to respond

8   to Michelle.

9   Q.   And when you say "respond to Michelle," let's be very clear

10  with the jury.  Respond to Michelle about what?

11  A.   About her exposing that I was getting paid by the Paul

12  Campaign.

13  Q.   And we're talking about Michelle Bachmann, right?

14  A.   Yes.

15  Q.   The candidate that you had just switched from to go to Ron

16  Paul, right?

17  A.   Yes.

18  Q.   And you said she had gone on the offensive.  What had she

19  done?

20  A.   Well, I'm not sure if they did press release, radio or

21  television, but I knew that it was getting spread far and wide

22  that I had been offered a large sum of money from the Paul

23  Campaign.

24  Q.   And you had, right?

25  A.   Yes.

1  Q.  And was the conference that you had about that?

2  A.  Yes.

3  Q.  Okay.  And you said Dimitri Kesari was on the phone.  Was he

4  on the phone the whole time you were having that conference?

5  A.  Yes.

6  Q.  Did he say who he was talking to on the phone?

7       MR. HOWARD:  Objection.  Your Honor, this is not for

8  Count 5.  It's a comment about Mr. Benton.  It's got no

9  exception coming, so it's hearsay.

10       THE COURT:  Overruled.

11       Answer the question.

12  A.  He was speaking to Jesse Benton.

13  BY MR. PILGER:

14  Q.  Did he continue speaking to Jesse Benton throughout the

15  meeting?

16  A.  Yes.  And I'm not sure if they were in -- I know Jesse was

17  on the phone.  I'm not sure if there was other people.  I know

18  Jesse was on the phone.

19  Q.  Fair enough.  You don't know if there were other people on

20  the line?

21  A.  Yes.

22  Q.  All you know is Jesse Benton was on the line?

23  A.  Yes.

24  Q.  Okay.  And what did you discuss doing about the Bachmann

25  accusation?

1  A.  I mean, we all agreed that we had to deny it.

2  Q.  Then what happened?  Did you do anything else?

3  A.  I remember they wanted me to go on television, and I was

4  really -- I did not want to do television because I had been up

5  all night and I hadn't been in the right frame of mind and I was

6  worried how to respond on television because I don't do well

7  when I don't sleep, and I remember them telling me I would be

8  okay.  And so I went on -- they sent me out to do MSN -- or no;

9  CNN and Fox News, and we discussed what I was going to say on

10  Fox News and CNN.

11  Q.  And did you actually go out and appear on CNN and Fox News?

12  A.  Yes.

13          MR. PILGER:  Your Honor, would this be a good place to

14  break?  We will be starting the video.

15          THE COURT:  It would, it would.

16          You can step down sir.

17          THE WITNESS:  Thank you.

18          THE COURT:  We'll continue at 9 o'clock tomorrow

19  morning.

20          So I know this sounds like the speech you've heard

21  that begins with in the unlikely event of a water landing,

22  because I repeat it so many times, but here it is.  Please do

23  not listen to any radio broadcast, view any television

24  broadcast, or read any newspaper accounts about this case.  Keep

25  an open mind.  Fight that natural tendency that we all have to

1  want to make up our mind.  Wait until you've heard all of the

2  evidence, the arguments, and my instructions on the law.

3          Thank you.

4          We'll see you ready to go at 9 o'clock tomorrow

5  morning.

6          (Recess at 4:52 p.m., until 8:30 a.m., Friday,

7  October 16, 2015.)