```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
                      CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :     Criminal No. 4:15-103
                            :
      vs.                   :
                            :
JESSE R. BENTON and         :     TRANSCRIPT OF TRIAL
DIMITRIOS N. KESARI,        :          VOLUME IV
                            :
          Defendants.       :
- - - - - - - - - - - - - -X
```

```
                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Friday, October 16, 2015
                         8:30 a.m.
```

BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.

```
              Terri L. Martin, CSR, RPR, CRR
              United States Court Reporter
              Room 189, U.S. Courthouse
              123 East Walnut Street
              Des Moines, Iowa  50309
```

```
APPEARANCES:

For the Plaintiff:              JONATHAN I. KRAVIS, ESQ.
                                U.S. Department of Justice
                                Criminal Division
                                10th and Constitution Avenue NW
                                John C. Keeney Building
                                Washington, D.C.  20530

                                RICHARD CHRISTIAN PILGER, ESQ.
                                U.S. Department of Justice
                                1400 New York Avenue NW
                                Suite 12100
                                Washington, D.C.  20005

For Defendant Benton:           ROSCOE C. HOWARD, JR., ESQ.
                                MEENA T. SINFELT, ESQ.
                                Barnes & Thornburg
                                1717 Pennsylvania Avenue NW
                                Suite 500
                                Washington, D.C.  20006

For Defendant Kesari:           JESSE RYAN BINNALL, ESQ.
                                Harvey & Binnall
                                717 King Street
                                Suite 300
                                Alexandria, Virginia  22314
```

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Kent Sorenson (Resumed) | 606 Pilger | 677 Binnall 727 Howard | | |
| (Resumed) | | 814 Howard | 824 Pilger | 840 Binnall 841 Howard |
| Pavlo Kesari | 757 Kravis | 770 Binnall 772 Sinfelt | | |
| Noel Izon | 773 Pilger | 797 Binnall 798 Sinfelt | 801 Pilger | |
| Michael Hartsock | 802 Pilger | 807 Binall | 813 Pilger | |

603

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 54 - | 623 | |
| 60 - | 664 | 665 |
| 72 - | 765 | 766 |
| 73 - | 781 | 781 |
| 91 - | 644 | 644 |
| 96 - | 793 | 794 |
| 153 - | 646 | 647 |
| 166 - | 832 | 833 |

| DEFENDANT KESARI'S EXHIBIT NUMBERS: | | |
|---|---|---|
| F - | 704 | 704 |

1                        P R O C E E D I N G S

2              (In open court, out of the presence of the jury.)

3              THE COURT:  Good morning.  Be seated

4              There's some things you wanted to take up today?

5              MR. BINNALL:  Yes, Your Honor.  Just as a matter of

6    the court's preference, we anticipate using an audio to impeach

7    Mr. Sorenson on cross-examination.  It is an audiotape that's

8    found on the Internet of Mr. Fusaro -- I'm sorry, of Kent

9    Sorenson talking to Mr. Fusaro.  What we've done is we have the

10   audio with a running text of what's appearing from each of the

11   speakers to make it just easier to see, and I just want to make

12   sure that that's going to be acceptable with the court for how

13   we do that during that.

14             THE COURT:  How do you find the particular spots that

15   you're going to use for impeachment?

16             MR. BINNALL:  We already have it broken up in clips,

17   Your Honor.

18             THE COURT:  Mr. Pilger.

19             MR. PILGER:  Yes, Your Honor.  As to the presentation,

20   we would only ask to see the text before this happens.  If we

21   could do that with defense on a break, I'm sure we could work

22   that out.  But just to alert the court, if Mr. Sorenson doesn't

23   testify contrary to something or to forgetting something and

24   it's offered for impeachment, we'll have an objection to the

25   impeachment.

1              THE COURT:  The foundation is an inconsistency.

2              MR. BINNALL:  Yes.

3              THE COURT:  All right.  That's fine.

4              Anything else?

5              MR. HOWARD:  Nothing from Mr. Benton, Your Honor.

6              THE COURT:  Is he your last witness?

7              MR. KRAVIS:  No, Your Honor.  We have -- and I talked

8    to the defense about this yesterday.  We expect to call behind

9    Mr. Sorenson, Pavlo Kesari, Sonny Izon, Special Agent Sahaghian

10   whose direct examination will be very brief, the FEC witness

11   whose direct will also be very brief, and one of the agents who

12   will testify about five minutes about the absence of certain

13   references in the FEC filings.

14             All told, I expect that other than Mr. Sorenson, the

15   government's total direct examination time remaining is under

16   two hours.

17             THE COURT:  Okay.

18             MR. PILGER:  And, Your Honor, on the unavailable

19   witness issue from yesterday, we're still working on that, so

20   we're just checking whether the motive is the same with

21   immunized testimony in the case law.  We're just about done with

22   that.  We got excerpts from the defense last night.  We hope to

23   have that worked out shortly.

24             THE COURT:  Good.

25             MR. HOWARD:  Your Honor, appreciating the government's

 1  representation of witnesses, we're not planning to start up

 2  until Monday.  I just want you to know if they end early on

 3  Friday, we don't have our witnesses lined up.  We were trying to

 4  anticipate --

 5           THE COURT:  And we have other things to do.  We've got

 6  motions and we've got jury instructions, so that's fine.

 7           MR. HOWARD:  That's fine.  I just wanted to let you

 8  know.

 9           THE COURT:  No, that's fine.  I appreciate that.

10           Thanks.

11           (Recess at 8:34 a.m., until 9:00 a.m.)

12           (In open court, in the presence of the jury.)

13           THE COURT:  Please be seated.  Members of the jury,

14  good morning.

15           Mr. Pilger was speaking with Mr. Sorenson on direct

16  examination when we left.

17           You may continue.

18           MR. PILGER:  Yes, Your Honor.  May it please the

19  court.

20                      KENT SORENSON,

21  resumed his testimony as follows:

22               DIRECT EXAMINATION (Continued)

23  BY MR. PILGER:

24  Q.  Mr. Sorenson, do you understand you're still under oath?

25  A.  Yes.

1    Q.  I understand that you want to clarify something that you

2    said yesterday?

3    A.  Yes.

4    Q.  Let's go slowly and wait for the questions so that everyone

5    knows what's coming and has an opportunity to evaluate whether

6    you're allowed to say it.

7           What is the subject you want to clarify?

8    A.  Who I spoke to about payment at the Bachmann Campaign.

9    Q.  I'm sorry?  I lost the end of that.

10   A.  Who I spoke to about the payment at the Bachmann campaign.

11   Q.  Okay.  In what way do you want to clarify that?

12   A.  I spoke to an additional person that I failed to mention

13   yesterday and I realized it last night.

14   Q.  Who else did you speak to?

15   A.  Marcus Bachmann.

16   Q.  Okay.  So just to remind the jury, we were talking about the

17   switch that happened on the 28th and then we proceeded to the

18   morning of the 29th.

19          Do you recall that?

20   A.  Yes.

21   Q.  And you endorsed Ron Paul on which day?

22   A.  The 28th.

23   Q.  And on the 28th, is that when you had the conversation

24   personally with Jesse Benton?  Did you have a conversation

25   personally with Jesse Benton?

608

1    A.   Yes.  Then on -- I think it was in the evening when I

2    endorsed Ron Paul.  It was at a rally in the fairgrounds, and

3    Dimitri led me into the back of the building, and that's when I

4    engaged Mr. Benton.

5    Q.   Okay.  So, Mr. Sorenson, I'm really not supposed to repeat

6    all the testimony.  Just stay with the questions.  I'm just

7    trying to get you back to the topic.

8    A.   Okay.

9    Q.   So Mr. Benton said something to you.  Remind the jury what

10   that was.

11   A.   I asked him if they will take care of me, and he said,

12   you're bleeding for us, we'll take care of you.

13   Q.   Okay.  When Mr. Benton said that about we'll take care of

14   you, did you have any understanding about whether that included

15   financial matters or not?

16          MR. HOWARD:  Objection.

17          MR. BINNALL:  Calls for speculation.

18          THE COURT:  The way it was presented it calls for

19   speculation.  Sustained.

20          MR. PILGER:  I'll rephrase.

21   BY MR. PILGER:

22   Q.   Did you observe Mr. Benton when he spoke to you?

23   A.   Yes.

24   Q.   Did you see his demeanor?

25   A.   Yes.

1  Q.  And did you have an understanding of what his words meant?

2  A.  Yes.

3         MR. HOWARD:  Objection.

4         THE COURT:  Sustained.

5  BY MR. PILGER:

6  Q.  When you came away from the Ron Paul endorsement, remind the

7  jury, did you feel secure or not that you would be paid the

8  amounts of money that you had talked about with Dimitri Kesari?

9  A.  Absolutely.

10  Q.  During the next morning you testified that you went to the

11  campaign headquarters, correct?

12  A.  Yes.

13  Q.  And you testified about a meeting at the campaign

14  headquarters?

15  A.  Yes.

16  Q.  Let's go to that point in time and pick up again, okay?

17  A.  Okay.

18  Q.  So at the meeting, did you still have an understanding of

19  whether or not you would be paid?

20  A.  Yes.

21  Q.  And did you talk about that with anyone at the meeting?

22  A.  I don't remember specifically talking about it at the

23  meeting.

24  Q.  And during the meeting did you have a discussion about

25  whether or not the campaign would say anything in particular

1  about whether you were being paid?

2  A.  Yes.

3  Q.  Okay.  And did Dimitri Kesari talk to you about what should

4  be said about whether you were being paid?

5  A.  Dimitri did, along with the group of people that we were

6  meeting with in the office that we discussed about yesterday.

7  Q.  And what did Dimitri Kesari say about what you and the

8  campaign should say about whether you were going to be paid?

9  A.  Everybody was in agreement that I would deny it.  That's how

10 I took it.

11 Q.  Well, did they say it to you or didn't they?

12 A.  Yes.

13 Q.  I'm sorry, I asked you in the alternative.  Did they say it

14 to you?

15 A.  Yes.

16 Q.  In fairness, do you remember --

17          MR. HOWARD:  Your Honor, I apologize, the "they," I

18 guess I'm confused.  I don't know if it's appropriate, but --

19          THE COURT:  Overruled.  That's for cross-examination.

20 BY MR. PILGER:

21 Q.  Did Dimitri Kesari say it to you?

22 A.  Yes.

23 Q.  Was he on the phone with anyone when he said it to you?

24 A.  Yes.

25 Q.  Who was he on the phone with, according to Dimitri Kesari?

1 A.  Jesse Benton.

2 Q.  In fairness, did you discuss the check from Designer

3 Goldsmiths during that meeting?

4 A.  I don't recall if the check specifically was discussed at

5 that time in that meeting, but it was discussed that day.

6 Q.  Who did you discuss the check with?

7 A.  Dimitri.  I believe it was during the meeting, I'm sorry.

8 It was with Dimitri.

9 Q.  Is there anything that would refresh your recollection about

10 that?

11 A.  Possibly, but I'm not sure if -- I remember having a

12 discussion because --

13 Q.  Okay.  Before you say what other people said, remember you

14 have to wait for the question so everyone in the room can

15 evaluate whether it's okay to answer, okay?

16 A.  Okay.

17 Q.  I'm going to show you a document.  I don't want you to read

18 aloud from it.  I want you to read it and then look up at me

19 when you're done reading it.  Read this page.

20          (Pause.)

21          MR. BINNALL:  Can we just get references to what's

22 being used to refresh his recollection?

23          MR. PILGER:  I'm happy to provide that, Your Honor, do

24 that directly to counsel.

25 A.  Yes.  I remember testifying to this.

1  BY MR. PILGER:

2  Q.  Okay.  Wait for the question, please.

3  A.  Sorry.

4  Q.  Does this refresh your recollection about whether or not you

5  discussed payment at that meeting?

6  A.  I remember discussing the payment.  I just don't remember

7  discussing the check specifically.

8  Q.  Okay.  So your testimony is you do not remember discussing

9  the check at the meeting at the campaign headquarters that we

10  have been talking about, to be clear?

11  A.  I don't recall discussing the check, but I do recall

12  discussing payment.

13  Q.  Okay.  Now, you said you discussed the payment later in the

14  day; is that right?

15  A.  Yes.

16  Q.  Who did you discuss that check with?

17  A.  I believe it was Dimitri only.

18  Q.  Okay.  And what did you and Dimitri say about the check?

19  A.  For me not to cash the check and to -- they would figure out

20  another way of paying me; but I wasn't clear what that was going

21  to be.

22  Q.  I'm sorry?  I didn't hear that.

23  A.  I wasn't clear how that was going to play out at that time.

24  Q.  At that time?

25  A.  Yes.

1  Q.  Please wait for the question.  Everyone in the room needs to

2  be able to evaluate whether they want to object or otherwise

3  discuss whether what you're saying is proper, okay?

4  A.  Okay.

5  Q.  Okay.  So when you talked to Dimitri, you said he told you

6  not to cash the check?

7  A.  Yes.

8  Q.  Did he tell you why he didn't want you to cash the check?

9  A.  Because I had told too many people about the check.

10  Q.  And remind the jury, who had you told about the check?

11  A.  At that time I had told Michelle Bachmann -- or not

12  Michelle; Marcus Bachmann, Guy Short, Eric Woolson.  We were all

13  with the Bachmann Campaign.  And then I'm not a hundred percent

14  sure -- I had a conversation with somebody on the 29th over a

15  phone call, and I know I told that person as well, and I'm not

16  sure if that conversation with Dimitri took place before the

17  phone call or after the phone call.

18  Q.  Okay.  Who did you talk to on the phone on the 29th?

19  A.  Dennis Fusaro.

20  Q.  Okay.  So you had told at least three people among the

21  Bachmann Campaign about the check?

22  A.  Yes.

23  Q.  And remind the jury, where had the accusation come from that

24  you were being paid to switch your allegiance to Ron Paul?

25  A.  Michelle Bachmann, the Bachmann Campaign.

1  Q.  Was it just her campaign staff or her personally, to your

2  knowledge?

3  A.  Her personally.

4  Q.  So when Mr. Kesari told you not to cash the check, did he

5  indicate anything about finding another way to pay you?

6  A.  Um, yeah.  I mean, he made it very clear I was going to be

7  paid.  I can't recall at that time if we discussed the specifics

8  of it.

9  Q.  Okay.  Now, I think yesterday you mentioned to the jury the

10  campaign wanted you to do something with regard to the media.

11  What was that?

12  A.  Yes.  They wanted me to go on CNN and Fox News and do media

13  that day, and that was early in the morning on the 29th, and I

14  actually didn't want to do it because I had been up all night.

15  Q.  Because you had --

16  A.  Been up all night and I knew I wouldn't do well.

17  Q.  Please keep your voice up.  Maybe put the microphone a

18  little closer.

19          Did you go ahead and do the meeting?

20  A.  Yes.

21  Q.  And was this on the 29th?

22  A.  Yes, it was.

23  Q.  Did you go on Fox News nationally with Megyn Kelly?

24  A.  Yes.

25  Q.  And have you reviewed -- did you end up seeing the broadcast

1   of that interview?

2   A.  Yes.

3           MR. PILGER:  At this time we'll offer 150.  The

4   authentication foundation was laid by the prior witness,

5   Mr. Aaron Dorr, Your Honor.

6           MR. HOWARD:  I'm sorry?

7           THE COURT:  He's offering 150.

8           MS. SINFELT:  Mr. Benton has a hearsay objection and

9   403 grounds also.

10          MR. BINNALL:  Hearsay as to Mr. Kesari.

11          THE COURT:  What's the purpose of offering?

12          MR. PILGER:  I'll ask one question to clarify it for

13  the court.

14          THE COURT:  Okay.

15  BY MR. PILGER:

16  Q.  Did you lie during that interview with Megyn Kelly?

17  A.  Yes.

18  Q.  Did that lie have to do with the meeting that you had

19  discussing how to handle media concerning payments?

20  A.  Yes.

21          THE COURT:  The objection is sustained.

22  BY MR. PILGER:

23  Q.  So about when did you go on TV?

24  A.  It would have been mid-morning.

25  Q.  And you went on Fox News with Megyn Kelly, right?

1   A.   Yes.

2   Q.   And did she ask you whether you were going to be paid by the

3   Ron Paul Campaign?

4   A.   Yes.

5   Q.   What did you say?

6   A.   Told her no.

7   Q.   Did you know if that was true or false when you said it?

8   A.   I knew it was false.

9   Q.   Did you make any reference to FEC filings during that

10  interview?

11  A.   Yes.

12  Q.   What did you say?

13          MR. BINNALL:  I'm going to object as to hearsay if the

14  interview came in, the same reason why he can't testify as to

15  what he said in an out-of-court statement.

16          THE COURT:  It's not offered to prove the truth of the

17  matter asserted.  Overruled.

18  A.  I said that one of the ways I tried defending it was -- and

19  we had discussed this at the campaign headquarters earlier --

20  that I would say that it would not appear on the FEC report.

21  BY MR. PILGER:

22  Q.  And to be clear, were the lies that you told to Megyn Kelly

23  part of something that you had agreed to with Dimitri Kesari?

24  A.   Yes.

25          MR. PILGER:  Your Honor, for the record, we're

1  offering this also pursuant to Rule 801(d)(2)(E), and we

2  understand that ruling is pending.  This is an alternative

3  ground, Your Honor.

4          THE COURT:  The objection is sustained.  Yeah, I

5  sustained their objection to the video.

6          MR. PILGER:  I wasn't going back to his video.  I

7  thought we were just addressing his testimony.

8          THE COURT:  Fine.

9  BY MR. PILGER:

10  Q.  So as to the FEC and filings of the campaign, what did you

11  tell Megyn Kelly?

12  A.  I told her that she will -- that in a matter of a few

13  weeks --

14          MR. BINNALL:  Your Honor, same objection.

15          THE COURT:  Overruled.

16          Answer the question.

17  A.  That just in a matter of a few weeks there would be an FEC

18  report and they could pull it up and see clearly I wasn't being

19  paid by the campaign.

20  BY MR. PILGER:

21  Q.  Now, in fairness, did you say FEC or Federal Election

22  Commission?

23  A.  I don't recall.  If I saw the video, it would refresh my

24  recollection, but I believe I said FEC.

25  Q.  That's the best of your recollection?

1    A.  Yes.

2    Q.  We're not playing the video.

3    A.  It could have been Federal Election Committee.  I mean, it's

4    the same.  It's just an abbreviation.

5    Q.  Did you refer to filings?

6    A.  Yes.

7    Q.  And to the extent that you referred to filings, did you mean

8    to refer to the FEC?

9    A.  Yes.

10   Q.  Now, after December 29th after you did the media, after you

11   lied to Megyn Kelly, did you also lie to another TV?

12   A.  CNN, but that was actually before Megyn Kelly.

13   Q.  I stand corrected.  So you talked to CNN before you talked

14   to Megyn Kelly?

15   A.  Yes.

16   Q.  And did you tell essentially the same lies?

17   A.  I believe so, but I haven't watched that video in quite some

18   time.

19   Q.  All right.  We're not playing videos today, so we'll leave

20   that there.

21          Did there come a time after December 29th where you

22   and Dimitri Kesari clarified how you would get paid?

23   A.  Yes.

24   Q.  Okay.  What's your best recollection of when that was?

25   A.  It was shortly -- it was shortly after and maybe before the

1  caucuses even, so it would have been within two or three days of

2  the 29th.

3  Q.  And what was your understanding from Dimitri Kesari of how

4  you would be paid?

5          MR. HOWARD:  Your Honor, as to Mr. Benton, we'll have

6  an objection.  At this point this has nothing to do with

7  Mr. Benton.  We believe it's prejudicial.

8          THE COURT:  Overruled.

9  BY MR. PILGER:

10  Q.  You may answer.  What was -- what did Mr. Kesari say to you

11  about how you would be paid?

12  A.  He told me that I -- I knew they were looking for a third

13  party to pay me, and at a later date, after the 29th, it was

14  clear that I was going to be billing ICT.

15  Q.  Okay.  So in the period right after the 29th, did Mr. Kesari

16  clarify to you that you would be paid by a third party?

17  A.  Yes.

18  Q.  Did he tell you right then or later whether or not that

19  would be ICT, or do you know?

20  A.  I don't recall if it was then.  I think it was after, maybe

21  even after the caucuses, that I realized I was going to be

22  billing ICT.

23  Q.  Now, turning your attention to what's in evidence as

24  Government's Exhibit 68.  If you can zoom in on the top header.

25          This is an e-mail from yourself to Dimitri Kesari?

1   A.   Yes.

2   Q.   What's the date of the e-mail?

3   A.   January 24, 2012.

4   Q.   What's the subject?

5   A.   Invoice.

6   Q.   Is there an attachment?

7   A.   Yes.

8   Q.   And what's the body of the e-mail?

9   A.   Would you like me to read that?

10  Q.   Yes, please read the e-mail to the jury.

11  A.   Okay.  "Dimitri,

12          "I really need to get this taken care of ASAP.  Hope

13  you understand," smiley face.

14          "Thanks.

15          "Kent."

16  Q.   And then directing your attention to the second page of the

17  e-mail, is that an invoice that you attached to your e-mail to

18  Dimitri Kesari?

19  A.   Yes.

20  Q.   Directing your attention to the top of the invoice, that's

21  from Grassroots Strategy, Inc., correct?

22  A.   Yes.

23  Q.   Remind the jury, what is that?

24  A.   That's my company, my corporation that I held.

25  Q.   And then directing your attention down to the line that

1  starts with "attention" --

2  A.  Yes.

3  Q.  -- to whose attention is this invoice directed?

4  A.  ICT, Inc., Hyattsville, Maryland.

5  Q.  So when you directed this to ICT, Inc., at Hyattsville,

6  Maryland, tell the jury whether or not Dimitri Kesari had said

7  anything about whether to do that.

8  A.  Yes.  That's -- that's how I knew who to bill to was Dimitri

9  told me to.  I actually didn't realize who ICT was at that time.

10  Q.  At that time you did not know who ICT was?

11  A.  No.

12  Q.  So you were just following the directions from Dimitri

13  Kesari or anyone else?

14  A.  Yes, just Dimitri at that time.

15  Q.  All right.  What's the date of this invoice?

16  A.  Well, the date is 7/22 of '11, but in the description it was

17  for January of 2012, so I'm assuming I made a mistake when I

18  dated the invoice.

19  Q.  So let's just go through it piece by piece.  So the date of

20  the invoice under the attention line is what?

21  A.  7/22 of '11.

22  Q.  And proceeding down to the description line items.

23  A.  Yes.

24  Q.  Ms. Draughn, if you could just make that a little bigger.

25  A.  It's fine, I can see it.

1   Q.   I just want to make sure the jury can see it.

2   A.   Okay.

3   Q.   Did you bill two line items in this invoice?

4   A.   Yes.

5   Q.   Please read them to the jury.

6   A.   Retainer to provide services, $25,000.

7            Provides monthly service for month of January 2012,

8   $8,000.

9   Q.   So the record is clear, you just read two separate line

10  items concerning two separate amounts, correct?

11  A.   Correct.

12  Q.   Did you send this e-mail to Dimitri Kesari on January 24,

13  2012?

14  A.   Yes.

15  Q.   And was that pursuant to the agreement you had made on the

16  29th of December that you would lie about the payments that

17  would be made?

18  A.   Yes.

19  Q.   And was that pursuant to your conversations with Dimitri

20  Kesari that you would use a third party to conceal the payments?

21  A.   Yes.

22  Q.   Let me direct your attention back to Government's Exhibit

23  54, which is not yet in evidence.  This is in front of you now,

24  is it not?

25  A.   Yes.

1  Q.  Okay.  So do you know what this is without reading aloud

2  from it?

3  A.  Yes.  It's the press release --

4  Q.  Don't.

5  A.  Okay.

6  Q.  So do you see whether or not it's an e-mail?

7  A.  Yes, it is.

8  Q.  Okay.  Does it contain a document that you are familiar

9  with?

10  A.  Yes.

11  Q.  Does that document concern Congresswoman Bachmann's

12  allegation that you were going to be paid?

13  A.  Yes.

14  Q.  Does this document have a date of December 29th?

15  A.  Yes, it does.

16  Q.  Was this document associated with the Ron Paul Campaign?

17  A.  Yes, it was.

18          MR. PILGER:  Your Honor, we would offer Government's

19  Exhibit 54 in evidence and note it was previously authenticated

20  in testimony earlier.

21                          (Government Exhibit 54 was

22                           offered in evidence.)

23          MR. HOWARD:  Your Honor, it's hearsay.  This is being

24  offered for the truth.

25          MR. BINNALL:  Same objection, Mr. Kesari

1   authentication.

2           MR. PILGER:  Your Honor, we offer it under

3   801(d)(2)(E) and also because it includes false statements.

4           THE COURT:  You're contending that Gary Howard is an

5   alleged co-conspirator?

6           MR. PILGER:  No, sir, no, sir.

7           THE COURT:  He's the declarant here.

8           MR. PILGER:  Let me clarify that with the witness.

9           THE COURT:  The objection is sustained.

10          MR. PILGER:  May I lay further foundation?

11          THE COURT:  Yes.

12  BY MR. PILGER:

13  Q.  Mr. Sorenson, did you approve this?

14  A.  Yes.

15          MR. PILGER:  We offer the exhibit, Your Honor.

16          MR. HOWARD:  Same objection, Your Honor.

17          MR. BINNALL:  Same objections.

18          THE COURT:  Sustained.

19          MR. PILGER:  Your Honor, may we redact the header and

20  use it?

21          THE COURT:  No.  That doesn't change anything.  It's

22  still the same declarant.  No.

23          MR. PILGER:  Your Honor, I don't want to argue with

24  the court.  Let me ask one more foundation question concerning

25  this document.

1  BY MR. PILGER:

2  Q.  Sir, does this contain a lengthy quote from yourself?

3  A.  Yes.

4  Q.  And did you approve this quote?

5  A.  Yes.

6          MR. PILGER:  May we publish the quote, Your Honor?

7          THE COURT:  Ask him what he said.

8          MR. PILGER:  Yes, Your Honor.

9  BY MR. PILGER:

10  Q.  Mr. Sorenson, do you recall a statement that was issued by

11  the Ron Paul Campaign quoting you on December 29th?

12  A.  Yes.

13  Q.  Do you remember -- without looking at that, do you remember

14  exactly what you said?

15  A.  No.  I can't do that.

16  Q.  If you look at that, does it refresh your recollection about

17  what you said?

18  A.  Yes.

19  Q.  Did you say what's reflected in the document?

20  A.  I approved that to be said, yes.

21  Q.  Do you recall that you said this particular statement could

22  be issued?

23  A.  Yes.

24          MR. PILGER:  Request permission for him to state his

25  recollection of what he said.

1          THE COURT:  Go ahead.

2   BY MR. PILGER:

3   Q.  You may read -- or you may tell the jury about what you

4   recall about what you said, Mr. Sorenson.

5   A.  Can I zoom in on this?

6   Q.  You can refer to that to refresh your recollection.

7   A.  Okay.  Can I zoom on it, on the content of it?

8          MR. PILGER:  Ms. Draughn, can you make the quote

9   larger starting at the last third of the page?

10  BY MR. PILGER:

11  Q.  Mr. Sorenson, what do you recall about what you said that

12  was issued by the Ron Paul Campaign?

13  A.  That I was saddened by how Michelle Bachmann chose to handle

14  my switching to the Ron Paul Campaign.

15         MS. SINFELT:  Your Honor, I'm sorry, I have an

16  objection to the question issued.  This is an internal e-mail

17  and the government has not established that this was actually

18  published to the press.

19         THE COURT:  Overruled.  He just said what he said.

20  That's all.  That's all it is.  He just identified what he said.

21         Pose the next question.

22  BY MR. PILGER:

23  Q.  Did you say anything else?

24  A.  Yes.

25  Q.  And what was that?

1   A.   The recent smears from the media and the national political

2   establishments motivated me to -- or motivated -- am I not

3   permitted to read this?

4   Q.   You can look at it to refresh your recollection.  If you

5   look at it and then you know what you said, you can tell the

6   jury what you said.

7   A.   Okay, okay.

8   Q.   Let's shorten this.  I'll shorten this up.  Just look at the

9   last line on the first page.

10  A.   "As for the ridiculous allegations that Congresswoman

11  Bachmann and her surrogates have made, I was never paid."

12  Q.   And continue to the next page, the top two lines.  What did

13  you say?

14  A.   "Financial reports come out in just days" --

15  Q.   No, no; the second page.

16  A.   Oh, I see.  "Offered money from the" --

17  Q.   Let's do this clearly.  Start on the first page.  You said

18  something about you were never, correct?

19  A.   Yes.

20  Q.   Go to the next page.  Does it refresh your recollection

21  about what you said you never what?

22  A.   I think I'm looking at a different -- is it possible to see

23  the bottom of the first page and --

24  Q.   Certainly.  Just look at the bottom of this document, read

25  it to yourself, and then look at the top of the next page of the

1  document, read it to yourself, and tell us if it refreshes your

2  recollection about what you said in the press release.

3  A.   Yes.

4  Q.   What did you say?

5  A.   I said that I was never offered money from the Ron Paul

6  Campaign and that it was ridiculous and that in just a few days

7  there will be an FEC report out.

8  Q.   In fairness, do you recall saying the words "FEC" or

9  "Federal Election Commission" or just reports?

10 A.   Reports.  I do believe I said FEC.  I don't believe I ever

11 used the actual term "Federal Election Reports," but I did use

12 FEC.

13 Q.   At times you recall using the term "FEC"?

14 A.   Yes.

15 Q.   Now, whose idea was this to make this statement and go on

16 with the media and lie to the media?

17 A.   I'm not sure who exactly came up with the idea, but it was

18 agreed upon in that room.

19 Q.   Okay.  Let's go slowly.

20 A.   Okay.

21 Q.   Did Dimitri Kesari agree in the room?

22 A.   Yes.

23 Q.   Was he on the phone with Jesse Benton?

24 A.   Yes.

25 Q.   So when the campaign issued the press release which you

1  recall containing the statement you had never been offered

2  money, that was a lie, too, right?

3  A.  Yes.

4  Q.  And turning your attention back to Halloween of 2011, there

5  had been a discussion of paying you back then, right?

6  A.  Yes.

7  Q.  And tell the jury whether or not that was a discussion of

8  the same monthly amount of money.

9  A.  Yes.  The monthly amount is the same in the Halloween

10  statement as it was that I billed for ICT.

11  Q.  And that first bill for ICT, turning your attention back to

12  what's in evidence as the second page of Government's Exhibit

13  68, is the second line item, the $8,000, related to the

14  Halloween e-mail from 2011?

15  A.  Yes.

16  Q.  Is it the same amount?

17  A.  Yes.

18  Q.  And what is the $25,000?

19  A.  It was -- represented the check that Dimitri had given me --

20  or given my wife.

21  Q.  So you testified Dimitri Kesari told you, don't cash that

22  check?

23  A.  Yes.

24  Q.  And, instead, you did this invoice to ICT; is that right?

25  A.  Correct.

1  Q.  Whose idea was that?

2  A.  That was Dimitri's.

3  Q.  The whole idea of paying through a third party, that was

4  your idea or someone else's?

5  A.  Someone else's.

6  Q.  And name that person, please.

7  A.  Dimitri Kesari.

8          MR. PILGER:  One moment, Your Honor.

9          (Pause.)

10 BY R. PILGER:

11 Q.  Turning your attention to what's in evidence --

12         THE COURT:  We're going to take a little recess here.

13 Suddenly I'm very dizzy.  Could you just go back into the jury

14 room and give me about 20 minutes, please.

15         (Recess at 9:31 a.m., until 9:38 a.m.)

16         (In open court, out of the presence of the jury.)

17         THE COURT:  You can be seated.

18         (In open court, in the presence of the jury.)

19         THE COURT:  Please be seated.

20         Sorry for the drama there.  I think I'm super

21 dehydrated.  I don't like the taste of the water in this

22 building at all, so I don't drink at all.  I'm just dehydrated.

23         Go ahead.  Thanks.

24         MR. PILGER:  May it please the court.

25 BY MR. PILGER:

1    Q.  So we were at Government's Exhibit 70 and Ms. Draughn has

2    already zoomed in on some line items, and those are the same two

3    line items we've been discussing, the $25,000 and the $8,000; is

4    that correct?

5    A.  Yes.

6    Q.  And if we can go back to the first page of the exhibit, that

7    invoice was attached to an e-mail dated what?

8    A.  January 24, 2012.

9          MR. PILGER:  Please bring up Government's Exhibit 70,

10   Ms. Draughn.

11   BY MR. PILGER:

12   Q.  Let's magnify that date for you, Mr. Sorenson.

13          What's the date of this e-mail?

14   A.  Thursday, January 26, 2012.

15   Q.  Okay.  So when we looked previously at Government's 68 --

16   and I think Ms. Draughn can put those two up at the same time --

17   you e-mailed this invoice on the 24th in Government's Exhibit 68

18   and you e-mailed it again two days later on the 26th, correct?

19   A.  Yes.

20   Q.  And if we could go back to the second page of Government's

21   Exhibit 70, did you include something different in the second

22   invoice of Grassroots Strategy to ICT for those two line items?

23   A.  Yes.

24   Q.  And what was the different thing?

25   A.  My EIN number.

1   Q.  Had someone asked you to provide that?

2   A.  Yes.

3   Q.  Who asked you to provide that?

4   A.  Dimitri Kesari.

5   Q.  Turning your attention to Government's Exhibit 78 in

6   evidence.

7           What is this?

8   A.  It's an e-mail from me sent to Dimitri.

9   Q.  Keep your voice up, please.

10  A.  It's an e-mail from me sent to Dimitri.

11          MR. BINNALL:  Your Honor, may we approach and take

12  this off the screen briefly?

13          MR. PILGER:  It's in evidence, Your Honor.

14          THE COURT:  It's in evidence.

15          MR. BINNALL:  The redacted version was, Your Honor.

16          (Pause.)

17          MR. PILGER:  Your Honor, for the record after

18  conferring, I understand there's a redaction and we're bringing

19  up the redacted version now.

20          THE COURT:  Fine.

21          MR. PILGER:  Thank you, Ms. Draughn.

22  BY MR. PILGER:

23  Q.  Mr. Sorenson, looking at Government's Exhibit 78 as redacted

24  in evidence, what is that?

25  A.  It's an e-mail from me to Dimitri Kesari.

```
 1   Q.  And what's the date?

 2   A.  Sunday, March 4, 2012.

 3   Q.  Can we zoom on the e-mail, Ms. Draughn?

 4           Can you see that better now?

 5   A.  Yes.

 6   Q.  And who is this e-mail to?

 7   A.  Dimitri Kesari.

 8   Q.  And what is the subject?

 9   A.  Invoice for February.

10   Q.  Is there an attachment?

11   A.  Yes.

12   Q.  What does the text say?

13   A.  "Hey Dimitri.  Hope all is well!

14           "I have attached the invoice for February.

15           "Thanks.

16           "Kent."

17   Q.  And, Ms. Draughn, if we could have the attachment.

18           Is this another invoice from your company, Grassroots

19   Strategy, Inc.?

20   A.  Yes.

21   Q.  Who is it to?

22   A.  ICT, Inc.

23   Q.  Located where?

24   A.  Hyattsville, Maryland.

25   Q.  What is the date on this invoice?
```

1   A.   March 1, 2012.

2   Q.   Is there a line item of billing on this invoice?

3   A.   Yes.

4   Q.   And as we zoom in on that, what does that line item say?

5   A.   Provides monthly service for month of February 2012, $8,000.

6   Q.   Thank you.

7        Turning your attention to what's in evidence as

8   Government's Exhibit 79, and there's a redaction here.  Let's

9   make sure we've got all of that.

10       Is this a redacted document that you're familiar with?

11  A.   Yes.

12  Q.   Okay.  Turning your attention to the first e-mail in the

13  string which is at the bottom of the page.

14  A.   Yes.

15  Q.   Who is that e-mail from?

16  A.   That's from me to Dimitri.

17  Q.   Is that the same e-mail we just read in Government's Exhibit

18  78?

19  A.   Yes.

20  Q.   And turning your attention to the e-mail above that, who is

21  that an e-mail from?

22  A.   It's from myself.

23  Q.   And what's the date?

24  A.   Sunday, March 18, 2012.

25  Q.   Who is the e-mail to?

1   A.   Dimitri Kesari.

2   Q.   What's the subject line?

3   A.   Forward:  Invoice for February.

4   Q.   Is there an attachment listed?

5   A.   Yes.

6   Q.   And what's the text?

7   A.   "Dimitri.

8        "I've tried checking in a few times, your voicemail is

9   full.  Would like to check on payment for February.  I am unsure

10  what I am going to do so please stay in touch and don't go dark

11  on me," smiley face.  "Hope you're doing well!

12       "Thanks.

13       "Kent."

14  Q.   And turning to the second page, is that the same invoice

15  that we just discussed concerning February?

16  A.   Yes.

17  Q.   Was receiving the payments reflected in these invoices a

18  matter of concern to you or not?

19  A.   I don't understand your question.  Did I think I was going

20  to get paid or --

21  Q.   No.  I'm asking you, was this important to you or not?

22  A.   Yes.

23  Q.   Was this a more or less significant part of your income at

24  this time of your life?

25  A.   At this time in my life, it was a significant part of my

1  income.

2  Q.  What other income did you have?

3  A.  The legislature.

4  Q.  And what did the legislature pay you?

5  A.  $25,000 a year.

6  Q.  You're mumbling a little bit.

7  A.  $25,000 a year.

8  Q.  Okay.  And you're getting -- you're submitting bills to ICT

9  for how much per month?

10  A.  $8,000 per month.

11  Q.  Turning your attention to Government's Exhibit 82 in

12  evidence.

13          Do you know what this is?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's an e-mail that I sent for myself.

17  Q.  Now, the to line of this version of the e-mail is blank; is

18  that correct?

19  A.  Yes.

20  Q.  Can you tell from the body of the e-mail to whom you sent

21  the e-mail?

22  A.  Yes.

23  Q.  Who did you send it to?

24  A.  Dimitri and Sonny.

25  Q.  Who is Sonny, to your knowledge?

1  A.  Sonny was the person at ICT.

2  Q.  Had you ever met Sonny?

3  A.  No.

4  Q.  Who told you to work with Sonny?

5  A.  Dimitri.

6  Q.  Going back to the subject line, what is the subject of this

7  e-mail?

8  A.  Invoicing.

9  Q.  Is there an attachment listed?

10  A.  Yes.

11  Q.  Going to the next page, there's further text.  After Dimitri

12  and Sonny, you said something, right?

13  A.  Pardon me?

14  Q.  Page 2, Ms. Draughn.

15         After you said Dimitri and Sonny, you said something

16  else.  Could you read that to the jury?

17  A.  "I am sending a new invoice that now includes March as well.

18  Please let me know when this will be paid.

19         "Sincerely,

20         "Kent Sorenson."

21  Q.  Now if we could go to the attachment of Government's 82 in

22  evidence.

23         Is this another invoice to ICT in Hyattsville,

24  Maryland?

25  A.  Yes, it is.

1  Q.  Are there two line items on this invoice?

2  A.  Yes.

3  Q.  One at a time tell the jury what the line items are.

4  A.  Provides monthly service for month of February 2012, $8,000.

5  Q.  That's one line item, correct?

6  A.  Yes.

7  Q.  What's the other line item?

8  A.  Provides monthly service for month of March 2012, $8,000.

9  Q.  Turning your attention to Government's Exhibit 86 in

10  evidence.  This is a redacted e-mail chain.  Directing your

11  attention to the top from the header.

12          Do you recall this e-mail?

13  A.  Yes.

14  Q.  Who's it from?

15  A.  Myself.

16  Q.  What's the date?

17  A.  Wednesday, May 2, 2012.

18  Q.  Who did you send this to?

19  A.  Sonny and Dimitri.

20  Q.  Specifically did you send it to an e-mail address

21  sonnyizon@aol.com?

22  A.  Yes.

23  Q.  Where did you get that e-mail address?

24  A.  From Dimitri.

25  Q.  And what's the subject line?

1  A.  Additional invoices?

2  Q.  To be clear, does that say "Re:  Additional invoices?"

3  A.  Regarding additional invoices.

4  Q.  With a question mark?

5  A.  Yes.

6  Q.  Just for the court reporter's sake, please let's not talk

7  over each other.  It's very hard for her.

8          Is an attachment listed?

9  A.  Yes.

10  Q.  And you can read this e-mail to the jury, please.

11  A.  "Hey Sonny.

12          "I am attaching the invoice for April.  I have been

13  caught up trying to wrap up a few things with session and just

14  have not had time to submit it.  Thanks for the e-mail, we're

15  doing great!  I hope you are as well.

16          "Blessings,

17          "Kent."

18  Q.  Now, you're addressing Sonny Izon here and you're talking to

19  him and you're sending blessings to him.  At this point had you

20  ever met him?

21  A.  No.

22  Q.  At any point during the time you were being paid by the Paul

23  Campaign, did you ever meet Sonny Izon?

24  A.  No.

25  Q.  Turning to page 2 of Government's Exhibit 86.

1          Is that an invoice from Grassroots Strategy, your

2   company, to ICT, Inc. in Hyattsville, Maryland?

3   A.  Yes.

4   Q.  Is there a line item in this invoice?

5   A.  Yes.

6   Q.  Please read that line item to the jury.

7   A.  Provides monthly service for month of April 2012, $8,000.

8   Q.  Turning your attention to Government's Exhibit 90 in

9   evidence.

10         Mr. Sorenson, if you would look up at the paper, this

11  is a three-page document, is it not?

12  A.  Yes.

13  Q.  And it's an e-mail string, is it not?

14  A.  Yes.

15  Q.  Ms. Draughn, if you could put up the top half of -- I'm

16  sorry.  If we could go to the very bottom of page 1.

17         Is that the header of the first e-mail?

18  A.  Yes.

19  Q.  Who's it from?

20  A.  Myself.

21  Q.  And who is it to?

22  A.  Sonny Izon.

23  Q.  Is that at the same address that you received from Dimitri

24  Kesari?

25  A.  Yes.

1  Q.  What's the date?

2  A.  February 10, 2012.

3  Q.  And turning to page 2 at the top.  Please read that to the

4  jury.

5  A.  Would you like me to start from the bottom and go up because

6  I believe that's the order --

7  Q.  No.  Please start with "It was received."

8  A.  Okay.  "It was received, I really appreciate it.  Thanks

9  Sonny."

10  Q.  And there's an e-mail below that, correct?

11  A.  Yes.

12  Q.  Which preceded you saying, "I really appreciate it, thanks

13  Sonny," right?

14  A.  Right.

15  Q.  What's the date of that e-mail?

16  A.  February 10, 2012.

17  Q.  And who wrote you that e-mail?

18  A.  Sonny.

19  Q.  And what does it say?

20  A.  "Good morning.

21      "Just wanted to confirm your receipt of wire transfer.

22  Let me know if you need anything else.

23      "Peace,

24      "Sonny."

25  Q.  Did you, in fact, receive payment from Sonny Izon's company,

1   ICT?

2   A.  Yes.

3   Q.  If we could go back to page 1, to the e-mail in the middle

4   of the page dated May 2nd at 1:54 a.m.

5           Is this an e-mail that we saw before about you trying

6   to wrap up and sending blessings to Sonny?

7   A.  Yes.

8   Q.  And then if we go to the very top e-mail -- I'm sorry, the

9   next e-mail, which is May 17, 2012, at 9:11, who wrote to you

10  then?

11  A.  Sonny.

12  Q.  And what did he say?

13  A.  "Hi Kent.

14          "I know you are wrapping up work on the campaign.  I

15  was wondering if you will be sending a full or partial invoice

16  for May.  Please advise.

17          "Peace,

18          "Sonny."

19  Q.  And now the final e-mail at the top.  Please read that to

20  the jury.

21  A.  "I ha an agreement with Dimitri that went thru the month of

22  June.

23          "Thanks.

24          "Kent."

25  Q.  Did you write that?

1  A.  Yes.

2  Q.  Did you write that to Sonny Izon?

3  A.  Yes.

4  Q.  Who else did you write that to?

5  A.  I cc'd or I copied Dimitri on it.

6  Q.  And on the e-mail from yourself to Sonny Izon, how can

7  you -- I'm sorry; to Sonny Izon, is it copied to Dimitri Kesari

8  or is it to Dimitri Kesari?

9  A.  It's to both of them.

10 Q.  And when you said, "I ha an agreement with Dimitri that went

11 thru the month of June," what's "ha"?

12 A.  Had.

13 Q.  Is that a typo or --

14 A.  Yes.

15 Q.  Just making that clear.

16         Turning your attention to Government's Exhibit 91,

17 which is not in evidence.

18         Ms. Draughn, can you make that as large as possible.

19         Do you know what this document is?

20 A.  It's an e-mail from me to Sonny.

21 Q.  Do you remember it?

22 A.  Yes.

23 Q.  Does it concern the invoicing?

24 A.  Yes.

25         MR. PILGER:  Your Honor, the government offers 91 in

1  evidence.

2                         (Government Exhibit 91 was

3                          offered in evidence.)

4          MS. SINFELT:  Your Honor, hearsay as to Mr. Benton,

5  Your Honor.

6          MR. BINNALL:  Hearsay objection as well.

7          THE COURT:  Overruled.  91 is received.

8                         (Government Exhibit 91 was

9                          received in evidence.)

10  BY MR. PILGER:

11  Q.  Mr. Sorenson, is that big enough for you to read to the

12  jury?

13  A.  Yes.

14  Q.  All right.  So you said -- well, who is this from?

15  A.  It's from me.

16  Q.  And who is it to?

17  A.  Sonny Izon.

18  Q.  And what is the date?

19  A.  May 21, 2012.

20  Q.  Are there PDF -- are there PDFs listed in the header?

21  A.  Yes.

22  Q.  And what's a PDF?

23  A.  Did you say what's the PDF or what is a PDF?

24  Q.  What is a PDF?

25  A.  The PDF is a document that I saved in my invoices.

1  Q.  And are those documents that you attached to this e-mail

2  that we're about to see?

3  A.  Yes.

4  Q.  Okay.  Please read the e-mail to the jury.

5  A.  "Sonny,

6       "I wasn't real clear on your invoice request.  I am

7  attaching one that just has May and one that includes May and

8  June.

9       "Thanks.

10       "Kent."

11  Q.  Turning to page 2 of this exhibit, is this an invoice from

12  your company, Grassroots Strategy, to ICT in Hyattsville,

13  Maryland?

14  A.  Yes.

15  Q.  Does it include two line items?

16  A.  Yes, it does.

17  Q.  Please read them one at a time to the jury.

18  A.  Provides monthly service for month of May 2012, $8,000.

19  Q.  Is that the first one?

20  A.  Yes.

21  Q.  What's the next one?

22  A.  Provides monthly service for month of June 2012, $8,000.

23  Q.  Turn to page 3, please, of the exhibit.

24       Is this the different invoice that you attached to the

25  same e-mail?

1   A.   Yes.

2   Q.   Is it from your company, Grassroots Strategy, to ICT, Inc.,

3   in Hyattsville, Maryland?

4   A.   Yes, it is.

5   Q.   And does it have one line item on it?

6   A.   Yes.

7   Q.   Please read that line item to the jury.

8   A.   Provides monthly service for month of May 2012, $8,000.

9   Q.   Okay.  Turning your attention to Government's Exhibit 153,

10  which is not in evidence.

11          Mr. Sorenson, showing you the multiple page document

12  that's Government's Exhibit 153, do you know what that is?

13  A.   Yes.

14  Q.   What is it?

15  A.   It's my bank statements for Grassroots Strategies, Inc.

16  Q.   And if you would turn to the very last page of the exhibit,

17  does it include a certificate from a custodian of records at the

18  bank?

19  A.   Yes.

20  Q.   Are these, in fact, your bank records?

21  A.   Yes, they are.

22          MR. PILGER:  The government offers 153 in evidence,

23  Your Honor.

24                            (Government Exhibit 153 was

25                             offered in evidence.)

1          MR. HOWARD:  No objection, Your Honor.

2          MR. BINNALL:  Hearsay objection from Mr. Kesari.

3          THE COURT:  Overruled.  153 is received.

4                              (Government Exhibit 153 was

5                               received in evidence.)

6  BY MR. PILGER:

7  Q.  If you could look at page 1.  Grassroots Strategy, Inc.,

8  banked at City State Bank in Indianola, correct?

9  A.  Correct.

10 Q.  And if we could zoom in, please, on the top part of the line

11 items, including the deposits.

12         Can you see those numbers all right, Mr. Sorenson?

13 A.  Yes.

14 Q.  Okay.  Is there a line item for $33,000?

15 A.  Yes.

16 Q.  What is it?  Is it a deposit, a debit?

17 A.  It's a deposit.

18 Q.  Where did that $33,000 come from?

19 A.  It was a wire transfer.

20 Q.  Wire transfer from --

21 A.  ICT.

22 Q.  -- where?  Okay.  Don't talk over each other.

23 A.  Sorry.

24 Q.  Turning your attention to page 4 -- I'm sorry; the next one.

25 Sorry, Ms. Draughn.  Actually could you go back to page 1?

1          What was the date of the $33,000 wire transfer?

2  A.  February 9, 2012.

3  Q.  Thank you.

4          Now going to page 4, please.

5          Is this another page of your bank statements?

6  A.  Yes.

7  Q.  And focusing on the line items at the top, deposits/other

8  credits, did something happen on April 9th of 2012?

9  A.  Yes.

10  Q.  What happened?

11  A.  There was a deposit for $16,000.

12  Q.  Where did that come from?

13  A.  ICT, Inc.

14  Q.  Turning your attention to page 6.

15          Is that a page of another bank statement of yours --

16  your company's, I should say?

17  A.  Yes.

18  Q.  Turning to the deposits and other credits section, did

19  something happen on May 4, 2012?

20  A.  Yes.

21  Q.  What happened?

22  A.  Deposit for $8,000.

23  Q.  Where did that come from?

24  A.  ICT, Inc.

25  Q.  Turning your attention to page 8.

1          Is that a page from another statement of your company,

2  Grassroots Strategy, Inc.?

3  A.  Yes.

4  Q.  Directing your attention to the deposits and other credits

5  section, did something happen on June 12th?

6  A.  Yes.

7  Q.  What happened?

8  A.  Deposit from ICT for $8,000.

9  Q.  The words "ICT" are not on this exhibit, are they?

10  A.  No.

11  Q.  Is it your independent recollection that the $8,000 came

12  from ICT?

13  A.  Correct.

14  Q.  Directing your attention to page 10.

15          Is this another page from another statement of your

16  bank for Grassroots Strategy?

17  A.  Yes.

18  Q.  And directing your attention to the deposits and other

19  credits section, did something happen on July 27, 2012?

20  A.  Yes.

21  Q.  What happened?

22  A.  A deposit for $8,000.

23  Q.  Where did that come from?

24  A.  ICT, Inc.

25  Q.  Mr. Sorenson, did you ever do any work for ICT, Inc.?

1 A.  No.

2 Q.  Did your company, Grassroots Strategy, ever do a lick of

3 work for ICT, Inc.?

4 A.  No.

5 Q.  Did you lie to various investigators about whether or not

6 you had done work for ICT, Inc.?

7 A.  Yes.

8 Q.  Did you tell investigators that you had scouted photo

9 locations for ICT?

10          MR. HOWARD:  Objection.  These are all leading.

11          THE COURT:  That's leading.  Sustained.

12          MR. PILGER:  Yes, Your Honor.

13 BY MR. PILGER:

14 Q.  Tell the jury whether or not your -- what you lied about

15 concerning ICT and any work that you may have done.

16 A.  During the senate ethics probe while I was in the State

17 Senate, Investigator -- or Special Investigator Mark Weinhardt

18 asked me under oath if I had done any work for ICT, Inc., and I

19 lied and told him that I had and that I had scouted locations

20 for commercials and videos in Des Moines and in Iowa.

21 Q.  And when you say lied, just to be very clear, did you ever

22 scout a photo location for ICT, Inc., or not?

23 A.  No.

24 Q.  Never did?

25 A.  No.

1  Q.  So you mentioned lying to Mr. Weinhardt, who was working for

2  whom?

3  A.  He was appointed by the Senate Ethics Committee as a special

4  investigator looking into an ethics complaint that was filed

5  against me.

6  Q.  If you can keep your voice up, I'm having trouble hearing

7  you.

8  A.  Sorry.

9  Q.  If you could pull the microphone closer.

10        And when you say the senate, that's the Iowa State

11  Senate, correct, not the U.S. Senate?

12  A.  Correct.

13  Q.  And the Iowa State Senate investigation had you under oath

14  at one point, right?

15  A.  Yes.

16  Q.  And that's when you lied and said that you hadn't done

17  work -- or that you had done work for ICT, correct?

18  A.  I lied and said that I had done work for them, yes.

19  Q.  Now, tell the jury, have you pled to any crimes arising from

20  the things that we've been discussing?

21  A.  Yes.

22  Q.  What crimes have you pled guilty to?

23  A.  I pled guilty to causing someone to file --

24        MR. BINNALL:  Objection as to exactly what crime comes

25  in as it might improperly give the idea that those were

1  actually -- that what he did was actually illegal.

2          THE COURT:  Overruled.

3          MR. PILGER:  You may answer, sir.

4  A.  That I -- I'm sorry, that I pled guilty to causing someone

5  to file a false FEC report.

6  BY MR. PILGER

7  Q.  Was that one thing you pled guilty to?

8  A.  Yes.

9  Q.  Did you plead guilty to something else?

10 A.  Yes.

11 Q.  What was that?

12 A.  Obstruction of justice.

13 Q.  Let's talk about the obstruction of justice.  In what way

14 did you obstruct justice that you pled guilty to?

15 A.  I pled guilty to obstruction of justice because of lying

16 under oath and covering up that we had not put the payments on

17 the FEC reports.

18         MR. BINNALL:  Objection as to relevance on that.

19         THE COURT:  Overruled.

20 BY MR. PILGER:

21 Q.  Would it refresh your recollection as to exactly what you

22 pled guilty to to review any documents?

23 A.  Yes.

24 Q.  Just look at this document.  Do not read aloud from it.

25 Please read the paragraph I'm indicating and the highlighted

1   portions and look up at me when you're done.

2           Does that refresh your recollection as to exactly what

3   obstruction of justice crime you pled guilty to?

4   A.   Yes.

5   Q.   And exactly what crime was that?

6   A.   Falsifying records and covering up for it.

7   Q.   I'm sorry?

8   A.   Falsifying records and trying to hide it and cover it up.

9   Q.   In connection with anything in particular?

10  A.   Pardon me?

11  Q.   Falsifying in connection with anything in particular?

12  A.   Yes; getting paid by the campaign.

13  Q.   And with any particular kind of investigation?

14  A.   Yes, an investigation by the FBI and the FEC.

15  Q.   Did you reach a plea agreement with the government when you

16  entered your plea to those charges?

17  A.   Yes.

18  Q.   Do you remember all of the terms of that plea agreement off

19  the top of your head?

20  A.   No.

21  Q.   All right.  I'm going to go through your understanding of it

22  now.  If you need to refresh your recollection, you can ask,

23  okay?

24  A.   Yes.

25  Q.   What is your understanding about whether any further charges

1   will be brought against you either by the Federal Government or

2   the State of Iowa concerning your conduct that you have

3   described in these proceedings?

4   A.  As long as I'm honest and truthful, there will be no other

5   charges --

6          MR. HOWARD:  Objection, Your Honor.

7          THE WITNESS:  -- no further --

8          THE COURT:  Overruled.

9          THE WITNESS:  -- no further charges will be filed.

10          MR. PILGER:  Definitely don't talk over the judge.

11          THE WITNESS:  I'm sorry.

12          THE COURT:  You're fine.

13          Go ahead.  Pose your next question.

14   BY MR. PILGER:

15   Q.  Okay.  And was there any agreement as to prosecution of your

16   spouse?

17   A.  Yes.

18   Q.  What was that?

19   A.  That if I'm honest and truthful, no further prosecution will

20   apply to my wife either.

21   Q.  Do you understand there are penalties for the crimes that

22   you have pled guilty to?

23   A.  Yes.

24   Q.  Do you know what the maximum possible statutory penalties

25   are?

1  A.  Yes.

2  Q.  What are they?

3  A.  Twenty years for obstruction of justice and five years for

4  causing someone to falsify an FEC report.

5  Q.  Are there also fines that could be imposed?

6  A.  Yes.

7  Q.  And do you know the maximum amount of the fines for those

8  two offenses?

9  A.  I believe $250,000 each.

10  Q.  Do you know what supervised release is?

11  A.  Yes.

12  Q.  Do you understand the maximum term of supervised release

13  that you might face on these two charges?

14  A.  I believe it was three years.

15  Q.  On both?

16  A.  I believe so.

17  Q.  Does the plea agreement contain an agreement between the

18  government and yourself and counsel on whether or not you will

19  receive already, regardless of anything -- your testimony or

20  anything else, consideration for acceptance of responsibility?

21  A.  I believe that was for pleading guilty.

22  Q.  Tell the jury your understanding of that provision.

23  A.  According to my attorney, I believe I get --

24  Q.  Don't say what your attorney said.  Here, let me approach

25  you.

1  A.  Okay.

2  Q.  Please read this paragraph quietly to yourself and look up

3  at me when you're done.

4          (Pause.)

5          What is your understanding of the agreement as to your

6  acceptance of responsibility credit or consideration?

7  A.  The sentencing guidelines are based upon a point system and

8  I would receive a three-level point reduction.

9  Q.  And does that depend in any way on anything else that you

10  do?

11  A.  No.

12  Q.  As long as the plea agreement stays in effect, correct?

13  A.  Correct.

14  Q.  Are there circumstances where the plea agreement may not

15  stay in effect?

16  A.  Yes.

17  Q.  What are those?

18  A.  If I lie under oath.

19  Q.  And are there other things that could cause your plea

20  agreement to not remain in effect?

21  A.  I don't recall.

22  Q.  Well, let me back up.  You understand that you have no right

23  to withdraw from this plea agreement on your own, right?

24  A.  Correct.

25  Q.  If you violate the law, could your plea agreement be voided?

1    A.   Yes.

2    Q.   Now, you also -- at the time that you entered your plea and

3    with your plea agreement, you had a cooperation agreement with

4    the United States, correct?

5    A.   Yes.

6    Q.   And that's in a separate document and -- that's in a

7    separate document than your plea agreement, correct?

8    A.   Correct.

9    Q.   Let's talk about your understanding of your cooperation

10   agreement.

11         Okay.  Just tell the jury what's your understanding of

12   what you have to do under the cooperation agreement.

13   A.   I need to cooperate fully and be honest and truthful in my

14   testimony.

15   Q.   Do you have an obligation as to questions that may be asked

16   of you?

17   A.   Yes.

18   Q.   Do you have an obligation regarding withholding information?

19   A.   Yes.

20   Q.   What is that?

21   A.   That I can't withhold information.

22   Q.   Do you have an obligation about attempting to protect or

23   implicate any person?

24   A.   Yes.

25   Q.   What's that?

1  A.  I'm not allowed to.

2  Q.  You're not allowed to -- are you allowed to do that

3  truthfully?

4  A.  Yes, but not with wrong motives.

5  Q.  Are you allowed to lie about it?

6  A.  No.

7  Q.  Do you understand what's the consequence of failing to

8  provide complete and truthful information under your cooperation

9  agreement?

10  A.  I could face further charges.

11  Q.  Do you have an obligation to be truthful with regard to just

12  the government or with anyone else?

13  A.  My obligation of truth is on the case, not just to the

14  government.

15  Q.  Well, you signed up to be truthful to a list of people.  Do

16  you recall that list?

17  A.  I don't, but maybe you could refresh my memory.

18  Q.  Let's look at the highlighted portion, and don't read aloud,

19  but tell me when you're done reading it.

20          (Pause.)

21          Okay.  Who do you have to be truthful with?

22  A.  The defendants.

23  Q.  And who else?

24  A.  The jury.

25  Q.  Directing your attention to this portion of this page, who

1  do you have to be truthful with?

2  A.  The judge.

3  Q.  You understand that you'll be sentenced by a judge of this

4  court, correct?

5  A.  Yes.

6  Q.  Not the judge here today, but a different judge, right?

7  A.  Correct.

8  Q.  You understand the United States has the sole discretion to

9  determine whether you're being truthful under this agreement?

10  A.  Yes.

11  Q.  Do you understand that the United States will on that

12  initial determination decide whether or not to make a motion to

13  your sentencing judge asking for a sentencing consideration?

14  A.  Yes.

15  Q.  Who will ultimately decide whether you get sentencing

16  consideration after that decision?

17  A.  The judge.

18  Q.  Does the government ultimately decide whether you get a

19  lenient sentence or not?

20  A.  No.

21  Q.  Under your cooperation agreement, what is the effect of any

22  violation of law or your pretrial conditions?

23        MR. HOWARD:  Your Honor, I'm going to object.

24        THE COURT:  Overruled.  It's his understanding of his

25  plea agreement.

1    BY MR. PILGER:

2    Q.   Do you need to be refreshed?

3    A.   I would like to be refreshed.

4    Q.   Directing your attention to this paragraph highlighted.

5          Does that refresh your recollection?

6    A.   Yes.

7    Q.   What could be the effect of a violation of law on your

8    cooperation agreement?

9    A.   Our agreement could be void.

10   Q.   And, Mr. Sorenson, you have been charged with a misdemeanor

11   case in Warren County; is that correct?

12   A.   Correct.

13   Q.   And that's pending, correct?

14   A.   Yes.

15   Q.   Do you remember the factors that the cooperation agreement

16   lists that will -- can and will be considered by the sentencing

17   judge in looking at your case?

18   A.   I do not.

19   Q.   Would this document refresh your recollection on these

20   factors?

21   A.   Yes.

22         MR. BINNALL:  And I'm going to object to this as to

23   relevance.  Objection to relevance, hearsay, and legal

24   conclusions.

25         THE COURT:  The plea agreement is relevant.

1                Go ahead and show it to him.

2                MR. PILGER:  Yes, Your Honor.

3    BY MR. PILGER:

4    Q.  Directing your attention to the indicated paragraph and the

5    highlighted provisions, does that refresh your recollection?

6    A.  Yes.

7    Q.  Okay.  Is it a factor for the court to evaluate something

8    about the nature of your assistance or cooperation?

9    A.  Could you -- I don't understand the question.  I'm sorry.

10   Q.  Looking at the first provision, does that refresh your

11   recollection on the nature of the first factor the court would

12   consider as to your cooperation?

13   A.  Yes.

14   Q.  And what is that factor?

15   A.  The court evaluates the significance and usefulness of my

16   testimony.

17   Q.  Significance and usefulness will be evaluated by the court,

18   correct?

19   A.  Yes.

20   Q.  We're not going to do all of these.

21                What's the next factor?

22   A.  Truthfulness, completeness, and reliability.

23   Q.  And directing your attention to the -- down the page to a

24   factor that's highlighted --

25   A.  Yes.

1  Q.  -- is there a factor concerning any criminal violations you

2  might commit?

3  A.  Yes.

4  Q.  And explain that.  What's your understanding of that?

5  A.  Well, that will also take part in my sentencing.

6  Q.  The judge is going to consider whether you've committed

7  another criminal offense, correct?

8  A.  Absolutely.

9  Q.  And, finally, is it a factor whether or not you have abided

10  by the terms of your plea agreement?

11  A.  Yes.

12        MR. PILGER:  One moment, Your Honor.

13        (Pause.)

14  BY MR. PILGER:

15  Q.  So we talked about the payments that went through 2012?

16  A.  Yes.

17  Q.  Other than endorsing Ron Paul on December 28, 2011, did you

18  really do any work for $8,000 a month for the Paul Campaign?

19  A.  No, other than I went to South Carolina once.

20  Q.  What did you do in South Carolina?

21  A.  There was a group of state senators they were trying to get

22  to endorse Ron Paul, and Dimitri asked me to come to South

23  Carolina and reassure them that they would take care of them if

24  they endorsed Ron Paul.

25  Q.  Did you do that?

1   A.  Yes.

2   Q.  Now I'm going to turn your attention one year forward, so

3   now we're in 2013.  Are you with me?

4   A.  Yes.

5   Q.  In 2013 were you aware that there were multiple

6   investigations of your conduct that we've been discussing?

7   A.  Yes, I was.

8   Q.  Turning your attention to February of 2013, did you become

9   aware of anything regarding the FEC?

10          MR. BINNALL:  Your Honor, I don't -- there's no

11  relevance at this point as to what he knew.

12          THE COURT:  Overruled.

13  A.  Um --

14  BY MR. PILGER:

15  Q.  Just "yes" or "no" to start.  Let's go slow.

16  A.  I don't recall.

17  Q.  At some point during 2013, did you become aware of an FEC

18  investigation?

19  A.  Yes.

20  Q.  And at some point during 2013, did you become aware of an

21  FBI investigation?

22  A.  Yes.

23  Q.  Did you talk to Dimitri Kesari about that?

24  A.  Many times.

25  Q.  And did you also e-mail him in regard to the investigations?

1  A.  I believe so.

2  Q.  Turning your attention to Government's Exhibit 60, which is

3  not in evidence.

4           Preliminarily, is this an e-mail?

5  A.  Yes.

6  Q.  From you?

7  A.  Yes.

8  Q.  Do you recognize or remember it?

9  A.  I do.

10  Q.  Is it to Dimitri Kesari?

11  A.  Yes.

12  Q.  What's the date?

13  A.  August 7, 2013.

14  Q.  And does it concern the events that you've been testifying

15  to previously in these proceedings?

16  A.  Yes.

17  Q.  And does it concern specifically the check in evidence as

18  Government's Exhibit 133?

19  A.  Yes.

20           MR. PILGER:  The government offers 60 into evidence.

21                         (Government Exhibit 60 was

22                          offered in evidence.)

23           MR. HOWARD:  Your Honor; as to Mr. Benton, multiple

24  objections, relevance, undue prejudice.  This has nothing to do

25  with Mr. Benton, and hearsay, Your Honor.

```
 1            MR. BINNALL:  And Mr. Kesari objects as to the
 2   hearsay.  No proper hearsay exception is applicable.
 3            THE COURT:  Overruled.  60 is received.
 4                            (Government Exhibit 60 was
 5                             received in evidence.)
 6   BY MR. PILGER:
 7   Q.  So, Mr. Sorenson, once that comes up on the screen, let's
 8   just show the jury the header.
 9            You sent an e-mail to Dimitri Kesari on August 7,
10   2013, correct?
11   A.  Correct.
12   Q.  And explain the body of this e-mail.
13            If you could scroll down.
14            It says, "The check," right?
15   A.  Yes.
16   Q.  And what check are you referring to?
17   A.  The $25,000 check written to me from Dimitri on the check of
18   Designer Goldsmiths, Inc.
19   Q.  And scrolling down, just read the next portion.  Does it say
20   something about a release?
21   A.  Yes.
22   Q.  What does that say?
23   A.  "For immediate release."
24   Q.  Okay.  What is the rest of this e-mail doing?
25   A.  It is an e-mail that I was putting out -- I wanted to put
```

1   out, a press release, addressing the check because the check had

2   become public at that time.

3   Q.  Is this an actual release at this point or a draft release?

4   A.  I believe it's a draft release.

5   Q.  And you were sending the draft release to who?

6   A.  To Dimitri.

7   Q.  Okay.  Please read the date of the draft press release.

8   A.  August 7, 2013.

9   Q.  And the byline is what location?

10  A.  Milo, Iowa.

11  Q.  And please read the entire draft press release.

12  A.  "From the week or two after I started advocating for the

13  Michelle Bachmann Campaign back in the early part of 2011,

14  people close to what would soon become the Ron Paul Campaign

15  approached me about supporting Congressman Ron Paul instead.

16       "It made sense for them to do so.  Several of these

17  people were friends of mine from previous campaigns and had

18  helped with the organization of my own legislative race.

19       "On one occasion, an Iowa staff member for Congressman

20  Paul did suggest a payment to switch ranks.

21       "The check was offered to a family member; however, as

22  I felt strong ethical and legal deficiencies in accepting it, I

23  ignored the check, and never deposited it nor cashed such.

24       "Hence, I was never paid.

25       "This check was turned over to my attorney for the

1  event that a day such as this one should ever arrive.  My

2  attorney can verify that the check was real, the check was

3  intact and that the check was unendorsed.

4         "The fact of the matter is that, with the Bachmann

5  Campaign crashing down around itself, with their refusal to

6  listen to the advice and counsel of members of the Iowa staff,

7  including myself, and with the surging support for Dr. Paul,

8  whom was my next closest idealogical candidate and many of whose

9  supporters I considered my own, my move to the Paul Campaign at

10 the time was a natural fit."

11 Q.  Okay.  Did you talk to Dimitri Kesari about this draft press

12 release?

13 A.  Yes.

14 Q.  How did you communicate with him?

15 A.  I'm not sure --

16 Q.  Let me ask a better question.

17        How did you first communicate with him?

18 A.  I don't know if it was an e-mail or phone call, but I

19 believe it was a phone call.

20 Q.  And what's your understanding of where he was when you made

21 that phone call?

22 A.  I believe that was the time when Dimitri was overseas maybe

23 in Greece or Albania.  I'm not sure.

24 Q.  And what did you and Dimitri Kesari say about this draft

25 press release?

 1  A.  He did not want me to send it out.

 2  Q.  Did he say why?

 3  A.  He did not want me to openly talk about the check.

 4  Q.  Did he say why he didn't want you to openly talk about the

 5  check?

 6  A.  At that time I don't believe he did.  He just wanted me to

 7  deny that I ever received a check.

 8  Q.  Okay.  What was his demeanor?  Was he calm, upset, happy,

 9  sad, what?

10  A.  Frustrated and flustered.

11  Q.  In the time period near the time of this e-mail, did

12  something happen concerning a visit to your home?

13  A.  Yes.

14  Q.  What happened?

15          THE COURT:  Let's take that up after the break.  We'll

16  come back at 10:55.  See you then.

17          (Recess at 10:33 a.m., until 11:01 a.m.)

18          THE COURT:  Please be seated.

19          Mr. Pilger, you may continue.

20          MR. PILGER:  May it please the court.

21  BY MR. PILGER:

22  Q.  Mr. Sorenson, during the time that you were being paid by

23  the Ron Paul Campaign, did you know what you were doing was

24  illegal?

25          MR. HOWARD:  Objection.

1          MR. BINNALL:  Objection; calls for a legal conclusion.

2          THE COURT:  Overruled.

3          Did you believe what you were doing was illegal?

4          MR. BINNALL:  Your Honor, the question was know, and

5   that's particularly the objection here.

6          MR. PILGER:  It's part of --

7          THE COURT:  The objection is overruled.

8   A.  Yes.

9   BY MR. PILGER:

10  Q.  And is that a part of your plea you entered in front of

11  another judge?

12  A.  Yes.

13         THE COURT:  By the way, his plea agreement can only be

14  used against him to determine his credibility, not the

15  credibility of any others.  It's what he's done.  It's for his

16  credibility and for no other purpose.

17         Go ahead.

18  BY MR. PILGER:

19  Q.  Turning your attention back to Exhibit 60 and to remind

20  everyone, tell me, is this the e-mail that you sent with a draft

21  press release to Dimitri Kesari on August 7, 2013, after the

22  payments?

23  A.  Yes.

24  Q.  And if we could zoom in on the line that starts, "On one

25  occasion."

1          Just read that one portion to the jury.

2 A.  "On one occasion, an Iowa staff member for Congressman Paul

3 did suggest a payment to switch ranks."

4 Q.  Who were you referring to when you wrote that?

5 A.  Dimitri Kesari.

6 Q.  And what was Dimitri Kesari's response to you about this

7 portion of the press release?

8 A.  He wanted me to -- he actually didn't want the press release

9 period, but he did not want that part included as well.

10 Q.  I understand that, but I want you to address whether or not

11 he had a particular reaction to this part of the press release

12 or not.

13 A.  I don't recall if he had something on this specific

14 sentence.

15 Q.  Very well.  Overall as to the press release, was he unhappy

16 or happy about what you were doing?

17 A.  Very unhappy.

18 Q.  So then --

19          THE COURT:  Can I interrupt for just a second?

20          Turn your phone back on, ma'am.  If you need to take a

21 call, I want you to get that phone call.

22          Is your phone with you?

23          JUROR RUBEL:  Yes.

24          THE COURT:  Turn it on.

25          Go ahead.

1          MR. PILGER:  Yes, sir.

2    BY MR. PILGER:

3    Q.  You talked to Mr. Kesari about the press release, correct?

4    A.  Yes.

5    Q.  Did you or did you not talk to him about the investigations

6    that you testified were going on?

7    A.  Yes.  We spoke about that on multiple occasions.

8    Q.  Fair enough.  On multiple occasions during 2013?

9    A.  Yes.

10   Q.  Okay.  Did he talk to you about whether or not you should

11   lie to people about what had happened?

12   A.  He made it very clear that he did not want me to discuss it

13   and to cover it up.

14   Q.  And would that include lying to anyone who asked about the

15   facts that had happened?

16   A.  Yes.

17          MR. BINNALL:  Objection; calls for speculation.

18          THE COURT:  Overruled.

19   BY MR. PILGER:

20   Q.  Just to be clear the jury heard your answer, would that

21   include lying to anyone who asked about your conduct?

22   A.  Yes.

23   Q.  Okay.  And, in fact, you did lie to people prior to your

24   plea agreement, correct?

25   A.  Yes.

1  Q.  And you even lied to the FBI, didn't you?

2  A.  Yes.

3  Q.  Turning your attention to, for example, December 4, 2013,

4  there had already been a search warrant at your house, right?

5  A.  Yes.

6  Q.  Who conducted the search warrant?

7  A.  There was a team of agents.

8  Q.  I'm not asking for their names.  Do you know the agency?

9  A.  The FBI.

10  Q.  Did you have a telephone call with an FBI agent after that

11  search?

12  A.  Yes.

13  Q.  Did you repeatedly tell the FBI agent about whether or not

14  you had done anything wrong?

15  A.  Yes.

16  Q.  What did you tell the FBI agent?

17  A.  I told him I had done nothing wrong.

18  Q.  Was that true or false?

19  A.  That was false.

20  Q.  And it was your understanding that that was in accord with

21  what Dimitri Kesari wanted you to do?

22  A.  Yes.

23  Q.  And in accord to discussions that you had specifically had

24  with Dimitri Kesari in 2013?

25  A.  Yes.

1  Q.  And did those discussions stretch back to the December 29,

2  2011 meeting?

3  A.  The discussions about what I was to say?

4  Q.  Let me ask a better question.

5         Did the discussions about lying about the payments

6  stretch back to December 29th of 2011?

7  A.  Yes.

8  Q.  So we've talked about Government Exhibit 60, and you

9  explained Mr. Kesari was unhappy about that?

10 A.  Yes.

11 Q.  Did something happen next concerning a visit to your home?

12 A.  Yeah.  I'm not sure exactly how soon after, but shortly

13 after.

14        MR. HOWARD:  Excuse me.  Hearsay as to Mr. Benton.

15        THE COURT:  Overruled.

16        MR. PILGER:  You may answer.

17 A.  Shortly after, it was after this e-mail and before I

18 testified in the grand jury, Dimitri came to my house.

19 BY MR. PILGER:

20 Q.  Okay.  When he came to your house, did he tell you how he

21 had gotten to your house?

22 A.  Yes.  He actually may have told me before he came that he

23 was going to fly into Omaha rather than Des Moines.

24 Q.  Did he tell you why he was going to do that?

25 A.  Because he didn't want to be seen in Des Moines, it would

1  draw less attention in Omaha.

2  Q.  When he would ordinarily come to see you, where would he fly

3  to?

4  A.  He wouldn't typically just come and see me.  He was just in

5  town for business.

6  Q.  Okay.  Fair enough.  On times when you were aware of his

7  presence in Iowa or this part of Iowa, in particular, where

8  would he fly to?

9  A.  Either to Des Moines or Cedar Rapids.

10  Q.  Okay.  In your experience did he ever fly to Omaha?

11  A.  Not that I know of, no.

12  Q.  On this occasion he told you he did?

13  A.  Yes.

14  Q.  And that was why again?

15  A.  He flew to Omaha and rented a rental car because it would be

16  less suspicious for him to come to my house.  He didn't want to

17  be seen in Des Moines because of the current investigation of

18  the Senate Ethics Committee and the ongoing investigation with

19  the FEC and FBI.

20  Q.  Okay.  So he told you that he rented a rental car?

21  A.  Yes.

22  Q.  And you said he came to you house; is that right?

23  A.  Yes.

24  Q.  Did you see him arrive in the rental car?

25  A.  Yes.

1  Q.  Okay.  Then what happened?

2  A.  Well, he was on his way over and he called and asked what we

3  wanted to eat, and we discussed that and he picked up groceries.

4  So when he got to the house, I met him outside to help him carry

5  in the groceries, and when he got out of his car, I left my

6  garage and we met each other, and he asked me if I was wearing a

7  wire.  And I kind of scoffed at him, and I said, are you, and he

8  lifted his shift up and asked me to do the same.  And I did.

9  Q.  You did lift your shirt up?

10  A.  Yes.

11  Q.  What was your understanding of why that was happening?

12  A.  I wasn't really sure at the time.  I mean, I assumed it was

13  because of everything that was going on, but that was the first

14  inclination that I was really in trouble.

15  Q.  Okay.  Fair enough.  You're not sure, but I want to make

16  clear to the jury, did you think this was some joke or was a

17  serious thing?

18  A.  I could tell by his face he was serious.

19  Q.  Then what happened?

20  A.  We talked outside for a little bit.  We talked about the

21  check.  He -- my family was still in the house.  I'm not sure if

22  my wife had come out yet or not, but we talked about the check.

23  He asked me for the check and he --

24  Q.  Could we pause there and do this slowly?

25  A.  Yes.

1  Q.  What do you mean he asked you for the check.  What does that

2  mean?

3  A.  He asked me for the check that he had given me in 2011.

4  Q.  So can we get 133?

5       Is that the check from Designer Goldsmiths on the

6  screen now as Government's Exhibit 133 in evidence?

7  A.  Yes.

8  Q.  And he asked you for the check.  You mean -- to do what with

9  the check?

10 A.  Well, first he wanted me to give it back to him.

11 Q.  Okay.  Did you agree to do that?

12 A.  No.  I refused to.

13 Q.  Did he --

14 A.  And then -- I'm sorry, I interrupted you.

15 Q.  That's all right.  Did he ask you anything else about the

16 check?

17 A.  He asked me if he could -- first -- I don't remember which

18 happened first.  He asked me two other things about the check.

19 One was if he could write loan on the bottom of it in the memo

20 or at the bottom of the check, and I told him no.  Then he also

21 asked if he could change it from 25,000 to 2,500.

22 Q.  Did you agree to let him do those things?

23 A.  No.  And I remember asking him, I said, well, the check is

24 already -- I had already showed it to somebody, and I remember

25 asking him that I thought that was odd that he could just write

1  a check for 2,500 and change it, and he said that he carried a

2  separate checkbook from his wife, I believe, and that the

3  numbers -- that he doesn't use the checkbook frequently.

4          MR. PILGER:  Okay.  Nothing further, Your Honor.

5          THE COURT:  Mr. Howard?

6          MR. HOWARD:  Your Honor, I'm going to defer to

7  Mr. Binnall first and then I'll follow.

8          THE COURT:  Mr. Binnall.

9          MR. BINNALL:  Thank you, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. BINNALL:

12  Q.  Good morning, Mr. Sorenson.

13          My name is Jesse Binnall.  I represent Dimitri Kesari.

14  A.  Good morning.

15  Q.  Mr. Sorenson, when you were on the Bachmann Campaign, you

16  weren't being paid directly by the Bachmann Campaign, correct?

17  A.  Correct.

18  Q.  And your company, Grassroots Strategy, it wasn't being paid

19  directly by the Bachmann Campaign either, correct?

20  A.  Correct.

21  Q.  You were being paid through a company called C & M

22  Strategies?

23  A.  Yes.

24  Q.  So C & M Strategies would receive payment, and then that

25  payment would then be sent to your company, Grassroots Strategy,

1   correct?

2   A.   Correct.

3   Q.   And C & M Strategies was receiving that money from a

4   Political Action Committee associated with Ms. Bachmann's

5   campaign?

6   A.   I was not aware that she was receiving the money from a PAC.

7   Q.   Okay.  So --

8   A.   I thought it was coming from the campaign.

9   Q.   I understand.  But it was coming from some committee

10  associated with Michelle Bachmann, either her Presidential

11  Campaign or Political Action Committee?

12  A.   Correct.

13  Q.   And there came a time where you grew frustrated with the

14  Bachmann Campaign, right?

15  A.   Yes.

16  Q.   And they weren't taking your advice?

17  A.   No.

18  Q.   Her poll numbers weren't doing very well?

19  A.   No.

20          MR. PILGER:  I'm sorry, Your Honor, I can't hear

21  Mr. Binnall.

22          MR. BINNALL:  I'll try and keep my voice up.

23  BY MR. BINNALL:

24  Q.   Her poll numbers were not doing very well?

25  A.   Correct.

1  Q.  And many of your political friends were in the Ron Paul
2  Campaign?
3  A.  Correct.
4  Q.  In a lot of ways idealogically you felt more comfortable
5  with the Paul Campaign?
6  A.  In some areas.  In other areas I didn't agree with
7  Congressman Paul.
8  Q.  Is it safe to say you're probably not going to agree with
9  everybody on a hundred percent of things; is that correct?
10  A.  Correct.
11  Q.  Idealogically speaking, you were probably more in the Paul
12  camp?
13  A.  There was a specific incident in October where I realized
14  that Michelle had no business being President, and that's when I
15  was more open to switching to Ron Paul.
16  Q.  Okay, all right.  And, in fact, your wife also wanted you to
17  switch to support Ron Paul, too, right?
18  A.  Correct.
19  Q.  And part of that was finances, correct?
20  A.  Not then, not in October.
21  Q.  Okay.
22  A.  She was -- she didn't believe -- it was the same incident
23  that I had shared with Michelle Bachmann that we both lost faith
24  with Michelle.
25  Q.  Okay.  In fact, your wife didn't even think a woman should

1  be President, right?

2  A.  Correct.

3  Q.  And you guys, both you and your wife, were both concerned

4  that the Bachmann Campaign was running out of money by December,

5  correct?

6  A.  Yes.

7  Q.  And in October did you talk with Aaron Dorr about the

8  possibility of switching over to the Paul Campaign?

9  A.  Aaron Dorr consistently approached me about it, as well as

10  Dimitri and other people throughout the Paul Campaign.  That

11  happened for the whole year of 2011.

12  Q.  All right.  And you knew that Mr. Dorr sent a proposal on

13  Halloween of 2011 about terms for you to switch, right?

14  A.  I don't recall seeing it until Jesse Benton replied to it.

15  Q.  Did you talk with Mr. Dorr about the terms before Halloween?

16  A.  I don't recall that, no.

17  Q.  In December were you becoming more concerned about your own

18  finances?

19  A.  Well, I hadn't been paid, and that was a concern of mine.

20  Q.  The Bachmann Campaign was late on paying staffers?

21  A.  They were late on paying everybody.

22  Q.  How about your own personal finances, were you becoming more

23  concerned about your own personal finances?

24  A.  We weren't behind on income, but we were concerned about

25  future income.  I admit -- can I rephrase that?

1  Q.  Yes.

2  A.  We weren't behind on our bills, but we were concerned about

3  future income.

4  Q.  Okay.  Had you guys just been approved for purchasing a new

5  house at that point?

6  A.  A couple of months prior we had moved into a new house, and

7  I'm not sure if it was September or October.

8  Q.  And so the bills were getting larger, at this point your

9  kind of bottom line was going up a little bit?

10  A.  No.

11  Q.  Okay.

12  A.  We rented out our previous house, and really our payment,

13  our monthly payment went down a little.

14  Q.  But by December you did have financial concerns about

15  yourself and your family?

16  A.  About the future?

17  Q.  Yes.

18  A.  Or about the financial concerns as far as being behind in

19  payments?

20  Q.  Both.

21  A.  I was concerned about my income going forward because I knew

22  that Michelle Bachmann's campaign was coming to an end, but my

23  bills were being paid at that time.

24  Q.  And you knew that any leverage that you would get for being

25  able to join a new campaign and get paid probably needed to

1   happen before Iowa?

2   A.   I wasn't sure about that.  I mean, I -- that wasn't my main

3   concern going in was using -- having leverage.

4   Q.   Okay.  At that point -- well, we'll come back to that.

5            At that point did you feel financially dependent on

6   the income that you were getting from the Bachmann Campaign?

7   A.   That's safe to say.

8   Q.   At the dinner with Mr. Kesari on December the 26th, did you

9   talk to Mr. Kesari about whether the Bachmann Campaign was

10  current in its bills?

11  A.   I believe that was discussed.

12  Q.   And, in fact, you also told him that you were expecting to

13  receive about $25,000 from the Bachmann Campaign; isn't that

14  correct?

15  A.   That is not true.

16  Q.   Okay.  We'll come back to that.

17            Were you living paycheck to paycheck at that point?

18  A.   I don't know if we were living paycheck to paycheck.  I

19  mean, I think we -- just like most Americans, I've always lived

20  paycheck to paycheck, but I was able to buy a little bit of

21  silver and precious metal and stuff.  But did I have a year's

22  worth of income to support myself if something happened, no.

23  Q.   You testified in front of the grand jury on March the 25th,

24  2015, correct?

25  A.   Yes.

1   Q.   And you took an oath there to tell the truth?

2   A.   Yes.

3   Q.   You've taken a few of those, haven't you?

4   A.   Yes.

5            (Counsel conferring.)

6   BY MR. BINNALL:

7   Q.   Mr. Sorenson, in front of you is page 86 from your grand

8   jury testimony, correct?

9   A.   Yes.

10  Q.   You were asked the question:

11           "What did you tell Mr. Bachmann?"

12           You responded:

13           "Told him I was struggling.  I was concerned --

14        actually I told Guy, I told Guy part of my concern was I

15        wasn't sure what I was going to do after -- I believe it

16        was January 2nd was the caucus -- after the caucuses, I

17        wasn't sure what I was going to do.  We lived paycheck to

18        paycheck, and I didn't know what I was going to do."

19           You said that in your grand jury, didn't you?

20  A.   Yes.

21  Q.   You told Mr. Kesari that you had credit card payments coming

22  due, didn't you?

23  A.   I told him that I had out-of-pocket expenses from the

24  Bachmann Campaign.

25  Q.   At that point it's your testimony you never told him

1   anything about $25,000?

2   A.   I don't believe the figure $25,000 was actually mentioned,

3   but I could be wrong.

4   Q.   You spoke to the FBI a number of times between July of 2014

5   and last week, right?

6   A.   I don't know if it's several times.  I spoke to --

7   Q.   I'm sorry, I didn't say several.  That's my fault.  Several

8   times?

9        MR. PILGER:  I'm sorry.  I don't know what the

10   question is right now.

11   BY MR. BINNALL:

12   Q.   You spoke to the FBI several times between July of 2014 and

13   now, correct?

14   A.   I spoke to them on a few occasions, yes.

15        MR. BINNALL:  One moment, please.

16        (Pause.)

17   BY MR. BINNALL:

18   Q.   Do you remember speaking to them on July 24th of 2014?

19   A.   I don't remember that day, but --

20   Q.   Do you remember speaking to them in late July 2014?

21   A.   Yes.

22   Q.   Do you remember telling them that in December 2011 or

23   January 2012 that you would receive a $25,000 check from

24   Michelle PAC and that's how you were going to cover your

25   expenses?

1   A.   No.

2   Q.   Is it your testimony you didn't say that?

3   A.   No.

4   Q.   That's -- you were -- I'm sorry, probably the way I asked

5   it.

6           Today you're saying that you never said that?

7   A.   I didn't say I was going to receive a $25,000 check from

8   Michelle PAC.  I said Guy Short was going to receive a $25,000

9   check from Michelle PAC and pay us $9,000 a month.

10  Q.   Okay.  And you told Mr. Kesari that that night at the

11  barbecue place in Altoona, didn't you?

12          MR. PILGER:  I'm sorry, Your Honor.  I just cannot

13  hear Mr. Binnall.

14  BY MR. BINNALL:

15  Q.   You told that to Mr. Kesari that night at the barbecue

16  restaurant, didn't you?

17  A.   That Guy Short was going to get a $25,000 check?

18  Q.   And then continue to pay you?

19  A.   The eight or nine thousand dollars a month or $7,500 a

20  month?

21  Q.   Yes.

22  A.   I may have.  I'm not sure.

23          I just want to be clear, I never thought I was going

24  to get a $25,000 check from Michelle PAC.

25  Q.   Okay.  And you -- at that dinner Mr. Kesari never showed you

1  any check at all, right?

2  A.  No.

3  Q.  You testified yesterday that the first time that you saw

4  that check was as you were driving home from the restaurant with

5  your wife, correct?

6  A.  Yes.

7  Q.  And when you went to the fairgrounds in Altoona, at that

8  point you had no idea what any deal with the Paul Campaign was

9  going to be, right?

10  A.  That's not an accurate statement.  I had an idea because it

11  had been discussed.  Did I know that that was going to -- that

12  it was going to be the same deal, no, but I assumed so.

13  Q.  In fact, you testified that you actually had to ask

14  Mr. Benton at the fairgrounds whether you were going to be taken

15  care of; is that the phrase you used?

16  A.  Correct.

17  Q.  So you didn't know for sure at that point whether or not

18  there was going to be a deal, did you?

19  A.  I wasn't -- I mean, at that point I was going on the

20  assumption of what we had discussed prior.  Walking in there,

21  I -- in the parking lot I asked Dimitri specifically, is John on

22  board, is Jesse on board?  He said, yes.

23          So I was assuming that was revisiting their

24  conversation following my decision to switch or my contemplating

25  the decision to switch; but I wasn't sure, no.

1  Q.  And when you went to the -- strike that.

2          You said that you had a meeting on December the 29th

3  regarding the Bachmann allegations at the Paul Campaign

4  headquarters?

5  A.  Yes.  You're bouncing around a lot.  I'm having a hard time

6  following you.

7  Q.  I understand.  December 29th, the meeting at the Paul

8  Campaign headquarters, do you remember talking about that

9  earlier?

10  A.  Yes.

11  Q.  And do you remember saying that there was a gentleman in the

12  room with the last name Spanos?

13  A.  Yes.

14  Q.  Do you remember for sure what his first name was?

15  A.  Sonny -- I'm not sure if it was Sonny or Nick.  There was

16  two brothers, and I got them mixed up.

17  Q.  Okay.  And Nick Spanos, he's from New York?

18  A.  Yes.

19  Q.  And he was in the room?

20  A.  I'm not sure if it was Sonny or Nick.

21  Q.  If I told you that there was nobody on the Paul Campaign

22  named Sonny Spanos, would you disagree with me?

23  A.  I could be wrong, but I believe there was a Sonny Spanos and

24  a Nick.  I'm not sure if they were on the campaign, but they

25  were volunteering.  They were brothers, and I know they're from

1  out East, and I know that he's a real estate agent and has

2  multiple bars and I heard how successful he was from Dimitri.

3  So I know there was a Sonny and Nick Spanos there.

4  Q.  And you didn't know for sure if you had a deal at that

5  point, did you?

6  A.  On the 29th?

7  Q.  Correct.

8  A.  I don't recall that at that point it was worked out, but I

9  knew that I was going to be paid.

10  Q.  We'll come back to that.

11          Mr. Kesari you're saying told you that day not to cash

12  the $25,000 check, though, correct?

13  A.  Yes, because he was going to work out a wire transfer.

14  Q.  And I understand.  I'm just saying that he did say that,

15  right?

16  A.  Correct.

17  Q.  And you didn't give it back to him, though, right?

18  A.  No.

19  Q.  You used it as leverage over him, didn't you?

20  A.  He didn't ask for it back at that time.

21  Q.  Well, at no point did you even -- at some point you

22  considered giving him the check back, right?

23  A.  I don't remember considering giving him the check back.  I

24  remember him asking for it, but at -- on the 29th, that was

25  never discussed, the check wasn't.  If I remember right, he told

1  me to throw it away, but I could be wrong on that; but he didn't

2  ask for it back.  I probably would have gave it back to him then

3  if he had.

4  Q.  So specifically, because I don't want to mince words here --

5  A.  Sure.

6  Q.  -- there came a point sometime in the end of December or

7  beginning of January that Mr. Kesari -- or that you considered

8  giving Mr. Kesari that check back, right?

9  A.  I don't recall that.

10  Q.  And you didn't give it back to him because you viewed it as

11  leverage over Mr. Kesari; isn't that right?

12  A.  I believe that was when he came to Iowa, but I could be

13  wrong.

14  Q.  Do you remember telling the grand jury -- talking to the

15  grand jury about why you kept the check?

16  A.  I don't.

17  Q.  In front of you is page 106 of your grand jury testimony.

18  And on page 17 -- I'm sorry, on line 17 -- line 18, you were

19  asked:

20          "Why did you keep the check?"

21          And you answered:

22          "I viewed it as leverage over Dimitri."

23          Isn't that correct?

24  A.  Yes, I haven't denied that.  You're just saying that I said

25  it in December or January, which isn't true.

1  Q.  Oh, that part isn't true?

2  A.  Yes.

3  Q.  All right.  We'll come back to that, too.

4        You actually viewed that check as a way to get -- to

5  make sure that you get a final deal with the Paul Campaign,

6  right?

7  A.  No.  I didn't need the check for the final deal.  At that

8  point the deal was done.  I mean, I had endorsed, they promised

9  to take care of me, and I knew it was going to happen.  I was

10  advised by another person to keep the check.

11  Q.  We'll get to that, too.

12        And you viewed it as a -- you even thought that

13  Mr. Kesari told you not to cash the check, that you could still

14  go to the bank and present it to the bank, didn't you?

15  A.  I'm not sure.  I probably would assume so.

16  Q.  Do you remember talking to the grand jury about that?

17  A.  Possibly.

18        MR. BINNALL:  106 to 107 of the grand jury testimony.

19  BY MR. BINNALL:

20  Q.  This is on two different pages and, again, this was on March

21  the 25th of this year before the grand jury.

22        You were asked:

23        "Did you also -- did you draw any conclusion about

24    whether you could cash this check if you needed to?"

25        And you answered:

1         "I assumed I could, unless he told me I couldn't.  But

2     even at that point, even if he told me I couldn't, I could

3     still go to the bank.  He can tell me I can't cash it, but

4     I can attempt to cash it."

5  A.  That sounds accurate.  I would think that's a true

6  statement.

7  Q.  I want to go back briefly to the period before you actually

8  switched over to the Paul Campaign.  So this was after the time

9  that you said you saw a check from Mr. Kesari's company from

10 your wife and before you actually went to the fairgrounds to

11 announce.

12        During that time you had a conference call with some

13 people, didn't you?

14 A.  I believe so.

15 Q.  You had a conference call with Aaron Dorr, Paul Dorr, Chris

16 Dorr, and Dennis Fusaro?

17 A.  I had said Dennis Fusaro, but I don't recall if he was on

18 the call or not.  I know I spoke to Dennis Fusaro on the 29th,

19 but I don't recall if he was on the conference call for sure.  I

20 believe I said that; but I'm having second thoughts now if

21 Dennis was there or not, but I know the other three people were.

22 Q.  All right.  Give me just one second.

23 A.  I'm not saying Dennis wasn't there.  I just don't recall.

24 Q.  Do you remember telling the grand jury that you were sure

25 that Mr. Fusaro was there?

1  A.  Yes.

2  Q.  And that was inaccurate?

3  A.  I don't know.  I'm not saying it was inaccurate.  I'm saying

4  that I testified before the grand jury some time ago, and now I

5  don't recall if Fusaro was there or not.  He very well could

6  have been.  He was a typical person to have on a conference call

7  with the Dorrs.

8  Q.  And on that conference call did you say anything about

9  giving the check back?

10  A.  I don't recall.

11  Q.  Do you remember discussing whether or not you were going to

12  switch?

13  A.  Yes.

14  Q.  And what did you tell everyone on the conference call?

15  A.  That I was not going to switch.

16  Q.  But then you did end up switching, correct?

17  A.  Yes.

18  Q.  Now, you actually did do some work for the Paul Campaign,

19  right?

20  A.  No.

21  Q.  You didn't travel to South Carolina like you previously

22  testified to campaign for Ron Paul?

23  A.  I went to South Carolina once, and I met with some senators.

24  If that constitutes work, then so be it.

25  Q.  On behalf of Ron Paul?

1  A.  Correct.

2  Q.  You recorded robo calls, too, didn't you?

3  A.  Yes, I did.  Yes, I did.  I forgot about the robo calls.

4  Q.  You traveled to some locations in Iowa with Dr. Paul's

5  Campaign on his behalf before the caucuses?

6  A.  Yes.

7  Q.  Now, you know South Carolina to be a pretty important

8  primary, maybe not as important maybe as the caucuses, but a

9  pretty important primary because it's early, right?

10  A.  Yes.

11  Q.  And in this case it was just shortly after the Iowa

12  caucuses, right?

13  A.  I believe it was third in line.  I could be wrong, but I

14  believe it was third.

15  Q.  Iowa, New Hampshire, South Carolina?

16  A.  Yes.  I could be wrong.  I'm sure you have that answer.

17  Q.  And they're important because they occur early in the

18  process?

19  A.  Yes.

20  Q.  And candidates that don't do well in one or more of those

21  primaries typically don't last very long in the presidential

22  campaign process, right?

23  A.  Correct.

24  Q.  And so you flew from Des Moines, Iowa, to Greenville, South

25  Carolina, on January the 18th, 2012, right?

1  A.  I can't -- I'm not sure if that was the date, but I assume

2  so.

3  Q.  That sounds about right, right?

4  A.  Yes.

5  Q.  And you stayed there until January the 22nd, 2012, right?

6  A.  I don't recall the dates, but that sounds about right.

7  Q.  You spent about four full days in South Carolina campaigning

8  for Ron Paul, right?

9  A.  Yes.

10 Q.  And you understood the importance of earned media in a

11 campaign, right?

12 A.  Yes.

13 Q.  And you got some earned media on behalf of Dr. Paul,

14 correct?

15 A.  Correct.

16 Q.  Some of it better than others, we would probably agree?

17 A.  True.

18 Q.  You even worked the televised spin room as a result of the

19 South Carolina Primary debate, didn't you?

20 A.  I don't recall that, but I could have.  I thought the only

21 appearance I made in South Carolina was at a pro life rally.

22 Q.  Have you ever been in a spin room after a debate?

23 A.  Yes.

24 Q.  But you don't remember one way or another if you were at the

25 one in South Carolina after the South Carolina debate?

1  A.  I don't remember that one.  I remember New Hampshire for

2  Michelle Bachmann and in Iowa for Michelle Bachmann.

3  Q.  You were interviewed by Iowa newspapers on behalf of

4  Dr. Paul?

5  A.  I don't remember doing an interview with the Des Moines

6  Register or any Iowa newspapers, but I very easily could have.

7  Q.  How about lending your name to blast e-mails that were

8  targeted to Iowa caucus goers?

9  A.  Yes.

10  Q.  And the caucuses were in early January 2012; is that right?

11  A.  I believe it was January 3rd.

12  Q.  I'm sorry, January 3rd; but that's not where the actual

13  delegates to the National Convention are actually selected,

14  right?

15  A.  Correct.

16  Q.  And it's actually those delegates from each state that

17  actually go to choose who the party is going to be, right?

18  A.  Yes.

19  Q.  And those delegates were selected in June of 2012, right?

20  A.  I don't recall, but that sounds about right.

21  Q.  And at the end of the day, Ron Paul got 22 delegates from

22  Iowa; isn't that right?

23  A.  I'm not sure, but I do remember that he came in third in the

24  caucuses; but he was first in delegate counts, I believe, but I

25  could be wrong.  I mean, that's how I recall it.

1  Q.  In fact, Mitt Romney only got six delegates from Iowa; isn't

2  that right?

3  A.  I don't recall that.  I know Mitt Romney got less.

4  Q.  And six sounds about right to you?

5  A.  Sure.

6  Q.  You did a pretty good job for Ron Paul in Iowa, didn't you?

7  A.  I don't believe I was responsible for the delegates, but --

8  Q.  Have you ever been to LPAC before?

9  A.  You mean Liberty PAC?

10  Q.  Right.

11  A.  Yes.

12  Q.  What year did you go?

13  A.  I believe it was 2013.  If it was held in D.C. or the D.C.

14  area, that's the year I went.

15  Q.  If I represented to you it's always been held in the D.C.

16  area --

17  A.  Oh, okay.

18  Q.  You met with the prosecutors a couple of times last week,

19  correct?

20  A.  Yes -- well, no; once last week.

21  Q.  Just once last week?

22  A.  Friday, yes.

23  Q.  Let me ask you another question.  Were you walking down

24  Water Street right on the other side of the Des Moines River on

25  Wednesday or Thursday of last week?

1  A.  Where is Water Street?

2  Q.  It's right on the other side of the Des Moines River.

3  There's a couple of hotels there, Residence Inn and Hampton Inn.

4  Then there's some newer apartments and then there's a pedestrian

5  bridge that goes across to the police station?

6  A.  I don't -- I don't know.  I remember parking on the -- is

7  this the front of the building over here (indicating)?

8  Q.  I think so.

9  A.  I'm turned around.  I remember parking on the bridge and

10  walking over here to meet with them.

11  Q.  And -- well, was that on Friday that you met with them and

12  did you meet with them on another day, too?

13  A.  Friday.

14  Q.  Okay.  So you didn't -- you weren't meeting with anybody on

15  Wednesday or Thursday of last week?

16  A.  No.  I believe it was Friday.

17  Q.  Okay.  Let's talk about the summer of 2013.  When the story

18  broke about the $25,000 check, it was politically difficult for

19  you at that point, wasn't it?

20  A.  Well, that was one of the political difficulties.  My

21  political difficulties actually started when I endorsed Ron

22  Paul.

23  Q.  This certainly added to it when that story broke, correct?

24  A.  That was one of the stories, but that was a later story.

25  Q.  Okay.  And Mr. Kesari has been a friend of yours for a

1 while, right?

2 A.   I mean since 2008 when I ran.  I mean, it started out as

3 associates, but I considered him a friend.

4 Q.   And he was also a bit of a political advisor to you in a lot

5 of ways, too, wasn't he?

6 A.   Yes.

7 Q.   And in the summer of 2013, he was advising you about whether

8 or not you should resign your seat in the Iowa State Senate in

9 order to run for U.S. Senate; isn't that right?

10 A.   Yes.

11 Q.   And you considered doing that?

12 A.   I didn't do it, but it was a thought.  It was flattering to

13 have somebody tell you to do that, but, in actuality, rationale

14 won out and I decided not to.

15 Q.   There was an Iowa State Senate Ethics investigation going

16 on; is that right?

17 A.   Correct.

18 Q.   And the Iowa State Senate Ethics investigation, that

19 investigation wasn't necessarily that you had broken any laws

20 but whether you violated the rules of the State Senate in Iowa

21 as a senator, right?

22 A.   Correct.

23 Q.   Because in Iowa a state senator isn't supposed to directly

24 receive money from a campaign, right?

25 A.   That's a -- it's a poorly written rule.  It was very clear

1   on PACs.

2   Q.  It was clear on PACs?

3   A.  Yes.

4   Q.  And you were concerned that if it was coming from a

5   candidate committee as well, it might apply, too, correct?

6   A.  Correct.  That was up for debate.

7   Q.  And it's because of that that you asked Mr. Kesari to pay

8   through an intermediary, right?

9   A.  I don't remember asking him to pay through a third party.

10  Q.  Well, you asked him to pay you the same what you were being

11  paid on the Bachmann Campaign, didn't you?

12  A.  I don't recall asking him to pay it that way.  I think it

13  was just assumed that would happen, but I could have.  I -- you

14  know, a lot was going on then, so it's hard to keep simple

15  conversations like that clear.

16  Q.  In fact, you actually told Mr. Kesari that the Bachmann

17  Campaign people had checked and that it was legal to do it that

18  way, didn't you?

19          MR. PILGER:  Objection.

20          THE COURT:  Overruled.

21  A.  I don't recall telling Mr. Kesari that.  At some point in

22  time, that was discussed.

23  BY MR. BINNALL:

24  Q.  With Mr. Kesari?

25  A.  I don't recall having that conversation with Mr. Kesari; but

1 you said it was the facts, so if you have something to back it

2 up, I would love to see it.

3 Q.  But while -- well, we'll get to it this way.

4         You actually did know that the Bachmann Campaign

5 people had received a legal opinion on that subject, didn't you?

6         MR. PILGER:  Objection; foundation, hearsay.

7         THE COURT:  Sustained.

8         MR. BINNALL:  Your Honor, if I could just be heard on

9 this?  I'm not offering this for the truth of the matter

10 asserted.  The truth of the matter is irrelevant here.  This

11 goes directly to the mens rea requirement, and what Mr. Sorenson

12 knew and may have told to Mr. Kesari, that goes to the mens rea

13 aspect of this.

14         MR. PILGER:  It's unfairly prejudicial.  It's hearsay,

15 Your Honor.

16         THE COURT:  No, no, it's not that.  So get to the

17 point as to whether he told Mr. Kesari something about it before

18 we get to the opinion.

19 BY MR. BINNALL:

20 Q.  And you don't remember one way or another if you told

21 Mr. Kesari about that information from the Bachmann Campaign?

22 A.  I don't recall if I shared that with Mr. Kesari.

23 Q.  But you don't have any reason to believe that you didn't,

24 right?

25 A.  No.  But I'm not a lawyer, and if it was, it was based upon

1   something -- what I had heard.

2           Could I get some more water?

3   Q.  Absolutely.

4           THE COURT:  Actually, why don't we just break for

5   lunch.  We'll come back at 1:15.  See you then.

6           (Recess at 11:52 a.m., until 1:15 p.m.)

1                    AFTERNOON SESSION 1:15 p.m.

2              (In open court, in the presence of the jury.)

3              THE COURT:  Please be seated.

4              Mr. Binnall, you may continue.

5              MR. BINNALL:  Thank you, Your Honor.

6                          KENT SORENSON,

7    resumed his testimony as follows:

8                    CROSS-EXAMINATION (Continued)

9    BY MR. BINNALL:

10   Q.  Good afternoon, Mr. Sorenson.

11   A.  Good afternoon.

12   Q.  Mr. Sorenson, as you were talking with the government, you

13   pled guilty to a federal felony charge more than a year ago,

14   didn't you?

15   A.  Yes.

16   Q.  And as part of that guilty plea, you entered into an

17   agreement with the Federal Government, right?

18   A.  Yes.

19   Q.  And as you talked about, there was a plea agreement and a

20   cooperation agreement, correct?

21   A.  Correct.

22   Q.  But even though you pled guilty more than a year ago, you

23   still haven't been sentenced, right?

24   A.  Correct.

25   Q.  And it's your understanding that the government wants this

1  trial to occur before you get sentenced, right?

2  A.  I'm not sure on that, but I'm assuming so.

3  Q.  And agreement contains a document labeled attachment B;

4  isn't that right?

5  A.  I'm not sure.

6          MR. BINNALL:  Hold on one moment.

7          (Pause.)

8  BY MR. BINNALL:

9  Q.  Mr. Sorenson, in front of you is there a document labeled

10 attachment B?

11 A.  Yes.  To the top of the right of the page I see attachment

12 B.

13 Q.  And that's an agreement concerning cooperation and

14 substantial assistance?

15 A.  Yes.

16 Q.  All right.  And you signed that page there on page 7,

17 correct?

18 A.  Correct.

19 Q.  And the government signed it as well?

20 A.  Yes.

21 Q.  And attachment -- I'm sorry; the first label (sic) that is

22 labeled cooperation, right?

23 A.  I didn't pay attention to it.  I'm sorry.

24 Q.  That's fine.

25 A.  I was looking at the other sections.

1  Q.  I understand.  See that (indicating)?

2  A.  Yes.

3          MR. PILGER:  Objection, Your Honor.  If he wants to

4  move it into evidence, we won't object.  If he wants to refresh

5  his recollection, he should do that.

6          MR. BINNALL:  Yeah, I'll go ahead and move Kesari

7  Exhibit F into evidence.

8                              (Defendant Kesari's Exhibit F was

9                              offered in evidence.)

10          THE COURT:  Any objection?

11          MR. PILGER:  No objection from the government.

12          THE COURT:  F is received.

13                              (Defendant Kesari's Exhibit F was

14                              received in evidence.)

15  BY MR. BINNALL:

16  Q.  All right.  Now, Mr. Sorenson, the first part there is

17  labeled cooperation, correct?

18  A.  Yes.

19  Q.  And the first paragraph under that heading states that your

20  substantial assistance is part of the plea agreement, correct?

21  A.  Yes.

22  Q.  So you not only have to help the government, but your help

23  to them has to be substantial, correct?

24          MR. PILGER:  Objection.  Have to as to what?

25          THE COURT:  Overruled.  It's his understanding.

1          Is that your understanding?

2   A.   I took it as I had to fully cooperate, yes.

3   BY MR. BINNALL:

4   Q.   And that cooperation has to be substantial, right?

5   A.   Truthful and honest and fully cooperate.

6   Q.   Are you saying that it doesn't have to be substantial?

7   A.   Well, I'm not sure of the definition of substantial as in

8   this case, but that's what it says.

9   Q.   Okay.  And part of your assistance includes speaking to the

10  government investigators without your attorneys present, right?

11  A.   That has happened, yes.

12  Q.   Do you see paragraph 4 there?

13  A.   Yes.

14  Q.   That's actually part of the agreement that you have to

15  participate with the government investigators without your

16  attorneys present?

17  A.   Yes.

18  Q.   And if anyone other than the government wants to discuss

19  this case with you, you have to notify the government, right?

20  A.   Well, typically I notify my attorney and then he would

21  notify the government.

22  Q.   But part of the agreement is that you have to notify the

23  government, right?

24  A.   I believe so, if that's what it says.  I signed it.

25  Q.   And you have to let government attorneys be present if

1   anyone outside the government wants to discuss this case with

2   you, right?

3   A.  I believe so.

4   Q.  That's --

5   A.  Which section is --

6   Q.  That's what it says in paragraph 4, right?

7   A.  Yes.  Yes, it does.

8   Q.  It says, the government requests to have a representative

9   present for any such discussions should they occur, right?

10  A.  Yes.

11  Q.  And if you change your story in court today from what you

12  told the government earlier, the government can prosecute you

13  for making a false statement; isn't that right?

14  A.  Yes.

15  Q.  So if you lied to the government earlier, but you tell the

16  truth here today, you can be prosecuted for that, can't you?

17  A.  Yes, but that's not happening.

18  Q.  Okay.  We'll get to that.

19       It's a tough situation to be in, though, isn't it?

20  A.  I suppose.  I think we're all in a tough situation in this

21  courtroom.

22  Q.  And you've lied before about this case?

23  A.  Before I resigned, yes.

24  Q.  Before you resigned?

25  A.  Yes.

1  Q.  Everything you said about this case since then has been

2  truthful?

3  A.  Everything that I said to the grand jury and what I'm saying

4  today I believe to be truthful.

5  Q.  You've lied a lot of times about this case, though, right?

6  A.  Well, that's why I pled guilty to obstruction of justice.

7  Q.  You lied to Megyn Kelly and her Fox News audience, right?

8  A.  Yes.

9  Q.  You lied to Natalie Allen and the CNN audience, right?

10 A.  Yes.

11 Q.  You lied to the government?

12 A.  Yes.

13 Q.  And if you look at paragraph 9 of your substantial

14 assistance agreement, the government gets to decide whether your

15 cooperation was substantial; isn't that right?

16 A.  Yes.

17 Q.  It reads -- and I quote -- should the defendant fully comply

18 with all the terms and conditions of this plea agreement and the

19 government concludes that the defendant has provided substantial

20 assistance, end quote, the government may file a motion to

21 reduce your sentence below the statutory minimum, right?

22 A.  Correct.

23 Q.  It doesn't say -- it says may, right?

24 A.  Correct.

25 Q.  So you have to please the government in order to get them to

1  ask for a sentence reduction; isn't that right?

2  A.  Um, I suppose that's how it can be taken.

3  Q.  That's the way you take it, isn't it?

4  A.  I believe I'm here to tell the truth.  I've made a lot of

5  mistakes, and I regret those mistakes, and one of the reasons

6  why I decided to own up to it and plead guilty was I watched my

7  dad die.  I watched him get diagnosed with lung cancer, and I'll

8  never forget that moment and the disappointment I felt like I

9  laid upon him.  And so, yeah, I'm here to cooperate with the

10 government, but I'm also trying to right wrongs that I've done

11 to my family.

12 Q.  I'm very sorry to hear about your loss.

13         You would agree, though, that this agreement gives you

14 a very strong incentive to testify in a way that pleases the

15 government, right?

16 A.  Yes.

17 Q.  And you have a lot of bills to pay, right?

18 A.  I have bills to pay just like I think most Americans do.

19 Q.  But you have a lot right now, right?

20 A.  I have the same bills that I had then.

21 Q.  I mean, one of your houses is in foreclosure right now,

22 correct?

23 A.  Correct.

24 Q.  You really can't afford to spend much time in prison?

25 A.  I mean, can anybody?  But I would rather not.

1  Q.  That puts you under a good amount of pressure, right?

2  A.  Of course.

3  Q.  You haven't always reacted well to that pressure, have you?

4  A.  I made a lot of bad decisions because of pressure.

5  Q.  In fact, since you pled guilty, you've continued to use

6  illegal drugs, right?

7  A.  That's not true.

8  Q.  It's not true?

9  A.  No.

10  Q.  Are you saying that you haven't failed government drug tests

11  since you pled guilty?

12  A.  Yes, I'm not saying that.  You're saying I used drugs.  Yes,

13  I failed a drug test but it was not use after I pled guilty.

14  Q.  But you have failed drug tests since you pled guilty?

15  A.  Yeah, shortly after I pled guilty, I failed a drug test for

16  marijuana, which is kind of ironic that you want to go there

17  because --

18          THE COURT:  Wait, wait.  Pose a new question.

19          MR. BINNALL:  Thank you.

20  BY MR. BINNALL:

21  Q.  Staying drug-free is actually a condition of you staying out

22  of jail pending your sentencing, isn't it?

23  A.  Yes, I have been since I pled guilty.

24  Q.  But you're not in jail, are you?

25  A.  No, because I haven't used drugs since I pled guilty.

1   Q.  I want to talk to you briefly about the financial situation

2   again that you were in back in early 2012.

3           Earlier the government showed you your bank records

4   from Grassroots Strategy.  Do you remember seeing those?

5   A.  Yes.

6   Q.  And Exhibit -- Government's Exhibit 153 is your bank records

7   for the period starting on February the 1st of 2012.

8           Do you remember seeing those?

9   A.  Yes.

10  Q.  All right.  What was the starting balance on February the

11  1st?

12  A.  It appears to be $29.69.

13  Q.  And that's your business account; but I think you probably

14  agree with me that you didn't just use it for business expenses,

15  right?

16  A.  Well, it wasn't -- we had a personal account that we

17  primarily used, but yes, we did use it for multiple things.

18  Q.  You could use it for gas, for instance?

19  A.  Yes, but gas is a business expense.  I'm not denying that I

20  didn't use it for personal use also.

21  Q.  Yeah, that's fine.

22          All right.  Now, let's talk about August 2013 again.

23  Earlier do you remember seeing the proposed press release that

24  you sent to Mr. Kesari?  It's Government's Exhibit 60.

25  A.  Oh, the draft, yes.

1  Q.  The draft, yes.  In there you say that the check was turned

2  over to your attorney?

3  A.  Yes.

4  Q.  That was a lie, right?

5  A.  Yes, on August 7th that was a lie.

6  Q.  In fact, is it safe to say pretty much everything in this

7  exhibit was --

8           THE COURT REPORTER:  Excuse me.  I didn't hear the end

9  of your question.

10  BY MR. BINNALL:

11  Q.  Pretty much everything in this exhibit was a lie, correct?

12           THE COURT:  Can we give you a lavaliere mic?  You can

13  put it on your lapel and then we won't have that problem.

14           THE WITNESS:  Would you like me to answer that or

15  wait?

16           THE COURT:  Go ahead.

17  A.  Yes, I believe a lot of it was a lie.

18  BY MR. BINNALL:

19  Q.  All right.  Is this better?

20           Now, let's talk about this meeting that you say

21  happens in August of 2013 with Mr. Kesari.

22           Mr. Kesari was over at your house a great number of

23  times, right?

24  A.  Yes.

25  Q.  And when he would come over, he would often cook for you and

1   your family, right?

2   A.   Yes.

3   Q.   And he often gave you political advice, right?

4   A.   Yes.

5   Q.   In fact, in August of 2013, at the same time that you're

6   looking at that press release, you're still trying to save your

7   political career, right?

8   A.   That was the whole point of the lies was that and to try and

9   stay out of trouble.

10  Q.   And, again, there's consideration going on around that about

11  whether or not you're going to drop out of the State Senate in

12  Iowa and run for the United States Senate, right?

13  A.   No.   That was -- I mean, there was -- Dimitri was trying to

14  talk me into that, but I wasn't -- I mean, obviously, that was

15  not a viable option for me.

16  Q.   As a political advisor, that was one of the pieces of advice

17  that he was giving you, right?

18  A.   Yes.

19  Q.   And during that time you were aware of Dennis Fusaro?

20  A.   Yes.

21  Q.   And you knew that Dennis Fusaro was recording people and

22  trying to hurt them politically, right?

23  A.   I believe -- I don't know if it was.   Yes, I believe on

24  August 7th it was.   I have a tough time keeping July, August

25  straight with the events.

1  Q.  That period right there, August or shortly before, you knew

2  that Mr. Fusaro was recording people and having recorded people

3  for a good amount of time and trying to hurt them politically?

4  A.  Absolutely.

5  Q.  In fact, he recorded you, right?

6  A.  Yes.

7  Q.  And you heard he recorded other people?

8  A.  Yes.

9  Q.  And he recorded people without telling them they were

10  recorded, right?

11  A.  Yes.

12  Q.  And then he would often release those recordings to the

13  media, right?

14  A.  Yes.

15  Q.  And, in fact, he released a recording from you to the Iowa

16  Republican, correct?

17  A.  Yes.

18  Q.  And it was a politically harmful recording that he released,

19  right?

20  A.  Yes.

21  Q.  But everything you said in that was true, right?

22  A.  In the recording?

23  Q.  Yes.

24  A.  I don't recall.  I would have to listen to it.

25  Q.  Well, let's go to your grand jury testimony first, page 120

1   of your grand jury testimony.  I apologize.

2          And in your grand jury testimony, you said about those

3   tapes that, quote, they were all truthful and they were

4   politically negative, but they were the truth; isn't that right?

5   A.  Well, I can't say that all of the tapes, but the tape he

6   played -- that he released to the media I believe was, but I'm

7   not sure.  I would have to listen to the tape again, but I think

8   I was speaking in -- I think you're speaking in more of a

9   general term and I was speaking about a specific tape.

10  Q.  Mr. Fusaro, this is page 120 of your grand jury testimony.

11  A.  You mean Mr. Sorenson?

12  Q.  I'm very sorry.

13  A.  That's all right.

14  Q.  I'm very sorry.

15  A.  I'm a little bit taller.

16  Q.  Mr. Sorenson, page 120 of your grand jury testimony here?

17  A.  Yes.

18  Q.  And you were -- you see the question there:

19          "And just as a side note on this, I don't want to get

20      sidetracked on this, but had there been interactions

21      between you and others and Mr. Fusaro that he had recorded

22      and released to the media?"

23          And you responded:

24          "Yes."

25  A.  Yes.

1  Q.  And then the next question:

2          "And did those generally cast all of you in a negative

3       light in the media?"

4          And you responded:

5          "As far as they were all truthful and they were --

6       they were politically negative, but they were the truth."

7          And that's what you told the grand jury, right?

8  A.  Yes.

9  Q.  All right.  Thank you.

10         So at that point in August, you knew Mr. Fusaro and

11 his recordings were out there, right?

12 A.  Pardon me?

13 Q.  You knew Mr. Fusaro was out there with his recordings,

14 right?

15 A.  Yes.

16         MR. PILGER:  I've just lost track of the date.  August

17 of what year?

18         MR. BINNALL:  2013.

19 BY MR. BINNALL:

20 Q.  And, in fact, you have no idea if Mr. Kesari was worried

21 about any federal investigation when you said he came to your

22 house or if he was worried about Mr. Fusaro trying to record

23 him; isn't that right?

24 A.  That's not true because I asked Mr. Kesari if we broke any

25 laws, and he said possibly a RICO, but he wasn't sure.

1  Q.  Well, you never told that to the grand jury, did you?

2  A.  I wasn't asked that.

3  Q.  But you were asked by the grand jury -- this is page 120.

4  You were asked:

5          "Did he explain any further why that concerned him?"

6          And you said:

7          "Well, this was after Dennis Fusaro recorded us.  So

8      I'm not sure if he was worried" --

9          THE COURT:  Stop just a second, would you?  You're

10 lightning fast.  Just remember when smoke comes out of her ears,

11 that means you're going too fast.

12         MR. BINNALL:  That's my bad.  I'm usually more careful

13 about that.  My apologies.

14 BY MR. BINNALL:

15 Q.  All right.  You said:

16         "Well, this was after Dennis Fusaro recorded us.  So

17      I'm not sure if he was worried about the federal

18      investigation at that time, or Dennis Fusaro, but either

19      way he was very worried about something."

20         That's what you said to the grand jury, right?

21 A.  Yes.  But you said earlier if I was only worried about

22 Dennis, and that's not true, and I made that clear in the grand

23 jury statement as well.

24 Q.  About you being worried?

25 A.  No; about -- no.  You said that -- you only brought up

1  Dennis Fusaro, and I actually brought up both Dennis Fusaro and

2  the federal investigation in the grand jury, just as I have

3  today.

4  Q.  Right.  But you don't know which it was?

5  A.  Correct.

6  Q.  Correct.  That's what I'm getting at.

7  A.  Okay.

8  Q.  Thank you.

9        In fact, you at that point knew Mr. Kesari was pretty

10 concerned about Dennis Fusaro because you knew that Dennis

11 Fusaro didn't like him at all, right?

12 A.  Correct.

13 Q.  Mr. Kesari actually told you he was concerned about

14 Mr. Fusaro?

15 A.  Yes.  We all were.

16 Q.  Now, I think we've already said that at least one of the

17 recordings that you had with Mr. Fusaro was published, right?

18 A.  Yes.

19 Q.  And you didn't know at the time that you were being

20 recorded, right?

21 A.  No.

22 Q.  Just so we get the timing right, you endorsed Ron Paul on

23 December 28th of 2011, right?

24 A.  Correct.

25 Q.  And you knew that right -- shortly after, not right after,

1   but shortly after you endorsed Dr. Paul, a reporter from the

2   Iowa Republican named Kevin Hill wrote about a story about your

3   switch from Michelle Bachmann to Ron Paul, right?

4   A.  I'm not sure when it happened, but I know there were

5   multiple stories on the Iowa Republican.

6   Q.  It was published on January 1, 2012, wasn't it?

7   A.  Okay.

8   Q.  You agree with that?

9   A.  Yeah, if that's what it says; but if I saw it, it would

10  probably refresh my memory.

11  Q.  I'm fine to let you take a look at it.

12  A.  You have to understand they publish multiple stories, so

13  it's hard to keep them all straight.

14          MR. BINNALL:  May I approach the witness?

15          THE COURT:  Yes.

16          MR. BINNALL:  Thank you.

17          (Counsel conferring.)

18  BY MR. BINNALL:

19  Q.  All right.  I'm going to hand this to you.  Take a look at

20  it for a moment.

21  A.  Okay.

22          (Pause.)

23          I do remember this story.

24  Q.  Okay.

25  A.  Do you want me to read it all?

1  Q.  No.

2  A.  Okay.

3  Q.  So you do remember this story?  And the date on it is

4  January the 1st, 2012, right?

5  A.  Yes.

6  Q.  All right.  And do you recall if Mr. Fusaro was after that

7  story, correct?

8  A.  Pardon me?

9  Q.  Do you recall if Mr. Fusaro's call that was recorded

10  happened after that story?

11  A.  I believe that the call with Mr. Fusaro -- no, I believe the

12  call with Mr. Fusaro took place on the 29th because I remember

13  the phone call, but it wasn't released.

14        MR. PILGER:  Objection.  Could we get a foundation

15  about which of probably various calls may be at issue that

16  they're talking about?

17        MR. BINNALL:  Yes; the call with Mr. Fusaro that was

18  recorded and put on the Iowa Republican web site.

19  A.  I believe -- was there only one call with Mr. Fusaro put on

20  the Iowa Republican web site?  I thought there was multiple.

21  BY MR. BINNALL:

22  Q.  There might have been.  Well, we'll just -- clip No. 2,

23  please.  And this has the video portion with it with the text

24  and just a picture of Mr. Sorenson on it.

25        THE COURT:  For what purpose?  I don't get this.

```
1            MR. BINNALL:  As to the date when the telephone call

2     with Mr. Fusaro came in -- took place.

3            THE COURT:  Oh, are you refreshing his recollection;

4     is that it?

5            MR. BINNALL:  Yes, plus do that -- since he says he

6     can't remember -- well, no, actually impeachment.  He said it

7     happened after December 29th.  It happened after January 1st.

8            MR. PILGER:  I object to that characterization as the

9     foundation.  I'm not sure what the witness is speaking to in

10    terms of what tape is at issue.  I think counsel could clear

11    that up and maybe there wouldn't be a problem.  I can't tell

12    yet.

13           THE COURT:  Would you please ask that particular

14    question that you want to impeach on again, please?

15           MR. BINNALL:  The question on the particular date?

16           THE COURT:  Yes.

17    BY MR. BINNALL:

18    Q.  Okay.  The phone call that you had with Mr. Fusaro where you

19    talked with him about a number of subjects, including whether or

20    not to give the check back to Mr. Kesari, that happened after

21    the Iowa Republican article came out, it happened after January

22    the 1st?

23    A.  Okay.  I was misunderstanding which recording.  I would have

24    to hear that one.  There was a recording -- there was a

25    conversation I had with Mr. Fusaro on the 29th, but I'm not sure
```

1  if that's the one you're referring to, so I can't answer that.

2          MR. BINNALL:  All right.  That's fine.  He wants to

3  hear the recording to refresh his recollection.  I'm happy to do

4  that and not publish it and just put it over the audio system,

5  unless the court wants to do it another way.

6          THE COURT:  Let's just do that at the break.  We'll

7  move on to something else now.

8          MR. BINNALL:  Well, I'm kind of stuck until we get

9  past that point right now.

10         THE COURT:  Could I just talk to you at the side-bar?

11         MR. BINNALL:  Yes.

12         THE COURT:  I don't need the court reporter.

13         (Side-bar conference, not reported.)

14         MR. BINNALL:  All right.  Clip 2, please.

15         (Clip 2 was played.)

16  BY MR. BINNALL:

17  Q.  Okay.  So, first of all, the louder voice in that clip was

18  Dennis Fusaro, right?

19  A.  The louder voice?

20  Q.  Louder.

21  A.  Yeah, I believe he was louder.

22  Q.  And the one that is just a little bit quieter because it's

23  on the other end of the phone, that's you, right?

24  A.  Yes.  I wasn't really paying attention to the volume of each

25  person, but that was Dennis Fusaro and myself.

1   Q.   Okay.  And, again, at that point you didn't know the phone

2   call was being recorded, right?

3   A.   Right.

4   Q.   And he referenced that Iowa Republican article, correct?

5   A.   I can't tell you that for sure because there was multiple

6   articles by Kevin Hill that was damaging to me, so I'm not sure

7   if that was the article that was being referenced or if it

8   wasn't.  Maybe if I heard the entire call I would know.

9   Q.   Well, we're going to talk a little bit more about the call.

10          By that point in the call, regardless of what

11  happened, Mr. Kesari had, according to you, given your wife a

12  check, correct?

13  A.   Was that in the call that we just saw?

14  Q.   No, not in that part, but can we -- let me just ask you

15  about that.  At that point in the call, you're saying that

16  Mr. Kesari had already given your wife the check, right?

17  A.   Well --

18  Q.   Strike that.  Let me ask a better question.

19          When that telephone call was made, that telephone call

20  was after you had received a $25,000 check?

21  A.   I have no idea because you just played a small clip of the

22  call, and I can't tell you when that call took place.

23  Q.   Okay.

24  A.   I mean, the Iowa Republican constantly wrote bad articles

25  about me even before I took the check.

1   Q.  Okay.  And your wife gave you the check -- is it your

2   testimony still that your wife gave you the check in the car on

3   the way home from dinner that night?

4   A.  I believe it was in the car.  It could have been at home,

5   but I believe it was in the car.

6   Q.  But, in reality, you hadn't even looked at that check at the

7   time that you had the telephone call with Dennis Fusaro; isn't

8   that right?

9   A.  I don't know when the telephone call took place.

10  Q.  But whenever that call took place, you hadn't seen the

11  check, right?

12  A.  I can't answer that because I don't know when the call took

13  place.

14          MR. BINNALL:  Okay.  Clip No. 3, please.

15          (Clip 3 was played.)

16  BY MR. BINNALL:

17  Q.  So at the time that you had that call with Mr. Fusaro, you

18  hadn't even seen the check; isn't that right?

19  A.  That's not true.  I lied to Mr. Fusaro.

20  Q.  And I thought you told the grand jury there that he was

21  right?

22  A.  Well, I must have been mistaken --

23  Q.  Okay.

24  A.  -- because I lied --

25  Q.  Okay.  I understand, I understand.

1   A.  I lied to Mr. Fusaro because of everything that was going on

2   and the tension between --

3           MR. BINNALL:  Your Honor, I don't have a question

4   pending right now.

5           THE COURT:  He'll ask you about that when he asks you

6   questions later.

7   BY MR. BINNALL:

8   Q.  In fact, as part of -- on the day of the call with

9   Mr. Fusaro that we're listening to, you were considering not

10  working for anybody, right?

11  A.  Yes.

12  Q.  Not Ron Paul?

13  A.  I was considering coming out and telling the truth and

14  exposing what had happened.

15  Q.  And so you were considering not working for Ron Paul,

16  right?

17  A.  I was considering coming out and exposing what happened,

18  which I would assume would have terminated my employment with

19  Ron Paul.

20  Q.  And you were considering not working for Michelle Bachmann

21  either?

22  A.  That was after I left Michelle Bachmann.

23  Q.  But there wasn't any consideration of not going back to --

24  of going back to work for her, we'll put it that way?

25  A.  I don't think so.

1    Q.  Yeah.  And, in fact, in January of 2012, you had no idea

2    what you were going to do, right?

3    A.  At that point, I didn't, no.

4    Q.  In fact, you told Mr. Fusaro that you honestly did not know

5    what you were going to do, right?

6    A.  Yes, but I believe I was referencing not employment, about

7    if I was going to stay with Ron Paul or if I was going to go to

8    the media.  And if I remember right, in that call, Mr. Fusaro

9    asked me -- or yeah, Mr. Fusaro asked me if I was going to jump

10   on a grenade.

11            MR. BINNALL:  Let's listen to clip 5, please.

12            (Clip 5 was played.)

13   BY MR. BINNALL:

14   Q.  So in early January 2012, you had no idea whether you were

15   going to do anything for the Ron Paul Campaign; is that right?

16   A.  That's not true.  And you're misrepresenting that call

17   because you didn't play the first part of it where he asked

18   me -- or he heard I was going to jump on a grenade.  If you

19   would like to play that, I would love to have the conversation.

20            MR. BINNALL:  One moment.

21            (Pause.)

22            Clip No. 1.

23            (Clip 1 was played.)

24   BY MR. BINNALL:

25   Q.  All right.  Let's move to --

```
 1  A.  Would you like to discuss what --
 2           THE COURT:  Well, he gets to ask the questions.
 3           THE WITNESS:  I'm sorry.
 4           THE COURT:  Pose your next one.
 5  BY MR. BINNALL:
 6  Q.  And, in fact, sir, at that point you didn't know whether you
 7  should hold on to the check from Dimitri, give it back or hold
 8  it over him so that you could do a deal with the Paul Campaign;
 9  isn't that right?
10  A.  That's not true.
11           MR. BINNALL:  Clip 4, please.
12           (Clip 4 played.)
13  BY MR. BINNALL:
14  Q.  At the end that was you saying that you agree with him,
15  right?
16  A.  On some aspects of it, yes.
17  Q.  That's not what you said here.  You said, I agree with you;
18  isn't that right?
19  A.  If I wasn't doing his bidding, he wasn't going to pay me,
20  yes, I agree with that.
21  Q.  And you also said in there, do you think I should hold on to
22  it or do a deal?  Should I hold on to it so I have something
23  over him, question mark.
24           That was you when you said that, right?
25  A.  Yes, but you're taking it out of context.
```

1  Q.  You asked Mr. Fusaro, do you think I should or should I hold

2  on to it?  I'm not cashing it.

3          You told him that, right?

4  A.  Yes.

5  Q.  You actually asked him at one point, I'm going to give him

6  his check back.  And then Mr. Fusaro asked, oh, you are, right?

7  A.  Yes.

8          MR. BINNALL:  One moment, please.

9          (Pause.)

10          MR. BINNALL:  No further questions.

11          THE COURT:  Mr. Howard?

12          MR. HOWARD:  Yes.

13          THE COURT:  You can just leave that on the podium

14  there.

15          MR. HOWARD:  Your Honor, I'm not usually accused of

16  being quiet, so I'm unlikely to put this on.

17                      CROSS-EXAMINATION

18  BY MR. HOWARD:

19  Q.  Mr. Sorenson, my name is Roscoe Howard.  I represent

20  Mr. Benton.

21          When you moved to the Paul Campaign, you were still a

22  State senator; isn't that correct?

23  A.  Correct.

24  Q.  And you still had the issues with the Iowa ethics laws;

25  isn't that correct?

```
 1   A.  Rules, but yes.

 2   Q.  The rules.  The rules would be that if you were paid by a

 3   PAC or campaign, you would be expelled; isn't that correct?

 4   A.  But I want to verify, everybody keeps saying laws --

 5   Q.  Sir --

 6            THE COURT:  Hold it.  He gets to ask the question.

 7            THE WITNESS:  I'm sorry.

 8            THE COURT:  Go ahead.

 9   BY MR. HOWARD:

10   Q.  And it's true, sir, that at the time that you moved to the

11   Paul Campaign, you indicated that your pay was $25,000, is that

12   right, annually?

13   A.  Pardon?

14   Q.  What was your pay as a State senator?

15   A.  The Statehouse, it was roughly $25,000, and that's not

16   including the health benefits and 401K -- or IPERS, I'm sorry.

17   Q.  And when Mr. Dorr contacted Mr. Benton, he contacted him

18   after talking to you; isn't that correct?  It's a "yes" or "no"

19   question, sir.  Is it correct or is it not correct?

20   A.  Which time?

21   Q.  When Mr. Dorr --

22            MR. PILGER:  Objection.

23            THE COURT:  Overruled.  Go ahead and pose your next

24   question.

25   BY MR. HOWARD:
```

1  Q.  Mr. Dorr contacted Mr. Tate.  Do you remember that?

2  A.  No.

3  Q.  I'm going to show you -- excuse me -- what's been marked as

4  Government's Exhibit 7.  I believe it's in evidence, Your Honor.

5          This is Government's Exhibit 7.  It looks like it's

6  from Aaron Dorr.  This is Mr. Tate's e-mail address.

7          Have you seen -- you've seen that before, sir?

8  A.  Yes.

9  Q.  And when that was sent, you had already talked to Mr. Dorr;

10  isn't that correct?

11  A.  About some -- yeah, I had talked to Mr. Dorr numerous times.

12  Q.  And that's why he contacted Mr. Tate; isn't that correct?

13  A.  Um, I believe so.

14  Q.  And at that point you needed a job, didn't you, sir?

15  A.  No.

16  Q.  You were the father of six children; do I have that right?

17  A.  Yes.

18  Q.  You own -- you had just purchased a second house; isn't that

19  correct?

20  A.  Yes.

21  Q.  You were working for a campaign, the Bachmann Campaign, that

22  was sinking fast; isn't that correct, sir?

23  A.  In October I don't believe it was.

24  Q.  But you knew it was sinking, right?

25  A.  I know we dipped in the polls.

1  Q.  You were dipping -- Ms. Bachmann was dipping in the polls?

2  A.  Correct.

3  Q.  Running out of money; isn't that correct?

4  A.  I'm not sure if we had hit our financial difficulties in

5  October or not.

6  Q.  It was hitting you financially, wasn't it, sir?

7  A.  No.

8  Q.  And you were her state campaign chair for the State of Iowa;

9  isn't that correct?

10  A.  Correct.

11  Q.  When Mrs. Bachmann hired you -- and I apologize;

12  Congresswoman Bachmann hired you around the 1st of September of

13  2011, she was leading the polls or at least top three

14  nationally, wasn't she?

15  A.  I believe so.

16  Q.  Then on December 1st of 2011, she had dropped to sixth in

17  the Iowa polls; isn't that right?

18  A.  Did you say December or October?

19  Q.  I'm sorry, December 1st, she dropped?

20  A.  Yeah, about two months after this e-mail or month after.

21  Q.  She was in the low single digits, isn't that correct, in

22  terms of --

23  A.  I can't tell you for sure where she was at.  I know what our

24  internal polling said.

25  Q.  She was heading down because by January 3rd she dropped out

1  of the race, right?

2  A.  Yes.

3  Q.  And you're an experienced political operative, and you saw

4  that coming, didn't you, sir?

5  A.  I was pretty inexperienced at that time, but --

6  Q.  But you knew to get out, right?

7          MR. PILGER:  Objection as to the time frame.  Are we

8  talking October or December?

9  BY MR. HOWARD:

10  Q.  Do you understand what I'm talking about?  You were

11  contacting -- this is about the time you were contacting the Ron

12  Paul Campaign?

13  A.  Well, you're bouncing around from December to October, so I

14  don't know what you're talking about.

15  Q.  Okay.

16  A.  In politics a month is a lot.

17  Q.  That's fine, that's fine.

18          Just -- now, when you were contacted -- when Mr. Dorr

19  contacted the Paul Campaign on your behalf, this is Exhibit 7,

20  he is offering to match what you gave to Mr. Dorr as your

21  current salary at the Bachmann Campaign, and that was, according

22  to you, $8,000 a month; is that correct?

23  A.  Mr. Dorr knew what I was making at the Bachmann Campaign.

24  Q.  And you were making $7,500 a month; is that correct?

25  A.  Yes.

1  Q.  But you thought you needed a little bump in pay; isn't that

2  correct?

3  A.  No.

4  Q.  Or you wanted a little bump in pay?  There's nothing wrong

5  with that.

6  A.  I understand that, but I told Mr. Dorr I was making $7,500 a

7  month.

8  Q.  So Mr. Dorr gave you the bump in pay or at least the

9  request?

10  A.  Mr. Dorr drafted this.

11  Q.  Understood.  I'm asking, do you understand that you asked

12  for -- or at least it was asked for on your behalf, that you get

13  $8,000 in pay?

14  A.  I understand that was asked for.  I did not ask for it.

15  Q.  Okay.  And do you understand that they were -- they wanted a

16  hundred thousand dollars for a Political Action Committee that

17  you were to head; is that correct?

18  A.  I saw this when Mr. Benton sent it back to me, yes.

19  Q.  And there is also a $5,000 per month amount for your

20  brother; is that correct?

21  A.  No.

22  Q.  I'm sorry?

23  A.  I don't have a brother.

24  Q.  And I apologize.  Oh, I'm sorry.  It's for Mr. Dorr's

25  brother.  I apologize.  Is that correct?

1   A.  Chris Dorr.

2   Q.  Chris Dorr, and I apologize, Mr. Sorenson.  Chris Dorr was

3   what to you?

4   A.  He was my legislative clerk.

5   Q.  And when the Paul Campaign was asking for Chris Dorr to come

6   over, this was to work; isn't that correct, to be employed?  He

7   was going to be an employee; isn't that correct?

8   A.  I don't know.

9   Q.  You don't know?  You were being asked to come over to work;

10  isn't that correct, sir?

11  A.  Yes.

12  Q.  That's what -- that was the expectation, wasn't it?

13  A.  I believe so, yes.

14  Q.  Okay.  And at that time you're at the Michelle Bachmann

15  Campaign, you have a deal with Michelle Bachmann and Guy Short;

16  isn't that correct?

17  A.  Correct.

18  Q.  And that was to make sure that whatever you were getting

19  paid wasn't detected by the Iowa Ethics Commission; isn't that

20  right.

21  A.  Yes.

22  Q.  And the whole idea was you wanted to be able to hide your

23  money so you could continue to serve as a senator and provide

24  for your family; isn't that correct?

25  A.  Yes.

1  Q.  And when you were talked to by Susan Geddes -- you know

2  Ms. Geddes I presume?

3  A.  Yes.

4  Q.  Would you tell the members of the jury who Ms. Geddes was?

5  A.  She was a former campaign manager and my former assistant.

6  Q.  And when you spoke to Ms. Geddes at one time and you told

7  her about your plan to be -- to get paid by the Bachmann

8  Campaign and she warned you, did she not, that that would be a

9  problem?

10 A.  I don't recall.

11 Q.  And do you remember her saying to you -- you saying to her,

12 don't worry, I have a way around this?

13 A.  I don't recall that conversation, but it could have

14 happened.

15 Q.  Okay.  And the fact of the matter is hiding the money and

16 continuing to work for the Senate was your goal; isn't that

17 correct?

18 A.  Yes.

19 Q.  Okay.  Just excuse me for a minute, sir.

20          (Pause.)

21          Now, in -- I apologize.  Around October Mr. Benton

22 responded to Mr. Dorr, to you and to Mr. Dorr's brother, and I

23 want to show you what has been marked as Government's Exhibit

24 10, which is in evidence.

25          Do you remember this e-mail, sir?

1   A.   Yes.

2   Q.   And in the e-mail Mr. Benton indicates that he is happy to

3   offer you a job at fair market value.

4           Do you understand that?

5   A.   Yes.

6   Q.   And he says that the value has been set at $8,000 per month

7   and $5,000 per month for Chris Dorr.

8           Do you see that, sir?

9   A.   Yes.

10  Q.   And you understood that to be for you to work; isn't that

11  correct?

12  A.   Yes.

13  Q.   Chris Dorr is not going to endorse anybody, is he, sir?

14  A.   I mean, yeah, he would have endorsed her.  I don't think his

15  endorsement would have got --

16  Q.   Certainly not the value of a senator; isn't that right?

17  A.   I would assume so.

18  Q.   So if you're going to bring him over, he's going to work,

19  right?  And they expected you to work.  You're in the same line

20  with Chris Dorr.

21          Now, at this point when the offer is made, you're

22  still an Iowa State Senator; isn't that right?

23  A.   Correct.

24  Q.   You still have some money issues; isn't that correct?

25  A.   No.

```
 1    Q.  You still have six children?
 2    A.  Yes.
 3    Q.  You still have two homes?
 4    A.  Yes.
 5    Q.  You're --
 6    A.  Well, one was a rental property.
 7    Q.  Okay.  You still have two pieces of property and you still
 8    make $25,000 a year; isn't that correct?
 9    A.  And $7,500 a month with Michelle Bachmann.
10    Q.  And you still need to figure out how to supplement your
11    income; isn't that correct?
12    A.  I was supplementing my income.
13    Q.  And you still needed to figure out how to supplement your
14    income without the Senate Ethics Commission finding out, didn't
15    you, sir?
16    A.  That's what I was doing with Michelle Bachmann.
17    Q.  Okay.  And that was always going to be your goal, right?
18    A.  Pardon me?
19    Q.  You wanted to stay in your job --
20    A.  Stay as a legislator?
21    Q.  I'm sorry.
22    A.  I don't understand the question.  Did I want to stay as a
23    legislator?
24    Q.  Yes.
25    A.  Yes.
```

1    Q.  And you still wanted to make some extra money; isn't that

2    correct?

3    A.  Well, I had to.  In Iowa we're a part-time legislature.

4    Q.  So you wanted to make extra money; isn't that correct?

5    A.  That's why I was working for Michelle Bachmann.

6    Q.  Now, when you started to move over to the Ron Paul Campaign,

7    the person who you were talking to the most was Dimitri Kesari;

8    isn't that correct?

9    A.  Yes.

10   Q.  And Dimitri Kesari, as we've learned on the last

11   cross-examination, is or was a good friend; isn't that correct?

12   A.  Yes.

13   Q.  He had been to your home, cooked meals for you and your

14   family.  You had at least been out to Virginia to visit him;

15   isn't that what you said in testimony today?

16   A.  That was following this.

17   Q.  I'm sorry?

18   A.  That was following this e-mail.

19   Q.  Well --

20   A.  I didn't go to Virginia until 2013, I believe.

21   Q.  Oh, all right.

22   A.  Maybe it was '12.  I think it was '12.

23   Q.  All right.  I'll take this off.

24            In April of 2011, you won an award, did you not?

25   A.  Yes.

1  Q.  And would you tell the members of the jury what that award

2  was?

3  A.  I don't remember the name of it.

4  Q.  It was for your work with the Right to Work organization; do

5  I have that right?

6  A.  Yes, yes.

7  Q.  And do you remember the award?

8  A.  Yeah.  It was a glass -- I don't remember the name of it.

9  Q.  Do you remember the name of the award?

10  A.  I do not.

11  Q.  What were you being honored for?

12  A.  Being the legislator of the year, but I don't remember the

13  name of the award.  Something could refresh my memory.

14  Q.  And the person who flew you down there was Dimitri Kesari,

15  wasn't it?

16  A.  Yes.

17  Q.  And Dimitri Kesari has always kind of been there for you,

18  hasn't he?  He worked on your campaign?

19  A.  Well, he didn't actually work on it.  He advised it, and he

20  put people in my campaign that was underneath him.

21  Q.  He was helping you, right?

22  A.  Yes.

23  Q.  And he tries to help you, doesn't he?

24  A.  Politically he's always been there.

25  Q.  And personally he's been there probably for some meals and

1  some conversation, right?

2  A.  Yes, as an associate and somebody I felt close to.

3  Q.  And, you know, you've been out to dinner outside your home

4  also, haven't you?

5  A.  Yes.

6  Q.  Okay.  And Dimitri was trying to recruit you to move over,

7  wasn't he?

8  A.  Yes.

9  Q.  And during the time he was trying to recruit you to move

10  over, you told him about how you were handling things with the

11  Bachmann Campaign, weren't you?

12  A.  I don't understand what you're asking.

13  Q.  Oh, I'm sorry.  You told him how you were handling the pay

14  you were receiving from Michelle Bachmann's Campaign.  You told

15  him that you were hiding it, didn't you?

16  A.  I don't know if I would use hiding.  He knew I was working

17  for Guy Short and Guy Short was billing the campaign.  Actually

18  Guy Short was at that awards ceremony as well.

19  Q.  Okay.  And so -- but Mr. Kesari was informed that you were

20  using Guy Short as a third party so you could get money from

21  Michelle Bachmann; isn't that right?  Dimitri knew that, right?

22  A.  It was common knowledge in the circles.

23  Q.  Okay.  And it was working for you, wasn't it?

24  A.  Yes.

25  Q.  And you were doing pretty well at $7,500 a month; is that

1   right?  That's fairly comfortable, wouldn't you say?

2   A.  I don't know if it was comfortable, but I was paying my

3   bills and able to save a little bit.

4   Q.  But you knew that Bachmann was about to end, didn't you?  I

5   mean, her campaign was about to end?  It was spiralling out of

6   control?  It was dying, right?

7          MR. PILGER:  Objection, Your Honor.

8          THE COURT:  That was three questions.  Which one do

9   you want answered?

10         MR. HOWARD:  I'll start with the last one, Your Honor.

11         THE COURT:  Thank you.  Go.

12  BY MR. HOWARD:

13  Q.  We'll go back to the last one.

14         You knew that the Michelle Bachmann Campaign was

15  spiralling out of control, right?

16  A.  In December I knew that, yes.

17  Q.  Okay.  Now, interestingly, Christmas Day you were working,

18  weren't you?

19  A.  It was common.

20  Q.  Would you say it was common with your other legislature

21  colleagues?

22  A.  I'm not sure.

23  Q.  You're on the phone Christmas Day, I think that's the

24  testimony you gave?

25  A.  Yes.

1   Q.  You're on the phone with -- you're fund-raising -- well, let

2   me do this.

3           Tell the jury what were you doing on Christmas Day.

4   What was upsetting your family?

5   A.  That I was on the phone, but it was every holiday.  It

6   wasn't just Christmas Day, it was every holiday.

7   Q.  You worked around the clock?

8   A.  Then I did.

9   Q.  And you want to stay in office, right?

10  A.  Yes.

11  Q.  And that means you have to work 24 hours, 365 days a year,

12  seven days a week; isn't that right?

13  A.  Yes.

14  Q.  Just give the members of the jury an idea -- and, look, this

15  isn't a gotcha question.  Just tell them what you're doing.

16  We're not politicians.  Give us a little education.

17  A.  It was always something.  I was talking to either lobbyists

18  or other legislators or citizens and constituents, and looking

19  back now it was a waste of my life and I wish I wouldn't have

20  done it.

21  Q.  Okay.

22  A.  But, unfortunately, I missed a lot of birthdays and holidays

23  because of that, and I have a lot of regrets because of that.

24  Q.  And thank you for that.  That's -- a lot of us just aren't

25  in politics and don't know.  But, you know, we were -- you had

 1  some difficulty remembering things today and yesterday, haven't

 2  you, sir?

 3  A.  Well, I have a tough time when you go back and forth between

 4  October, November, December in one question or the dates.  It

 5  was almost four years ago.

 6  Q.  And it's sometimes difficult to remember things when you

 7  have a lot of things going on in your personal and professional

 8  life, isn't it, sir?

 9  A.  Sometimes.  It just depends on the situation.

10  Q.  Okay.  But, I mean, you clearly had -- you've used the term

11  "I don't recall" quite a bit since you've been on the stand.

12          Do you remember that?

13  A.  Yes.

14  Q.  And some of it is just because of the time that has elapsed;

15  isn't that correct?

16  A.  Correct.

17  Q.  Some of it is just the details that are involved; isn't that

18  correct?

19  A.  Some of it is, yes.

20  Q.  And some of it is just the number of people you deal with on

21  a regular basis when you're in a presidential campaign; isn't

22  that correct?

23  A.  Some of it, yes.

24  Q.  Okay.  Now, you were trying to make a decision whether to

25  stay with Michelle Bachmann, isn't that right, on -- around

1  December 25th, '6th and '7th; isn't that correct?

2  A.  Yes.

3  Q.  You were vacillating, you didn't know what to do; isn't that

4  correct?

5  A.  Unfortunately, I knew what to do, but I made a poor

6  decision.

7  Q.  Well, you're a Ron Paul fan, aren't you, sir?

8  A.  Yes.

9  Q.  You would support him if he had been running for President

10 at the time you were trying to make a decision on who to

11 support?

12 A.  Correct.

13 Q.  You go to Michelle Bachmann because she actually is up and

14 running; isn't that right?

15 A.  Yes.

16 Q.  And she can pay you money; isn't that correct?

17 A.  Well, I had numerous candidates talking to me, but I needed

18 somebody that aligned more with my idealogical beliefs, and

19 Michelle was second.

20 Q.  I'm sorry?

21 A.  Michelle would have been my second choice.

22 Q.  Okay.

23 A.  But at the time she was my first.

24 Q.  But she could pay you, right?

25 A.  Yes.

1   Q.  You wanted to make money, right?

2   A.  Well, they wanted me to work full time, and for me to do

3   that I had to make money.

4   Q.  Okay.  So but you were -- but Ron Paul was your presidential

5   candidate; isn't that correct?

6   A.  By after -- there was an event in October that really made

7   me decide that Michelle wasn't fit to be president, and I --

8   that's when I decided privately I would probably still support

9   Ron Paul.

10  Q.  Now, around December -- you had your dinner on

11  December 26th, I believe.  Do I have the right date?  December

12  26th with Mr. Kesari, your wife?  Was Jared Gamble there or not,

13  do you remember?

14  A.  I don't remember if Jared Gamble was there or not, but --

15  Q.  Do you remember there being three people or four?

16  A.  I remember three people.  Jared Gamble could have been

17  there, but I just remember my wife and Mr. Kesari because that's

18  primarily who I was talking to, but Jared Gamble was often at

19  meetings.

20  Q.  Okay.  And your wife's name is what, sir?

21  A.  Shawnee.  Well, her legal name is Jeannine.  She'll be

22  referred to here as Jeannine, but I call her Shawnee.

23  Q.  And at least for the record, would you just spell Shawnee

24  for us, please.

25  A.  S-H-A-W-N-E-E.

1  Q.  How long have you been married, sir?

2  A.  On the 9th of September, it was 20 -- I'm sorry.

3  Q.  We will withdraw that question.

4          (Laughter.)

5  A.  It was 26 years.  I was trying to remember if it was 26 or

6  27.

7  Q.  Honestly, you don't want to go there.

8          On that night the check was given to her by

9  Mr. Kesari; isn't that correct?

10  A.  Yes.

11  Q.  And on that night -- before that night your wife had been

12  talking to you about switching; isn't that correct?

13  A.  Yes.

14  Q.  And part of the -- and I'll just call it tension.  And

15  forgive me if I'm wrong.  Part of the tension with your wife was

16  political affiliation and money; isn't that correct, sir?

17  A.  I think it was more political affiliation, but she -- she

18  wasn't really worried about the future because at one point I

19  had somebody else offer me a job afterwards.

20  Q.  Okay.  But money was part of the equation, wasn't it?

21  A.  Yeah.  I mean, if you're committing full-time work, you have

22  to be compensated.

23  Q.  And you knew Michelle Bachmann was about to go down in

24  flames, didn't you, sir?

25  A.  In December?

1   Q.   Yeah, uh-huh.

2   A.   Yes, yes.

3   Q.   And so --

4   A.   It was --

5   Q.   So you needed the money, right?  You wanted the money?

6   Forget the need.

7   A.   I needed to be paid.

8   Q.   You needed to be paid?

9   A.   Yes.

10  Q.   You knew Michelle Bachmann wasn't going to do it for you

11  much past December, didn't you?

12  A.   Yes.

13  Q.   She had missed -- or tell me, didn't she miss your last

14  payment?  It wasn't paid on time, was it, sir?

15  A.   Correct.

16  Q.   That had you worried, didn't it, sir?

17  A.   A little, yes.

18  Q.   And during this entire time you are talking to Dimitri

19  Kesari, aren't you, sir?

20  A.   Yes.

21  Q.   Kesari wants you to come over to the Paul Campaign, doesn't

22  he, sir?

23  A.   Yes.

24  Q.   And you are talking to people at the Michelle Bachmann

25  Campaign about what you should do, aren't you?

1   A.  I don't believe I was until -- which dates are you talking

2   about?

3   Q.  Oh, I'm sorry.  Well, let's try December 26th.  You're

4   talking to people in the Michelle Bachmann Campaign -- well,

5   you --

6   A.  I believe it was the 27th when I spoke with them.

7   Q.  The 27th?

8   A.  I believe so.

9   Q.  And you're talking to Ms. Bachmann's husband; is that

10  correct?

11  A.  Yes.

12  Q.  Can you give us his first name?

13  A.  Marcus.

14  Q.  Marcus.  You're talking to the Dorr family; isn't that

15  correct?

16  A.  Yes.

17  Q.  And you're talking to all -- well, I don't know how many

18  Dorrs there are; but you're talking to all three Dorrs, aren't

19  you, sir?

20  A.  Yes.  There's a lot of Dorrs, by the way.

21  Q.  But the ones you're talking to that night --

22  A.  Yes, I understand.

23  Q.  -- you're talking to Aaron Dorr?

24  A.  Yes.

25  Q.  You're on the phone with him?

1  A.  Yes.

2  Q.  You're talking to Chris Dorr?

3  A.  Yes.

4  Q.  And Paul Dorr is the father; isn't that correct?

5  A.  Yes.

6  Q.  And you're trying to get some guidance on what to do, aren't

7  you, sir?

8  A.  Yes.

9  Q.  Also on that call is Dennis Fusaro; isn't that right, sir?

10  A.  I thought I remembered him being on the call, but I question

11  if he was now.

12  Q.  And they are advising you to stay put, aren't they?

13  A.  Yes.

14  Q.  You talked to Michelle Bachmann, didn't you, sir?

15  A.  Yes.

16  Q.  And you told Michelle Bachmann about your money concerns,

17  didn't you, sir?

18  A.  I don't recall having that conversation with Michelle, but I

19  did with Marcus.

20  Q.  And all of this time from the Ron Paul Campaign you are

21  talking to Dimitri on a fairly regular basis, aren't you, sir?

22  A.  Yes.

23  Q.  And it's interesting as we listen to your testimony at this

24  time frame you talked about Mr. Kesari on a number of occasions

25  in terms of -- and the e-mails show that, in terms of trying to,

1   if you will, lure you over; isn't that right?  Is that right,

2   sir?

3   A.  Yeah.  I mean, he was -- I don't know if I would use the

4   word "lure."  I mean, I was being hounded by people in my

5   district, by people in the state.  I mean, the Ron Paul Campaign

6   had a great network of people.

7   Q.  And let's not misunderstand anything.  During this entire

8   time, after this letter from Mr. Benton in which he is offering

9   you and Chris Dorr a job, you don't talk to him, do you?

10  A.  Not until --

11  Q.  During this period you weren't talking to him, before you

12  moved over, you weren't talking to Mr. Benton, were you?

13  A.  Yes, I actually spoke to him just before I went on stage and

14  moved over.

15  Q.  That was after you had made your decision, right?

16  A.  Well, I mean it's all -- if you want to split hairs, I made

17  the decision on the stage.

18  Q.  I'm not trying to split hairs, sir.

19  A.  Okay.

20  Q.  I am just trying to figure out what happened, okay.  Before

21  you went on that stage on the evening of December 28th, after

22  you got that job offer, you never spoke to Jesse Benton, did

23  you?

24  A.  After I went on stage?

25  Q.  No; before.  I'll try again.  Before you went on stage and

1    after the letter was sent to you and Mr. Dorr and Chris Dorr --

2    Aaron and Chris Dorr and you, in that period you did not speak

3    with Jesse Benton?

4    A.   That's not true.

5    Q.   Okay.  All right.  Let me ask you this.  Before you went on

6    stage, had you met Jesse Benton?

7    A.   Yes.

8    Q.   Okay.  And did you understand what Mr. Kesari's role was in

9    the campaign, in the Ron Paul Campaign?

10   A.   I believe his title was deputy campaign manager.

11   Q.   Okay.  And did you understand that he was in charge of all

12   field operations?

13   A.   I did not understand that.

14   Q.   Okay.  Did you understand that Mr. Benton was the chairman

15   of the campaign?

16   A.   Yes.

17   Q.   And did you understand that Mr. Benton ordinarily dealt with

18   running around with the candidate?

19   A.   I didn't really understand what he did, but I understood

20   what a chairman does.

21   Q.   Okay.  Fair enough.  And you were a chairman, right?

22   A.   State chair, yes.

23   Q.   And did you understand that it was Mr. Kesari who handled

24   the field staff and the workers in the State of Iowa for the Ron

25   Paul Campaign?  Did you understand that?

1   A.   I wasn't really sure who handled them.

2   Q.   Okay.  Now, the night of December 27th -- 28th, you've left

3   the Bachmann Campaign.  You drove out, you told them you were

4   leaving; am I right about that?

5   A.   I did not tell them I was leaving.  I told Guy Short.

6   Q.   Oh, okay.

7   A.   And I didn't tell him I was leaving.  I said, I'm sorry for

8   what I'm about to do.

9   Q.   And that was fairly ominous, so you thought he understood

10  what was going on; is that right?

11  A.   Yes.

12  Q.   And I am not from Des Moines.  Can you tell me where this

13  was going on in relationship to where we are now?

14  A.   Where what was going on?

15  Q.   Oh, you're having the conversation with Guy Short.  Where

16  were you?

17  A.   Well, I picked him up at the airport.

18  Q.   Okay.

19  A.   I left Indianola.  Indianola is 12 miles south of here.  And

20  I believe -- I don't know which way is south.  I get turned

21  around in here.

22  Q.   Okay.

23  A.   But 12 miles south of Des Moines.  And there was a rally,

24  and that's where I had the interaction with the campaign staff

25  that morning from the Bachmann Campaign, and then I went to the

1   airport and I picked up Guy Short from the airport.

2   Q.  All right.

3   A.  And I took him to a hotel in West Des Moines.

4   Q.  And after you took him to the hotel, you told him you were

5   sorry for what you were about to do?

6   A.  Yes.

7   Q.  And if I understand, sir, then you drove around Des Moines

8   for a while?

9   A.  Yes, because I believe when I dropped him off, it was

10  daylight, and when I appeared at the fairgrounds it was dark;

11  but I can't be definite on the time.

12  Q.  And when you got to the fairgrounds, you called your friend,

13  Mr. Kesari; is that right?

14  A.  Yes.

15  Q.  And after you called your friend, Mr. Kesari, you walked in

16  to -- you -- I'm sorry.  He met you at your car; is that

17  correct?

18  A.  It was -- I believe it was in my car.  It may be just

19  outside the car, but it was in the parking lot near my car.

20  Q.  Okay.  And at that point your arrival at the fairgrounds was

21  a surprise; isn't that correct?  He didn't know you were coming,

22  did he?

23  A.  I believe I told him in the fairgrounds parking lot.

24  Q.  Okay.  Let me ask you the question again.  Mr. Kesari did

25  not know you were coming, did he?

1   A.   I don't believe so, until I showed up at the fairgrounds.

2   Q.   Okay.  And then when he -- and at that point the offer to

3   join the Ron Paul Campaign was a month old, wasn't it?  The

4   offer, your job offer, you got that in November, correct?

5   A.   The e-mail I got, I believe it was the day after Halloween;

6   but on the 26th at dinner he offered me to come over to the Paul

7   Campaign.

8   Q.   Okay.  Mr. Kesari offered you --

9   A.   I'm sorry, he -- yes, he offered me to come over multiple

10  times.

11  Q.   Mr. Kesari offered you to come over; is that right?

12  A.   Yes, yes.

13  Q.   But the check that you got was written on a jewelry store

14  account; isn't that correct?

15  A.   I didn't get the check until we left and, yes, it was

16  written on a jewelry store account.

17  Q.   It wasn't from the Ron Paul Campaign, was it?

18  A.   No.  But I made it very clear, I asked him --

19  Q.   It was not from the Ron Paul -- and it's okay.  I mean,

20  these guys will get up.  They get to ask you questions.  You'll

21  get a chance to explain yourself.

22          The check was not from the Ron Paul Campaign, was it,

23  sir?

24  A.   No.  We saw the check.

25  Q.   Okay.  And you get there and your first question to

1    Mr. Kesari, and then I'll actually move back a little bit, the

2    question that is -- that you asked is, Jesse Benton and John

3    Tate, are they on board; is that right?

4    A.   Did you say that was the first question or --

5    Q.   It was a question you asked?

6    A.   Yes.

7    Q.   It was important to you, wasn't it?

8    A.   Yes.

9    Q.   You wanted to make sure that they wanted you on this team;

10   isn't that correct?

11   A.   Yes.

12   Q.   And Mr. Kesari said what to you, sir?

13   A.   He said yes, they were.

14   Q.   Yes, they were.  And did Mr. Kesari share -- and that was on

15   December 28th; is that correct?

16   A.   Yes.

17   Q.   Did he tell you -- this is Government's Exhibit No. 35, and

18   I believe, Your Honor, this is in evidence.

19            THE COURT:  It is.

20   BY MR. HOWARD:

21   Q.   Mr. Kesari didn't tell you that Jesse Benton the day before

22   said about you, "Fuck you, this is absurd."

23            Do you see that written there?

24   A.   Yes.

25   Q.   That doesn't sound like somebody who is on board with you

1   coming, does it, sir?

2   A.  I don't know.

3   Q.  You don't know?  Really?  I mean, sir, just work with me

4   here.  Look, I mean, that's what it says, right?

5   A.  I think he was upset because I wasn't coming on board.

6   Q.  Yeah, right.  He doesn't want you, does he?

7   A.  That's not --

8   Q.  He doesn't want you, does he?

9   A.  That's not true.

10  Q.  Really?  Is that what you say to people you want?

11         THE COURT:  That's argumentative.  Why don't you go

12  back to the podium and ask him a question.

13         MR. HOWARD:  Yes, sir.

14  BY MR. HOWARD:

15  Q.  Let me ask you a different question.

16         Dimitri is your friend; is that correct?

17  A.  Yeah.  I trusted Dimitri.

18  Q.  You trust him?

19  A.  I did, yes.

20  Q.  He wants to help you; isn't that correct?

21  A.  I can't question his motives.

22  Q.  Okay.  He knows you need a job; is that correct?

23  A.  Well, yeah, but he knew I had other opportunities.

24  Q.  Okay.

25  A.  I talked to him about those.

1  Q.  Okay.  But he knows you need a job, doesn't he?

2  A.  Yes.  I think everybody in America needs a job.

3  Q.  And you show up unannounced at a campaign; isn't that

4  correct?

5  A.  Yes.

6  Q.  And the campaign was busy?

7  A.  Yes.

8  Q.  A lot of people?

9  A.  Yes.

10 Q.  And he walks you back to meet the people on the campaign,

11 including Jesse Benton and John Tate; is that correct?

12 A.  Yes, but it wasn't as busy where we were at because it was

13 behind the stage.

14         THE COURT:  Okay.  We're going to take our mid

15 afternoon recess and come back at 3:00.  Is that when we're

16 going to take some witnesses out of order?

17         MR. PILGER:  Yes, Your Honor.

18         THE COURT:  Good.  We'll do that.

19         See you at 3:00.

20         (Recess at 2:40 p.m., until 3:00 p.m.)

21         THE COURT:  Please be seated.

22         It's Friday afternoon, and as I understand it, there's

23 some out-of-town witnesses that the government is trying to get

24 back on airplanes, right?

25         MR. KRAVIS:  Yes, thank you, Your Honor.

```
 1              THE COURT:  Call the first one.

 2              MR. KRAVIS:  The government would call Mr. Pavlo

 3  Kesari.

 4              THE COURT:  Come forward, sir.  If you'll approach

 5  her, she'll administer your oath.

 6              THE CLERK:  Would you raise your right hand, please.

 7              PAVLO KESARI, GOVERNMENT'S WITNESS, SWORN.

 8              THE CLERK:  Please be seated.

 9                         DIRECT EXAMINATION

10  BY MR. KRAVIS:

11  Q.  Good afternoon, sir.

12  A.  Good afternoon.

13  Q.  What is your name?

14  A.  My name is Pavlo Kesari.

15  Q.  How do you spell your last name?

16  A.  K-E-S-A-R-I.

17  Q.  Now, Mr. Kesari, do you know the defendant in this case,

18  Dimitri Kesari?

19  A.  I do.

20  Q.  How do you know him?

21  A.  He's my brother.

22  Q.  Mr. Kesari, what do you do for a living?

23  A.  I have a video production company.

24  Q.  What exactly does a video production company do?

25  A.  I help produce shows with, like, visual aids, LED walls,
```

1    plasmas, do a little audio.

2    Q.   What is the name of the company you work for now?

3    A.   Control Video.

4    Q.   I want to turn your attention to the time period that is the

5    end of December 2011, into the beginning of January 2012.   Did

6    there come a time around then when your brother, Dimitri Kesari,

7    asked you to help him with something related to the Ron Paul

8    Presidential Campaign?

9    A.   Yes.

10   Q.   Where did that conversation happen?

11   A.   It happened at my office in Williamsburg, Maryland.

12   Q.   And at that time were you working for Control Video?

13   A.   Well, at the time we had a company called Performance Video

14   Systems.

15   Q.   The company was called Performance Video --

16   A.   -- Video Systems.

17   Q.   And was it common for your brother, Dimitri Kesari, to come

18   to your office and talk to you in person?

19   A.   Not very often he came by.

20   Q.   Now, when Dimitri Kesari came by your office on this day,

21   what exactly did he ask you to do for the campaign?

22   A.   Well, he said he had a graphic designer that needed to be

23   paid because of internal politics.   He didn't get along with

24   people, I guess.

25   Q.   And what was your brother, Dimitri Kesari, asking you to do

1  for this graphic designer?

2  A.  To pay him like a paymaster.

3  Q.  And what is a paymaster?

4  A.  It's a person who, like, you hire somebody for services and

5  you pay them.

6  Q.  So the idea is that Dimitri Kesari was asking you to pay

7  this graphic designer?

8  A.  Yes.

9  Q.  And what exactly did Dimitri Kesari tell you that this

10 person that you were going to be paying would be doing for the

11 campaign?

12 A.  Graphics, campaign stuff, ads, I guess, posters, banners,

13 stuff like that.

14 Q.  Posters, banners, stuff like that?

15 A.  I imagine, graphics.

16 Q.  What did you tell Dimitri Kesari when he made this request?

17 A.  I said I would think about it.

18 Q.  And did there come a time when Dimitri Kesari brought it up

19 with you again?

20 A.  Yes.

21 Q.  And when Dimitri Kesari asked you again, what did you tell

22 him?

23 A.  I said I couldn't do it for him.

24 Q.  And how did Dimitri Kesari respond when you said you

25 couldn't do it for him?

1  A.  Well, he asked why and I explained to him why.

2  Q.  And why was it?

3  A.  It was because I have -- in the company I was at at the

4  time, I had a bunch of partners and we had a bunch of internal

5  problems, so I didn't think it was a good thing to do.

6  Q.  And when you told that to Dimitri Kesari, what, if anything,

7  did he ask you to do next?

8  A.  Well, he asked if I knew somebody that would do it.

9  Q.  And what did you tell him?

10  A.  I said I might have somebody to do it.

11  Q.  Who did you ask to do it?

12  A.  I asked my friend, Noel Izon.

13  Q.  And what does Noel Izon do?

14  A.  Noel Izon is an independent documentary filmmaker.

15  Q.  I'm going to show you now what's been marked and entered

16  into evidence as Government's Exhibit 69, and as Government's

17  Exhibit 69 is coming up on the screen in front of you,

18  Mr. Kesari, I'm going to ask if we can zoom in there at the top

19  of the page, which is an e-mail.

20  A.  Okay.

21  Q.  Mr. Kesari, do you recognize this e-mail?

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  It's an e-mail from Dimitri Kesari to me, Pavlo.  It says,

25  invoice.

1          "Here is the invoice that needs to be taken care of.

2          "Send me an invoice for video services.  33k plus."

3  Q.  This address in the to line, pkesari@msn.com, was that your

4  e-mail address at the time?

5  A.  Yes, that's my e-mail.

6  Q.  And the request at the bottom of the message, "Here is the

7  invoice that needs to be taken care of.

8          "Send me an invoice for video services.  33 K plus."

9          Did you understand this to be related to Dimitri

10  Kesari's request to help pay the graphics person for the

11  campaign?

12  A.  Yes.

13  Q.  Now I'm going to ask you to take a look at the second page

14  of this exhibit, the attachment.

15          Do you recognize this document, the attachment, second

16  page of Government's Exhibit 69?

17  A.  Yes, I recognize this.  It's an invoice, attention:  ICT in

18  Hyattsville.

19  Q.  Now, do you know what ICT, Inc., in Hyattsville, Maryland

20  is?

21  A.  That is Noel Izon's company.

22  Q.  And who is this invoice from?

23  A.  It says Grassroots Strategy.

24  Q.  At the time that you got this e-mail with this attachment,

25  had you ever heard of the company, Grassroots Strategy, Inc.?

1   A.   No, never heard of it.

2   Q.   I'm going to direct your attention now to the bottom of the

3   invoice where it says, sincerely yours, Kent Sorenson.

4            Do you see that there?

5   A.   Yes, at the bottom there.

6   Q.   At the time that you received this e-mail from January 2012,

7   did you know someone named Kent Sorenson?

8   A.   No.  I do not know Kent Sorenson.

9   Q.   What did you do with this e-mail after you got it from

10  Dimitri Kesari?

11  A.   I just -- I forwarded it to Noel Izon at ITC (sic).

12  Q.   You mean ICT?

13  A.   Oh, ICT, I mean.

14  Q.   And after you forwarded this e-mail to Mr. Izon, did there

15  come a time when you and Mr. Izon spoke about the invoice?

16  A.   Yes.

17  Q.   Now, I don't want you to say what Mr. Izon said to you, but

18  during that conversation, did Mr. Izon raise some questions

19  about this company and the invoice?

20  A.   Yes.  Yes, he did.

21  Q.   And what did you do after you had that conversation with

22  Mr. Izon?

23  A.   I asked, there was no EIN number, which is a business

24  number, identification number.

25  Q.   You mean there was no EIN number on the invoice in

1   Government's Exhibit 69?

2   A.  There is no EIN, yes.

3   Q.  So what did you do about that?

4   A.  I asked for an EIN number.

5   Q.  Who did you ask for an EIN number?

6   A.  Dimitri.

7   Q.  That's Dimitri Kesari?

8   A.  That's correct.

9   Q.  I'm going to show you now what's been marked and entered

10  into evidence as Government's Exhibit 71.  And as this is coming

11  up on the screen, I'm going to ask you to focus your attention

12  on the e-mail message that appears in the top third of the page

13  of Government's Exhibit 71.  We're going to zoom in there.

14          I'm sorry.  Could we get the whole -- yep, thanks.

15          Okay.  Do you recognize this e-mail exchange?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's an e-mail from Dimitri to myself.  Subject:  Invoice.

19  It says:

20          "I am attaching an invoice that contains my EIN

21  number, my address is included in the bill.

22          "Thanks.

23          "Kent."

24  Q.  That e-mail you're reading from is the e-mail from Kent to

25  Dimitri; is that right?

1  A.  It's a forward I guess.

2  Q.  It's a forward from Dimitri Kesari to you on the 27th?

3  A.  Yes, on the 27th.

4  Q.  All right.  Now I'm going to ask you to turn your attention

5  to the second page of this e-mail to the attachment, and we're

6  going to zoom in there for you so you can see a little better.

7        Do you recognize this document, the attachment to

8  Government's Exhibit 71?

9  A.  Yes.

10  Q.  And is this version of the attachment, the invoice that

11  appears in Government Exhibit 71, different in any way from the

12  invoice we saw a moment ago, the attachment to Government's

13  Exhibit 69?

14  A.  Well, it's the same, but it has the EIN number which is

15  blacked out on it.

16  Q.  I'm going to turn your attention now to Government's Exhibit

17  72.

18  A.  Okay.

19  Q.  This exhibit has been marked but not yet entered into

20  evidence.

21        I'm going to ask you to look on the screen in front of

22  you and tell me if you recognize Government's Exhibit 72.

23  A.  It looks like it's an e-mail from me to Sonny.

24  Q.  And what's the date of the e-mail?

25  A.  February 2, 2012.

1  Q.  Do you recognize this e-mail?

2  A.  Yeah, I recognize it.

3  Q.  Did you write it?

4  A.  There's nothing really on here, but yes.

5  Q.  I'm going to ask you to turn your attention now to page 3 of

6  Government's Exhibit 72.

7           Is that -- that's one of the attachments to the e-mail

8  you're looking at.

9           Do you recognize that document?

10 A.  I do recognize it.

11 Q.  Did you prepare that document?

12 A.  I did prepare the document.

13 Q.  And the e-mail that is Government's Exhibit 72, was that an

14 e-mail from you forwarding this document and some others to

15 Mr. Izon?

16 A.  That's correct.

17          MR. KRAVIS:  At this time the government moves Exhibit

18 72 into evidence.

19                              (Government Exhibit 72 was

20                               offered in evidence.)

21          MS. SINFELT:  On what basis, under what rule?

22          THE COURT:  What's your objection?

23          MS. SINFELT:  Hearsay, prejudice.

24          MR. BINNALL:  Same; hearsay, prejudice.

25          THE COURT:  And why do you contend it's not hearsay?

1          MR. KRAVIS:  The document is not offered for the

2    truth; offered to show what the witness did next.

3          THE COURT:  The objection is overruled.  72 is

4    received.

5                              (Government Exhibit 72 was

6                               received in evidence.)

7    BY MR. KRAVIS:

8    Q.  Now, Mr. Kesari, I'm going to ask you to turn your attention

9    to the third page of Government's Exhibit 72.

10         Is this the invoice that you said you prepared -- you

11   said a moment ago that you prepared?

12   A.  Yes.

13   Q.  Who is this invoice from?

14   A.  Well, it says at the top it's from Grassroots to ICT.

15   Q.  And Grassroots Strategy, Inc., is the company on the two

16   invoices we just looked at?

17   A.  That's correct, that's correct.

18   Q.  And ICT is Mr. Izon's company?

19   A.  Yes.

20   Q.  Now, I want to direct your attention to the middle of the

21   exhibit, the middle of the invoice.  Do you see where it says, 1

22   week July 11, consulting services.  Then 4 weeks September 11?

23   A.  Yes.

24   Q.  Do you see that?

25   A.  Uh-huh.

1  Q.  Who wrote those dates in there?

2  A.  I made this up.

3  Q.  And where did you get the information to create this

4  document, to create those dates?

5  A.  Well, I was trying to figure out the other invoice, and when

6  I talked to Dimitri, he said that the guy hadn't been paid in

7  months.  So I was just trying to figure out, you know, six

8  months would be -- it would break it down to this.

9  Q.  But when you said that Dimitri told you that the guy hadn't

10 been paid in months, are you referring to the graphic designer

11 that Dimitri Kesari asked you to pay on behalf of the campaign?

12 A.  I'm referring to the graphic designer, yes.

13 Q.  And what did you do -- well, let me ask you this.  Why was

14 it that you -- sorry.  Let me go back.

15         What did you do with this invoice after you prepared

16 it?

17 A.  I forwarded it to Sonny.

18 Q.  Is that Sonny Izon?

19 A.  Izon, yes, Mr. Izon.

20 Q.  Now, why was it that you created a new invoice from

21 Grassroots Strategy to ICT to forward to Mr. Izon instead of

22 just forwarding the two attachments that Dimitri Kesari sent

23 you, the attachments to 69 and 71?

24 A.  Well, Mr. Izon had some concerns about the other invoice

25 that he got because without the EIN and -- I was just trying to

1   make it more clear basically, like consulting services over a

2   period of time instead of just a fee because that's my

3   understanding.

4   Q.  I'm going to turn your attention now to page 6 of this

5   exhibit.

6           Do you recognize the attachment that appears at page 6

7   of the exhibit?

8   A.  I do.

9   Q.  And what is it?

10  A.  It is an invoice of services that I provided the campaign

11  back in 2010.  I rented them some audio equipment from my --

12  some audio equipment which is listed here.

13  Q.  Did you create this invoice?

14  A.  I did create this one.

15  Q.  And who is this invoice from?  That is, who is the person

16  who's --

17  A.  I mean, that's my name at the top.  That's my business

18  address.  I made it out to Sonny -- I mean ICT.

19  Q.  And was this invoice for some work that you had actually

20  performed in your own company?

21  A.  I rented this equipment to them for five weeks.

22  Q.  When you say "them," who is them?

23  A.  The Ron Paul Campaign.

24  Q.  And was the service that you provided for this invoice, the

25  rental to the Ron Paul Campaign, in any way related to the

1  Grassroots Strategy invoices that we saw earlier?

2  A.  It has nothing to do with that.

3  Q.  Why if the two invoices were not related, they were for two

4  separate things, why did you forward both invoices to Mr. Izon

5  at the same time?

6  A.  Well, clearly it says 2010, it's been over a year and I

7  haven't been paid for this, so I was trying to speed up the

8  process to be paid for the services that I had provided.

9  Q.  So you had provided services to the Paul Campaign and never

10  got paid for them?

11  A.  That's correct.

12  Q.  So you filed the invoice to Mr. Izon hoping to get paid for

13  the work that you had done some time ago?

14  A.  Yes.

15  Q.  Finally, I'm going to turn your attention, Mr. Kesari, to

16  Government's Exhibit 80, which I believe has been marked and

17  entered into evidence.  And we're going to focus your attention

18  at the top of the page.

19          Do you recognize this e-mail?

20  A.  Yes.  It's from Dimitri Kesari to me, invoice for February.

21  Q.  And what is the date of this e-mail?

22  A.  March 18, 2012.

23  Q.  And what does the e-mail say?

24  A.  Can you send me a bill.

25  Q.  Can I ask you now to take a look at page 2 of the document.

1          Do you recognize the invoice that appears at page 2?

2   A.  Yes, I recognize it.

3   Q.  Was this invoice attached to the e-mail that we just saw on

4   page 1?

5   A.  Yes.

6   Q.  What did you do with this invoice after you received it?

7   A.  I just forwarded it to Sonny, I mean Mr. Izon.

8   Q.  Did you get any more invoices from Dimitri Kesari and

9   Grassroots Strategy after this or was this the last one?

10  A.  To my knowledge, it's the last one.

11          MR. KRAVIS:  Can I have just a moment, please?

12          THE COURT:  Yes.

13          MR. KRAVIS:  Thank you.

14          (Pause.)

15          MR. KRAVIS:  Thank you, Mr. Kesari.

16          No further questions.

17          THE COURT:  Mr. Binnall, do you want to go first?

18          MR. BINNALL:  Yes, Your Honor.

19                      CROSS-EXAMINATION

20  BY MR. BINNALL:

21  Q.  Good afternoon, Mr. Kesari.  My name is Jesse Binnall.  I

22  represent your brother, Dimitri Kesari.

23          So you did perform some audiovisual services for the

24  Ron Paul Campaign, correct?

25  A.  Yes.  I sent some audio equipment to the campaign.

1  Q.  And you included that bill for that equipment in the first

2  bill that Mr. Izon sent to the Paul Campaign, right?

3  A.  Yes.  I sent it to Mr. Izon.

4  Q.  And do you remember what life was like for Mr. Kesari in

5  December -- my client and yourself in December of 2011?

6  A.  Well, December 2011 my mother passed, our mother passed on

7  December 7th, so it was kind of rough for the family, you know,

8  just like anybody else who loses their mother or father or

9  brother.

10  Q.  And that was December 7, 2011?

11  A.  Well, she had a stroke on Thanksgiving and she didn't

12  recover, and she passed on the 7th of December.

13  Q.  I'm very sorry for that loss.

14  A.  Of 2011.

15  Q.  And, Mr. Kesari, you do know, of course, about my client's

16  family situation in general as well, right?

17  A.  Yes.  I do know about my brother's family, yeah.

18  Q.  You know that he's married?

19  A.  He's married, has three kids, yeah.

20  Q.  And you serve as a godfather to his oldest son?

21  A.  I'm the godfather to his oldest child.

22  Q.  And you just got married this year?

23  A.  I just got married in March.

24  Q.  Congratulations.  And your brother served as your best man?

25  A.  Yes.  He was there.

1  Q.  Congratulations.

2  A.  Well, thank you.

3          MR. BINNALL:  No further questions.

4          THE COURT:  Mr. Howard, do you have questions?

5          MR. HOWARD:  Ms. Sinfelt.

6          THE COURT:  Ms. Sinfelt, go ahead.

7                     CROSS-EXAMINATION

8  BY MS. SINFELT:

9  Q.  Just one question.  You've never spoken with Mr. Benton,

10 have you?

11 A.  To whom?

12 Q.  Mr. Benton.

13 A.  No, I have never spoken to Mr. Benton.

14         MS. SINFELT:  Thank you.

15         No further questions.

16         MR. KRAVIS:  Nothing further.

17         THE COURT:  Thank you, sir.  You're excused.

18                          (Witness excused.)

19         THE COURT:  Call your next witness, please.

20         MR. PILGER:  The government calls Sonny Izon.

21         THE CLERK:  Please raise your right hand.

22           NOEL IZON, GOVERNMENT'S WITNESS, SWORN

23         THE CLERK:  Please be seated.

24

25

```
 1                    DIRECT EXAMINATION

 2   BY MR. PILGER:

 3   Q.  Good afternoon, sir.

 4           Please state your name for the record.

 5   A.  My name is Noel Izon.

 6   Q.  And spell your name for us.

 7   A.  First name is N-O-E-L, last name is I-Z-O-N.

 8   Q.  Do you go by a nickname?

 9   A.  Yes.  I'm called Sonny by my friends.

10   Q.  How do you spell your nickname?

11   A.  It's S-O-N-N-Y.

12   Q.  What is your job, sir?

13   A.  I'm a filmmaker.

14   Q.  How long have you been a filmmaker?

15   A.  A little over 40 years.

16   Q.  Have you done documentaries?

17   A.  Yes, I have done quite a bit of documentaries, over 200

18   films for television.

19   Q.  Have some of your documentaries been on PBS?

20   A.  They've been on PBS, National Geographic.  Mostly historical

21   documentaries in the past 20 years.

22   Q.  Do you have a family, sir?

23   A.  Yes, I do.

24   Q.  Children?

25   A.  I have two daughters and three -- well, almost three
```

1  grandchildren, one coming in January.

2  Q.  Congratulations.

3       Let me turn your attention to someone named Pavlo or

4  Paul Kesari.  Do you know that person?

5  A.  Yes, I do.

6  Q.  How long have you known that person?

7  A.  Approximately ten years.

8  Q.  How did you meet?

9  A.  Through another friend in the business.

10  Q.  And is that the film production business?

11  A.  Correct.

12  Q.  And what's the nature of your relationship with Mr. Pavlo

13  Kesari?

14  A.  Well, it's both a business and a friendship as well.  We've

15  been on vacations together.  In fact, he came to my daughter's

16  bridal shower -- engagement party, I'm sorry.

17  Q.  Now, did you come to meet Mr. Pavlo Kesari's brother,

18  Mr. Dimitri Kesari?

19  A.  Could you repeat the question, please?

20  Q.  Did you ever meet Dimitri Kesari?

21  A.  Yes, I did.

22  Q.  And turning your attention to the time frame of 2012, had

23  you met Dimitri Kesari before August of 2012?

24  A.  No, sir.

25  Q.  Did you have occasion to correspond and deal with him

1  otherwise?

2  A.  By e-mail.

3  Q.  Now, turning your attention even further back to December of

4  2011, did Pavlo Kesari ask you to handle something regarding

5  some payments?

6  A.  Yes, he did.

7  Q.  What did he ask you to do?

8  A.  He had asked me to act as paymaster for some work that his

9  brother required.  I was told that they wanted to hire a certain

10  professional to work for them, but needed to not have the

11  person's name be too prominent because there was some kind of

12  political infighting within the organization and they wanted to

13  hire him but not call attention --

14          MR. BINNALL:  Your Honor, I object to the hearsay on

15  this.

16          THE COURT:  Overruled.

17          MR. PILGER:  You may continue to answer.

18          THE WITNESS:  Okay.

19  BY MR. PILGER:

20  Q.  Did you have anything else you wanted to add?

21  A.  Okay.  So basically they said the idea was to be able to

22  hire this person through me and have the work done and then we

23  would process the invoices for them, which is not an uncommon

24  practice in my business, having paymaster.  I typically will

25  hire a paymaster to hire all of the talent, for example, for

1  production even though that paymaster will not do any work for

2  the production itself other than paying the talent for the

3  production.

4  Q.  Fair enough.  And your business again is what?

5  A.  Say that again, sir.

6  Q.  I'm sorry, I'm speaking too quickly.

7        Tell us again, what is your business?

8  A.  Oh, my business is film production.

9  Q.  Okay.  Now, I think you said that Pavlo Kesari came to you

10  and talked to you about doing this on behalf of someone else.

11  Who was that other person?

12  A.  That was his brother, Dimitri Kesari.

13  Q.  And you learned from Pavlo Kesari that -- the understanding

14  from Pavlo Kesari from Dimitri Kesari was that this had to do

15  with inside politics of an organization?

16  A.  That's correct, sir.

17  Q.  Do you know what the organization was?

18  A.  I think at the time -- I found out a little bit later on --

19  Q.  Hold up.  I'm just asking you at the time, did you know what

20  the organization was at the time?

21  A.  At the time, no.

22  Q.  Did you end up sending e-mails to Dimitri Kesari about this

23  issue?

24  A.  I did.

25  Q.  Okay.  Is there anything that might refresh your

1  recollection about whether you knew the nature of the

2  organization that Dimitri Kesari was involved in?  Would seeing

3  those e-mails refresh your recollection?

4  A.  Yes, because the e-mails would be directed to the

5  organization that he worked for.

6  Q.  Did the e-mails contain some invoices?

7  A.  Yes.

8  Q.  Showing you an invoice -- please don't read from it; just

9  look at it -- does that refresh your recollection as to the

10  organization that Dimitri Kesari was interested in doing

11  something for?

12  A.  That is correct, sir.

13  Q.  And what was the organization?

14  A.  Ron Paul.

15  Q.  Any particular Ron Paul entity?

16  A.  I believe it's Ron Paul, LLC, or something like that.

17  Q.  Okay.  Well, I'm going to show you some documents in

18  evidence and we'll go into that in a little more detail.

19        It had something to do with Ron Paul; is that fair?

20  A.  That is correct.

21  Q.  So your understanding was -- let me be clear.  Was your

22  understanding that Dimitri Kesari had represented that the issue

23  involved inside the Ron Paul entity issues and not outside

24  issues?

25  A.  That is correct.

1           MR. BINNALL:  I again object.  It's hearsay.

2           THE COURT:  It was.  You're a little late.

3           MR. PILGER:  I'm sorry?

4           THE COURT:  I said it was, but he was a little late.

5           Go ahead.  Pose your next question.

6  BY MR. PILGER:

7  Q.  Did you have an understanding on whether the issues

8  concerned anything outside of the campaign such as a government

9  agency?

10  A.  No, sir.

11  Q.  Did you have any understanding whether it concerned the FEC

12  at all?

13  A.  No, sir.

14  Q.  Did you agree to do this for your friend, Paul or Pavlo

15  Kesari?

16  A.  Yes, sir.

17  Q.  Did you expect to receive something for doing this?

18  A.  Other than the normal 10 percent commission, no, sir.

19  Q.  Were there some expenses involved in doing this?

20  A.  Yes, sir.  I think it was the wire transfer costs.

21  Q.  Did you end up including in billing that you did both a

22  commission and expenses?

23  A.  That is correct.

24  Q.  In terms of the Ron Paul entity, did you -- who did you work

25  with at the Ron Paul entity to do this task?

1  A.  My only contact was with Dimitri Kesari.

2  Q.  And you said that you worked with him by e-mail.  Did you

3  work with him in any other way, by telephone or fax or anything

4  else that you recall?

5  A.  My recollection is mostly e-mail.  I did not meet him until

6  August of 2012.

7  Q.  And by August of 2012, were you done with this business on

8  the payments?

9  A.  That is right.  We were done by June.

10  Q.  Did Mr. Dimitri Kesari tell you who would be billing you?

11  A.  Yes, sir.

12  Q.  Do you recall who that was, who would be billing you?

13  A.  Initially it was -- I was given the name of the entity

14  Grassroots Strategy, and then later on I heard from Grassroots

15  Strategy, and it was a name, Mr. Kent Sorenson, but I didn't

16  know who he was.

17  Q.  Did Grassroots Strategy or -- first of all, did Grassroots

18  Strategy send you -- strike that.

19        Did you receive invoices from Grassroots Strategy?

20  A.  I did, sir.

21  Q.  Did you receive them from Dimitri Kesari sometimes?

22  A.  The invoices?

23  Q.  Yes, sir.

24  A.  I received the invoices from Grassroots Strategy.

25  Q.  I'm sorry, what did you do with them?  What did you do with

 1   the invoices?

 2   A.   I paid the invoice after we had -- we had invoiced the Ron

 3   Paul Campaign, and then we would get paid.  And then when we got

 4   paid, we paid the invoices from Grassroots Strategy.

 5   Q.   And when you sent the invoices in to the Ron Paul Campaign

 6   so that you would get paid, who did you send them to?

 7   A.   To Dimitri Kesari.

 8   Q.   Did you ever send them to Fernando Cortes?

 9   A.   No, sir.

10   Q.   Did you ever send them to anyone else at the Paul Campaign?

11   A.   No, sir.

12   Q.   Sir, I would like to go through some exhibits for you that

13   are going to appear on your screen.

14   A.   Yes, sir.

15   Q.   First, Government's Exhibit 73 for identification, which is

16   not yet in evidence.

17            Do you recognize this e-mail?

18   A.   I do.

19   Q.   Do you remember it?

20   A.   I do.

21   Q.   Did you send it to Dimitri Kesari?

22   A.   Yes, I did.

23   Q.   Does it concern the invoicing we just talked about?

24   A.   Yes, sir.

25            MR. PILGER:  The government moves 73 into evidence.

1                    (Government Exhibit 73 was

2                    offered in evidence.)

3          THE WITNESS:  I'm sorry, I didn't catch that last.

4          MR. PILGER:  I was talking to the judge there.

5          MS. SINFELT:  Hearsay objection from Mr. Benton.

6          MR. BINNALL:  Hearsay objection as well.

7          THE COURT:  Overruled.  73 is received.

8                    (Government Exhibit 73 was

9                    received in evidence.)

10   BY MR. PILGER:

11   Q.  Mr. Izon, we're just waiting for it to come up on the screen

12   so the jury can see it.

13          Just focusing on the top, the header and the text,

14   that's an e-mail from the address sonnyizon@aol.com.  Is that

15   your e-mail?

16   A.  That is my e-mail, sir.

17   Q.  And you sent it to dkesari@aol.com, correct?

18   A.  That's correct.

19   Q.  Did you understand that to be Dimitri Kesari's e-mail

20   address?

21   A.  Yes, sir.

22   Q.  What was the subject?

23   A.  It was an invoice.

24   Q.  Could you read the subject line?

25   A.  Production services invoice.

1  Q.  And when was that sent?

2  A.  Say that again, sir?

3  Q.  I'm sorry.  What date did you send that?

4  A.  February 5, 2012.

5  Q.  What did you say?

6  A.  Do you want me to read what it says?

7  Q.  Yes, sir.

8  A.  Okay.  "Attached is the production services invoice we

9  discussed.  Let me know if you need anything else.  By the way,

10 the web site for my latest holocaust documentary is up.  Please

11 check it out when you come up for air.

12          "Www.anopendoormovie.com.

13          "Let me know what you think.

14          "Thanks for the business.

15          "Sonny Izon."

16 Q.  And if we could have page 3.

17          Is that an invoice from your company to Ron Paul PCC,

18 Inc., attention:  Dimitri Kesari?

19 A.  That is correct, sir.

20 Q.  Is there one line item billed on this invoice?

21 A.  Production services.

22 Q.  And what is the amount?

23 A.  38,125.

24 Q.  And do you recall how you came to that number, 38,125?  What

25 were the components of that number?

1   A.   That was given to us by the campaign, and it was 25,000,

2   which was supposedly previous services because our -- we were

3   given to think -- we were told that they had already done work

4   that they hadn't been paid for yet, so that was the 25.  And

5   then there was the current bill of 8,000, which would make it

6   33.  There was the 10 percent paymaster fee, which would be

7   about 3,200, and then I believe there was -- a little short of

8   $2,000 additional audiovisual equipment that was actually

9   provided for some event and for which they asked me to just go

10  ahead and put that in also so I could pay that vendor.

11  Q.   Who is "they"?

12  A.   The campaign through Dimitri Kesari.

13  Q.   And was that work that had been done by a person known to

14  you?

15  A.   Yes.  The audiovisual work?

16  Q.   The actual audiovisual work.

17  A.   The one that was for less than $2,000?

18  Q.   Yes, sir.

19  A.   Yes.

20  Q.   Who did that work?

21  A.   It was performed by Pavlo Kesari.

22  Q.   And you have personal knowledge of that?

23  A.   Yes, I do.

24  Q.   Turning your attention to Government's 81, which is in

25  evidence.

1          Sir, can you see that well enough to read it?

2   A.  Yes, I do.

3   Q.  We'll make it bigger.

4          Is this another e-mail from yourself to Dimitri

5   Kesari?

6   A.  That is correct.

7   Q.  What's the subject?

8   A.  February invoice.

9   Q.  What's the date?

10  A.  March 21, 2012.

11  Q.  And what's the text?

12  A.  It says:

13          "Hey Dimitri.

14          "Attached is the invoice for services rendered in

15  February.  Let me know if you need anything else.

16          "Best,

17          "Sonny."

18  Q.  And if we could have page 3, is there another invoice from

19  your company, ICT, to Ron Paul PCC, Inc., attention:  Dimitri

20  Kesari?

21  A.  That is correct, sir.

22  Q.  Is there one line item?

23  A.  Production services, February.

24  Q.  In what amount?

25  A.  $8,850.

1   Q.  Turning your attention to Government's Exhibit 83 in

2   evidence.

3          Is that another e-mail from yourself to Dimitri

4   Kesari?

5   A.  That is correct, sir.

6   Q.  What's the subject?

7   A.  March invoice.

8   Q.  When was it sent?

9   A.  March 26, 2012.

10  Q.  What does the text say?

11  A.  It says:

12          "Hi Dimitri.

13          "Here is the invoice for March.

14          "Peace,

15          "Sonny."

16  Q.  At page 2 of this exhibit, is there another invoice?

17  A.  Yes, sir, there's an invoice.

18  Q.  Is that an invoice from your company, Interactive

19  Communication Technologies or ICT, to Ron Paul PCC, Inc.,

20  attention:  Dimitri Kesari?

21  A.  Yes, sir.

22  Q.  Is there one line item?

23  A.  Production services, March.

24  Q.  In what amount?

25  A.  8,850.

1  Q.  Turning your attention to Government's Exhibit 87a in

2  evidence.

3           Is this another e-mail from yourself to Dimitri

4  Kesari?

5  A.  That is correct, sir.

6  Q.  What's the subject?

7  A.  April invoice.

8  Q.  What is the date?

9  A.  May 2, 2012.

10  Q.  What does it say?

11  A.  "Hi Dimitri.

12           "Here's the production services invoice for April

13  2012.  Hope you are doing well.

14           "Peace,

15           "Sonny Izon."

16           "240" --

17  Q.  You don't need to read your phone number into the record.

18  A.  Okay.

19  Q.  Turning to the next page of the exhibit, is there an

20  invoice?

21  A.  That's another invoice from my company, sir.

22  Q.  And is it to Ron Paul PCC, Inc, attention:  Dimitri Kesari?

23  A.  That is correct, sir.

24  Q.  Is there one line item?

25  A.  Production services, April in parens.

1   Q.  And what is the amount?

2   A.  $8,850.

3   Q.  Okay.  We're going to turn to an exhibit in a moment that

4   does not have an invoice.  As to any of the invoices that we

5   have talked about so far.  Did Grassroots Strategy actually do

6   any work for your company, ICT?

7   A.  Not for my company, sir.

8   Q.  Did the person, Kent Sorenson, ever actually do any work for

9   your company, ICT?

10  A.  He did not, sir.

11  Q.  Turning to Government's Exhibit 90 in evidence.

12          This is a two-page exhibit.  Do you recall -- and it's

13  an e-mail.  Do you recall this e-mail?

14  A.  I do, sir.

15  Q.  It's a string.  Do you recall the string?

16  A.  Did you say string, sir?

17  Q.  Yes.  It's a string of e-mails?

18  A.  Yes.  I recall this string of e-mails.

19  Q.  Okay.  I want you to start on page 2 of this exhibit with

20  the first e-mail, February 10th at 5:12 a.m.

21  A.  Do you want me to read it, sir?

22  Q.  At 5:12 a.m. did you write to somebody?

23  A.  Yes, sir.

24  Q.  Who did you write to?

25  A.  To Kent.

```
 1  Q.  And what did you say?
 2  A.  I said:
 3          "Good morning.
 4          "Just wanted to confirm your receipt of wire transfer.
 5  Let me know if you need anything else.
 6          "Peace,
 7          "Sonny."
 8  Q.  So by this time, the time of this e-mail, you're in
 9  communication with someone named Kent?
10  A.  Yes, sir.
11  Q.  By e-mail?
12  A.  By e-mail, yes, sir.
13  Q.  Did you ever meet this person?
14  A.  No, sir.
15  Q.  Turning back to page 1.
16          Do you see this is the start of the next e-mail at the
17  very bottom where it says from Kent Sorenson?
18  A.  Yes, sir.
19  Q.  Can you read that?
20  A.  From Kent Sorenson, kent@kentsorenson.com to Sonny Izon,
21  sonnyizon@aol.com, Friday, February 10, 2012, at 8:19 a.m.
22  Q.  And then I have to flip you back to page 2 for the text.
23          Just read that to the jury, please.
24  A.  "It was received, I really appreciate it.  Thanks, Sonny."
25  Q.  Now back to page 1 to finish the chain.
```

```
 1              If we could zoom in on the May 1st 10:07 p.m. e-mail.
 2   A.  Should I read it, sir?
 3   Q.  Not yet.
 4              Okay.  On May 1 at 10:07 did you write to Kent?
 5   A.  Yes, I did.
 6   Q.  What did you say, sir?
 7   A.  "Hi Kent, just checking in to see if you will be forwarding
 8   invoices for April and beyond.  Hope you are well."
 9   Q.  And let's go to the next e-mail in the chain.
10              Did Kent Sorenson respond to your e-mail?
11   A.  He did, sir.
12   Q.  That was on Wednesday, May 2nd?
13   A.  That is correct, sir.
14   Q.  Was the subject "Re:  Additional invoices?"
15   A.  Yes, sir.
16   Q.  What did it say?
17   A.  I can't read the whole thing.
18              There you go.
19              "Hey Sonny.
20              "I am attaching the invoice for April, I have been
21   caught up trying to wrap up things with session and just have
22   not had time to submit it.  Thanks for the e-mail, we're doing
23   great!  I hope you are as well."
24   Q.  Then does it say "Blessings, Kent"?
25   A.  I can't see it -- blessings, Kent, yes, it says that at the
```

1   end.

2   Q.  And then if we scroll up to the next e-mail which begins on

3   May 17th.

4   A.  Shall I read it?

5   Q.  Did you write to Kent on May 17th at 9:11?

6   A.  I did, sir.

7   Q.  What did you say?

8   A.  I said:

9           "Hi Kent.

10          "I know you are wrapping up work on the campaign.  I

11  was wondering if you will be sending a full or partial invoice

12  for May.  Please advise."

13  Q.  Okay.  Now I would like to go to the last e-mail at the top.

14          Who is this e-mail from?

15  A.  It is from Kent Sorenson.

16  Q.  And who is it to?

17  A.  To Sonny Izon.

18  Q.  Who else is it to?

19  A.  To Dimitri Kesari.

20  Q.  What is the subject?

21  A.  May invoice, question mark.

22  Q.  When was it sent?

23  A.  May 17, 2012.

24  Q.  What does it say?

25  A.  It says:

```
 1          I ha" -- I think he meant had, but it's I ha -- "an

 2    agreement with Dimitri that went thru the month of June."

 3    Q.  Does it say anything else, just to complete it?

 4    A.  It says:

 5          "Thanks.

 6          "Kent."

 7    Q.  Thank you, sir.

 8          Turning your attention to Exhibit 91 in evidence.  And

 9    if we could zoom in and make the text as large as possible.

10          Can you read that, sir?

11    A.  I think I can.  Should I read the whole thing or just the

12    message?

13    Q.  I just want to make sure you can read it.  I can show you a

14    piece of paper with an enlargement if you need it.

15    A.  Okay.  I think I can read it.

16    Q.  All right.  Let's try that.

17          What is this?

18    A.  This is an e-mail from Kent Sorenson to me dated May 21,

19    2012.

20    Q.  What does it say?

21    A.  It says:

22          "Sonny.

23          "I wasn't real clear on your invoice requests.  I am

24    attaching one that just has May and one that includes May and

25    June.
```

1              "Thanks.

2              "Kent."

3   Q.  And are there, in fact, two attachments to this e-mail?

4   A.  That is correct, sir.

5   Q.  You recall that?

6   A.  Yes, sir.

7   Q.  So turning your attention to page 2 of this exhibit.  If we

8   could -- is this an invoice that you received from Grassroots

9   Strategy, Inc.?

10  A.  Yes, sir.

11  Q.  It's attached to the e-mail you just read?

12  A.  That is correct, sir.

13  Q.  Does it include two line items?

14  A.  Yes.  Monthly service for the month of May 2012 and monthly

15  service for the month of June of 2012.

16  Q.  And the total amount is?

17  A.  $16,000.

18  Q.  Did Grassroots Strategy ever do $16,000 worth of work for

19  your company, ICT?

20  A.  I'm sorry, I didn't hear that.

21  Q.  Did the company, Grassroots Strategy, ever do $16,000 of

22  work for ICT?

23  A.  Never.

24  Q.  Did they ever do any work for ICT?

25  A.  Never.

1  Q.  Turning to Government's Exhibit 92, which is in evidence.

2          In the interest of time, is this another e-mail from

3  yourself to Dimitri Kesari, including an invoice?

4  A.  Yes, sir.

5  Q.  If you go to page 2, is that the invoice?

6  A.  That's correct, sir.

7  Q.  Is there one line item?

8  A.  Yes, sir.

9  Q.  What does it say?

10 A.  Production services, May.

11 Q.  What's the amount?

12 A.  8,850.

13 Q.  Turning your attention to Government's Exhibit 96, which is

14 not in evidence.

15         Is this an e-mail from yourself to Dimitri Kesari?

16 A.  Yes, sir.

17 Q.  Is the subject concerning an invoice?

18 A.  Yes, sir.

19         MR. PILGER:  The government offers 96 in evidence,

20 Your Honor.

21                          (Government Exhibit 96 was

22                           offered in evidence.)

23         MS. SINFELT:  Hearsay objection as to Mr. Benton.

24         MR. BINNALL:  Hearsay.

25         THE COURT:  Overruled.  96 is received.

1                    (Government Exhibit 96 was

2                    received in evidence.)

3    BY MR. PILGER:

4    Q.  Just waiting for the document to load.

5    A.  Yes, sir.

6    Q.  And then I'm going to ask you to completely read that e-mail

7    from yourself to Dimitri Kesari.  What was the subject line?

8    A.  June invoice.

9    Q.  When was this sent?

10   A.  June 18, 2012.

11   Q.  And read it, please.

12   A.  "Hi Dimitri.

13           "Hope you are well.  Since I will be on travel for

14   most of the rest of the month, I'm sending you the June invoice.

15           "Peace,

16           Sonny."

17   Q.  And turning to the next page, is there, in fact, an invoice?

18   A.  That is correct, sir.

19   Q.  Is that another invoice to Ron Paul PCC, Inc., attention:

20   Dimitri Kesari?

21   A.  Yes, sir.

22   Q.  Is it for one line item, production services, June?

23   A.  That is correct, sir.

24   Q.  Is the amount $8,850?

25   A.  That is correct.

1  Q.  Turning your attention finally to Government's Exhibit 97,

2  which is in evidence.

3          Is this another e-mail from yourself to Dimitri

4  Kesari?

5  A.  Yes, sir.

6  Q.  Does it also concern June invoice?

7  A.  Yes, sir.

8  Q.  When was this sent?

9  A.  June 25, 2012.

10         MR. PILGER:  I'm sorry, are we on Government's 96?

11         I'm sorry, I'm sure that's my fault, Ms. Draughn.

12  We're finished with 96 now.

13  BY MR. PILGER:

14  Q.  Turning to 97 finally.  This is in evidence.

15         Is this another e-mail from yourself to Dimitri Kesari

16  concerning June invoice forwarded?

17  A.  Yes, sir.

18  Q.  Please read it.

19  A.  "Hi Dimitri.

20         "Hope you are well.  Since I will be on travel for

21  most of the rest of the month, I'm sending you the June invoice.

22         "Peace,

23         "Sonny."

24  Q.  And then the forwarding is the top e-mail, correct?

25  A.  That's correct, sir.

1  Q.  And is that another e-mail from yourself to Dimitri Kesari?

2  A.  Yes, sir.

3  Q.  When was that sent?

4  A.  June 25, 2012.

5  Q.  And what does that say?

6  A.  "Hey Dimitri.

7       "Here it is.  Thanks for everything.

8       "Sonny."

9  Q.  And does that top e-mail actually attach the final invoice?

10 A.  Yes, sir.

11 Q.  And is that an invoice from ICT to Ron Paul PCC, Inc.,

12 attention:  Dimitri Kesari?

13 A.  Yes, sir.

14 Q.  Is it for one line item, production services, June?

15 A.  Yes, sir.

16 Q.  Is that in the amount of $8,850?

17 A.  Yes, sir.

18 Q.  For all of the invoices I showed you from your company, ICT,

19 to Ron Paul PCC, attention:  Dimitri Kesari, did Grassroots

20 Strategy ever do any of the work billed under production

21 services?

22 A.  To me, to us?

23 Q.  For ICT.

24 A.  No.

25 Q.  And other than being paid your commission and handling these

1    documents, did ICT ever do any work for the Ron Paul Campaign?

2    A.  No, sir.

3              MR. PILGER:  No further questions.

4              THE COURT:  Mr. Binnall, do you want to go first?

5                         CROSS-EXAMINATION

6    BY MR. BINNALL:

7    Q.  Good afternoon, Mr. Izon.  My name is Jesse Binnall.  I

8    represent Dimitri Kesari.

9    A.  Good afternoon, sir.

10   Q.  Good afternoon.

11             You didn't do any other work for the Ron Paul

12   Campaign, did you?

13   A.  No, sir.

14   Q.  But you did want to at one point do some other video work

15   and you were hoping the Ron Paul Campaign would become a client

16   of yours; isn't that correct?

17   A.  I wouldn't say that.  I would say that every new business

18   person that I meet there's always the potential for perhaps

19   doing work; but, no, I did not expect any work from him.

20   Q.  But nothing ever came of it?

21   A.  No.

22   Q.  Okay.  And then on the first invoice, the first invoice did

23   include audiovisual work done by Pavlo Kesari, correct?

24   A.  Yes, sir.

25   Q.  Sir, you said that you think it was December 2011 that you

1  first heard about this project.  Could it have been January

2  2012?

3  A.  It could have been.

4  Q.  Sometime in that general time frame, though?

5  A.  Yes.

6       MR. BINNALL:  All right.  Thank you very much.

7       THE COURT:  Ms. Sinfelt?

8       MS. SINFELT:  Yes, Your Honor.

9                    CROSS-EXAMINATION

10  BY MS. SINFELT:

11  Q.  Good afternoon, Mr. Izon.  My name is Meena Sinfelt, and I

12  accept Jesse Benton.

13       Do you know who Jesse Benton is?

14  A.  No, ma'am, I don't.

15  Q.  I'm just going to quickly ask you a few questions about some

16  of the invoices the government just showed you.

17  A.  Please do.

18  Q.  Thank you.

19       I'm going to show you what's been marked previously as

20  Government's Exhibit 73 in evidence.

21       This e-mail address here, is that Mr. Kesari's

22  personal e-mail address, do you know?

23  A.  That's how he contacted me.  I don't know whether it was

24  personal or not.

25  Q.  Okay.  That's an AOL address; is that correct?

1    A.   Yes, ma'am.

2    Q.   And this is the first invoice that you sent; is that

3    correct?

4    A.   That's correct.

5    Q.   I'm going to now show you Government Exhibit 81, already in

6    evidence.

7            This says February invoice; is that correct?

8    A.   Yes, ma'am.

9    Q.   And this again is a dkesari@aol e-mail address; is that

10   correct?

11   A.   That is correct.

12   Q.   I'm going to now show you Government Exhibit 83 already in

13   evidence.

14           March invoice.  Again, dkesari@aol.com; is that

15   correct?

16   A.   That is correct.

17   Q.   Rather than go through all of these with you, Mr. Izon, do

18   you recall, did you ever send an e-mail to Mr. Kesari at the Ron

19   Paul Campaign address that he had?

20   A.   I only used whatever address he contacted me with.

21   Q.   Are you aware if he had a Ron Paul e-mail address?

22   A.   I do not know that.

23   Q.   If I showed you a document, would it refresh your memory if

24   you've ever seen it?

25   A.   Sure, I would love to see it.

1  Q.  I will show the witness Government Exhibit 90.

2          Mr. Izon, are you aware if Mr. Kesari had a

3  ronpaul.com e-mail address?

4  A.  That document has refreshed my memory, yes, and he does have

5  one.

6  Q.  Okay.  Thank you.

7          And Mr. Kesari had told you he needed your help

8  because the campaign didn't want to pay Mr. Sorenson; is that

9  correct?

10 A.  No.  What I was told through his brother was that he needed

11 to hire a particular consultant and that there were certain

12 inside political, whatever it was, that they were having some

13 disagreements.  He wanted to use this particular person because

14 he thought he was best for the job and didn't want to raise any

15 ruckus inside the campaign, so --

16 Q.  And he couldn't pay him directly through the campaign at

17 that time, correct?

18 A.  Because it would show that he was using this person that he

19 wanted to use but other people might have objections to.

20 Q.  And so he was hiding the payment from the campaign; is that

21 correct?

22 A.  Oh, he was hiding the identity of who he was hiring I think.

23 Q.  From the campaign, correct?

24 A.  From the campaign.

25          MS. SINFELT:  Thank you, Your Honor -- thank you

1  Mr. Izon.

2         No further questions, Your Honor.

3         THE COURT:  Any follow-up?

4         MR. PILGER:  Very briefly.

5                         REDIRECT EXAMINATION

6  BY MR. PILGER:

7  Q.  Mr. Izon, the e-mails that you sent to Dimitri Kesari, they

8  were to an AOL personal address; correct?

9  A.  That is correct, sir.

10  Q.  The invoices attached all billed Ron Paul PCC, attention:

11  Dimitri Kesari; is that correct?

12  A.  That is correct.

13         MR. PILGER:  No further questions, Your Honor.

14         THE COURT:  Anything else?

15         MR. BINNALL:  No.

16         THE COURT:  Thank you, sir.  You're excused.

17         THE WITNESS:  Thank you.

18                                 (Witness excused.)

19         THE COURT:  Call your next witness, please.

20         MR. PILGER:  The United States calls Michael Hartsock.

21         THE COURT:  Please step forward, sir.

22         THE WITNESS:  Okay.

23         THE COURT:  If you'll approach her, she will

24  administer your oath.

25         THE WITNESS:  All right.

1          THE CLERK:  Raise your right hand, please.

2          MICHAEL HARTSOCK, GOVERNMENT'S WITNESS, SWORN

3          THE CLERK:  Please take a seat.

4                    DIRECT EXAMINATION

5  BY MR. PILGER:

6  Q.  Good afternoon, sir.

7          Please state your name for the record.

8  A.  Mike Hartsock.

9  Q.  Is that Michael; is that your full name?

10  A.  Michael is my full name, correct.

11  Q.  How do you spell Hartsock?

12  A.  H-A-R-T-S-O-C-K.

13  Q.  Where are you employed?

14  A.  I work for the Federal Election Commission.

15  Q.  What is your title?

16  A.  Branch chief.

17  Q.  And do you work in the reports analysis division?

18  A.  Correct.

19  Q.  Do you have duties that include analyzing incoming

20  expenditure reports?

21  A.  Yes.

22  Q.  Do you have duties that include disclosure of the

23  information on those reports to the public?

24  A.  Yes.

25  Q.  Showing you what's in evidence as Government's Exhibit 145,

1   please.

2            Is this an FEC report of receipts and disbursements

3   form?

4   A.  Yes.

5   Q.  Was it filed by the Ron Paul 2012 Presidential Campaign

6   Committee, Inc.?

7   A.  Yes.

8   Q.  Was it electronically filed through the treasurer, Lori

9   Pyeatt, on April 20, 2012?

10  A.  Yes.

11  Q.  Turning your attention to page 2 of this exhibit at block C.

12           Does block C report a disbursement to Interactive

13  Communication, Incorporated?

14  A.  Yes.

15  Q.  In Hyattsville, Maryland?

16  A.  Yes.

17  Q.  What was the purpose of disbursement?

18  A.  The purpose of disbursement is audio/visual expenses.

19  Q.  What was the date of the disbursement?

20  A.  February 8, 2012.

21  Q.  What was the amount?

22  A.  $38,125.

23  Q.  In the course of your duties, do you examine disbursement

24  reports like this to determine whether they are facially

25  sufficient to publish?

1   A.  Yes.

2   Q.  Is this facially sufficient to public?

3           MR. HOWARD:  Objection, Your Honor.

4           MS. SINFELT:  Objection, Your Honor.  This is a fact

5   witness.  He has not laid a foundation that he reviewed this

6   document in the course of his job.

7           THE COURT:  Okay.  Do you have an objection, too?

8           MR. BINNALL:  That, and hearsay.

9           THE COURT:  Overruled.  This is one of the elements

10  they have to prove.  The objection is overruled.

11          Answer the question.

12  BY MR. PILGER:

13  Q.  Is it facially sufficient to publish?

14  A.  Yes.

15  Q.  And would the FEC proceed to publish this on the Internet

16  for the public to see?

17  A.  Yes.

18  Q.  Turning your attention to Government's Exhibit 146 in

19  evidence.

20          Is this another report of receipts and disbursements

21  from the Ron Paul 2012 Presidential Campaign?

22  A.  Yes.

23  Q.  Was it filed electronically by Lori Pyeatt on July 18, 2012?

24  A.  Yes.

25  Q.  Turning to page 2 of the exhibit at block C, does it report

1   a disbursement to Interactive Communications, Inc., which I'm

2   going to call ICT from now on, in Hyattsville, Maryland?

3   A.   Yes.

4   Q.   For what purpose?

5   A.   The purpose is audio/visual expenses.

6   Q.   Was that a disbursement on April 3rd of 2012?

7   A.   Yes.

8   Q.   Was it for $17,700?

9   A.   Yes.

10   Q.   Is this facially sufficient to publish?

11   A.   Yes.

12   Q.   Turning your attention to Government's Exhibit 147.

13          Is this another report of receipts and disbursements?

14   A.   Yes.

15   Q.   Was it filed by Lori Pyeatt on July 18, 2012?

16   A.   Yes.

17   Q.   Turning your attention to page 2, block B.

18          Does that block report a disbursement to ICT in

19   Hyattsville, Maryland?

20   A.   Yes.

21   Q.   What's the purpose?

22   A.   Audio/visual expenses.

23   Q.   Was that on May 2, 2012?

24   A.   Yes.

25   Q.   For $8,850?

1  A.  Yes.

2  Q.  Is this facially sufficient to be published on the Internet

3  by the FEC?

4  A.  Yes.

5  Q.  Turning your attention to the next page of this exhibit at

6  block A.

7          Is that another disbursement to ICT in Hyattsville,

8  Maryland?

9  A.  Yes.

10  Q.  What's the purpose?

11  A.  Audio/visual expenses.

12  Q.  That was on May 29, 2012?

13  A.  Yes.

14  Q.  Is that in the amount of $8,850?

15  A.  Yes.

16  Q.  Turning your attention lastly to Government's Exhibit 148 in

17  evidence.

18          Is that another report of receipts and disbursements

19  of the Ron Paul 2012 Presidential Campaign?

20  A.  Yes.

21  Q.  Was that filed electronically by Lori Pyeatt on

22  September 5th of 2012?

23  A.  Yes.

24  Q.  Turning your attention to the next page at block C.

25          Does that report another disbursement to ICT in

1    Hyattsville, Maryland?

2    A.   Yes.

3    Q.   What's the purpose?

4    A.   Audio/visual expenses.

5    Q.   Was that on July 27th of 2012?

6    A.   Yes.

7    Q.   Was the amount $8,850?

8    A.   Yes.

9           MR. PILGER:  No further questions.  I'm sorry, I do

10   have one further question.

11   BY MR. PILGER:

12   Q.   Is this facially sufficient to publish on the Internet by

13   the FEC?

14   A.   Yes.

15          MR. PILGER:  No further questions.

16          THE COURT:  Ms. Sinfelt?

17          MS. SINFELT:  Nothing, Your Honor.

18          THE COURT:  Mr. Binnall?

19          MR. BINNALL:  One minute, Your Honor.

20          (Pause.)

21                      CROSS-EXAMINATION

22   BY MR. BINNALL:

23   Q.   Good afternoon, Mr. Hartsock.  My name is Jesse Binnall.

24   I'm the attorney for Dimitri Kesari.

25          Mr. Hartsock, the FEC is a federal regulatory agency,

1  correct?

2  A.  Correct.

3  Q.  And one of the things that regulatory agencies do is issue

4  regulations, right?

5  A.  Correct.

6  Q.  And the FEC issues regulations that govern federal

7  elections, correct?

8  A.  Correct.

9  Q.  Since 1975 the FEC has issued --

10         MR. PILGER:  Objection; beyond the scope, Your Honor.

11         THE COURT:  Overruled.

12         Answer the question -- or finish your question.

13 BY MR. BINNALL:

14 Q.  Since 1975 the FEC has issued a lot of regulations, haven't

15 they, sir?

16 A.  Yes.

17 Q.  In fact, since 1975 the FEC has adopted over 568 pages of

18 regulations, right?

19         MR. PILGER:  Objection; beyond the scope and

20 irrelevant, Your Honor.

21         THE COURT:  Relevance is sustained.

22 BY MR. BINNALL:

23 Q.  Between 1975 and 2012, the FEC has provided an additional

24 1,278 pages of explanations and justifications for regulations,

25 correct?

1          MR. PILGER:  Objection; irrelevant.

2          THE COURT:  Sustained.

3   BY MR. BINNALL:

4   Q.  Sir, you work for the FEC in the reports and analysis

5   division, correct?

6   A.  Correct.

7   Q.  It's called the RAD division sometimes?

8   A.  We abbreviate it as RAD, correct.

9   Q.  The analysts who work in RAD assist campaign committee

10  officials in complying with reporting requirements, correct?

11  A.  That is correct.

12  Q.  And the RAD analysis also examines campaign financial

13  reports filed by political committees, correct?

14  A.  Correct.

15  Q.  And the RAD -- if RAD discovers a prohibited activity in one

16  of its reviews, the RAD analysis -- excuse me, the RAD analysts

17  typically send the committee a letter requesting that the

18  committee amend its report and provide further information,

19  correct?

20  A.  The analyst would send a request for additional information

21  asking for additional information on the matter if it met -- if

22  it was subject to our internal policies.

23  Q.  All right.  You jumped ahead of me by answering that.  Thank

24  you.

25  A.  Sorry about that.

1   Q.  No, not at all.  That helps us move things along.

2          An example of prohibited activity would be an

3   excessive campaign contribution, correct?

4          MR. PILGER:  Objection; relevance.

5          THE COURT:  Overruled.

6          Answer that question.

7   A.  That is an example.

8   BY MR. BINNALL:

9   Q.  And then by sending off the request for additional

10  information, the campaign is given an opportunity to fix the

11  report voluntarily, correct?

12  A.  That is correct.  They're given 35 days to respond.

13  Q.  In fact, by sending a request for additional information,

14  RAD tries to encourage full disclosure, right?

15  A.  That is correct.

16  Q.  And, sir, isn't it true that RAD never sent the 2012 Ron

17  Paul for President Committee any requests for additional

18  information with respect to the reports that you were just shown

19  by Mr. Pilger?

20  A.  That is correct.

21  Q.  Sir, do you remember being an author of a memo to the FEC on

22  December the 14, 2012?

23  A.  No, I do not.

24  Q.  The Federal Election Commission is governed by

25  commissioners, correct?

1  A.  Correct.

2  Q.  And there's six of them, right?

3  A.  Correct.

4  Q.  And they're all technically appointed by the President, but

5  in practice there's usually three Republican commissioners and

6  three Democrat commissioners, correct?

7  A.  In practice, correct.

8  Q.  Right.  And they have meetings every so often, correct?

9  A.  Correct.

10  Q.  I'm going to approach and show you a memorandum dated

11  December 14, 2012.  And would you look up when you recognize it?

12          MR. KRAVIS:  I'm sorry, is this in the binder?

13          MR. BINNALL:  It is not.

14          MR. KRAVIS:  Do you have a copy for us?

15          MR. BINNALL:  I'll let you see it afterwards.

16          Hold on I might have an extra copy.

17          (Pause.)

18          MR. PILGER:  Your Honor, to save time, may I approach

19  and view the document?

20          MR. BINNALL:  I don't have any objection.

21          THE COURT:  Go ahead.

22          (Pause.)

23          MR. PILGER:  Your Honor, we object to this entire

24  document.

25          THE COURT:  He hasn't offered it yet.

1    BY MR. BINNALL:

2    Q.  Are you done, sir?

3    A.  Yes.

4    Q.  Thank you.

5          Do you remember this memorandum then?

6    A.  Yes, I do.

7    Q.  And it's from the Office of Compliance, correct?

8    A.  Correct.

9    Q.  And from the General Counsel's office?

10   A.  Yes.

11   Q.  And you're listed as one of the authors of the memo,

12   correct?

13   A.  Correct.

14   Q.  And there's actually handwritten initials by your name,

15   right?

16   A.  Correct.

17   Q.  And the memo is dated December 14, 2012?

18   A.  I believe that was the date on the memorandum.

19   Q.  And that was after the 2012 Primary Elections were over?

20   A.  Correct.

21   Q.  In fact, it was after the 2012 General Election, correct?

22   A.  Yes.

23   Q.  And the subject of this memo is a request for guidance,

24   correct?

25   A.  Correct.

 1   Q.  And the issue is whether a political campaign committee

 2   needed to make a memo entry when an entity that provides goods

 3   or services in the campaign is paid through an intermediary,

 4   correct?

 5          MR. PILGER:  Objection; beyond the scope.  This is a

 6   matter concerning the law for the court and is irrelevant to

 7   this proceeding.

 8          THE COURT:  Bring it up.  Let me see it.

 9          MR. BINNALL:  Yes, sir.

10          (Pause.)

11          THE COURT:  The objection is sustained.

12          MR. BINNALL:  Your Honor, just for the record, we're

13   proffering this not for the truth of the matter asserted at all;

14   just for the mens rea element is the reason we're proffering

15   this.

16          THE COURT:  And there might come a time when it

17   becomes relevant, but it isn't right now.

18          MR. BINNALL:  I understand.

19          No further questions.

20          THE COURT:  Mr. Pilger, anything else?

21          MR. PILGER:  One question, Your Honor.

22                        REDIRECT EXAMINATION

23   BY MR. PILGER:

24   Q.  In any of the blocks showing distributions to ICT, did you

25   see anything that would require a request for further

1  information from the RAD unit?

2  A.  No.

3  Q.  Were they facially sufficient to be published on the

4  Internet?

5  A.  Yes.

6          MR. PILGER:  No further questions.

7          THE COURT:  Anything else anybody?  No.

8          You're excused.  Thank you.

9                              (Witness excused.)

10         MR. KRAVIS:  May we resume with Mr. Sorenson?

11         THE COURT:  Yes, that would be fine.

12                        KENT SORENSON,

13  resumed his testimony as follows:

14         THE COURT:  You don't need to be resworn.  You're

15  still under oath.

16         THE WITNESS:  Is this still my water?

17         MR. HOWARD:  I don't know.

18         THE WITNESS:  Okay.

19         MR. HOWARD:  Your Honor, is it okay to proceed?

20         THE COURT:  Yes, please.

21              CROSS-EXAMINATION (Continued)

22  BY MR. HOWARD:

23  Q.  Mr. Sorenson, just before -- just after you committed to

24  Dr. Paul -- let me step back.

25         After you committed to Dr. Paul on December 28th --

1  that was in the evening, correct?

2  A.  Yes.

3  Q.  -- the next day you were at the Ron Paul for President

4  campaign headquarters; is that correct?

5  A.  Yes.

6  Q.  As you walked in, could you just give the members of the

7  jury an idea of what the campaign headquarters looked like,

8  please.

9  A.  Yes.  When I walked in -- I'm really bad with directions, so

10  I'll just give a description of left and right.  As I walked in

11  the front door, there was an open room with a group of desks

12  similar to what you see in this courtroom, and then to the

13  right, which would be where you guys are sitting, there was a

14  private office, and I think beyond that there was a kitchenette,

15  and then when you went to the left through a doorway, maybe a

16  back hallway, there was a call center.

17  Q.  Okay.  And so the only rooms were the room you described

18  with a door and then the call center room, and that was filled

19  with people; is that correct?

20  A.  Those were the only rooms I remember.

21  Q.  All right.

22  A.  I think there was a back area, too, but I'm not sure, and

23  then we had a war room in a hotel across the way.

24  Q.  And you had a meeting on the 28th with some individuals to

25  talk about your situation moving over to Ron Paul; is that

1  right?

2  A.  Okay.  So are you talking about -- because we were just

3  talking about the 29th.  You're going back to the 28th?

4  Q.  I'm sorry, the 29th.  I'm sorry.  Did you have a meeting?

5  A.  Yes.

6  Q.  And at that meeting the discussion was about your financial

7  situation with the Ron Paul Campaign; is that what I understand,

8  sir?

9  A.  No.

10  Q.  What was the meeting about?

11  A.  It was about me going on media.

12  Q.  Okay.

13  A.  You're talking about the -- see I'm getting confused.

14  Q.  Okay.  Then that's my fault.  If you'll just give me a

15  chance.  You had a meeting about the media.  And then did you

16  have a meeting subsequent to that?

17  A.  No.  I shipped out of there and went to the meeting.

18  Q.  At the meeting about the media, did you talk about the media

19  and some other things?  Let me make this simple.  Did you talk

20  about filing -- not -- I apologize.

21        Did you talk about not making sure that your payments

22  didn't show up on FEC forms?

23  A.  We didn't talk about it making sure it didn't show up on the

24  FEC filings, I don't recall that; but we did talk about what I

25  was going to say to the media, and that was that it would not

1  show up on the FEC report.

2  Q.  And I apologize.  So the conversation -- just so the jury

3  understands it clearly, so I understand it, so the conversation

4  was about the media, what you were going to say to the media,

5  and part of that was the fact that your pay was not going to

6  show up on the FEC forms.

7          Do I have that correct?

8  A.  I believe -- yeah, I believe we're on the same page.  I just

9  have a tough time following because you're moving around a lot

10  with dates.

11  Q.  And I apologize.  Again, it's my fault.

12          Was anything else discussed in that meeting?

13  A.  I don't recall specifics.  If you had something to help

14  refresh my memory, that would be great.

15  Q.  Sir, I'm just asking you.

16  A.  Okay.

17  Q.  Do you recall anything else being discussed in that meeting?

18  A.  I remember us talking about the media.  I did not want to go

19  to the media interviews.  I complained that I didn't want to go

20  to the media because I had been up all night and I didn't

21  perform well when I was tired.  And then shortly after the

22  meeting I was shipped off in a car with Megan Stiles, I believe

23  that's her name, Megan Stiles, to do media.

24  Q.  The room where the meeting was in, can you describe for the

25  members of the jury how big it was?

1  A.  If you were to look at the judge's area, it was probably

2  that size, maybe a little smaller.  There was, I believe, two,

3  maybe three desks in it.

4  Q.  And in the course of that meeting, you described on a number

5  of occasions who was there; is that correct?

6  A.  Yes.

7  Q.  Now, you interviewed with the FBI on a number of occasions;

8  is that correct?

9  A.  Yes.

10 Q.  And do you remember your first meeting being on July 24,

11 2014?

12 A.  I don't remember the date, but we talked about that earlier

13 and it could very easily have been July 24, 2014.

14 Q.  Now, on that date you did not talk about the meeting or who

15 was there.

16        Do you remember that?

17 A.  I don't remember that.

18 Q.  Would it help if you saw your FBI 302s, the report?

19 A.  Sure.

20 Q.  Sir, if you could look through it and I will represent to

21 you that there's no meeting in it discussed.  Okay?

22 A.  Okay.

23        MR. PILGER:  Your Honor, this is an 11-page report.

24 We would request Mr. Howard direct the witness where he would

25 like to refresh his recollection in the interest of time.

1        MR. HOWARD:  I represented there's no meeting.  I

2   don't know where to direct him.

3   A.  I'm not arguing.  If it's not in the report, I'm sure I

4   didn't discuss it.

5   BY MR. HOWARD:

6   Q.  I would like an answer from you, sir, that's all, and if you

7   can't give one without looking through the report, please take

8   time to look through the report.  And you can flip through if

9   you want, I mean.

10       (Pause.)

11  A.  If you want me to answer directly, I'm just going to have to

12  look through it because I don't recall.

13  Q.  No, that's fine.  I just want to make sure.

14       (Pause.)

15       Did you find anything in there?

16  A.  Pardon me?

17  Q.  You found no meeting in there, did you?

18  A.  No, no.  Would you like this back?

19  Q.  And you talked to them again on August 25, 2014, and I do

20  have this marked.  You did talk about the meeting, and you

21  mentioned Jedd Coburn, Dimitri Kesari, Jared Gamble --

22       MR. PILGER:  Objection.  I'm sorry, what is he reading

23  from?

24       MR. HOWARD:  My notes.

25       MR. PILGER:  Withdraw the objection.

1  BY MR. HOWARD:

2  Q.  Jared Gamble, Dimitri Kesari, Jedd Coburn, Zach Huff

3  (phonetic), Megan Stiles, and then you say you're not sure if

4  Benton and Tate were there.  I do have the page marked here.

5          First of all, let me ask you, do you remember saying

6  that to the FBI on February 25th?

7  A.  I'm not sure of the date, but I remember that conversation.

8  Q.  And did I name the people correctly that you said on April

9  25th were present for the meeting we had just discussed?

10         MR. PILGER:  Objection.  Through his notes or not,

11  summarizing and publishing to the jury the contents of a

12  document not in evidence is not the way to do this.

13         THE COURT:  Just ask him who was at the meeting.

14         MR. HOWARD:  I did.

15         THE COURT:  And you can do it in a leading way.  The

16  meeting is the fact.  It's not the 302 that's the fact.  That's

17  the problem here.

18  BY MR. HOWARD:

19  Q.  Do you know who was at the meeting, sir?

20  A.  Which meeting?

21  Q.  The meeting --

22  A.  I'm sorry.

23  Q.  The meeting we've been discussing, do you know who was at

24  the meeting?

25  A.  You're speaking about the day of the 29th when I was at the

1    campaign headquarters?

2    Q.   Right.

3    A.   And who was in the meeting in the room?

4    Q.   Yes.

5    A.   I will do my best to remember everybody that was in the

6    meeting.

7    Q.   Okay.

8    A.   I know that Dimitri was there.

9    Q.   Okay.

10   A.   I know that Jedd Coburn was there.

11   Q.   All right.

12   A.   I know that Brian Gentry was there.

13   Q.   All right.

14   A.   Now, he was going in and out.  He wasn't in the office the

15   whole time.

16           All right.  Jared Gamble was there as well.

17   Q.   All right.

18   A.   There was a gentleman, I'm not sure of his name.  He was

19   Greek.  He was from out East also, I believe.  And I just don't

20   remember his name.  He was somebody that that was the only

21   interaction I ever had with him.

22   Q.   All right.

23   A.   And then there was a Sonny or a Nick Spanos.

24   Q.   All right.

25   A.   I got them mixed up.  They were brothers, and they were

1   coming and going in and out of the meeting as well.

2   Q.  All right.  And Mr. Benton wasn't there?

3   A.  Physically he wasn't there.

4   Q.  And you say physically.  Somebody told you he was someplace

5   else?

6   A.  Dimitri was on the phone with him.

7   Q.  You never got on the call, did you?

8   A.  No.

9   Q.  You never heard his voice, did you?

10  A.  I thought I heard his voice, but I can't be sure.

11  Q.  And other than Dimitri telling you that, you don't know if

12  Mr. Benton was on the phone, do you?

13  A.  I can't for sure say it was Mr. Benton, but I believe -- I

14  was under the impression it was Mr. Benton.  The voice I heard

15  coming through the phone sounded like Mr. Benton, but,

16  obviously, I couldn't see through the phone line to see

17  Mr. Benton.

18  Q.  And on October -- on August 25, 2014, with the same meeting,

19  you said that Zach Huff and Megan Stiles were there.

20          Do you remember that?

21  A.  Yes.

22  Q.  Were they there or not?

23  A.  Well, they were coming and going.  They weren't an integral

24  part of the meeting, but they were coming and going out of the

25  room.

 1  Q.  And on March 18, 2015, you said that one other person -- and

 2  I apologize.  On August 25th you said that you were not sure --

 3          MR. PILGER:  Objection.  He can ask him if he said

 4  something on a date.  What he's doing is -- it's the same

 5  problem as before.

 6          THE COURT:  You can use leading questions, too, but

 7  ask him what happened, not what is in the FBI report.

 8  BY MR. HOWARD:

 9  Q.  In your meeting on October 25th, you said to the FBI you did

10  not know, you were not sure if Mr. Benton was on the phone;

11  isn't that correct, sir?

12  A.  I don't recall if I said that on October 25th.  Which year?

13  Q.  I'm sorry; October 25, 2014.

14  A.  Yeah, I'm not sure about that.

15  Q.  And other than Mr. Kesari telling you, you have no idea

16  whether Mr. Benton heard any of the things on the phone, are

17  you?

18  A.  If he heard anything or if I --

19  Q.  No.  Right, if he heard anything.

20  A.  Because you said --

21  Q.  Well, let me back up.  You aren't sure if he was on the

22  phone, are you?

23  A.  I can't be a hundred percent positive, no.

24  Q.  Okay, all right.  And you don't know if he was on the phone

25  how long he was on the phone?  You don't know that, do you?

1   A.   No.

2            MR. HOWARD:  Your Honor, I don't have any further

3   questions.

4            THE COURT:  Anything else, Mr. Pilger?

5            MR. PILGER:  Yes, sir.  May it please the court.

6                        REDIRECT EXAMINATION

7   BY MR. PILGER:

8   Q.   Mr. Sorenson, on December 29th, the meeting that Mr. Howard

9   was just talking to you about, did the role of Mr. Kesari and

10  Mr. Benton in the campaign give you any particular reason to

11  remember their participation?

12  A.   Yes.

13  Q.   What was their role?

14  A.   I viewed Dimitri as a subordinate to Mr. Benton and

15  Mr. Tate.

16  Q.   And what was your understanding of their roles as opposed to

17  anyone else who was there?  Were they higher, lower, the same?

18  A.   Whose roles?  I'm sorry.

19  Q.   I'm sorry; Mr. Kesari, the defendant Dimitri Kesari, who was

20  in the room and defendant Benton, who you testified you believed

21  was on the phone, were they higher or lower in the campaign than

22  the other people in the room?

23  A.   They were both higher.  I viewed Mr. Benton as over Dimitri

24  and Dimitri over the other people in the room.

25  Q.   Okay.  Please just wait for the questions.

1   A.   I'm sorry.

2   Q.   Now, Mr. Howard was just asking you about whether in

3   December when Dimitri Kesari was recruiting you to flip, whether

4   he wanted to help you, and I believe you testified that -- I'm

5   not sure what your answer was.   Remind us.

6   A.   If he wanted to help me personally?

7   Q.   Yes.

8   A.   Dimitri is my friend politically, but to say that Dimitri --

9   if I -- I don't believe I could have called Dimitri and asked

10  him for a personal loan.   I don't believe I could have called

11  Dimitri and asked him to make a bill payment for me.   But did he

12  want to help me politically?   Yes, because it was beneficial for

13  both of us.

14  Q.   And in terms of it being beneficial to him, what effect

15  would it have for the Ron Paul Campaign and against the Michelle

16  Bachmann Campaign if you flipped?

17          MR. HOWARD:   Objection.

18          MS. SINFELT:   Objection.

19          THE COURT:   Overruled.

20  A.   It had a significant effect.   In fact, I remember asking

21  Dimitri once if it was -- afterwards if he thought it was worth

22  it, and he said -- I remember him specifically saying that it

23  was cheaper than a commercial and it brought satisfaction that

24  they destroyed a presidential campaign, and it made me feel

25  sleazy.

1  Q.  Would it be accurate for someone to say that getting you to

2  flip put a fork in Michelle Bachmann?

3  A.  Yes.

4  Q.  Put up Exhibit 35, please.  35 is in evidence.

5       Mr. Howard was asking you about 35.  As it comes up on

6  the monitor, that's going to be an e-mail exchange that ends

7  with Mr. Benton talking about you, saying, F him.  This is

8  absurd?

9  A.  Yes.

10  Q.  And Mr. Howard asked you a bunch of questions about how

11  could this be that Jesse Benton really wanted you to join the

12  campaign when he says, F him, this is absurd.

13       Do you recall those questions?

14  A.  Yes, I do.

15  Q.  What's the date of this e-mail?

16  A.  December 27, 2011.

17  Q.  Mr. Howard didn't ask you about that, did he?

18  A.  No.

19  Q.  On December 27th had you flipped?

20  A.  No.

21  Q.  Had you taken the $25,000 check from Dimitri through your

22  wife?

23  A.  Yes.

24  Q.  And you still hadn't flipped?

25  A.  Correct.

```
 1   Q.  At the time of this statement on December 27th, do you know

 2   whether or not Jesse Benton had been talking to the press about

 3   how you were going to flip?

 4   A.  I had heard through the grapevine within the media --

 5            MR. HOWARD:  Objection.

 6            THE WITNESS:  Okay.

 7            MR. BINNALL:  Objection.

 8            THE COURT:  Sustained.

 9            MR. PILGER:  I'll withdraw that question.

10   BY MR. PILGER:

11   Q.  Let's put up Government's Exhibit 38, please, in evidence.

12            You're not on this e-mail chain, are you?

13   A.  No.

14   Q.  Or this e-mail, this single e-mail.  But it's in evidence,

15   and it's from Jesse Benton to Dimitri Kesari and John Tate.

16            Do you see that?

17   A.  Yes.

18   Q.  And it's about you, Kent, right?

19   A.  Yes.

20   Q.  What's it say?

21   A.  "In all seriousness, I am" -- I'm assuming not, but it's nto

22   -- "sure what to do about this.  The DMR has his statement, I

23   sent last night since Kent said" -- and then it says -- "h

24   wads" -- I'm not sure if I'm getting the entire document.

25   Q.  That's all right.  Read it verbatim.
```

1  A. -- "comfortable. Mary Stegmier won't check e-mail until

2  12/28, but she has it."

3  Q. What's your understanding what DMR is?

4  A. Des Moines Register.

5  Q. Do you know who Mary Stegmier is?

6  A. No.

7  Q. So do you understand from this e-mail that Jesse Benton had

8  talked to the press, the Des Moines Register in particular,

9  about how you were going to flip?

10  A. Yes.

11         MS. SINFELT: Objection, Your Honor.

12         THE COURT: Overruled.

13  A. Yes.

14  BY MR. PILGER:

15  Q. Does that help you understand why he was saying F you in the

16  prior e-mail we were talking about?

17         MR. HOWARD: Objection.

18         THE COURT: Calls for the state of mind of another.

19  Sustained.

20         MR. PILGER: I'll move on, Your Honor.

21  BY MR. PILGER:

22  Q. Mr. Howard was asking you questions at length about how the

23  check, Government's 133, if we could pull that up, was not from

24  the Ron Paul Campaign. And that's true, right?

25  A. Yes.

1    Q.   But the person who brought it to you, who was that?

2    A.   The deputy manager of the Ron Paul Campaign.

3    Q.   That person was Dimitri Kesari, right?

4    A.   Yes.

5    Q.   He gave it to your wife to give to you, right?

6    A.   Yes.

7    Q.   And he was from the Ron Paul Campaign; is that fair?

8    A.   That's very fair, yes.

9    Q.   You mentioned to Mr. Howard in the midst of his questioning

10   of you that the Michelle Bachmann Campaign wanted you to work

11   full time.

12            Do you remember that?

13   A.   Yes.

14   Q.   And that had a bearing on why you needed a salary from her?

15   A.   Yes.  I wasn't able to support myself otherwise.

16   Q.   And you had an understanding what the full-time work was

17   that went into a campaign from the Michelle Bachmann Campaign,

18   correct?

19   A.   Yes.

20   Q.   Did you have an understanding of it from your own campaigns?

21   A.   Yes.

22   Q.   Did you do anything like full-time work for the Ron Paul

23   Campaign?

24   A.   No.

25   Q.   Mr. Binnall asked you some questions about work that you did

1  for the Ron Paul Campaign.  You did go to South Carolina and

2  meet with some senators, right?

3  A.  Yes.

4  Q.  Did you do any audiovisual work for them?

5  A.  No.

6  Q.  Did ICT ask you to go down to South Carolina?

7  A.  No.

8  Q.  Did ICT ever ask you to go to any spin rooms?

9  A.  No.

10  Q.  Mr. Howard asked you if it's hard to remember some things

11  from years ago.

12           Do you remember that?

13  A.  Yes.

14  Q.  And you can't disagree with that, can you?

15  A.  Of course not.

16  Q.  Is it easier to remember things when you sit down with an

17  FBI agent who lays out documents in front you for day after day?

18  A.  Yes.

19  Q.  Have you had that experience?

20  A.  Yes.

21  Q.  Is it easier when you have a lawyer advising you as you go

22  through those documents?

23  A.  Yes.

24  Q.  Mr. Howard asked you about Christmas Day and how you have

25  worked on Christmas Day and other holidays.

```
 1              Do you recall that?
 2   A.   Yes.
 3   Q.   Did you enjoy doing that?
 4   A.   No.
 5   Q.   He talked to you about your wife's feelings about it.  Was
 6   she upset with you?
 7   A.   Yes.
 8   Q.   Did you try to pare it back to just what you had to do on
 9   those days?
10   A.   Yes.
11   Q.   So when you worked on those days, were you working on the
12   most important things or just everything?
13   A.   Unfortunately, I allowed things to consume me, and my family
14   took a toll for that, and I regret that, and that's one of the
15   bad things about being in politics is you tend to get wrapped up
16   in your position and you put your family in second place, and I
17   did that.  And so I'm sure I was working because I didn't have
18   to, but it consumed me, and I was wrong for doing that.
19   Q.   Did you try to keep it down to --
20   A.   Yes, I tried to keep it down to a minimum.
21              THE COURT:  It's been awhile since we've heard
22   something new.  Just anything left that hasn't been said before?
23              MR. PILGER:  We do need to cover the recording, Your
24   Honor.  The government -- well, let me ask this question of
25   Mr. Sorenson.
```

1  BY MR. PILGER:

2  Q.  You were played a bunch of snippets from a recording; is

3  that correct?

4  A.  Yes.

5  Q.  And that involved you and Dennis Fusaro?

6  A.  Correct.

7  Q.  Were those snippets taken out of order and without the

8  context?

9  A.  Yes.

10 Q.  And would having the order correct and the context around it

11 make that evidence more understandable?

12 A.  Yes.

13        MR. PILGER:  Your Honor, under the rule of

14 completeness, we offer the entire recording at this time.

15        THE COURT:  Objections?

16        MR. BINNALL:  No objection.

17        MS. SINFELT:  No objection.

18        MR. HOWARD:  No objection.

19        (Counsel conferring.)

20        MR. PILGER:  I'm sorry, Your Honor.  One moment.

21        (Pause.)

22        MR. PILGER:  This will be Government's Exhibit 166

23 offered into evidence, Your Honor.

24                        (Government Exhibit 166 was

25                         offered in evidence.)

1          THE COURT:  166 is received.

2                            (Government Exhibit 166 was

3                            received in evidence.)

4    BY MR. PILGER:

5    Q.  While we're waiting for that to come up, that nice little

6    picture of you on the phone, that wasn't you during the actual

7    conversation?

8    A.  No.

9    Q.  That's just something used --

10   A.  Yes.  That actually was a picture that I paid --

11           (The recording started to play.)

12   BY MR. PILGER:

13   Q.  I'm sorry.  You can finish the answer.

14   A.  That was a picture that when I first started -- the very

15   first tour that I went on with Michelle Bachmann, I hired Dave

16   Davidson to come along, and I paid for that picture.  And

17   that's -- I mean, it's not a picture I like.  It's a horrible

18   picture of me --

19   Q.  I'm going to interrupt you.  That's just not a picture of

20   you having this call, is it?

21   A.  Correct.

22   Q.  Okay.  Let's play the call.

23           (The entire recording of the call was played.)

24   BY MR. PILGER:

25   Q.  So, Mr. Sorenson, in what we just heard, we heard some

1  things that were omitted from what the defense played for you,

2  didn't we?

3  A.  Yes.

4  Q.  And we heard you saying -- I'm sorry; we heard Mr. Fusaro

5  say, sure, I'm sure Jesse Benton knows, he's a scum.  And we

6  hear you respond, oh, I know that Jesse knows, I know Jesse

7  knows.

8        What did Jesse know?

9  A.  He knew that Dimitri had offered me a check.  He knew that

10  when I came on board, I asked him specifically if he was going

11  to take care of me, and he made the comment that I'm bleeding

12  for them, they'll take care of me.  I believe he knew that the

13  entire deal was done through Dimitri.

14  Q.  And they didn't play that, did they?

15  A.  No.

16  Q.  Now, Mr. Binnall asked you questions about whether you had

17  lied to Mr. Fusaro, correct?

18  A.  Yes.

19  Q.  And then he talked about the grand jury testimony?

20  A.  Yes.

21  Q.  You didn't say in the grand jury that you hadn't lied to

22  Mr. Fusaro, did you?

23  A.  I don't believe so, no.

24  Q.  And going to the context of the questions that Mr. Binnall

25  asked you, you were asked, just on a side note on this, I don't

1   want to get sidetracked on this, but had there been interactions

2   between you and others and Mr. Fusaro that he had recorded and

3   released to the media.

4           And you said yes.

5           And then the question, and had those generally cast

6   all of you in a negative light in the media?  And you answered,

7   as far as they were all truthful and they were -- they were

8   politically negative, they were the truth.  But they were the

9   truth.

10          That's all that says, right?

11  A.  Yes.

12  Q.  That doesn't say that you didn't tell some lies to

13  Mr. Fusaro?

14  A.  Correct.

15  Q.  And you told a lot of lies before you signed up for your

16  cooperation agreement, didn't you?

17  A.  Yes.

18  Q.  Including to the FBI?

19  A.  Yes.  It's not something that I'm proud of.

20  Q.  Wait for the questions.

21  A.  Sorry.

22  Q.  Mr. Binnall also asked you about the meeting with Mr. Kesari

23  that you described where he had you pull up your shirt to see if

24  you were wearing a recording device.

25          Do you recall that?

1    A.  Yes.

2    Q.  And he talked about how Mr. Kesari had played a role in

3    giving you political advice, and you guys talked about that.

4           Do you remember?

5    A.  Yes.

6    Q.  And Mr. Kesari talked to you about -- I'm sorry, Mr. Binnall

7    for Mr. Kesari talked to you about how Mr. Kesari was talking to

8    you about dropping out of the House to run for a U.S. Senate

9    seat -- I'm sorry, dropping out of the Iowa Senate to run for a

10   U.S. Senate seat, correct?

11   A.  Yes.

12   Q.  Mr. Kesari was talking to you about resigning, right?

13   A.  Correct.

14   Q.  If you had resigned when he wanted you to, what effect would

15   that have had on the pending Iowa State Senate Ethics

16   proceedings?

17   A.  It would have gone --

18           MS. SINFELT:  Calls for speculation.

19           THE COURT:  Overruled.

20           Answer if you know.

21   A.  It would have gone away.

22   BY MR. PILGER:

23   Q.  It would have gone away?

24   A.  Yes.

25   Q.  And would that have taken the scrutiny of the Iowa Senate

1  off of you and what you had done?

2          MR. HOWARD:  Objection, Your Honor.

3          THE COURT:  The objection is sustained.

4  BY MR. PILGER:

5  Q.  Mr. Binnall talked to you about a drug test.  You used

6  marijuana before you signed up for your cooperation agreement,

7  correct?

8  A.  Yes.

9  Q.  And that was in your system when you then started getting

10  tested after your cooperation agreement; is that right?

11  A.  Yes, and we shared that.

12  Q.  And you told the government about that before you signed

13  your cooperation agreement, right?

14  A.  Correct.

15  Q.  What did the government tell you about using drugs?

16  A.  To no longer use it.

17  Q.  And was the judge in your case informed that you had failed

18  the drug test?

19  A.  Yes.

20  Q.  Mr. Binnall asked you about part of your cooperation

21  agreement that provides that you're to notify the government if

22  anyone else wants to interview you.  Did anyone else ask to

23  interview you?

24  A.  No.

25  Q.  Did anyone from the government tell you you couldn't be

1    interviewed?

2    A.   No.

3    Q.   Mr. Binnall asked you about not cashing the check.

4              Do you remember that?

5    A.   Yes.

6    Q.   And you answered about how there was going to be a wire.

7              Do you remember that?

8    A.   Yes.

9    Q.   What do you remember about a wire?

10   A.   I remember Dimitri telling me sometime after I went on stage

11   and endorsed Dr. Paul and sometime on the 29th or 30th, I'm not

12   sure, that there would be a wire transfer and not to use a check

13   because a check would draw too much attention because I had

14   shared it with too many people.

15   Q.   Mr. Binnall asked you about the possibility that your

16   sentencing judge will give you a lighter sentence.  Who is

17   ultimately responsible for deciding whether or not you get any

18   consideration or lighter sentence because of your cooperation

19   with the government?

20   A.   The judge.

21             MR. BINNALL:  Objection; asked and answered.

22             THE COURT:  Yes, that's been asked and answered.

23   We've been through this.

24   BY MR. PILGER:

25   Q.   Finally, Mr. Sorenson, we have met and prepared for trial,

1  have we not?

2  A.  Yes.

3  Q.  Mr. Binnall asked you about that?

4  A.  Yes.

5  Q.  And we've met more than once, haven't we?

6  A.  Correct.

7  Q.  What has the government always asked you to do?

8  A.  Tell the truth, repeatedly.

9  Q.  Did you ever tell Dimitri Kesari that it was legal to call

10  whatever it was you were doing for the Ron Paul Campaign

11  audiovisual services?

12  A.  No.

13  Q.  Whose idea was it to use ICT for the billing?

14  A.  Dimitri's.

15  Q.  Whose idea was it to use a film production company to bill a

16  political campaign for your endorsement?

17  A.  It was somebody from the Ron Paul Campaign, and I assume it

18  to be Dimitri.

19  Q.  Did Dimitri communicate it to you?

20  A.  Yes.

21  Q.  Dimitri Kesari?

22  A.  Yes.

23          MR. PILGER:  Nothing further, Your Honor.

24          THE COURT:  Mr. Binnall, Mr. Howard?

25          MR. HOWARD:  Yes, Your Honor.

```
1              MR. BINNALL:  Oh, go ahead.

2              MR. HOWARD:  Go ahead.  I'm sorry.

3              MR. BINNALL:  Well, can we approach very, very

4    briefly?  I don't think we need the court reporter.

5              THE COURT:  No; just finish your examination.  We want

6    to get this one done.

7              MR. BINNALL:  Okay.

8                        RECROSS-EXAMINATION

9    BY MR. BINNALL:

10   Q.  Mr. Sorenson, Mr. Pilger just asked you if you ever told

11   Mr. Kesari about what the Bachmann Campaign had done about

12   whether it was legal, right?

13   A.  No.

14   Q.  I'm sorry, that's not the question you got?

15             MR. PILGER:  That's not the question.  It's beyond the

16   scope.

17   BY MR. BINNALL:

18   Q.  Okay.  You knew that the Bachmann Campaign had received a

19   legal opinion, didn't you?

20             MR. PILGER:  Objection; beyond the scope, asked and

21   answered.

22             MR. BINNALL:  He opened the door.

23             THE COURT:  He did not.  Sustained.

24             MR. BINNALL:  One quick moment.

25             (Pause.)
```

1          MR. BINNALL:  No further questions.

2          THE COURT:  Anything else, Mr. Howard?

3          MR. HOWARD:  Yes.  Briefly, Your Honor.

4                    RECROSS-EXAMINATION

5  BY MR. HOWARD:

6  Q.  On the meeting on the 29th that was just mentioned that you

7  and I had discussed, do you remember Mr. Kesari wearing an

8  earpiece?

9  A.  I don't recall.

10  Q.  Okay.  And you had mentioned moving from Michelle Bachmann's

11  campaign to Dr. Paul's campaign would be helpful to you, to the

12  campaign.  Do you remember that?  Do you remember testifying to

13  that?

14  A.  I was told that it would be helpful.

15  Q.  Okay.  And do you also remember that Dr. Paul on

16  December 28th, do you remember him being in first place in terms

17  of the poll of candidates here in Iowa?

18  A.  I actually remember him and Romney being neck and neck.

19  Q.  And do you remember him eventually coming in -- that was on

20  December 28th?

21          MR. PILGER:  Objection; beyond the scope.

22          THE COURT:  Overruled.

23          Answer the question.

24  BY MR. HOWARD:

25  Q.  Do you remember him being in first place with Mitt Romney on

1  December 28th?

2  A.  I remember -- I remember them being in the top two.  I can't

3  for sure tell you which one was where.

4  Q.  And you realize that at the time that you came over, he

5  dropped to third; do you realize that?

6  A.  Yes.

7  Q.  Okay.  And you also testified that on the 29th and 30th, you

8  were going to get a -- Dimitri Kesari told you you were going to

9  get a $25,000 check -- wire to replace the check.

10          Do you remember just saying that?

11 A.  Yes.

12 Q.  And -- but the -- but if you had gotten that check, the Iowa

13 State Senate would have learned about that check, wouldn't they,

14 learned about that wire?

15 A.  No.

16 Q.  No; they wouldn't have learned about the wire?  Is that your

17 answer?

18 A.  I don't -- I don't understand what you're asking.  I did get

19 a wire.

20 Q.  I'm sorry?

21 A.  I did get a wire transfer to my account.

22 Q.  But that is something that the Iowa State Senate Ethics

23 Committee would have easily -- would easily learn; is that true?

24 A.  No.

25 Q.  Okay.  Now, you -- I had asked you -- you were asked about

843

1  the different meetings that you had with the FBI, and you said

2  that you got one on -- you met with them on last Friday.  Was

3  that date the 9th?

4  A.  I would have to see a calendar, but it was last Friday.

5  Q.  Last Friday was the 9th; is that correct?

6  A.  I would have to see a calendar, but I trust you that it was

7  the 9th.

8  Q.  Okay.  Today is the 16th.  Would the math work?

9  A.  Yes.

10  Q.  And did you also meet with them on Monday?

11  A.  Yes.

12  Q.  Okay.  So you met with them on both days?

13  A.  Yes.

14  Q.  On Friday, the 9th, do you remember who you met with?

15  A.  Yes.  I met with the same people that I have been meeting

16  with.

17  Q.  Were people taking notes?

18  A.  I don't recall.

19  Q.  Were pads out?

20  A.  Yes.

21  Q.  And were people writing on those pads as you spoke to them?

22  A.  I would assume so, yes.

23          MR. HOWARD:  Your Honor, if we could have a short

24  side-bar.  I'm done except one issue, just a short side-bar.

25          (Side-bar conference, not reported.)

1          THE COURT:  Thank you, sir.  You're excused.

2          THE WITNESS:  Thank you.

3                              (Witness excused.)

4          THE COURT:  Does the government have additional

5    witnesses?

6          MR. KRAVIS:  One moment, please.

7          (Pause.)

8          MR. KRAVIS:  We have two brief additional witnesses.

9          THE COURT:  Okay.  We'll do those on Monday.  And

10   we'll start at 9:00 a.m. on Monday.

11         Very well.  Members of the jury, thank you for the

12   long day, long week.  Thank you for your time and attention.

13   We're going to wrap this up on Monday morning on the

14   government's side and then we'll go to the defendants' side.

15   You can kind of see that we're going to get this case to you

16   sometime Tuesday or Wednesday for your deliberations.  The

17   closing arguments themselves will take upwards of three hours or

18   more.  My jury instructions in this case are long.  That will

19   take 45 minutes.  So it's a full half a day just to finish that

20   last piece, but those -- everything that is left is still

21   important.

22         So I ask you to not discuss this case amongst

23   yourselves or remain within earshot of anyone discussing it.

24   Keep an open mind.  Wait until you've heard all of the evidence,

25   the arguments of the lawyers, and my instructions on the law

1  before even beginning to make up your mind as to how this case

2  should be resolved.

3          Have a great weekend, and we'll see you ready to go on

4  Monday morning at 9 o'clock.

5          (In open court, out of the presence of the jury.)

6          THE COURT:  Please be seated.

7          Three things:  First of all, in a case with this many

8  exhibits, we're going to need an index of exhibits for use in

9  jury deliberations.  Your exhibit list is, by and large, fine.

10 There's some comments in there that are more appropriate for a

11 judge and not for jurors.  You know, something suggesting that

12 something happens, that should all be removed.  An index of all

13 of the ones that have been admitted, and then there should be a

14 column for the ones you're only offering against a particular

15 defendant, which will aid in that.  Some of them take notes

16 about that and some of them don't, and it's hard to imagine that

17 people could be expected to remember all of that; but that

18 exhibit list will accomplish that.

19         I won't leave work today until I e-mail a set of jury

20 instructions out to you.  Just because of all of the other stuff

21 we've been doing on this, I think it's the latest I think I've

22 ever delivered jury instructions.  They're very rough, but it

23 will be a good document to provide a basis to discuss the

24 instructions.  You'll have that tonight.

25         I would sure like your comments by mid afternoon on

 1   Sunday, before that if you can.  And I would like you to

 2   prioritize the biggest problems that you have with the

 3   instructions, what's in there and what's not, so that I can work

 4   down the list for anybody.  So I would appreciate that by at

 5   least mid afternoon Sunday because that's when I'll start

 6   working on this one again.

 7           Who are the last witnesses?  Is this the FBI agent

 8   that also assisted in the interview?

 9           MR. KRAVIS:  Right.

10           THE COURT:  And --

11           MR. KRAVIS:  Special Agent Frank D'Amico will testify

12   that he's reviewed the campaign's FEC reports and there's no

13   mention about Kent Sorenson or Grassroots Strategy, and that's

14   also about three minutes direct examination.

15           THE COURT:  And that's it then, you will rest?

16           MR. KRAVIS:  That's it.

17           THE COURT:  So here is what I recommend.  You know,

18   that's a very short period of time.  I don't really want to

19   take, you know, a half hour of testimony and then go recess for

20   two hours to do motions.  I have found in complex cases like

21   this and where the law is this complex that a written Rule 29

22   motion is -- you do a better job of it and I get more

23   information, and if you could file that this weekend, you would

24   get a lot more attention from me than you would in the hubbub of

25   trying to get this thing off to where it's supposed to go.

1          So I would appreciate that.  You know what the rest of

2    their evidence is.  I think you can comfortably file it, and I

3    would appreciate that.

4          With that, I'm available this weekend.  See you at

5    8:30 on Monday.

6          (Recess at 5:07 p.m., until 8:30 a.m., Monday,

7    October 19, 2015.)