IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :     Criminal No. 4:15-103
                           :
     vs.                   :
                           :
JESSE R. BENTON,           :     TRANSCRIPT OF HEARING
JOHN FREDERICK TATE, and   :        (Motion to Sever)
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X



                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Thursday, February 4, 2016
                         8:58 a.m.



BEFORE:  THE HONORABLE HELEN C. ADAMS, Magistrate Judge.








                Terri L. Martin, CSR, RPR, CRR
                United States Court Reporter
                 Room 189, U.S. Courthouse
                  123 East Walnut Street
                  Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                  JOSEPH P. COONEY, ESQ.
                                    RICHARD C. PILGER, ESQ.
                                    Public Integrity Section
                                    Criminal Division
                                    U.S. Department of Justice
                                    1400 New York Avenue NW
                                    Suite 12100
                                    Washington, D.C.  20005

For Defendant Benton:               GARY D. DICKEY, JR., ESQ.
                                    Dickey & Campbell Law Firm
                                    301 East Walnut, Suite 1
                                    Des Moines, Iowa  50309

For Defendant Tate:                 DAVID A. WARRINGTON, ESQ.
                                    LAURIN H. MILLS, ESQ.
                                    LeClair Ryan
                                    2318 Mill Road, Suite 1100
                                    Alexandria, Virginia  22314

For Defendant Kesari:               JESSE R. BINNALL, ESQ.
                                    Harvey & Binnall
                                    717 King Street
                                    Suite 300
                                    Alexandria, Virginia  22314

3

E X H I B I T S

| GOVERNMENT EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| A – Kesari proffer agreement | 31 | 63 |
| B – 302 | 31 | 63 |
| C – PowerPoint slides | 31 | 63 |

4

```
 1                    P R O C E E D I N G S

 2              (In open court, with defendant Kesari and defendant

 3   Tate present, defendant Benton via telephone.)

 4              THE COURT:  Please be seated.

 5              Good morning.

 6              We are here this morning in United States of America

 7   versus Jesse R. Benton, et al., and that is Criminal No.

 8   4:15-103.

 9              What I would like to do first is just have counsel

10   introduce themselves for the record.  So why don't we start with

11   the government's table.

12              MR. COONEY:  Good morning, Your Honor.

13              I'm J.P. Cooney here on behalf of the United States.

14   I have here with me my co-counsel, Richard Pilger, and then also

15   with us at counsel table today is FBI Agent Karen LoStracco and

16   paralegal assistant Starnes.

17              THE COURT:  And are you going to be arguing on behalf

18   of the government?

19              MR. COONEY:  I will, Your Honor.

20              THE COURT:  All right.  Mr. Kesari's counsel.

21              MR. BINNALL:  Good morning, Your Honor.

22              Jesse Binnall on behalf of Mr. Kesari.  Mr. Kesari is

23   at counsel table with me.

24              THE COURT:  Thank you.

25              For Mr. Tate.
```

1          MR. WARRINGTON:  Your Honor, David Warrington for

2   Mr. Tate.  At counsel table with me is my colleague, Mr. Mills,

3   and Mr. Tate.

4          THE COURT:  And for Mr. Benton?

5          MR. DICKEY:  Good morning, Your Honor.

6          Gary Dickey on behalf of Jesse Benton.

7          THE COURT:  And do we have Mr. Benton on the phone?

8          THE CLERK:  Yes.

9          THE COURT:  Mr. Benton, can you hear me?

10         DEFENDANT BENTON:  Yes, Your Honor.

11         THE COURT:  Okay.  You might have to talk up a little

12   bit, Mr. Benton, if there's anything you have to talk about, and

13   there may be nothing, but just so we can hear you because you're

14   a little light coming across this phone.  Okay?

15         DEFENDANT BENTON:  Yes, Your Honor.

16         THE COURT:  All right.  Thank you.

17         We are here today to have oral argument with respect

18   to defendant Tate's motion for severance of his trial from that

19   of Mr. Kesari.  Just so everybody knows, I have had an

20   opportunity to look at everything that's been filed up through

21   yesterday, so if there's anything filed this morning, I haven't

22   gotten that yet.

23         Did anybody file anything this morning?  The

24   government?

25         MR. COONEY:  Nothing from the government.

1          THE COURT:  Mr. Tate?

2          MR. WARRINGTON:  Nothing, Your Honor.

3          THE COURT:  Mr. Kesari?

4          MR. BINNALL:  Nothing, Your Honor.

5          THE COURT:  Mr. Benton?

6          MR. DICKEY:  No, Your Honor.

7          THE COURT:  Then I think I've got everything that has

8   been filed.  And we are here, as I said, with respect to oral

9   argument with respect to the motion to sever.  Just so everybody

10  knows, we've set aside two hours if we need it, so we've got

11  from 9:00 to 11:00.  I don't know if we need all of that, but we

12  do have that amount of time.

13          It is Mr. Tate's motion, so I'm going to let you guys

14  go ahead and start.

15          Whenever you're ready, Mr. Warrington.

16          MR. WARRINGTON:  Good morning, Your Honor.  David

17  Warrington for Mr. Tate.

18          I've got a PowerPoint slide and I've got a deck here

19  that I would like to hand up so you can follow along if for some

20  reason the PowerPoint doesn't work.

21          THE COURT:  That would be fine.

22          MR. WARRINGTON:  May I approach?

23          THE COURT:  That would be fine.

24          MR. WARRINGTON:  I'm going to hand one of these to

25  Mr. Binnall.  I believe Mr. Mills is going to give one to the

1    government.

2              Okay.  Is that showing up?

3              THE COURT:  Tricia, do you have it?  I don't have

4    anything on my screen.

5              MR. WARRINGTON:  There it is.

6              THE COURT:  Okay.  I do have it up here as well.  No.

7              (Pause.)

8              MR. WARRINGTON:  Okay.  Calling for an assist.

9              THE COURT:  That's all right.  Go ahead.

10             (Pause.)

11             MR. WARRINGTON:  I don't claim to be technologically

12    proficient.

13             Your Honor, we are here on Mr. Tate's motion to sever

14    his trial from that of Mr. Kesari.  There are two burdens that

15    we must satisfy in order for the court to grant that motion; the

16    first being that Mr. Kesari is likely to testify in the case if

17    he is severed, if Mr. Tate is severed from his trial, and the

18    second burden is that that testimony will be exculpatory as to

19    Mr. Tate.

20             The first burden, you'll hear shortly from Mr. Binnall

21    that Mr. Kesari is willing and likely to testify, and I would

22    dare say he would testify.  And the second issue is whether the

23    testimony that Mr. Kesari is going to present would be

24    exculpatory with regard to Mr. Tate and the crimes for which he

25    is charged.

1          I presume Your Honor is familiar with the case; but in

2  order for us to show the exculpatory nature of the testimony, I

3  need to give you a little bit of background on that.  I think it

4  will connect up the dots and make it easier for the court.

5          The government has charged Mr. Tate with four counts

6  of essentially aiding and abetting the filing of false campaign

7  reports during the Ron Paul 2012 Presidential Campaign, and they

8  have charged that he has knowingly and willfully participated in

9  that alleged scheme.

10          Mr. Kesari's testimony will essentially show the court

11  that Mr. Tate had nothing to do with this.  With respect to some

12  specifics, we've got on 12/28 of 2011, the night that

13  Mr. Sorenson endorsed Dr. Paul, the government contends that

14  that was the beginning of an agreement where Mr. Sorenson was

15  going to be paid and the campaign was going to hide those

16  payments by paying Mr. Sorenson through a third party.

17  Mr. Kesari's testimony is going to show Mr. Tate was told on

18  that night that Sorenson was not being paid and that there was

19  no deal in place to pay Sorenson for his endorsement and that

20  Sorenson had not been promised anything for his endorsement,

21  that Sorenson was just endorsing Dr. Paul because that's where

22  his friends were.

23          The second thing Mr. Kesari is going to testify about

24  is that during the period of January through June 25th of 2012

25  Mr. Tate didn't know anything about this, he wasn't told

1   anything about the deal to pay Sorenson, he wasn't told about

2   any details to pay Sorenson and that the only thing that he was

3   told was that on June 25th of 2012 that payments to this

4   company, ICT, were for Sorenson; but that was the extent and the

5   totality of what Mr. Tate was told about this.

6          THE COURT:  And was that via an e-mail?

7          MR. WARRINGTON:  That would be a June 25, 2012 e-mail.

8          THE COURT:  All right.

9          MR. WARRINGTON:  So there are two other issues, two

10  other facts that the government is going to contend, that there

11  was a $25,000 check that Mr. Kesari wrote and gave to

12  Mr. Sorenson drawn on his wife's jewelry store account.

13  Mr. Kesari is going to testify that he didn't tell Mr. Tate

14  about that so Mr. Tate had no knowledge of that, and the second

15  thing was a $25,000 wire request that was never processed.

16  Mr. Kesari is going to testify that he never told Mr. Tate what

17  the purpose of that wire was, certainly didn't tell him it was

18  for Mr. Sorenson.

19         So at the end of what Mr. Binnall is going to proffer

20  to the court as Mr. Kesari's testimony is going to be that

21  Mr. Tate had nothing to do with any payments to Sorenson, had no

22  knowledge of any details of payments to Sorenson and certainly

23  couldn't have been a knowing and willful participant in this

24  scheme that the government alleges.

25         So as I said before, Mr. Tate has been charged with

1   four counts.  We've been involved -- myself and Mr. Mills as

2   counsel for Mr. Tate, we've been involved in this case I would

3   say from the beginning.  We originally represented the Ron Paul

4   2012 Campaign when this investigation began.  When the questions

5   arose, we took a look at the evidence, we took a look at the

6   information that we had, and we determined that two other people

7   needed separate counsel.  We did not believe that Mr. Tate

8   needed to have his own counsel because we didn't think there was

9   any evidence that showed that he participated in any scheme that

10  the government alleges.

11          Obviously, the government disagreed because they

12  indicted him, but before they got to that indictment, we made

13  two vital presentations to the Department of Justice staking out

14  our position that Mr. Tate was factually innocent and should not

15  be indicted.

16          Now, the government went to trial in October, as I'm

17  sure Your Honor is fully aware of; but prior to that trial

18  Mr. Tate was -- all four charges against him, which are the same

19  charges alleged against him now, were dismissed because the

20  government reached a proffer agreement with Mr. Tate.  So the

21  government proceeded to trial against Mr. Kesari and Mr. Benton.

22  Four of those counts were also dismissed against Mr. Benton.  So

23  they proceeded against Mr. Benton on one obstruction of justice

24  charge and against Mr. Kesari on the four counts and another

25  obstruction of justice charge -- excuse me, Mr. Benton was

1   actually charged with one count.

2          After trial the jury acquitted Mr. Benton of the one

3   charge that he faced, convicted Mr. Kesari on one count of

4   causing a false record, acquitted him on the count of

5   obstruction of justice, and then hung on the other three counts,

6   three of which are currently pending against all four -- or all

7   three defendants right now.

8          So the evidence at the first trial will show that

9   there was no doubt that Mr. Kesari was involved in creating this

10  arrangement with Mr. Sorenson.  His defense was not that he

11  didn't do these acts; that he didn't know that they were

12  illegal.  With these FEC crimes and related crimes, there's a

13  heightened mens rea standard that attaches to these that you

14  have to be a knowing and willful participant in the crimes

15  alleged.  That was his defense at trial.

16         Now, the case against Mr. Tate, after the government

17  finished with the last trial, they decided to get superseding

18  indictments against Mr. Tate and Mr. Benton and retry Mr. Kesari

19  on the three counts on which the jury was hung with regard to

20  him.

21         The case against Mr. Tate is based entirely on

22  e-mails, and those e-mails -- the government's case is based on

23  their interpretation about what those e-mail messages mean.

24  Tate never spoke with Sorenson about any deals to pay, any

25  arrangements to pay.  There was no contact between Sorenson and

1   Mr. Tate directly about that.  There was no -- there's nothing

2   in the evidence that the government put on at trial before, that

3   the government has in its possession now that we know of that

4   they've turned over to us in discovery that shows that Tate was

5   a participant in any of this and knowing and willful in any of

6   this other than the authentication of e-mails.

7           There's two periods of time that are important here in

8   the government's case from the last trial.  Pre December 28,

9   2011, during the period leading up to Sorenson's --

10  Mr. Sorenson's switch, there was a bunch of e-mail back and

11  forth that showed that Mr. Tate was interested in Sorenson's

12  endorsement of Dr. Paul and he was willing to pay him at the

13  same rate that the Bachmann Campaign was willing to pay him.

14  But Mr. Kesari's testimony will show that as of 12/28/2011,

15  there was no deal in place to pay Sorenson.  So that evidence or

16  those e-mails pre December 28, 2011 are mere background.

17  They're just things that establish the narrative that the

18  government is putting forward, that the campaign was going to

19  pay Mr. Sorenson.

20          Now, on December 28th when Mr. Sorenson endorsed

21  Dr. Paul, Mr. Kesari's testimony is going to show there was no

22  deal in place to pay him and there wasn't a promise of any

23  future deal.  So Mr. Tate's defense is Sorenson wasn't paid for

24  his endorsement.  He had no knowledge of any monetary deal with

25  Sorenson at the time of the switch.  He had no knowledge of who

1    ICT was, this Interactive Communication Technology.  He had no

2    idea of how Sorenson was getting paid when he was told Sorenson

3    was being paid, and he had no involvement in this, and the

4    evidence actually supports these defenses.

5           I mentioned the $25,000 check earlier.  Mr. Kesari

6    gave Mr. Sorenson -- on December 26, 2011, gave Mr. Sorenson a

7    check for $25,000 that was drawn on the Designer Goldsmiths

8    jewelry store account of Mr. Kesari's wife.  Sorenson never

9    cashed that check, and Mr. Kesari will testify if he's severed

10   from this case, that he never told Mr. Tate about that check.

11          As I said earlier, on 12/28 when Mr. Sorenson came to

12   endorse Dr. Paul at a public event, Mr. Tate was told that there

13   was no deal in place to pay Sorenson, Sorenson was not being

14   paid for his switch, Sorenson was switching because he felt all

15   of his friends were on the Paul Campaign and that's where he

16   felt the most comfortable, and that he wasn't promised anything

17   in return for his endorsement.

18          And that's actually supported by contemporary e-mail

19   evidence that the government has in its possession.  The first

20   e-mail I'm going to show you is an e-mail between Mr. Tate and

21   Mr. Benton.  So if Mr. Benton and Mr. Tate are co-conspirators

22   in this, why would they be lying to each other in this e-mail?

23   I'll just read it to you.

24          Jesse, brings up a thought.

25          This is Mr. Tate writing to Mr. Benton.

```
 1            We need to make sure anyone asked about this
 2   (including Drew, Kent, et cetera) is prepared to say the same
 3   thing.  I would assume that is something like:  The Ron Paul
 4   Campaign has not and is not paying Kent for his endorsement.
 5   Kent decided to endorse Ron because blah, blah, blah.
 6            Short, sweet and truthful.
 7            That shows Mr. Tate's understanding at the time on
 8   December 28th, 10:43 p.m., after Mr. Sorenson endorsed Dr. Paul,
 9   that same night, that there was no deal to pay Mr. Sorenson.
10   They weren't paying him.  They weren't going to pay him.
11            The next day Mr. Tate had an e-mail exchange with Doug
12   Stafford, who was a consultant to the campaign, and Dimitri
13   Kesari, and Mr. Stafford sent an e-mail to both of them and says
14   in response to a question, well, that sounds bad for Michelle,
15   meaning Michelle Bachmann, since RP, Ron Paul, isn't paying Kent
16   and she was.
17            And Mr. Tate responds yeah.  That shows his
18   understanding at the time that there was no deal to pay Kent
19   Sorenson.
20            Sorenson's testimony at trial and the evidence there
21   also supports this.  There's an early first week of January 2012
22   phone call between Mr. Sorenson and a gentleman by the name of
23   Dennis Fusaro.  Mr. Sorenson is referring to that $25,000
24   Designer Goldsmiths check, and he's talking about Mr. Kesari.
25   He says, I'm going to give him his check back.
```

1            Mr. Fusaro responds, oh, you are?

2            Sorenson says, do you think I should, or should I hold

3    on to it?  I'm not cashing it.

4            Mr. Fusaro said, I understand.

5            Mr. Sorenson says, do you think I should hold on to it

6    or do a deal?

7            Clearly no deal was in place.

8            Should I hold on to it so I have something over him?

9            He wants to use this check as leverage against

10   Mr. Kesari.  This is in January.

11           And Fusaro responds, no, I don't think I'd give it to

12   him.

13           So, clearly, the evidence is going to show -- and

14   Mr. Kesari's testimony is going to corroborate all of this --

15   that there was no deal as of December 28, 2011 to pay Sorenson,

16   there was no promise to pay Sorenson.  That came about later on

17   in January.  Certainly Mr. Tate knew nothing about any of this.

18           As you can see, on Friday, January 20, 2012,

19   Mr. Kesari is copied on an e-mail exchange between Gary Howard

20   and John Tate.  Mr. Howard was the press secretary for the Ron

21   Paul Campaign.  He received an inquiry regarding Mr. Sorenson

22   and what he was doing in South Carolina when Mr. Sorenson was in

23   South Carolina as a surrogate for Dr. Paul during this lead up

24   to the South Carolina Primary.  A reporter questioned whether

25   Sorenson was being paid for that work.  Mr. Howard didn't know.

1    He asked Mr. Tate.  Mr. Tate responded, no, he is not.  He is

2    volunteering as I understand it.

3           So you can see from that exchange Mr. Tate's

4    understanding on January 20th was that he didn't have any

5    knowledge of any payment arrangement or deal to pay

6    Mr. Sorenson, and Mr. Kesari's testimony is going to corroborate

7    that.

8           We go back to this $25,000 wire on December 29th.

9    Now, this wire, there's a handful of e-mails that talk about a

10   $25,000 called mystery wire for Dimitri.  There is nothing in

11   these e-mails that say what that wire was for.  There is no

12   testimony that the government has or that anybody else has as to

13   what that wire was for.  There's some speculation that it was

14   for some year-end expenses on the campaign, some filing fee that

15   was later on.  There's also speculation by the government -- and

16   this is the government's theory -- that because of the timing of

17   this mystery wire and the $25,000 check that this is related to

18   Mr. Sorenson.  But that's just speculation.  There is no

19   independent testimony or independent documentation that says

20   that this had anything to do with Sorenson.  Mr. Kesari's

21   testimony is going to be that he certainly didn't tell Mr. Tate

22   that this $25,000 wire was for Mr. Sorenson.  Furthermore, that

23   wire never happened.  Mr. Tate put the kibosh on it.  He said,

24   we're not taking it, wipe it off the books.

25           So at most this is -- there's no reporting obligation

1    under the law that comes about for reporting a payment that you

2    don't make if you're a federal campaign.  And it's not evidence

3    of any later scheme to pay Sorenson.

4              Mr. Kesari will testify that the deal to pay Sorenson

5    was reached between Mr. Sorenson and Mr. Kesari in January of

6    2012 and this arrangement was created because Kent Sorenson

7    wanted to be paid and he told Mr. Kesari that he could be paid

8    through a third party to avoid that showing up to the knowledge

9    of the Iowa Senate Ethics Committee and that was legal to do it

10   that way because that's how the Bachmann Campaign lawyers said

11   it could be done legally.  Mr. Sorenson had been paid by the

12   Bachmann Campaign through the consulting company of

13   Congresswoman Bachmann's campaign manager.  He did this to avoid

14   the Iowa Senate Ethics Committee finding out that he was being

15   paid for work on a political campaign, which there was an ethics

16   rule for the sitting Iowa State Senators they couldn't be paid

17   for working on presidential campaigns.  They'd done this with

18   the campaign workers over at the Bachmann Campaign.  They told

19   the structure of this arrangement by having Sorenson paid

20   through Guy Short's company.  That's what Mr. Sorenson told

21   Mr. Kesari, that this was okay to do because this is how the

22   Bachmann lawyers said it was okay to do it.

23             Mr. Tate had no knowledge of this.  And the only time

24   that Mr. Tate had any knowledge about this, Mr. Sorenson and

25   ICT, comes on that June 25, 2012 e-mail.

1           Now, the government in the last indictment had I think

2   trouble connecting Mr. Tate to any of these earlier issues.  So

3   that's why they made up a statement in a proffer session and

4   said that he lied during the proffer to show that he was

5   guilty -- that it was guilty knowledge and evidence that he was

6   a participant in this scheme.  So what they were saying is

7   because he lied in 2014 in a proffer session, that meant that he

8   was part of this conspiracy going back to 2011 through 2012

9   because the only thing, the only piece of evidence that's out

10  there that has John Tate with any knowledge of ICT and a

11  connection to Sorenson is this one June 25th e-mail from 2012,

12  which interestingly enough was only found on Mr. Kesari's iPad,

13  I believe.  It was not found in Mr. Tate's inbox, so Mr. Tate --

14  there's no record of Mr. Tate actually receiving that.

15          But assuming for sake of argument that he did receive

16  it, the only thing that he's told in that e-mail is this is the

17  last payment for Kent Sorenson, the deal agreed to by Jesse.

18  That's it.  There's no details about this.  There's no details

19  about we're doing this because Sorenson is trying to avoid the

20  Iowa Senate Ethics Committee finding out about him getting paid

21  by the campaign and we're going to report it this way.  There's

22  none of that detail.  It's just one line.

23          So the government had that in the first indictment.

24  They used this proffer session.  Well, that caused the case

25  against Mr. Tate to get dismissed.  So in the new indictment,

1   which is nearly identical, save for one allegation, the

2   allegation that on February 7, 2012, Mr. Tate approved payments

3   to Sorenson and from that February 7th date and that approval by

4   e-mail is what the allegation is all of these other things

5   occurred that caused the false report to be made, caused the

6   false records to be made and thereby a false statement to the

7   FEC.

8          That February 7th e-mail is on the screen right now.

9   Mr. Tate is asked by Mr. Kesari, did Jesse get Kent paid?

10         Mr. Tate says, no idea.  Ask him.

11         That's not approval of anything.  Mr. Tate said I have

12  no idea.  There's no other e-mail with regard to Mr. Tate

13  dealing with any February payments to Mr. Sorenson; but the

14  government alleges that that e-mail that's on the screen right

15  now is an approval of payments to Mr. Sorenson and it's an

16  approval of a whole cascade of other things for which he is

17  charged.

18         A month later, February 16th, Mr. Tate receives an

19  e-mail from the deputy comptroller who sends a list of payments

20  or a list of invoices that he's asking whether they should be

21  approved for payment.  The routine of the campaign was

22  Mr. Cortez would send a list by e-mail with just a name and an

23  amount and said should we pay these.  In most instances there's

24  no description, there's no follow-up.  It's really a decision of

25  whether, does the campaign have the cash on hand to pay its

1  bills or not, or is it getting close to a reporting period, can

2  you delay a payment so the campaign looks like it has more cash

3  on hand, therefore, it looks like it's stronger.

4          But this February 16th e-mail is important because

5  Interactive Communication Technology is one of the companies

6  listed in here, okay.  But Mr. Tate says, don't know what

7  Interactive Communication Technologies is.  He had no idea what

8  this company -- who this company was, and there's no follow-up

9  explanation to Mr. Tate as to what that is in February.

10          Fast forward to June.  This is the June 25th e-mail

11  that I've been mentioning.  After a series of prior e-mails with

12  this list of payments to be made, Mr. Tate sees this Interactive

13  Communication Technologies in there, and he says, who is this?

14  Why do we keep taking this?  And Mr. Cortez says, well,

15  Mr. Kesari says this is the last payment for them.  Mr. Tate

16  tersely decides he's going to find out what this is all about

17  because he has no idea, so he sends this e-mail and says, what

18  is this?  What is it for?  Who is it?  Why do we keep paying

19  them?  The last payment was supposedly the last.

20          Just prior to that in the month of May, there was an

21  e-mail exchange where those lists that Mr. Cortez sends to

22  Mr. Tate, Interactive Communication Technologies was on that,

23  Mr. Tate responds to Mr. Cortez and says, I don't know what

24  Interactive Communication Technologies is.

25          Mr. Cortez reaches out to Mr. Kesari.  Mr. Cortez then

1    says, John doesn't know what this is.  What is it?  Mr. Kesari

2    responds, it's the last one.  No further information.

3         Mr. Cortez forwards that to Mr. Tate.  Mr. Tate

4    approves the expenses.  His deputy campaign manager is

5    essentially telling him this is an okay expense to pay; but he's

6    not telling him any details, not telling him it's related to

7    Sorenson, not telling him anything.  He just says it's the last

8    payment.  That's why Mr. Tate is a little bit miffed that the

9    next month he's got another request to pay this Interactive

10   Communication Technologies more money and he doesn't know who it

11   is or what it's for.

12        This is the response that the government says that

13   Mr. Tate knew all about this arrangement:  This is the last

14   payment for Kent Sorenson, the deal Jesse agreed to with Kent.

15        That's one of two responses that Mr. Kesari supposedly

16   sent to Mr. Tate.  There's one e-mail that I believe is 43

17   seconds before this where Mr. Kesari says, it was for six

18   months, that's it.  Mr. Tate responds to that to Mr. Cortez and

19   says, approved.  And like I said before, this e-mail appears on

20   one of Mr. Kesari's devices.  It doesn't appear in the Ron Paul

21   Campaign records, on its server or in Mr. Tate's e-mail, so

22   there's some doubt as to whether he even saw this; but even if

23   he did, it doesn't tell Mr. Tate anything about the details of

24   the deal.  He's not told that ICT is Sorenson's company, is not

25   Sorenson's company, that it's being arranged this way in order

1  to hide payments from the FEC, nothing.  He's just told that

2  this is a deal that was approved by somebody else.

3         There's no information and there's no testimony and

4  there's no evidence to show that Mr. Tate knew anything about

5  ICT or any arrangements with Mr. Sorenson beyond what's in that

6  June 25th e-mail.

7         So that's the state of the government's evidence

8  against Mr. Tate.  It's a series of e-mails where the government

9  has a particular interpretation of what the e-mails mean, and

10  Mr. Kesari's testimony is going to show that their

11  interpretation is wrong or is just pure guesswork.  Mr. Kesari

12  is going to testify that Mr. Tate didn't know about the $25,000

13  Designer Goldsmiths check.  He's going to testify that Mr. Tate

14  was told that Sorenson wasn't being paid for his endorsement or

15  promised anything in return for his endorsement, and he's going

16  to testify that Tate had no involvement in the deal with

17  Sorenson and no knowledge of the ICT payments beyond what's in

18  that June 25th e-mail.

19         Your Honor, at our last hearing, the phone hearing we

20  had, Your Honor, the government raised the issue and said this

21  is the first time that they've heard about this theory.  That's

22  just factually wrong.  Since the beginning of this case when we

23  determined that other people needed separate counsel, we have

24  always believed that the evidence shows Mr. Tate didn't have any

25  participation in this in a knowing and willful manner.  We told

1  the government this repeatedly.  We have repeated this time and

2  time again.  When the government decided that they were going to

3  indict, prior to that we had met with two levels higher than

4  this prosecution team at the justice department to show them and

5  try to convince them Mr. Tate was factually innocent here and

6  should not be indicted.

7          And on the phone call, I believe Mr. Cooney said that

8  this is sort of raised late, this is the first time they've ever

9  heard it, so that's just factually wrong.

10         Prior to the last trial, we effectively did sever

11  Mr. Tate from that trial because the case against him was

12  dismissed, and the only reason we're here asking for severance

13  now is because the government couldn't prove their case against

14  Mr. Tate -- I mean, against Mr. Kesari and Mr. Benton.  Their

15  case is weak across the board.  And because they couldn't -- if

16  they had been able to convict Mr. Tate and -- Mr. Benton and

17  Mr. Kesari, Mr. Tate would be having a separate trial, he would,

18  in fact, be severed, and we would be entitled to call Mr. Kesari

19  to rebut the government's evidence.  But because the government

20  couldn't prove its case at trial, we're here now.  The

21  government wants to try these three individuals together,

22  specifically Mr. Tate to prevent him from accessing this

23  exculpatory information.

24         Now, we understand the concerns about judicial

25  economy, not wanting to try this case two or three times, but

1  judicial economy has never trumped the Constitution, the

2  defendant's constitutional right to have a fair trial.

3           The government doesn't even need to try Mr. Kesari

4  again because his guideline ranges don't change if they get

5  convictions on the three hung counts.  They're trying him again

6  because they're trying to keep him in the mix so Mr. Tate can't

7  get access to the exculpatory information, and it's not

8  Mr. Tate's fault we're in this situation.  If the government

9  hadn't breached their proffer last time, you know, they may have

10 been able to try everybody together, but they didn't.

11          So why do we need this testimony?  Because this case

12 is built largely or solely upon the government's interpretation

13 of the e-mails, there's only one person that can exonerate

14 Mr. Tate, and that's Mr. Kesari.  The testimony Mr. Kesari would

15 present completely contradicts the government's entire theory of

16 the case that John Tate was a knowing and willful participant in

17 any of these acts.

18          I also want to be very clear of what we're not here --

19 what we're here and what we're not asking for at this hearing.

20 Obviously, we weren't asking for an ex parte hearing.  We were

21 asking for this hearing in open court to protect Mr. Kesari's

22 rights, frankly, and we're not asking for a pretrial admission

23 on any admissibility with regard to Mr. Binnall's proffer of

24 Mr. Kesari's testimony should Mr. Kesari choose to testify at a

25 later trial.  What we're simply asking the court, given the

1   exculpatory nature of his testimony and Mr. Kesari's willingness

2   and likelihood that he will testify at Mr. Tate's trial if

3   Mr. Tate is severed from this matter, that the court grant this

4   motion for severance so that Mr. Tate can have access to this

5   exculpatory information and receive a fair trial.

6           Unless the court has any other questions --

7           THE COURT:  Just one question for you, Mr. Warrington.

8   So with respect to the testimony that Mr. Kesari can give

9   regarding Mr. Tate's knowledge, he can testify about what he

10  may -- what he, Mr. Kesari, may or may not have told Mr. Tate.

11          MR. WARRINGTON:  That's correct.

12          THE COURT:  And what involvement Mr. Tate had.  For

13  example, was Mr. Tate at meetings, et cetera.  But he would not

14  be able to testify as to Mr. Tate's knowledge if that knowledge

15  came from a third party other than Mr. Kesari.  Is that -- would

16  you agree with me in that regard?

17          MR. WARRINGTON:  I would agree with you in that

18  regard, and I would note that there is no other party that the

19  government has that can say that Mr. Tate was told something

20  about something else.  The case against Mr. Tate is all based on

21  his e-mails.

22          And I think I'll turn it over to Mr. Binnall so that

23  he can give the court the proffer --

24          THE COURT:  That would be fine.

25          MR. WARRINGTON:  -- on what the testimony would be.

1          THE COURT:  Thank you.

2          MR. BINNALL:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. BINNALL:  The facts as laid out by Mr. Warrington

5   on behalf of Mr. Tate are correct.  The information that

6   Mr. Kesari has in this case where he wants to testify on behalf

7   of Mr. Tate at a severed trial is exculpatory to Mr. Tate.  It

8   is substantial.

9          Regarding the government's opposition that it filed,

10  Your Honor, first of all, it is troubling as an officer of the

11  court, there is a very real probability here that exculpatory

12  information, information that can set an innocent man free, will

13  not be able to be introduced at trial, will be put beyond that

14  party, a defendant.  And that is troubling, but the law doesn't

15  support it either.  The law, the United States Supreme Court in

16  the Simmons case, 390 U.S. 377, supports the idea that a

17  defendant can testify, usually in a suppression hearing type

18  situation, at a pretrial event without waiving the Fifth

19  Amendment for the actual trial.  In the Eighth Circuit, Your

20  Honor, there is the Jackson case.  It's 549 F.2d 517.  It's a

21  1977 case out of the Eighth Circuit, Your Honor, where a similar

22  issue about severance came up and that there was a proffer such

23  as we're set to have here and there was never held to be any

24  waiver of the Fifth Amendment there.

25          But Mr. Kesari does wish to testify at a severed trial

1  on behalf of Mr. Tate, and he is anxious to do so because

2  Mr. Tate is both legally and factually innocent of these

3  charges.  Mr. Kesari knows that.  Mr. Kesari is the one and only

4  person that can get that information to the court and to the

5  jury.  There's no one else that has that information that really

6  shows that Mr. Tate was completely not involved with the facts

7  that the government says amounted to crimes.

8         And the important part here is what the government

9  says amounts to the crimes, and that's the payments to ICT and

10  knowing that the payments were going to ICT and then on to Kent

11  Sorenson, not the fact that Mr. Sorenson was ever paid.  It's

12  completely legal to pay Mr. Sorenson.  There's never been any

13  argument to the contrary.  What the government alleges was the

14  crime was those payments to ICT.  On that and Mr. Tate's

15  knowledge of what ICT was, Mr. Kesari has the information for

16  that that is exculpatory in this case as well as what led up to

17  that.

18         Indeed, Your Honor, Mr. Kesari does want to testify

19  that on the night Sorenson endorsed Mr. Paul, Mr. Tate was told

20  that Sorenson had not been promised anything in return for his

21  endorsement and Sorenson was endorsing Ron Paul just because he

22  wanted to because his friends were with Ron Paul.

23         THE COURT:  And that would have been that 12/28 date

24  that we were talking about?

25         MR. BINNALL:  Yes, December 28, 2011, Your Honor.

1            Mr. Kesari will testify in a severed trial that there

2  was no deal in place to pay Mr. Sorenson at the time

3  Mr. Sorenson endorsed Congressman Paul.  Mr. Kesari will testify

4  that he did not tell Mr. Tate about the $25,000 check drawn on

5  the jewelry store, which is actually owned jointly by Mr. Kesari

6  and his wife, that was given to Mr. Sorenson.  Mr. Kesari will

7  testify that he has no recollection of ever telling Mr. Tate

8  anything about the $25,000 wire or its purpose.  He will testify

9  that there's no deal to pay Mr. Sorenson until January of 2012.

10  Mr. Sorenson -- Mr. Kesari will testify that Mr. Sorenson told

11  Mr. Kesari that he could be paid through a third party because

12  that is how the Bachmann campaign lawyers said it could be done,

13  but that Mr. Kesari never passed any of that information on to

14  Mr. Tate.  Mr. Kesari never passed any information about ICT or

15  any methods of payment at all to Mr. Sorenson and none of that

16  information was passed on to Mr. Tate.

17            Mr. Kesari does not recall ever telling Mr. Tate

18  anything about payments to Sorenson other than those e-mails,

19  nor does he recall ever telling him the details of how the

20  payments were made or how they would be reported to the FEC.  In

21  fact, the only instances that Mr. Kesari recalls communicating

22  anything to Mr. Tate are the e-mails that the court just saw

23  from Mr. Warrington.  And it's important to know that at no

24  point does Mr. Kesari say in any of those e-mails what ICT is

25  and specifically that ICT isn't a company directly involved with

1   Mr. Sorenson.

2          In campaigns its normal for people to be paid in a

3   corporate entity.  A consultant usually has a corporate entity

4   set up, so it's not unusual for a particular consultant to have

5   a business involved in the payment arrangement, and Mr. Kesari

6   never, to speak his testimony, told Mr. Sorenson -- or I'm

7   sorry, Mr. Tate that ICT was not directly involved with

8   Mr. Sorenson.

9          Mr. Kesari wants to testify, and he will testify if

10  this case is severed, if he can do so without giving up his

11  right not to be a witness against himself at his own trial.  He

12  is quite upset that Mr. Tate has been brought into this because,

13  again, Mr. Tate is not only legally innocent, Mr. Tate is

14  factually innocent.

15         And we ask the court not put exculpatory information

16  outside of the reach of an innocent man, and we ask that the

17  motion to sever be granted.

18         I'm happy to answer any questions from the court.

19         THE COURT:  Okay.  Are there limitations on

20  Mr. Kesari's willingness to testify on behalf of Mr. Tate at

21  trial?  For example, I'm assuming that based on your comments

22  that there may be a timing issue in terms of how the trial is

23  played out.  Is that a correct assumption on my part?

24         MR. BINNALL:  Not exactly, Your Honor, but

25  effectively.  And let me explain that.

1          I've been pretty clear on this going back to November.

2   We want to exercise Mr. Kesari's speedy trial rights.

3   Mr. Kesari has been continuously under the cloud of this

4   indictment since August, and we want to get him to trial.  He is

5   the only one in this case that has been under indictment since

6   August continuously.  I think his speedy trial rights, however,

7   are the most important to protect, and we want to go first

8   primarily for that reason.  We are not putting a condition on

9   what order the trials happen as far as Mr. Kesari testifying

10  regarding the severance; but that being said, we do insist on

11  our speedy trial right.

12          THE COURT:  All right.  But if it turned out that

13  Mr. Kesari's trial went second, would Mr. Kesari still be

14  willing to testify on behalf of Mr. Tate?

15          MR. BINNALL:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  I don't think I have

17  anything further for you at this time.

18          MR. BINNALL:  Thank you, Your Honor.

19          THE COURT:  I may have something after I hear from the

20  government, but for now I appreciate that.

21          MR. BINNALL:  Very well.

22          THE COURT:  Thank you.

23          All right.  Mr. Cooney, you're up.

24          MR. COONEY:  Thank you, Your Honor.

25          May I have just a moment to get things ready here?

1              THE COURT:  You may.

2              MR. COONEY:  Thank you very much.

3              (Pause.)

4              MR. COONEY:  Your Honor, if I may.  I would like to

5    just hand up to Your Honor and provide copies to the defense of

6    some exhibits I would like to use.  I'm not going to use them

7    right at this moment, but I feel like if I can distribute them

8    now, I can move through the argument a little more efficiently

9    if that's all right.

10             THE COURT:  That will be fine.

11             MR. COONEY:  Thank you.

12             So if I may hand up to Your Honor Government's

13   Exhibits -- I'm going to use letters for a reason I'll explain

14   in a moment, but Government's Exhibits A, B, and C.

15             Government's Exhibit A is a proffer agreement entered

16   into between Dimitri Kesari and the United States.

17             Government Exhibit B is an FBI 302 of an interview

18   conducted on March 26, 2014 by FBI agents of Dimitri Kesari

19   pursuant to the terms of that proffer agreement.

20             And then Government's Exhibit C is a copy of some

21   PowerPoint slides that I would likely use during the

22   presentation.

23             And I would just like to say with regards to the FBI

24   302, it would be my request -- I don't know if -- I do not know

25   if the defendants would have a different position.  Maybe we can

1  discuss that at the end of the hearing; but my request is that

2  not be filed on the public record.  It is subject to a

3  protective agreement, and so I think the 302 itself should not

4  be filed on the public record, although I do intend to use it

5  throughout the course of this hearing.

6          May I pass these documents up?

7          THE COURT:  Yes, you may.

8          (Counsel conferring.)

9          MR. COONEY:  The interview itself was in January of

10 2014.

11         MR. BINNALL:  And, Your Honor, just for the record, we

12 do object to any use of the 302, the notes of the officer,

13 pursuant to the terms of the proffer agreement at this point.

14         THE COURT:  So if I'm understanding you correct,

15 you're objecting to it because it violates the proffer

16 agreement?

17         MR. BINNALL:  Yes, Your Honor.

18         MR. COONEY:  So I'll start with that issue if I may,

19 Your Honor.

20         Well, actually if I could just go forward with my

21 argument, I'm happy to address that when I reach the point that

22 I would like to use information from that 302 if that's all

23 right.

24         THE COURT:  That's fine.  I'll just hang on to it for

25 now and we'll make a determination what we're going to do with

1  them at the end.

2          MR. COONEY:  Thank you.

3          So, Your Honor, I think the law has been set forth.

4  It is the burden of defendant Tate to show that this is

5  substantially exculpatory.  I don't think there's a dispute

6  about that.  And as we set forth in our original opposition to

7  the motion to sever, what the case law says about that is merely

8  giving the defendant a better chance of acquittal or merely

9  impeaching some of the government's evidence is not sufficient.

10  It must go substantially beyond that.

11          And there were a lot of arguments made over the course

12  of defendant Tate's argument about what the documents mean, what

13  inferences can be drawn, a lot of arguments about the evidence.

14  But what there wasn't a lot of argument about is how

15  specifically defendant Kesari's testimony would further those

16  arguments, and that with respect to the substantially -- the

17  allegedly substantially exculpatory nature of his testimony,

18  that's what the court needs to evaluate.

19          So what I want to talk about today is set up some

20  context for evidence that the government will present at trial

21  with respect to the December 2011 deal between Sorenson and the

22  Paul Campaign and the subsequent payments that were made to him

23  throughout the course of 2012 up until the time that on June 25,

24  2012 that the e-mail that you were shown in which defendant

25  Kesari tells defendant Tate what ICT is and defendant Tate

1   approves that last, I think it's $8,800 payment to ICT.

2          And then what I would like to do is take a look at

3   what defendant Kesari has already said about those subject

4   matters in a proffer with the government on January 9, 2014,

5   because to evaluate the reliability of this testimony and the

6   substantially exculpatory effect or allegedly substantially

7   exculpatory effect, the court should have the benefit of knowing

8   what he has already said and how his prior statements are

9   inconsistent with what he now is coming forward to the court to

10  say I would like to say at a trial.

11         And, furthermore, by showing you that context and that

12  background, I believe that holding aside his prior inconsistent

13  statements, what it shows is nothing that Mr. Kesari would

14  actually -- that he proposes to testify in trial would actually

15  exculpate defendant Tate.  At best it might impeach otherwise

16  incontrovertible documents that memorialize contemporaneous

17  conversations between defendant Tate, defendant Kesari, and

18  defendant Benton.  And that's one thing that is so important

19  that I really want to kind of focus on, too, about defendant

20  Tate's argument about the government case is strung together on

21  nothing but documents.

22         E-mail communications are statements.  They are

23  conversations.  They are not live witnesses, but they are better

24  than that because the e-mails that the government will present

25  in trial and some of which have already been shown and that I

1  intend to talk about during this argument are contemporaneous

2  communications from the mouths of these defendants back and

3  forth between each other.

4         So I would like to turn to first some of the

5  documentary evidence in the case and in particular turn to the

6  December 2011 agreement between the Paul Campaign and Sorenson

7  for payments in return for an endorsement.

8         And if I could back up, too, and just make one kind of

9  overarching, the way I intend to kind of organize these is the

10 way I see -- based on the proffer that's been given, it's still

11 a little bit unclear to me what it is that defendant Kesari

12 would testify to, other than I believe he would say that he had

13 no conversations about payments or endorsements with defendant

14 Tate, that no deal was reached until 2012, that he never told

15 defendant Tate what ICT -- you know, what its purpose was or

16 what those payments were.  But I think that essentially they

17 move into kind of three broad categories, and this is

18 actually -- I'm quoting this from the original severance motion,

19 but the first -- they all go to three kind of evidentiary

20 points.

21        The first is that the claim that Tate was not aware of

22 any agreements or plans to pay Kent Sorenson at the time that he

23 switches his endorsement; the second that Tate was not involved

24 in or even aware of any subsequent plans or agreements or any

25 details thereof for the Ron Paul Campaign to pay Kent Sorenson;

1  and then, third, that John Tate was first made aware that

2  payments to ICT were related to Kent Sorenson on June 25, 2012.

3  I think those are the three categories that he claims that

4  Kesari's testimony would assist him, and I think the documentary

5  evidence alone negates that, but particularly as well Kesari's

6  prior statements on these subjects negate that.

7           So if I could start with the first category, that the

8  claim that Tate was not aware of any agreements or plans to pay

9  Sorenson at the time he switched his endorsement, the reason why

10  I lettered those exhibits, Your Honor, is that I'm going to put

11  up on the screen, I think, a series of documentary exhibits that

12  have numbers, and the numbers are exhibit numbers that were used

13  at the prior trial.  So I'm going to stay consistent with the

14  prior trial so there's no confusion about what these documents

15  are.

16           (Pause.)

17           MR. COONEY:  Where can we test it?

18           THE COURT:  We'll see if we can get IT up here as

19  well.

20           (Pause.)

21           THE COURT:  Chris, could you see if you can help these

22  guys?

23           MR. COONEY:  Thank you, Your Honor.  Thank you very

24  much, Chris.

25           (Pause.)

1            THE COURT:  We just had something.

2            MR. COONEY:  There we go.  Something happened.  There

3    we go.  I'm sorry.

4            All right.  Can you see this, Your Honor?

5            THE COURT:  I can.  Would you hang around for a

6    second.

7            Now I can't.  It's flicking in and out.

8            MR. COONEY:  If I have to, I can do it with the Elmo

9    if this doesn't --

10           THE COURT:  It stays on but then it goes off.

11           MR. COONEY:  Right.

12           (Pause.)

13           MR. WARRINGTON:  Your Honor, I'm happy with paper.

14           THE COURT:  All right.  We'll see if it works this

15   time.

16           Well, that's a nice picture of your son.

17           MR. COONEY:  Thank you.

18           I'm not trying to use it to my advantage, but he's got

19   a nice swing.

20           We'll do it hard copy, that's fine.

21           THE COURT:  That's fine.

22           MR. COONEY:  Can we switch to the Elmo, please?

23           Thank you.

24           So I'll forego the first exhibit I was going to show,

25   which is Government's Exhibit 133, because I think we can, which

1  that is the $25,000 check on December 26th that was paid by

2  Designer Goldsmiths, Inc. -- or payable on Designer Goldsmiths,

3  Inc. check -- that's a jewelry company -- that Mr. Kesari

4  provided to Kent Sorenson during their dinner.  So that check

5  was paid on December 26th.

6          Now, on -- I'm going to move to Government's Exhibit

7  37.  This is an e-mail on December 27th.  That e-mail chain

8  begins on December 27th in an e-mail from Dimitri Kesari, and

9  the e-mail states, hold the release.

10         That reference, Your Honor, is to a press release

11 announcing that Sorenson is going to endorse Ron Paul, that he's

12 going to switch from the Bachmann Campaign to the Paul Campaign.

13 It says, Kent is getting cold feet.  He wants to meet with me in

14 about two hours.  Any advice?

15         And, damn, I was afraid of this.

16         Jesse Benton responds on the e-mail with Dimitri

17 Kesari, John Tate, Gary Howard, the press officer who's

18 responsible for releasing the press release, Benton states, I am

19 not interested in this game anymore.  Dimitri, pull the offer.

20 Pull the offer.  If we can't depend on him, I don't want him

21 involved.

22         So December 26th, $25,000 payment.  December 27th, an

23 e-mail that John Tate is on, pull the offer.  The offer is a

24 reference to the payment for Kent Sorenson's endorsement.

25         Government Exhibit 39, that same day, December 27th,

1   Gary Howard pulled off of the e-mail chain, the press officer.

2   Jesse Benton starts by saying to Tate and to Kesari, in all

3   seriousness, I am not sure -- typo error there; I am not sure

4   what to do about this.  The DMR -- that's the Des Moines

5   Register -- has his statement, I sent last night since Kent said

6   he was comfortable.  Mary Stegmeir -- that is the reporter --

7   won't check e-mail until 12/28, but she has it.

8           And then Benton sends another e-mail, I am tempted to

9   say this is hard ball time.  I'm reading through the typos as

10  you can see there.  Either he honors his commitment or we have

11  to expose him as the money-grubbing shakedown artist that he is.

12          Now, one thing that I want to point out for Your Honor

13  that I think is important as to this issue about whether this

14  claim that Kesari will testify that he never told Tate anything

15  about the $25,000 check is that there's significant background

16  here that I won't walk through e-mail by e-mail, but in October

17  of 2011, beginning in October of 2011, a representative of

18  Sorenson reached out to the Paul Campaign offering to trade

19  Sorenson's endorsement in return for a series of payments,

20  including a PAC contribution and a number of other things.  The

21  e-mail chains make explicitly clear in there that John Tate was

22  fully aware of that back and forth.  He is involved in that back

23  and forth between Benton, Kesari, and the Sorenson camp with

24  respect to the fact that on the table was this request from

25  Sorenson to be paid.

```
1              THE COURT:  Is he either a recipient or a sender of
2    some or all of those e-mails?
3              MR. COONEY:  He is both, he is both.
4              THE COURT:  Okay.
5              MR. COONEY:  And, in fact, let me turn to one in
6    particular, a November 15, 2011 e-mail, Government's Exhibit 17,
7    which relates to that, to this back and forth.
8              THE COURT:  Did you say that was 17?
9              MR. COONEY:  November 17 (sic).
10             THE COURT:  Government's Exhibit 17?
11             MR. COONEY:  Government's Exhibit 17, correct.
12             THE COURT:  Okay.
13             MR. COONEY:  Excuse me, November 15, 2011.  I said
14   Government's Exhibit 17.  The date of the e-mail is November 15,
15   2011.
16             There was these other e-mails, the e-mails regarding
17   the proposal from Sorenson for the payments.  There was a lot of
18   concern by the members of the Paul Campaign about this, and I
19   think that fairly the e-mails demonstrate that they were angered
20   by it because he was asking for a lot of money and they viewed
21   it as an extortion request; but they pursued his endorsement
22   nonetheless.  They engaged in conversations with him regarding
23   that, and those conversations continued all the way up until the
24   $25,000 payment on December 26th.
25             And here is just one e-mail from John Tate.  I'm
```

1   pointing at it now, Your Honor, November 15, 2011.  This is on a

2   chain regarding whether Kesari should speak with Sorenson.  And

3   it's John Tate that chimes in and says, Dimitri, make sure you

4   talk to Jesse about how we want to do this and what you are

5   supposed to say.  We need to be very careful.

6          Again, in the context of Sorenson wanting payments in

7   return for his endorsement, Tate being aware that that was one

8   thing that he wanted, and the Paul Campaign actively pursuing

9   that endorsement nonetheless.

10         Now, going back to December.  So I showed Government's

11  Exhibit 39 with the reference to the money-grubbing shakedown

12  artist that he is, the point is -- I'll put that back up, that's

13  the December 27, 2011 -- it illustrates that money is on the

14  table here, money is on the table.

15         And now we go back to the chronology that was

16  discussed.  December 28th, Sorenson endorses Ron Paul.  That

17  same night the Bachmann Campaign begins to make accusations that

18  he switched allegiances in return for money, that he was paid

19  for his endorsement.

20         Government's Exhibit 63.  This begins with a

21  December 28 e-mail, so that's the day of the endorsement.  Two

22  days after providing the $25,000 check, after Kesari provided a

23  $25,000 DGI check, he writes an e-mail to Fernando Cortez,

24  that's the controller for the Ron Paul Campaign, cc'ing Benton

25  and Tate, I will need a wire for $25,000 first thing in the

1   morning.  Jesse has approved.  I will get you the wire info

2   tonight.  Could you send me the form?

3            That's at 7:36.

4            1:38 the next day, December 29, John Tate:  Yep

5   approved.  John Tate.

6            Government Exhibit 64.  Now, remember the "yep

7   approved" e-mail was at 1:38 p.m. -- excuse me, Mr. Pilger just

8   corrected me, 1:38 a.m.; I'm sorry.  The time chronology is

9   going to get more important here in just a moment, 1:38 a.m.

10           The next afternoon, 2:30 p.m., Jesse Benton sends an

11  e-mail out to Cortez, cc'ing Kesari and Tate.  This is in

12  response to an e-mail that Cortez had sent a little bit further

13  down here saying, if you want to get that wire out today, we're

14  going to need the information.  We've got about 40 minutes left

15  essentially is what he's saying.

16           Benton:  Hold for a couple days.

17           Now, the context here on December 29th is that the

18  press accounts are heating up.  This goes to the other e-mail

19  that I showed beginning on the 27th where the Des Moines

20  Register begins to have this information.  They are getting

21  questions from the press, was this guy paid, allegations from

22  the Bachmann Campaign are heating up and are actually going

23  national at this point.

24           John Tate within just a couple of minutes says, yep,

25  we are going to.  That's at 2:32 p.m.  That's this e-mail here.

1    That's John Tate.

2            Dimitri Kesari, 4:03 p.m., about an hour-and-a-half

3    later, we are holding till after the filing.

4            That, Your Honor, is a reference to the FEC filing.

5    This e-mail is from Dimitri Kesari.

6            That same day, December 29th, Kent Sorenson goes on

7    national television, Fox News.  He is interviewed by Megyn Kelly

8    about the allegations that the Bachmann Campaign -- by the

9    Bachmann Campaign that he's been paid for his endorsement.  He

10   says, no, it didn't happen.  Check the FEC reports.  You can

11   check the FEC reports.

12           Of course, this is acknowledged a couple of days

13   before the end of the year for the cutoff for what's going to be

14   reported in the next filing.

15           So Kesari says on December 29th, we're holding until

16   after the filing.  And that e-mail importantly was at 4:03 p.m.,

17   we're holding until after the filing.

18           Government's Exhibit 67, the version I'm putting up is

19   the same e-mail that was shown by defendant Tate.  It's a

20   redacted version because this was the version that was presented

21   at trial by agreement of the parties; but this is the same

22   e-mail.  I just don't want the court to think I'm hiding

23   anything.  This is the same e-mail where Cortez in the redacted

24   portions down here writes, we've got these series of payments,

25   and he writes, 25k Dimitri mystery wire.

1          John Tate -- this is at 6:41 p.m.  This is two hours

2   after he receives an e-mail from Kesari saying, I don't want

3   this showing up on this quarter's filings.  He says, thanks.

4   There will not be the 25,000 Dimitri wire for now.  Wipe it off

5   the books.

6          THE COURT:  And when did that filing occur?

7          MR. COONEY:  The filing itself?

8          THE COURT:  Yes.

9          MR. COONEY:  I'm going to need to confer with

10  Mr. Pilger; but what is important about the dates here is that

11  for that quarter's filings, everything was brought up until the

12  end of the year.

13          THE COURT:  End of the year.

14          MR. COONEY:  So if you postpone the payment until the

15  next quarter, then it's going to make the next filing; but

16  that's what's significant about the date itself.

17          THE COURT:  So as long as the payment is not made in

18  2011, it wouldn't show up on that FEC filing?

19          MR. COONEY:  That's exactly right, that's exactly

20  right.  And the claim of that I do want to make clear, though,

21  is we're not -- part of our criminal case against the defendants

22  is not by, for example, withholding a payment until the next

23  quarter that that creates a false FEC filing.  Our claim is that

24  the payments to ICT which were dubbed audiovisual expenses

25  concealed the Sorenson payments creating a false filing in the

1  subsequent filing periods.

2          THE COURT:  Yeah, I understand.

3          MR. COONEY:  All right.

4          THE COURT:  You're just telling me so I understand

5  some of the timing issues of the evidence.

6          MR. COONEY:  Yes, that's exactly right.

7          THE COURT:  All right.

8          MR. COONEY:  So right now it's -- whether they've

9  figured out how they're going to make payments to ICT, how

10  they're going to route them and whatnot, that's not really part

11  of the case as terms of the evidence; but what is clear from

12  this is we don't want anything showing up on FEC reports about

13  Kent Sorenson.  That can't happen.

14          So with that context then, I want to turn now to the

15  proffer that Kent -- or excuse me; the proffer that defendant

16  Kesari made on January 9, 2014 to the government.  So I think on

17  that the first thing I'll address is Mr. Binnall's objection to

18  the use of that proffer agreement on the basis that it is in

19  violation of the proffer agreement.

20          I hand up the proffer agreement as Government's

21  Exhibit A.  What I would simply point out about the government's

22  proffer agreement with Mr. Binnall is first and I think

23  principally and most importantly is an agreement between

24  Mr. Binnall that we will not use any statements that he made

25  during the proffer session in our case in chief in a criminal

1    prosecution against him.  I'm not introducing or attempting to

2    use any of these proffer statements today against him.  I'm

3    using these proffer statements in opposition to defendant Tate's

4    severance motion.  Regardless of whether Kesari was here at the

5    table today, Kesari was in the case, that would be a permissible

6    use of these proffer statements.

7             Second, and most importantly, the instances in a

8    trial -- and this is a pretrial hearing; but the instances in

9    this trial in which the government could utilize proffer

10   statements are when Kesari himself testified and said something

11   inconsistent with what he said at the proffer or if they

12   presented evidence inconsistent with his proffer statements.

13            The way which I'm using these statements today I think

14   strikes right at the heart of the permissible purpose of them,

15   which is to contradict.  He's now saying that I'll testify that

16   we didn't have any conversations about what the $25,000 was for,

17   that there was no agreement with Sorenson until January 2012.

18   He makes inconsistent statements on these subjects, statements

19   inconsistent with those claims during his January 9, 2014

20   proffer.

21            So before I -- I don't know if Your Honor wants to

22   hear arguments from Mr. Binnall or not before I start to move in

23   to explain the statements, but --

24            MR. BINNALL:  I would like to be heard, Your Honor.

25            THE COURT:  Why don't you come up here, Mr. Binnall,

1   so we can make sure we can hear you for your record.

2           MR. BINNALL:  Yes, Your Honor.

3           THE COURT:  Thank you.

4           MR. BINNALL:  Your Honor, this is the same proffer

5   agreement with a different party that the government has already

6   had its case against Mr. Kesari's two co-defendants thrown out

7   and dismissed because of the government's misconduct in

8   violation of their proffer agreements, and now they're trying to

9   do the same thing with Mr. Kesari.

10          The idea that it's limited to only being brought --

11  their particular argument regarding that the timing has already

12  been rejected by Judge Jarvey who found that the use of the

13  statements in grand jury was a violation of the proffer

14  agreement.  And on top of that, Your Honor, Mr. Kesari is still

15  a part of this case.

16          If the government wants to agree to the severance now

17  and then only use it in regards to the severed case with

18  Mr. Tate, that would be fine; but as of right now, the case is

19  not severed, and so it still is being put in for all purposes

20  against Mr. Kesari, and paragraph 5 of the proffer agreement

21  specifically says that if they are offered, it will be at trial

22  or sentencing, not at a pretrial motion.

23          It is the government who drafted this language.  They

24  are strictly held to the proffer agreement, and they should not

25  be able to breach it as they did Mr. Kesari's co-defendants

1   previously.

2          THE COURT:  I'm going to at this point just accept the

3   exhibits subject to the objections so we can go ahead with

4   today's arguments, and then I'll make a ruling as part of the

5   ultimate ruling on the motion to sever with respect to the usage

6   of those.

7          MR. COONEY:  May I reply on one point on that?

8          THE COURT:  You may.

9          MR. COONEY:  It is correct that Judge Jarvey dismissed

10  counts in this case because of the government's use of proffered

11  statements before the grand jury, and the gravamen of that

12  opinion was that the government should not have used statements,

13  proffered statements used -- or made by Mr. Tate against him in

14  the grand jury, that we should not have used statements that

15  Mr. Benton proffered to against him in the grand jury.  That was

16  the gravamen, the direct use against those individual

17  defendants.  The gravamen of that opinion was not Mr. Kesari's

18  proffered statements, for example, could not be used against

19  Mr. Tate in the grand jury or could not be used against

20  Mr. Benton in the grand jury.

21         So I think, first of all, use in the grand jury is

22  significantly different than use in a severance hearing; but I

23  go back to specifically, you know, where I started.  These are

24  being used to defeat a severance motion by defendant Tate, not

25  by defendant Kesari, and they're not being used as substantive

1    evidence.  They're being used much differently in this hearing

2    to rebut claims about what Kesari might testify to.  Paragraph 5

3    of the government's proffer agreement simply references

4    substantive evidence.

5            So going forward then with the statements, the first

6    thing that I would like to draw the court's attention to -- you

7    know what, Mr. Binnall could I trade you?  I don't have a full

8    size copy.

9            MR. BINNALL:  No, that's fine.

10           MR. COONEY:  Thank you.  I appreciate that.

11           I'm actually going to move to the last slide.  This is

12   Government's Exhibit C for the record.  And I just want to point

13   out some things that defendant Kesari did not say during his

14   proffer, significant omissions which undercut this and I think

15   will be filled in when I show Your Honor what he did say during

16   the proffer; but Kesari never said that Tate did not know that

17   the campaign agreed to pay Sorenson for his endorsement, never

18   made that claim during his proffer.

19           He did not say that he and/or Jesse Benton hid

20   information from Tate about the Sorenson payments from Tate or

21   that he ever lied to him about it.

22           Kesari did not say that Tate ever objected to paying

23   Sorenson, either in December 2011 or after the June 25, 2011

24   e-mail exchange where within one minute of Kesari's

25   clarification about ICT Tate approved the payment.  And while

1    I'll get to that June 25, 2011 e-mail, I kind of want to set the

2    stage.  Those are things that were not said during the proffer.

3    And now I want to show Your Honor some of the things that were

4    said.

5            If you go to page, I believe it's page 2, Kesari's

6    statements inconsistent with Tate not knowing about the December

7    Sorenson deal.  And I have a mistake on here, Your Honor.  I

8    apologize.  I say quotations from the FBI 302 of March 26, 2014

9    interview.  It was January 9, 2014 interview.  The report was

10   written on March 26th.  But if you turn to page 4 of the 302, so

11   what I'm putting up on these slides are just quotes from the

12   302, the 302 reads:  Kesari did most of the negotiation as he

13   was the middleman -- "middleman" was his word; that's why it's

14   in quotations there -- for the Ron Paul for President Campaign

15   senior management.  He said, Tate did not see the value Sorenson

16   could bring to the Ron Paul Campaign.  Benton wanted Sorenson's

17   support because we all thought any bit would help.

18           And then importantly, Ron Paul was not aware of any of

19   the details regarding Sorenson joining his campaign as he had

20   nothing to do with the day-to-day operations and staff members.

21           So what Kesari tells the FBI is, look, I did the

22   negotiating as the middleman, Tate not as on board, didn't think

23   it was that important.  Benton thought it was more important.

24   Ron Paul did not know any of the details.  He did not know any

25   of the details.  What Kesari doesn't say importantly is that

1    Tate doesn't know details or Benton doesn't know details.  It's

2    Ron Paul that doesn't know the details.  Kesari is doing the

3    negotiation as the middleman between him, Sorenson, and the Ron

4    Paul Campaign senior manager.

5         If you turn to the next page, this is on page -- we'll

6    start with page 7 of the 302.  This is Kesari.  Quote:  The

7    deal -- and deal is in quotes.  That's because it was his word.

8    Of course, the 302 is a summary of his interview prepared by

9    Special Agent LoStracco, but deal is his word.  The deal of

10   12/26/2011 -- that's the $25,000 check -- and 12/29/2011 --

11   that's pull the wire; i.e., we'll make the payments later on --

12   was understood.  Kesari and his team already knew and agreed on

13   Sorenson's terms.

14        That is wholly inconsistent with his claim, one, that

15   he never discussed this with Tate, but it's also wholly

16   inconsistent, two, with his proposed testimony now that there's

17   no deal reached with Sorenson until January of 2012.

18   Specifically in his proffer he states, the deal of 12/26 and

19   12/29, 2011 was understood.

20        Page 9, Kesari states, Drew Ivers, the Ron Paul

21   Presidential Campaign Committee Iowa co-chair and other

22   co-chairs were aware Sorenson was joining the Ron Paul Campaign.

23   They just knew he was joining the campaign but did not know any

24   details regarding it.

25        The reason why this is so important, Your Honor, is

1   that it goes to the omission, the impeachment by omission of

2   Kesari's now claim that he never had conversations about this

3   subject with John Tate.  Nowhere in his proffer on January 9,

4   2014, did he ever make that claim; but he made very specific

5   claims about who did not know that information.  For example,

6   Drew Ivers.  For example, Ron Paul.  And that proffer, Your

7   Honor, was a proffer that extended more than four hours.  It's a

8   14-page 302.  That was not a 30-minute interview.  It was

9   extensive and topics were covered repeatedly if you look at the

10  302 and cover from beginning to end.  And on more than one

11  occasion, as memorialized in that 302, defendant Kesari was

12  explicitly provided the opportunity to change anything he said,

13  make additions, amend anything, what have you, did not take that

14  opportunity, never made a claim that Tate was not in the know.

15          And then page 11 -- I think this is important, and

16  this is consistent with the e-mail traffic -- he says, mostly,

17  mostly, Kesari, Benton, and Sorenson discussed Sorenson joining

18  the Ron Paul for President Campaign.  And e-mail traffic is I

19  think generally consistent with that, mostly Kesari, Benton, and

20  Sorenson.

21          But that's not only those people.  That's not John

22  Tate didn't know.  That's not John Tate wasn't involved.  And

23  that's so important in the context of other explicit statements

24  during that interview, during that proffer session about who is

25  in the know and who was not in the know.

1          All right.  I want to move now kind of categorically

2  to the second big picture claim by the Benton camp -- excuse me,

3  by the Tate camp about what Kesari's testimony would show, that

4  John Tate was not involved in or even aware of subsequent plans

5  or agreements or any details thereof for the Ron Paul Campaign

6  to pay Kent Sorenson and the claim that there was no

7  conversation about what ICT was in that January 2012 period up

8  until June 25, 2012.

9          So, first, let's start with something that Kesari

10  said, so I'll go back to the PowerPoint.  For the record, that's

11  Government's Exhibit C.

12          And I have to admit, I apologize, I've lost track of

13  what page I am on the PowerPoint.  I think there's only seven

14  pages on the PowerPoint, so this is probably about page 5, but

15  it's from page 10 of the Kesari proffer.  Kesari states, Kesari

16  did not know how much Tate knew about Sorenson's invoices since

17  Kesari was talking to Benton about this matter.

18          That is an inconsistent statement with the claim that

19  he didn't know because I never told him.  Defendant Kesari can't

20  come in and testify as to what Tate knew and when he knew it

21  when he makes a statement on another date, Kesari did not know

22  how much Tate knew about Sorenson's invoices since Kesari was

23  talking to Benton about this matter.

24          But here is what we do know about February 7, about

25  that time period, February 7, 2012.  Government's Exhibit 74,

1    and this is one that defendant Tate attempts to rely on in

2    support of the statements.

3          On February 7, 2012, Government's Exhibit 74, Kesari

4    e-mails Tate, did Jesse get Kent paid?  He said he would handle

5    it and Kent is texting me today.

6          John Tate responds, no idea.  Ask him.

7          If defendant Kesari never spoke with John Tate about

8    paying Kent Sorenson, about a deal, a payment in return for his

9    endorsement, that the campaign was paying him anything at all,

10   what is he doing in February 2012 sending an e-mail to Tate

11   asking him if Jesse had gotten Sorenson paid?  If Tate is not in

12   the know, there's no reason for Tate to send an e-mail to him.

13   That is inconsistent with what he is proffering today he would

14   testify to in a trial.

15         Subsequent to that e-mail, Government's Exhibit 84a,

16   John Tate approves an invoice for a payment to ICT on April 3,

17   2012.

18         On May 29, 2012, Government's Exhibit 95 -- and I can

19   put these up for Your Honor, but they do not discuss what ICT

20   is.  These are simply just memorializing for the record that

21   he's approving payments in the spring of 2012.  Government's

22   Exhibit 95 --

23         THE COURT:  Just a second.

24         Mr. Warrington?

25         MR. WARRINGTON:  Your Honor, I think it would be

1   helpful to put them up since they don't discuss ICT.

2          THE COURT:  If you've got them available, why don't

3   you put them up.

4          MR. COONEY:  Sure.  That's right, they don't, they

5   don't.  So let me put another one up, Government's Exhibit 59.

6          THE COURT:  59?

7          MR. COONEY:  Yes, ma'am.

8          THE COURT:  Okay.

9          MR. COONEY:  An e-mail from Fernando Cortez to Tate

10  and Benton, and a reminder, kind of setting the stage here about

11  who is who in the campaign; but Tate and Benton are, in terms of

12  their role in the campaign, senior to Dimitri Kesari and are the

13  two most senior people in the Ron Paul Presidential Campaign.

14  So Cortez on February 22, 2012 sends an e-mail to Tate and

15  Benton and he says -- attaches a spreadsheet -- here is the full

16  breakdown of the expenses since January 1, 2012.

17         The spreadsheet attached -- let's see if you can see

18  that -- down here (indicating) contains a February 8, 2012

19  check, Interactive Communication Technologies, ICT, $38,125,

20  making it the most significant expense in that category and on

21  this spreadsheet the third highest expense on the spreadsheet.

22         MR. WARRINGTON:  Your Honor --

23         THE COURT:  Yes.

24         MR. WARRINGTON:  -- I hate to do this, but they're

25  showing one page of a spreadsheet that was rather large, and

1   they have no evidence or inference for taking this to open up

2   the Excel spreadsheet.  They're just slinging things together.

3          THE COURT:  Go ahead, Mr. Cooney.

4          MR. COONEY:  Thank you.

5          All right.  So here's the point, Your Honor, he gets

6   an e-mail, shows that ICT is on there.  Subsequent to receiving

7   that spreadsheet, John Tate, one of the senior most officials

8   responsible for approving payments, approves invoices on

9   April 3, 2012, on May 29, 2012 for payments to ICT.

10          Why is John Tate explicitly approving significant

11   payments if he does not know what those payments are for?  And

12   I'll show them Government's Exhibit 84a -- I'm sorry, that's in

13   the other binder.

14          Actually I'll use Government's Exhibit 84b.  This says

15   simply, attached is the invoice for services rendered in

16   February.  Let me know if you need anything else.

17          That is an e-mail from Sonny Izon to Dimitri Kesari.

18   Kesari passes it on to Cortez saying, approved by Jesse.  Cortez

19   checks with Tate.  Tate says approved.  It's a payment to ICT.

20   There's no discussion in the e-mail about what ICT is, no

21   discussion in there because John Tate doesn't need any

22   discussion of that.

23          Government's Exhibit 95, same situation involving a

24   wire.  There is a request for a wire payment to ICT for $8,850.

25   Cortez forwards it on to Tate:  Approved?  Dimitri said it is

1   the last one.

2          Tate:  Approved.

3          So this is the setup now for June 25, 2012.

4          Let's start with Government's Exhibit 102, same

5   situation.  Bottom e-mail, June 25, 2012, e-mail from a member

6   of the campaign, one of Cortez's employees, requesting an $8,850

7   wire to ICT.  Cortez e-mails Tate:  According to Dimitri this is

8   the last one (again).  Approved?  8 thousand.  And this is the

9   e-mail that Tate sends to Kesari:  What is this?  What is it

10  for, who is it?  Why do we keep paying them?  The last payment

11  was supposedly the last.

12         6:22 p.m.:  This the last payment for Kent Sorenson.

13  The deal Jesse agreed to with Kent.

14         That's not, let me explain to you exactly what ICT is.

15  That's a reminder, this is the deal that Jesse made with Kent.

16  This money is for Kent Sorenson.  That's at 6:22.

17         Government's Exhibit 103, same e-mail chain.  Now,

18  Kesari at 6:23 sends another e-mail in response -- there's no

19  response yet from Tate, but he sends an additional e-mail in

20  response to the original question by Tate about what this was.

21  6:23:  It was for 6 months, it was for 6 months.

22         One minute later, a minute later:  Okay.  Thanks.

23         Not more clarification needed.  Okay.  Thanks.  So he

24  has two e-mails.  It's money for Kent Sorenson and it was for

25  six months.  Okay.  Thanks.

1            Government's Exhibit 104, doesn't even take a minute,

2   John Tate to Fernando Cortez:   Approved.

3            Defendant Tate is correct about Government's Exhibit

4   102.  We got that e-mail from the computer of Dimitri Kesari.

5   We didn't get it from the Ron Paul server.  We didn't get it

6   from John Tate's e-mail.  Their claim is that there's no

7   evidence he ever saw it.  That evidence is consistent with that

8   e-mail, an e-mail identifying exactly what ICT is for, that it's

9   a passthrough for Kent Sorenson.  That is consistent with John

10  Tate deleting that e-mail.

11           The government has provided in discovery and called a

12  witness at trial to testify regarding this and will likely call

13  a witness to testify at trial again; but the Ron Paul server

14  uploads from individuals' computers who are using them on a

15  regular basis and it updates.  An individual that has a hard

16  drive and then stops using a computer, for example, does not

17  upload to the server, a local copy of the e-mail may be retained

18  in that person's computer; but when it's deleted from someone

19  else's computer who does roll up to the server, it may be gone

20  from the server.  If it's deleted from another device like a

21  Blackberry or an iPhone, it can be deleted.

22           That, Tate's argument, that's inconsistent.  Again

23  with that e-mail existing or him even seeing the e-mail about

24  what ICT is for, that e-mail is at least, at least equally

25  consistent with that e-mail being deleted.

1           And then, finally, Your Honor, what I would like to

2    turn to in terms of discussing the evidence is there is now,

3    which was not in the original moving papers but is a component

4    of the proffer about what Kesari will testify to, that Sorenson

5    told me that this is what they did in the Bachmann Campaign and

6    the Bachmann lawyers said that was okay.  Again, that

7    information never comes up in his proffer.

8           And I don't have a PowerPoint slide prepared on this

9    one, but I'll just point out for Your Honor where in the 302, in

10   Government's Exhibit B, I think there are pertinent statements.

11          First at page 2, just to kind of set up, Kesari says,

12   I presumed he reported to Guy.  That's Guy Short.  That is an

13   individual who consulted for the Bachmann Campaign.  Kesari knew

14   Sorenson was paid by C & M, Short's company, but did not know

15   when and how he came about receiving compensation from C & M.

16          So the background here is Guy Short has a political

17   consulting firm, works for the Bachmann Campaign.  Bachmann

18   Campaign pays Short's company, C & M.  And it was Kesari's

19   understanding that Sorenson reported to Guy Short and so Guy

20   Short paid Sorenson.

21          He says, I didn't know when and how he came about

22   receiving compensation from C & M.  I don't know details.

23          Page 3 of Kesari's proffer, that's Government Exhibit

24   B.

25          Kesari did not think he ever had a conversation with

1    Sorenson regarding the Federal Election Commission, FEC.  Kesari

2    stated -- and this part now is a quote from Agent LoStracco that

3    she put in the 302 -- none of us thought, hey, how are we going

4    to get around FEC disclosures or reports?  However, there were

5    conversations about the general public finding out Sorenson was

6    getting paid by the campaign.  Sorenson did not want to violate

7    the Iowa State ethics rules.

8             That is not a conversation of endorsement from the

9    Bachmann people, that he had conversations with the Bachmann

10   lawyers that this would be fine to do this on the FEC.  In fact,

11   he's saying we never discussed the FEC.

12            And then, finally, in his proffer he was asked

13   questions about whether he reached out for legal advice to the

14   Ron Paul Campaign.  And Kesari says, "Kesari did not ask

15   Warrenton" -- that is a misspelling.  That's with reference, I

16   think, to Mr. Warrington who at the time was a lawyer for the

17   Paul Campaign -- "for advice regarding Sorenson joining the

18   RPPCC.  Kesari stated:  'I would say I just told him about

19   bringing him [Sorenson] to the campaign.'"

20            And the point is this:  Nowhere in his proffer does he

21   make the claim that Sorenson told him that Bachmann's lawyers

22   said that this would be fine.  In fact, his statements are

23   inconsistent with that.  And he acknowledges he reached out to

24   his own lawyers.  He didn't seek legal advice or anything like

25   that; but it simply makes no sense whatsoever that he would have

1   done this on the authority of Bachmann's lawyers when he clearly

2   was in contact with the Paul Campaign lawyers but elected to ask

3   nothing about it.

4          So what's the point of all of this, Your Honor?  As we

5   set forth in our pleading papers, there is a very strong

6   presumption in the law for a joint trial.  Defendant Tate bears

7   a very high burden to overcome that.  It is all based on

8   Kesari's testimony, not a long explanation of all of the

9   evidence in the case, and we both know that.  We've traded barbs

10  about what these e-mails mean and what they don't mean, and

11  that's exactly what we're going to do in this trial; but not a

12  single thing to the extent there have been specific proffers by

13  defendant Kesari about what he might say when there wasn't a

14  deal until January of 2012, I never spoke about it with Tate, I

15  didn't tell him about ICT.  All these things do is merely an

16  effort to impeach otherwise incontrovertible documents, and

17  defendant's own statements, lengthy statements to the government

18  are littered with inconsistencies.

19         On that record he can't establish that defendant

20  Kesari's testimony, that him appearing in trial would be

21  substantially exculpatory to defendant Tate.  And, moreover,

22  they expose exactly what this is.

23         Based on all of the inconsistencies that I've just set

24  forth, defendant Kesari is not showing up to testify in a trial.

25  This is an effort to overcome the strong presumption in favor of

1  a joint trial.  It is an effort to simply obtain a severance of

2  this case, not to secure his testimony.

3          And, finally, I'll end in the same place that

4  defendant Tate did, which is, with respect to whether the

5  government was on notice and things like that, that's not my

6  point.  My point is this allegedly substantially groundbreaking

7  exculpatory testimony that defendant Kesari apparently wants to

8  provide for defendant Tate, the first time we ever hear he wants

9  to testify is the motion in this trial, not a motion before the

10 last trial when defendant Tate was a defendant all the way up

11 until the Friday before that trial was to begin, the first time

12 we ever hear defendant Kesari raise his hand and say, "I want to

13 come and testify," or defendant Tate raises his hand to say, "I

14 want to use Kesari as a witness" is after Kesari has already

15 gone through a trial one time, not on the eve of the first time

16 this trial began.

17          I think that helps here.  That is telling as to

18 whether this is substantially exculpatory or whether this is a

19 strategic point to obtain a severance.

20          Unless Your Honor has any questions --

21          THE COURT:  Just one.

22          MR. COONEY:  Yes.

23          THE COURT:  With respect to the exhibits that you gave

24 me, I would say that Exhibit C is not really an exhibit.  It's

25 more of a -- I mean, it's your argument.

1          MR. COONEY:  No; I agree, and that's fine.

2          THE COURT:  All right.

3          MR. COONEY:  It cites the pages in the 302.  I

4   completely agree, it should not be in evidence.  It is a

5   demonstrative, that is right.

6          THE COURT:  All right.  So I'm just going to keep it a

7   demonstrative exhibit similar to what I have with respect to the

8   PowerPoint presentation that defense counsel provided to me.

9   And as I indicated then, with respect to A and B, I'm accepting

10  those at this time subject to the objections until I have a

11  further opportunity to review that.

12                              (Government Exhibits A and B

13                              were received in evidence.)

14         THE COURT:  Thank you.

15         MR. COONEY:  Thank you.

16         And, Your Honor, I failed to mention one thing, that I

17  would encourage Your Honor to look at the Jackson case that

18  Mr. -- that defendant Kesari cited today, which I don't think is

19  in his moving papers; but there the district court's decision to

20  not grant a severance was affirmed, and I don't believe there

21  was any discussion about placing conditions on a proffer.  That

22  issue never really came up during this hearing today, I suppose,

23  but even the district court's decision to deny severance was

24  actually affirmed in that case.

25         The entire paragraph in the Jackson case is one

 1  paragraph.

 2          THE COURT:  Thank you.

 3          All right.  Mr. Warrington, can you give me just a

 4  second?

 5          Mr. Dickey.

 6          MR. DICKEY:  Yes.  Thank you, Your Honor.

 7          We take no position on the motion.  However, I would

 8  note that if the court does grant the motion, we would like an

 9  opportunity to be heard with respect to with which co-defendant

10  our case would be tried.  I think there's some important issues

11  with respect to the speedy trial.

12          THE COURT:  Okay.  Thank you, Mr. Dickey.

13          All right.  Mr. Warrington, you can respond.

14          MR. WARRINGTON:  No computer this time, Your Honor.

15          Let me first address the standard here because I think

16  a lot of what the government -- a lot of what the government

17  spent its time on had nothing to do with the standard in this

18  case.  We have to satisfy the burden that Mr. Kesari is likely

19  to testify.  You heard testimony from -- you heard the proffer

20  from Mr. Binnall that he is and is eager to testify if the trial

21  is severed and, secondly, that the testimony is exculpatory.  It

22  doesn't mean that it's not impeachable.  The government may have

23  arguments to impeach Mr. Kesari, but that is exactly the

24  situation where the Eighth Circuit said in the Starr case that

25  it was error to not sever the case when they had a co-defendant

1    who had testified in one manner incriminating a co-defendant in

2    front of a grand jury and then a month later testifying saying

3    he lied in that grand jury in testimony that was exculpatory to

4    the co-defendant.

5           So there was ample opportunity to impeach that

6    testimony, but the court, the Eighth Circuit said that it didn't

7    matter; you were preventing the defendant from having access to

8    testimony that basically said he wasn't involved in the crime.

9           So that's the first issue.

10          The second issue is, let me just kind of walk through

11   some of the things that Mr. Cooney represented for the

12   government.  He spent a lot of time talking about the Paul

13   Campaign's interest and Mr. Tate's interest in having

14   Mr. Sorenson's endorsement.  All of that stuff -- and I think

15   you can see from his PowerPoint presentation or his slides, all

16   of that stuff is pre 2012 discussion.  We don't deny, there's

17   never been a denial that the campaign and Mr. Tate was involved

18   in wanting Mr. Sorenson's endorsement and was even willing to

19   pay Mr. Sorenson what he was being paid for by the Bachmann

20   Campaign.  Keep in mind Mr. Tate is not charged with any pre

21   2012 conduct.  So none of this stuff in 2011, it might provide

22   background to the government's theory of the case, but it

23   certainly doesn't constitute evidence to satisfy any element of

24   the charges against Mr. Tate.  All of that stuff has to do with

25   is the misreporting of campaign expenditures that occurred in

1  2012.

2          So all of that pre 2012 conduct is really just

3  background.  And this is consistent with how the government

4  tried the case in the last trial is they tried to take that pre

5  2012 conduct and just smear it over things that occurred in 2012

6  in the spring and say that it was all part of one ongoing

7  conspiracy.

8          When they went -- when Mr. Cooney started talking

9  about the proffer session with regard to Mr. Kesari, I would

10 note that the question, the responses -- and everybody knows

11 that FBI 302s are notoriously not verbatim records.  There are

12 differences between what's in the handwritten notes of the agent

13 and the transcribed 302 that was transcribed nearly three months

14 later from when the interview occurred, and you can see some

15 inconsistencies there when, you know, they give great credence

16 to this notion that the team knew.  They don't know what -- they

17 don't reference what team they're talking about.  Mr. Kesari's

18 team on the campaign was Mr. Kesari and another person named

19 Jared Gamble.  It doesn't necessarily mean it was Mr. Tate and

20 Mr. Benton.  So that's unclear from the 302.  So they're not

21 really determinative of whether Mr. Kesari's testimony should be

22 credited or not, or proffered testimony.

23          But the most important thing with regard to the 302,

24 and it shows how the government has approached this case from

25 the very beginning because the most evident thing that leaps out

1   from you -- leaps out to me when I read these 302s is the

2   questions that the government did not ask.  Remember all of

3   these are responses to government questions.  The government

4   never asked the basic question that anybody who's been alive

5   since Watergate knows is what did the President know and when

6   did he know that.  They never asked that question.  They never

7   asked Mr. Kesari, what did John Tate know and when did he know

8   it?  They make certain assumptions based off of answers to other

9   questions, and that's where they build their entire theory of

10  the case.  They purposely did not ask those two questions.

11          So if they never ask those two questions, the fact

12  that they stand up here now and say he answered those two

13  questions by their crypt interpretation of what his statements

14  were just doesn't hold any water.  And regardless of that,

15  that's not the standard we need to meet here today, Your Honor.

16  All we need to show is that Mr. Kesari's testimony would be

17  exculpatory.

18          So Mr. Kesari will testify that he told Mr. Tate on

19  the night that Sorenson endorsed Dr. Paul that, one, there was

20  no deal in place to pay Sorenson for his endorsement; two,

21  Sorenson wasn't being paid for his endorsement or promised

22  anything for his endorsement, that Sorenson was simply coming to

23  the campaign because this is where his friends were.

24          The fact that prior to that Tate would have been

25  willing to pay Sorenson, that doesn't mean that those statements

1  aren't true, but it certainly goes to whether Tate had any

2  knowledge about any deal to pay Kent Sorenson on the night of

3  December 28, 2011, which is a key element of the government's

4  case.

5          Subsequent to that, Mr. Kesari's testimony that the

6  deal to pay Kent Sorenson came about in January 2012 and that

7  Mr. Tate didn't know anything about that, that is entirely

8  consistent with the next series of e-mails that go all the way

9  from June 25th that Mr. Tate is always saying, who is this, why

10 are we paying these people, I don't know what Interactive

11 Communication Technologies is, and the February 7th e-mail that

12 the government now says is the linchpin connecting Mr. Tate to

13 all of these misreporting activities, which is what he's charged

14 with, not paying Sorenson, not bribing Sorenson, not anything

15 like that, he's charged with filing false reports to the FEC.

16 The February 7th e-mail that they say is the linchpin, Mr. Tate

17 says, no idea.  And, in fact, the government knows that Mr. Tate

18 thought that Mr. Kesari was talking about a reimbursement for

19 travel for Mr. Sorenson; but that was what Mr. Tate thought.

20          So Mr. Kesari can't testify as to what was in

21 Mr. Tate's mind.  What's important with that is on that date,

22 all of the other e-mails about paying Sorenson, Mr. Tate is not

23 on any of them.

24          And Mr. Cooney spent some time going through the May

25 and -- April and May e-mails where it says Mr. Tate approved

1  these payments; but if you'll note on those, he's told that

2  those payments are okay to pay by his deputy campaign manager,

3  who he trusted, and that the payments were approved by the

4  campaign chairman, Mr. Benton, who he trusted.  It doesn't

5  necessarily mean that he knew of any of the details of any

6  payment arrangements between ICT or Sorenson or that they were

7  even connected.  And Mr. Kesari's testimony would be that he did

8  not tell Mr. Tate those details.

9          So this testimony that Mr. Kesari will give in the

10  courtroom is completely exculpatory because it proves that

11  Mr. Tate was not a knowing and willful participant in the crimes

12  that he's charged with, which have nothing to do with 2011

13  conduct, has nothing to do with that he was willing or wanting

14  Sorenson's endorsement, has nothing to do with the fact that he

15  was willing to pay Sorenson the same amount that Michelle

16  Bachmann was.  It's about whether he knowingly and willfully

17  caused the misreporting of an expenditure with the Federal

18  Election Commission.

19          If he didn't know that Sorenson was being paid until

20  June 25th and he didn't know the mechanisms of how Sorenson was

21  being paid even after that, to the extent -- only to the extent

22  that Sorenson was somehow connected to ICT, he cannot have been

23  a knowing and willful participant in this and, therefore, the

24  government cannot make its case.

25          This testimony shows -- and the Starr case is right on

1  point on this -- that Mr. Tate was not involved in this deal to

2  a knowing and willful level.  Now, we may -- as Mr. Cooney

3  pointed out, we may have arguments back and forth about what the

4  testimony means, what the e-mails mean.  We may have

5  impeachment.  We certainly have a lot of impeachment for their

6  key witness, Mr. Sorenson.  They might have impeachment material

7  for Mr. Kesari.  That's what a trial is for.  But here we're on

8  motion to sever this trial, and if this court does not grant the

9  motion for severance, Mr. Tate does not have access to the one

10 person that can exculpate him from this.  And that's the

11 standard we've met.

12        And I will note that the slides that Mr. Cooney ended

13 on, it's important that when they say that Kesari did not say

14 that Tate did not know the campaign agreed to pay Sorenson for

15 his endorsement, he didn't ask that question.  And Mr. Binnall

16 was in the proffer session.  I'll let him talk about that, what

17 was there; but if they never asked him what Mr. Tate knew and

18 when did he know it, there's no possible way that they're

19 interested in seeking justice here, and to deny Mr. Tate the

20 right to bring this exculpatory testimony before the court in a

21 trial where he's in jeopardy for his very life and freedom would

22 be a grave miscarriage of justice and, therefore, we ask the

23 court grant Mr. Tate's motion.

24        THE COURT:  Thank you.

25        Mr. Binnall, how much time do you need?

1          MR. BINNALL:  No more than five minutes, Your Honor.

2          THE COURT:  Okay.  That's fine.

3          MR. BINNALL:  Your Honor, everything that the

4    government showed about its e-mails were very selective quotes

5    from -- alleged quotes, I should say, from the proffer session,

6    is subject to the context, is subject to filling in the blanks.

7    And it's very clear that the government doesn't want those

8    blanks filled in with anyone who's going to go against their

9    narrative, with someone who actually does know what happened;

10   but all of this is subject to context.

11         Mr. Warrington is exactly right that on the slide that

12   Mr. Cooney showed the court about what Mr. Kesari didn't say at

13   the proffer session is because he wasn't asked those questions.

14   And, in fact, Your Honor, the 302 that was prepared after the

15   investigation is inconsistent on numerous occasions with the own

16   notes -- with the notes of the proffer session.  It was

17   transcribed in the 302 more than two months later.  Some of

18   those errors in the 302 are typographical.  Some of the errors

19   are substantial.  And not just that, Your Honor, neither the

20   notes nor the 302s have the questions that were asked.

21         Again, the government is afraid of context in this

22   case.  Mr. Kesari is the one who can fill in the context.  For

23   instance, in the slide that the government handed up that talked

24   about Kesari and his team already knew and agreed on Sorenson's

25   terms, and his team.  Mr. Kesari's team are not the people above

1   him.  Mr. Kesari's team are the people that are underneath him,

2   the deputy campaign manager, the field staff.  Jared Gamble,

3   his right-hand man, he was the primary person on his team, and

4   then he has field staff under him.  That's not talking about

5   Mr. Tate.  That's not talking about Mr. Benton.  That's talking

6   about the people under Mr. Kesari, not above him.

7           And that's one of those things that because the FBI

8   purposefully decides not to record these proffer sessions, not

9   to have any sort of transcript -- and we do know that these

10   notes and the 302's are not transcripts -- much as now, when it

11   helps them, they would like the court to believe that they

12   essentially are.  It makes it where important things are lost,

13   where live testimony can fill in those gaps.

14           Mr. Kesari certainly doesn't know what was discussed

15   between Mr. Tate and Mr. Benton; but Mr. Kesari does know what

16   information he shared directly with Mr. Tate, and the

17   government's evidence, the government's evidence is that

18   Mr. Kesari, that's the one that organized all of the payment

19   arrangements with Mr. Sorenson, and that's the important thing

20   here.  It's the government's burden to prove guilt, not the

21   defendant's, and this is important evidence that Mr. Kesari

22   wishes to be known at trial.

23           As far as discussion about the FEC and Kent Sorenson,

24   Your Honor, that's exactly right, that Mr. Kesari did not talk

25   with Mr. Sorenson about anything about the FEC.  They did talk

1   about what the lawyers said that they needed to do to make

2   things legal, but they had no idea about whether or not it had

3   to do with the FEC.  That wasn't even on my client's radar.

4          Your Honor, the government has a duty to do more than

5   go search for a conviction.  They have the duty to search for

6   the truth; but it's very clear that they're only interested in

7   the convictions in this case and they're scared of the truth.

8   Mr. Kesari has that truth.  And wouldn't it be nice if for these

9   differences in the stories, between the government's side of the

10  story and the defendants' version of the story, the jury got to

11  make that determination?  But the only way that the jury is

12  likely to be able to make that determination is if this case is

13  severed so that Mr. Kesari can testify on behalf of Mr. Tate

14  without having to give up his own constitutional and protected

15  rights.

16         Thank you, Your Honor.

17         THE COURT:  Thank you very much.

18         All right.  We normally don't file the exhibits.  We

19  ask the government to just maintain the originals.  I'll keep

20  the copy that I have and make sure that it goes on to Judge

21  Jarvey when he gets the file from me.  So I don't think we need

22  to worry about at this point filing them under seal because we

23  normally just don't file them anymore.  So I think that should

24  take care of that issue.

25         And I do thank you all.  I'm taking the motion under

1  advisement.  I appreciate the arguments both in the briefing as

2  well as here live today, and I thank you for your time.

3          Anything further we need to --

4          MR. COONEY:  Your Honor, just a procedural question.

5          THE COURT:  Sure.

6          MR. COONEY:  It occurred to me as I was going through

7  the exhibits, the hard copy exhibits, would Your Honor like us

8  to provide your chambers with a copy of those exhibits that we

9  showed or do you have access or --

10         THE COURT:  I have access, but it would be very

11  helpful if you provided me with a copy so that I don't have to

12  look at all of the exhibits to find the ones that you

13  referenced.

14         MR. COONEY:  We will do that today.

15         THE COURT:  Thank you.

16         MR. BINNALL:  Your Honor, a housekeeping question, in

17  the order I believe that Your Honor signed resetting the trial

18  date, you asked us to bring up I believe at this hearing

19  regarding the actual start date of the trial in April.  And,

20  Your Honor, this is my own scheduling issue that I did bring up

21  to the court when we were trying to schedule it.  I am traveling

22  internationally on the Saturday before, and so I would ask that

23  the trial start no earlier than Tuesday and preferably on

24  Wednesday.

25         THE COURT:  I will let Judge Jarvey know that.

1          Are you guys set for a hearing with him --

2          MR. BINNALL:  We are.

3          THE COURT:  -- on the other pending motions?

4          MR. BINNALL:  Yes, Your Honor.

5          THE COURT:  Okay.  I will make sure that he's aware of

6   that so he can talk with you about that further.  I don't know

7   that that would be a problem.  I think we had enough room in the

8   following week to accommodate that.  I did talk to him briefly

9   about it.  I don't think he had an issue specifically with

10  Tuesday.  I don't know about Wednesday, but I will make sure and

11  mention it to him as well.

12         MR. BINNALL:  Thank you, Your Honor.

13         THE COURT:  You're welcome.

14         Anything else, Mr. Warrington, that you wanted to

15  bring up today?

16         MR. WARRINGTON:  Your Honor, I was given the task by

17  one of my colleagues to make sure that I got scheduling stuff

18  right.

19         THE COURT:  Come on up so I can hear you.

20         MR. WARRINGTON:  I believe when the trial was reset,

21  Your Honor, we don't have a designated time for designation of

22  expert witnesses.  And according to the local rule, April 18th

23  is the date for motions in limine and all other trial-related

24  motions, and I just want to make sure that's what the local rule

25  says and that would be where we -- when we would file those.

1          THE COURT:  Does anybody have any objection to that as

2  your date?

3          MR. BINNALL:  I'm sorry, Your Honor.  The objection to

4  what exactly?

5          THE COURT:  To the date that Mr. Warrington is

6  proposing with respect to designation of expert witnesses?

7          MR. BINNALL:  No objections, Your Honor.

8          MR. WARRINGTON:  That was actually two things.

9          THE COURT:  Okay.  Are you proposing a date for me for

10  expert witnesses?  Let's start there.

11          MR. WARRINGTON:  I don't have a proposed date, but I

12  would suspect we would be fine with maybe March.

13          MR. COONEY:  I'm sorry; would that be the end of

14  March?

15          MR. WARRINGTON:  End of March.

16          MR. COONEY:  The only thing I would say, there is

17  already a pending motion to exclude expert testimony, and we

18  have a motion hearing set for March 4th, and it might be easier

19  to tee it up -- I don't know if you're talking about designating

20  individuals or expanding the scope of what an expert witness

21  might testify to, but it seems like to have teed up what we need

22  for Judge Jarvey on the 4th of March makes sense.

23          THE COURT:  That's what I'm concerned about.  I know

24  we have that hearing.

25          MR. WARRINGTON:  I forgot about that, Your Honor, so I

1    would say end of February.  I believe it's a leap year, so we

2    get February 29th, which would be a Monday.

3            MR. COONEY:  It would be great if we had a little bit

4    more than a week before the hearing to be able to lodge any

5    objections or anything like that, but, I mean, I'm flexible

6    here.

7            THE COURT:  I'm going to set it for the 24th of

8    February.

9            MR. WARRINGTON:  24th?  That's fine.

10           THE COURT:  That's a Wednesday.  That gives you about

11   ten days, okay.  So expert witnesses, any additional by

12   February 24.

13           And then, I'm sorry, go ahead to your next issue.

14           MR. WARRINGTON:  The second issue was deadline for

15   motions in limine and any other pretrial motions.  Under the

16   local rule the date is April 18th, and unless anybody has any --

17   unless the government has a position otherwise, Mr. Binnall or

18   Mr. Benton's counsel, I'm okay with the April 18th date.

19           MR. BINNALL:  No objection from defendant Kesari.

20           THE COURT:  Again, we're going to get into the same

21   issue I think on the motions.  We can certainly set another date

22   with Judge Jarvey.  I'm concerned that April 18th is going to be

23   too late with your trial date to get the motions briefed for him

24   and for him to have a full opportunity to review them.  So my

25   suggestion would be, again, I would be looking at something

1    closer to the end of March.

2              MR. WARRINGTON:  Okay.

3              THE COURT:  And so my suggestion would be that we set

4    March 31 as your deadline then.

5              Is that agreeable with the government?

6              MR. COONEY:  That's agreeable, Your Honor.  So as I

7    understand, we're essentially talking about motions in limine at

8    this point, right?

9              THE COURT:  Yes, that's my understanding.

10             MR. BINNALL:  No objections.

11             THE COURT:  All right.

12             MR. BINNALL:  Sorry; as long as anything that comes up

13   after then that we hadn't had an opportunity to file a motion on

14   we could still file a motion.

15             THE COURT:  Well, my hope is you get everything

16   exchanged well in advance of that.

17             Mr. Dickey, you're so quiet back there.  Are you okay

18   with all of this?

19             MR. DICKEY:  Yes.  No objections.

20             THE COURT:  All right.  So March 31 for motions in

21   limine and then February 24 for expert witnesses.

22             MR. COONEY:  Should we slot an opposition date for

23   motions in limine?

24             THE COURT:  I was just going to do that.  Let me take

25   a look here.  So motions in limine come in on the 31st.  Can you

1  guys have your objections in by April 8th?

2           MR. WARRINGTON:  That works for us.

3           THE COURT:  Or any responses.  That at least gives

4  Judge Jarvey an opportunity if he needs oral argument to get

5  that in before your trial date and give time to get rulings out.

6  So we'll set the response deadline for April 8th.

7           Tricia, you got those?

8           THE CLERK:  Yes.

9           THE COURT:  Okay.  Anything else?

10          MR. WARRINGTON:  Nothing, Your Honor.

11          Thank you for your patience on technology.

12          THE COURT:  Oh, no problem.  Sometimes it works;

13  sometimes it doesn't.

14          MR. WARRINGTON:  I think this was mostly operator

15  error.

16          THE COURT:  I think it's just life.

17          So all right.  Mr. Dickey, anything else on behalf of

18  your client?

19          MR. DICKEY:  No, Your Honor.

20          THE COURT:  All right.  Thank you all very much, and

21  as I indicated, I've got the motion under advisement then.

22          MR. WARRINGTON:  Thank you, Your Honor.

23          MR. COONEY:  Thank you.

24          THE COURT:  Mr. Cooney, my office is up on the fourth

25  floor, so if somebody wants to bring it up there when you have

1    time, that's great.

2            MR. COONEY:  We will do that, Your Honor.  Is after

3    lunch okay?

4            THE COURT:  Yes.  I'm not going to look at it before.

5            All right.  We're in recess.

6            (Proceedings concluded at 11:10 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6              That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12             Dated at Des Moines, Iowa, this 9th day of February,

13   2016.

14

15

16

17                              /s/ Terri L. Martin
                                CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25