IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :      Criminal No. 4:15-103
                           :
     vs.                   :
                           :
JESSE R. BENTON,           :      TRANSCRIPT OF HEARING
JOHN FREDERICK TATE, and   :        (Motion to Sever)
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X


Second Floor Courtroom
United States Courthouse
123 East Walnut Street
Des Moines, Iowa  50309
Thursday, February 4, 2016
8:58 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, Magistrate Judge.


Terri L. Martin, CSR, RPR, CRR
United States Court Reporter
Room 189, U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa  50309

```
1   discuss that at the end of the hearing; but my request is that

2   not be filed on the public record.  It is subject to a

3   protective agreement, and so I think the 302 itself should not

4   be filed on the public record, although I intend to use it

5   throughout the course of this hearing.

6           May I pass these documents up?

7           THE COURT:  Yes, you may.

8           (Counsel conferring.)

9           MR. COONEY:  The interview itself was in January of

10  2014.

11          MR. BINNALL:  And, Your Honor, just for the record, we

12  do object to any use of the 302, the notes of the officer,

13  pursuant to the terms of the proffer agreement at this point.

14          THE COURT:  So if I'm understanding you correct,

15  you're objecting to it because it violates the proffer

16  agreement?

17          MR. BINNALL:  Yes, Your Honor.

18          MR. COONEY:  So I'll start with that issue if I may,

19  Your Honor.

20          Well, actually if I could just go forward with my

21  argument, I'm happy to address that when I reach the point that

22  I would like to use information from that 302 if that's all

23  right.

24          THE COURT:  That's fine.  I'll just hang on to it for

25  now and we'll make a determination what we're going to do with
```

1   subsequent filing periods.

2           THE COURT:  Yeah, I understand.

3           MR. COONEY:  All right.

4           THE COURT:  You're just telling me so I understand

5   some of the timing issues of the evidence.

6           MR. COONEY:  Yes, that's exactly right.

7           THE COURT:  All right.

8           MR. COONEY:  So right now it's -- whether they've

9   figured out how they're going to make payments to ICT, how

10  they're going to route them and whatnot, that's not really part

11  of the case as terms of the evidence; but what is clear from

12  this is we don't want anything showing up on FEC reports about

13  Kent Sorenson.  That can't happen.

14          So with that context then, I want to turn now to the

15  proffer that Kent -- or excuse me; the proffer that defendant

16  Kesari made on January 9, 2014 to the government.  So I think on

17  that the first thing I'll address is Mr. Binnall's objection to

18  the use of that proffer agreement on the basis that it is in

19  violation of the proffer agreement.

20          I hand up the proffer agreement as Government's

21  Exhibit A.  What I would simply point out about the government's

22  proffer agreement with Mr. Binnall is first and I think

23  principally and most importantly is an agreement between

24  Mr. Binnall that we will not use any statements that he made

25  during the proffer session in our case in chief in a criminal

1  prosecution against him.  I'm not introducing or attempting to

2  use any of these proffer statements today against him.  I'm

3  using these proffer statements in opposition to defendant Tate's

4  severance motion.  Regardless of whether Kesari was here at the

5  table today, Kesari was in the case, that would be a permissible

6  use of these proffer statements.

7         Second, and most importantly, the instances in a

8  trial -- and this is a pretrial hearing; but the instances in

9  this trial in which the government could utilize proffer

10  statements are when Kesari himself testified and said something

11  inconsistent with what he said at the proffer or if they

12  presented evidence inconsistent with his proffer statements.

13         The way which I'm using these statements today I think

14  strikes right at the heart of the permissible purpose of them,

15  which is to contradict.  He's now saying that I'll testify that

16  we didn't have any conversations about what the $25,000 was for,

17  that there was no agreement with Sorenson until January 2012.

18  He makes inconsistent statements on these subjects, statements

19  inconsistent with those claims during his January 9, 2014

20  proffer.

21         So before I -- I don't know if Your Honor wants to

22  hear arguments from Mr. Binnall or not before I start to move in

23  to explain the statements, but --

24         MR. BINNALL:  I would like to be heard, Your Honor.

25         THE COURT:  Why don't you come up here, Mr. Binnall,

```
 1   so we can make sure we can hear you for your record.

 2              MR. BINNALL:  Yes, Your Honor.

 3              THE COURT:  Thank you.

 4              MR. BINNALL:  Your Honor, this is the same proffer

 5   agreement with a different party that the government has already

 6   had its case against Mr. Kesari's two co-defendants thrown out

 7   and dismissed because of the government's misconduct in

 8   violation of their proffer agreements, and now they're trying to

 9   do the same thing with Mr. Kesari.

10              The idea that it's limited to only being brought --

11   their particular argument regarding that the timing has already

12   been rejected by Judge Jarvey who found that the use of the

13   statements in grand jury was a violation of the proffer

14   agreement.  And on top of that, Your Honor, Mr. Kesari is still

15   a part of this case.

16              If the government wants to agree to the severance now

17   and then only use it in regards to the severed case with

18   Mr. Tate, that would be fine; but as of right now, the case is

19   not severed, and so it still is being put in for all purposes

20   against Mr. Kesari, and paragraph 5 of the proffer agreement

21   specifically says that if they are offered, it will be at trial

22   or sentencing, not at a pretrial motion.

23              It is the government who drafted this language.  They

24   are strictly held to the proffer agreement, and they should not

25   be able to breach it as they did Mr. Kesari's co-defendants
```

1 previously.

2        THE COURT:  I'm going to at this point just accept the

3 exhibits subject to the objections so we can go ahead with

4 today's arguments, and then I'll make a ruling as part of the

5 ultimate ruling on the motion to sever with respect to the usage

6 of those.

7        MR. COONEY:  May I reply on one point on that?

8        THE COURT:  You may.

9        MR. COONEY:  It is correct that Judge Jarvey dismissed

10 counts in this case because of the government's use of proffered

11 statements before the grand jury, and the gravamen of that

12 opinion was that the government should not have used statements,

13 proffered statements used -- or made by Mr. Tate against him in

14 the grand jury, that we should not have used statements that

15 Mr. Benton proffered to against him in the grand jury.  That was

16 the gravamen, the direct use against those individual

17 defendants.  The gravamen of that opinion was not Mr. Kesari's

18 proffered statements, for example, could not be used against

19 Mr. Tate in the grand jury or could not be used against

20 Mr. Benton in the grand jury.

21        So I think, first of all, use in the grand jury is

22 significantly different than use in a severance hearing; but I

23 go back to specifically, you know, where I started.  These are

24 being used to defeat a severance motion by defendant Tate, not

25 by defendant Kesari, and they're not being used as substantive

1  evidence.  They're being used much differently in this hearing

2  to rebut claims about what Kesari might testify to.  Paragraph 5

3  of the government's proffer agreement simply references

4  substantive evidence.

5          So going forward then with the statements, the first

6  thing that I would like to draw the court's attention to -- you

7  know what, Mr. Binnall could I trade you?  I don't have a full

8  size copy.

9          MR. BINNALL:  No, that's fine.

10          MR. COONEY:  Thank you.  I appreciate that.

11          I'm actually going to move to the last slide.  This is

12  Government's Exhibit C for the record.  And I just want to point

13  out some things that defendant Kesari did not say during his

14  proffer, significant omissions which undercut this and I think

15  will be filled in when I show Your Honor what he did say during

16  the proffer; but Kesari never said that Tate did not know that

17  the campaign agreed to pay Sorenson for his endorsement, never

18  made that claim during his proffer.

19          He did not say that he and/or Jesse Benton hid

20  information from Tate about the Sorenson payments from Tate or

21  that he ever lied to him about it.

22          Kesari did not say that Tate ever objected to paying

23  Sorenson, either in December 2011 or after the June 25, 2011

24  e-mail exchange where within one minute of Kesari's

25  clarification about ICT Tate approved the payment.  And while

1   I'll get to that June 25, 2011 e-mail, I kind of want to set the

2   stage.  Those are things that were not said during the proffer.

3   And now I want to show Your Honor some of the things that were

4   said.

5          If you go to page, I believe it's page 2, Kesari's

6   statements inconsistent with Tate not knowing about the December

7   Sorenson deal.  And I have a mistake on here, Your Honor.  I

8   apologize.  I say quotations from the FBI 302 of March 26, 2014

9   interview.  It was January 9, 2014 interview.  The report was

10  written on March 26th.  But if you turn to page 4 of the 302, so

11  what I'm putting up on these slides are just quotes from the

12  302, the 302 reads:  Kesari did most of the negotiation as he

13  was the middleman -- "middleman" was his word; that's why it's

14  in quotations there -- for the Ron Paul for President Campaign

15  senior management.  He said, Tate did not see the value Sorenson

16  could bring to the Ron Paul Campaign.  Benton wanted Sorenson's

17  support because we all thought any bit would help.

18         And then importantly, Ron Paul was not aware of any of

19  the details regarding Sorenson joining his campaign as he had

20  nothing to do with the day-to-day operations and staff members.

21         So what Kesari tells the FBI is, look, I did the

22  negotiating as the middleman, Tate not as on board, didn't think

23  it was that important.  Benton thought it was more important.

24  Ron Paul did not know any of the details.  He did not know any

25  of the details.  What Kesari doesn't say importantly is that

1   Tate doesn't know details or Benton doesn't know details.  It's

2   Ron Paul that doesn't know the details.  Kesari is doing the

3   negotiation as the middleman between him, Sorenson, and the Ron

4   Paul Campaign senior manager.

5          If you turn to the next page, this is on page -- we'll

6   start with page 7 of the 302.  This is Kesari.  Quote:  The

7   deal -- and deal is in quotes.  That's because it was his word.

8   Of course, the 302 is a summary of his interview prepared by

9   Special Agent LoStracco, but deal is his word.  The deal of

10  12/26/2011 -- that's the $25,000 check -- and 12/29/2011 --

11  that's pull the wire; i.e., we'll make the payments later on --

12  was understood.  Kesari and his team already knew and agreed on

13  Sorenson's terms.

14         That is wholly inconsistent with his claim, one, that

15  he never discussed this with Tate, but it's also wholly

16  inconsistent, two, with his proposed testimony now that there's

17  no deal reached with Sorenson until January of 2012.

18  Specifically in his proffer he states, the deal of 12/26 and

19  12/29, 2011 was understood.

20         Page 9, Kesari states, Drew Ivers, the Ron Paul

21  Presidential Campaign Committee Iowa co-chair and other

22  co-chairs were aware Sorenson was joining the Ron Paul Campaign.

23  They just knew he was joining the campaign but did not know any

24  details regarding it.

25         The reason why this is so important, Your Honor, is

1  that it goes to the omission, the impeachment by omission of

2  Kesari's now claim that he never had conversations about this

3  subject with John Tate.  Nowhere in his proffer on January 9,

4  2014, did he ever make that claim; but he made very specific

5  claims about who did not know that information.  For example,

6  Drew Ivers.  For example, Ron Paul.  And that proffer, Your

7  Honor, was a proffer that extended more than four hours.  It's a

8  14-page 302.  That was not a 30-minute interview.  It was

9  extensive and topics were covered repeatedly if you look at the

10  302 and cover from beginning to end.  And on more than one

11  occasion, as memorialized in that 302, defendant Kesari was

12  explicitly provided the opportunity to change anything he said,

13  make additions, amend anything, what have you, did not take that

14  opportunity, never made a claim that Tate was not in the know.

15        And then page 11 -- I think this is important, and

16  this is consistent with the e-mail traffic -- he says, mostly,

17  mostly, Kesari, Benton, and Sorenson discussed Sorenson joining

18  the Ron Paul for President Campaign.  And e-mail traffic is I

19  think generally consistent with that, mostly Kesari, Benton, and

20  Sorenson.

21        But that's not only those people.  That's not John

22  Tate didn't know.  That's not John Tate wasn't involved.  And

23  that's so important in the context of other explicit statements

24  during that interview, during that proffer session about who is

25  in the know and who was not in the know.

1          All right.  I want to move now kind of categorically

2   to the second big picture claim by the Benton camp -- excuse me,

3   by the Tate camp about what Kesari's testimony would show, that

4   John Tate was not involved in or even aware of subsequent plans

5   or agreements or any details thereof for the Ron Paul Campaign

6   to pay Kent Sorenson and the claim that there was no

7   conversation about what ICT was in that January 2012 period up

8   until June 25, 2012.

9          So, first, let's start with something that Kesari

10  said, so I'll go back to the PowerPoint.  For the record, that's

11  Government's Exhibit C.

12         And I have to admit, I apologize, I've lost track of

13  what page I am on the PowerPoint.  I think there's only seven

14  pages on the PowerPoint, so this is probably about page 5, but

15  it's from page 10 of the Kesari proffer.  Kesari states, Kesari

16  did not know how much Tate knew about Sorenson's invoices since

17  Kesari was talking to Benton about this matter.

18         That is an inconsistent statement with the claim that

19  he didn't know because I never told him.  Defendant Kesari can't

20  come in and testify as to what Tate knew and when he knew it

21  when he makes a statement on another date, Kesari did not know

22  how much Tate knew about Sorenson's invoices since Kesari was

23  talking to Benton about this matter.

24         But here is what we do know about February 7, about

25  that time period, February 7, 2012.  Government's Exhibit 74,

1    and this is one that defendant Tate attempts to rely on in

2    support of the statements.

3           On February 7, 2012, Government's Exhibit 74, Kesari

4    e-mails Tate, did Jesse get Kent paid?  He said he would handle

5    it and Kent is texting me today.

6           John Tate responds, no idea.  Ask him.

7           If defendant Kesari never spoke with John Tate about

8    paying Kent Sorenson, about a deal, a payment in return for his

9    endorsement, that the campaign was paying him anything at all,

10   what is he doing in February 2012 sending an e-mail to Tate

11   asking him if Jesse had gotten Sorenson paid?  If Tate is not in

12   the know, there's no reason for Tate to send an e-mail to him.

13   That is inconsistent with what he is proffering today he would

14   testify to in a trial.

15          Subsequent to that e-mail, Government's Exhibit 84a,

16   John Tate approves an invoice for a payment to ICT on April 3,

17   2012.

18          On May 29, 2012, Government's Exhibit 95 -- and I can

19   put these up for Your Honor, but they do not discuss what ICT

20   is.  These are simply just memorializing for the record that

21   he's approving payments in the spring of 2012.  Government's

22   Exhibit 95 --

23          THE COURT:  Just a second.

24          Mr. Warrington?

25          MR. WARRINGTON:  Your Honor, I think it would be

1    helpful to put them up since they don't discuss ICT.

2            THE COURT:  If you've got them available, why don't

3    you put them up.

4            MR. COONEY:  Sure.  That's right, they don't, they

5    don't.  So let me put another one up, Government's Exhibit 59.

6            THE COURT:  59?

7            MR. COONEY:  Yes, ma'am.

8            THE COURT:  Okay.

9            MR. COONEY:  An e-mail from Fernando Cortez to Tate

10   and Benton, and a reminder, kind of setting the stage here about

11   who is who in the campaign; but Tate and Benton are, in terms of

12   their role in the campaign, senior to Dimitri Kesari and are the

13   two most senior people in the Ron Paul Presidential Campaign.

14   So Cortez on February 22, 2012 sends an e-mail to Tate and

15   Benton and he says -- attaches a spreadsheet -- here is the full

16   breakdown of the expenses since January 1, 2012.

17           The spreadsheet attached -- let's see if you can see

18   that -- down here (indicating) contains a February 8, 2012

19   check, Interactive Communication Technologies, ICT, $38,125,

20   making it the most significant expense in that category and on

21   this spreadsheet the third highest expense on the spreadsheet.

22           MR. WARRINGTON:  Your Honor --

23           THE COURT:  Yes.

24           MR. WARRINGTON:  -- I hate to do this, but they're

25   showing one page of a spreadsheet that was rather large, and

1  they have no evidence or inference for taking this to open up

2  the Excel spreadsheet.  They're just slinging things together.

3          THE COURT:  Go ahead, Mr. Cooney.

4          MR. COONEY:  Thank you.

5          All right.  So here's the point, Your Honor, he gets

6  an e-mail, shows that ICT is on there.  Subsequent to receiving

7  that spreadsheet, John Tate, one of the senior most officials

8  responsible for approving payments, approves invoices on

9  April 3, 2012, on May 29, 2012 for payments to ICT.

10         Why is John Tate explicitly approving significant

11 payments if he does not know what those payments are for?  And

12 I'll show them Government's Exhibit 84a -- I'm sorry, that's in

13 the other binder.

14         Actually I'll use Government's Exhibit 84b.  This says

15 simply, attached is the invoice for services rendered in

16 February.  Let me know if you need anything else.

17         That is an e-mail from Sonny Izon to Dimitri Kesari.

18 Kesari passes it on to Cortez saying, approved by Jesse.  Cortez

19 checks with Tate.  Tate says approved.  It's a payment to ICT.

20 There's no discussion in the e-mail about what ICT is, no

21 discussion in there because John Tate doesn't need any

22 discussion of that.

23         Government's Exhibit 95, same situation involving a

24 wire.  There is a request for a wire payment to ICT for $8,850.

25 Cortez forwards it on to Tate:  Approved?  Dimitri said it is

1  the last one.

2          Tate:  Approved.

3          So this is the setup now for June 25, 2012.

4          Let's start with Government's Exhibit 102, same

5  situation.  Bottom e-mail, June 25, 2012, e-mail from a member

6  of the campaign, one of Cortez's employees, requesting an $8,850

7  wire to ICT.  Cortez e-mails Tate:  According to Dimitri this is

8  the last one (again).  Approved?  8 thousand.  And this is the

9  e-mail that Tate sends to Kesari:  What is this?  What is it

10 for, who is it?  Why do we keep paying them?  The last payment

11 was supposedly the last.

12          6:22 p.m.:  This the last payment for Kent Sorenson.

13 The deal Jesse agreed to with Kent.

14          That's not, let me explain to you exactly what ICT is.

15 That's a reminder, this is the deal that Jesse made with Kent.

16 This money is for Kent Sorenson.  That's at 6:22.

17          Government's Exhibit 103, same e-mail chain.  Now,

18 Kesari at 6:23 sends another e-mail in response -- there's no

19 response yet from Tate, but he sends an additional e-mail in

20 response to the original question by Tate about what this was.

21 6:23:  It was for 6 months, it was for 6 months.

22          One minute later, a minute later:  Okay.  Thanks.

23          Not more clarification needed.  Okay.  Thanks.  So he

24 has two e-mails.  It's money for Kent Sorenson and it was for

25 six months.  Okay.  Thanks.

1        Government's Exhibit 104, doesn't even take a minute,

2   John Tate to Fernando Cortez:   Approved.

3        Defendant Tate is correct about Government's Exhibit

4   102.   We got that e-mail from the computer of Dimitri Kesari.

5   We didn't get it from the Ron Paul server.   We didn't get it

6   from John Tate's e-mail.   Their claim is that there's no

7   evidence he ever saw it.   That evidence is consistent with that

8   e-mail, an e-mail identifying exactly what ICT is for, that it's

9   a passthrough for Kent Sorenson.   That is consistent with John

10  Tate deleting that e-mail.

11       The government has provided in discovery and called a

12  witness at trial to testify regarding this and will likely call

13  a witness to testify at trial again; but the Ron Paul server

14  uploads from individuals' computers who are using them on a

15  regular basis and it updates.   An individual that has a hard

16  drive and then stops using a computer, for example, does not

17  upload to the server, a local copy of the e-mail may be retained

18  in that person's computer; but when it's deleted from someone

19  else's computer who does roll up to the server, it may be gone

20  from the server.   If it's deleted from another device like a

21  Blackberry or an iPhone, it can be deleted.

22       That, Tate's argument, that's inconsistent.   Again

23  with that e-mail existing or him even seeing the e-mail about

24  what ICT is for, that e-mail is at least, at least equally

25  consistent with that e-mail being deleted.

1          And then, finally, Your Honor, what I would like to

2     turn to in terms of discussing the evidence is there is now,

3     which was not in the original moving papers but is a component

4     of the proffer about what Kesari will testify to, that Sorenson

5     told me that this is what they did in the Bachmann Campaign and

6     the Bachmann lawyers said that was okay.  Again, that

7     information never comes up in his proffer.

8          And I don't have a PowerPoint slide prepared on this

9     one, but I'll just point out for Your Honor where in the 302, in

10    Government's Exhibit B, I think there are pertinent statements.

11         First at page 2, just to kind of set up, Kesari says,

12    I presumed he reported to Guy.  That's Guy Short.  That is an

13    individual who consulted for the Bachmann Campaign.  Kesari knew

14    Sorenson was paid by C & M, Short's company, but did not know

15    when and how he came about receiving compensation from C & M.

16         So the background here is Guy Short has a political

17    consulting firm, works for the Bachmann Campaign.  Bachmann

18    Campaign pays Short's company, C & M.  And it was Kesari's

19    understanding that Sorenson reported to Guy Short and so Guy

20    Short paid Sorenson.

21         He says, I didn't know when and how he came about

22    receiving compensation from C & M.  I don't know details.

23         Page 3 of Kesari's proffer, that's Government Exhibit

24    B.

25         Kesari did not think he ever had a conversation with

1   Sorenson regarding the Federal Election Commission, FEC.  Kesari

2   stated -- and this part now is a quote from Agent LoStracco that

3   she put in the 302 -- none of us thought, hey, how are we going

4   to get around FEC disclosures or reports?  However, there were

5   conversations about the general public finding out Sorenson was

6   getting paid by the campaign.  Sorenson did not want to violate

7   the Iowa State ethics rules.

8           That is not a conversation of endorsement from the

9   Bachmann people, that he had conversations with the Bachmann

10  lawyers that this would be fine to do this on the FEC.  In fact,

11  he's saying we never discussed the FEC.

12          And then, finally, in his proffer he was asked

13  questions about whether he reached out for legal advice to the

14  Ron Paul Campaign.  And Kesari says, "Kesari did not ask

15  Warrenton" -- that is a misspelling.  That's with reference, I

16  think, to Mr. Warrington who at the time was a lawyer for the

17  Paul Campaign -- "for advice regarding Sorenson joining the

18  RPPCC.  Kesari stated:  'I would say I just told him about

19  bringing him [Sorenson] to the campaign.'"

20          And the point is this:  Nowhere in his proffer does he

21  make the claim that Sorenson told him that Bachmann's lawyers

22  said that this would be fine.  In fact, his statements are

23  inconsistent with that.  And he acknowledges he reached out to

24  his own lawyers.  He didn't seek legal advice or anything like

25  that; but it simply makes no sense whatsoever that he would have

1  done this on the authority of Bachmann's lawyers when he clearly

2  was in contact with the Paul Campaign lawyers but elected to ask

3  nothing about it.

4         So what's the point of all of this, Your Honor?  As we

5  set forth in our pleading papers, there is a very strong

6  presumption in the law for a joint trial.  Defendant Tate bears

7  a very high burden to overcome that.  It is all based on

8  Kesari's testimony, not a long explanation of all of the

9  evidence in the case, and we both know that.  We've traded barbs

10 about what these e-mails mean and what they don't mean, and

11 that's exactly what we're going to do in this trial; but not a

12 single thing to the extent there have been specific proffers by

13 defendant Kesari about what he might say when there wasn't a

14 deal until January of 2012, I never spoke about it with Tate, I

15 didn't tell him about ICT.  All these things do is merely an

16 effort to impeach otherwise incontrovertible documents, and

17 defendant's own statements, lengthy statements to the government

18 are littered with inconsistencies.

19        On that record he can't establish that defendant

20 Kesari's testimony, that him appearing in trial would be

21 substantially exculpatory to defendant Tate.  And, moreover,

22 they expose exactly what this is.

23        Based on all of the inconsistencies that I've just set

24 forth, defendant Kesari is not showing up to testify in a trial.

25 This is an effort to overcome the strong presumption in favor of

1  a joint trial.  It is an effort to simply obtain a severance of

2  this case, not to secure his testimony.

3          And, finally, I'll end in the same place that

4  defendant Tate did, which is, with respect to whether the

5  government was on notice and things like that, that's not my

6  point.  My point is this allegedly substantially groundbreaking

7  exculpatory testimony that defendant Kesari apparently wants to

8  provide for defendant Tate, the first time we ever hear he wants

9  to testify is the motion in this trial, not a motion before the

10  last trial when defendant Tate was a defendant all the way up

11  until the Friday before that trial was to begin, the first time

12  we ever hear defendant Kesari raise his hand and say, "I want to

13  come and testify," or defendant Tate raises his hand to say, "I

14  want to use Kesari as a witness" is after Kesari has already

15  gone through a trial one time, not on the eve of the first time

16  this trial began.

17          I think that helps here.  That is telling as to

18  whether this is substantially exculpatory or whether this is a

19  strategic point to obtain a severance.

20          Unless Your Honor has any questions --

21          THE COURT:  Just one.

22          MR. COONEY:  Yes.

23          THE COURT:  With respect to the exhibits that you gave

24  me, I would say that Exhibit C is not really an exhibit.  It's

25  more of a -- I mean, it's your argument.

1          MR. COONEY:  No; I agree, and that's fine.

2          THE COURT:  All right.

3          MR. COONEY:  It cites the pages in the 302.  I

4    completely agree, it should not be in evidence.  It is a

5    demonstrative, that is right.

6          THE COURT:  All right.  So I'm just going to keep it a

7    demonstrative exhibit similar to what I have with respect to the

8    PowerPoint presentation that defense counsel provided to me.

9    And as I indicated then, with respect to A and B, I'm accepting

10   those at this time subject to the objections until I have a

11   further opportunity to review that.

12                              (Government Exhibits A and B

13                               were received in evidence.)

14         THE COURT:  Thank you.

15         MR. COONEY:  Thank you.

16         And, Your Honor, I failed to mention one thing, that I

17   would encourage Your Honor to look at the Jackson case that

18   Mr. -- that defendant Kesari cited today, which I don't think is

19   in his moving papers; but there the district court's decision to

20   not grant a severance was affirmed, and I don't believe there

21   was any discussion about placing conditions on a proffer.  That

22   issue never really came up during this hearing today, I suppose,

23   but even the district court's decision to deny severance was

24   actually affirmed in that case.

25         The entire paragraph in the Jackson case is one

1  paragraph.

2          THE COURT:  Thank you.

3          All right.  Mr. Warrington, can you give me just a

4  second?

5          Mr. Dickey.

6          MR. DICKEY:  Yes.  Thank you, Your Honor.

7          We take no position on the motion.  However, I would

8  note that if the court does grant the motion, we would like an

9  opportunity to be heard with respect to with which co-defendant

10 our case would be tried.  I think there's some important issues

11 with respect to the speedy trial.

12         THE COURT:  Okay.  Thank you, Mr. Dickey.

13         All right.  Mr. Warrington, you can respond.

14         MR. WARRINGTON:  No computer this time, Your Honor.

15         Let me first address the standard here because I think

16 a lot of what the government -- a lot of what the government

17 spent its time on had nothing to do with the standard in this

18 case.  We have to satisfy the burden that Mr. Kesari is likely

19 to testify.  You heard testimony from -- you heard the proffer

20 from Mr. Binnall that he is and is eager to testify if the trial

21 is severed and, secondly, that the testimony is exculpatory.  It

22 doesn't mean that it's not impeachable.  The government may have

23 arguments to impeach Mr. Kesari, but that is exactly the

24 situation where the Eighth Circuit said in the Starr case that

25 it was error to not sever the case when they had a co-defendant