**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>         **Plaintiff,**<br><br>**vs.**<br><br>**JESSE BENTON,**<br>**JOHN TATE, and**<br>**DIMITRIOS N. KESARI,**<br><br>         **Defendants.** | Criminal No. 4:15-cr-00103<br><br>**BRIEF IN SUPPORT OF**<br>**DEFENDANT BENTON'S RENEWED**<br>**RULE 29 MOTION FOR JUDGMENT OF**<br>**ACQUITTAL AND RULE 33 MOTION**<br>**FOR NEW TRIAL** |

<u>**BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION FOR NEW TRIAL**</u>

COMES NOW Jesse Benton, through counsel, and submits this brief in support of his

motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and

renews his prior Rule 29 motions made during trial.  Additionally, Benton moves pursuant to

Federal Rule of Criminal Procedure 33(a) for a new trial because the interest of justice so

requires.  In support of this motion, Benton submits the following:

## TABLE OF CONTENTS

**STANDARDS OF REVIEW**………………………………………………………**4**

**ARGUMENT**………………………………………………………………………**6**

**I.**    **JESSE BENTON IS ENTITLED TO A NEW TRIAL BECAUSE KENT SORENSON COMMITTED PERJURY**……………………………………..…………**6**

**II.**    **JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 1 BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT HE CONSPIRED TO COMMIT ANY OF THE LISTED CRIMES**………………………………………………………………..……**9**

    **A. ELEMENT ONE – THERE WAS NO AGREEMENT TO COMMIT AN OFFENSE**……………………………………………………...…………**9**

    **B. ELEMENT TWO – BENTON DID NOT VOLUNTARILY AND INTENTIONALLY JOIN ANY AGREEMENT TO COMMIT A LISTED OFFENSE**…………………………………………………………………..**12**

    **C. ELEMENT THREE – BENTON NEVER KNEW OF ANY ILLEGAL PURPOSE OF ANY AGREEMENT**………………………...………………..**13**

**III.**    **JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 2 BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF THE ELEMENTS NECESSARY FOR COUNT 2**…………...**14**

    **A. ELEMENT ONE – BENTON NEVER VOLUNTARILY AND INTENTIONALLY CAUSED A FALSE ENTRY INTO A RECORD OR DOCUMENT**……………………………………………………………**14**

    **B. ELEMENT TWO – BENTON NEVER INTENDED TO IMPEDE, OBSTRUCT, OR INFLUENCE THE PROPER ADMINISTRATION OF A MATTER**……………………………………………………….…..**15**

**IV.**    **JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 3 BECAUSE THE EVIDENCE WAS INSUFFICIENT ON THE ELEMENTS OF COUNT 3**…………………………**18**

    **A. ELEMENT ONE – BENTON DID NOT MAKE A FALSE REPORT TO THE FEDERAL ELECTION COMMISSION BY REPORTING OPERATING EXPENSE PAYMENTS TO ICT FOR AUDIO/VISUAL EXPENSES**…………………………………………………………..**18**

      **B. ELEMENT TWO – THERE WERE NO FALSELY REPORTED EXPENDITURES PAID TO SORENSON THAT WERE NOT ACCURATELY REPORTED THAT AGGREGATED $25,000 OR MORE IN A CALENDAR YEAR**…………………………………………………………...18

      **C. BENTON DID NOT KNOWINGLY OR WILLFULLY CAUSE ANY FALSE REPORTS**………………………………………………………..19

**V. JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 4 BECAUSE THERE IS INSUFFICIENT EVIDENCE OF THE ELEMENTS OF COUNT 4**………………………………24

      **A. ELEMENTS 1 AND 2 – BENTON DID NOT KNOWINGLY AND WILLFULLY CAUSE THE FILING OF EXPENDITURE REPORTS WITH THE FEC THAT FALSIFIED, CONCEALED, OR COVERED UP A FACT AND DID NOT USE A TRICK, SCHEME, DEVICE, OR COURSE OF ACTION INTENDED TO DECEIVE OTHERS**………………………...24

      **B. ELEMENT 3 – THE FACTS PROVIDED TO THE FEC WERE NOT MATERIAL TO THE FEC**…………………………………………………24

**VI. BENTON SHOULD RECEIVE A NEW TRIAL BECAUSE THE COURT ERRED IN EXCLUDING EXPERT TESTIMONY OF MASON AND LINK AND ERRED IN INSTRUCTING THE JURY**…………………………..………25

**VII. BENTON'S CONVICTION VIOLATES HIS DOUBLE JEOPARDY RIGHTS**………………………………………………………………………..26

**CONCLUSION**………………………………………………………………………27

## STANDARDS OF REVIEW

Federal Rule of Criminal Procedure 29(c) provides that the court may set aside a guilty

verdict and enter an acquittal.  Fed. R. Crim. P. 29(c).  "[T]he pertinent inquiry is whether there

is sufficient evidence to support the conviction if the government's evidence is accepted."

*United States v. Starr*, 533 F.3d 985, 998 (8th Cir. 2008) (quoting Rule 29).  More specifically,

> A motion for judgment of acquittal should be granted only where the evidence,
> viewed in the light most favorable to the government, is such that a reasonably
> minded jury must have a reasonable doubt as to the existence of any of the
> essential elements of the crime charged.

*United States v. Baker*, 367 F.3d 790, 797 (8th Cir. 2004).  This standard is not met in cases

where the Government's evidence is "so scant that the jury could only speculate as to

defendant's guilt, or if the evidence presented "gives equal or nearly equal circumstantial support

to a theory of guilt and a theory of innocence."  *United States v. Schuchmann*, 84 F.3d 752, 753-

54 (5th Cir. 1996).   When the conditions for relief under Rule 29 are met, entry of judgment of

acquittal is mandatory.  *Starr*, 533 F.3d at 997 (citing Fed. R. Crim. 29(a)).

Although generally a district court may not consider credibility of a witness in

ruling on a motion for judgment of acquittal, extraordinary circumstances can render testimony

discredited as a matter of law.  *See United States v. Watson,* 952 F.2d 982, 988 (8th Cir. 1991);

*United States v. Lanier,* 578 F.2d 1246, 1251 (8th Cir. 1978). Extraordinary circumstances

warranting acquittal exist if "no reasonable person could believe the incriminating testimony."

*Watson,* 952 F.2d at 988.

Unlike the standard to grant a motion for judgment of acquittal, when the court evaluates

the evidence for the new trial motion under Federal Rule of Evidence 33, the evidence is no

longer viewed in the light most favorable to the government.  Instead, the court may grant a new

trial motion "where it finds that the verdict is contrary to the weight of the evidence" or "where

the evidence presented weighs heavily enough against the verdict that the court believes a miscarriage of justice may have occurred." *United States v. Davis*, 534 F.3d 903, 912 (8th Cir. 2008) *citing United States v. Smart*, 501 F.3d 862, 865 (8th Cir. 2007). The district court has broader discretion to grant a new trial under Rule 33 than it does to grant a motion for judgment of acquittal under Rule 29. *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002). In determining the appropriateness of granting a new trial, the district court should weigh the evidence and evaluate the credibility of the witnesses. *Davis*, 534 F.3d at 912. The district court is free to disbelieve witnesses during this assessment. *United States v. Bertling*, 510 F.3d 804, 808 (8th Cir. 2007).

While the defendant understands that the district court's authority to grant a new trial is to be exercised sparingly and with caution, *see United States v. Sturdivant*, 513 F.3d 795, 802 (8th Cir. 2008), the defendant submits that this case warrants such a remedy. Benton's conviction is a miscarriage of justice because there was insufficient evidence to support his convictions, because evidence demonstrates that Kent Sorenson fabricated his testimony, because the jury's verdicts were unreasonable and not supported by the law or the facts, because the Court erred in refusing to permit expert testimony or give appropriate instructions, and because the evidence presented demonstrates a violation of Benton's double jeopardy rights.

If the court grants a motion for judgment of acquittal, it must still conditionally determine whether the motion for new trial should be granted in case the judgment of acquittal is later vacated or reversed.  Fed. R. Crim. Pro. 29(d)(1). Benton requests a ruling granting both motions.

## ARGUMENT

**I.      JESSE BENTON IS ENTITLED TO A NEW TRIAL BECAUSE KENT SORENSON COMMITTED PERJURY.**

It has been conceded by both the government and Kent Sorenson himself repeatedly that Sorenson has a long history of lying and deceit.  (TT 859; TT 889, "I lied, I lied, I lied").  Yet, the government contended during this most recent trial that Sorenson has not lied since entering into the cooperation agreement with the government because, well, because Sorenson has said he isn't lying.  (TT 889, "I haven't lied since I pled guilty.")  This Court saw both times Sorenson testified, and is well aware that the government's reliance on Sorenson's word that he hasn't lied is misplaced.  Sorenson must have committed perjury at both the prior trial and the recent trial.

There are many possible examples to demonstrate that Sorenson committed perjury – a few main examples are illustrative.  At the first trial in October of 2015, Sorenson testified that Kesari was on the phone with Benton the entire time Sorenson was being told to lie to the media on December 29, 2011.  (Trial 1 Trans. p. 597).  Sorenson was very clear that Kesari was on the phone with Benton the entire time he was in the meeting, and said "I know Jesse was on the phone.  I'm not sure if there was other people.  I know Jesse was on the phone."  (Trial 1 Trans. p. 597).   Later when he was asked again whether during the time he made the agreement to lie to the press, "Was he on the phone with Jesse Benton?" Sorenson answered unequivocally, "Yes." (Trial 1 Trans. p. 628).

However, by the time of the second trial, the parties had obtained all of the phone records.  Suddenly, Sorenson's story changed.  Sorenson was very clear that he did not know if Benton was on the phone and never heard his voice (TT p. 936).

Q:  So you never talked to Mr. Benton, right?

A:  No.

6

Q:  You never heard Mr. Benton?

A:  Not that day, no.

Q:  In fact, you said this phone was on speakerphone you thought, right?

A:  I said at one time it may have been on speakerphone because he was holding it away.
I don't know.  I wasn't listening to his conversation.

Q:  But you didn't hear Mr. Benton?

A:  Correct.

(TT 936).

 This drastic change in sworn testimony came at a convenient time for Sorenson and the

government, as the phone records conclusively showed that there was no time Kesari was on the

phone with Benton when Sorenson was not on his own phone before the press interviews on

December 29, 2011.  (Compare Gov. Ex. 182, PIN-00658928-29 with Gov. Ex. 183, PIN-

0659489-90.) These records also showed that there was no call between Kesari and Benton while

Kesari was in Ankeny at the campaign headquarters that even lasted more than 2 minutes. (Gov.

Ex. 183, PIN-00659-490).

Similarly, the government went to great pains to try to make Dr. Ron Paul say he never

saw Sorenson during the campaign (TT 422-423), and their theme throughout the first trial and

the first half of the second trial was that Sorenson did no work for the campaign.  Yet, once

Sorenson realized the defense could determine his location from his cell phone records, he

testified that he actually went to Northwest Iowa for the campaign and even had dinner

personally with Dr. Paul. (TT 936-937).  This fact had never come out before in Sorenson's prior

testimony, indeed it appeared that the government had not heard that fact despite having met

with Sorenson numerous times because they were badgering the former candidate on cross trying to get him to say that he conclusively never saw Sorenson on the campaign.

Other emails and records conclusively demonstrated that Sorenson continues to not be truthful throughout these proceedings.  Sorenson denied (sort of) knowing about the contents of the Dorr memo. (TT 908-99, "I knew there was discussions" but "I was shocked by some of the contents of it," yet "I've talked to him every day, from the day I got elected until I resigned.") Sorenson denied (sort of) knowing, reading, or approving the Alfred Pennyworth press release. (TT 906-908).  Sorenson denied (sort of) using another alias and email account despite it being clear that it was being used by him involving a subject matter that he would definitely not forget. (Ex. B29, offered but not admitted, "My name is actually Kent and my wife is Shawnee…"; TT 875, "I'm not denying it or admitting it.  I'm saying I don't recall.").  Sorenson denied telling anyone he had been offered a paid position with Newt, despite the Chair of the Republican party emailing that Sorenson had said so.  (TT 894, Ex. 3).

And, inexplicably, the FBI themselves even go so far as to try to explain away Sorenson's lies when they could. Agent Lostracco's testimony is illustrative.  When asked a simple question about how Sorenson's emails contained falsehoods directed at Kesari, she simply would not admit they were false.  She instead tried to imply to the jury that Sorenson might not have been lying when he told Kesari he was at Bachmann's office in Des Moines because the campaign might have had another satellite office in Milo.  (TT 647).  Of course, there never was a campaign office in Milo and Sorenson was just lying to Kesari.  (TT 887).

Sorenson is simply not a credible witness.  In such a circumstance, judicial interference with the verdict is appropriate and a new trial is warranted. *Mesarosh v. United* States, 352 U.S. 1, 9 (1956) (granting new trial when government's witness was discredited at trial.) To allow

Benton to remain convicted based on the incredible and dishonest testimony of Kent Sorenson would be a miscarriage of justice. Benton should get a new trial, if not a full judgment of acquittal, for this reason. *See Davis*, 534 F.3d at 912; *Bertling*, 510 F.3d at 808.

**II.     JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 1 BECAUSE THERE IS NO CREDIBLE EVIDENCE THAT HE CONSPIRED TO COMMIT ANY OF THE LISTED CRIMES.**

Count 1 of the Superseding Indictment charges Jesse Benton with conspiracy to commit three separate crimes (Counts 2-4), all involving the use of ICT and "audio visual" on the RPPCC FEC expenditure reports.  Conspiracy, as instructed to the jury in this matter, has four elements.  There was insufficient evidence on each element,[1] both under the Rule 29 standard and the Rule 33 standard.

**A.  ELEMENT ONE – THERE WAS NO AGREEMENT TO COMMIT AN OFFENSE.**

The first element of the conspiracy count requires the government to prove that two or more people reached an agreement to commit the crimes detailed in Counts 2 through 4.  The details of the failures in the evidence of each of these crimes is detailed below.

As argued in Benton's first motion, there was simply no evidence that a conspiracy to violate the FEC laws even existed.  Weighing the evidence, and assessing credibility of the witnesses shows even more clearly that a reasonable jury could not have found guilt beyond a reasonable doubt on this, or any element because the Government's evidence is "so scant that the jury could only speculate as to defendant's guilt," and the evidence presented "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *United States v. Schuchmann*, 84 F.3d 752, 753-54 (5th Cir. 1996).

---

[1] There was insufficient evidence of overt acts.  Benton relies upon the arguments already made both by himself, and by his codefendants, in his challenge to this element.

Such an alternative theory is not only equal, but actually more likely, in this case.  Kesari wanted Sorenson to work for the Paul campaign.  He finally convinced Benton that it would be useful.  Benton made an offer to Sorenson.  Sorenson tried to weasel his way into more money from both Bachmann and the RPPCC, and his actions angered Benton.  Benton pulled the offer. Kesari still wanted Sorenson to join the Paul campaign.  Kesari, at dinner, offered a $25,000 check to Sorenson, assuming that he would either get that money back from Sorenson if the campaign agreed to pay him, or Sorenson would not cash the check if he got the deal he wanted. Kesari did not tell Benton about this check.  After Sorenson made the endorsement, Kesari, knowing that Benton would not authorize a $25,000 payment to Sorenson based on the very clear direction that people worked for their money, needed to make sure that he had $25,000 in his checking account to cover the check if Sorenson cashed it.  So, Kesari notified Cortez he needed a wire.  Whether Kesari was actually owed the $25,000 for work and services provided by his company or not is of really no import at this stage – he clearly did not tell Benton or Cortez what the wire was for and never provided an invoice.  Benton responded to the request saying that if it was to be paid, it had to wait.  Then, Sorenson, being pressed by Meghan Kelly, tried to be cute with his words on the air, just as this Court saw him try to be cute with his words at trial.  During that, Sorenson said he wasn't being paid.  And so then, having said it, he couldn't be paid. Benton at that point, when asked, said that Sorenson was not being paid, because he was not being paid.  Benton never once said he was not offered to be paid.

Kesari, however, was now in a bind.  He had a $25,000 check out there.  He had promised Sorenson, someone who he had considered his friend, but who had also had his people break his foot at the straw poll, that he would be paid.  So he tried to come up with a way to get him paid through the campaign still.  He had him do robo-calls and email blasts.  But, Benton

had said not to pay Sorenson.  And so, even though generally Kesari could hire and fire people at will, he shouldn't go against a direct order from Benton.  So Kesari asked Benton if Sorenson could go to South Carolina.  Despite it being a hotly contested race in South Carolina, Benton's response was luke warm – "what would he do."  Kesari took that as not a "no" and sent Sorenson to South Carolina.  Kesari then asked again if Benton had gotten Sorenson paid for going to South Carolina.  Benton told him he could handle it, assuming it would be the amount previously offered - $8000 a month, and knowing that Sorenson had, in fact, done work for the campaign.

Kesari, however, had not completely resolved his problem.  He needed to try to cover the floating $25,000 check.  He had the big payment run through ICT, included other amounts for other items on the invoice to make the amount less obvious, and sent it to Cortez.  While he had gotten Benton's permission to pay Sorenson the $8000, he had not gotten permission to pay him $33,000, and so he explained to Izon and his brother that he was doing it this way because of the "intermural politics."  Instead of explaining that Benton had only approved one $8000 payment to Sorenson, Kesari simply told Cortez, "Jesse approved."  It worked.  It got paid, coded, and submitted to the FEC.  Benton never knew how it was coded, or how it got reported to the FEC.

Cortez, not yet realizing what Kesari had done, paid the invoice, and added it to the multi-million expense reports.  While technically the expense report got emailed to Benton, he only would look at the bottom line, not at individual vendors.  This particular expense report would have gotten even less attention than that because Benton was puking on a plane after a debate at the time it was sent, later to be admitted for several days into the hospital.

The ICT invoice got coded by Cortez and sent to Texas.  Benton never saw it, never knew how it was coded, and never thought twice about it because Kesari, as well as all of the other hundreds of employees, were the ones handling the day to day payments.  But, Sorenson

wasn't done yet.  He wanted more money.  He bugged Kesari until he got it.  Benton told Kesari to stop paying Sorenson.  Kesari, however, couldn't stop because Sorenson had the check that Benton did not know about.  So he switched to emailing Tate.  Tate took Kesari at his word that Benton approved the payments, when, in fact, he had not.

This theory, being equally likely and supported by all of the evidence, warrants at least a new trial, if not a judgment of acquittal.  *Schuchmann*, 84 F.3d at 753-54.

## B.  ELEMENT TWO – BENTON DID NOT VOLUNTARILY AND INTENTIONALLY JOIN ANY AGREEMENT TO COMMIT A LISTED OFFENSE.

There was no credible evidence presented that Benton voluntarily and intentionally joined an agreement to submit something false to the FEC.  The only witness who testified that Benton was part of the agreement was Sorenson, and this time (as compared to the last trial), this "agreement" happened at the veteran's rally.

The only time Sorenson ever even claimed to have talked to Benton at the rally was before Sorenson took the stage when Sorenson supposedly asked Benton if the campaign was going to "take care of [him]," and Benton supposedly responded by allegedly saying "you bled for us, we'll take care of you, or you're bleeding for us and we'll take care of you, something like that."  (Trial Tr. at 787-88).  While the court must view this testimony in the light most favorable to the government for the Rule 29 motion, it may evaluate Sorenson's credibility under Rule 33.  Sorenson's claim that this statement was made, much less that it indicated Benton was joining a conspiracy to lie to the FEC, strains credulity.  Noone else around Benton heard him say the statement to Sorenson.  (Trial Tr. at 1240, 1261).  These witnesses, including Tonya Hester and John Baeza, neither of whom have credibility problems, testified that they were very

familiar with Jesse Benton and the "bleed for you" statement was not the type of language that Benton would use.  (Trial Tr. at 1240, 1262).

Sorenson's testimony itself belies even an inference that this statement meant that Benton was agreeing to pay him $25,000, much less that it also meant that he would "bleed" by choosing a code file the payments to Sorenson as audio/visual expenses with the FEC.  Sorenson testified that he himself did not know that the deal was for $25,000 even at the dinner with Kesari, or what the deal was at the time of the rally.  And, the Dennis Fusaro recording demonstrated that Sorenson did not have a deal as late as January.  Sorenson also testified that he thought he was being paid by someone within the campaign.  (TT 820, "I believe it was Sonny Izon now, but at that time I wasn't sure.  I thought it was Sonny Spanos from the campaign.  I didn't realize that it was somebody that I didn't know).

Similarly there was no evidence of any conspiracy with Kesari, as detailed in Benton's initial motion for judgment of acquittal.  Benton never agreed to either the method of structuring the payment, or the reporting of the payments to the FEC.

Weighing the evidence, and taking Sorenson's credibility into count, the Court should hold that this "bleed for you" statement was never made, and find that Benton never implied, much less agreed, to violate the FEC reporting requirements for payments to Sorenson.  A new trial at least, if not a judgment of acquittal, is warranted on this ground.

## C.  ELEMENT THREE – BENTON NEVER KNEW OF ANY ILLEGAL PURPOSE OF ANY AGREEMENT.

The government offered zero evidence that Benton knew of an illegal purpose of any agreement.  Essentially, their argument is that he must have known because of three factors, (1) he got an email asking for a wire for $25,000 from Kesari to which he responded to hold the payment for a few days; (2) he agreed to let Kesari handle paying Sorenson in a two word email,

13

"yo handle"; (3) he received an 84 page financial report that included the amount that had been

paid to ICT while he was on his way to the hospital and (4) he received in May an email that had

a bill from ICT which he was told was "Kent's bill" and he allowed it to be paid, saying it was

the "last time."

For the reasons already stated, there was a complete lack of evidence that Benton knew of

any illegal purpose of agreeing to pay Sorenson, and therefore, both a judgment of acquittal, and

a new trial, are warranted.

### III. JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 2 BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF THE ELEMENTS NECESSARY FOR COUNT 2.

#### A. ELEMENT ONE – BENTON NEVER VOLUNTARILY AND INTENTIONALLY CAUSED A FALSE ENTRY INTO A RECORD OR DOCUMENT.

In order to be false and therefore trigger liability under this statute, the entry into a record

not only must be false, but it must be material.  Instruction No. 7; *United States v. Ionia*

*Management S.A.*, 555 F.3d 303, 309 (2nd Cir. 2009) (noting materiality requirement under 18

U.S.C. § 1519).   As argued in the prior motion, and as argued by codefendant counsel, there was

no evidence of falsity or materiality offered at trial.  Also, as previously argued there was no

evidence that Benton voluntarily and intentionally caused the entry into the FEC records. This is

the type of case where the evidence of falsity and materiality was "so scant that the jury could

only speculate as to defendant's guilt" and the evidence presented "gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence."  *Schuchmann*, 84 F.3d at

753-54.  A such, acquittal on this ground is the correct legal remedy, or alternatively, using the

more favorable standard under Rule 33, where the Court can weigh the evidence and assess

whether the "evidence" the government argues supports their theory of falsity, materiality, and

voluntary and intentional conduct should be considered insufficient to support a conviction.

### B. ELEMENT TWO – BENTON NEVER INTENDED TO IMPEDE, OBSTRUCT, OR INFLUENCE THE PROPER ADMINISTRATION OF A MATTER.

As codefendant Tate has argued in his motion, Count 2 charges a violation of the "anti-

shredding" statute, codified in 18 U.S.C. § 1519.[2]  To the extent the government contends that

their evidence in this case satisfies this statute, such a reading of the statute would be overbroad,

vague, and violate Benton's due process rights under the Fifth Amendment.  *See United States v.*

*Aguilar*, 515 U.S. 593 (1995) (reversing jury verdict convicting a defendant of a statute with

similar language as § 1519, because simply making a false statement to law enforcement was not

sufficient to prove that he intended to influence, obstruct, impede the due administration of

justice under 18 U.S.C. §1503 because falsity alone was not sufficient to show intent to

influence, obstruct or impede.)  In *Aguilar*, the U.S. Supreme Court curtailed the government's

broad reading of the statute and required proof – much like the proof missing in the instant case –

that the false statement was made with a specific intent to obstruct justice.  In so doing, the Court

explained,

> We think the transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that respondent testified falsely to an investigating agent. Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice.

---

[2] Benton incorporates Defendant Tate's procedural history and argument on this matter, as detailed in Tate's Renewed Rule 29 Motion and Rule 33 motion.  18 U.S.C. § 1519 should not be read to obfuscate 18 USC § 1512 and 2232.

*Aguilar*, 515 U.S. at 601.

As in *Aguilar*, this Court should restrict the application of § 1519 to more narrow circumstances to which the statute was intended to apply – false statements made to obstruct justice.  The statute should not be applied to descriptions of expenditures made in an FEC report by someone other than the defendant that end up being arguably misclassified under the FEC's non-exhaustive, and seemingly nonsensical, list of "approved" and "unapproved" explanations for expenses.  The FEC's rules, and § 1519's application to the FEC's rules, render the statute unconstitutionally ambiguous and vague as applied to Benton.  The court should apply the rule of lenity in this circumstance, and find that § 1519 does not prohibit any of Benton's conduct in this case.

In *United States v. Reeves*, 84 F.Supp.3d 375 (D. New Jersey 2015), the district court found insufficient evidence of a violation of 18 U.S.C. §1519 and overturned a jury's guilty verdict and granted the defendant's post-trial motion for judgment of acquittal under Federal Rule of Evidence 29.  The defendant in question in *Reeves* had he himself presented the false writing in question to the FDA, but the court found that when it had been produced, there was no evidence that it had been done with the intent to obstruct an FDA program or investigation.  *Id.* at 407.  Indeed the court found that the agents had not served a subpoena or search warrant for the records, and the record at trial was "barren of evidence that [the defendant] was aware that his furnishing of this false oyster shipping log would impede an FDA program or investigation, so a *fortiori* there is insufficient evidence from which a jury could find that he *intended* to do so." *Id.*

16

Similarly in *United States v. Katakis*, 800 F.3d 1017 (9th Cir. 2015), the Ninth Circuit reversed a conviction under §1519 because making an investigation more difficult for investigating agents was not sufficient for criminal liability under the statute.

> In this case, we need not set out a comprehensive standard for what it means to "conceal" a record under § 1519. Suffice to say, contrary to the Government's position, we cannot ignore entirely the effort that an investigator would have to expend to uncover a hidden document. In this case, removing an email from one file folder and placing it in another was not sufficient to actually conceal it. Under the Government's theory, a defendant would have concealed a document even by lifting it from the surface of his desk with the intent to place it somewhere else, because the defendant would have removed the document from where investigators (or not even an investigator, a casual onlooker) expected to find it. The Government must show actual obstruction. It cannot show that here, where it seized all three computers and the email server in the course of its investigation and would have discovered all single deleted emails within due course. Indeed, the Government is in essence arguing that it need not undertake any investigation at all: if things are not as the Government expects to find them, a defendant may be exposed to a term of twenty years' imprisonment. More is needed, there must be some likelihood that the item will not be found in the course of a cursory examination (without using forensic tools) of a defendant's computer.

> We emphasize the limited nature of this holding. Our conclusion that the evidence was insufficient to convict Katakis for single deleting emails rests upon the unique factual circumstance that pressing the delete key in this context serves only to move an email from one file folder to another. Section 1519 was drafted to prevent corporate document shredding. The digital context threatens to expand § 1519 and its potentially harsh punishment well beyond its intended reach. We are hesitant to expand the reach of § 1519, in part because the Government barely developed the facts necessary to support the single-deletion theory at trial and we are left without many of the facts that might prove actual concealment. As with the other theories raised on appeal, the single-deletion theory was an afterthought, a comment the Government made at closing and now urges was sufficient to warrant a potential twenty-year sentence. Accordingly, we cannot endorse the Government's reading of the statute. Actual concealment must do more than merely inconvenience a reasonable investigator—there must be some likelihood that the item will not be found. That low bar is not met in this case.

*Katakis*, 800 F.3d at 1030.

In the instant case, no records were destroyed, shredded, deleted, or concealed from the FEC.  The FEC never asked for further explanation, never performed an audit, and never once asked for more information.  There was simply no credible evidence of this element and both Benton's motion for judgment of acquittal and motion for a new trial should be sustained.

## IV.   JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 3 BECAUSE THE EVIDENCE WAS INSUFFICIENT ON THE ELEMENTS OF COUNT 3.

### A.   ELEMENT ONE – BENTON DID NOT MAKE A FALSE REPORT TO THE FEDERAL ELECTION COMMISSION BY REPORTING OPERATING EXPENSE PAYMENTS TO ICT FOR AUDIO/VISUAL EXPENSES.

As argued previously, Benton did not make, sign, review, or receive, the FEC reports in question.  Thus, as a matter of law, the evidence was insufficient to convict him under 52 U.S.C. § 30109 because he did not make the reports to the FEC, did not know what the reports said, did not arrange or agree to have the payments go through ICT, did not know what ICT even was or who owned it, and perhaps most importantly, he did not agree to have the reports say that the payments were for audio visual services.  Also, under the Rule 33 standard, weighing the evidence and reviewing the credibility of Sorenson, Benton deserves a new trial on this ground.

### B.   ELEMENT TWO – THERE WERE NO FALSELY REPORTED EXPENDITURES PAID TO SORENSON THAT WERE NOT ACCURATELY REPORTED THAT AGGREGATED $25,000 OR MORE IN A CALENDAR YEAR.

As the Court has recognized, the use of ICT in and of itself as a pass-through "paymaster" was not an illegal structure for paying Sorenson, indeed it is a structure commonly used by businesses.  (Trial Tr. at 590).   The government therefore alleges that it was the combination of ICT and "audio visual" services that made the FEC reports false because Sorenson did very little work, therefore the payments must have been for his endorsement.

There was no evidence or legal authority provided at trial that indicates it would have been illegal for the RPPPCC to pay for an endorsement under the FEC rules, and there was no evidence that the FEC would have even allowed the campaign to submit the expenditure with "endorsement" as a sufficient explanation for such an expenditure.

This argument, in addition to being completely void of legal support, also fails factually under both the Rule 29 and Rule 33 standards. The government offered no evidence whatsoever how much the market value was for celebrities making robo-calls, for sending email blasts to their lists of supporters, for traveling on behalf of the campaign to events out-of-state, or for attending events in Sioux City. Thus, even if some portion of the payment was for the endorsement, there was no evidence (1) how much of the $73,000 could have been appropriately assigned for the robo-calls, email blasts, and travel and event time, or (2) how the FEC would have required payments for mixed purposes to be reported on the FEC forms. As such, there was no evidence, much less credible evidence, to support a jury finding that more than $25,000 of the $73,000 payments were for services other than audio visual services.

## C.  BENTON DID NOT KNOWINGLY OR WILLFULLY CAUSE ANY FALSE REPORTS.

As repeated perhaps *ad nauseam* in this case, the record is completely devoid of any evidence that Benton knew, or willfully caused, the reports to be submitted claiming the payments to ICT or claiming audio visual services. In fact, even the lawyers involved in the case have repeatedly disagreed over whether the reports are even false as a matter of law under the current state of the FEC regulations and opinions. On this point, it bears repeating what the evidence proves with respect to Benton. In October 2011, he authorized $8,000 per month payments to Sorenson to work for the RPPCC. (Trial Tr. at 66-67, Ex. 10). He expressly rejected any expenditure above and beyond the $8,000 per month. (Trial Tr. at 66, Ex. at 10). In

the weeks that followed, there was an on-again, off-again courtship between Sorenson and various members of the RPPCC that ended with Benton expressly declaring, "Fuck him, this is absurd. . . . I'm not interested in this game anymore.  Dimitri, pull the offer.  If we can't depend on him, I don't want him involved."  (Trial Tr. at 332, Ex. 35, 37).  After Sorenson subsequently endorsed Ron Paul on his own initiative, Benton approved monthly payments to Sorenson for his services to the RPPCC, which included producing robo-calls, appearing on television, and producing email lists.  Nothing that Benton did in this regard is illegal.

The Government's evidence establishes that Sorenson sent invoices from Grassroots Strategy to Kesari.  (Ex. 98).  Kesari sent the Grassroots Strategy invoices to his brother Pavlo.  (Ex. 69).  Sonny Izon would then submit invoices from ICT for "production services" to Kesari in the same amount as the Grassroots Strategy's invoices together with an upcharge.  (Ex. 81).  Kesari would forward the ICT invoices to Fernando Cortes with instructions for payment along with a representation that it had Benton's approval.  (Trial Tr. at 476, Ex. 76).  Most importantly, Sorenson testified that the conduit payments were his idea and designed by him to avoid his problem with ambiguous ethics rules of the Iowa Senate.  Izon also testified that ICT was being used because there was someone inside RPPCC who did not want him paid.

In any event, there is no evidence that Benton was aware of, or involved with, this conduit payment system.  To the contrary, the evidence proves that he was not involved.  Benton never talked to Pavlo or Izon about any of the ICT invoices.  (Trial Tr. at 598-99, 627).  Indeed, neither Pavlo, nor Izon, even knew who Benton was in 2012.  (Trial Tr. at 600, 627).  Equally important, Benton had no involvement in the coding decision for the ICT invoices.  (Trial Tr. at 236-37).  If the Government's evidence is insufficient to establish Benton was aware of the mechanics of the Sorenson-to-ICT-to-RPPCC transactions, then he could not have possibly

"knowingly and willfully" caused or conspired to cause the campaign's treasurer to file a false report.

This case is a novel use of the criminal law to try to instigate nationwide election reform. As the Fifth Circuit has recognized, when a financial reporting requirement is subject to dispute, criminal proceedings are the inappropriate method to resolve the dispute, "Nevertheless, the tax question was completely novel and unsettled by any clearly relevant precedent. A criminal proceeding pursuant to section 7201 is an inappropriate vehicle for pioneering interpretations of tax law." *United States v. Garber*, 607 F.2d 92, 100 (5th Cir. 1979)

Because criminal prosecutions are a novel way of controlling campaign expenditure reporting, there is limited ability to draw upon cases directly on point in a criminal context. Review, however, of the civil cases under this statute indicate that the "knowing and willful" standard has not been met in this case.  In this vein, *American Federation of Labor and Congress of Indus. Organizations v. Federal Election Commission*, 628 F.2d 97 (DC Cir. 1980) is instructive.  In reversing a civil fine for a failure of proof of willfulness, the DC Circuit explained,

> Given the statutory context, a "willful" violation must necessarily connote "defiance or such reckless disregard of the consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act." To hold otherwise would fail to distinguish between a "serious" offense and a "willful" one and would "disrupt the gradations of penalties" established by Congress....
>
> In our case there is not only no finding but also no evidence of such "defiance" or "knowing, conscious, and deliberate flaunting" of the Act. In fact, every indication is that the AFL-CIO considered itself to be in compliance with the Act. It learned nothing to the contrary from the GAO upon the occasion of the latter's audit. The fact that the AFL-CIO was routinely reporting the inter-fund transfers to the very agency charged with enforcement of the Act is persuasive evidence of a lack of intent to violate the Act's prohibitions. The Commission would seem to have conceded this point in stating at the District Court hearing that "the Commission must reiterate we are not attributing a direct mal-feasance (sic) on the part of the AFL-CIO." …

In addition to a lack of evidence that the AFL-CIO acted otherwise than in good faith, we can not say that their belief in the legitimacy of the inter-fund transfers was unreasonable. Neither the Act nor any court decision had addressed the immediate issue. Most telling is the fact that the audit by the Office of Federal Elections of the GAO, two years after the decision in *Pipefitters Local No. 562 v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) had noted the transfers and did not indicate disapproval in any way. It is clear that uncertainty as to the meaning of the law can be considered in assessing the element of willfulness in a violation of the law. *See James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), *United States v. Garber*, 607 F.2d 92 (5th Cir. 1979).

The Garber case was a criminal tax prosecution where, as here, willfulness was, by express command of the statute, an element of the offense. The holding (en banc, with four dissents) was that it was reversible error to exclude testimony by experts tending to show that the rightness or wrongness of defendant's reporting of the involved income was uncertain. The court said that no one should be convicted on the basis of an interpretation of law that is so written as to be of uncertain meaning to the mind of the accused. We do not have before us the question whether an uncertainty of law can be shown by witnesses. We think it is obvious that in construction of any penal statute of which willfulness is an element, it is possible for the meaning of the statute to be clear to the mind of a trained judge, and still be less than clear enough to support a finding of willful violation. This is certainly so where, as here, the question whether the conduct of the AFL-CIO was unlawful, was hitherto untested by any sort of tribunal, and there was no regulation or even press release by the Commission, so far as cited to us.

*Am. Fed'n of Labor & Cong. of Indus. Organizations (AFL-CIO) v. Fed. Election Comm'n*, 628 F.2d 97, 101 (D.C. Cir. 1980) (Some citations omitted).

Similarly, the district court in the central district of California refused to require civil penalties to be paid even though the final legal conclusion was that the defendants had violated FECA.  In so holding, the court explained,

On the basis of the undisputed evidence before the Court, the Court concludes that defendants violated section 441b(a) of the FECA by accepting corporate contributions. However, a close examination of the facts surrounding defendants' conduct indicates that these were not deliberate violations of the federal election laws. There is no evidence that defendants believed at the time that the fundraiser was not being conducted in accordance with existing law. In addition, the Court notes that the violations themselves are not substantial nor obvious. The FEC concedes that with only modest modifications, the events surrounding the 1993 fundraiser would have been perfectly legal. For example, if the contributions by Hughes executives had gone to a post office box, and a Harman Campaign employee had collected individual checks at the fundraiser, the "conduit" issue

would not have arisen. ... If the Harman Campaign had paid Hughes in advance for employee time, defendants' reimbursement for their services would also not be at issue. Furthermore, as defendants point out, the FEC issued clarifying regulations with respect to "corporate facilitation" of contributions subsequent to the events at issue in this litigation. ... The regulations currently in effect clarify the scope of permissible corporate activity. The case before the Court involves a detailed analysis of complex statutes and regulations, with fine lines separating permissible and impermissible activity. Consequently, although the Court finds that violations occurred, it is with the above considerations in mind that the Court addresses the FEC's request for penalties and injunctive relief in this action.

*Fed. Election Comm'n v. Friends of Jane Harman*, 59 F. Supp. 2d 1046, 1057 (C.D. Cal. 1999).

Surely then, this Court should hesitate to impose a criminal sanction for similar sort of conduct.  As this Court knows, federal election laws "are silent with respect to any definition or description of the person to whom an expenditure is ultimately made."  FEC Advisory Opinion 1983-25: *Mondale for President*.  "Moreover, they do not address the concepts of ultimate payee, vendor, agent, contractor, or subcontractor in this context."  *Id.*  For this reason, a committee "may report its payment to Consultants as expenditures *without further itemization of payments made by Consultants to others*."  *Id.* (emphasis added). Similarly, federal election laws and FEC rules are not only silent, but **secret** as to what purposes of expenditure are sufficient for the FEC forms.  Thus, no one, much less Benton, would even have known whether reporting payments to ICT as "audio/visual" versus reporting "endorsement" would have been acceptable by the FEC. There was simply no credible evidence of a knowing and willful violation of the FEC rules.  The court should set aside the verdict or order a new trial on this ground.

**V.    JESSE BENTON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND A NEW TRIAL ON COUNT 4 BECAUSE THERE IS INSUFFICIENT EVIDENCE OF THE ELEMENTS OF COUNT 4.**

**A.   ELEMENTS 1 AND 2 – BENTON DID NOT KNOWINGLY AND WILLFULLY CAUSE THE FILING OF EXPENDITURE REPORTS WITH THE FEC THAT FALSIFIED, CONCEALED, OR COVERED UP A FACT AND DID NOT USE A TRICK, SCHEME, DEVICE, OR COURSE OF ACTION INTENDED TO DECEIVE OTHERS.**

For the reasons stated in the previous motion, and for the reasons stated above, the knowing and willfully element was not supported at trial by any evidence, much less by the weight of the evidence.  There was no evidence offered at trial regarding a trick, scheme, device or course of action that Benton used to deceive others.  Indeed, he used his iphone to say "Yo handle" and "Yes – last time" to Kesari.  And, the falsity requirement has not been satisfied.  The evidence is simply not sufficient as a matter of law under either the Rule 29 or Rule 33 standard.

**B.   ELEMENT 3 – THE FACTS PROVIDED TO THE FEC WERE NOT MATERIAL TO THE FEC.**

Materiality is an essential element of all of the Counts, but specifically detailed in Count 4.  "A statement is material if it has a natural tendency to influence, or was capable of influencing the government agency or official."  *United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008) (citations omitted).  The Government bears the burden of proof on the issue of materiality.  *United States v. Jerke*, 896 F. Supp. 962, 964 (D.S.D. 1995).  Materiality is a question of law.  *United States v. Johnson*, 937 F.2d 392, 397 (8th Cir. 1991).

As codefendant Tate argued,[3] evidence the Government presented on materiality consisted of solely testimony from FEC employee Michael Hartsock that reports submitted by the RPPCC were "sufficiently filled out to remain published on the Internet" (Trial Tr. at 547);

---

[3] Benton adopts and incorporates all of the arguments made by codefendants Tate and Kesari in their simultaneous filings for judgment of acquittal and new trials.

and a warning stating that misstatements on forms submitted to the FEC could result in criminal prosecution under a now outdated provision of the federal election laws (Trial Tr. at 1113-14). Indeed the reports themselves were automatically posted on the internet. For the reasons stated in Tate's motion, Benton's verdict should also be overturned because of the lack of evidence of materiality. *See United States v. Talkington*, 589 F.2d 415, 417 (9th Cir. 1978) (statement in a claim for government funds was not material where the information provided in the statement had no effect on the processing of the claim). A false statement that has no impact on any agency decision is not "material" as a matter of law. As Tate sets forth, this case is similar to *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), which granted a Rule 29 motion for failure of proof on materiality. This Court should similarly grant such a motion and grant a new trial.

## VI.   BENTON SHOULD RECEIVE A NEW TRIAL BECAUSE THE COURT ERRED IN EXCLUDING EXPERT TESTIMONY OF MASON AND LINK AND ERRED IN INSTRUCTING THE JURY.

At trial, the Court erred in disallowing the defendants' expert witnesses, David Mason and Jeff Link, and erred refusing appropriate jury instructions. In cases where knowing and willful conduct is required, and proof of intent to violate the law is required, expert testimony should be allowed. As the Fifth Circuit has recognized,

> When the taxability of unreported income is problematical as a matter of law, the unresolved nature of the law is relevant to show that defendant may not have been aware of a tax liability or may have simply made an error in judgment. Nordstrom v. United States, 360 F.2d 734 (8th Cir.), Cert. denied, 385 U.S. 826, 87 S.Ct. 59, 17 L.Ed.2d 63 (1966); United States v. Bridell, 180 F.Supp. 268 (N.D.Ill.1960). Furthermore, the relevance of a dispute in the law does not depend on whether the defendant actually knew of the conflict. In United States v. Critzer, 498 F.2d 1160 (4th Cir. 1974), the Fourth Circuit reversed a criminal tax fraud conviction against an Eastern Cherokee Indian who failed to report a portion of her income derived from land held by the United States in trust for the Eastern Cherokee Band. The evidence clearly established that the underreporting was intentional. Whether the income was taxable, however, was a disputed question dependent on the interpretation of certain land allotment statutes, which the court did not resolve.

Instead, it reversed the conviction because of the absence of authority definitively governing the situation. The court's language is particularly apt here:

As a matter of law, defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions. As a matter of law, the requisite intent to evade and defeat income taxes is missing. The obligation to pay is so problematical that defendant's actual intent is irrelevant. Even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required. 498 F.2d at 1162 (emphasis added).

*Garber*, 607 F.2d 92, 98 (5th Cir. 1979).

The court not only disallowed relevant and necessary expert testimony to challenge the knowing and willful elements, the court also disallowed a requested instruction on vague and highly debatable laws, as proposed by Benton in his instruction 20. And, the court allowed, over objection, statements made which do not meet the coconspirator exception to the hearsay rule. These errors each, and collectively, warrant a new trial.

## VII. BENTON'S CONVICTION VIOLATES HIS DOUBLE JEOPARDY RIGHTS.

These same charges were dismissed by the Court for violation of Benton's proffer agreement. Benton went to trial on a false statements charge, alleging that he made false statements during that proffer about the events surrounding the payments to Sorenson. At this most recent trial, the government offered the exact same evidence that it did in the first trial, despite Benton moving in limine to exclude this evidence (which the Court denied). Under these circumstances, a conviction in the instant case is a violation of Benton's rights to due process and to be free from double jeopardy. *See Dowling v. United States*, 493 U.S. 342 (1990) ); (majority holding that collateral estoppel prevents a defendant from having to re-litigate an issue that was necessarily found in his favor in a first trial, and dissent opining that a defendant should not be forced to re-litigate any of the disputed facts underlying the prior acquittal in a subsequent

prosecution); *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) (setting forth test for collateral estoppel

in a criminal matter upon acquittal of the defendant); *United States v. Riley*, 684 F.2d 542, 546

(8th Cir. 1982) (barring re-litigation of ultimate issue as a violation of collateral estoppel, and

setting forth Circuit split on use of evidence that resulted in an acquittal, in a subsequent

prosecution by the same sovereign.)  Dismissal of the charges against Benton is the correct

remedy for this violation.

## CONCLUSION

For the reasons articulated herein, as well as those reasons advanced in the Rule 29 and

Rule 33 motions of his co-defendants, Jesse Benton moves the Court to enter a judgment of

acquittal on all four counts and to alternatively order a new trial on all four counts.


**/s/ Angela Campbell**
Angela Campbell AT# 0009086
DICKEY & CAMPBELL LAW FIRM, P.L.C.
301 E. Walnut St., Suite 1
Des Moines, Iowa 50309
PHONE: 515.288.5008  FAX: 515.288.5010
E-MAIL:  angela@dickeycampbell.com

CERTIFICATE OF SERVICE
I hereby certify that on May 19, 2016, I
electronically filed this document with the
Clerk of Court using the ECF system which
will serve it on the appropriate parties.


       /s/ Angela Campbell