IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA


UNITED STATES OF AMERICA, )

      Plaintiff,       )

      v.              ) Criminal No.

JESSE R. BENTON,      ) 4:15-CR-103-JAJ-HCA

JOHN F. TATE, and      )

DIMITRIOS N. KESARI,    )

      Defendants.     )

          - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF WESLEY YOO

Monday, September 28, 2015


Reported by:

Lori J. Goodin, RPR, CLR, CRR,

Job No: 14915

1

2

3              The deposition of WESLEY YOO was

4    convened on Monday, September 28, 2015,

5    commencing at 10:02 a.m., at the offices of,

6    Barnes & Thornburg, 1717 Pennsylvania Avenue,

7    Northwest, Suite 500, Washington, D.C.  20006,

8    before Lori J. Goodin, Registered Professional

9    Reporter, Certified LiveNote Reporter, Certified

10   Realtime Reporter, Realtime Systems Administrator,

11   and Notary Public in and for the District of

12   Columbia.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    APPEARANCES

 2

 3   For Plaintiff:

 4       JONATHAN I. KRAVIS, ESQUIRE

 5       UNITED STATES DEPARTMENT OF JUSTICE

 6       PUBLIC INTEGRITY SECTION, CRIMINAL DIVISION

 7       950 Pennsylvania Avenue, Northwest

 8       Washington, D.C.  20530

 9       202-616-2840

10       jonathan.kravis@usdoj.gov

11

12

13   For Defendant John Tate:

14       LAURIN H. MILLS, ESQUIRE

15       LECLAIRRYAN

16       2318 Mill Road

17       Suite 1100

18       Alexandria, Virginia  22314

19       703-657-5903

20       laurin.mills@leclairryan.com

21

22

23

24

25
```

1              APPEARANCES CONTINUED

2

3   For Defendant Dimitrios Kesari:

4       JESSE R. BINNALL, ESQUIRE

5       HARVEY & BINNALL, PLLC

6       717 King Street

7       Suite 300

8       Alexandria, Virginia  22314

9       703-888-1943

10      jbinnall@harveybinnall.com

11

12

13  For Defendant Jesse Benton:

14      ROSCOE C. HOWARD, JR., ESQUIRE

15      MEENA T. SINFELT, ESQUIRE

16      BARNES & THORNBURG, LLP

17      1717 Pennsylvania Avenue, Northwest

18      Suite 500

19      Washington, D.C.  20006

20      202-289-1313

21      roscoe.howard@btlaw.com

22      meena.sinfelt@btlaw.com

23

24

25

1                    APPEARANCES CONTINUES

2

3    ALSO PRESENT:

4

5       Richard C. Pilger, Director, Election Crimes

6          Branch, U.S. Dept. Of Justice, Criminal

7          Division, Public Integrity Section

8

9       Theresa Dalmut, paralegal, Harvey & Binnall

10

11      Carlos Garcia, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CONTENTS

2    EXAMINATION BY                        PAGE

3    Direct Mr. Kravis                      10

4    Voir Dire Mr. Mills                    15

5    Direct Mr. Kravis                      19

6    Cross Mr. Mills                        39

7    Cross Mr. Binnall                      56

8    Cross Mr. Howard                       67

9    Cross Ms. Sinfelt                      73

10   Redirect Mr. Kravis                    74

11   Recross Mr. Mills                      80

12

13                        EXHIBITS

14   GOVERNMENT

15   NO. DESCRIPTION                        PAGE

16   1   CD containing Cellebrite Report of Exam   37

17       of cell phone of Mr. Kesari

18   2   Document containing serial number of      28

19       examined laptop

20

21                        EXHIBITS

22   YOO

23   NO. DESCRIPTION                        PAGE

24   3   Curriculum Vitae of Wesley Yoo        16

25   4   Report of examination, 8/4/2015       39

```
1                    EXHIBITS CONTINUED

2    YOO

3    NO. DESCRIPTION                           PAGE

4    5   Chain of custody document for laptop      68

5        Item IB44

6    6   Chain of custody document for iPhone      69

7        Item 1B43

8

9           (Original Exhibits retained by counsel.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    PROCEEDINGS
 2              THE VIDEOGRAPHER:  This is Disk
 3    Number 1 of the video deposition of Wesley
 4    Yoo, in the matter of United States of
 5    America v. Jesse R. Benton, John F. Tate and
 6    Dimitrios N. Kesari, in the United States
 7    District Court for the Southern District of
 8    Iowa, Criminal Number 4:15-CR-103-JAJ-HCA.
 9              This deposition is being held at
10    1717 Pennsylvania Avenue, Northwest,
11    Washington, D.C. on September 28, 2015, at
12    approximately 10:02.
13              My name is Carlos Garcia, from the
14    firm of TransPerfect Legal Solutions and I am
15    the legal video specialist.
16              The court reporter is Lori Goodin,
17    in association with TransPerfect Legal
18    Solutions.
19              Will counsel please introduce
20    themselves.
21              MR. KRAVIS:  Good morning everyone,
22    my name is Jonathan Kravis, and I represent
23    the United States.
24              MR. PILGER:  I am Richard Pilger, I
25    also represent the United States.
```

1           MR. MILLS:  Good morning.  Laurin

2      Mills on behalf of John Tate.  And since this

3      is a trial type deposition, I would like to

4      invoke the rule on witnesses.

5           MR. KRAVIS:  Okay.  Special Agent

6      Brooks, why don't you wait outside, thank

7      you.  Just in case.  I don't think you are

8      likely a trial witness, but just in case.

9           MR. BINNALL:  Jesse Binnall,

10     J-E-S-S-E, last name B-I-N-N-A-L-L on behalf

11     of Dimitrios Kesari.

12          MR. HOWARD:  Roscoe Howard with

13     Barnes & Thornburg.  My last name is spelled

14     H-O-W-A-R-D.  I represent Jesse Benton.

15          MS. SINFELT:  Meena Sinfelt,

16     S-I-N-F-E-L-T, I also represent Jesse Benton,

17     with Barnes & Thornburg.

18          MR. HOWARD:  Did you want the

19     paralegals to introduce themselves?

20          MR. KRAVIS:  That's fine.

21          THE VIDEOGRAPHER:  Would the court

22     reporter please swear in the witness.

23                  *   *   *

24          WESLEY J. YOO,

25   a witness called for examination, having been

1  first duly sworn, was examined and testified as

2  follows:

3              THE VIDEOGRAPHER:  Please proceed.

4                  DIRECT EXAMINATION

5  BY MR. KRAVIS:

6        Q.    Good morning, sir.

7        A.    Good morning.

8        Q.    What is your name?

9        A.    My name is Wesley J. Yoo.  My last

10  name is spelled Y-O-O.

11       Q.    And, what do you do for a living?

12       A.    I am a special agent for the Federal

13  Bureau of Investigation.

14       Q.    How long have you been a special

15  agent with the Federal Bureau of Investigation?

16       A.    I have been a special agent for

17  approximately 15 years.

18       Q.    And, what is your current assignment

19  with the Federal Bureau of Investigation?

20       A.    I am currently assigned as a Special

21  Agent Forensic Examiner With the Computer

22  Analysis Response Team which is primarily

23  responsible for processing and analysis of

24  digital media.

25       Q.    And, how long have you been a

1    forensic examiner with the FBI?

2         A.    I have been with the FBI as a

3    forensic examiner for approximately ten years.

4         Q.    And what exactly does a forensic

5    examiner with the FBI do?

6         A.    As a forensic examiner, I am

7    responsible for the processing and analysis of

8    information and potential evidentiary material

9    from digital storage media.

10              For example, hard drives, thumb

11   drives, and so forth.

12        Q.    Did you receive any specialized

13   training to allow you to do that work?

14        A.    Yes.  In order to be -- in order to

15   be certified as a forensic examiner, there is a

16   lengthy process that one must go through which

17   involves a specialized training, and at the end

18   of that training it involves testing and then

19   ultimately a certification of you being certified

20   as a forensic examiner.

21        Q.    You said that is a lengthy process.

22   About how long, exactly, is that process?

23        A.    It depends on the individual, but

24   when I went through the program it took

25   approximately about two years.

1          Q.    And, you said that during those two

2     years you received training?

3          A.    Specialized training, yes, sir.

4               For example, one of the trainings

5     that you have to take as part of your training

6     curriculum is A Plus, which deals with hardware,

7     software, and at the end of that training you are

8     then certified to handle those types of material

9     in your forensic exams.

10         Q.    And did you also say that part of

11    your two years of training required you to do

12    some testing in this area?

13         A.    Yes.  At the end of each process an

14    individual is routinely checked to make sure that

15    you have a understanding of what that field

16    entails.

17               So, the tools that you are using to,

18    the tools that you are using on a daily basis to

19    do your job, you are tested on.  And then

20    ultimately, you know, you are given a pass/fail.

21         Q.    And how did you do on those tests?

22         A.    I passed every single one of those.

23         Q.    And at the end of your training

24    after you passed the tests, what, if any

25    certifications did you receive from the FBI?

1          A.     I was certified to deal with what
2    they call Window platforms which are
3    Windows-based operating systems.
4              And then later on I received the
5    cell phone, so I was certified to do cellphone.
6    And the other certifications that I was given was
7    dealing with Apple McIntosh platforms.
8          Q.     And when was it that you received
9    that certification from the FBI?
10          A.     In 2004 or '5.  I can't recall
11    exactly.  But, I believe it is in my curriculum
12    vitae.
13          Q.     And, since the time that you
14    received that certification from the FBI, what,
15    if anything, have you done to keep up to date
16    with developments in your field?
17          A.     As part of best practices that
18    oversees our program, everyone that is certified
19    as a forensic examiner, on an annual basis must
20    undergo a proficiency test as well as additional
21    training to maintain the knowledge in the field,
22    as well as maintaining the best practices that
23    is, that are involved in the processing and
24    analysis of the digital media.
25          Q.     And how have you done on your most

1   recent proficiency exams?

2          A.    I have passed.

3          Q.    Approximately how many cell phones

4   would you say you have analyzed in your career

5   with the FBI?

6          A.    Numerous.  I mean, I think it must

7   be maybe hundreds.

8          Q.    And, about how many computers have

9   you analyzed in your career with the FBI?

10         A.    Again, too many to count, but

11   numerous.

12         Q.    And, without listing all of them,

13   what are some of the certifications that you hold

14   in this field?

15         A.    Like I stated before, again Windows,

16   the most recent one that I have been certified

17   was through the SANS organization which deals

18   with, again, Windows platform, forensic exam of

19   digital media.  So, that was my most recent

20   certification that I have.

21              MR. KRAVIS:  At this time the

22       government offers Special Agent Wesley Yoo as

23       an expert in the field of digital forensics.

24              MR. MILLS:  Would it be possible for

25       me to voir dire the witness.

1          MR. KRAVIS:  Of course.

2              VOIR DIRE EXAMINATION

3  BY MR. MILLS:

4      Q.    Good morning Agent Yoo, I am Laurin

5  Mills, counsel for Mr. Tate.

6              You have an undergraduate degree in

7  biology.  Is that correct?

8      A.    That is correct.

9      Q.    And you received that degree in

10  1991?

11      A.    That is correct.

12      Q.    And you also have an undergraduate

13  degree in chemistry; is that right?

14      A.    That is correct.

15      Q.    And you received that degree in

16  1992, right?

17      A.    That's correct.

18      Q.    In 1996 you received a master's

19  degree in analytical chemistry; is that right?

20      A.    That's correct.

21      Q.    And from January of 1996 until May

22  of 2000, you worked as a chemist; is that right?

23      A.    That is correct, I believe, yes.

24      Q.    And not as a computer forensic

25  analyst?

1          A.     That is correct.

2          Q.     I'm going to show you what we will

3    mark as exhibit, since you already have two

4    exhibits marked, I will call this Exhibit 3.

5                    MR. KRAVIS:  Very well.

6                    (Yoo Exhibit Number 3

7                     marked for identification.)

8    BY MR. KRAVIS:

9          Q.     Agent Yoo, you have the Exhibit 3 in

10   front of you, don't you?

11         A.     Yes.

12         Q.     Can you identify it?

13         A.     Yes.

14         Q.     Let me help you.  Exhibit 3 is the

15   Government's Notice of Expert Witnesses; is that

16   correct?

17         A.     Yes.

18         Q.     And that is your name on the first

19   page in bold letters, Wesley Yoo; is that

20   correct?

21         A.     That is correct.

22         Q.     Okay.  And attached to Exhibit 3

23   toward the end is a four-page document entitled

24   Curriculum Vitae, correct?

25         A.     Yes.

1          Q.     And this is the curriculum vitae of

2     Wesley J. Yoo; is that correct?

3          A.     That is correct.

4          Q.     And a curriculum vitae is a fancy

5     name for a resumé; is that right?

6          A.     Yes.

7          Q.     And at the bottom of Page 3 of 4 is

8     a heading called Publications.

9                 Do you see that?

10         A.     Yes.

11         Q.     And, you have been an author on

12    three published academic papers; is that right?

13         A.     Yes, according to this, yes.

14         Q.     And isn't it true that all of the

15    academic papers on which you have been an author

16    have been in the field of chemistry?

17         A.     That is correct.

18         Q.     And they all dealt with

19    supercritical fluid extraction; is that correct?

20         A.     Yes.

21         Q.     And they are all published in the

22    1990s?

23         A.     That is correct.

24         Q.     And your resumé also lists five

25    academic presentations, correct?

1          A.    Goodness gracious.  Yes.

2          Q.    And all of those presentations were

3    also in the 1990s?

4          A.    Yes.

5          Q.    And all of them were in the field of

6    chemistry; is that right?

7          A.    Yes.

8          Q.    Okay.  And, in fact, your resumé

9    does not list you as an author on a single

10   published paper in the field of computer

11   forensics, does it?

12         A.    That is correct.

13         Q.    And, it doesn't list you as an

14   author on a single published paper in the field

15   of computer science, does it?

16         A.    That is correct.

17         Q.    Okay.  And it doesn't list a single

18   presentation in the field of computer science,

19   does it?

20         A.    That is correct.

21         Q.    And your resumé does not list a

22   single presentation in the field of computer

23   forensics, does it?

24         A.    That is correct.

25         Q.    Okay.  And your resumé does not list

1    any instances where you have been qualified as an

2    expert witness in the field of computer science,

3    does it?

4         A.    That is correct.

5         Q.    And it doesn't list a single

6    instance where you have been qualified as an

7    expert witness in digital forensic sciences, does

8    it?

9         A.    That is correct.

10        Q.    Okay.

11             MR. MILLS:  Your witness.

12             DIRECT EXAMINATION (resumed)

13   BY MR. KRAVIS:

14        Q.    Thank you.  Very briefly Special

15   Agent Yoo, in your role as a forensic examiner

16   for the FBI, is it your job to publish papers or

17   is it your job to analyze digital evidence in

18   criminal investigations?

19        A.    My job is to process digital

20   evidence, not publish.

21        Q.    Now, Special Agent Yoo, I want to

22   ask you some questions about your field, about

23   how digital forensics works.

24             What are the steps you take to

25   perform a forensic analysis of an electronic

1  device like a computer?

2      A.    In general terms, the Number 1 most

3  important thing is the integrity of the

4  evidentiary material.

5      Q.    Okay.  And what is it that you mean

6  by the integrity of the evidentiary material?

7      A.    The best practices are utilized to

8  ensure that I am not introducing any artifacts to

9  the evidence where thereby I'm changing stuff or

10 making modifications, additions, deletions to the

11 material that I am analyzing.

12     Q.    And how is that you -- or what are

13 the steps that you take to make sure that you are

14 not modifying the electronic evidence that you

15 are charged with examining?

16     A.    The initial process would involve

17 some kind of a baseline.

18          So, the first thing I would do is do

19 an inventory of all of the material that I will

20 be processing or analyzing from a physical

21 standpoint as well as what I call a digital

22 perspective.

23          So, for example, I have to account

24 for everything that is within a digital storage

25 media.

1          For example, in a hard drive, I've

2     got to make sure that what I am looking at is

3     everything that is within the hard drive.  And I

4     have to account for that so that my beginning and

5     my ending will be exactly the same.

6          Another tool that we use is write

7     protection devices.

8          Q.    And what are write protection

9     devices?

10         A.    It could be a physical device or a

11    software device where it is connected with your

12    digital storage media and it prohibits any write

13    functions to that particular device.

14         So that anything I do gets stopped

15    by this particular device.

16         Q.    And is that one of the methods you

17    used to make sure that you are not modifying the

18    digital evidence that you are examining?

19         A.    That is correct.  Yes.

20         Q.    Go ahead.

21         A.    I did use a write protection device

22    for all of my processing and all of my analysis

23    in this particular case.

24         Q.    So, once you have done that physical

25    and digital examination of the electronic devices

1    that you are examining, what is the next thing do

2    you?

3            A.     The other tool or practice that we

4    utilize to ensure that no modifications are done

5    is on a regular basis what we do is MD5 algorithm

6    checks.

7            Q.     And what are MD5 algorithm checks?

8            A.     Basically it is a fancy mathematical

9    computation where you run the process and it

10   generates a unique number, which is like a

11   fingerprint of, let's say, for example, a file.

12              You have a file.  You run the fancy

13   algorithm.  It generates a unique number and that

14   particular number should be maintained throughout

15   your whole processing.

16              So, you compare that particular

17   number at the beginning and at interim steps to

18   ensure that that number stays consistent.  And,

19   thereby, it indicates that no changes have been

20   made.

21           Q.     And, once you have done the initial

22   review of the items and made sure these checks

23   that you have described are in place, the

24   algorithm, the write protection, what is it that

25   you do with an electronic device when you receive

1   it to begin your analysis?

2          A.     Again, with all of those best

3   practices in place, the general inventory is done

4   where I note the serial number, any unique

5   features associated with the device.

6                 Again, total accountability at the

7   beginning.

8                 And then, what we do is take what we

9   call a bit-by-bit image which is an exact

10  duplicate copy of the storage media so that you

11  are not working off of a, the original evidence,

12  you are actually working off a bit-by-bit copy,

13  which is an exact copy.

14         Q.     And why do you do that?  Why is it

15  that it is important in your work to make sure

16  that you are working off an exact copy of the

17  evidence rather than the original device itself?

18         A.     Because your best evidence is the

19  original.  And you do not want to compromise that

20  best evidence.

21                But, using a bit-by-bit copy, you

22  ensure that you have the integrity of the

23  original evidence, but at the same time you have

24  confirmation that it is an exact copy.

25         Q.     And you touched on this a moment

1    ago, but just to make the point clearly, what is

2    the evidence you have or the check to make sure

3    that the duplicate that you have created is an

4    exact bit-by-bit copy of the original item?

5         A.    Again, it goes back to the MD5

6    algorithm where, when you make your bit-by-bit

7    copy, an MD5 number is generated for that

8    particular bit-by-bit copy.

9              That number is compared to

10   throughout the whole analysis process at

11   particular points to ensure that that number

12   stays consistent with the beginning and at the

13   end.

14        Q.    Once you have made the bit-by-bit

15   copy and confirmed that the bit-by-bit copy is an

16   exact duplicate of the original device, what is

17   the next step in your analysis?

18        A.    The next step is using that

19   particular bit-by-bit copy, is the processing

20   phase which we use specialized tools to parse

21   through that image and it will go through the

22   image and pull out deleted files, special

23   categories like that, e-mails, documents, so that

24   the end user, in this case a case agent, can go

25   through the material and review for potential

1    evidentiary material.

2         Q.    And is it your job to go through the

3    copy or image of the item to find relevant

4    evidence?

5         A.    No, it is not.

6         Q.    Whose job is it?

7         A.    That particular responsibility falls

8    on the case agent.

9         Q.    And, what is the platform, or tool,

10   or network you use to make the analysis that you

11   do available to the case agent to go through and

12   identify relevant material?

13        A.    We have a system called CAIR.

14        Q.    What does CAIR stand for?

15        A.    Case Agent Investigative Review.

16        Q.    And what is CAIR?

17        A.    CAIR is a utility that we use to

18   provide the case agent a platform to review the

19   material that I had processed in a format which

20   is readable.

21              And that is some, of the material

22   cannot be read in a very easy format.  So,

23   e-mails show up as e-mails, documents show up as

24   documents.

25        Q.    And who is responsible for uploading

1   the materials to the CAIR System?

2        A.    I am.

3        Q.    And what happens to the materials

4   after they are uploaded to the CAIR System?

5        A.    Once it is uploaded into the CAIR

6   System, the agent will go through the material

7   looking for potential evidentiary material.

8             Once the agent deems that a

9   particular file could be of evidentiary material,

10  he or she will bookmark that particular file for

11  maybe further investigative review or for further

12  analysis and ultimately an FTK Report is

13  generated if it is deemed relevant.

14       Q.    I want to ask you some questions now

15  about your work on this case.

16            Were you asked to perform forensic

17  analysis like the one that you have just

18  described on a computer in this case?

19       A.    Yes.

20       Q.    And, did you prepare a report

21  explaining the steps that you took to analyze the

22  computer in this case?

23       A.    Yes.

24       Q.    Now, as you sit here, do you

25  remember the serial number of the computer that

1    you were asked to examine?

2          A.    No, I do not.

3          Q.    During your analysis, did you record

4    the serial number of the computer anywhere?

5          A.    Yes, I did.  In my notes.

6          Q.    And, is it recorded also in your

7    report?

8          A.    Yes.

9          Q.    And the serial number of the

10   computer that you recorded in your report, was it

11   recorded accurately when you put it in the

12   report?

13         A.    Yes.

14         Q.    In fact, is it part of your job to

15   make sure that you are accurately recording the

16   serial numbers of the items that you examined?

17         A.    That is correct, yes.

18         Q.    And did you document the serial

19   number of the computer contemporaneously, or as

20   you were doing your work on the computer?

21         A.    Yes, I did.

22         Q.    Okay.  I'm going to show you what

23   has been marked for identification and shown to

24   defense counsel as Government's Exhibit 2.  Do

25   you recognize Government's Exhibit 2?

1          (Government's Exhibit Number 2

2          marked for identification.)

3          THE WITNESS:  Yes.

4  BY MR. KRAVIS:

5          Q.    What is Government's Exhibit 2?

6          A.    It is my Dell Recs Report of

7  Examination for this particular case.

8          Q.    And do you see the serial number of

9  the computer that you examined for this case

10  written on the report?

11          A.    Yes.

12          Q.    Is that next to where it says

13  Item 1B44?

14          A.    Yes.

15          Q.    Okay.  I'm going to ask you to read

16  out loud now the serial number that you recorded

17  for the computer on your report.

18          A.    The serial number for the computer

19  is C02JG3N6DKQ2.

20          Q.    Thank you Special Agent Yoo.

21          And I'm taking back from you now

22  Government's Exhibit 2.

23          Now, what did you do with that

24  computer?

25          A.    Again as I stated before, a lengthy

1    inventory process was performed.  Then, the next

2    step involved the archival image, archival image

3    of the digital storage media that was within the

4    laptop, in this particular case.

5              And then, processing the image so

6    that the case agent can review the material.

7         Q.    Do you remember earlier in your

8    testimony you talked about the steps that you

9    take to ensure that the copy of the item that you

10   are working from is bit-by-bit identical to the

11   original, the fancy algorithm as you put it and

12   so forth?

13        A.    Yes.

14        Q.    Did you take those steps in your

15   analysis of the computer in this case?

16        A.    Yes, I did.

17        Q.    And what were the results of those

18   checks that you did throughout the process on

19   your examination of the computer in this case?

20        A.    The checks were consistent from the

21   beginning to the end.

22        Q.    Now, earlier in your testimony you

23   also talked about the CAIR System.  Do you

24   remember that?

25        A.    Yes.

1       Q.    Okay.  What did you do with the

2   results of the computer that you analyzed in this

3   case when you had completed your analysis?

4       A.    I provided the material for the CAIR

5   System for further review to the case agent so

6   that the potential evidentiary material can be

7   searched for.

8       Q.    And, does the CAIR System archive or

9   categorize, analyze digital evidence using case

10  ID numbers to make sure that the case agent is

11  looking at the right thing when they log onto the

12  CAIR System?

13      A.    Yes.  When I set out the CAIR System

14  I have to ensure that it is a unique number

15  associated with the request by the case agent.

16      Q.    And did you use such a unique case

17  ID number in this case?

18      A.    Yes, I did.

19      Q.    As you sit here today, do you

20  remember off the top of your head, the unique

21  Case ID Number you used for this case?

22      A.    No.

23      Q.    Okay.  I'm going to show you again

24  what has been marked and provided to defense

25  counsel as Government's Exhibit 2, your report.

1            Did you record on your report the

2    unique Case ID Number you used for this case on

3    the CAIR System?

4            And you can look at the whole

5    report.  But I will just direct your attention to

6    the top right corner of the first page.

7        A.    Yes.

8        Q.    And was that unique Case ID Number

9    accurate when you wrote it on your report?

10        A.    Yes.

11        Q.    In fact, it is a part of your job to

12    make sure that the Case ID Numbers are accurate

13    so you don't mix-up evidence for different cases?

14        A.    That is correct.

15        Q.    Okay.  And did you record the Case

16    ID Number as you were doing the work on this

17    case?

18        A.    Yes, I did.

19        Q.    Okay.  Can you read from your report

20    the unique Case ID Number that you used for this

21    case?

22        A.    It is 56D-WF-2881718.

23        Q.    And, Special Agent Yoo, I'm just

24    going to collect Government's Exhibit 2 from you

25    again.

1                And, after you put the results of

2    your analysis of the computer in this case on the

3    CAIR System, did you do any further work with

4    that material or was it just turned over to the

5    case agent for review?

6            A.    It was turned -- for the work in --

7    what sense?

8            Q.    I just mean, after -- let me try to

9    ask the question a better way.

10           A.    Okay.

11           Q.    After you put the results of the

12   computer search on the CAIR System, whose

13   responsibility is it at that point to do any

14   further analysis on the material you have put on

15   the CAIR System?

16           A.    It was the case agent's.

17           Q.    Okay.  Now, in addition to the

18   computer, were you also asked to provide a

19   digital analysis of a cell phone in this case?

20           A.    Yes.

21           Q.    And, as you sit here today, do you

22   remember the serial number of the cell phone that

23   you were asked to analyze?

24           A.    No.

25           Q.    Did you record the serial number of

1    the cell phone you were asked to analyze in your

2    report?

3            A.    Yes.

4            Q.    I'm going to show you again

5    Government's Exhibit 2.  Was the serial number of

6    the cell phone accurate when you recorded it?

7            A.    Yes.

8            Q.    And, again, did you record the

9    serial number of the phone like with the

10   computer, at the same time that you were doing

11   your work on the case?

12           A.    Yes, I did.

13           Q.    Okay.  I'm going to direct your

14   attention to the Line 1B43 on the report and ask

15   you to read out loud the serial number of the

16   cell phone that you analyzed in this case.

17           A.    The cellphone is an Apple iPhone and

18   the serial number is C39HL2XNDTC1.

19           Q.    Thank you, Special Agent Yoo.

20                 I'm going to collect Government's

21   Exhibit 2 from you.

22                 Now, as with the computer, when you

23   were doing the analysis of the cell phone in this

24   case, did you use the tools or methods that we

25   talked about earlier to make sure that your image

1    of the cell phone was a bit-for-bit copy of the

2    contents of the cell phone itself?

3         A.    In processing the cell phone, a

4    different approach was taken, due to the fact

5    that limitations with the tools that were

6    available to me did not preclude me to use

7    certain functions.

8               For example, access to e-mail was

9    rather difficult so that the numerous tools,

10   several tools had to be used to extrapolate the

11   information that was requested by the case agent.

12              And, in terms of write protection,

13   and again it is not feasible for a particular

14   device, mobile devices.

15        Q.    So, what are the steps that you took

16   to perform your digital analysis of the cell

17   phone in this case?

18        A.    Again, just like the laptop, best

19   practice involves inventory of the material that

20   you are processing.

21              And to ensure that you do not

22   introduce any artifacts to your analysis, you do

23   not, I guess, step on or go through a process

24   where you are changing data or information on the

25   cell phone.

1          And, in this case instead of taking

2    a very aggressive approach to extrapolating

3    information requested by the case agent, a

4    logical extraction was performed rather than a

5    physical.

6          Q.    What do you mean by rather than take

7    an aggressive approach?  What do you mean by an

8    aggressive approach?

9          A.    Aggressive in the sense that in

10    order to get at information which may not be

11    readily available, you must, there are ways to

12    actually get at that information by making

13    additions and modifications to the phone.

14          Q.    So, am I right that what you are

15    saying is there are methods you can use to try to

16    get more information out of the phone that

17    involve adding or modifying the phone in some

18    way?

19          MR. BINNALL:  Objection, leading.

20    BY MR. KRAVIS:

21          Q.    Go ahead.

22          A.    I could have taken an, an approach

23    where I could have made changes to the phone, for

24    example, jailbreaking is a common terminology.

25          Q.    What is jailbreaking?

1          A.     Jailbreaking is actually making

2    changes to the operating system so that you can

3    access the whole file system on the phone.

4          Q.     Did you, in your analysis of the

5    cell phone in this case, use jailbreaking or some

6    other aggressive search tool?

7          A.     No.  I did not.

8          Q.     Why not?

9          A.     Because I did not want to introduce

10   in artifacts or make any changes to the phone

11   when it was, when I determined that the laptop

12   might potentially contain the same type of

13   information that was on the phone.

14         Q.     So, because you chose not to take

15   more aggressive steps in analyzing the phone,

16   were there some items on the phone that you did

17   not recover in your forensic analysis of the

18   phone?

19         A.     That is correct.

20         Q.     What -- well, let me ask a better

21   way.

22                What items were you not able to

23   extract from the phone because you chose not to

24   use the more aggressive methods?

25         A.     E-mail, specifically.

1      Q.    If you were not able to get the
2  e-mails, what were you able to extract from the
3  phone?
4      A.    Photos, music, videos, some text
5  messages.
6      Q.    And, the items that you were able to
7  recover from the cellphone, did you put those up
8  on the CAIR System like with the computer, or did
9  you do something else?
10     A.    I did something else.
11     Q.    What was it that you did with the
12  materials that you were able to extract from the
13  cell phone?
14     A.    A report was generated for the case
15  agent to further review the material that was
16  extrapolated from the cell phone.
17     Q.    Okay.  I'm going to show you now
18  what has been marked for identification and shown
19  to defense counsel as Government's Exhibit
20  Number 1.
21                (Government's Exhibit Number 1
22                 marked for identification.)
23  BY MR. KRAVIS:
24     Q.    Do you recognize Government's
25  Exhibit Number 1?

1         A.    Yes.

2         Q.    What was Government's Exhibit

3  Number 1?

4         A.    It was a Cellebrite report of exam.

5         Q.    And, what is actually in front of

6  you, Government's Exhibit 1, is a CD that can

7  play on a computer, right?

8         A.    That is correct.

9         Q.    And have you had a chance to examine

10  the contents of this particular CD?

11        A.    Yes.

12        Q.    And what is it that is on this

13  particular CD?

14        A.    It is the Cellebrite report of the

15  iPhone belonging to Mr. Kesari.

16        Q.    That is the phone that you analyzed

17  in this case?

18        A.    Yes.

19        Q.    And after you looked at the contents

20  of the CD, did you make any markings on the CD so

21  that you would be able to recognize it here at

22  this deposition?

23        A.    Yes.

24        Q.    What are the markings you made on

25  this CD?

1        A.    I see my initials on the right lower

2    corner of the CD.

3        Q.    Okay.  At this time the government

4    moves Exhibit Number 1 as redacted into evidence.

5              MR. BINNALL:  Objection to

6        foundation.

7              MR. KRAVIS:  May I have just a

8        moment, please?  Thank you Special Agent Yoo,

9        I have no further questions.

10                  CROSS-EXAMINATION

11   BY MR. MILLS:

12       Q.    Good morning again, Agent Yoo.

13             I'm going to hand you what we will

14   mark as Exhibit Number 4.

15                  (Yoo Exhibit Number 4

16                   marked for identification.)

17             MR. KRAVIS:  Thank you.

18   BY MR. MILLS:

19       Q.    Exhibit Number 4 is a Report of

20   Examination, correct?

21       A.    Yes.

22       Q.    And the date of this report is

23   August the 4th, 2015, is that right?

24       A.    That is correct.

25       Q.    And, if you turn to Page 4 of 4 of

1  the report, that is your name there; isn't that

2  right?

3          A.    Yes.

4          Q.    But you did not sign Exhibit

5  Number 4, did you?

6          A.    I believe the official report exam

7  has my signature.

8          Q.    Okay.  So, this, so the exhibit that

9  is in front of you right now is not the official

10 report, is it?

11         A.    It may be a copy.

12         Q.    Let me ask you this.  Did you

13 actually write Exhibit 4?

14         A.    Yes, I did.

15         Q.    Okay.  Did anyone assist you?

16         A.    Nobody assisted me.

17         Q.    Okay.  On what date did you create

18 Exhibit 4?

19         A.    August the 4th.  Based on the date

20 of the report of exam on the first page.

21         Q.    Do you see the line that says

22 Reference on the first page?  Toward the top?

23         A.    Reference, yes, Service Request

24 Date.

25         Q.    And the service request is dated

1   March 4th, 2014.  Is that correct?

2          A.    That is correct.

3          Q.    And the Service Request ID Number is

4   60336.

5                MR. KRAVIS:  Objection, calls for

6      hearsay.

7   BY MR. MILLS:

8          Q.    That is what it says on your report,

9   correct?

10         A.    That is what it says on my report.

11         Q.    Okay.  And, but, the date the items

12  were received was listed as May 29th, 2014; is

13  that right?

14               MR. KRAVIS:  Objection, calls for

15     hearsay.

16  BY MR. MILLS:

17         Q.    That is what your report says,

18  right?

19         A.    That is correct.

20         Q.    Okay.  So there was almost a

21  three-month delay between the date of the service

22  request and your receipt of the items; is that

23  right?

24         A.    That is correct.

25         Q.    And the report says that the items

1    submitted were an Apple MacIntosh Mini.

2                    MR. KRAVIS:  Objection, calls for

3         hearsay.  Object to the question about the

4         contents of the report which is hearsay

5         without establishing a foundation that the

6         witness does not recall or needs to be

7         impeached with the report.  You can answer.

8    BY MR. MILLS:

9         Q.    Okay.  Do you recall answering a

10   service request for an Apple MacIntosh Mini?

11                   MR. KRAVIS:  Objection to witness

12        answering the questions with the report in

13        front of him if the questions are not about

14        the report.

15   BY MR. MILLS:

16        Q.    Okay.  Go ahead, you can answer.

17        A.    That is what the report says.

18        Q.    Okay.  Let me ask you this

19   independently.  You can take the report away.

20   Turn the report over.

21                   Do you recall in connection with

22   this case doing a review of an Apple MacIntosh

23   Mini?

24        A.    Yes, sir.

25        Q.    And do you recall the serial number

1   of the Apple MacIntosh Mini that you reviewed?

2           A.    No.

3           Q.    If you turn Exhibit 4 over.  Does

4   that refresh your recollection?

5           A.    Yes.

6           Q.    Okay.  And what was the serial

7   number of the Apple MacIntosh Mini that you

8   reviewed?

9           A.    It looks like the serial number is

10  F4KJW7VVF193.

11          Q.    Thank you.  Now, did you review more

12  than one -- strike that.

13                The number you just read was for an

14  Apple iPad Mini; is that correct?

15          A.    Yes.

16          Q.    Okay.  And I think I asked you about

17  an Apple MacIntosh Mini?

18          A.    I'm sorry.

19          Q.    If you can look to the line above

20  that, do you see Apple MacIntosh Mini?

21          A.    Yes.

22          Q.    And do you recall actually reviewing

23  an Apple MacIntosh Mini in connection with this

24  case?

25          A.    Yes.

1          Q.     What was the serial number of the

2     Apple MacIntosh Mini that you investigated?

3          A.     The serial number is D2HHQ00CDTCK.

4          Q.     Okay.  And you also reviewed an

5     Apple iPad Mini.  Is that correct?

6          A.     Yes.

7          Q.     Okay.  And if you take a look at

8     Exhibit 4, does that refresh your recollection of

9     the serial number of the Apple iPad Mini that you

10    reviewed?

11         A.     Yes.

12         Q.     And what is the serial number of the

13    Apple iPad Mini that you reviewed?

14                MR. KRAVIS:  Objection, vague.  The

15       report lists two different Apple iPad Minis.

16                MR. MILLS:  That's a fair objection.

17    BY MR. MILLS:

18         Q.     How many Apple iPad Minis did you

19    review?

20         A.     To the best of my recollection I

21    reviewed or processed two iPad Minis.

22         Q.     Okay.  Can you tell us for the

23    record the serial numbers of the two Apple iPad

24    Minis that you processed?

25         A.     Based on my, based on this

1   particular report, they both had the same serial

2   number which is F4KJW7VVF193.

3          Q.    Okay.  Is it your testimony they

4   both have the same serial number?

5          A.    Based on this report it looks like

6   it, yes.

7          Q.    I'm going to ask you to look closely

8   at the second Apple iPad Mini.  It is a similar

9   serial number, but I don't believe it is the

10  same; is that correct?

11         A.    Oh, I'm sorry, yes, you are correct,

12  yes.

13         Q.    And what is the, the item listed

14  1B16, what is the serial number for that?

15         A.    The serial number for Item 1B16 is

16  F4KJQ8YSF193.

17         Q.    Okay.  Now, all of those devices

18  belong to Mr. Kesari, correct?

19              MR. KRAVIS:  Objection, lack of

20     foundation.  Calls for hearsay.

21  BY MR. MILLS:

22         Q.    Okay.  Do you know who the devices

23  belong to?

24         A.    Yes, I believe so.

25         Q.    Okay.  And who do they belong to?

1          MR. KRAVIS:  Objection, lack of

2     foundation.  Calls for hearsay.

3  BY MR. MILLS:

4          Q.    You can answer.

5          A.    I believe this belongs to

6  Mr. Sorenson.

7          Q.    Mr. Sorenson.  So, these are

8  Mr. Sorenson's devices?

9          MR. KRAVIS:  Objection, calls for

10     hearsay.

11  BY MR. MILLS:

12          Q.    Okay.

13          MR. KRAVIS:  You can answer the last

14     question.

15          THE WITNESS:  To the best of my

16     recollection, I believe it is Mr. Sorenson's,

17     yes.

18  BY MR. MILLS:

19          Q.    Okay.  Now, let me take you to, back

20  to Exhibit Number 2.

21          And Mr. Kravis asked you about

22  Exhibit Number 2, correct?

23          A.    Yes.

24          Q.    And that is your report of

25  examination dated August 17th, 2015?

1          A.     August, yes.

2          Q.     Okay.  And, did you sign Exhibit

3     Number 2?

4          A.     Yes, I did.

5          Q.     Okay.  Where is your signature

6     found?

7          A.     Again, I believe this is a copy.

8          Q.     Okay.  So, the Exhibit Number 2 that

9     is in front of you is not signed; is that

10    correct?

11         A.     That is correct.

12         Q.     Okay.  Do you know if it varies in

13    any way from the version you signed?

14         A.     It does not.

15         Q.     Okay.  Now, the devices in Exhibit

16    Number 2 belong to Mr. Kesari, correct?

17              MR. KRAVIS:  Objection, lack of

18        foundation.  Calls for hearsay.

19    BY MR. MILLS:

20         Q.     Okay.  Do you know who they belong

21    to?

22         A.     Mr. Kesari.

23         Q.     Okay.  What e-mail client software

24    was installed on each device?

25         A.     Again, I can't recall because my

1    responsibility does not delve into that

2    particular area other than maybe a cursory look.

3             But, I do not know.

4        Q.    Okay.  Now, on your report,

5    Exhibit 2, you don't state what date your

6    examination took place, do you?

7        A.    What page are you referring to?

8        Q.    On any page of Exhibit Number 2?

9        A.    No, it does not specify a date.

10       Q.    Okay.  And it doesn't list any

11   e-mail messages that were located in your search,

12   does it?

13       A.    No, it does not.  Because again,

14   that is not my responsibility.

15       Q.    Okay.  And you can't recall whether

16   any of these devices contained e-mail client

17   software; is that correct?

18       A.    E-mail client software, in what --

19   can you --

20       Q.    Did it have software capable of

21   processing the e-mail?

22       A.    Yes, it did, I believe.  That is the

23   only way that I could get e-mail information.

24       Q.    Okay.  And isn't it true you

25   couldn't, you didn't find any e-mail information

1    on the iPhone that you reviewed; is that correct?

2          A.    Again, the processing of the e-mail

3    made it very difficult to extrapolate enough

4    information, yes.

5          Q.    And that is because Apple encrypts

6    e-mail, correct?

7          A.    That's correct.

8          Q.    And FBI did not take the effort to

9    decrypt the e-mail; is that correct?

10          A.    It is locked down pretty tightly in

11    terms of accessing the e-mail, yes.

12          Q.    But you did find e-mail on the, on

13    his Mini, on his personal computer; is that

14    correct?

15          A.    Can I clarify?

16          Q.    Sure.

17          A.    My answer.  The first thing is,

18    during the inventory and accountability of that

19    particular iPhone, since it was unlocked, I can

20    physically go through the iPhone and see that

21    there were e-mail on the phone.

22                I could visually observe that there

23    was e-mail on the phone.

24                To logically or physically

25    extrapolate that data in a, into another digital

1    format was the problems that I ran into.

2              So, there was e-mail on the phone.

3              I just could not extrapolate it so

4    that the case agent can review it in our CAIR

5    System.

6         Q.    So you did not upload any e-mail for

7    the case agent to review, correct?

8         A.    Not from the iPhone.

9         Q.    That's correct.  But you did from

10   the personal computer?

11        A.    Yes, I believe so.  And the

12   Cellebrite report contains, again, some

13   information from the iPhone that I was able to

14   extrapolate.

15        Q.    Okay.  And, do you recall what

16   e-mail client software was used on the personal

17   computer?

18        A.    Not to the -- I did not record that,

19   I believe, in my notes, I believe.

20        Q.    Okay.  So you don't know if it was

21   Apple mail?

22        A.    No.

23        Q.    Okay.

24        A.    In fact, let me see, in my notes, I

25   believe in my notes I think it was Microsoft

1    Office, maybe.  It was a client that was used

2    also.  But I'm not quite sure.

3         Q.    Do you recall whether -- now,

4    Microsoft Office uses file folders to store

5    e-mail; is that correct?

6         A.    (Indicating).

7         Q.    You have to say yes or no.

8         A.    Yes.

9         Q.    Do you recall which folders you were

10   able to access?

11        A.    No.  I didn't.

12        Q.    So, now, you are actually trained on

13   Microsoft Outlook; is that correct?

14        A.    Basically it is a Wintel platform,

15   so, yes.

16        Q.    And when you say Wintel, you mean

17   Windows/Intel, correct?

18        A.    Yes.

19        Q.    And Outlook is published by

20   Microsoft; is that correct?

21        A.    That is correct.

22        Q.    And so it runs under Windows; is

23   that correct?

24        A.    That's correct.

25        Q.    And there is also a version that

1    runs on the Mac under the Apple operating system?

2         A.    That's correct.

3         Q.    But the Mac version runs

4    substantially the same way as the Windows

5    version, correct?

6         A.    Yes.

7         Q.    And it has a file folders structure

8    for e-mail; is that right?

9         A.    That's correct.

10        Q.    And one of the folders would be

11   Inbox, correct?

12        A.    That is correct.

13        Q.    Another would be Sent Items?

14        A.    Yes.

15        Q.    Another would be Deleted Items?

16        A.    Yes.

17        Q.    One would be, another item is Junk

18   Mail, correct?

19        A.    Yes.

20        Q.    Another could be Spam?

21        A.    Absolutely.

22        Q.    And you don't recall what item you

23   found, you don't recall what folder you found the

24   e-mail messages in?

25        A.    If I can recall, I believe I had to

1    do a, what they call conversion so that the

2    e-mail that was on the laptop could be, in a

3    human readable format.

4              So, I believe in my notes I

5    specified a particular path in which I took to

6    process that conversion process.

7         Q.    Does that path tell you what folder

8    it was in?

9         A.    It was a general mailbox folder.

10        Q.    And one of the Microsoft Outlook

11   standard folders is Draft; is that correct?

12        A.    Yes.

13        Q.    And so as you sit here today you

14   don't know whether any of the e-mail you

15   processed was in a draft folder, do you?

16        A.    I did not delve into that process

17   that deeply, because it was not requested of me

18   at that particular time.  Or, for that matter,

19   afterwards.

20        Q.    How long did your analysis take of

21   the personal computer?

22        A.    It could be a lengthy process based

23   on any issues with the hardware that you

24   encounter during your exam.

25        Q.    I mean but I'm asking you for the

1    analysis of Mr. Kesari's laptop.  How long did

2    the analysis take?

3            A.    It is, I can't recall.  But if you

4    look in my notes it does document the time frame

5    in terms of dates.  So, maybe, I don't know.  I

6    would have to look at my notes.

7            Q.    Now did you personally review any of

8    the e-mail that you extracted?

9            A.    No, I did not.

10           Q.    Did you personally review any of the

11   metadata?

12           A.    No, I did not.

13           Q.    Okay.  And do you know what metadata

14   is?

15           A.    Yes, I do.

16           Q.    And what is metadata?

17           A.    Metadata is information that is

18   associated with a particular file that exchanges

19   information, for example, date, time stamps,

20   geolocation information.

21           Q.    Now --

22           A.    Extra information basically.

23           Q.    And now I believe you, did you issue

24   any other reports in connection with this case

25   other than Exhibits 2 or 4?

1           A.     I believe these are the only two

2      report of exams that I generated along with the

3      FTK reports that was mentioned previously.

4           Q.     And when you say FTK you mean

5      Forensic Toolkit?

6           A.     That is correct, yes.

7           Q.     But, other than the Forensic Toolkit

8      report and Exhibits 2 and 4, there are no other

9      reports that you issued?

10          A.     The one that was specified earlier,

11     Cellebrite report, no.

12          Q.     Okay.  Did you analyze any devices

13     that belonged to John Tate?

14          A.     No.

15                 MR. KRAVIS:  Objection, calls for

16          hearsay.  Lack of foundation.

17                 MR. MILLS:  That is all I have, your

18          witness.

19                 (Brief discussion off the record.)

20     BY MR. MILLS:

21          Q.     Did you review any devices that

22     belonged to John Tate?

23                 MR. KRAVIS:  Same objections.  Lack

24          of foundation, you can answer.

25                 THE WITNESS:  No.

1                    CROSS-EXAMINATION

2    BY MR. BINNALL:

3         Q.    Good morning, Agent Yoo.  My name is

4    Jesse Binnall.  I represent Dimitrios Kesari.

5              The date on the Report of

6    Examination on Government's Exhibit 2, that is

7    August the 17th, 2015, correct?

8         A.    That is what the report says, yes.

9         Q.    Okay.  But the service request was

10   on January the 15th 2014, correct?

11        A.    That is correct.

12             MR. KRAVIS:  And I'm sorry, counsel,

13        before we continue with the examination, do

14        you mind collecting the exhibits that are in

15        front of the witness, since the reports

16        themselves are hearsay?

17             MR. MILLS:  Sure.

18             MR. KRAVIS:  Thank you.

19   BY MR. BINNALL:

20        Q.    And the items actually received,

21   that was on January the 30th, 2014, correct?

22        A.    I need my -- excuse me.

23        Q.    Would it refresh your recollection

24   to see the report?

25        A.    Which exhibit?

1     Q.    Exhibit 2.

2     A.    Date item received, is that what you

3   are referring to?

4     Q.    Yes.

5     A.    Yes, it says January 30th, 2014.

6     Q.    Okay.  You can go ahead and turn

7   that over if you don't mind.

8            And, in fact, on the second page,

9   you were approached by Special Agent Les Straka

10  at some point regarding this work that you did?

11    A.    Yes.

12    Q.    And Special Agent Les Straka

13  approached you on June the 10th, 2014, correct?

14    A.    If that is what my report says, yes.

15    Q.    But you didn't actually prepare this

16  report until August 17th, 2015, correct?

17    A.    That is correct.

18    Q.    And Agent Yoo, how did you actually

19  received the laptop that you analyzed in

20  Exhibit 2?

21    A.    I, the laptop was stored and secured

22  in our evidence control room.  I went to the

23  evidence control room, checked it out and started

24  my analysis.

25    Q.    Okay.  And when did you do that?

1          A.     Again, I've got to take a look at my

2     notes.  But, I believe the report of exam that

3     specifies the date as Item Received is the

4     correct date for when I checked out the evidence.

5               That date should correspond to the

6     date that is in my notes.

7          Q.    Okay.  But you don't have any direct

8     knowledge, sitting here today, of exactly when

9     you checked it out?

10         A.     I believe that the Item Received

11    date should correspond to the exact date that it

12    was checked out.

13         Q.    So you think you checked it out on

14    January the 30th, 2014.

15              What did you do with the computer

16    after you were done uploading it to the CAIR

17    System?

18         A.     Again, at the end of my process, I

19    would then make sure and account for everything

20    that is in that particular container, or in this

21    case 1B item.  Make sure that if it came with a

22    power cord, it goes with the laptop.  And then

23    submit that whole package back into evidence

24    control.

25         Q.    You have no idea who handled the

1   computer before you checked it out, correct?

2         A.    Based on the chain of custody, I

3   have a name, a date, and a time as to when it was

4   collected, who handled a particular device before

5   I received it.

6         Q.    But you don't maintain that chain of

7   custody, correct?

8         A.    We maintain, we have copies of that

9   particular chain of custody.

10        Q.    Okay.  And, where is that chain of

11   custody report now?

12        A.    I include a copy of that chain of

13   custody as part of my verification process, and

14   it is within my case notes.

15        Q.    Do you know if that report was

16   produced by the Federal Bureau of Investigation

17   to the Public Integrity Section of the Department

18   of Justice?

19        A.    What report are you referring to?

20        Q.    I'm sorry, the chain of custody

21   report.

22        A.    Has it been given to the Department

23   of Justice?  Is that what you are saying?

24        Q.    Correct.

25        A.    A copy of my notes was provided to

1    the Department of Justice.  And within that

2    packet should be a copy, yes.

3           Q.    Did anyone else other than you

4    handle the computer between the time that you

5    checked it out and checked it back in?

6           A.    No.  I am, once I take control of

7    the evidence, it is my responsibility to ensure,

8    again, that the integrity is not compromised and

9    a particular item is secured and no one handled

10   it outside from myself.

11          Q.    Was the uploading of the computer,

12   was it done all in one day?

13          A.    It can stay a couple of days based

14   on how large a file that you are trying to

15   upload.  But that whole upload process, again,

16   involves what I specified before, an MD5

17   algorithm check at the end to ensure that what

18   you are uploading is consistent with the

19   beginning and the end.

20          Q.    All right.  Now, the, when you say

21   that the MD5 algorithm is done at the end, is

22   that algorithm done on the bit-for-bit image that

23   is made or is it done on what is updated to the

24   CAIR System?

25          A.    In this particular case, for

1    example, the laptop, the MD5 algorithm check was

2    done post exam.

3              I'm going to refer you to my notes

4    and it does specify when that was done.

5              And any kind of uploading that was

6    done on the CAIR System again, was done at the

7    beginning -- I mean at the end of the process to

8    ensure that all files that were copied or

9    uploaded into the CAIR System was consistent from

10   the beginning of the process.

11        Q.   All right.  And I'm sorry, I just

12   want to make sure I have your answer right.

13             So, it is done on the image before

14   uploading or after uploading?

15        A.   In this particular case,

16   Mr. Kesari's laptop, a final MD5 algorithm was

17   done at the end of my exam, okay.  And then

18   during the CAIR process, I believe you will have

19   screen shots of that whole process where it

20   specifies that a certain number of files were

21   copied and that there were no mismatches.

22        Q.   Okay.  How was the laptop computer

23   stored between the time that you checked it out

24   and you checked it back in?

25        A.   Once the archival process is done,

1   and I am satisfied as to the integrity of my

2   copy, the working copy, is an exact duplicate,

3   the laptop is, again, if I have to take it apart,

4   I put it back together, put it back in its

5   package and secure it in a drawer, where it is

6   locked in my cube or in a very secure place where

7   I have only the access to.

8          Q.    Okay.  And, was that done

9   specifically that with Mr., the computer that you

10  analyzed in regards to Exhibit 2?

11         A.    If you are referring to Mr. Kesari's

12  laptop, yes.

13         Q.    Well, you never took that laptop

14  from Mr. Kesari, correct?

15         A.    No, I did not.

16         Q.    Okay.  So, the computer that you

17  actually analyzed.  Correct?

18         A.    Yes.  In this particular case, the

19  laptop was not taken apart.  Okay.

20              The digital storage media was left

21  intact with the laptop.

22         Q.    Okay.  And so, from the time that

23  you checked out Mr. Kesari's laptop until the

24  time you checked it back in with evidence, were

25  you with that computer 24/7?

1          A.    Physically, no.

2          Q.    Okay.  When you weren't with the

3    laptop, how was that computer stored?

4          A.    Again, it is placed in a secure

5    location, which is my whole office space.  And

6    within that my cubical, which has locked drawers,

7    where I can put that particular laptop and lock

8    it overnight.

9          Q.    And, did you specifically put, do

10   you remember putting Mr. Kesari's laptop in a

11   locked drawer?

12         A.    Yes.

13         Q.    Okay.  And, you say you have a cube

14   and an office, is there other people within that

15   office environment?

16         A.    Yes, in order to enter my office

17   space, which has controlled access, to, you have

18   to card key your way in, and that number of

19   people that has access to that space is extremely

20   limited.  And then within that, my cubical and so

21   forth.

22         Q.    Okay.  And who has a key to the

23   drawer that Mr. Kesari's laptop was stored in?

24         A.    Just me.

25         Q.    All right.

1          Now, as far as the cell phone with

2     the, that you identified earlier with the serial

3     number Charlie 02 Juliet Golf 3 November 6 Delta

4     Kilo Quebec 2.  Do you remember talking about

5     that cellphone?

6          A.    Yes.

7          Q.    Okay.  I'm very sorry.  I read off

8     the wrong number.  It is actually, I believe,

9     Charlie 39 Hotel Lima 2 X-Ray November Delta

10    Tango Charlie 1.  Does that sound right?

11         A.    Yes.

12         Q.    Okay.  Do I understand that you did

13    not create an image of that cellphone?

14         A.    That is correct.  A physical image

15    was not obtained.

16         Q.    Okay.  Did you check out that device

17    also on January 30, 2014?

18         A.    Can I --

19         Q.    Yes, to refresh your recollection,

20    please look at the first page of Government's

21    Exhibit 2.

22         A.    January is the item receive date,

23    yes.

24         Q.    Is it normal to go almost nineteen

25    months between receiving an item and creating

1   your report?

2         A.    No.  Not really.

3         Q.    Okay.  Was the cell phone stored in

4   the same manner that the laptop was stored when

5   you were not with the cell phone after checking

6   it out?

7         A.    Yes, I mean, as part of best

8   practices in my field, we are trained from the

9   very beginning that integrity of the evidence is

10  number one priority and you take certain measures

11  to uphold that philosophy throughout the whole

12  exam process.

13        Q.    Okay.  And do you specifically

14  remember with that phone if you stored it the

15  same way?

16        A.    Yes.

17        Q.    Okay.  Do I understand that you are

18  ill?

19        A.    Yes, I am.

20        Q.    I am sorry to hear that.  Can you

21  please tell me the nature of your illness?

22              MR. KRAVIS:  Objection, relevance.

23              THE WITNESS:  Currently I am, I have

24        a health condition that precludes me from

25        actually travelling away from this area.

1  BY MR. BINNALL:

2          Q.    Okay.  I'm sorry, and what is that

3  health condition.

4                MR. KRAVIS:  Objection, relevance.

5                THE WITNESS:  It is terminal.

6      Cancer.

7  BY MR. BINNALL:

8          Q.    I'm very sorry to hear that, sir.

9  Are you on any medications for that?

10         A.    Yes.  Currently.  Excuse me.

11         Q.    Yes, please take all of the time you

12  need.

13         A.    All right.

14         Q.    And, are you currently on any

15  medications?

16         A.    Other than chemo, no.  Currently,

17  no.

18         Q.    Okay.  And, have you been on any

19  medication since you prepared this report?

20         A.    Again, when I, when that report was

21  created, I was undergoing chemotherapy, yes.

22         Q.    I'm very sorry.  The, other than

23  chemotherapy, has there been anything else?

24         A.    No.  But, if you want to clarify my

25  answer, I would be more than willing to and that

1    is when I did the exam for this particular case,

2    I was not under any chemo or any type of, I

3    guess, medication that you are referring to or

4    that you are alluding to.

5            Q.    Okay.  Thank you.

6                  MR. BINNALL:  All right, no further

7        questions on behalf of Mr. Kesari.

8                       CROSS-EXAMINATION

9    BY MR. HOWARD:

10           Q.    Agent Yoo, it is very nice meeting

11   you.  My name is Roscoe Howard, I represent

12   Mr. Benton, and if it is okay with you and

13   counsel, can we take a five minutes?  I would

14   like to just confer and we will see if we have

15   any questions.

16                 MR. KRAVIS:  Very well, thank you.

17                 THE VIDEOGRAPHER:  Going off the

18       record.  The time now is 11:09.

19                 (Recess taken -- 11:09 a.m.)

20                 (After recess -- 11:21 a.m.)

21                 THE VIDEOGRAPHER:  We are now back

22       on the record.  The time now is 11:21.

23   BY MR. HOWARD:

24           Q.    All right.  Agent Yoo, I have just a

25   few more questions for you.

1          I'm going to--

2          MR. HOWARD:  What exhibit are we on?

3          MR. KRAVIS:  5.

4    BY MR. HOWARD:

5          Q.    I'm going to mark this as Exhibit 5.

6               (Yoo Exhibit Number 5

7                marked for identification.)

8    BY MR. HOWARD:

9          Q.    Agent Yoo, will you take a look at

10   that document, is that the chain of custody

11   document that you mentioned in regards to the

12   laptop computer that you identified earlier as

13   serial number Charlie 02 Juliet Golf 3 November 6

14   Delta Kilo Quebec 2?

15         A.    Are you referring to Item 1B44 with

16   that particular serial number?

17         Q.    I am.  Yes, that would probably be

18   the more efficient way to recognize it.

19         A.    And, based on the exhibit that is

20   presented in front of me, for Item 1B44, it looks

21   like our chain of custody.

22         Q.    And it looks like you checked that

23   out on or about January 30, 2014, correct?

24         A.    Yes.

25         Q.    And you checked it back in on

1    February the 7th, 2014?

2         A.    Yes.

3         Q.    All right.  And I'm going to mark

4    this as Exhibit 6.

5                     (Yoo Exhibit Number 6

6                     marked for identification.)

7    BY MR. HOWARD:

8         Q.    And is that the chain of custody

9    form for Item 1B43?

10        A.    Yes.

11        Q.    Okay.

12        A.    It looks like it is a continuation

13   page.

14        Q.    Okay.  And, have you seen, ever seen

15   a previous page for that document?

16        A.    Yes.

17        Q.    Okay.  Do you know where the

18   previous page of that document is?

19        A.    It is with the original evidence.

20        Q.    Okay.  And what day did you check

21   out Item 1B43?

22             MR. KRAVIS:  Objection, the chain of

23      custody log is hearsay.  Calls for hearsay.

24      Lack of foundation.

25   BY MR. HOWARD:

1          Q.    Okay.  Well, Agent Yoo, when did

2    you -- strike that.

3               Agent Yoo, when did you check out

4    Item 1B43?

5          A.    According to this particular

6    document, which is a continuation page, it looks

7    like I checked the item out on May 20th, 2015.

8               MR. KRAVIS:  Objection, calls for

9       hearsay, lack of foundation.

10   BY MR. HOWARD:

11         Q.    Okay.  Will you go ahead and turn

12   that page over, please.

13               Agent Yoo, when did you check out

14   Item 1B43?

15               MR. KRAVIS:  Objection, vague as to

16      when.

17               THE WITNESS:  Based on what I just

18      saw previously, May 2015.

19   BY MR. HOWARD:

20         Q.    All right.  And when did you check

21   it back in?

22               MR. KRAVIS:  Objection, vague as to

23      when.

24               THE WITNESS:  I did not note.

25   BY MR. HOWARD:

1          Q.     Okay.  Strike that.  Did you ever

2    check that out and back in?

3          A.     Yes, I did.

4          Q.     Okay.  When did you do that?

5                 MR. KRAVIS:  Objection, vague as to

6          when and lack of foundation as to whether he

7          checked it in more than once.

8    BY MR. HOWARD:

9          Q.     All right.  You can answer the

10   question.

11         A.     I believe, if I, I believe that in

12   the first page, again this is a continuation

13   page, it documents when that was done.

14         Q.     All right.  You can go ahead and

15   turn that over, if it will refresh your

16   recollection.

17         A.     Again.

18         Q.     Does that refresh your recollection?

19                MR. KRAVIS:  Objection, lack of

20         foundation.  Refreshed recollection as to

21         what?  The witness hasn't said he doesn't

22         remember something that he needs to be

23         refreshed with.

24   BY MR. HOWARD:

25         Q.     Go ahead, sir.

1          A.    It was checked out, checked back in

2    in May, I mean June of 2015.

3                MR. KRAVIS:  Objection, lack of

4        foundation.  Calls for hearsay.  The chain of

5        custody log is hearsay.

6    BY MR. HOWARD:

7          Q.    What day in June.

8                MR. KRAVIS:  Just same objection.

9    BY MR. HOWARD:

10         Q.    Go ahead.

11         A.    June 5th, 2015.

12         Q.    All right, sir.  Had you ever

13   checked that item out prior to that?

14         A.    Yes.

15         Q.    Okay.  To your knowledge, has the

16   chain of custody form been produced from the FBI

17   to the Public Integrity Section of the Department

18   of Justice that shows when you had previously

19   checked that out or not?

20                MR. KRAVIS:  Objection.  Lack of

21        foundation.  You can answer if you know.

22                THE WITNESS:  As I stated before, a

23        copy of my cart exam notes was provided and

24        within this package this continuation page

25        was provided.

1           The only reason this continuation

2      page was in this notes and not the first page

3      is just to note the final disposition of that

4      particular 1B item number.

5  BY MR. HOWARD:

6      Q.    Okay.  But my question was very

7  specifically, do you know if any previous pages

8  of the chain of custody form for 1B43 were ever

9  given by the FBI to the Public Integrity Section

10 of the Department of Justice?

11          MR. KRAVIS:  Same objection.

12          THE WITNESS:  I have no knowledge of

13     that.

14 BY MR. HOWARD:

15     Q.    Okay.  And you don't have a copy of

16 the previous chain of custody pages with you here

17 today, correct?

18     A.    That is correct.

19          MR. HOWARD:  All right.  That is all

20     of the questions I have.

21                CROSS-EXAMINATION

22 BY MS. SINFELT:

23     Q.    Good morning, Agent Yoo.  My name is

24 Meena Sinfelt and I am one of the attorneys for

25 defendant Jesse Benton.  I just have a few

Page 74

1    questions for you, okay.

2              I believe earlier in your testimony

3    you referred to MD5 which is known as a

4    cryptographic hash algorithm; is that correct?

5         A.    It is a mathematical algorithm,

6    that's correct.

7         Q.    Okay.  And that is used to make sure

8    that content is not changed while you are doing

9    your analysis; is that correct?

10        A.    It is a check, yes.

11        Q.    Okay.  But isn't it true that MD5

12   cannot tell whether the content was altered

13   before you start your analysis; is that correct?

14        A.    That is correct.

15        Q.    Okay.  Thank you, no further

16   questions.

17              MR. KRAVIS:  Special Agent Yoo, I

18      have just a few final questions for you.

19                 REDIRECT EXAMINATION

20   BY MR. KRAVIS:

21        Q.    First, you were asked on

22   cross-examination about your illness.  Do you

23   remember those questions?

24        A.    Yes.

25        Q.    During the time that you examined

1    the computer and the phone that we have been

2    talking about here today, were you still able to

3    do your job as an FBI forensic examiner

4    notwithstanding your illness?

5         A.    Yes.

6         Q.    And, in fact, you continue to work

7    as an FBI forensic examiner today?

8         A.    Yes.

9         Q.    You were asked a few questions on

10   cross-examination about the location of

11   particular e-mails within the computer.  Do you

12   remember those questions?

13        A.    Yes.

14        Q.    Is it your job as an FBI Forensic

15   Examiner to look through the devices that you

16   examined to find particular e-mails?

17        A.    No.  It is not my responsibility.

18        Q.    What is your job as an FBI Forensic

19   Examiner with respect to these items?

20        A.    My responsibility is, again, to make

21   sure that the integrity of the evidence is

22   maintained throughout the whole process and

23   parsing through the material for case agent

24   review.

25              I am not responsible for determining

1    what is pertinent, what is not pertinent.  Unless

2    it is specifically requested by the case agent.

3          Q.    You were also asked on

4    cross-examination a few questions about the

5    timing of your work in this case.  Do you

6    remember those questions?

7          A.    Yes.

8          Q.    If you remember, when was it that

9    you were first asked to work on the items of

10   evidence that we have been talking about here

11   today?  The cell phone and the computer?

12         A.    That date would correspond with the

13   date that I checked out the evidence or a couple

14   of days prior to.

15         Q.    And, would that date be reflected on

16   the report that you prepared?

17         A.    Yes, to some degree.

18               The date that you see when items

19   were received, is the date that I would actually

20   physically check out the evidence, out of the

21   evidence control to start my analysis.

22         Q.    Do you remember, as you sit here

23   today, what that date was for the cell phone and

24   computer we have been talking about today?

25         A.    Not off -- directly off of my head,

1  no.

2       Q.    Would the report refresh your

3  recollection?

4       A.    Yes.

5       Q.    I'm going to show you what has been

6  marked for identification as Government's

7  Exhibit 2.

8            I want you to look at that report

9  and don't say anything, when you finish looking

10 at the report, go ahead and look up at me.

11      A.    All right.  Okay.

12      Q.    Okay.  And now I'm taking back to

13 you Government's Exhibit Number 2.  Does that

14 refresh your recollection as to when you received

15 the items and began your work in this case?

16      A.    Yes, I did.

17      Q.    And when was that?

18      A.    January 30th, 2014.

19      Q.    And how soon after you received the

20 items from evidence control, January 30th, 2014,

21 how soon after that did you start your work in

22 this case?

23      A.    Pretty quickly.  But shortly

24 thereafter.

25      Q.    When you say shortly thereafter, do

1    you mean a matter of days, weeks, months, just

2    ballpark.

3         A.    Probably that day.

4         Q.    And you were asked about the date on

5    your report, which is August 17th of 2015.  Why

6    is it that if you began your work in January of

7    2014, the date of the report is actually

8    August of 2015.  Can you explain that?

9         A.    Due to logistical reasons, the

10   review process can be quite lengthy.  So, the

11   case agent, based on his or her case load may

12   take a long time to review the material that I

13   provide on the CAIR System.

14              And, that could be one of the

15   reasons.  Another reason could be that there

16   might be technical issues that I have to overcome

17   to ensure, again, that what I am providing to the

18   case agent is not compromised in any way, or is

19   in a format that is readable to the end user.

20        Q.    Finally, you were asked some

21   questions on cross-examination about the FBI not

22   taking the effort to decrypt the e-mails in the

23   cell phone.  Do you remember those questions?

24        A.    Yes.

25        Q.    Now, Special Agent Yoo, are there

1    out there in the world more aggressive search

2    techniques that you could have used on the

3    cellphone in order to potentially generate more

4    material?

5            A.    Yes.

6                  MR. HOWARD:  Objection.  Objection.

7                  MR. KRAVIS:  What is the basis?

8                  MS. SINFELT:  Foundation.

9                  MR. HOWARD:  Foundation, irrelevant.

10   BY MR. KRAVIS:

11           Q.    Special Agent Yoo, are you a

12   certified digital forensic examiner?

13           A.    Yes.

14           Q.    Do you have personal experience with

15   the various tools that can be used to examine a

16   cell phone.

17           A.    Yes.

18           Q.    Based on your personal experience

19   with those kind of tools, are there software

20   tools available, are there search tools available

21   that you could have used to potentially get more

22   information off the cell phone?

23                 MR. HOWARD:  Objection, irrelevant.

24   BY MR. KRAVIS:

25           Q.    You can answer.

1          A.    Yes.

2          Q.    Why didn't you use those tools in

3    this case?

4                MR. HOWARD:  Objection, irrelevant.

5    BY MR. KRAVIS:

6          Q.    You can answer.

7          A.    Because I did not want to introduce

8    any artifacts where I am compromising the

9    integrity of that particular digital storage

10   media evidence.

11               MR. KRAVIS:  Thank you, I have no

12      further questions.

13               FURTHER CROSS-EXAMINATION

14   BY MR. MILLS:

15         Q.    I just have a couple of follow up

16   questions on Exhibit Number 6.

17               Agent Yoo, could you turn Exhibit

18   Number 6 over.

19               Exhibit Number 6 is a chain of

20   custody report; is that correct?

21         A.    It is a chain of custody, yes.

22         Q.    And it is on a preprinted FBI form,

23   correct?

24         A.    Can you clarify preprinted?

25         Q.    Okay.  It is on a form, correct?

1       A.    Yes.

2       Q.    And is that a form that you are

3    provided with at work by the FBI?

4       A.    Yes.

5       Q.    And isn't it true it is your job to

6    keep track of the chain of custody evidence that

7    you review, correct?

8       A.    Yes.

9       Q.    Okay.  And it is your job to make a

10   record of the evidence that you review; is that

11   right?

12      A.    Yes.

13      Q.    And Exhibit 6 is an example of a

14   record that you kept in the normal course of your

15   regularly conducted business practices of the

16   evidence you reviewed, right?

17      A.    The official record is the one that

18   is maintained with the evidence.  This is just a

19   reflection of that particular document.

20      Q.    Okay.  And this is a record that you

21   kept, that is your handwriting on Exhibit 6,

22   correct?

23      A.    Yes.

24      Q.    Okay.  And did you make the entry at

25   or near the time you put the device back in

1  storage?

2       A.    That is the final disposition or the

3  last time I handled the evidence.

4       Q.    Okay.  And, Exhibit 6 is something

5  that you gave to the Department of Justice as a

6  record of the chain of custody in this case,

7  correct?

8       A.    As part of my case notes.

9       Q.    Okay.  Move to admit Exhibit 6.

10            MR. KRAVIS:  Objection on the ground

11       that the witness has already stated that

12       Exhibit 6 is not the complete chain of

13       custody form for the item of evidence at

14       issue here.

15            MR. MILLS:  Okay.  Nothing further

16       for me.

17            FURTHER REDIRECT EXAMINATION

18  BY MR. KRAVIS:

19       Q.    I have a few additional questions.

20  Special Agent Yoo, I'm going to show you what is

21  marked as exhibit, it doesn't say whose, but

22  Exhibit 5.  But, do you recognize Exhibit 5?

23       A.    Yes.

24       Q.    What is Exhibit 5?

25       A.    Exhibit 5 is the FBI Evidence Chain

1   of Custody.  It is the very first page.

2         Q.    And, is this the same kind of

3   document that you were just talking about with

4   respect to Exhibit 6?

5         A.    Yes.

6         Q.    Same in terms of how it is prepared,

7   and so on and so forth?

8         A.    That is correct.

9         Q.    Okay.  And, just for the record,

10  what is the 1B item number that Exhibit 5 is the

11  chain of custody for?

12        A.    1B44.

13        Q.    And, do you remember which item 1B44

14  is?

15        A.    I believe that is the laptop.  1B44.

16        Q.    You answered with some hesitation in

17  your voice.  Are you sure or not sure?

18        A.    I'm not sure.  I could look on my --

19        Q.    Would your report refresh your

20  recollection?

21        A.    Yes.

22        Q.    Okay.  I'm going to show you again,

23  Special Agent Yoo, Government's Exhibit 2, direct

24  your attention to the middle of the page.  I want

25  you to read Government's Exhibit 2.  See if it

1   refreshes your recollection as to which item is

2   1B44.  Don't say anything.  Look up at me when

3   you've had a chance.

4            Does that refresh your recollection

5   as to which item is 1B44 as to the item to which

6   Exhibit 5 corresponds?

7        A.    Yes.

8        Q.    And what is it?

9        A.    It is the Apple laptop.

10           MR. KRAVIS:  Thank you, I have no

11      further questions.

12           THE VIDEOGRAPHER:  Going off the

13      record, the time now is 11:36.

14        (Whereupon, signature having been waived,

15   the deposition concluded at 11:36 a.m.)

16                    *   *   *

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA   )

3    DISTRICT OF COLUMBIA        )

4          I, LORI J. GOODIN, the reporter before

5    whom the foregoing deposition was taken, do

6    hereby certify that the witness whose testimony

7    appears in the foregoing deposition was sworn by

8    me; that the testimony of said witness was taken

9    by me in machine shorthand and thereafter

10   transcribed by computer-aided transcription; that

11   said deposition is a true record of the testimony

12   given by said witness; that I am neither counsel

13   for, related to, nor employed by any of the

14   parties to the action in which this deposition

15   was taken; and, further, that I am not a relative

16   or employee of any attorney or counsel employed by

17   the parties hereto, or financially or otherwise

18   interested in the outcome of this action.

19

20                   _____

21                   LORI J. GOODIN

22                   Notary Public in and for the

23                   District of Columbia

24   My Commission expires:

25   May 14, 2016

**A**

**able** 36:22 37:1,2,6
  37:12 38:21 50:13
  51:10 75:2
**Absolutely** 52:21
**academic** 17:12,15
  17:25
**access** 34:8 36:3
  51:10 62:7 63:17
  63:19
**accessing** 49:11
**account** 20:23 21:4
  58:19
**accountability** 23:6
  49:18
**accurate** 31:9,12
  33:6
**accurately** 27:11
  27:15
**action** 85:14,18
**adding** 35:17
**addition** 32:17
**additional** 13:20
  82:19
**additions** 20:10
  35:13
**Administrator** 2:10
**admit** 82:9
**agent** 9:5 10:12,15
  10:16,21 14:22
  15:4 16:9 19:15
  19:21 24:24 25:8
  25:11,15,18 26:6
  26:8 28:20 29:6
  30:5,10,15 31:23
  32:5 33:19 34:11
  35:3 37:15 39:8
  39:12 50:4,7 56:3
  57:9,12,18 67:10
  67:24 68:9 70:1,3
  70:13 73:23 74:17
  75:23 76:2 78:11
  78:18,25 79:11
  80:17 82:20 83:23
**agent's** 32:16
**aggressive** 35:2,7,8

35:9 36:6,15,24
  79:1
**ago** 24:1
**ahead** 21:20 35:21
  42:16 57:6 70:11
  71:14,25 72:10
  77:10
**Alexandria** 3:18
  4:8
**algorithm** 22:5,7
  22:13,24 24:6
  29:11 60:17,21,22
  61:1,16 74:4,5
**allow** 11:13
**alluding** 67:4
**altered** 74:12
**America** 1:4 8:5
  85:2
**analysis** 10:22,23
  11:7 13:24 19:25
  21:22 23:1 24:10
  24:17 25:10 26:12
  26:17 27:3 29:15
  30:3 32:2,14,19
  33:23 34:16,22
  36:4,17 53:20
  54:1,2 57:24 74:9
  74:13 76:21
**analyst** 15:25
**analytical** 15:19
**analyze** 19:17
  26:21 30:9 32:23
  33:1 55:12
**analyzed** 14:4,9
  30:2 33:16 38:16
  57:19 62:10,17
**analyzing** 20:11,20
  36:15
**annual** 13:19
**answer** 42:7,16
  46:4,13 49:17
  55:24 61:12 66:25
  71:9 72:21 79:25
  80:6
**answered** 83:16
**answering** 42:9,12
**apart** 62:3,19

**APPEARANCES**
  3:1 4:1 5:1
**appears** 85:7
**Apple** 13:7 33:17
  42:1,10,22 43:1,7
  43:14,17,20,23
  44:2,5,9,13,15,18
  44:23 45:8 49:5
  50:21 52:1 84:9
**approach** 34:4 35:2
  35:7,8,22
**approached** 57:9
  57:13
**approximately**
  8:12 10:17 11:3
  11:25 14:3
**archival** 29:2,2
  61:25
**archive** 30:8
**area** 12:12 48:2
  65:25
**artifacts** 20:8 34:22
  36:10 80:8
**asked** 26:16 27:1
  32:18,23 33:1
  43:16 46:21 74:21
  75:9 76:3,9 78:4
  78:20
**asking** 53:25
**assigned** 10:20
**assignment** 10:18
**assist** 40:15
**assisted** 40:16
**associated** 23:5
  30:15 54:18
**association** 8:17
**attached** 16:22
**attention** 31:5
  33:14 83:24
**attorney** 85:16
**attorneys** 73:24
**August** 39:23 40:19
  46:25 47:1 56:7
  57:16 78:5,8
**author** 17:11,15
  18:9,14
**available** 25:11

34:6 35:11 79:20
  79:20
**Avenue** 2:6 3:7
  4:17 8:10
**a.m** 2:5 67:19,20
  84:15

**B**

**back** 24:5 28:21
  46:19 58:23 60:5
  61:24 62:4,4,24
  67:21 68:25 70:21
  71:2 72:1 77:12
  81:25
**ballpark** 78:2
**Barnes** 2:6 4:16
  9:13,17
**based** 40:19 44:25
  44:25 45:5 53:22
  59:2 60:13 68:19
  70:17 78:11 79:18
**baseline** 20:17
**basically** 22:8
  51:14 54:22
**basis** 12:18 13:19
  22:5 79:7
**began** 77:15 78:6
**beginning** 21:4
  22:17 23:7 24:12
  29:21 60:19 61:7
  61:10 65:9
**behalf** 9:2,10 67:7
**believe** 13:11 15:23
  40:6 45:9,24 46:5
  46:16 47:7 48:22
  50:11,19,19,25
  52:25 53:4 54:23
  55:1 58:2,10
  61:18 64:8 71:11
  71:11 74:2 83:15
**belong** 45:18,23,25
  47:16,20
**belonged** 55:13,22
**belonging** 38:15
**belongs** 46:5
**Benton** 1:7 4:13 8:5
  9:14,16 67:12

73:25
**best** 13:17,22 20:7
  23:2,18,20 34:18
  44:20 46:15 65:7
**better** 32:9 36:20
**Binnall** 4:4,5 5:9
  6:7 9:9,9 35:19
  39:5 56:2,4,19
  66:1,7 67:6
**biology** 15:7
**bit-by-bit** 23:9,12
  23:21 24:4,6,8,14
  24:15,19 29:10
**bit-for-bit** 34:1
  60:22
**bold** 16:19
**bookmark** 26:10
**bottom** 17:7
**Branch** 5:6
**Brief** 55:19
**briefly** 19:14
**Brooks** 9:6
**Bureau** 10:13,15
  10:19 59:16
**business** 81:15
**B-I-N-N-A-L-L**
  9:10

**C**

**C** 4:14 5:5
**CAIR** 25:13,14,16
  25:17 26:1,4,5
  29:23 30:4,8,12
  30:13 31:3 32:3
  32:12,15 37:8
  50:4 58:16 60:24
  61:6,9,18 78:13
**call** 13:2 16:4 20:21
  23:9 53:1
**called** 9:25 17:8
  25:13
**calls** 41:5,14 42:2
  45:20 46:2,9
  47:18 55:15 69:23
  70:8 72:4
**Cancer** 66:6
**capable** 48:20

**card** 63:18
**career** 14:4,9
**Carlos** 5:11 8:13
**cart** 72:23
**case** 9:7,8 21:23
24:24,24 25:8,11
25:15,18 26:15,18
26:22 28:7,9 29:4
29:6,15,19 30:3,5
30:9,10,15,16,17
30:21,21 31:2,2,8
31:12,15,17,20,21
32:2,5,16,19
33:11,16,24 34:11
34:17 35:1,3 36:5
37:14 38:17 42:22
43:24 50:4,7
54:24 58:21 59:14
60:25 61:15 62:18
67:1 75:23 76:2,5
77:15,22 78:11,11
78:18 80:3 82:6,8
**cases** 31:13
**categories** 24:23
**categorize** 30:9
**CD** 6:16 38:6,10,13
38:20,20,25 39:2
**cell** 6:17 13:5 14:3
32:19,22 33:1,6
33:16,23 34:1,2,3
34:16,25 36:5
37:13,16 64:1
65:3,5 76:11,23
78:23 79:16,22
**Cellebrite** 6:16
38:4,14 50:12
55:11
**cellphone** 13:5
33:17 37:7 64:5
64:13 79:3
**certain** 34:7 61:20
65:10
**CERTIFICATE**
85:1
**certification** 11:19
13:9,14 14:20
**certifications** 12:25

13:6 14:13
**certified** 2:9,9
11:15,19 12:8
13:1,5,18 14:16
79:12
**certify** 85:6
**chain** 7:4,6 59:2,6,9
59:10,12,20 68:10
68:21 69:8,22
72:4,16 73:8,16
80:19,21 81:6
82:6,12,25 83:11
**chance** 38:9 84:3
**changed** 74:8
**changes** 22:19
35:23 36:2,10
**changing** 20:9
34:24
**charged** 20:15
**Charlie** 64:3,9,10
68:13
**check** 24:2 60:17
61:1 64:16 69:20
70:3,13,20 71:2
74:10 76:20
**checked** 12:14
57:23 58:4,9,12
58:13 59:1 60:5,5
61:23,24 62:23,24
68:22,25 70:7
71:7 72:1,1,13,19
76:13
**checking** 65:5
**checks** 22:6,7,22
29:18,20
**chemist** 15:22
**chemistry** 15:13,19
17:16 18:6
**chemo** 66:16 67:2
**chemotherapy**
66:21,23
**chose** 36:14,23
**clarify** 49:15 66:24
80:24
**clearly** 24:1
**client** 47:23 48:16
48:18 50:16 51:1

**closely** 45:7
**CLR** 1:24
**collect** 31:24 33:20
**collected** 59:4
**collecting** 56:14
**Columbia** 2:12
85:3,23
**commencing** 2:5
**Commission** 85:24
**common** 35:24
**compare** 22:16
**compared** 24:9
**complete** 82:12
**completed** 30:3
**compromise** 23:19
**compromised** 60:8
78:18
**compromising** 80:8
**computation** 22:9
**computer** 10:21
15:24 18:10,15,18
18:22 19:2 20:1
26:18,22,25 27:4
27:10,19,20 28:9
28:17,18,24 29:15
29:19 30:2 32:2
32:12,18 33:10,22
37:8 38:7 49:13
50:10,17 53:21
58:15 59:1 60:4
60:11 61:22 62:9
62:16,25 63:3
68:12 75:1,11
76:11,24
**computers** 14:8
**computer-aided**
85:10
**concluded** 84:15
**condition** 65:24
66:3
**conducted** 81:15
**confer** 67:14
**confirmation** 23:24
**confirmed** 24:15
**connected** 21:11
**connection** 42:21
43:23 54:24

**consistent** 22:18
24:12 29:20 60:18
61:9
**contain** 36:12
**contained** 48:16
**container** 58:20
**containing** 6:16,18
**contains** 50:12
**contemporaneou...**
27:19
**content** 74:8,12
**contents** 6:1 34:2
38:10,19 42:4
**continuation** 69:12
70:6 71:12 72:24
73:1
**continue** 56:13
75:6
**CONTINUED** 4:1
7:1
**CONTINUES** 5:1
**control** 57:22,23
58:24 60:6 76:21
77:20
**controlled** 63:17
**convened** 2:4
**conversion** 53:1,6
**copied** 61:8,21
**copies** 59:8
**copy** 23:10,12,13
23:16,21,24 24:4
24:7,8,15,15,19
25:3 29:9 34:1
40:11 47:7 59:12
59:25 60:2 62:2,2
72:23 73:15
**corner** 31:6 39:2
**correct** 15:7,8,11
15:14,17,20,23
16:1,16,20,21,24
17:2,3,17,19,23
17:25 18:12,16,20
18:24 19:4,9
21:19 27:17 31:14
36:19 38:8 39:20
39:24 41:1,2,9,19

41:24 43:14 44:5
45:10,11,18 46:22
47:10,11,16 48:17
49:1,6,7,9,14 50:7
50:9 51:5,13,17
51:20,21,23,24
52:2,5,9,11,12,18
53:11 55:6 56:7
56:10,11,21 57:13
57:16,17 58:4
59:1,7,24 62:14
62:17 64:14 68:23
73:17,18 74:4,6,9
74:13,14 80:20,23
80:25 81:7,22
82:7 83:8
**correspond** 58:5,11
76:12
**corresponds** 84:6
**counsel** 7:9 8:19
15:5 27:24 30:25
37:19 56:12 67:13
85:12,16
**count** 14:10
**couple** 60:13 76:13
80:15
**course** 15:1 81:14
**court** 1:1 8:7,16
9:21 85:1
**create** 40:17 64:13
**created** 24:3 66:21
**creating** 64:25
**Crimes** 5:5
**criminal** 1:6 3:6
5:6 8:8 19:18
**Cross** 6:6,7,8,9
**cross-examination**
39:10 56:1 67:8
73:21 74:22 75:10
76:4 78:21 80:13
**CRR** 1:24
**cryptographic** 74:4
**cube** 62:6 63:13
**cubical** 63:6,20
**current** 10:18
**currently** 10:20
65:23 66:10,14,16

**curriculum** 6:24
12:6 13:11 16:24
17:1,4
**cursory** 48:2
**custody** 7:4,6 59:2
59:7,9,11,13,20
68:10,21 69:8,23
72:5,16 73:8,16
80:20,21 81:6
82:6,13 83:1,11
**C02JG3N6DKQ2**
28:19
**C39HL2XNDTC1**
33:18

---

**D**

**daily** 12:18
**Dalmut** 5:9
**data** 34:24 49:25
**date** 13:15 39:22
40:17,19,24 41:11
41:21 48:5,9
54:19 56:5 57:2
58:3,4,5,6,11,11
59:3 64:22 76:12
76:13,15,18,19,23
78:4,7
**dated** 40:25 46:25
**dates** 54:5
**day** 60:12 69:20
72:7 78:3
**days** 60:13 76:14
78:1
**deal** 13:1
**dealing** 13:7
**deals** 12:6 14:17
**dealt** 17:18
**decrypt** 49:9 78:22
**deemed** 26:13
**deems** 26:8
**deeply** 53:17
**defendant** 3:13 4:3
4:13 73:25
**Defendants** 1:10
**defense** 27:24
30:24 37:19
**degree** 15:6,9,13,15

15:19 76:17
**delay** 41:21
**deleted** 24:22 52:15
**deletions** 20:10
**Dell** 28:6
**Delta** 64:3,9 68:14
**delve** 48:1 53:16
**Department** 3:5
59:17,22 60:1
72:17 73:10 82:5
**depends** 11:23
**deposition** 1:13 2:3
8:3,9 9:3 38:22
84:15 85:5,7,11
85:14
**Dept** 5:6
**described** 22:23
26:18
**DESCRIPTION**
6:15,23 7:3
**determined** 36:11
**determining** 75:25
**developments**
13:16
**device** 20:1 21:10
21:11,13,15,21
22:25 23:5,17
24:16 34:14 47:24
59:4 64:16 81:22
**devices** 21:7,9,25
34:14 45:17,22
46:8 47:15 48:16
55:12,21 75:15
**different** 31:13
34:4 44:15
**difficult** 34:9 49:3
**digital** 10:24 11:9
13:24 14:19,23
19:7,17,19,23
20:21,24 21:12,18
21:25 29:3 30:9
32:19 34:16 49:25
62:20 79:12 80:9
**Dimitrios** 1:9 4:3
8:6 9:11 56:4
**dire** 6:4 14:25 15:2
**direct** 6:3,5 10:4

19:12 31:5 33:13
58:7 83:23
**directly** 76:25
**Director** 5:5
**discussion** 55:19
**Disk** 8:2
**disposition** 73:3
82:2
**District** 1:1,2 2:11
8:7,7 85:3,23
**Division** 3:6 5:7
**document** 6:18 7:4
7:6 16:23 27:18
54:4 68:10,11
69:15,18 70:6
81:19 83:3
**documents** 24:23
25:23,24 71:13
**doing** 27:20 31:16
33:10,23 42:22
74:8
**draft** 53:11,15
**drawer** 62:5 63:11
63:23
**drawers** 63:6
**drive** 21:1,3
**drives** 11:10,11
**due** 34:4 78:9
**duly** 10:1
**duplicate** 23:10
24:3,16 62:2
**D.C** 2:7 3:8 4:19
8:11
**D2HHQ00CDT...**
44:3

---

**E**

**earlier** 29:7,22
33:25 55:10 64:2
68:12 74:2
**easy** 25:22
**efficient** 68:18
**effort** 49:8 78:22
**Election** 5:5
**electronic** 19:25
20:14 21:25 22:25
**employed** 85:13,16

**employee** 85:16
**encounter** 53:24
**encrypts** 49:5
**ensure** 20:8 22:4,18
23:22 24:11 29:9
30:14 34:21 60:7
60:17 61:8 78:17
**entails** 12:16
**enter** 63:16
**entitled** 16:23
**entry** 81:24
**environment** 63:15
**ESQUIRE** 3:4,14
4:4,14,15
**establishing** 42:5
**evidence** 19:17,20
20:9,14 21:18
23:11,17,18,20,23
24:2 25:4 30:9
31:13 39:4 57:22
57:23 58:4,23
60:7 62:24 65:9
69:19 75:21 76:10
76:13,20,21 77:20
80:10 81:6,10,16
81:18 82:3,13,25
**evidentiary** 11:8
20:4,6 25:1 26:7,9
30:6
**exact** 23:9,13,16,24
24:4,16 58:11
62:2
**exactly** 11:4,22
13:11 21:5 58:8
61:17 65:12 67:1
72:23
**examination** 6:2,25
9:25 10:4 15:2
19:12 21:25 28:7
29:19 39:20 46:25
48:6 56:6,13
74:19 82:17
**examine** 27:1 38:9
79:15

**examined** 6:19 10:1
27:16 28:9 74:25
75:16
**examiner** 10:21
11:1,3,5,6,15,20
13:19 19:15 75:3
75:7,15,19 79:12
**examining** 20:15
21:18 22:1
**example** 11:10 12:4
20:23 21:1 22:11
34:8 35:24 54:19
61:1 81:13
**exams** 12:9 14:1
55:2
**exchanges** 54:18
**excuse** 56:22 66:10
**exhibit** 16:3,4,6,9
16:14,22 27:24,25
28:1,5,22 30:25
31:24 33:5,21
37:19,21,25 38:2
38:6 39:4,14,15
39:19 40:4,8,13
40:18 43:3 44:8
46:20,22 47:2,8
47:15 48:5,8 56:6
56:25 57:1,20
62:10 64:21 68:2
68:5,6,19 69:4,5
77:7,13 80:16,17
80:19 81:13,21
82:4,9,12,21,22
82:22,24,25 83:4
83:10,23,25 84:6
**exhibits** 6:13,21 7:1
7:9 16:4 54:25
55:8 56:14
**experience** 79:14
79:18
**expert** 14:23 16:15
19:2,7
**expires** 85:24
**explain** 78:8
**explaining** 26:21
**Extra** 54:22
**extract** 36:23 37:2

37:12
**extracted** 54:8
**extraction** 17:19
  35:4
**extrapolate** 34:10
  49:3,25 50:3,14
**extrapolated** 37:16
**extrapolating** 35:2
**extremely** 63:19
**e-mail** 34:8 36:25
  47:23 48:11,16,18
  48:21,23,25 49:2
  49:6,9,11,12,21
  49:23 50:2,6,16
  51:5 52:8,24 53:2
  53:14 54:8
**e-mails** 24:23 25:23
  25:23 37:2 75:11
  75:16 78:22

**F**

**F** 1:8 8:5
**fact** 18:8 27:14
  31:11 34:4 50:24
  57:8 75:6
**fair** 44:16
**falls** 25:7
**fancy** 17:4 22:8,12
  29:11
**far** 64:1
**FBI** 11:1,2,5 12:25
  13:9,14 14:5,9
  19:16 49:8 72:16
  73:9 75:3,7,14,18
  78:21 80:22 81:3
  82:25
**feasible** 34:13
**features** 23:5
**February** 69:1
**Federal** 10:12,15
  10:19 59:16
**field** 12:15 13:16
  13:21 14:14,23
  17:16 18:5,10,14
  18:18,22 19:2,22
  65:8
**file** 22:11,12 26:9

26:10 36:3 51:4
  52:7 54:18 60:14
**files** 24:22 61:8,20
**final** 61:16 73:3
  74:18 82:2
**Finally** 78:20
**financially** 85:17
**find** 25:3 48:25
  49:12 75:16
**fine** 9:20
**fingerprint** 22:11
**finish** 77:9
**firm** 8:14
**first** 10:1 16:18
  20:18 31:6 40:20
  40:22 49:17 64:20
  71:12 73:2 74:21
  76:9 83:1
**five** 17:24 67:13
**fluid** 17:19
**folder** 52:23 53:7,9
  53:15
**folders** 51:4,9 52:7
  52:10 53:11
**follow** 80:15
**follows** 10:2
**foregoing** 85:5,7
**forensic** 10:21 11:1
  11:3,4,6,15,20
  12:9 13:19 14:18
  15:24 19:7,15,25
  26:16 36:17 55:5
  55:7 75:3,7,14,18
  79:12
**forensics** 14:23
  18:11,23 19:23
**form** 69:9 72:16
  73:8 80:22,25
  81:2 82:13
**format** 25:19,22
  50:1 53:3 78:19
**forth** 11:11 29:12
  63:21 83:7
**found** 47:6 52:23
  52:23
**foundation** 39:6
  42:5 45:20 46:2

47:18 55:16,24
  69:24 70:9 71:6
  71:20 72:4,21
  79:8,9
**four-page** 16:23
**frame** 54:4
**front** 16:10 38:5
  40:9 42:13 47:9
  56:15 68:20
**FTK** 26:12 55:3,4
**functions** 21:13
  34:7
**further** 26:11,11
  30:5 32:3,14
  37:15 39:9 67:6
  74:15 80:12,13
  82:15,17 84:11
  85:15
**F4KJQ8YSF193**
  45:16
**F4KJW7VVF193**
  43:10 45:2

**G**

**Garcia** 5:11 8:13
**general** 20:2 23:3
  53:9
**generate** 79:3
**generated** 24:7
  26:13 37:14 55:2
**generates** 22:10,13
**geolocation** 54:20
**given** 12:20 13:6
  59:22 73:9 85:12
**go** 11:16 21:20
  24:21,24 25:2,11
  26:6 34:23 35:21
  42:16 49:20 57:6
  64:24 70:11 71:14
  71:25 72:10 77:10
**goes** 24:5 58:22
**going** 16:2 27:22
  28:15 30:23 31:24
  33:4,13,20 37:17
  39:13 45:7 61:3
  67:17 68:1,5 69:3
  77:5 82:20 83:22

84:12
**Golf** 64:3 68:13
**Good** 8:21 9:1 10:6
  10:7 15:4 39:12
  56:3 73:23
**Goodin** 1:24 2:8
  8:16 85:4,21
**Goodness** 18:1
**government** 6:14
  14:22 39:3
**Government's**
  16:15 27:24,25
  28:1,5,22 30:25
  31:24 33:5,20
  37:19,21,24 38:2
  38:6 56:6 64:20
  77:6,13 83:23,25
**gracious** 18:1
**ground** 82:10
**guess** 34:23 67:3

**H**

**H** 3:14
**hand** 39:13
**handle** 12:8 60:4
**handled** 58:25 59:4
  60:9 82:3
**handwriting** 81:21
**happens** 26:3
**hard** 11:10 21:1,3
**hardware** 12:6
  53:23
**Harvey** 4:5 5:9
**hash** 74:4
**head** 30:20 76:25
**heading** 17:8
**health** 65:24 66:3
**hear** 65:20 66:8
**hearsay** 41:6,15
  42:3,4 45:20 46:2
  46:10 47:18 55:16
  56:16 69:23,23
  70:9 72:4,5
**held** 8:9
**help** 16:14
**hereto** 85:17
**hesitation** 83:16

**hold** 14:13
**Hotel** 64:9
**Howard** 4:14 6:8
  9:12,12,18 67:9
  67:11,23 68:2,4,8
  69:7,25 70:10,19
  70:25 71:8,24
  72:6,9 73:5,14,19
  79:6,9,23 80:4
**human** 53:3
**hundreds** 14:7
**H-O-W-A-R-D**
  9:14

**I**

**IB44** 7:5
**ID** 30:10,17,21 31:2
  31:8,12,16,20
  41:3
**idea** 58:25
**identical** 29:10
**identification** 16:7
  27:23 28:2 37:18
  37:22 39:16 68:7
  69:6 77:6
**identified** 64:2
  68:12
**identify** 16:12
  25:12
**ill** 65:18
**illness** 65:21 74:22
  75:4
**image** 23:9 24:21
  24:22 25:3 29:2,2
  29:5 33:25 60:22
  61:13 64:13,14
**impeached** 42:7
**important** 20:3
  23:15
**Inbox** 52:11
**include** 59:12
**independently**
  42:19
**indicates** 22:19
**Indicating** 51:6
**individual** 11:23
  12:14

**information** 11:8
34:11,24 35:3,10
35:12,16 36:13
48:23,25 49:4
50:13 54:17,19,20
54:22 79:22
**initial** 20:16 22:21
**initials** 39:1
**installed** 47:24
**instance** 19:6
**instances** 19:1
**intact** 62:21
**integrity** 3:6 5:7
20:3,6 23:22
59:17 60:8 62:1
65:9 72:17 73:9
75:21 80:9
**interested** 85:18
**interim** 22:17
**introduce** 8:19 9:19
34:22 36:9 80:7
**introducing** 20:8
**inventory** 20:19
23:3 29:1 34:19
49:18
**investigated** 44:2
**Investigation** 10:13
10:15,19 59:16
**investigations**
19:18
**investigative** 25:15
26:11
**invoke** 9:4
**involve** 20:16 35:17
**involved** 13:23 29:2
**involves** 11:17,18
34:19 60:16
**Iowa** 1:2 8:8
**iPad** 43:14 44:5,9
44:13,15,18,21,23
45:8
**iPhone** 7:6 33:17
38:15 49:1,19,20
50:8,13
**irrelevant** 79:9,23
80:4
**issue** 54:23 82:14

**issued** 55:9
**issues** 53:23 78:16
**item** 7:5,7 24:4
25:3 28:13 29:9
45:13,15 52:17,22
57:2 58:3,10,21
60:9 64:22,25
68:15,20 69:9,21
70:4,7,14 72:13
73:4 82:13 83:10
83:13 84:1,5,5
**items** 22:22 27:16
36:16,22 37:6
41:11,22,25 52:13
52:15 56:20 75:19
76:9,18 77:15,20

---
**J**

**J** 1:24 2:8 9:24 10:9
17:2 85:4,21
**jailbreaking** 35:24
35:25 36:1,5
**January** 15:21
56:10,21 57:5
58:14 64:17,22
68:23 77:18,20
78:6
**jbinnall@harvey...**
4:10
**Jesse** 1:7 4:4,13 8:5
9:9,14,16 56:4
73:25
**job** 1:25 12:19
19:16,17,19 25:2
25:6 27:14 31:11
75:3,14,18 81:5,9
**John** 1:8 3:13 8:5
9:2 55:13,22
**Jonathan** 3:4 8:22
**jonathan.kravis...**
3:10
**JR** 4:14
**Juliet** 64:3 68:13
**June** 57:13 72:2,7
72:11
**Junk** 52:17
**Justice** 3:5 5:6

59:18,23 60:1
72:18 73:10 82:5
**J-E-S-S-E** 9:10

---
**K**

**keep** 13:15 81:6
**kept** 81:14,21
**Kesari** 1:9 4:3 6:17
8:6 9:11 38:15
45:18 47:16,22
56:4 62:14 67:7
**Kesari's** 54:1 61:16
62:11,23 63:10,23
**key** 63:18,22
**Kilo** 64:4 68:14
**kind** 20:17 61:5
79:19 83:2
**King** 4:6
**know** 12:20 45:22
47:12,20 48:3
50:20 53:14 54:5
54:13 59:15 69:17
72:21 73:7
**knowledge** 13:21
58:8 72:15 73:12
**known** 74:3
**Kravis** 3:4 6:3,5,10
8:21,22 9:5,20
10:5 14:21 15:1
16:5,8 19:13 28:4
35:20 37:23 39:7
39:17 41:5,14
42:2,11 44:14
45:19 46:1,9,13
46:21 47:17 55:15
55:23 56:12,18
65:22 66:4 67:16
68:3 69:22 70:8
70:15,22 71:5,19
72:3,8,20 73:11
74:17,20 79:7,10
79:24 80:5,11
82:10,18 84:10

---
**L**

**lack** 45:19 46:1
47:17 55:16,23

**Les** 57:9,12
**letters** 16:19
**let's** 22:11
**Lima** 64:9
**limitations** 34:5
**limited** 63:20
**line** 33:14 40:21
43:19
**list** 18:9,13,17,21
18:25 19:5 48:10
**listed** 41:12 45:13
**listing** 14:12
**lists** 17:24 44:15
**LiveNote** 2:9
**living** 10:11
**LLP** 4:16
**load** 78:11
**located** 48:11
**location** 63:5 75:10
**lock** 63:7
**locked** 49:10 62:6
63:6,11
**log** 30:11 69:23
72:5
**logical** 35:4

69:24 70:9 71:6
71:19 72:3,20
**laptop** 6:19 7:4
29:4 34:18 36:11
53:2 54:1 57:19
57:21 58:22 61:1
61:16,22 62:3,12
62:13,19,21,23
63:3,7,10,23 65:4
68:12 83:15 84:9
**large** 60:14
**Laurin** 3:14 9:1
15:4
**laurin.mills@lecl...**
3:20
**leading** 35:19
**LECLAIRRYAN**
3:15
**left** 62:20
**legal** 8:14,15,17
**lengthy** 11:16,21
28:25 53:22 78:10

**logically** 49:24
**logistical** 78:9
**long** 10:14,25 11:22
53:20 54:1 78:12
**look** 31:4 43:19
44:7 45:7 48:2
54:4,6 58:1 64:20
68:9 75:15 77:8
77:10 83:18 84:2
**looked** 38:19
**looking** 21:2 26:7
30:11 77:9
**looks** 43:9 45:5
68:20,22 69:12
70:6
**Lori** 1:24 2:8 8:16
85:4,21
**loud** 28:16 33:15
**lower** 39:1

---
**M**

**Mac** 52:1,3
**machine** 85:9
**MacIntosh** 42:1,10
42:22 43:1,7,17
43:20,23 44:2
**mail** 50:21 52:18
**mailbox** 53:9
**maintain** 13:21
59:6,8
**maintained** 22:14
75:22 81:18
**maintaining** 13:22
**making** 20:10
35:12 36:1
**manner** 65:4
**March** 41:1
**mark** 16:3 39:14
68:5 69:3
**marked** 16:4,7
27:23 28:2 30:24
37:18,22 39:16
68:7 69:6 77:6
82:21
**markings** 38:20,24
**master's** 15:18
**material** 11:8 12:8

20:4,6,11,19
24:25 25:1,12,19
25:21 26:6,7,9
29:6 30:4,6 32:4
32:14 34:19 37:15
75:23 78:12 79:4
**materials** 26:1,3
37:12
**mathematical** 22:8
74:5
**matter** 8:4 53:18
78:1
**McIntosh** 13:7
**MD5** 22:5,7 24:5,7
60:16,21 61:1,16
74:3,11
**mean** 14:6 20:5
32:8 35:6,7 51:16
53:25 55:4 61:7
65:7 72:2 78:1
**measures** 65:10
**media** 10:24 11:9
13:24 14:19 20:25
21:12 23:10 29:3
62:20 80:10
**medication** 66:19
67:3
**medications** 66:9
66:15
**Meena** 4:15 9:15
73:24
**meena.sinfelt@b...**
4:22
**meeting** 67:10
**mentioned** 55:3
68:11
**messages** 37:5
48:11 52:24
**metadata** 54:11,13
54:16,17
**methods** 21:16
33:24 35:15 36:24
**Microsoft** 50:25
51:4,13,20 53:10
**middle** 83:24
**Mill** 3:16
**Mills** 3:14 6:4,6,11

9:1,2 14:24 15:3,5
19:11 39:11,18
41:7,16 42:8,15
44:16,17 45:21
46:3,11,18 47:19
55:17,20 56:17
80:14 82:15
**mind** 56:14 57:7
**Mini** 42:1,10,23
43:1,7,14,17,20
43:23 44:2,5,9,13
45:8 49:13
**Minis** 44:15,18,21
44:24
**minutes** 67:13
**mismatches** 61:21
**mix-up** 31:13
**mobile** 34:14
**modifications**
20:10 22:4 35:13
**modifying** 20:14
21:17 35:17
**moment** 23:25 39:8
**Monday** 1:14 2:4
**months** 64:25 78:1
**morning** 8:21 9:1
10:6,7 15:4 39:12
56:3 73:23
**Move** 82:9
**moves** 39:4
**music** 37:4

## N

N 1:9 8:6
**name** 8:13,22 9:10
9:13 10:8,9,10
16:18 17:5 40:1
56:3 59:3 67:11
73:23
**nature** 65:21
**near** 81:25
**need** 56:22 66:12
**needs** 42:6 71:22
**neither** 85:12
**network** 25:10
**never** 62:13
**nice** 67:10

**nineteen** 64:24
**normal** 64:24 81:14
**Northwest** 2:7 3:7
4:17 8:10
**Notary** 2:11 85:22
**note** 23:4 70:24
73:3
**notes** 27:5 50:19,24
50:25 53:4 54:4,6
58:2,6 59:14,25
61:3 72:23 73:2
82:8
**Notice** 16:15
**notwithstanding**
75:4
**November** 64:3,9
68:13
**number** 6:18 8:3,8
16:6 20:2 22:10
22:13,14,17,18
23:4 24:7,9,11
26:25 27:4,9,19
28:1,8,16,18
30:14,17,21 31:2
31:8,16,20 32:22
32:25 33:5,9,15
33:18 37:20,21,25
38:3 39:4,14,15
39:19 40:5 41:3
42:25 43:7,9,13
44:1,3,9,12 45:2,4
45:9,14,15 46:20
46:22 47:3,8,16
48:8 61:20 63:18
64:3,8 65:10 68:6
68:13,16 69:5
73:4 77:13 80:16
80:18,19 83:10
**numbers** 27:16
30:10 31:12 44:23
**numerous** 14:6,11
34:9

## O

**Object** 42:3
**objection** 35:19
39:5 41:5,14 42:2

42:11 44:14,16
45:19 46:1,9
47:17 55:15 65:22
66:4 69:22 70:8
70:15,22 71:5,19
72:3,8,20 73:11
79:6,6,23 80:4
82:10
**objections** 55:23
**observe** 49:22
**obtained** 64:15
**offers** 14:22
**office** 51:1,4 63:5
63:14,15,16
**offices** 2:5
**official** 40:6,9
81:17
**Oh** 45:11
**okay** 9:5 16:22 18:8
18:17,25 19:10
20:5 27:22 28:15
30:1,23 31:15,19
32:10,17 33:13
37:17 39:3 40:8
40:15,17 41:11,20
42:9,16,18 43:6
43:16 44:4,7,22
45:3,17,22,25
46:12,19 47:2,5,8
47:12,15,20,23
48:4,10,15,24
50:15,20,23 54:13
55:12 56:9 57:6
57:25 58:7 59:10
61:17,22 62:8,16
62:19,22 63:2,13
63:22 64:7,12,16
65:3,13,17 66:2
66:18 67:5,12
69:11,14,17,20
70:1,11 71:1,4
72:15 73:6,15
74:1,7,11,15
77:11,12 80:25
81:9,20,24 82:4,9
82:15 83:9,22
**once** 21:24 22:21

24:14 26:5,8 60:6
61:25 71:7
**operating** 13:3 36:2
52:1
**order** 11:14,14
35:10 63:16 79:3
**organization** 14:17
**original** 7:9 23:11
23:17,19,23 24:4
24:16 29:11 69:19
**outcome** 85:18
**Outlook** 51:13,19
53:10
**outside** 9:6 60:10
**overcome** 78:16
**overnight** 63:8
**oversees** 13:18

## P

**package** 58:23 62:5
72:24
**packet** 60:2
**page** 6:2,15,23 7:3
16:19 17:7 31:6
39:25 40:20,22
48:7,8 57:8 64:20
69:13,15,18 70:6
70:12 71:12,13
72:24 73:2,2 83:1
83:24
**pages** 73:7,16
**paper** 18:10,14
**papers** 17:12,15
19:16
**paralegal** 5:9
**paralegals** 9:19
**parse** 24:20
**parsing** 75:23
**part** 12:5,10 13:17
27:14 31:11 59:13
65:7 82:8
**particular** 21:13,15
21:23 22:14,16
24:8,11,19 25:7
26:9,10 28:7 29:4
34:13 38:10,13
45:1 48:2 49:19

53:5,18 54:18
58:20 59:4,9 60:9
60:25 61:15 62:18
63:7 67:1 68:16
70:5 73:4 75:11
75:16 80:9 81:19
**parties** 85:14,17
**passed** 12:22,24
14:2
**pass/fail** 12:20
**path** 53:5,7
**Pennsylvania** 2:6
3:7 4:17 8:10
**people** 63:14,19
**perform** 19:25
26:16 34:16
**performed** 29:1
35:4
**personal** 49:13
50:10,16 53:21
79:14,18
**personally** 54:7,10
**perspective** 20:22
**pertinent** 76:1,1
**phase** 24:20
**philosophy** 65:11
**phone** 6:17 13:5
32:19,22 33:1,6,9
33:16,23 34:1,2,3
34:17,25 35:13,16
35:17,23 36:3,5
36:10,13,15,16,18
36:23 37:3,13,16
38:16 49:21,23
50:2 64:1 65:3,5
65:14 75:1 76:11
76:23 78:23 79:16
79:22
**phones** 14:3
**Photos** 37:4
**physical** 20:20
21:10,24 35:5
64:14
**physically** 49:20,24
63:1 76:20
**Pilger** 5:5 8:24,24
**place** 22:23 23:3

48:6 62:6
**placed** 63:4
**Plaintiff** 1:5 3:3
**platform** 14:18
25:9,18 51:14
**platforms** 13:2,7
**play** 38:7
**please** 8:19 9:22
10:3 39:8 64:20
65:21 66:11 70:12
**PLLC** 4:5
**Plus** 12:6
**point** 24:1 32:13
57:10
**points** 24:11
**possible** 14:24
**post** 61:2
**potential** 11:8
24:25 26:7 30:6
**potentially** 36:12
79:3,21
**power** 58:22
**practice** 22:3 34:19
**practices** 13:17,22
20:7 23:3 65:8
81:15
**preclude** 34:6
**precludes** 65:24
**prepare** 26:20
57:15
**prepared** 66:19
76:16 83:6
**preprinted** 80:22
80:24
**PRESENT** 5:3
**presentation** 18:18
18:22
**presentations**
17:25 18:2
**presented** 68:20
**pretty** 49:10 77:23
**previous** 69:15,18
73:7,16
**previously** 55:3
70:18 72:18
**primarily** 10:22
**prior** 72:13 76:14

**priority** 65:10
**probably** 68:17
78:3
**problems** 50:1
**proceed** 10:3
**PROCEEDINGS**
8:1
**process** 11:16,21
11:22 12:13 19:19
20:16 22:9 24:10
29:1,18 34:23
53:6,6,16,22
58:18 59:13 60:15
61:7,10,18,19,25
65:12 75:22 78:10
**processed** 25:19
44:21,24 53:15
**processing** 10:23
11:7 13:23 20:20
21:22 22:15 24:19
29:5 34:3,20
48:21 49:2
**produced** 59:16
72:16
**Professional** 2:8
**proficiency** 13:20
14:1
**program** 11:24
13:18
**prohibits** 21:12
**protection** 21:7,8
21:21 22:24 34:12
**provide** 25:18
32:18 78:13
**provided** 30:4,24
59:25 72:23,25
81:3
**providing** 78:17
**Public** 2:11 3:6 5:7
59:17 72:17 73:9
85:22
**Publications** 17:8
**publish** 19:16,20
**published** 17:12,21
18:10,14 51:19
**pull** 24:22
**put** 27:11 29:11

32:1,11,14 37:7
62:4,4 63:7,9
81:25
**putting** 63:10

**Q**
**qualified** 19:1,6
**Quebec** 64:4 68:14
**question** 32:9 42:3
46:14 71:10 73:6
**questions** 19:22
26:14 39:9 42:12
42:13 67:7,15,25
73:20 74:1,16,18
74:23 75:9,12
76:4,6 78:21,23
80:12,16 82:19
84:11
**quickly** 77:23
**quite** 51:2 78:10

**R**
**R** 1:7 4:4 8:5
**ran** 50:1
**read** 25:22 28:15
31:19 33:15 43:13
64:7 83:25
**readable** 25:20
53:3 78:19
**readily** 35:11
**really** 65:2
**Realtime** 2:10,10
**reason** 73:1 78:15
**reasons** 78:9,15
**recall** 13:10 42:6,9
42:21,25 43:22
47:25 48:15 50:15
51:3,9 52:22,23
52:25 54:3
**receipt** 41:22
**receive** 11:12 12:25
22:25 64:22
**received** 12:2 13:4
13:8,14 15:9,15
15:18 41:12 56:20
57:2,19 58:3,10
59:5 76:19 77:14

77:19
**receiving** 64:25
**recess** 67:19,20
**recognize** 27:25
37:24 38:21 68:18
82:22
**recollection** 43:4
44:8,20 46:16
56:23 64:19 71:16
71:18,20 77:3,14
83:20 84:1,4
**record** 27:3 31:1,15
32:25 33:8 44:23
50:18 55:19 67:18
67:22 81:10,14,17
81:20 82:6 83:9
84:13 85:11
**recorded** 27:6,10
27:11 28:16 33:6
**recording** 27:15
**recover** 36:17 37:7
**Recross** 6:11
**Recs** 28:6
**redacted** 39:4
**Redirect** 6:10
74:19 82:17
**refer** 61:3
**Reference** 40:22,23
**referred** 74:3
**referring** 48:7 57:3
59:19 62:11 67:3
68:15
**reflected** 76:15
**reflection** 81:19
**refresh** 43:4 44:8
56:23 64:19 71:15
71:18 77:2,14
83:19 84:4
**refreshed** 71:20,23
**refreshes** 84:1
**regarding** 57:10
**regards** 62:10
68:11
**Registered** 2:8
**regular** 22:5
**regularly** 81:15
**related** 85:13

**relative** 85:15
**relevance** 65:22
  66:4
**relevant** 25:3,12
  26:13
**remember** 26:25
  29:7,24 30:20
  32:22 63:10 64:4
  65:14 71:22 74:23
  75:12 76:6,8,22
  78:23 83:13
**report** 6:16,25
  26:12,20 27:7,10
  27:12 28:6,10,17
  30:25 31:1,5,9,19
  33:2,14 37:14
  38:4,14 39:19,22
  40:1,6,10,20 41:8
  41:10,17,25 42:4
  42:7,12,14,17,19
  42:20 44:15 45:1
  45:5 46:24 48:4
  50:12 55:2,8,11
  56:5,8,24 57:14
  57:16 58:2 59:11
  59:15,19,21 65:1
  66:19,20 76:16
  77:2,8,10 78:5,7
  80:20 83:19
**Reported** 1:23
**reporter** 2:9,9,10
  8:16 9:22 85:1,4
**reports** 54:24 55:3
  55:9 56:15
**represent** 8:22,25
  9:14,16 56:4
  67:11
**request** 30:15
  40:23,25 41:3,22
  42:10 56:9
**requested** 34:11
  35:3 53:17 76:2
**required** 12:11
**respect** 75:19 83:4
**Response** 10:22
**responsibility** 25:7
  32:13 48:1,14

60:7 75:17,20
**responsible** 10:23
  11:7 25:25 75:25
**results** 29:17 30:2
  32:1,11
**resumed** 19:12
**resumé** 17:5,24
  18:8,21,25
**retained** 7:9
**review** 22:22 24:25
  25:15,18 26:11
  29:6 30:5 32:5
  37:15 42:22 43:11
  44:19 50:4,7 54:7
  54:10 55:21 75:24
  78:10,12 81:7,10
**reviewed** 43:1,8
  44:4,10,13,21
  49:1 81:16
**reviewing** 43:22
**Richard** 5:5 8:24
**right** 15:13,16,19
  15:22 17:5,12
  18:6 30:11 31:6
  35:14 38:7 39:1
  39:23 40:2,9
  41:13,18,23 52:8
  60:20 61:11,12
  63:25 64:10 66:13
  67:6,24 69:3
  70:20 71:9,14
  72:12 73:19 77:11
  81:11,16
**Road** 3:16
**role** 19:15
**room** 57:22,23
**Roscoe** 4:14 9:12
  67:11
roscoe.howard@...
  4:21
**routinely** 12:14
**RPR** 1:24
**rule** 9:4
**run** 22:9,12
**runs** 51:22 52:1,3
_____
            **S**

**SANS** 14:17
**satisfied** 62:1
**saw** 70:18
**saying** 35:15 59:23
**says** 28:12 40:21
  41:8,10,17,25
  42:17 56:8 57:5
  57:14
**science** 18:15,18
  19:2
**sciences** 19:7
**screen** 61:19
**search** 32:12 36:6
  48:11 79:1,20
**searched** 30:7
**second** 45:8 57:8
**Section** 3:6 5:7
  59:17 72:17 73:9
**secure** 62:5,6 63:4
**secured** 57:21 60:9
**see** 17:9 28:8 39:1
  40:21 43:20 49:20
  50:24 56:24 67:14
  76:18 83:25
**seen** 69:14,14
**sense** 32:7 35:9
**Sent** 52:13
**September** 1:14 2:4
  8:11
**serial** 6:18 23:4
  26:25 27:4,9,16
  27:18 28:8,16,18
  32:22,25 33:5,9
  33:15,18 42:25
  43:6,9 44:1,3,9,12
  44:23 45:1,4,9,14
  45:15 64:2 68:13
  68:16
**service** 40:23,25
  41:3,21 42:10
  56:9
**set** 30:13
**shorthand** 85:9
**shortly** 77:23,25
**shots** 61:19
**show** 16:2 25:23,23
  27:22 30:23 33:4

37:17 77:5 82:20
  83:22
**shown** 27:23 37:18
**shows** 72:18
**sign** 40:4 47:2
**signature** 40:7 47:5
  84:14
**signed** 47:9,13
**similar** 45:8
**Sinfelt** 4:15 6:9
  9:15,15 73:22,24
  79:8
**single** 12:22 18:9
  18:14,17,22 19:5
**sir** 10:6 12:3 42:24
  66:8 71:25 72:12
**sit** 26:24 30:19
  32:21 53:13 76:22
**sitting** 58:8
**software** 12:7
  21:11 47:23 48:17
  48:18,20 50:16
  79:19
**Solutions** 8:14,18
**soon** 77:19,21
**Sorenson** 46:6,7
**Sorenson's** 46:8,16
**sorry** 43:18 45:11
  56:12 59:20 61:11
  64:7 65:20 66:2,8
  66:22
**sound** 64:10
**Southern** 1:2 8:7
**space** 63:5,17,19
**Spam** 52:20
**special** 9:5 10:12
  10:14,16,20 14:22
  19:14,21 24:22
  28:20 31:23 33:19
  39:8 57:9,12
  74:17 78:25 79:11
  82:20 83:23
**specialist** 8:15
**specialized** 11:12
  11:17 12:3 24:20
**specifically** 36:25
  62:9 63:9 65:13

73:7 76:2
**specified** 53:5
  55:10 60:16
**specifies** 58:3 61:20
**specify** 48:9 61:4
**spelled** 9:13 10:10
**stamps** 54:19
**stand** 25:14
**standard** 53:11
**standpoint** 20:21
**start** 74:13 76:21
  77:21
**started** 57:23
**state** 48:5
**stated** 14:15 28:25
  72:22 82:11
**States** 1:1,4 3:5 8:4
  8:6,23,25 85:2
**stay** 60:13
**stays** 22:18 24:12
**step** 24:17,18 29:2
  34:23
**steps** 19:24 20:13
  22:17 26:21 29:8
  29:14 34:15 36:15
**stopped** 21:14
**storage** 11:9 20:24
  21:12 23:10 29:3
  62:20 80:9 82:1
**store** 51:4
**stored** 57:21 61:23
  63:3,23 65:3,4,14
**Straka** 57:9,12
**Street** 4:6
**strike** 43:12 70:2
  71:1
**structure** 52:7
**stuff** 20:9
**submit** 58:23
**submitted** 42:1
**substantially** 52:4
**Suite** 2:7 3:17 4:7
  4:18
**supercritical** 17:19
**sure** 12:14 20:13
  21:2,17 22:22
  23:15 24:2 27:15

30:10 31:12 33:25
49:16 51:2 56:17
58:19,21 61:12
74:7 75:21 83:17
83:17,18
swear 9:22
sworn 10:1 85:7
system 25:13 26:1,4
26:6 29:23 30:5,8
30:12,13 31:3
32:3,12,15 36:2,3
37:8 50:5 52:1
58:17 60:24 61:6
61:9 78:13
systems 2:10 13:3
S-I-N-F-E-L-T
9:16

**T**
T 4:15
take 12:5 19:24
20:13 23:8 29:9
29:14 35:6 36:14
42:19 44:7 46:19
49:8 53:20 54:2
58:1 60:6 62:3
65:10 66:11 67:13
68:9 78:12
taken 34:4 35:22
62:19 67:19 85:5
85:8,15
talked 29:8,23
33:25
talking 64:4 75:2
76:10,24 83:3
Tango 64:10
Tate 1:8 3:13 8:5
9:2 15:5 55:13,22
Team 10:22
technical 78:16
techniques 79:2
tell 44:22 53:7
65:21 74:12
ten 11:3
terminal 66:5
terminology 35:24
terms 20:2 34:12

49:11 54:5 83:6
test 13:20
tested 12:19
testified 10:1
testimony 29:8,22
45:3 74:2 85:6,8
85:11
testing 11:18 12:12
tests 12:21,24
text 37:4
thank 9:6 19:14
28:20 33:19 39:8
39:17 43:11 56:18
67:5,16 74:15
80:11 84:10
Theresa 5:9
thing 20:3,18 22:1
30:11 49:17
think 9:7 14:6
43:16 50:25 58:13
Thornburg 2:6
4:16 9:13,17
three 17:12
three-month 41:21
thumb 11:10
tightly 49:10
time 13:13 14:21
23:23 33:10 39:3
53:18 54:4,19
59:3 60:4 61:23
62:22,24 66:11
67:18,22 74:25
78:12 81:25 82:3
84:13
timing 76:5
today 30:19 32:21
53:13 58:8 73:17
75:2,7 76:11,23
76:24
tool 21:6 22:3 25:9
36:6
Toolkit 55:5,7
tools 12:17,18
24:20 33:24 34:5
34:9,10 79:15,19
79:20,20 80:2
top 30:20 31:6

40:22
total 23:6
touched 23:25
track 81:6
trained 51:12 65:8
training 11:13,17
11:18 12:2,3,5,7
12:11,23 13:21
trainings 12:4
transcribed 85:10
transcription 85:10
TransPerfect 8:14
8:17
travelling 65:25
trial 9:3,8
true 17:14 48:24
74:11 81:5 85:11
try 32:8 35:15
trying 60:14
turn 39:25 42:20
43:3 57:6 70:11
71:15 80:17
turned 32:4,6
two 11:25 12:1,11
16:3 44:15,21,23
55:1
type 9:3 36:12 67:2
types 12:8

**U**
ultimately 11:19
12:20 26:12
undergo 13:20
undergoing 66:21
undergraduate
15:6,12
understand 64:12
65:17
understanding
12:15
unique 22:10,13
23:4 30:14,16,20
31:2,8,20
United 1:1,4 3:5
8:4,6,23,25 85:2
unlocked 49:19
updated 60:23

uphold 65:11
upload 50:6 60:15
60:15
uploaded 26:4,5
61:9
uploading 25:25
58:16 60:11,18
61:5,14,14
use 21:6,21 24:20
25:10,17 30:16
33:24 34:6 35:15
36:5,24 80:2
user 24:24 78:19
uses 51:4
utility 25:17
utilize 22:4
utilized 20:7
U.S 5:6

**V**
v 1:6 8:5
vague 44:14 70:15
70:22 71:5
varies 47:12
various 79:15
verification 59:13
version 47:13 51:25
52:3,5
video 8:3,15
Videographer 5:11
8:2 9:21 10:3
67:17,21 84:12
videos 37:4
VIDEOTAPED
1:13
Virginia 3:18 4:8
visually 49:22
vitae 6:24 13:12
16:24 17:1,4
voice 83:17
voir 6:4 14:25 15:2

**W**
wait 9:6
waived 84:14
want 9:18 19:21
23:19 26:14 36:9

61:12 66:24 77:8
80:7 83:24
Washington 2:7
3:8 4:19 8:11
way 32:9 35:18
36:21 47:13 48:23
52:4 63:18 65:15
68:18 78:18
ways 35:11
weeks 78:1
went 11:24 57:22
weren't 63:2
Wesley 1:13 2:3
6:24 8:3 9:24
10:9 14:22 16:19
17:2
willing 66:25
Window 13:2
Windows 14:15,18
51:22 52:4
Windows-based
13:3
Windows/Intel
51:17
Wintel 51:14,16
witness 9:8,22,25
14:25 19:2,7,11
28:3 42:6,11
46:15 55:18,25
56:15 65:23 66:5
70:17,24 71:21
72:22 73:12 82:11
85:6,8,12
witnesses 9:4 16:15
work 11:13 23:15
26:15 27:20 31:16
32:3,6 33:11
57:10 75:6 76:5,9
77:15,21 78:6
81:3
worked 15:22
working 23:11,12
23:16 29:10 62:2
works 19:23
world 79:1
write 21:6,8,12,21
22:24 34:12 40:13

**written** 28:10
**wrong** 64:8
**wrote** 31:9

**X**

**X-Ray** 64:9

**Y**

**years** 10:17 11:3,25
  12:2,11
**Yoo** 1:13 2:3 6:22
  6:24 7:2 8:4 9:24
  10:9 14:22 15:4
  16:6,9,19 17:2
  19:15,21 28:20
  31:23 33:19 39:8
  39:12,15 56:3
  57:18 67:10,24
  68:6,9 69:5 70:1,3
  70:13 73:23 74:17
  78:25 79:11 80:17
  82:20 83:23
**Y-O-O** 10:10

**0**

**02** 64:3 68:13

**1**

**1** 6:16 8:3 20:2
  37:20,21,25 38:3
  38:6 39:4 64:10
**1B** 58:21 73:4
  83:10
**1B16** 45:14,15
**1B43** 7:7 33:14
  69:9,21 70:4,14
  73:8
**1B44** 28:13 68:15
  68:20 83:12,13,15
  84:2,5
**10** 6:3
**10th** 57:13
**10:02** 2:5 8:12
**11:09** 67:18,19
**11:21** 67:20,22
**11:36** 84:13,15
**1100** 3:17

**14** 85:25
**14915** 1:25
**15** 6:4 10:17
**15th** 56:10
**16** 6:24
**17th** 46:25 56:7
  57:16 78:5
**1717** 2:6 4:17 8:10
**19** 6:5
**1990s** 17:22 18:3
**1991** 15:10
**1992** 15:16
**1996** 15:18,21

**2**

**2** 6:18 27:24,25
  28:1,5,22 30:25
  31:24 33:5,21
  46:20,22 47:3,8
  47:16 48:5,8
  54:25 55:8 56:6
  57:1,20 62:10
  64:4,9,21 68:14
  77:7,13 83:23,25
**20th** 70:7
**2000** 15:22
**20006** 2:7 4:19
**2004** 13:10
**2014** 41:1,12 56:10
  56:21 57:5,13
  58:14 64:17 68:23
  69:1 77:18,20
  78:7
**2015** 1:14 2:4 8:11
  39:23 46:25 56:7
  57:16 70:7,18
  72:2,11 78:5,8
**2016** 85:25
**202-289-1313** 4:20
**202-616-2840** 3:9
**20530** 3:8
**22314** 3:18 4:8
**2318** 3:16
**24/7** 62:25
**28** 1:14 2:4 6:18
  8:11
**29th** 41:12

**3**

**3** 6:24 16:4,6,9,14
  16:22 17:7 64:3
  68:13
**30** 64:17 68:23
**30th** 56:21 57:5
  58:14 77:18,20
**300** 4:7
**37** 6:16
**39** 6:6,25 64:9

**4**

**4** 6:25 17:7 39:14
  39:15,19,25,25
  40:5,13,18 43:3
  44:8 54:25 55:8
**4th** 39:23 40:19
  41:1
**4:15-CR-103-JA...**
  1:7 8:8

**5**

**5** 7:4 13:10 68:3,5,6
  82:22,22,24,25
  83:10 84:6
**5th** 72:11
**500** 2:7 4:18
**56** 6:7
**56D-WF-2881718**
  31:22

**6**

**6** 7:6 64:3 68:13
  69:4,5 80:16,18
  80:19 81:13,21
  82:4,9,12 83:4
**60336** 41:4
**67** 6:8
**68** 7:4
**69** 7:6

**7**

**7th** 69:1
**703-657-5903** 3:19
**703-888-1943** 4:9
**717** 4:6
**73** 6:9

**74** 6:10

**8**

**8/4/2015** 6:25
**80** 6:11

**9**

**950** 3:7