IN THE UNITED STATES DISTRICT COURT
                      FOR THE SOUTHERN DISTRICT OF IOWA
                             CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :        Criminal No. 4:15-103
                            :
     vs.                    :
                            :
DIMITRIOS N. KESARI,        :        TRANSCRIPT OF SENTENCING
                            :
          Defendant.        :
- - - - - - - - - - - - - -X

                                  Second Floor Courtroom
                                  United States Courthouse
                                  123 East Walnut Street
                                  Des Moines, Iowa  50309
                                  Wednesday, September 21, 2016
                                  9:05 a.m.


BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge.


APPEARANCES:

For the Plaintiff:              JOSEPH P. COONEY, ESQ.
                               RICHARD C. PILGER, ESQ.
                               Public Integrity Section
                               Criminal Division
                               U.S. Department of Justice
                               1400 New York Avenue NW
                               Suite 12100
                               Washington, D.C.  20005

For the Defendant:             JESSE RYAN BINNALL, ESQ.
                               Harvey & Binnall
                               717 King Street
                               Suite 300
                               Alexandria, Virginia  22314


                   Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                     Room 189, U.S. Courthouse
                      123 East Walnut Street
                     Des Moines, Iowa  50309

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendant: | | | | |
| George Alexson | 9 | 12 | | |
| William Sylvester | 14 | 15 | | |
| Kenneth Connor | 16 | | | |

```
 1                    P R O C E E D I N G S

 2              (In open court, with defendant present.)

 3              THE COURT:  Please be seated.

 4              The record can reflect that we're here in the matter

 5    of the United States of America versus Dimitrios Kesari.  It's

 6    Case 4:15-cr-103.  Mr. Kesari is before the court for

 7    sentencing.  He pleaded guilty on -- or he was found guilty on

 8    May 5th of Counts 1, 3 and 4 of the superseding indictment, and

 9    he had earlier been found guilty on October 22, 2015, of Count 2

10    of the original indictment.  He's present, he's represented by

11    Jesse Binnall, and the government is represented by Richard

12    Pilger and Joseph Cooney.

13              In preparation for sentencing, I reviewed the

14    presentence report in its entirety.  I've also received and

15    reviewed the sentencing memoranda filed by both parties, and

16    there were a number of letters submitted in support of

17    Mr. Kesari, including a letter from himself.

18              Mr. Binnall, there are guideline issues still

19    remaining in this case.  Did you want to make argument on those?

20              MR. BINNALL:  Briefly, Your Honor.  First of all, Your

21    Honor, just a housekeeping matter.  With me at counsel table

22    today is Anastasia Uzilevskaya, and she is a third-year law

23    student.  I want to make sure it's okay with the court that she

24    be here.

25              THE COURT:  Yes, absolutely.
```

1          Welcome.

2          MR. BINNALL:  Thank you very much, Your Honor.

3          Your Honor, I was in the courtroom yesterday for the

4    sentencings of Mr. Tate and Mr. Benton.  I understand that from

5    some of the court's comments in that some of the issues may be

6    the same and some may be just a little different.  So as to move

7    things along this morning, I believe, for instance, the court's

8    ruling on otherwise extensive, I'm not likely to change your

9    mind on that based on the arguments that Ms. Campbell made and

10   that were previously made on the papers, and I'm going to rest

11   on those.

12         Regarding whether or not -- unless the court, of

13   course, feels that there's something else that the court has

14   questions on that the court would like me to address on that.

15         THE COURT:  No.  I mean, given his participation in

16   this offense, arguments that it's not otherwise extensive are

17   less available to Mr. Kesari.

18         MR. BINNALL:  I understand the court's ruling on that,

19   and we rest on our arguments and incorporate that of co-counsel

20   for Mr. Benton.

21         As far as Mr. Kesari's role as essentially an

22   organizer of the offense, the court mentioned yesterday, and

23   Mr. Kesari essentially said as much in the letter that he

24   submitted to the court, that he was more involved in this, and

25   we acknowledge that.  It still is not the type of activity in

1  our position that merits any sort of enhancement because using

2  the analogy that the court used yesterday, this isn't something

3  where he's going to get people from different licensures, such

4  as mortgage fraud or anything like that where you need a lawyer,

5  a broker, a banker, et cetera.

6          Mr. Kesari was part of a presidential campaign and was

7  getting things done.  We believe that any sort of an enhancement

8  based on that role is taken care of on the otherwise extensive

9  part, but perhaps most importantly, Your Honor, it's within the

10 offense itself is essentially as an obstruction type of offense,

11 as an offense of taking the actions that were taken in that time

12 in 2011 and 2012 that Mr. Kesari was active in that but not any

13 more than any other offense that is covered otherwise under the

14 statutes at issue under which he was convicted.

15         The crime itself was the coverup and, Your Honor, that

16 is essentially what Mr. Cooney said yesterday, that the payment

17 of Mr. Sorenson, to paraphrase, was untoward but not illegal.

18 The crime itself was the coverup, and this brings us into our

19 obstruction arguments, Your Honor, on whether or not Mr. Kesari

20 should have a sentencing enhancement for obstruction of justice,

21 which is acquitted conduct in this case.  The government tried

22 to prove to the jury that Mr. Kesari should be punished for

23 obstruction of justice.  They made their case.  They had their

24 day in court.  The jury came back and found that he was not

25 guilty, and we believe that jury verdict deserves some deference

1    here and that Mr. Kesari should not be punished for something

2    that he was acquitted of.

3           Now, we are aware of Supreme Court case law, though I

4    will point out it's pre Booker, pre Apprendi Supreme Court case

5    law, that does allow for punishment on acquitted conduct with

6    certain findings.  We still maintain that that is not

7    appropriate in this case.  It's something that the court has an

8    option to do, but we would ask the court not to do that.  And

9    the biggest reason for doing that, again, is that these are

10   obstruction offenses that he was found guilty (sic) of that he's

11   being sentenced for here today.  It is within the guideline

12   range itself of the statute that Mr. Kesari has already been

13   punished for.  It would be inappropriate if he was further

14   doubly punished for that.  And, of course, it's our position

15   that they haven't even proved by a preponderance of the evidence

16   any sort of obstruction of justice.  The court has heard the

17   evidence in this case on several occasions and is very familiar

18   with the facts of the case; but that is our argument.

19          Should the government argue that Mr. Kesari was

20   acquitted only because of the type of narrow indictment, I would

21   ask the court not to let them profit from their own negligence.

22   They had an opportunity not once but twice to get the dates

23   wrong (sic) in their indictments.  They failed to do so both

24   times.  That is not Mr. Kesari's fault, and he should not be

25   punished for the fact that they did not get the dates right in

1  their indictments.

2          Your Honor, we have also asked for acceptance of

3  responsibility credit, and our argument on that is that

4  Mr. Kesari -- our position is just the facts with him were never

5  really in dispute.  We had a dispute about the law.  The court

6  has made its rulings on the law.  I assume that the ruling that

7  the court announced yesterday regarding the Rule 29 and Rule 33

8  motions applies to our motions as well.

9          THE COURT:  They do.

10          MR. BINNALL:  And that's not what we're here for

11  today, but that was the main dispute of Mr. Kesari was a legal

12  argument.

13          As far as the facts go, there with Mr. Kesari was

14  never a lot really in doubt, certainly a few things here and

15  there, but nothing serious that we contested on the facts.

16  Indeed, regardless of what the law says, this is a good man, who

17  has done good things, who had a serious lapse in judgment in an

18  effort to help a friend and to help a campaign that he was a

19  part of, and he did it in a difficult time in his life.  We'll

20  get more into that later, Your Honor; but that is just to say

21  that we believe there is some consideration there.

22          Unless the court has any questions, that's our

23  position on the objections.

24          THE COURT:  Mr. Pilger, Mr. Cooney, just on the

25  guideline issues?

1          MR. PILGER:  The government rests on the papers, with

2     the exception of the acceptance of responsibility points.  We

3     would just note that the defense vigorously contested every fact

4     that the government alleged throughout the course of the trial.

5     Otherwise, we rest on the papers, Your Honor.

6          THE COURT:  Thank you.

7          I find that the base offense level here is 14, that

8     there is a two-level enhancement in paragraph 37 appropriately

9     given and that Mr. Kesari was appropriately attributed the

10    obstruction of justice enhancement in paragraph 41 for his

11    personal activities in August of 2013.  I find by the

12    preponderance of the evidence that those acts were committed and

13    committed with the intent to obstruct justice.

14         He has a total -- oh, I deny the request for

15    acceptance of responsibility request.

16         He has a total offense level of 18 and a criminal

17    history category I.

18         I would hear first from you, Mr. Binnall, then from

19    Mr. Kesari, and then from Mr. Pilger before imposing sentence.

20         MR. BINNALL:  Yes, Your Honor.  We do have some brief

21    evidence for the court, and I do not expect that it will take

22    very long at all.

23         THE COURT:  Go ahead.

24         MR. BINNALL:  Your Honor, first I would like to call

25    Father George Alexson.

1          THE COURT:  Come forward, sir.

2          MR. BINNALL:  And he -- Your Honor, the government

3  told me they were going to request removing the witnesses, so I

4  have to go get him out in the hallway.

5          THE COURT:  Go get him.

6          MR. BINNALL:  Certainly.

7          THE CLERK:  Please raise your right hand.

8          GEORGE ALEXSON, DEFENDANT'S WITNESS, SWORN

9          THE CLERK:  Please be seated.

10                    DIRECT EXAMINATION

11  BY MR. BINNALL:

12  Q.  Good morning, sir.

13          Would you please state your name for the record and

14  please spell your last name.

15  A.  Father George Alexson, A-L-E-X-S-O-N.

16  Q.  Thank you.

17          And, Mr. Alexson, do you know Dimitri Kesari?

18  A.  Yes.

19  Q.  When did you meet Mr. Kesari?

20  A.  In January of 2011.

21  Q.  And how did you come to know him?

22  A.  When I assumed responsibilities at the parish where he

23  attends.

24  Q.  And what was his capacity in the parish that you're at now?

25  A.  Dimitrios is one of the founders of this parish.  We're only

1  ten years old, and he was a member of the parish council when I

2  arrived there.

3  Q.  All right.  And what were his activities as a member of the

4  parish council?

5  A.  The responsibilities of the council members is to assist the

6  priest in governing the life of the church.  So he was involved

7  in pretty much all aspects of the parish life.

8  Q.  All right.  Was he involved in any building projects?

9  A.  Yes.  He was one of the contributors who helped to fit out

10  the church, build the altar area, things like that.

11  Q.  And is he ever involved in maintaining the church?

12  A.  Yes, yes.  He's been doing that just about all of the years

13  he's been with us.

14  Q.  Did you know Mr. Kesari's mother as well?

15  A.  Yes.  She was one of my most faithful parishioners.

16  Whenever the church doors were open, she was sitting in the

17  front pew.

18  Q.  All right.  And did you get a chance to observe Mr. Kesari's

19  relationship with his mother?

20  A.  Yes.  It was a good son/mother relationship, and he took

21  very good care of her.

22  Q.  Do you know whether or not he was his mother's primary

23  caregiver?

24  A.  I believe he was, yes.

25  Q.  Did there ever come a point where he had to do things like

1    take the keys to the car from her?

2    A.   Actually she asked me, it was my responsibility to convince

3    him to give the keys back.

4    Q.   Okay.  Sir, did there come a point when his mother died?

5    A.   Yes.

6    Q.   And was that about Thanksgiving of 2011?

7    A.   I'm sorry?

8    Q.   Was that about Thanksgiving time 2011?

9    A.   I believe so, somewhere around there.

10   Q.   And were you able to observe Mr. Kesari's demeanor during

11   the time of his mother's passing?

12   A.   Yes.  It was a difficult experience.  I would hope anyone

13   who loses a mother would feel the loss, and I presided at her

14   funeral and ministered to him and the family.

15   Q.   Sir, if given the opportunity to do community service, are

16   there opportunities at the church for Mr. Kesari to serve the

17   community?

18   A.   Yes.  Yes, there are several ways that he could help us, in

19   the continuing of the upkeep of the church, we have need for

20   assistance for people who are elderly, youth work, many things

21   like that.

22   Q.   All right.

23   A.   Both on the parish level as well as the diocese level, we

24   could arrange for that.

25            MR. BINNALL:  Thank you, sir.

1          Those are the questions that I have, Your Honor.

2          THE COURT:  Any questions from the government?

3          MR. PILGER:  Just a couple, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. PILGER:

6    Q.  Good morning, Father.

7          I'm Richard Pilger.  I represent the United States.

8    A.  Good morning.

9    Q.  Father, do you know anything about the facts of this case?

10   A.  Some, yes.

11   Q.  And do they change your opinion of the defendant's character

12   at all on what he did?

13   A.  Well, we all sin and we are all indeed a restoration.

14   Q.  Fair enough.

15   A.  But I think basically he's a good, decent human being.

16   Q.  Fair enough.  And you've given your assessment of his

17   character based on what you know of him over the years, right?

18   A.  Yes.

19   Q.  And would it be fair to say there must be some things you

20   don't know about him?

21   A.  There's a lot of things that I don't know about a lot of

22   people.

23   Q.  Right.  Have you heard --

24   A.  Including myself, yes.

25   Q.  Okay.  Father, have you heard that the defendant posed as a

1   cleric of your church to lure a couple away from their home so

2   that he could burglarize it?

3   A.   That -- I'm not familiar with that, no.

4   Q.   If you were aware that he had posed in an e-mail as a cleric

5   of your church in order to lure a couple away from their home --

6            MR. BINNALL:   I object because he already said he's

7   not aware of it.   There's really --

8            THE COURT:   Overruled.   It is posed as a hypothetical

9   question.

10  BY MR. PILGER:

11  Q.   If you were aware by e-mail he posed as a cleric of your

12  church to lure a couple away from their home so that he could

13  burglarize it to retrieve a computer, would that change your

14  opinion?

15  A.   If he's guilty, I suppose I would expect him to repent to

16  it.

17            MR. PILGER:   No further questions.

18            THE COURT:   Thank you, sir.

19            You're excused.

20                                  (Witness excused.)

21            THE COURT:   Mr. Binnall.

22            MR. BINNALL:   William Sylvester, Your Honor.   And I'll

23  go get him.

24            THE CLERK:   Could you raise your right hand.

25            WILLIAM SYLVESTER, DEFENDANT'S WITNESS, SWORN

1          THE CLERK:  Please be seated.

2                    DIRECT EXAMINATION

3    BY MR. BINNALL:

4    Q.  Good morning, sir.

5            Will you please state your name for the record and

6    please spell your last name.

7    A.  William Sylvester, S-Y-L-V-E-S-T-E-R.

8    Q.  Thank you, sir.

9            And do you know Dimitri Kesari?

10   A.  Yes, I do.

11   Q.  How long have you known Mr. Kesari for?

12   A.  I've known him for about five years.

13   Q.  All right.  And how did you come to know him?

14   A.  I originally met him through some community organizations

15   within our local area and then we reconnected through some

16   neighbors and friends.

17   Q.  And are you aware of his activities in the Boy Scouts of

18   America?

19   A.  Yes, I am.

20   Q.  And what is your knowledge about his involvement in the Boy

21   Scouts?

22   A.  He is an active leader within his son's Boy Scout troop.  He

23   and I attended Boy Scout training together.  I know that he's

24   created many events for the Boy Scouts, as well as Boy Scout

25   involvement in the local community.

1  Q.  All right.  How about an organization called Lego League?

2  A.  Yes.  The Lego League, he was an advisor, mentor for a Lego

3  team for children.  It's a program that educates kids on science

4  technology and engineering, math.  They work together to build

5  Legos, tackle problems, work through ethical issues within

6  science.

7  Q.  All right.  And do you know what Mr. Kesari's actual role in

8  that is?

9  A.  Yes.  He was a mentor to the kids with the members of the

10 team supporting -- you know, we had meetings.  We had

11 competitions.

12 Q.  All right.  Is he also a business partner of yours?

13 A.  Yes, he is.

14 Q.  All right.  Can you explain that business relationship?

15 A.  Yes.  We created an eCommerce web site delivering lobster.

16 Q.  And is that something that you are currently actively trying

17 to build?

18 A.  Yes.

19         MR. BINNALL:  No further questions, Your Honor.

20         THE COURT:  Do you have questions, Mr. Pilger?

21         MR. PILGER:  Just a couple, Your Honor.

22                     CROSS-EXAMINATION

23 BY MR. PILGER:

24 Q.  Good morning, sir.

25         I'm Richard Pilger.  I represent the United States.

1          Has Mr. Kesari brought a lot of educational knowledge

2   and skill to the activities that you've talked about?

3   A.  Yes, he has.

4   Q.  And has he had money to contribute and time to contribute to

5   make these things happen?

6   A.  He's contributed his time.  He has not contributed money.

7          MR. PILGER:  No further questions.

8          THE COURT:  Thank you, sir.

9          You're excused.

10                              (Witness excused.)

11          MR. BINNALL:  Ken Connor will be our last witness,

12   Your Honor, and I will go get him as well.

13          THE COURT:  Come forward, sir.

14          If you'll approach her, she'll administer your oath.

15          THE WITNESS:  Yes, Your Honor.

16          THE CLERK:  Please raise your right hand.

17       KENNETH LUKE CONNOR, DEFENDANT'S WITNESS, SWORN

18          THE CLERK:  Please take a seat.

19          THE WITNESS:  Thank you.

20                      DIRECT EXAMINATION

21   BY MR. BINNALL:

22   Q.  Good morning, sir.

23          Would you please state your name for the record and

24   spell your last name.

25   A.  Kenneth Luke Connor, C-O-N-N-O-R.

1    Q.   And, Mr. Kesari -- I'm sorry; Mr. Connor, do you know

2    Mr. Kesari?

3    A.   I do.

4    Q.   How did you come to know Mr. Kesari?

5    A.   I met Mr. Kesari approximately 20 years ago when he was

6    lobbying for a religious freedom bill in the Florida Legislature

7    and I had been involved in some public policy issues, and

8    somehow we were connected.

9    Q.   And what is your profession, sir?

10   A.   I'm a civil trial lawyer.

11   Q.   And are you involved in any organizations as well?

12   A.   A number of professional organizations, yes, sir.

13   Q.   I'll ask it this way.  Have you been involved with the

14   Family Research Council?

15   A.   Yes.  I served as president of the Family Research Council

16   in Washington, D.C.

17   Q.   And when that happened, did you move up to D.C.?

18   A.   I did.

19   Q.   Did you continue your relationship with Mr. Kesari at that

20   point?

21   A.   I did.  He became my personal assistant at the Family

22   Research Council.

23   Q.   And did you find Mr. Kesari to be a hard worker when he was

24   in that capacity?

25   A.   Very hard worker, yes.

1  Q.  Did there come a time while you were up in Washington, D.C.,

2  that you fell ill?

3  A.  Yes.

4  Q.  Was there anyone that particularly helped you during that

5  period?

6  A.  Yes.  I suffered an unexpected consequence of a routine test

7  that resulted in an almost lethal and fatal illness.  During

8  that time Mr. Kesari was of immense help to me.  I was

9  hospitalized for five weeks, on a feeding tube for months,

10  initially not expected to survive.  During that time Mr. Kesari

11  visited me virtually every day, assisted me with things like

12  changing my gown when I threw up, changing bed pans, assisting

13  me in walking down the hall.  He assisted my wife in getting to

14  and from the hospital, which was about an hour away, assisted

15  her at home with our horses and animals and just really showed a

16  servant's heart throughout that entire time.

17          MR. BINNALL:  Thank you very much, sir.

18          No further questions.

19          MR. PILGER:  No questions, Your Honor.

20          THE COURT:  Thank you, sir.

21          THE WITNESS:  Thank you, Your Honor.

22                              (Witness excused.)

23          THE COURT:  That's it?

24          MR. BINNALL:  That's all our evidence, Your Honor,

25  yes.

1           THE COURT:  Does the government have evidence?

2           MR. PILGER:  No, Your Honor.

3           THE COURT:  Yeah, I'll hear first from you,

4  Mr. Binnall, then from Mr. Kesari, and then from Mr. Pilger

5  before imposing sentence.

6           MR. BINNALL:  Thank you, Your Honor.

7           Your Honor, like I said before, we're not here today

8  to try to claim that what Mr. Kesari did was right, excusable,

9  or argue law anymore.  The time for that in the case has passed

10  about the law.  And our position is this is a very good man who

11  made -- who had a very serious lapse of judgment, and he did

12  that not for himself, not because he wanted to put $73,000 in

13  his pocket, not even because he wanted to advance his career.

14  Quite frankly, Your Honor, if you're in politics and you want to

15  advance your career, you don't work for Ron Paul.

16           But he made those serious mistakes because he was

17  trying to help a friend and because he was the type of person

18  that he describes from the letters as somebody who would go out

19  and try and get things done, and there were those serious

20  mistakes, those serious errors about the way that he did that in

21  this case, and we do not deny that.

22           Context is important.  We put on the witnesses today,

23  we sent Your Honor the letters from just some of the people who

24  Mr. Kesari has touched so much in his life.  As the court over

25  the last 14 months has heard a lot about the things that

1  Mr. Kesari did wrong, we think it's only appropriate that you

2  hear just some of the things in his life, the many, many things

3  that Mr. Kesari has done right.  And at a time when we're going

4  through things that luckily I haven't had to go through, but

5  many of us had, losing a parent, at the same time you're in one

6  of the busiest times in your life, Mr. Kesari made that serious

7  lapse in judgment, and that's not to excuse it.  Mr. Kesari's

8  letter to you doesn't ask you to excuse it.  He asks you to

9  consider the context in regards to everything else he has done

10 in his life.

11         Your Honor saw letters from people who have done

12 business with Mr. Kesari, stated they have gone into business

13 with a handshake.  From Linda Bean, Your Honor has read the

14 letter from somebody who has been the beneficiary of

15 Mr. Kesari's quick action, somebody who goes and gets things

16 done when she went through the horrifying experience this summer

17 of watching her child drown, and Mr. Kesari was there to care

18 for the family on the spot and make sure that that family, who

19 was going through one of the most horrible experiences any of us

20 could go through, Mr. Kesari cared for them.

21         You've seen letters about all of the different

22 things -- quite frankly, I have been with my client for three

23 years through this ordeal and known him before that.  He

24 doesn't, he doesn't toot his own horn on these things.  It's a

25 lot of things that I didn't even know about, about ways he's

1   involved in his community and serving his fellow citizens, far

2   beyond politics, and to helping individual people and being

3   active about it, and we ask the court to consider that.

4          He has touched many people in a positive way.  He's

5   somebody who has always maintained a positive outlook on life.

6   And aside from the other insinuations, of course, that the

7   government has made, none of which have been proved, of course,

8   should not be considered here today, this -- what has happened

9   here is a mark against somebody who has otherwise done very,

10  very good things.

11         So we look at what sort of punishment here is

12  appropriate, and we understand that the court is going to give a

13  punishment on this, and we understand that the court looks at

14  this as a serious offense and that the court is going to look at

15  different things, such as deterrence to others in Mr. Kesari's

16  position.  No one is going to want to go through what Mr. Kesari

17  has gone through the past three years of his life, of having a

18  career that he loved that he will almost certainly never work in

19  again, having his information through the national media, money

20  and bills going through not one but a second trial where the

21  fact is that second trial doesn't affect us here today because

22  the guidelines were based on the conviction in the first trial,

23  and he had incalculable expenses, hardships, difficulties during

24  that time.  He has already received a substantial punishment.

25         Now, I understand the court is going to give a

1    punishment in addition to that today, but we do ask and it is

2    appropriate that the court take what he has already gone through

3    into consideration; that this is someone who is the primary

4    breadwinner, has had a difficult time preparing and supporting

5    his family during the past three years but always finds a way to

6    try to move the ball forward on that in his career and find new

7    things.

8              You heard from his business partner today in a new

9    venture that he's trying to get going with sweat equity because

10   he doesn't have the actual money, real equity for a new

11   business.  You've heard he's active in the Boy Scouts with his

12   son, and you've heard his involvement in the church and helping

13   his 17-year-old daughter learn how to drive, wants to be there

14   for his daughter's wedding, which the date is waiting until

15   after today to be set.  These are some things that somebody who

16   has overall lived a good life, this is what sets Mr. Kesari off.

17   This is what sets Mr. Kesari off from so many other people that

18   have been before this court in sentencing.  It's all positive

19   ways that he's impacted people throughout his life.

20             Your Honor, this case calls for a creative solution,

21   and that's what we're asking the court for today, for a little

22   bit of mercy based on what Mr. Kesari has gone through, not

23   based on but just similar to the mercy for his co-defendants,

24   and we understand his position is somewhat different as well,

25   and we understand that Mr. Kesari asked Your Honor for mercy on

1   his co-defendants and said show that mercy first before showing

2   it to him and more so.  And we, Your Honor, think that it is

3   appropriate that, for instance, Mr. Kesari serve more community

4   service time than his co-defendants which takes -- and takes

5   something that would be a net loss for so many people and can

6   actually turn this into a positive.  Instead of taking

7   Mr. Kesari away from his family, making him unable to make a

8   living, in order to take him away from his community that he

9   supports so well, instead make him a burden on the state and a

10  burden on his community through the prison system, we ask that

11  you increase the amount of community service time of Mr. Kesari

12  so instead he's giving back to those same people and is able to

13  continue to give more and participate more in his community and

14  make up for this wrong in his life through service to others.

15          You've heard from the church that he is able to do

16  that, and there are numerous other organizations that would be

17  more than willing to use Mr. Kesari's considerable talents to

18  help serve them in a process like that.  But those stories that

19  you heard from the witnesses and the letters, those deserve to

20  be considered here today by this court, and we ask that you do

21  this because this is a good guy.  He made a very bad decision

22  and then some other decisions that followed on with that, and we

23  don't deny that.  We just ask for mercy, that this life that

24  he's led calls for aside from this one bad event.

25          On a personal note, Your Honor, depending on what

1  happens with some of our other outstanding matters, this may

2  very well be my last time in front of the court on this matter,

3  and it was quite an honor being admitted here pro hac and be

4  here for the last year.  The court staff is just outstanding,

5  and we appreciate that greatly, the clerk's office, the federal

6  marshal's office, something that I'm sure the court here is all

7  very proud of.  The probation office was extremely professional

8  during this entire difficult process, and, of course, the court

9  was very patient with a bunch of Washington, D.C., lawyers

10 trying a case in this courtroom, and your patience is not lost

11 and it was appreciated.

12         THE COURT:  Thank you for that.

13         MR. BINNALL:  Thank you, sir.

14         Your Honor, of course, if there is any incarceration,

15 which we hope there is not, we have filed the motion for bond

16 pending appeal.  We do ask that Mr. Kesari be allowed to

17 self-report in that case and that it be at a facility close to

18 his home.  And then we also have the contact with justice at

19 this point in our case, and we can take that up at another time.

20         THE COURT:  Thank you.

21         Mr. Kesari, is there something you would like to say

22 before sentence is imposed?

23         THE DEFENDANT:  Yes, Your Honor.  First I want to

24 thank you for reading my letter and showing mercy to Mr. Benton

25 and Mr. Tate.  It means a lot to me.

1          THE COURT:  I found that an honorable thing for you to

2    do.

3          THE DEFENDANT:  Well, today, I am asking mercy for

4    sentencing.  I screwed up.  I made a bad mistake or even worse

5    mistake, and I'm paying for it.  I've been paying for it the

6    past three years, and I'll be paying for it probably the rest of

7    my life.  I was looking for a fast way to take care of this

8    problem and pay Mr. Sorenson instead of actually stepping back

9    and saying is what I'm doing right or wrong.  I -- yeah, I'm

10   sorry about that.  That was my fault.  I fully admit that.

11         My actions have hurt many people.  They've hurt my

12   family, my children.  My wife and family are here today.  My

13   wife has lost clients because of this bad publicity.  My

14   children have been humiliated.  You know how kids can be with

15   other kids sometimes.  Sorry, sir.

16         My actions have damaged the causes that I have

17   believed and worked so hard for over the years, not to mention

18   I've hurt the public confidence, a system that I believed in and

19   worked hard for.  I truly regret what I've done and wish I could

20   go back, back in time and repair what I've done and make better

21   decisions on that, make different decisions.  No matter what

22   sentence you give today, though, I will never be able to work

23   again in the profession that I so loved.  I ask you not to judge

24   me just on what I did on this, but look at my whole life, judge

25   me -- I had poor judgment in that, on that bad decision and what

1  I did there; but I think I've done a lot of good also in my

2  life.  I've always tried to do the right thing and tried to help

3  people that are in need.

4          One thing I learned from my late boss, Chuck Colson,

5  was the sword of justice.  So today I ask you to help me, help

6  me restore the damage that I have done.  I ask you to let me

7  further serve my community and be a productive member of

8  society.  My life and my future and my family's future are in

9  your hands, sir.

10          THE COURT:  Thank you.

11          THE DEFENDANT:  Thank you.

12          THE COURT:  Mr. Pilger.

13          MR. PILGER:  Thank you, Judge.

14          So the defendant here by his own admission in the

15  letter and through counsel today and his allocution admits that

16  he's more involved than the defendants who were sentenced

17  yesterday.  The government thinks it's important to continue

18  noting that the defendants yesterday were the bosses in this

19  scheme, but Mr. Kesari stands out as the point of the spear, as

20  the triggerman, as the person who's making it happen day by day

21  here in Iowa, corrupting the process involving Senator Sorenson,

22  paying him off, making all the arrangements.

23          Mr. Kesari was the person who throughout the fall of

24  2011 assiduously recruited Mr. Sorenson and served as a bridge

25  to the campaign leadership of Mr. Tate and Mr. Benton to make

1    sure that they kept Sorenson on the radar screen, kept pursuing

2    him, kept pursuing him knowing that he was going to want money

3    to make the switch.

4           It's Mr. Kesari who comes to the table on December 26,

5    2011, with a check drawn on his wife's jewelry company, his wife

6    who he talked about today, to make a payment to Mr. Sorenson.

7    That's a decision made by Mr. Kesari, and it goes on from there.

8           Now, I recognize and have the same sympathy as anyone

9    for someone who has lost their mother.  I've lost my mother.

10   Many of us have lost a parent.  That happened in 2011.  This

11   scheme continued through 2012.  Making allowances for grief in

12   the moment, this scheme preceded in a deliberative calculated

13   way well past the pressurized period right before the caucuses

14   into the period where Mr. Kesari recruited his own brother at

15   first to be the cutout for the payments to Mr. Sorenson and then

16   when his own brother didn't want to be part of that proceeded

17   further in a deliberative calculated way to find Mr. Izon and

18   set up the payment mechanism.

19          This wasn't a spur of the moment mistake of any kind.

20   This was a willful, deliberated crime that occurred over time,

21   with time to think, with time to stop, with time to not cause

22   the numerous false records and reporting that weaponized the

23   FEC.  And in particular I want to emphasize, I understand the

24   points are off the table for abuse of position of trust, but

25   it's Mr. Kesari who's again pointed the spear for causing the

1  false records within his own organization for which he was the

2  deputy campaign manager.  It's Mr. Kesari who's telling the

3  unwitting Mr. Cortes exactly how to book these expenditures

4  which were payoffs to Kent Sorenson.  It's Mr. Kesari who comes

5  up with the explanation of these should be audiovisual expenses.

6  It's Mr. Kesari, having arranged the cutout, who's in contact

7  with the person who then puts it in the books.  So causing the

8  exact crime for which Section 1519, the lead count in terms of

9  the guidelines and sentencing weight, the exact conduct that

10 that statute was enacted to prevent, corrupting an entity's

11 internal records to further a personal agenda.

12         So, again, recognizing your rulings on the guidelines

13 and not relitigating the guidelines calculation, I just want to

14 remind the court all of those factors of leadership and

15 organization, of abuse of trust and also of the backtrack of

16 obstruction conduct, they all are appropriate factors for you to

17 weigh, and we urge you to weigh them considering whether to

18 impose a guideline sentence, which we recommend, including a

19 term of imprisonment.

20         I want to mention just a couple more things.  As we

21 said in our papers, but I think it bears some emphasis now, this

22 is the kind of conduct that is most susceptible to deterrence.

23 And as you said, a sentence of imprisonment is the singular most

24 pointed way to make other people consider their conduct.

25         This is a calculated crime, a deliberative crime, is

1   the sort of crime that other political operatives, who will

2   absolutely being paying attention to the outcome of these

3   proceedings, will weigh up in deciding whether to commit these

4   crimes in the future.  They will weigh up in particular the

5   chances of getting caught, and in this case Mr. Kesari has been

6   held to justice in front of a jury in large part because Kent

7   Sorenson flipped, he decided to cooperate, and, of course,

8   defendants flip and cooperate because they see it as in their

9   interests in terms of the possible sentences they face.  And for

10  a defendant as involved as Mr. Kesari to walk away with no

11  prison time means that in the future people deciding whether or

12  not to cooperate and people deciding whether or not to commit

13  the crime are going to look at these results and weigh up, in

14  the case of a probationary sentence, the minimal cost of doing

15  business compared to the tremendous rewards in terms of their

16  career as political operatives securing something like the

17  endorsement of Kent Sorenson, pulling him away from the Bachmann

18  Campaign in a critical period and blowing up the campaign of

19  your opponent right before the caucuses.

20         So deterrence in this context is really important,

21  especially in this case, which will be noted, has already been

22  noted and will continue to be noted among election bar

23  practitioners.

24         Lastly, I want to talk about the points raised by the

25  defendant about his personal characteristics.  The defendant

1    essentially argues that he's suffered enough from these

2    proceedings.  The government would reiterate that's just not

3    really a legitimate sentencing factor.  It goes to his

4    socioeconomic status, which the guidelines specifically say

5    nobody gets to use.  The poor, disadvantaged, underprivileged

6    person who comes before the court is not allowed to say, hey, I

7    grew up under bad circumstances, so please forgive my drug crime

8    or my weapon crime or anything like that.  What's good for the

9    goose is good for the gander.

10          These defendants coming to you saying, after having

11   had all of the advantages, all of the privileges, all of the

12   opportunities that our society has to offer do not get to say

13   they have fallen from grace and they've suffered enough.  The

14   guidelines promulgated by the Commission under Congress's

15   mandate has said don't consider that either way for anybody.  It

16   comes down to considering what they did, what harm it had, the

17   deterrent effect, the other factors that I know you're

18   considering under Section 3553.

19          And, Your Honor, if you have no questions, we submit.

20          THE COURT:  Thank you.

21          In fashioning an appropriate sentence, I have

22   considered each of the factors found in Title 18, United States

23   Code, Section 3553(a).  That means that I have considered the

24   nature and circumstances of the offenses as well as the history

25   and characteristics of Mr. Kesari.

1          I have considered the seriousness of the offense.  Of

2     course, the offense strikes at the heart of the need for

3     transparency in political campaigns and political campaign

4     finances.  It was serious here in your case because you are the

5     architect or the structure that made the illegal scheme or you

6     certainly acted in concert with others.  You certainly used

7     unwitting participants.  At its core you were the one that made

8     it work, and you went to considerable efforts both to structure

9     it and to conceal it, and it went on for nearly two years.

10          I don't think that this can be characterized as a

11    legal dispute.  There were a lot of interesting legal questions

12    presented along the way.  One of the issues that I found

13    interesting was whether this conduct could be prosecuted under

14    three different statutes when there was one in particular that

15    reflected in Count 3 that was aimed particularly at this

16    behavior, and that which you were convicted of, and the others,

17    on Count 3 was behavior that's exactly what Count 3 very

18    specifically forbid.

19          I've considered the question of just punishment.  He

20    has a variety of convictions.  They're of no moment to the

21    court.

22          I've considered the need for adequate deterrence to

23    criminal conduct.  That is obviously an important component to a

24    prosecution such as this.

25          I've considered the need to protect the public from

1  further crimes from Mr. Kesari.  I don't see that as an

2  important factor in sentencing today.

3          I've looked to the sentencing guidelines as an

4  important though not in any way controlling factor to be

5  considered.  I'll add just one more thing about the guidelines,

6  and that is that if the guidelines were scored based on solely

7  the conduct in Count 3, the guidelines would have been lower,

8  not tremendously lower, but lower.

9          I disagree that people looking at this would consider

10 a prosecution like this as just a cost of doing business.  If

11 you look at each of the three defendants, they all have deep

12 six-figure legal bills as a result of this prosecution.

13         I have considered the good things that Mr. Kesari has

14 done in his life.  Obviously, other than a brief moment at the

15 time that we make bond decisions at the beginning of the case

16 until sentencing, we're not looking at the good things that

17 people have done in their life.  We're looking at what the

18 government has alleged and resolving those; but then at the time

19 of sentencing, we do look to the other things they've done in

20 their life, and if you look at it here, this behavior is

21 somewhat aberrant.

22         I've considered the need to avoid unwarranted

23 sentencing disparity among defendants with similar records or

24 lack thereof who have been found guilty of similar conduct.  As

25 I said yesterday, it's difficult to find people to compare with

1    as this crime is so unique to the court.

2              There's no restitution obligation here.

3              After considering all of those factors, I conclude the

4    following sentence is sufficient but not greater than necessary

5    to address the essential sentencing considerations.

6              It is the judgment of the court that Dimitrios Kesari

7    is sentenced to the custody of the Bureau of Prisons for three

8    months on Count 2 of the July 30, 2015, indictment and Counts 1,

9    3 and 4 of the November 19, 2015, superseding indictment, all of

10   those terms to run concurrent.

11             Upon release you'll be placed on supervised release

12   for two years.  Within 72 hours of release from the Bureau of

13   Prisons, you shall report in person to the probation office in

14   the district where you are released.

15             While on supervised release, you shall not commit

16   another federal, state, or local crime.  You shall not possess a

17   firearm or destructive device.  You shall not illegally possess

18   a controlled substance.  We'll waive the drug testing

19   requirement here.

20             You shall comply with all of the standard conditions

21   of supervision as adopted by the Sentencing Commission, plus the

22   search condition found in the presentence report.  In addition,

23   there will be three months home confinement with electronic

24   monitoring under the standard condition of this district; a

25   $10,000 fine, not 20,000 as suggested in the presentence report;

 1   80 hours of community service under the standard condition of

 2   this district per year.  You are ordered to pay a $400 special

 3   assessment.  It's due and payable with the fine with interest to

 4   the Clerk of Court.

 5            I recommend that he be incarcerated as close to home

 6   as possible.  He'll be given the privilege of self-surrender.

 7   The request for bond pending appeal is denied.

 8            You have the right to take an immediate appeal from

 9   this judgment.  Any appeal has to be filed within 14 days from

10   today.

11            Mr. Binnall, anything else?

12            MR. BINNALL:  Your Honor, only on that last point, and

13   that's only because we still have one matter under advisement,

14   and so I'm not sure this is a final order.

15            THE COURT:  Well, you know, I don't know the answer to

16   the question.

17            MR. BINNALL:  Okay.  And I understand the court's

18   point on that, and we'll follow-up on that.

19            THE COURT:  I'll arrange the self-surrender date so we

20   can take care of the one final matter, and I intend to resolve

21   it very promptly.  I have not looked at it one single bit.  I

22   know generally from the discussion that arose what it's about;

23   but, frankly, I've even forgotten most of that, which is almost

24   nothing.  So all I can say is that my intent would be to resolve

25   that by the end of October if possible.

1          MR. BINNALL:  Very well, Your Honor.  So his

2   self-surrender date will likely be after that probably?

3          THE COURT:  Yes.

4          MR. BINNALL:  Thank you, Your Honor.

5          THE COURT:  And if he gets another date, you just file

6   a motion to extend it.

7          MR. BINNALL:  Yes, Your Honor.

8          THE COURT:  Mr. Pilger, do you have anything else?

9          MR. PILGER:  Nothing further, Your Honor.

10          THE COURT:  We're in recess.

11          (Proceedings concluded at 9:57 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2            I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6            That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12           Dated at Des Moines, Iowa, this 7th day of November,

13   2016.

14

15

16

17                              /s/ Terri L. Martin
                                CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25