IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :      Criminal No. 4:15-103
                           :
     vs.                   :
                           :
JESSE R. BENTON,           :      TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and   :          VOLUME I
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X



                              Second Floor Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Tuesday, April 26, 2016
                              8:30 a.m.



BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.




                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                     Room 189, U.S. Courthouse
                      123 East Walnut Street
                      Des Moines, Iowa  50309

```
APPEARANCES:

For the Plaintiff:              JOSEPH P. COONEY, ESQ.
                                RICHARD C. PILGER, ESQ.
                                Public Integrity Section
                                Criminal Division
                                U.S. Department of Justice
                                1400 New York Avenue NW
                                Suite 12100
                                Washington, D.C.  20005

For Defendant Benton:           ANGELA L. CAMPBELL, JR., ESQ.
                                Dickey & Campbell Law Firm
                                301 East Walnut, Suite 1
                                Des Moines, Iowa  50309

For Defendant Tate:             DAVID A. WARRINGTON, ESQ.
                                LAURIN H. MILLS, ESQ.
                                LeClair Ryan
                                2318 Mill Road, Suite 1100
                                Alexandria, Virginia  22314

For Defendant Kesari:           JESSE R. BINNALL, ESQ.
                                Harvey & Binnall
                                717 King Street
                                Suite 300
                                Alexandria, Virginia  22314
```

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Aaron Dorr | 52 | 84 | | |
| | | Campbell | | |
| | | 91 | | |
| | | Warrington | | |
| | | 92 | 93 | |
| | | Binnall | | |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 7 - Dorr proposal | 57 | 57 |
| 10 - Benton e-mail to Dorr | 65 | 65 |
| 13 - Dorr e-mail to Benton | 69 | 69 |
| 23 - Dorr e-mail to Benton | 75 | 76 |

P R O C E E D I N G S

1

2          (In open court, with defendants present.)

3          THE COURT:  Please be seated.

4          The record can reflect that we're here in the matter

5   of the United States versus Jesse Benton, John Tate, and Dimitri

6   Kesari, Case 4:15-CR-103.  We're outside the presence of the

7   jury on the first morning of trial.  There's a number of things

8   that I wanted to visit with you about.

9          In preparation for a jury selection, obviously,

10   because we have done this before, you kind of know the drill.

11   I'll start with probably an hour worth of questions, 45 minutes

12   to an hour.  It will be just pretty similar to last time.  And

13   then I'll turn it over to the government for as much as a half

14   an hour and for each defendant for as much as 15 minutes of voir

15   dire.

16          Following that, I'll hear challenges for cause at the

17   side-bar, and at that time I'll rule for any requests by jurors

18   to be excused for hardship or inconvenience.  When the jury box

19   is filled with 36 people who have not been struck for cause or

20   excused for hardship, then we'll begin exercising the peremptory

21   challenges, with the government exercising two and the

22   defendants exercising four until the government's eight and the

23   defendants 12 have been exercised.  The last four jurors, last

24   four seats in the courtroom in the front row are the potential

25   alternates, and each side will be given one strike with respect

1   to the potential alternates so that we'll have 12 jurors and two

2   alternates on the jury panel.

3           Last time it was my recollection that the defendants

4   jointly exercised peremptory challenges.  Are you going to do

5   that again, Ms. Campbell, or do you know?

6           MR. BINNALL:  I believe we are, Your Honor.

7           MS. CAMPBELL:  Yes, Your Honor.

8           MR. WARRINGTON:  Yes, Your Honor.

9           THE COURT:  So I don't need to worry about the order

10  in which we assign those peremptories?

11          MR. BINNALL:  Yes, Your Honor.

12          THE COURT:  Very well.  So in this case I anticipate

13  that some people will know that there was a prior trial, some

14  people on the jury pool.  If someone indicates that, please do

15  not ask them any questions about what they know.  If it's

16  important, we'll ask them outside the presence of the other

17  jurors what they know about the prior trial.  If they simply

18  know that there was a hung jury, for example, that won't be a

19  problem; but to the extent that they know about acquittals or

20  anything as far as charges in the previous one that aren't here,

21  that will be of more concern to the court.

22          Just to get us through jury selection, Mr. Pilger,

23  what are your concerns?  Any in particular?

24          MR. PILGER:  No, Your Honor.  Mr. Cooney will handle

25  voir dire for the United States.

1            THE COURT:  Okay.  Very well.

2            Ms. Campbell?

3            MS. CAMPBELL:  No concerns, Your Honor.

4            THE COURT:  Mr. Binnall?

5            MR. BINNALL:  Not on jury selection, Your Honor.

6            THE COURT:  Mr. Warrington?

7            MR. WARRINGTON:  None, Your Honor.

8            THE COURT:  We've got a couple of extra minutes to get

9    us through opening statements.  Do you have any concerns?

10           MR. BINNALL:  Your Honor, first of all, just for

11   housekeeping, I had a paralegal with me last time at counsel

12   table.  I know last time it was fine.  I just want to verify

13   that's fine.

14           THE COURT:  That's fine.

15           MS. CAMPBELL:  Your Honor, I also have a law clerk

16   with me that's not a member of the bar.

17           THE COURT:  Okay.  So I will ask you to introduce

18   everybody at counsel table during jury selection.  I will also

19   ask you to read a list of witnesses, and I'm not going to ask

20   people who they practice law with because you're all from out of

21   town except you two, and you'll identify Mr. Dickey I assume as

22   well when you're called upon.  But I will ask you to identify

23   potential witnesses, so be ready to read a list of witnesses

24   that you may call, and if they are from out of town, you can

25   indicate that because that helps the jury.

1          MR. PILGER:  Your Honor I think covered the news media

2   attention in your voir dire last time.  To the extent you're

3   doing that again, I just want to bring to your attention there's

4   been recent media coverage in which it's been attributed to the

5   defendants that they're making the argument that this is somehow

6   different than how matters are handled with the other side of

7   the parse and divide.  If you don't cover that, we will; but I

8   wanted to make you aware of it for your questioning.

9          THE COURT:  What was it you wanted to say about that?

10         MR. PILGER:  So if you don't cover it, we'll ask if

11  there's been exposure to media coverage and want to take jurors

12  who might have seen that outside the presence of the others.

13         THE COURT:  Oh, yeah.  So I'll ask that question

14  about -- a few questions, have you ever heard about this, read

15  about it or know anything other than what you've learned today.

16         Mr. Warrington.

17         MR. WARRINGTON:  I just want to clarify something

18  Mr. Pilger said.  I believe he said it's been attributed to the

19  defendants.  We're not aware of anything of any coverage or any

20  representation that's been made from our side about that.  So I

21  don't know where that's coming from.

22         THE COURT:  Okay.  Other concerns to get us through

23  opening statements, Mr. Pilger or Mr. Cooney?

24         MR. PILGER:  Through opening statements, Your Honor,

25  you gave I believe 25 minutes last time, and I think I --

```
 1              THE COURT:  That's fine.

 2              MR. PILGER:  I think I can do it in 27.

 3              THE COURT:  Okay.  Good.

 4              Any other concerns to get us through opening

 5   statements, Ms. Campbell?

 6              MS. CAMPBELL:  No, Your Honor.

 7              THE COURT:  Mr. Binnall?

 8              MR. BINNALL:  No, Your Honor.

 9              THE COURT:  Mr. Warrington?

10              MR. WARRINGTON:  No, Your Honor.

11              THE COURT:  Okay.  Good.  Ms. Clerk, would you get

12   those four front chairs a little further away?  I will not be

13   able to see two or three jurors.  Just get that front row pushed

14   a little bit.

15              THE CLERK:  Okay.

16              THE COURT:  Hopefully at 9:00 they'll be checked in

17   and we can get the first 36 in the box before I come out to see

18   them.

19              (Recess at 8:39 a.m., until 9:00 a.m.)

20              (Jury selection process commenced.)

21              (Recess at 12:09 p.m., until 1:15 p.m.)

22

23

24

25
```

1          AFTERNOON SESSION  1:15 p.m.

2              (In open court, with defendants present.)

3              (A jury was impaneled and duly sworn.)

4          THE CLERK:  Please be seated.

5          THE COURT:  Ms. Clerk, would you hand out copies of

6     the preliminary jury instructions as well as notepads and pens.

7              (Pause.)

8          THE COURT:  So you've received a copy of the

9     preliminary jury instructions, your own copy.  You can keep that

10    during the course of the trial and resort back to it at any time

11    that you feel it's helpful.  At the end of the trial, I'm going

12    to give you fairly more elaborate instructions, but the

13    preliminary one helps us get going.

14              So if you would turn to the first instruction and read

15    them silently as I read the instructions aloud, that would be

16    good.  The court reporter doesn't need to take down the reading

17    of the instructions, just follow along on your copy and report

18    any place where I deviate from the written word.

19              So let's turn to instruction No. 1.

20              (Instructions 1 through 6 were read by the court.)

21          THE COURT:  So, before we hear the opening statements

22    of the lawyers, we'll take a ten-minute break.  So the jurors at

23    the far end will lead their row into court every day, so take a

24    look at the person on your right.  That's the person you're

25    going to follow into court every day.  The person immediately to

1 | your right you'll follow into court.  That way you won't trip

2 | over each other as you go into the jury box.

3 | The clerk, Ms. Walling, will take you to the jury room

4 | now.  She's going to show you -- that's the room where you'll

5 | gather before every session of court.  They lock it, so you can

6 | leave your purses and coats and whatever else that you need in

7 | there while you're in the courtroom.

8 | As I noted in the instructions, you have a notepad and

9 | pen.  Some people really like it, especially in a longer trial

10 | like this.  Some people find it distracting.  Do whatever you

11 | want with it.  I guess if there's only one recommendation I

12 | would make is that always you know where in the trial you are in

13 | your notes.  So in my notes I'll write opening statements at the

14 | top of the next thing that we're about to hear after the break

15 | so I don't confuse it later on with the evidence that follows

16 | it.

17 | Social media is a big deal.  We heard in jury

18 | selection that a number of you participate in various forms of

19 | social media, which is fine.  I would ask that during the jury

20 | trial you not use social media at all with respect to this case.

21 | Do it with respect to anything else you want to, but don't

22 | mention this case in social media.  There's a really good reason

23 | for it, and that's because jurors aren't accustomed to the

24 | concerns that outsiders will have about your participation in

25 | the trial and sometimes people write stuff on Facebook or on

1  social media that to them is very benign but will appear to

2  outsiders like partisan or favoring one side or the other, and

3  that's a big concern in this case.  So we ask during the trial

4  you not mention this in any form of social media.  When the

5  trial is done -- I'll tell you about it later, but when the

6  trial is done, you can say anything, do anything you want and

7  that will be fine but not during the trial, please.

8          And I'll talk to you more tonight about thinking about

9  as you go home tonight about how you tell your friends and

10  family what you're doing here today without soliciting comments

11  from them about the case, and I'll give you further instructions

12  about not doing any investigation on your own, and I'll keep

13  referring throughout the life of the trial telling you to not

14  listen to radio or TV or read the newspaper about this case

15  because there will be articles.  And the reason is because

16  you're going to get every bit of information here in the

17  controlled confines of the courtroom that you need to resolve

18  this case.  The lawyers are responsible for presenting the facts

19  to you.  I'm responsible for providing the law to you, and

20  between the lawyers and the court, you'll get everything you

21  need here in the courtroom to resolve this case.

22          Okay.  So we're going to take a ten-minute recess.

23  Ms. Walling will show you the room, and she'll come and get you

24  when it's time to start again; but it will just take us a minute

25  to clear these chairs out and get ready for the opening

1   statements.

2              See you in a bit.

3              (Recess at 2:24 p.m., until 2:42 p.m.)

4              THE COURT:  Please be seated.

5              So we're about to hear the opening statements of the

6   lawyers.  As you recall from the instructions just a moment ago,

7   the opening statements aren't evidence in the case, just a

8   summary of what the lawyers expect the evidence to be, but still

9   it's an important part of the trial, especially with a longer

10  trial like this, you know, the evidence will come in one

11  question and an answer at a time, one e-mail at a time, and so

12  it's helpful to kind of have an overview so that you can put the

13  evidence into perspective as it comes in in a case like this.

14             Mr. Pilger, you may make the government's opening

15  statement.

16             MR. PILGER:  May it please the court.

17             Ladies and gentlemen, I'll get right to work.  This

18  case is about a coverup here in the Southern District of Iowa.

19  Mr. Cooney and I will prove to you that these defendants behind

20  me, Benton, Tate in the back in the middle there, and Mr. Kesari

21  in the front in the middle, covered up their payments to an Iowa

22  State Senator during the 2012 federal election.  They all

23  conspired, falsified records and lied in that coverup.

24             You see, these defendants were senior officials of a

25  presidential campaign and they came here to Iowa knowing that

1  winning in Iowa matters to presidential campaigns, and the

2  evidence is going to show you they tried to win by breaking the

3  law.

4           Now, who is their candidate?  You've heard it a couple

5  of times already.  That was Ron Paul.  Now, Ron Paul knew

6  nothing about the coverup that brings us here today.  You will

7  see the defendants went behind his back and they did it to show

8  off what they could do in the business, the business of winning

9  political campaigns.  These defendants were big enough in that

10  business to actually run the Paul Campaign.  They were the

11  bosses.  Benton was the chairman of the campaign and married to

12  Ron Paul's granddaughter.  Tate was the campaign manager.

13  Kesari was the deputy campaign manager under Benton and Tate.

14  Benton and Tate were in charge and Kesari reported to them.  In

15  fact, you will learn that Kesari didn't do much of anything

16  without their approval.

17          So what did they do?  Here's what they did.  Running

18  up to the 2012 caucuses, they decided to secretly pay Iowa State

19  Senator Kent Sorenson $73,000 of campaign money and to hide that

20  from their candidate, from the United States Federal Election

21  Commission, that's the FEC, and from the voting public here in

22  Iowa and across the country.

23          Now, Sorenson has pled guilty and you will hear from

24  him what he did with these defendants to hide what they paid

25  him.

1          Now, why did they do that?  Why did they cover this up

2   from the voting public?  They did it because Ron Paul and

3   Michelle Bachmann were running against each other for the

4   nomination.  At first Sorenson supported Bachmann, but the

5   defendants made a deal with him to switch his support from

6   Bachmann to Paul right before the Iowa caucuses, and they got

7   him to switch by promising to pay him, and they did not want the

8   voting public to know that.

9          Well, right after Sorenson switched, though, Michelle

10  Bachmann told the world that the Paul Campaign was paying

11  Sorenson to switch and that brought public scrutiny, negative

12  public scrutiny to the Paul Campaign, and that's when the

13  defendants decided to hide the Sorenson money so deep that the

14  public could never trace it.  They decided they would cover up

15  what they did from anyone they had to, and that included the

16  media, their campaign staff, their candidate, the FEC, law

17  enforcement and, most importantly, again, the voting public.

18          How do they cover up the Sorenson money?  You will

19  learn that Kesari executed the details.  He was the detail guy.

20  He did it with false invoices, with shell companies, with false

21  entries in the campaign's business records, with false reports

22  to the FEC and then later, as it was being investigated, by

23  trying to get Sorenson to either give back or alter a check that

24  showed just how badly the defendants wanted Sorenson to flip,

25  and you will learn that Benton and Tate agreed to and approved

1  all of that as the bosses.

2         Ladies and gentlemen, I'm about to detail the evidence

3  of how they did all of this, but let me just be clear at the

4  outset about what the defendants are not charged with here

5  today.  They're not charged with bribing Sorenson.  That's not

6  the issue.  It's not about bribery.  They are charged with

7  covering up the money.  That's the nature of the charges before

8  you.  And we will prove that coverup with the defendants' very

9  own e-mail and in their very own words, and we'll also give you

10 the e-mail that they caused other people to write, other people

11 including their unsuspecting campaign workers, their

12 unsuspecting family members, others they used and manipulated

13 along the way, and we will show you that e-mail.  We will show

14 you exactly how they did it.

15        Headed into the 2012 caucuses, the defendants all

16 believed that Sorenson would be valuable to their campaign

17 before he switched.  They were all sure he would be valuable.

18 There was this problem though.  He had already endorsed Michelle

19 Bachmann.  He was so important to Michelle Bachmann.  He was her

20 Iowa State Chair.

21        So in the fall of 2011, these defendants began

22 courting Sorenson to leave Bachmann and defect and go to Ron

23 Paul, and you will see an e-mail exactly how motivated they were

24 to get Sorenson to flip.  You will see that a friend of Sorenson

25 at first angered them by proposing that Sorenson switch for a

1   salary, plus a big contribution to a political action committee

2   and other things.  But did the defendants give up on Sorenson

3   when they got angry?  No.  They still kept chasing after him.

4        And you'll learn that on Halloween of 2011, Jesse

5   Benton took the lead in responding to that proposal that angered

6   them.  He called it, quote, unethical and illegal.  But then

7   Benton went on in that very same Halloween e-mail to offer

8   Sorenson $8,000 a month for the rest of the Paul Campaign, and

9   the e-mails around Halloween will show you something important.

10  Kesari was the main contact with Sorenson, but Benton and Tate

11  called the shots.  Kesari couldn't even have a dinner with

12  Sorenson without their approval.

13       And then, ladies and gentlemen, comes Christmas,

14  Christmastime of 2011, right before the caucuses.  On

15  December 23rd, right before Christmas, the defendants were

16  excited because they thought they would flip Sorenson.  Benton

17  wrote if they flipped him at that point so close to the caucuses

18  then you could, quote, put a fork, end quote, in Michelle

19  Bachmann.  And you'll see that e-mail.

20       How badly did they want that?  I'll tell you.  Next on

21  Christmas Day Kesari sent Benton and others a draft statement

22  about Sorenson endorsing Ron Paul.  The defendants and others

23  then spent Christmas Day editing that statement, and then the

24  very next evening Kesari met Sorenson and his wife for dinner at

25  a restaurant in Altoona.  During that dinner Kesari gave

1   Sorenson's wife a check for $25,000 payable to Sorenson's

2   company.  This is the check that you'll see in evidence.  It was

3   not drawn on the campaign.  It was not drawn on Kesari's

4   personal account.  It was drawn on a private jewelry company,

5   ladies and gentlemen.

6          Then that very same night Kesari e-mailed two campaign

7   press officials, and the subject line said Kent, and the message

8   said, quote, the deal is done.  But, ladies and gentlemen, the

9   deal was not done.  Despite the jewelry store check, Sorenson

10  wasn't ready to flip yet.

11         The next morning because Sorenson is so conflicted

12  about doing this, Kesari had to e-mail Benton and said, quote,

13  hold the release.  The defendant spent the rest of that day

14  exchanging angry e-mails about Sorenson.  Benton said, F him,

15  this is absurd, except he said the whole word because he was

16  angry.  A few minutes later Benton ordered, quote, I'm not

17  interested in this game anymore.  Dimitri, pull the offer.

18         But they still were interested and they didn't pull

19  the offer, and so on December 28th, Sorenson came to a Paul

20  Campaign event and went back stage with Kesari, and then he got

21  on stage and in front of Benton, Tate and Kesari, he endorsed

22  Ron Paul for the party's nomination for President.

23         What happened next?  Right after Sorenson's

24  endorsement during the event, Kesari e-mailed the campaign's

25  finance staff and he copied Benton and Tate.  He asked for a

1    $25,000 wire first thing in the morning and he said that Benton

2    had approved, and then Tate e-mailed that, yes, it was approved.

3    The evidence will show that this wire was going to replace the

4    jewelry store check.  Why?  The evidence will show the

5    defendants decided it was too risky for Sorenson to deposit the

6    check.  He had simply told too many people about it at that

7    point.  But then the $25,000 wire also became too risky.  Why is

8    that?  Because something else happened that night.  That's when

9    Michelle Bachmann publicly accused the Paul Campaign of paying

10   Sorenson to switch.  And now the defendants had a big problem.

11   If the Paul Campaign just went ahead and paid Sorenson openly,

12   then the Bachmann accusation would be proven, and that would

13   cause damaging public attention right before the caucuses,

14   someone paying him through the check that he had talked too much

15   about from DGI.  So the defendants stopped that $25,000 wire

16   Kesari started the night of the switch, they stopped it.  Benton

17   specifically ordered the staff to hold the wire and Kesari

18   explained why they were holding it so it would not appear on FEC

19   filings.  And Tate, the campaign manager, he wrote, wipe it off

20   the books, wipe it off the books.

21          You will see from this proof that Bachmann's

22   accusation had made the defendants jump.  It made them jump into

23   a plan to hide Sorenson's money even deeper.  When Michelle

24   Bachmann publicly accused the Paul Campaign of paying Sorenson

25   for his endorsement, the defendants started working with

1   Sorenson to more thoroughly cover up his money and to put an end

2   to the negative public scrutiny of the switch.  And the evidence

3   will show that the only way to cover up the payments to Sorenson

4   was to make sure they never got truthfully reported either in

5   the campaign's records or in the campaign's FEC filings.

6           What's an FEC filing?  You will learn that federal

7   campaigns must report to the FEC how they spend their money.

8   That's because the FEC has an important job.  It posts

9   immediately spending on the Internet so the public can see

10  what's going on, who is getting paid for what by campaigns.  But

11  there was no way the defendants were going to let the public see

12  the Sorenson money for what it was.

13          So first, on the very night of the Bachmann

14  accusation, Benton flatly denied to the media that Sorenson was

15  being paid by the Paul Campaign.  Despite all the e-mail,

16  despite everything that was happening, everything you're going

17  to see, he denied it flatly.  Then on the morning of the next

18  day, Sorenson attended a meeting with Kesari and others at the

19  Paul Campaign headquarters, busy environment, a lot going on,

20  and Benton and Tate aren't there, but they're on the phone, and

21  the records will show you that.  The defendants and Sorenson

22  agreed that the campaign would say that he was not getting

23  money, but they knew he had a deal for $25,000 and $8,000 a

24  month.  But they already said to wipe that wire off the books

25  and told him not to cash the check.  Now they agreed that

1   Sorenson should say the campaign's FEC filings would prove that

2   Sorenson was telling the truth about not being paid to switch,

3   and they agreed to get away with that because the campaign would

4   pay Sorenson even more secretly.  That way the name Sorenson

5   would never appear on the campaign's FEC filings, never go

6   online, never be available to the public, and it would be as

7   difficult as possible for anyone to discover the truth.

8          Next the campaign put out a false statement from

9   Sorenson.  It said, quote, I was never offered money from the

10  Ron Paul Campaign or anyone associated with them and certainly

11  would never accept any.  Financial reports come out in just days

12  which will prove what I'm saying is true.

13         Benton and Tate both reviewed and approved that

14  statement for national news, and that statement was a lie.

15  Benton and Tate knew full well as far back as the Halloween

16  e-mail they were going to pay $8,000 a month in their campaign

17  and Benton and Tate knew full well the campaign would be paying

18  Sorenson $25,000 plus the $8,000 a month well into 2012.

19         Then that same day, the same day, Sorenson gave an

20  interview with Megyn Kelly on Fox News.  Sorenson told her that

21  he had not been paid to switch.  He knew full well he had just

22  made a deal to endorse Ron Paul for money, but Sorenson was

23  fully on board with the coverup, so he also told Fox News that

24  the campaign's reports would show that the campaign never paid

25  him.  And he could say that because he knew they had a plan to

1   pay him in secret.

2          How do we know that?  Sorenson will tell you about it,

3   but, more importantly, you can see it for yourself by following

4   the money.  Just follow the evidence about the phone.  It's

5   going to come in in bits and pieces through different witnesses,

6   but follow the money and you will see the whole coverup in black

7   and white.

8          Did Sorenson get paid with that $25,000 jewelry store

9   check?  No.  Did he get paid with that $25,000 wire that Tate

10  ordered wiped off the books?  No.  The e-mail, ladies and

11  gentlemen, proves that the defendants came up with a new plan

12  that shows that in 2012 Kesari asked his brother to pay Sorenson

13  through the brother's film production company, but the brother

14  didn't want to do it.  Did Kesari give up?  No.  He asked his

15  brother to find someone else, and so his brother went and found

16  a friend with a different film production company called ICT,

17  and the owner of ICT agreed for a fee to let them use ICT as a

18  shell company to pay Sorenson.

19         Ladies and gentlemen, you will hear from Kesari's

20  brother and from the owner of ICT, and you will see the e-mail

21  of those two men.  They didn't know what really was going on,

22  but the defendants used and manipulated them to cover up the

23  Sorenson money.

24         It worked like this, and you'll see a graph to help

25  understand it.  Sorenson's company, Grassroots Strategy,

1   submitted invoices to ICT.  Sorenson never actually did one lick

2   of work for ICT, but ICT turned around and sent an invoice, an

3   ICT invoice to Kesari at the campaign to cover Sorenson's bill;

4   but remember ICT is a film production company.  Its invoice

5   never mentioned Sorenson for Grassroots Strategy, and it did not

6   bill for anything Sorenson actually did.  It billed for, quote,

7   production, end quote, expenses.  And then Kesari gave the

8   invoice to unsuspecting people in the campaign's finance

9   operations, including a man named Fernando Cortes in Virginia,

10  who you will hear from maybe today, who sent it to others in

11  Texas, and they did that over and over again for months.

12          Then what happened?  Well, first, the campaign paid

13  ICT.  Why did they do that?  Because the ICT invoices came from

14  Kesari, the deputy campaign manager, and Kesari had approval

15  from Benton and Tate, the top bosses.  And so the staff trusted

16  and so the staff paid ICT.  ICT turned around and paid

17  Grassroots Strategy, and so the money made its way from the

18  campaign to Sorenson because of false campaign records caused by

19  these defendants.

20          Now, as I said, the false campaign records went to the

21  campaign's office in Texas.  The people there didn't know what

22  was going on with ICT either.  They thought the money paid to

23  ICT was for audiovisual expenses because that's what the

24  invoices from Kesari indicated, and so they did their job.  They

25  filed FEC reports that said the campaign was paying ICT, not

1    Sorenson, for bogus audiovisual expenses.  And you're going to

2    see a graphic of an FEC form come up in a second, and you're

3    going to see a bunch of these in evidence during the trial,

4    about the campaign's filings with the FEC, and each time these

5    reports went in to the FEC, they were false.  This is the false

6    reporting to the FEC.  This is the part of the crime that is

7    causing false reports to the FEC, on top of the false campaign

8    records.

9            Now, the money that Kesari asked for and that the

10   campaign paid and reported was not for ICT.  ICT did no work

11   whatsoever.  The money was for Sorenson and it was not for

12   audiovisual expenses.  It was to pay Sorenson for his

13   endorsement of Paul in secret.  What this money trails, invoices

14   and the e-mail shows you is that ICT invoices made sure that

15   Sorenson's name was never disclosed, the FEC reports would never

16   have Sorenson's name on them, so the public could never find out

17   that the campaign paid Sorenson.  In this way the defendants

18   arranged to secretly pay Sorenson $73,000 off the books, and so

19   the $73,000 of Sorenson money was completely hidden from the

20   public inside the false campaign records and the false FEC

21   filings.

22           Now, each defendant played their own important role in

23   this coverup.  Kesari wrote and received most of the e-mails

24   executing the payment scheme, but Benton played his role as the

25   campaign boss, and so did John Tate, the campaign manager.  Tate

1   worked with Benton to keep the money flowing while Kesari

2   handled the details.  For example, Kesari e-mailed Tate, did

3   Jesse get Tate paid?  Tate responded, no idea; ask him.  Kesari

4   then e-mailed Benton, did you get Kent paid?  And Benton

5   answered, you handle it.  And each time Kesari e-mailed staff an

6   ICT invoice for payment, he knew that Benton had approved.  And

7   the staff e-mailed Tate who also approved.

8           In June Kesari forwarded the last ICT invoice to

9   staff.  Staff forwarded it to Tate for approval and,

10  importantly, Tate was approving all large expenses.  Tate

11  approved many, many expenses, and on this one -- remember,

12  Kesari handles the details -- he forgot the specifics of the ICT

13  scheme that Kesari had to handle it, and so he asked Kesari,

14  what is this, what is it for, who is it, why do we keep paying

15  them?  And Kesari responded, this the last payment for Kent

16  Sorenson, the deal Jesse agreed to with Kent.  And Tate said,

17  okay, thanks.  And then, having just been reminded what ICT was

18  for, Tate approved payment.

19          Then after the payments to Sorenson ended, defendants

20  each kept working to keep the whole thing concealed.

21  Specifically, about a year later in August of 2013, in the midst

22  of an investigation by the FBI, defendant Kesari returned from

23  an international trip and rushed to Omaha, Nebraska, and then

24  backtracked and drove to Sorenson's home here in Des Moines,

25  near Indianola.  Now, there's a perfectly good airport right

1   here in Des Moines, folks, but Kesari didn't want a record that

2   he came to Iowa, so he goes to another state and backtracks to

3   get here.  And when he arrives at Sorenson's home, he insists

4   that both he and Sorenson lift up their shirts to show each

5   other that neither one is wearing a wire.  And then when Kesari

6   asks Sorenson to give him the $25,000 jewelry store check, this

7   same check from Altoona the day after Christmas, back to him,

8   Sorenson refused.  So Kesari asked Sorenson if he could alter

9   the check by writing loan on the memo line.  Sorenson refused.

10  Why would Kesari do that?  Because he knew that check was

11  evidence of what happened.  He knew it would corroborate

12  Sorenson if Sorenson talked.  He wanted to stop Sorenson from

13  ever giving that check to law enforcement or at least make it

14  less incriminating if he did.  But Kesari failed and Sorenson

15  did eventually give the check to the FBI.

16          So that's the coverup.  You're going to see it in the

17  defendants' e-mails in their own words.  You're going to see it

18  in the false invoices.  You're going to hear the witnesses that

19  the defendants used to manipulate and hide the payments.  And

20  you're going to hear from Sorenson.  He was in this.  He lied

21  about it just like the others.  Even under oath during an Iowa

22  Senate Ethics investigation, even to the FBI at first, but then

23  he pled guilty, pled guilty to it all and accepted

24  responsibility for what he did, and he agreed to cooperate.  And

25  when Sorenson is sentenced, make no mistake, he actually hopes

1   that the sentencing judge will give him a lighter sentence for

2   cooperating; but here's the thing about Sorenson.  Over and over

3   and over the defendants' very own words in their very own

4   e-mails back up what he says.

5           And you'll learn something else about why all of this

6   happened.  You will learn that Ron Paul went on TV within days

7   of the switch.  Ron Paul, the candidate, within days of the

8   switch, and he said exactly what you would expect.  He said he

9   knew nothing about any payment to Sorenson.  He was directly

10  asked.  He said he didn't know about it.  He said if Bachmann

11  had proof she should bring it forward.  The evidence will show

12  that's because the defendants were all hiding the payments from

13  their boss as well as the voting public because they knew he

14  would find it outrageous to pay for an endorsement, because

15  their desire to win was about them and their success and their

16  reputations, not about Ron Paul.

17          They had to forever hide the payments to Sorenson from

18  the voters because it would be a catastrophe for them, a

19  catastrophe if Ron Paul's public statements were shown to be

20  false.  There was no way they could let that happen without

21  angering and humiliating Ron Paul and in the process throwing

22  away their status as successful political operatives in a

23  business.  They were not going to let that happen.

24          In the end the evidence will show the defendants

25  committed crimes because they cared more about winning and their

1  own personal success than anything else that was going on.

2          Finally, ladies and gentlemen, you already know our

3  burden is to prove the defendants guilty beyond a reasonable

4  doubt.  We ask you, continue to ask you to hold us to every last

5  bit of that burden, give the fair trial that you just swore you

6  would give, listen to the evidence, and then at the end of the

7  case after the evidence, we'll speak to you again and we will

8  ask you to return a verdict finding each defendant guilty on all

9  counts.

10          Thank you.

11          THE COURT:  Ms. Campbell, you may make Mr. Benton's

12  opening statement.

13          MS. CAMPBELL:  Thank you, Your Honor.

14          MR. WARRINGTON:  Your Honor, could we have a rule on

15  the witnesses?  I don't think anybody has asked for that yet.

16          THE COURT:  Rule 615?  Yes, it's been invoked.  We'll

17  exclude witnesses.

18          MR. PILGER:  Your Honor, for the record, we designate

19  Special Agent Karen LoStracco as the case agent.

20          THE COURT:  That's fine.  She remains.

21          MS. CAMPBELL:  Defendants, counsel.  May it please the

22  court.

23          Ladies and gentlemen of the jury, much of what you're

24  going to hear over the next couple of days is not going to be

25  contested.  There was a run for president like there is

1  frequently in this country.  A Congresswoman from Minnesota

2  named Michelle Bachmann announced that she was going to run.

3  One of her colleagues, Dr. Ron Paul -- he's a physician so many

4  people call him doctor -- a Congressman from Texas, later

5  announced to run, and it was a primary race beginning in 2011

6  leading into 2012.  We're not contesting that.

7          And as part of that race, there were people involved

8  in Iowa working on both campaigns, both the Bachmann Campaign

9  and the Paul Campaign, and you see like politics are, campaigns

10  sort of switch and politicians switch and allegiances change,

11  and it's a primary race.  The people that are fighting against

12  each other in the beginning are on the same side, and so they're

13  positioning themselves and forming allegiances and making

14  compromises like we see in politics.  And the end game is to get

15  to the Republican National Convention where they will select one

16  person to run against the Democrat.  That's all not going to be

17  contested.

18          And as part of the Ron Paul Campaign, Jesse Benton was

19  the chairman of the campaign.  Now, you'll hear about different

20  campaigns and different types of campaigns, and we're not going

21  to contest that he's not part of the campaign.  He actually was

22  traveling with Dr. Paul to events, many, many events, some of

23  them in Iowa, all over the country as part of his job.  He's

24  like what you might call a body man.  He's with the candidate,

25  going to speeches and events and traveling on a plane and

1    driving in cars to reach as many voters as possible to try to

2    succeed in either becoming the Republican nominee or becoming --

3    affecting the policies of the persons that ends up being the

4    nominee.

5            So all of this context and what goes on in politics

6    and in campaigns is not going to be contested.  It is context

7    for the trial, but you'll be hearing about it.

8            Now, as part of the 2011 primary race here in Iowa, we

9    had State Senator Sorenson.  Now, you're going to hear from the

10   government, and probably from Mr. Sorenson, that he was very

11   important.  You'll hear a lot about Mr. Sorenson because he

12   thinks he is very important, and he has a role in a national

13   campaign, but it's not the type of role that Senator Sorenson

14   thinks about himself at this time, and you'll hear more about

15   that.

16           But Senator Sorenson wants to work on a national

17   campaign and he wants to get paid.  And what you'll hear is he

18   wants to work on the Ron Paul Campaign, and in February of 2011,

19   he is shopping around because he wants to get on the Ron Paul

20   Campaign, and you'll hear about that, February of 2011.  Now,

21   Dr. Paul has not announced yet in February of 2011 and there's

22   just exploratory committees and there are pre announcing

23   activities going on and the campaign is just starting.  And you

24   see, part of the context of understanding how campaigns work are

25   that there are politics which certainly play a part in

1    campaigns, but there also are businesses.  And campaigns are

2    these little multi million dollar businesses that spring up very

3    quickly and they can disband at any time.  A candidate could

4    make a slip and say something and they're polling could die.

5    Funding could just drop off.  They might not have the votes that

6    they thought in certain early states.  They might lose their

7    funding.  They might close major support.  All of these things

8    happen and it's in a constant state of flux in 2011.

9            So when it's starting, Kent Sorenson is trying to get

10   into that business, the business side of campaigns.  And you see

11   the campaigns are like businesses, but they're not like normal

12   businesses, and you'll hear about this.  The goal is not in a

13   campaign to have a sustainable business model.  The goal of the

14   campaign is to get someone elected and they raise millions of

15   dollars and they spend millions of dollars.  And it is a little

16   miniature business that is regulated by the Federal Election

17   Committee.  So every dollar that comes in and every dollar that

18   goes out goes into a report, whether it be, oh, I don't know, a

19   $50 expenditure -- or $50 donation on November 11, 2011 from

20   Mr. Stanley Lyons in Colorado or whether it be a $300

21   expenditure from Jane Stinson in Canton, Mississippi, on

22   April 23rd of 2012.  Every expenditure, every donation,

23   everything goes into these reports.  And the FEC has rules and

24   guidance and talks about what you're going to put in these

25   reports; but they're little miniature businesses that are formed

1  that have an exceptional requirement on what they are reporting.

2  And you're going to hear about the FEC reports.

3          So in February of 2011, Kent Sorenson wants to be one

4  of these expenditures, you see, but he has a problem because

5  he's not supposed to be paid because he's an Iowa state senator.

6  It's not a problem for these guys.  They can hire him, they can

7  hire him.  It's a problem for Senator Sorenson.

8          So in February of 2011 he wants to be paid even though

9  he's not supposed to be paid, and he wants to be paid by the Ron

10  Paul Campaign, and his answer from the Ron Paul Campaign is

11  you're not important enough, we don't want you on the payroll.

12  And he goes to the Michelle Bachmann Campaign, and he works and

13  he is paid by Michelle Bachmann.  But you see like politics,

14  like politics and campaigns in the primary election, we have

15  rising stars that burn out and we have people that are in it for

16  the long run and they're trying to get elected and they're

17  trying to go make it to the convention and maybe even be the

18  candidate.  And you see Michelle Bachmann started off really

19  well, but she faded in that election, and Kent Sorenson got

20  worried.

21          So even though he was turned down in February of 2011,

22  he will tell you -- and you will hear from him -- that he

23  aligned with the Paul people, he aligned with the Paul people.

24  He always wanted to be with the Paul people.  The thing is he

25  wanted so much money.  And you'll get to see what he sends in

1   October of 2011 to the Ron Paul Campaign folks, and it's absurd.

2   It's an absurd proposal to give a hundred thousand dollars to a

3   PAC.  The public apology by some people, you know, saying, oh,

4   you know, we were wrong and Senator Sorenson was right.  It's an

5   absurd proposal.  But what is not absurd in there is he can be

6   paid as a staff member.

7          So you're going to hear that he can be paid as a staff

8   member from the perspective of the Federal Election Commission,

9   from the perspective of the defendants, but he can't do -- these

10  other things are just not going to happen.  And it does, you can

11  see from the e-mails, make these guys upset because it's just

12  not something that they want to do.  If you're going to be paid

13  by the campaign, you're going to work.  And you see, as you'll

14  notice, Senator Sorenson is always looking for his bottom line,

15  former Senator Sorenson is always looking for his bottom line.

16  So he wants to be matched by what Michelle Bachmann was paying

17  him, and they all knew he was being paid by Michelle Bachmann.

18  Michelle Bachmann knew, everyone knew he was being paid by

19  Michelle Bachmann, and it was put in writing, and these guys

20  responded to it and said, if you want to switch and work, we'll

21  pay you.  That's in October 2011.

22         But it just isn't that simple for former Senator

23  Sorenson.  It goes back and forth and things change.  There's

24  problems you'll see about mid November where Ron Paul and

25  Michelle Bachmann just aren't getting along on their campaigns.

1  Goes into December, Senator Sorenson even though it seems like

2  he wants to come over -- and I'm not sure you'll ever hear what

3  he's doing back and forth between the campaigns to try and get

4  money out of both campaigns; but in the end what happens is they

5  want him to come over and work for them.  He says no, maybe, no,

6  maybe, yes, maybe, no.  And, finally, you'll see Jesse Benton

7  said -- and I apologize I quote -- fuck him because he's done.

8  Pull the offer.  I'm done with him.  This is ridiculous.  We've

9  been doing this since October.  We're in mid December.  You're

10  going to see that, we're in mid December.  We're done.  Pull the

11  offer.  He's not working for us.  At that point there was

12  nothing done.  There was no deal.

13         Well, Senator Sorenson -- and he'll tell you about

14  this -- got into a little tiff about that time with the Michelle

15  Bachmann folks, and he showed up anyway.  He shows up anyway at

16  a veterans event where he, frankly, doesn't fit at a veterans

17  event, but he shows up unannounced, and he has value to

18  campaigns as a state senator.  He brings with him some voters,

19  like the home schoolers and the Evangelicals, he brings them

20  with him.  So he has some value, and so he does offer an

21  endorsement of Dr. Paul and then the campaign event goes off.

22         Now, the government talks about the check from

23  Mr. Kesari, the $25,000 check from Mr. Kesari, but you'll see

24  when you see those e-mails -- and it's very important because

25  we've got three defendants.  You'll see who's on what e-mail and

1    who's talking about what.  There is no discussion about offering

2    him $25,000 in any of those e-mails.  There's him asking for a

3    hundred thousand dollars and them saying no.  There's them

4    saying, we'll pay you what Michelle Bachmann is paying you,

5    never mind that he's lied to them about what Michelle Bachmann

6    was paying him; but we'll pay the fake amount that you lied to

7    us about that we didn't know you lied about at the time about

8    what Michelle Bachmann was going to pay you and if you come and

9    you work.

10          So he shows up and he decides to join Ron Paul, gives

11   the endorsement, and Jesse Benton does not know about that

12   $25,000 check, and you'll see that.  You'll see that in

13   evidence.  He doesn't know that there's been this check handed

14   to Senator Sorenson, ex Senator Sorenson's wife.

15          So we head into January, and if you look at that

16   evidence and you listen to the evidence carefully, Senator

17   Sorenson knows he doesn't have a deal heading into January.  He

18   does not have a deal, but he does have this desire to keep

19   working because they make this big deal about they're hiding

20   stuff from the FEC and we don't want the voters and the caucuses

21   to know on January 3rd and all those kind of things.  They're

22   not even filed before the caucuses.  They're not even filed.  So

23   it's not like the public is going to know before the January 3rd

24   caucuses.  They're not filed yet.  So it has nothing to do with

25   January 15th hiding from the caucuses and the public, and you

1   can listen to the witnesses on that fact.

2          But you get into January, and you can see the evidence

3   that there is still this discussion between Mr. Kesari and

4   Mr. Sorenson about Mr. Sorenson working for the campaign.

5   There's still a discussion going on because he still has value,

6   because the game isn't over in Iowa on caucus day.  It might be

7   for voters, but it's not for the campaign because they still

8   have the convention.  There's still all of this stuff about

9   polling delegates and taking delegates from other campaigns and

10  merging campaigns and endorsing and making deals and going to

11  the convention.  That's all still happening in January and

12  February, March, April, May, into June of 2012.

13         And so what can you look for in that time to decide

14  whether or not there was a conspiracy between Mr. Benton,

15  Mr. Tate and Mr. Kesari to hide things from the FEC?  And I want

16  to point out a few things that you're going to see.

17         No. 1, when Kesari, Mr. Kesari says to Mr. Benton, do

18  you want Kent in South Carolina, he says not, well, of course,

19  we do.  We've already paid him.  We already said we're going to

20  pay him $25,000.  That's not what he said.  He says, what would

21  he do?  That's not the words of someone who is joining the

22  conspiracy to pay someone $25,000 and for them to say, no, we

23  don't want him, we don't want him.  He said, what would he do?

24         And then when Kesari actually sends Sorenson to South

25  Carolina, Senator Sorenson actually flies to South Carolina,

1   actually does work for the campaign and comes back and you'll

2   see that he now wants to be paid by the campaign.  There is no

3   deal leading up to that in early January.  He comes back, and

4   how do we now know that there's not this conspiracy to hide

5   things through ICT?  Look at the dates and look who's on the

6   e-mails because we have all of this discussion about Mr. Kesari

7   talking to his brother and then talking to the ICT owner,

8   setting up a structure and all of this talk, and he's doing that

9   before he says to John Tate, did Jesse get Kent paid?  Because

10  he's already gone to South Carolina.  Did Jesse get Kent paid?

11  And Mr. Tate says, I don't know and he says, ask Jesse.  Jesse,

12  did you get Kent paid?  His reaction is not, look at the e-mail.

13  It's not, Dude, we just talked about this.  We're going to run

14  this through a fake company called ICT.  Why would I have to

15  keep telling you how to do it?  That's not the reaction.  The

16  reaction is, you handle it.  Mr. Kesari has already handled it

17  on his own without Mr. Benton on the e-mails with Mr. -- with

18  his brother or with Sonny Izon at ICT.

19          How do we know it even more if he doesn't know how

20  he's getting paid or -- it's fine to be paying him to work, it's

21  fine to be paying him to work.  How do we know he doesn't know

22  this structure he's not in this conspiracy?  Just look at their

23  evidence.  In May of 2012, Kesari sends an e-mail with an ICT

24  attachment and says to Jesse Benton, Kent's bill.  Pay, question

25  mark.

1          If Jesse Benton was involved in a conspiracy to set up

2   ICT, to pay Senator Sorenson so it would be hidden from the FEC

3   reports, Mr. Kesari would not need to put on the e-mail, this is

4   Kent's bill because he would already know if he was already in

5   the conspiracy and if he was ever in a conspiracy because you

6   can pay people through a company.  There's nothing wrong with

7   that.

8          So there's nothing wrong with paying Senator Sorenson

9   through a company.  What's wrong is it's miscoded somehow in the

10  FEC reports.  And what you won't see is Mr. Benton saying to

11  Mr. Kesari, yes, but make sure you code it audiovisual services,

12  make sure that the FEC doesn't find out.  Nothing, nothing like

13  that.  You're not going to see evidence like that because it

14  just didn't happen.

15         The other thing that's telling is we have all of this

16  talk about it's Jesse's deal, the deal was for six months.  May,

17  early May of 2012 Jesse Benton says, pay Kent's bill in April,

18  last time, last time.  So suddenly Jesse Benton is now off of

19  all the e-mails.  Look at who the e-mails are sent to.  Kent

20  keeps getting paid.  Jesse Benton is just not on the e-mails.

21         And, in fact, Mr. Tate then has to say last time

22  because he wasn't on the first e-mail, was never forwarded the

23  first e-mail.  Doesn't know about Jesse saying last time was the

24  last time.  So then we have two more last times after Jesse

25  Benton has said last time.  That is not his deal.  It was never

1   his deal.  It's not his conspiracy.  It's not his crime.  Jesse

2   Benton did not join this conspiracy, and we're going to stand up

3   here and ask you for not guilty verdicts at the end of this

4   trial.

5            Thank you.

6            THE COURT:  Mr. Warrington.

7            MR. WARRINGTON:  Your Honor, Mr. Mills will be doing

8   the opening.

9            THE COURT:  Very well.

10           MR. MILLS:  Good afternoon.

11           What is this?  What is it for?  Who is it?  Why do we

12  keep paying them?  Let those words sink in the entire trial.

13  What is it?  Who is it?  What is it for?  Why do we keep paying

14  them?  Those are the words of John Tate written on June 25,

15  2012, at 6:00 p.m. from his office in Virginia.  Those are the

16  words of a man the government contends has been involved in a

17  conspiracy for the last six months.  He has no idea who

18  Interactive Communication Technologies is.  The government has

19  an argument -- and you must distinguish arguments from the

20  facts.  That Mr. Tate must have forgotten who ICT is.  That is

21  demonstrably untrue, and the evidence will show as much.  That

22  is because on February the 16th -- and that is an extremely

23  important date in this case.  It's a great document in this

24  case, February 16th -- Fernando Cortes, the deputy controller,

25  sends Mr. Tate an e-mail message listing outstanding invoices

1   and he asks for Mr. Tate's advice, which ones of these can we

2   pay and which ones can we hold.  And Mr. Tate responds to each

3   one of these line items, pay this one, hold this one, pay this

4   one, hold this one.  And at the very end of the e-mail message,

5   he says, I don't know who Interactive Communication Technologies

6   is, February the 16th.

7          So go back to June 25th he doesn't know, February the

8   16th he doesn't know.  And what's ironic is that message on

9   February the 16th never should have been sent to Mr. Tate

10   because Mr. Cortes made a mistake.  That invoice that he was

11   asking Mr. Tate whether to pay or not had already been paid

12   eight days earlier.  It had been paid on February the 8th

13   without Mr. Tate's knowledge or approval.  There's no evidence

14   that Mr. Tate knew anything about Interactive Communication

15   Technologies or its connection to Kent Sorenson until at least

16   January -- until at least June 25th and perhaps not even then.

17          And so the government's case that Mr. Tate was

18   involved in the conspiracy, they can't get to square one.

19   There's no agreement.  There's no knowledge of ICT.  You will

20   see nothing in any of the e-mails about how to code this.  You

21   will hear nothing that Mr. Tate had anything to do with how --

22   with filing FEC invoices or with the reporting or with

23   classifying expenses he received on invoices.  That's not what

24   he was doing.  He was running a national campaign that went all

25   the way to the Republican Convention, qualified to do business

1   in 50 states, and he was not paying attention to $300

2   contributions to somebody from Texas.  He was just not paying

3   attention at that level.  That's not what he was hired to do.

4          Now, the evidence will show that Mr. Tate was on board

5   in October of 2011 with bringing Kent Sorenson on to the

6   campaign.  They all knew that Kent Sorenson was being paid by

7   Michelle Bachmann.  They thought he was being paid $8,000 a

8   month.  That was a lie by Mr. Sorenson, but that's what they

9   thought.  And Mr. Tate was okay with matching the market rate

10  offered by Michelle Bachmann for Kent Sorenson to join the

11  campaign and do work for them.  But Kent Sorenson could not make

12  up what his -- could not make up his mind, and Ms. Campbell took

13  you through that.  He goes back and forth through November,

14  December, Christmas.  He can't figure out what he wants to do.

15  Mr. Benton pulls the deal.

16         On December 28th Mr. Sorenson is sitting in a parking

17  lot somewhere near here trying to figure out what he wants to

18  do, and then quite to his surprise and everybody else's, he

19  walks on stage and endorses Dr. Paul.  And the government is

20  going to show you a videotape of that, and take a look at

21  Dr. Paul's face and look at the surprise.  He has no idea who

22  Kent Sorenson is.  He doesn't even like endorsements.  He had

23  one person in his whole life that has endorsed him, and that's

24  Nolan Ryan, the famous baseball pitcher that lives down in his

25  district in Texas.  That's the only endorsement he ever wanted

1   in his whole life.  So he doesn't know about the senator from

2   Indianola who all the sudden wants to endorse him.

3           So there was no deal on December the 28th.  Jesse

4   Benton pulled it.  But, more importantly, you will hear that

5   from Kent Sorenson's own mouth because there's a tape-recording

6   of him saying, I don't have a deal.  And this is in January,

7   early January of 2012.  I don't have a deal.  Do you think I

8   should give the check back, he tells the person on the other end

9   of the call.  Should I hold onto it so I have some leverage over

10  Mr. Kesari to do the deal?  And he concludes the call, I don't

11  know, I don't know what I'm going to do.  So there is no deal.

12          At some point -- and I don't think that any of us

13  will ever know what that is; but at some point in January there

14  is an arrangement made between Mr. Kesari and Mr. Sorenson for

15  him to get paid to do work for the campaign, and they do it --

16  the chart that Mr. Pilger put up, the circular chart that goes

17  around, you could just put Michelle Bachmann's name on that and

18  it would be the exact same way that Kent Sorenson got paid by

19  the Bachmann Campaign.  He has an LLC called Grassroots

20  Strategy.  Grassroots Strategy generated an invoice.  It sent an

21  invoice to a company called C & M Consulting.  C & M Consulting

22  packaged up Mr. Sorenson's invoice, just added it on, doesn't

23  mention anything about Kent Sorenson, sends it to the Bachmann

24  Campaign and they pay it, goes back around.  It's an exact

25  duplicate of what the Bachmann Campaign was doing.  And you will

1   hear Mr. Sorenson thought that was legal.  You're going to hear

2   some very interesting testimony in this case.  He thought it was

3   legal, and apparently he and Mr. Kesari tried to duplicate what

4   was going on in the Bachmann Campaign and they believed it was

5   legal, it was what he needed to do with his ethics obligations

6   under the Iowa Senate.  He thought he couldn't be paid directly,

7   he had to get paid through an intermediary, and that's why he

8   set it up that way, and it had nothing to do with obscuring

9   anything from the FEC.  The FEC is just flat out not mentioned.

10          So when the evidence comes in, please let these words

11  echo in your ears:  What is it?  Who is it?  What is it for?

12  Why do we keep paying them?  Those are not the words of someone

13  who's been involved in a conspiracy.  Those are the words of an

14  innocent man.  John Tate is not guilty.

15          Thank you.

16          THE COURT:  Mr. Binnall, you may make Mr. Kesari's

17  opening statement.

18          MR. BINNALL:  Thank you, Your Honor.  May it please

19  the court.

20          THE COURT:  We have a lavaliere mic if you would like.

21          Thank you.

22          MR. BINNALL:  The government's case is full of holes,

23  and they're going to try and fill those holes with you with

24  evidence that is simply unreliable.  It's unreliable because

25  it's either coming from an untrustworthy source or it's

1  unreliable because instead of actually focusing on anything that

2  Mr. Kesari did that was illegal, they're going to try and

3  demonize him, and they're going to try to make it so you don't

4  like his tactics.  But it doesn't get away from the fact that

5  their case is full of holes, and they're not going to be able to

6  meet their burden of showing beyond a reasonable doubt that

7  Mr. Kesari willfully tried to go out and violate any laws and

8  their evidence is not going to show that it's because of

9  Mr. Kesari that the FEC reports you see back there for those

10 payments to Interactive Communication Technologies were labeled

11 audiovisual, and they're certainly not going to show that

12 Mr. Kesari was part -- intentionally went into some conspiracy

13 to violate the law.

14        And you've already heard a lot about some of the

15 defendants and a little bit about Mr. Kesari so far from the

16 government and from our co-defendants in this case.  Mr. Kesari

17 is a political operative in his career.  He has strongly held

18 political beliefs, and part of his job is to go out and have

19 other people that share his beliefs and try to get them elected.

20 He's good at it.  That's why he's the deputy campaign manager in

21 2012 campaign for Dr. Paul when he ran for President.

22        But we know if we pay attention to the media now in

23 the current race politics isn't always polite.  Maybe it's not

24 always as clean as we always like it.  Maybe it's a little bit

25 like sausage.  If you want to eat it, maybe you don't want to

1    watch it being made.  But it doesn't mean it's illegal.  A lot

2    of the things that you heard from the government, a lot of it is

3    uncontested like my colleague said, and a lot of it is not stuff

4    that we might want as politicians; but in this country we don't

5    punish people's bad politics, and the evidence is going to show

6    that's illegal.

7         Now, Mr. Kesari has family in Virginia.  He's married

8    and has three kids.  His wife is with the kids back in Virginia

9    right now while this is going on, and he's been doing this

10   political work for a number of years.  He became the deputy

11   campaign manager of the Paul Campaign, and one of the people he

12   wanted to work with was his friend, longtime friend, or at least

13   someone that he had known for a good deal of time at this point,

14   Kent Sorenson.  That's not going to be in doubt that

15   Mr. Sorenson and Mr. Kesari were friends and political allies,

16   and he couldn't bring Mr. Sorenson on his campaign early in 2011

17   like we heard.

18        In late 2011 when we were getting close to the

19   caucuses, he saw an opportunity to do something for his

20   candidate and bring Senator Sorenson into the campaign, and he

21   also got together with Mr. Sorenson on a regular basis.  He

22   would cook dinner for him when Mr. Kesari was in town -- sorry;

23   Mr. Kesari would cook dinner for Mr. Sorenson and his family at

24   Mr. Sorenson's home, and they did go out often and they did go

25   out for dinner in December.  And Mr. Sorenson, probably trying

1  to find a way to get money out of the Paul Campaign, told him of

2  his financial woes.  And it was Christmastime.  He had bills

3  due.  He had credit cards due.  He was having a hard time

4  financially.

5        And Mr. Kesari said, well, I can loan you some money

6  if that's an issue.  Mr. Sorenson actually said that he didn't

7  want that, but when Mr. Sorenson left to go to the rest room

8  during that meeting, Mr. Kesari actually did take out and write

9  a $25,000 check and offered it to his wife.  He was just trying

10 to help out.

11       You also have to understand a lot of this context.

12 Certainly Mr. Kesari wanted Mr. Sorenson to work on the

13 campaign.  Certainly the talk was coming up.  That's the month,

14 December of 2011, that Mr. Kesari went through one of the

15 hardest things that all of us will have to go through in our

16 lives, and that's losing a parent because he lost his mother

17 that month.  Maybe his judgment wasn't exactly the best; but

18 this whole check thing and what it's for, either one of those

19 things weren't the story meant to demonize him, but not

20 something that's actually against the law as you're going to see

21 in this case.  It's Mr. Kesari caring about his friend in a

22 difficult time while he's also trying to convince his friend to

23 come over to the campaign where he believes Mr. Sorenson is more

24 politically aligned and where Mr. Kesari thinks that

25 Mr. Sorenson can do some good.

1        Mr. Sorenson doesn't come over to the campaign.

2   Mr. Sorenson continues to go back and forth about what he's

3   going to do.  And then he finally decides he's going to come

4   over to the campaign, asks them if they still want him, and

5   Mr. Kesari tells him that they did.  And he indulges in a rather

6   awkward way that you've already heard about, and they go on with

7   the caucus, at this point days before the caucus.  These people

8   are busy.  They are in the midst of a presidential campaign.

9        Now, at that point there is no deal as far as money.

10  There's been talking about numbers, sure.  There's actually no

11  deal and there certainly isn't a deal that Mr. Sorenson is going

12  to get paid for doing nothing.  He does end up eventually coming

13  to an agreement with Mr. Kesari to get paid, but that's only

14  after he says -- and you've already heard it once -- that he was

15  going to use that $25,000 check as leverage, his words, over

16  Mr. Kesari to get a deal, and he does some work for the

17  campaign.  He travels to South Carolina.  He records robo calls

18  that some of us get.  He helps with putting together e-mail

19  lists.  He helps get delegates to the state convention in Iowa

20  and selects people that would go to Tampa, Florida, to the

21  Republican National Convention to nominate as President.  And

22  those are the delegates that actually matter, and we kind of see

23  a lot of that going on right now in the current race.

24        Mr. Sorenson is really helping with that.  So when it

25  comes to June, Ron Paul gets 22 delegates from Iowa and Mitt

1   Romney I think gets six.  This is all part of this campaign, why

2   Mr. Kesari thought Mr. Sorenson was important to bring on board,

3   and Mr. Sorenson is the deputy campaign manager.  He's the one

4   who sets this up, and Mr. Sorenson tells him that he wants to be

5   paid through an intermediary.  Nobody thinks anything of that.

6   Mr. Kesari sets that up.  He does it on his own.  He doesn't

7   have to go through anybody else.  He doesn't have to go through

8   Mr. Benton.  He doesn't have to go through Mr. Tate.  He finds a

9   way to set up a intermediary because there's nothing wrong with

10  that.

11          You know, you're also going to hear from a gentleman

12  named Fernando Cortes in this case I suspect, and Mr. Cortes is

13  a nice guy, but he's very involved in the campaign, too, and

14  you're going to find that probably being very busy he made some

15  mistakes and he wasn't as diligent as he should.  You see in

16  campaigns there's two different sides.  You've got the political

17  side people who actually go out and get votes, find out how to

18  win, and then you've got people on the compliance side who we've

19  heard that these campaigns are businesses that are set up,

20  structures in all the states that they have to file reports, do

21  tax reporting, payroll, all the accounting, all of these things,

22  and there's a whole compliance side of a campaign.  Mr. Cortes

23  is the one who's on the side of the campaign that has to file

24  these reports and is in charge of making sure that they comply

25  with the various regulations and laws that are out there

1  federally and state by state.  And Mr. Cortes is not

2  particularly cogent when he decides how to code these invoices,

3  and he's the one who decides to do it, and he gets that

4  information not from Mr. Kesari as far as what the codes are for

5  their accounting system that end up going to the FEC reports.

6  He gets that information from his boss, Deana Watts, in Texas.

7  So she gives him the codes.  He decides which codes are

8  appropriate for which thing, codes all the expenses.  It goes

9  back to Texas, eventually gets put into the FEC system.  And

10 you're not going to find any credible evidence that Mr. Cortes

11 relied on Mr. Kesari when he decided to label that audiovisual.

12         Now, Mr. Cortes doesn't particularly like Mr. Kesari,

13 and his story has changed over time a little bit.  But you will

14 not find anything reliable from Mr. Cortes that says Mr. Kesari

15 is the one who caused these things to be labeled audiovisual,

16 certainly not beyond a reasonable doubt.

17         So at the end of the day, you have these unreliable

18 witnesses, and, yeah, there's other witnesses that you'll hear

19 from, and we'll talk more about them in the trial.  There are

20 these witnesses that you'll hear that Mr. Sorenson, he has a

21 strained relationship with the truth to put it kindly.  You're

22 not going to find that he's a particularly trustworthy person.

23 The government has already told you he's lied about this case.

24 The very facts in this case he's already admitted to lying

25 about, but the government would have you believe they cured him.

1   If it wasn't for them, he's cured, and now you can believe

2   everything he says.  And, ladies and gentlemen, I suspect that

3   Kent Sorenson is going to get on that witness stand and I

4   wouldn't be surprised if he lies right to your faces still

5   because he needs to do everything he can to convince you that

6   these gentlemen did something wrong in order to save his own

7   skin.

8            And the government would have you believe that

9   everything he says is backed up by these e-mails.  And, boy,

10  you're going to see a lot of e-mails, a lot of e-mails.  They

11  might read you bodies of e-mails, subject lines of e-mails,

12  dates, times, headers, a lot of it not relating in context, and

13  they're going to say that all of that supports Mr. Sorenson's

14  story.  That's not really what's happening here.  What's

15  happening here is they have their own story that they want to

16  sell to you, and they're using Mr. Sorenson to fill in those

17  holes.  That's not corroboration.  That's filling in the holes

18  with someone who is admittedly lying about this case, has in the

19  past.  I think you're going to believe he still is.  At the end

20  of the day, I think you're going to find that you just can't

21  rely on his word, certainly for not something as important as

22  this.

23           You're not going to get -- the judge already told you

24  you are the judges of the credibility of the witnesses.

25  Something this important, you can't send somebody away on the

1  word of Kent Sorenson.  You can't take away their freedom, not

2  on Kent Sorenson's word.  They're not going to be able to show

3  you again that Mr. Kesari tried to break the law, willfully

4  broke the law.

5          At the end of the day, Mr. Kesari may have made some

6  bad judgments.  He may have tactics that you don't agree with,

7  but he's a political operative and he was trying to do his job.

8  He certainly wasn't trying to break the law.  And so when I come

9  back and talk to you at the end, I'm going to ask you to send

10  Mr. Kesari home to his family and I'm going to ask you to find

11  him not guilty.

12          Thank you very much for your service.

13          THE COURT:  It's time to begin the presentation of

14  evidence.  Mr. Pilger, Mr. Cooney.

15          MR. PILGER:  The government calls Aaron Dorr.  It will

16  take a second to get him.

17          (Pause.)

18          THE COURT:  So I neglected to tell you about the

19  hours.  We'll start every day at 9:00 in the morning.  We'll

20  take an hour and 15 minutes every day at noon for lunch.  We'll

21  quit every day about 5 o'clock.  Today we'll probably quit about

22  15 minutes early, earlier than that.  We'll take a 20-minute

23  break about 10:30 in the morning and a 20-minute break probably

24  about 3:00, 3:30 in the afternoon.  If you ever need a break and

25  it's not during the scheduled break, don't sit there and be

1   uncomfortable.  Just raise your hand and say I need five

2   minutes, and we'll be happy to accommodate that.  But it will be

3   the same schedule about every day, 9:00 to 5:00, hour and 15

4   minutes for lunch, and that's how it goes.

5                (Pause.)

6                THE COURT:  Come forward, sir.  If you'll approach the

7   clerk, she'll administer the oath.

8                THE CLERK:  Please raise your right hand.

9                 AARON DORR, GOVERNMENT'S WITNESS, SWORN

10               THE CLERK:  Please be seated.

11                          DIRECT EXAMINATION

12  BY MR. PILGER:

13  Q.  Good afternoon, sir.

14  A.  Good afternoon.

15  Q.  Could you please state and spell your name for the record.

16  A.  Yes, Aaron Dorr, A-A-R-O-N D-O-R-R.

17  Q.  Mr. Dorr, how are you employed?

18  A.  I work for Iowa Gun Owners.

19  Q.  And what do you do for them?

20  A.  I'm their director.

21  Q.  And what does Iowa Gun Owners do?

22  A.  We're a Second Amendment gun rights organization that works

23  in the capitol trying to advance and defeat legislation.

24  Q.  And do you have a family, sir?

25  A.  I do.

1   Q.   Children?

2   A.   Yep.

3   Q.   Do you have siblings?

4   A.   I do.

5   Q.   Is one of your siblings a brother named Chris?

6   A.   Yes.

7   Q.   Do you know a man named Kent Sorenson?

8   A.   Yes, I do.

9   Q.   Turning your attention back to 2008, all the way to 2008 --

10  A.   Okay.

11  Q.   -- did you know Kent Sorenson then?

12  A.   I think I met him in January of 2009, I believe.

13  Q.   At the time that you met him, were you aware of whether or

14  not he was in elected office?

15  A.   He had just won an election when I met him, yes.

16  Q.   I'm sorry, I couldn't hear you.

17  A.   He had just won an election when I met him, yes.

18  Q.   Was that an election held in 2008?

19  A.   Yes, it was.

20  Q.   And what was it?

21  A.   To the Iowa House.

22  Q.   The Iowa House?

23  A.   Yes.

24  Q.   And what was the nature of your relationship with him at

25  that time when you met him in 2009?

```
 1   A.   He became our bill sponsor in the Legislature.   He
 2   introduced legislation on our behalf.
 3   Q.   And when you say "our," do you mean the --
 4   A.   The Iowa Gun Owners.
 5   Q.   The Iowa Gun Owners?
 6   A.   Yes, sir.
 7   Q.   And, to your knowledge, did Mr. Sorenson run for a higher
 8   office in the State of Iowa?
 9   A.   Yes.
10   Q.   And what was that?
11   A.   In 2010 he ran for the State Senate.
12   Q.   Did he win?
13   A.   Yes.
14   Q.   So he became an Iowa State Senator; is that fair?
15   A.   Yes, he did.
16   Q.   And did anyone in your family come to work for him after he
17   was a state senator?
18   A.   Yes; my brother, Chris.
19   Q.   And how did your brother, Chris, work for him?
20   A.   He was his legislative clerk.
21   Q.   And what does a legislative clerk do?
22   A.   Answers e-mails, phone calls, just all of the administrative
23   work that the legislators need to have done.
24   Q.   And was that a paid position?
25   A.   Yes, it was.
```

1    Q.  Now, turning your attention to 2011 and 2012, was there an

2    election going on then?

3    A.  Yes, there was.

4    Q.  Was the office of President of the United States at issue?

5    A.  Yes, it was.

6    Q.  Do you know who Kent Sorenson was supporting initially in

7    that race?

8    A.  Yes; Michelle Bachmann.

9    Q.  Do you know if he came to have a title in the Michelle

10   Bachmann Campaign?

11   A.  He may have been the state chairman, but I'm not positive of

12   the exact title he had with the campaign.

13   Q.  Okay.  If you don't know and you're estimating or

14   approximating, you can do that as long as you tell us.  That's

15   your best recollection?

16   A.  It is.

17   Q.  I want to turn your attention now -- and this is not in

18   evidence -- to Government's Exhibit 7.  Just bear with us for a

19   moment while we make the first connection here.

20   A.  Okay.

21            (Pause.)

22            THE COURT:  We're having a little trouble, little

23   technical problems.  We always do the first day.

24            MR. PILGER:  Yes, Your Honor.

25            THE COURT:  We're getting somebody to fix it.

1          MR. PILGER:  May I proceed in hard copy for the

2    moment?

3          THE COURT:  Would you, please?

4          MR. PILGER:  Yes.

5          THE COURT:  Can we make the Elmo work right now?

6          THE CLERK:  Yes.

7          THE COURT:  They've got theirs up, don't they?

8          MR. PILGER:  The jury can't see it?

9          THE CLERK:  Yeah, I can't turn the monitors off, can't

10   turn the jury monitors off.

11         MR. PILGER:  I'll approach, Your Honor.

12   BY MR. PILGER:

13   Q.  Showing you what's marked for identification as Government

14   Exhibit 7.  Do you know what that is?

15   A.  Yes.

16   Q.  Have you reviewed this previously in preparation for your

17   testimony?

18   A.  Yes, I've seen it.

19   Q.  Is this something authored by you?

20   A.  Yes, it is.

21   Q.  Who did you send it to?

22   A.  John Tate and Jedd Coburn.

23   Q.  Who is Jedd Coburn?

24   A.  He was a staffer with the Ron Paul Campaign.

25   Q.  Who's John Tate?

1   A.  He was involved with the Ron Paul Campaign.

2   Q.  And did you make a proposal concerning Senator Sorenson in

3   this document?

4   A.  Yes, I did.

5           MR. PILGER:  We would offer Government's Exhibit 7

6   into evidence, Your Honor.

7                           (Government Exhibit 7 was

8                            offered in evidence.)

9           MR. WARRINGTON:  No objection here.

10          THE COURT:  If there's no objection, you don't have to

11  say anything.  I'll just look and you be quick, and then I'll

12  admit it.  It's received.

13                          (Government Exhibit 7 was

14                           received in evidence.)

15          MR. PILGER:  I can publish from the Elmo now?

16          THE CLERK:  The system is going to get restarted.  Any

17  second it's going to go down; sorry.

18          THE COURT:  We're going to have to reboot the whole

19  system.  It takes five minutes.

20          MR. PILGER:  Yes, sir.

21          I'll continue on.

22          THE COURT:  Thanks.

23  BY MR. PILGER:

24  Q.  Let's just start off by talking about the first page.  This

25  is in evidence now, so there's a from line on an e-mail,

1   correct?

2   A.   Yes.

3   Q.   And it says your name, Aaron Dorr?

4   A.   Yes.

5   Q.   And then there's an e-mail address.  Is that an e-mail

6   address that you use?

7   A.   Yes, it is.

8   Q.   And there's a date.  What's the date?

9   A.   October 29, 2011.

10  Q.   And is there an entry in the to line that is an e-mail

11  address?

12  A.   Yes, there is.

13  Q.   In fact, how many e-mail addresses are there?

14  A.   Two.

15  Q.   And the first one, can you just read that off?

16  A.   Tfc02@aol.com.

17  Q.   And do you know who uses that e-mail to send and receive

18  e-mail?

19  A.   John Tate.

20  Q.   And who else is in the to line?

21  A.   Jedd Coburn.

22  Q.   And that's the gmail address for Jedd Coburn?

23  A.   Yes, it is.

24  Q.   And what does the subject say?

25  A.   Proposal.

1 Q.  Is there an attachment?

2 A.  Yes, there is.

3 Q.  And does the body of the e-mail say something?

4 A.  Yes, it does.  It says, see attached.

5 Q.  Okay.  So looking at page 2 of the exhibit, is this the

6 attachment or the first page of it?

7 A.  Yes, it is.

8 Q.  Is the entire attachment included in this exhibit?

9 A.  Yes, it is.

10 Q.  Let me ask you to read from the salutation through the first

11 paragraph.

12 A.  John, KS is considering the offer that was first brought to

13 his attention by a national campaign staffer.  As KS considers

14 this he needs to look at what he would need to replace should he

15 leave the MB campaign.  The following financial requirements are

16 things that he would be giving up and would need to have matched

17 if he leaves MB.

18 Q.  And then it goes on to talk about some financial matters,

19 right?

20 A.  Yes.

21 Q.  Let's just do some housekeeping at the start.  When you say

22 "John," who are you addressing?

23 A.  John Tate.

24 Q.  And when you say "KS," who are you referring to?

25 A.  Kent Sorenson.

1    Q.  So you said Kent Sorenson is considering the offer that was

2    first brought to his attention by a national campaign staffer,

3    and then the end of the first paragraph you say, the following

4    financial requirements are things he would be giving up and

5    would need to have matched if he leaves MB.

6              Who is MB?

7    A.  Michelle Bachmann.

8    Q.  And then there is a paragraph with a bold underlined

9    caption.

10             What's the caption?

11   A.  Salary requirements and other financial requirements.

12   Q.  And can you read that section to the jury?

13   A.  As KS or do I say Kent Sorenson or is there -- read it

14   verbatim?

15   Q.  You can state the name you understand the initials to stand

16   for, unless counsel objects.

17   A.  Okay.

18             MR. BINNALL:  Your Honor, I think the document speaks

19   for itself, especially since we don't have the audiovisual up

20   right now, I think it is probably best to read it verbatim.

21             THE COURT:  Go ahead.

22   A.  KS needs to match his current salary of 8,000 a month.  This

23   has been promised to him even after MB drops out of the race for

24   the majority of 2012.  As a result KS would need to be on

25   payroll into the fall of 2012.

1          CD works for and with KS and would leave the MB

2    campaign with him.  He would to have his salary matched 5,000

3    monthly through April of 2012 --

4    Q.  Stop there.  We know KS is who?

5    A.  Kent Sorenson.

6    Q.  And who is MB?

7    A.  Michelle Bachmann.

8    Q.  Who is CD?

9    A.  My brother, Chris Dorr.

10   Q.  And remind the jury, did Chris Dorr have the job with Kent

11   Sorenson in the Legislature?

12   A.  He did.

13   Q.  Did he also have a job concerning Michelle Bachmann?

14   A.  He did.

15   Q.  Tell the jury a little bit about that.

16   A.  He was a field staffer of some sort, coordinated events,

17   traveled for the campaign, that kind of thing.

18   Q.  And so it's your understanding that like Kent Sorenson he

19   worked for the Michelle Bachmann Campaign?

20   A.  Yes.

21   Q.  And did your brother receive money for that work?

22   A.  Yes.

23   Q.  Okay.  So I interrupted you.  I'm sorry.  Could you continue

24   where you left off?

25   A.  He would need to have his salary matched 5,000 monthly

1   through April of 2012, when he was currently scheduled to quit

2   the MB Campaign.  He would need to remain in Iowa.  He would

3   perhaps be able to handle some minor travel out of state but not

4   much.

5          We have established the Iowa Conservatives Fund PAC as

6   an entity that KS will be using to recruit and elect good

7   candidates to the Iowa General Assembly.  C4 will follow up

8   after next legislative session.  It is KS's leadership PAC.  He

9   would need a donation of $100,000 into this PAC prior to this

10  action.

11  Q.  Thank you.

12          I'll take that back from you.

13          What does C4 mean?

14  A.  501C4 organization.

15  Q.  And just explain to the jury what that means a little bit.

16  A.  It would be an organization that could advocate for and

17  against issues in the Legislature.

18  Q.  And does it have a certain tax status with the IRS?

19  A.  It's a nonprofit entity.

20  Q.  And the C4 refers to part of the tax --

21  A.  501C4 statute, yes.

22  Q.  So this document is something you sent to John Tate as a

23  representative of Ron Paul?

24  A.  Yes.

25  Q.  And you proposed that KS could leave the Michelle Bachmann

1  Campaign for $8,000 a month?

2  A.  Yes.

3  Q.  Where did you get that number?

4  A.  Kent Sorenson told me that's what he was being paid from the

5  Michelle Bachmann Campaign.

6  Q.  Do you know if that was true or not?

7  A.  I don't know it to be true either way.

8  Q.  And you made a proposal for a number for your brother.  Do

9  you know if that was true or not?

10  A.  I believe he was being paid less than that with the Michelle

11  Bachmann Campaign.

12  Q.  So you were angling for a little bit of a raise there; is

13  that right?

14  A.  Yes.

15  Q.  When you sent this e-mail off to the Ron Paul Campaign and

16  to John Tate in particular, did you get a response?

17  A.  I did.

18        THE CLERK:  It should be working now.

19        MR. PILGER:  Government's Exhibit 10, Ms. Draughn.

20  BY MR. PILGER:

21  Q.  Mr. Dorr, tell me if you can see it.

22  A.  I cannot.

23  Q.  I mean when you do.

24        MR. PILGER:  Your Honor, just so I don't get in

25  trouble, I don't think the jury can see this one at all.  It's

1   probably too small to read it.

2            THE COURT:  You're fine.

3   A.  I can see it now.

4   BY MR. PILGER:

5   Q.  So can I.  What is this?

6   A.  It's an e-mail response I received.

7   Q.  And who sent it to you?

8   A.  Jesse Benton.

9   Q.  And what's the date of it?

10  A.  October 31, 2011.

11  Q.  And who is it to?

12  A.  To Kent Sorenson and myself.

13  Q.  Is that an e-mail address of Kent Sorenson that you

14  recognize as one that he uses?

15  A.  Yes, I do.

16  Q.  And the other e-mail address in the to line is --

17  A.  My own.

18  Q.  It's yours.  For the record it says

19  freedomenterprisellc@gmail, right?

20  A.  That is correct.

21  Q.  Who is cc'd on this?

22  A.  John Tate and Jedd Coburn.

23  Q.  And is the subject the message that you just talked about

24  that's in evidence?

25  A.  Yes.

 1           MR. PILGER:  We offer Government's Exhibit 10 in

 2   evidence, Your Honor.

 3                              (Government Exhibit 10 was

 4                               offered in evidence.)

 5           THE COURT:  Received.  Oops.

 6           MR. BINNALL:  Objection as to hearsay and relevance as

 7   to Mr. Kesari.

 8           THE COURT:  Overruled.  It's received.

 9                              (Government Exhibit 10 was

10                               received in evidence.)

11   BY MR. PILGER:

12   Q.  So we'll wait a second for the jury to be able to see it.

13   There we go.

14           And, Ms. Draughn, can you make that just a little bit

15   bigger?

16           So just focusing on the header, we've been over this,

17   right?  This is a message from Jesse Benton to Kent Sorenson and

18   yourself, right?

19   A.  That's correct.

20   Q.  Dated October 31, 2011?

21   A.  That's correct.

22   Q.  What happens every year October 31st?

23   A.  Reformation Day.

24   Q.  What is that?

25   A.  Halloween; excuse me.

1          THE COURT:  What, you're not Lutheran?

2  BY MR. PILGER:

3  Q.  Halloween and -- tell me what it is.  I want to know.

4  Reformation Day?

5  A.  Reformation Day.

6  Q.  All right.  Now I know.

7          And so the copies are to John Tate and Jedd Coburn?

8  A.  That's correct.

9  Q.  And what does the subject line say?

10  A.  Dr. Paul endorsement.

11  Q.  And go ahead and read what you can see on the screen.

12  A.  Dear Aaron, Kent and Chris.

13          We are glad to hear you are no longer happy supporting

14  Michelle Bachmann and are considering throwing your support

15  behind Dr. Paul.

16          Dr. Paul, John and I would all welcome your support

17  and the considerable talent it brings.

18  Q.  And, Ms. Draughn, if you could scroll down.  If you could

19  bring up the next part of the text.

20          Can you continue from "The proposal"?

21  A.  The proposal you sent us was, however, surprising.  It

22  appeared that you were trying to sell Kent's endorsement for

23  hundreds of thousands of dollars and other in-kind support for

24  future political ventures.  That would be unethical and illegal.

25  Dr. Paul, John and I would never engage in such dealings.

1          We have no interest in hurting any of you and plan to

2    keep your proposal confidential, but if details were to get out

3    it would no doubt be damaging to all three of you.

4          That said, we would be pleased to have your support.

5    If you join our team and lend your efforts to our campaign, we

6    would be happy to employ you at fair market value.  Michelle

7    Bachmann has set that value at 8,000 per month for Kent and

8    5,000 per month for Chris Dorr.  We would plan to keep you on

9    retainer for the duration of the Paul Campaign, however long

10   that way be.  We would expect you both to lend your considerable

11   talents to our winning team in Iowa and, post caucus, in other

12   states across the country.

13         As for list sharing and future endorsements, we cannot

14   make any quid pro quo arrangements.  I can say, however, that

15   your joining our team would solidify our friendship for now and

16   the future and we always try to help our friends.

17         I hope you will find this agreeable and very much hope

18   you come aboard.

19         Please respond by COB Wednesday, November 2, and let

20   us know your plans.

21         Best, Jesse Benton, Chairman, Ron Paul 2012 PCC.

22   Q.  Did this plan cause you to have any reaction?

23   A.  Yes.

24   Q.  Why is that?

25   A.  Because I was concerned.

1   Q.  Why were you concerned?

2   A.  Because he said it was possibly illegal and unethical.

3   Q.  And did you write back to him as a result of your concern?

4   A.  Yes, I did.

5   Q.  And if we could bring up what is not yet in evidence,

6   Government's Exhibit 13.

7           Can you see that, sir?

8   A.  I can.

9   Q.  Is this an e-mail string that starts with the message you

10  just read from Jesse Benton to yourself and Kent Sorenson?

11  A.  No.  I believe this one comes after the response that I sent

12  back in that situation.

13  Q.  I stand corrected.  So what we have here is an e-mail chain

14  that follows the message from Jesse Benton, as you just

15  testified it's after, but it's not including that in the chain?

16  A.  Correct.  This is following my response to the e-mail I

17  received from Jesse Benton.

18  Q.  And this e-mail goes from the bottom up chronologically,

19  correct?

20  A.  Yes.

21  Q.  And does it start at the bottom of the first page with your

22  response to Jesse Benton and someone else?

23  A.  Yes, it does.  Again, just to clarify, this is not the

24  response to the e-mail that I just read from Jesse Benton, yes.

25  Q.  It's a correspondence to Jesse Benton, and does it concern

1    the same topic?

2    A.  Yes, it does.

3    Q.  Okay.  And on November 2nd you wrote to Jesse and who else

4    about this topic?

5    A.  John Tate.

6    Q.  Okay.  And then there is a response to what you said from

7    whom at the top of the document?

8    A.  From Jesse Benton.

9    Q.  And does he copy anyone?

10   A.  Yes, he does; John Tate.

11   Q.  Okay.  And what are the dates of these two e-mails, the

12   first one from you?

13   A.  My e-mail sent November 2, 2011.  The response from Jesse

14   Benton was November 3, 2011.

15           MR. PILGER:  We would offer 13 into evidence, Your

16   Honor.

17                              (Government Exhibit 13 was

18                               offered in evidence.)

19           THE COURT:  Received.

20                              (Government Exhibit 13 was

21                               received in evidence.)

22   BY MR. PILGER:

23   Q.  So let's have you read this to the jury.  We'll start with

24   the first e-mail, which is on the page, Ms. Draughn, at the

25   bottom of the e-mail.

1      There we go.  Thank you, Ms. Draughn.

2      Can you read this to the jury, please, starting with

3  the header.

4  A.  Yes.  Jesse and John,

5      Pardon the delay in the reply.  These are busy days as

6  I'm sure they are for you.

7      A couple of things to make sure we're all on the same

8  page here.  I do not and never have worked for MB.  I do not,

9  obviously, work for RP and am not trying to.  I have no direct

10  stake in any of this.

11  Q.  Let's slow down because we need to make sure everyone is

12  with us on all of the initials.

13      We know MB is who?

14  A.  Michelle Bachmann.

15  Q.  Who is RP?

16  A.  Ron Paul.

17  Q.  Okay.  Continue.

18  A.  I and I alone initiated this communication after I heard

19  that RP 2012 national campaign staffer Dimitri Kesari was

20  continuing to initiate contact with KS.  I've never thought that

21  MB was a good candidate.  I've never thought that her campaign

22  had what it took to win either and wanted to get my friends off

23  that train wreck.

24      I've long hoped that we could clear the collective air

25  and get the right people on the right campaign to assist that

1  candidate and advance the causes that we all care about.

2  Perhaps that can still take place later.  In that context I

3  communicated with the campaign to see if something could be

4  worked out.  I did not seek authorization from anyone, least

5  of -- I assume it's all KS.

6  Q.  Ms. Draughn, can you expand that out so he doesn't have to

7  guess at the end?

8  A.  Least of all KS.

9       He's not been a part of this communication, other than

10  not shooting down my idea of communicating with the campaign

11  after I heard about Kesari's latest phone call.  I trust I've

12  made that clear.

13  Q.  That continues on the second page of the exhibit,

14  Ms. Draughn.

15  A.  I was surprised at your response.  I certainly didn't intend

16  anything to come across as unethical or immoral.  Please, for my

17  edification, let me know what I said that was illegal so I don't

18  do that in the future.  Regarding the money, I was simply

19  ascertaining wages for my friends.  Regarding the PAC, that was

20  an idea that I thought would pay long-term benefits to many that

21  we all want to see succeed.  Clearly you don't agree, which is

22  fine, but certainly it wasn't done in an attempt to break the

23  rules as I've had no experience in presidential campaigns.

24  Please let me know what part of this was in violation of the

25  rules/laws so that I cannot make this mistake in the future.

1  Neither KS, my brother, or myself would engage in such dealings

2  either.  You know my father.

3           Regarding your time line of --

4  Q.  Let me stop you.  So there's an emoticon there at the end of

5  "you know my father," right?

6  A.  Yes, there is.

7  Q.  And it's a smiley face emoticon just for the record, right?

8  A.  That's correct.

9  Q.  Okay.  Proceed.

10  A.  Regarding your time line of close of business today, I don't

11  believe that's possible.  As was mentioned in the initial

12  communication, KS has a possible senate leadership vote on

13  November 8, as I recall, and couldn't do something on this issue

14  until after that.

15           Please let me know if you'd like me to encourage KS to

16  contact you or not, given the date issue.

17           Thanks.

18           Aaron.

19  Q.  So that's the first e-mail in this two e-mail chain,

20  correct?

21  A.  Yes.

22  Q.  And you -- it's not on display right now, but on the first

23  page you read about -- or you read out what you wrote to Jesse

24  Benton and John Tate about Kent Sorenson not being a part of

25  this communication, quote, other than not shooting down my idea

1   of communicating with the campaign after I heard about Kesari's

2   last phone call, end quote.

3          What does that mean?

4   A.  It means that I had heard from him about being approached by

5   Dimitri Kesari as far as joining the Ron Paul Campaign and I put

6   together the proposal without seeking authorization from Kent

7   Sorenson after getting the details of what he was doing for the

8   Michelle Bachmann Campaign.

9   Q.  So I just want to be perfectly clear there's a pronoun in

10  there.  You had heard from him.  Who is "him"?  You said you had

11  heard from him that --

12  A.  I'm sorry, heard from Kent Sorenson.  He had been

13  approached.

14  Q.  Had been approached by whom?

15  A.  By Dimitri Kesari.

16  Q.  Thank you.

17          Okay.  So let's go up and then see what response you

18  got from Jesse Benton.

19          Could you read that out starting with "From"?

20  A.  From Jesse Benton, jesserbenton@gmail.com on behalf of Jesse

21  Benton sent Thursday, November 3, 2011, at 6:58 p.m. to Aaron

22  Dorr, courtesy copy tfc02@aol.com.  Subject:  Regarding Dr. Paul

23  endorsement.

24          Aaron.

25          Thanks for getting back to us.

1          We'd still be very pleased to have Kent and Chris join

2     our team at the terms we laid out.  We're all friends fighting

3     for the same cause and the Senator and your brother would be

4     huge assets.

5          We are putting together some final touches to our

6     organization, so if we are to add Kent and Chris, we would need

7     to do so rather soon.  We can give it through the weekend for

8     Kent to mull things over, but we'll need to make a final

9     decision on Monday.  Please tell him if he has any questions he

10    can call Dimitri directly or you can give him my cell phone.

11         We're big fans of IGO and plan to work with you often

12    in the future.  We are also interested in pursuing partnership

13    with the Iowa Conservatives Fund and look forward to discussing

14    this more with you after the primary season.

15         Best, Jesse.

16    Q.  What is IGO?

17    A.  Iowa Gun Owners.

18    Q.  And did you understand this to take a position on whether or

19    not they were, despite having called your proposal unethical and

20    illegal, willing to pursue the proposal?

21    A.  Yes.

22    Q.  Lets turn ahead to Government's Exhibit 23 not yet in

23    evidence.

24         Can you see it, Mr. Dorr?

25    A.  Yes, I can.

1  Q.  Is this an e-mail from you to Jesse Benton copying John Tate

2  and Jedd Coburn?

3  A.  Yes, it is.

4  Q.  Is it concerning the same topic as the last e-mails that

5  we've been discussing?

6  A.  Yes, it is -- yes, it does, excuse me.

7  Q.  And that's the first e-mail at the top.  Going to the

8  bottom, there's an e-mail that precedes it by about a week,

9  right?

10  A.  Yes, there is.

11  Q.  And who is that e-mail to and from?

12  A.  It's from Jesse Benton to myself.

13       MR. PILGER:  We offer Government's Exhibit 23 into

14  evidence.

15                              (Government's Exhibit 23 was

16                               offered in evidence.)

17       THE COURT:  Received.  I've got an idea.  Instead of

18  laying the foundation for ones that you suspect aren't going to

19  be objected to, why don't you just offer them, and that will

20  save us the time of going through the foundation twice.

21       MR. PILGER:  Yes, sir.

22       THE COURT:  And then when we put up an exhibit, if the

23  jury is viewing it and it's in evidence, I would suggest that

24  you do leading questions on it because he's just reading them

25  anyway, leading questions as to the header.

```
 1            MR. PILGER:  Okay.

 2            THE COURT:  And I think we'll save time if we do it

 3   that way.  Thank you.

 4            23 is received.

 5                            (Government Exhibit 23 was

 6                             received in evidence.)

 7   BY MR. PILGER:

 8   Q.  So starting in the middle of the page, that's the

 9   chronologically first e-mail, yes?

10   A.  Yes, it is.

11   Q.  So let's zero in on that and enlarge it.  Make it so the

12   jury can see it.

13            Okay.  So on November 14, 2011, 9:30 a.m., did Jesse

14   Benton write to you by e-mail?

15   A.  Yes, he did.

16   Q.  And what did he say?

17   A.  Hi, Aaron.

18            Hope you are well.

19            And I hope the senate leadership meetings went well

20   for Senator Sorenson.  With those meetings in the rearview

21   mirror, I thought now might be a good time to revisit Kent and

22   your brother joining our team.  The window is still open, but it

23   will close in the next few days.  We are building for a top

24   finish in the caucus and we'd love to get him on board to help

25   push us over the top.
```

1          Please let me know.

2          Jesse.

3  Q.  And is this Jesse Benton contacting you or are you

4  initiating contact with Jesse Benton?

5  A.  He contacted me.

6  Q.  And what did you respond, moving to the top of the e-mail

7  string?  Actually let me set this up like the judge instructed.

8          Did you respond on November 21st, about a week later?

9  A.  Yes, I did.

10 Q.  November 21, 2011, you wrote an e-mail to Jesse Benton,

11 right?

12 A.  Yes, I did.

13 Q.  And you copied John Tate and Jedd Coburn?

14 A.  Yes, I did.

15 Q.  And the subject was re: Touching base, right?

16 A.  That's correct.

17 Q.  And what did you say?

18 A.  Jesse.

19         Pardon my delay.  Our extended family had a

20 Thanksgiving celebration over this past weekend due to family

21 schedules and I was away from work for a while.

22         I've tried to pull these sides together without

23 success for some time.

24         Considering that Dimitri had dinner with Kent at his

25 home over the weekend, I'll assume that you guys are taking a

1    more direct role in this process.  As I'm no longer needed to

2    facilitate the conversation at this point, I'll bow out and let

3    you, John, Dimitri and Kent work this out.

4            Perhaps you and I can talk sometime after January 3

5    about plans for the future.

6            THE COURT:  Okay.  Would you stop there.

7            Members of the jury, I would like you to pick up your

8    preliminary jury instructions and turn to instruction No. 3.

9    We're just going to have a little teaching moment here.

10           You don't have your copy.

11           JUROR WARES:  We left them in our room.

12           THE COURT:  You can read along with her, but leave

13   them in the courtroom because this is the place you're going to

14   want to refer to them from now on.

15           JUROR WARES:  Okay.

16           THE COURT:  So at the bottom of the first page of

17   instruction 3, I said this:  You will hear evidence about acts

18   and statements done before, during and after the agreement

19   allegedly existed.  If you determine that an agreement existed

20   and that one or more defendants joined the agreement, then the

21   acts and statements knowingly done by a member of the agreement

22   during the existence of the agreement and in furtherance of it

23   may be considered by you as evidence pertaining to the defendant

24   or defendants who joined the agreement.

25           Then listen to this next statement real clearly here.

1  It says, acts and statements which are made before the

2  conspiracy began or after it had ended are admissible only

3  against the person making them and should not be considered by

4  you against any other defendant.

5          Okay.  You'll remember maybe that the government

6  alleges that the conspiracy began in December of 2011, and so

7  this statement here of November 21st is before December of 2011,

8  and so it's only admissible against defendant Benton, the one in

9  that e-mail chain.  We don't have a ton of these in this case,

10 but there's enough of them that we have to remember when the

11 conspiracy began, and the statements before it are only

12 admissible against the defendant who made them.

13         Go ahead, Mr. Pilger.

14         MR. PILGER:  We ask for admission against Mr. Tate for

15 the purpose of --

16         THE COURT:  Anybody who's on the e-mail chain is

17 charged with notice of it anyway.

18 BY MR. PILGER:

19 Q.  And so to be fair, Mr. Dorr, Dimitri Kesari is not on the

20 e-mail chain, correct?

21 A.  That's correct.

22 Q.  He's only referenced within the text that you were talking

23 about, right?

24 A.  That's correct.

25 Q.  Okay.  And if I understand this correctly, you're bowing out

1  of the negotiations; is that fair?

2  A.  Yes.

3  Q.  So tell us in your own words, why did you bow out of the

4  negotiations?

5  A.  The original e-mail that concerned me, the allegation of

6  being possibly illegal or unethical or immoral, whatever the

7  phrase was, and that's why there's a week long delay between the

8  response to this e-mail.  I was just tired of it.  I was done

9  with it.  And I also understood the case from Kent Sorenson that

10 he was still --

11 Q.  Wait, wait.  Don't say what Kent Sorenson said.

12 A.  Okay.

13 Q.  Let's do this.  Did Kent Sorenson tell you something that

14 caused you to bow out?

15 A.  Yes.

16 Q.  What was that?

17 A.  That he was still being --

18         MS. CAMPBELL:  Objection, Your Honor.

19         MR. BINNALL:  Objection.

20         MR. WARRINGTON:  Objection.

21         THE COURT:  Overruled.

22         Answer the question.

23 A.  That he was being approached by Dimitri Kesari about this

24 arrangement.

25 BY MR. PILGER:

1  Q.  Thank you.

2          Court's indulgence.

3          (Pause.)

4          Mr. Dorr, you've previously reviewed a video,

5  Government's Exhibit 150; is that correct?

6  A.  Yes, I did.

7  Q.  Approaching you, showing you Government's Exhibit 150, this

8  was played for you at a previous time, correct?

9  A.  Yes, it was.

10  Q.  Does it contain a fair and accurate depiction of a

11  television program that you saw in real-time?

12  A.  Yes, it does.

13  Q.  Okay.  So I think you just testified that you bowed out in

14  November of what was going on between the Paul Campaign people

15  and Kent Sorenson, correct?

16  A.  That is correct.

17  Q.  What's the next thing that happened that you're aware of

18  concerning Kent Sorenson and the Paul Campaign?

19  A.  He joined the campaign.

20  Q.  So you're aware that he endorsed Ron Paul?

21  A.  I was aware of that.

22  Q.  How do you know that?

23  A.  I saw the news.

24  Q.  And were you on notice that was going to happen before it

25  happened?

1  A.  No, I was not.

2  Q.  Were you surprised or not?

3  A.  Yes.

4  Q.  Why were you surprised?

5  A.  We had a phone call soon in the days leading up to when he

6  made the actual endorsement where he indicated he is being --

7          MS. CAMPBELL:  Objection, Your Honor; hearsay.

8          THE COURT:  Overruled.

9          Answer the question.

10  A.  Where he, being Kent Sorenson, indicated to me he was not

11  going to be going through with this.

12  BY MR. PILGER:

13  Q.  And then after he went through with it, were you aware of

14  whether or not he was being paid to make the switch?

15  A.  No, I was not.

16          MS. CAMPBELL:  Your Honor, objection; hearsay.

17          THE COURT:  Said he wasn't aware.  Overruled.

18  BY MR. PILGER:

19  Q.  I just want to make sure the jury heard with the cross talk.

20  After he made the switch in the year 2012, were you aware that

21  Kent Sorenson was being paid by the Paul Campaign to make the

22  switch?

23  A.  I was not aware.

24          MR. PILGER:  One moment, Your Honor.

25          (Pause.)

1          Just a couple more questions, Your Honor.

2  BY MR. PILGER:

3  Q.  Coming back to Government Exhibit 150, the video that you

4  reviewed --

5  A.  Yes.

6  Q.  -- you said it was a fair and accurate depiction of a video

7  that you saw on real-time on television; is that right?

8  A.  That's correct.

9  Q.  Did it involve a particular news anchor?

10  A.  Yes, it did.

11  Q.  Who was she?

12  A.  Megyn Kelly.

13  Q.  And was she interviewing someone?

14  A.  Yes, she was.

15  Q.  And who was that?

16  A.  Kent Sorenson.

17  Q.  And do you remember, when was that?

18  A.  The date I don't recall, but I think it was just days or

19  perhaps even the same day that Kent Sorenson switched campaigns

20  from Michelle Bachmann to the Ron Paul Campaign.

21          MR. PILGER:  Thank you.

22          No further questions.

23          THE COURT:  Ms. Campbell?

24          MS. CAMPBELL:  Thank you, Your Honor.

25

CROSS-EXAMINATION

BY MS. CAMPBELL:

Q.  Good afternoon, Mr. Dorr.

A.  Good afternoon.

Q.  My name is Angela Campbell.  I don't believe we've met.  I
represent Jesse Benton.

A.  Okay.

Q.  And I want to go back to Exhibit 7, if you could pull that
up, please.  It's already into evidence.

        And, sir, when you sent this memo, did you have Kent
Sorenson's authorization?

A.  Yes, I did.

Q.  You later stated you didn't in your e-mail, but you actually
talked to him before you sent this, right?

A.  We discussed the details of the proposal, yes.

Q.  And Kent Sorenson was on board with the details?

A.  Yes, he was.

Q.  Because you wouldn't make an offer on behalf of a sitting
state senator without their approval, would you?

A.  Correct.

Q.  And the numbers that are in the memo, who came up with those
numbers?

A.  Which numbers in particular?  The salary amounts; is that
what you're --

Q.  Any number.  Let's start with the salary amount.  Who came

1  up with that?

2  A.   Kent Sorenson told me what he was being paid by the Michelle

3  Bachmann Campaign.

4  Q.   And how about the hundred thousand dollars, who came up with

5  that?

6  A.   No, that was my idea.

7  Q.   Do you have any idea what the regulations are regarding a

8  candidate committee giving money to a PAC?

9  A.   No, I do not.

10  Q.   Do you have any idea what the limit is for how much a

11  candidate committee could pay to a PAC?

12  A.   No, I do not.

13  Q.   Sitting here today, do you know whether or not your proposal

14  for a hundred thousand dollars from a candidate committee to a

15  PAC would have violated the rules?

16  A.   No, I do not.

17  Q.   And you got a response -- can you blow out that PAC section,

18  Exhibit 7, please.

19       And this PAC section here, you still today don't know

20  whether or not that's okay, right?

21  A.   Correct.

22  Q.   You asked Mr. Benton to let you know which part of the memo

23  was illegal; is that right?

24  A.   Yes, I did.

25  Q.   Did he ever tell you?

1    A.   No.

2    Q.   But he responded only that he would pay the salaries; is

3    that right?

4    A.   Yes.

5    Q.   He didn't even talk about this PAC money?

6    A.   No, he did not.

7    Q.   And there were more parts to this memo.  Let's blow up the

8    Drew Ivers part.  I think it goes over on two different pages.

9         You include a section that requires Kent Sorenson to

10   do -- Drew Ivers to do something for Kent Sorenson in this

11   proposal; is that right?

12   A.   That's correct.

13   Q.   Whose idea was that?

14   A.   Mine.

15   Q.   And who is Drew Ivers?

16   A.   He was involved with the campaign, with the Ron Paul

17   Campaign in 2011.

18   Q.   Okay.  So part of this was that Drew Ivers was going to have

19   to give a glowing exception of Kent Sorenson's Ron Paul

20   endorsement; is that right?

21   A.   That's correct.

22   Q.   What's going on?  I mean, there's something wrong with Drew

23   Ivers, right?

24   A.   Drew Ivers had made some statements about the organization

25   that I worked for myself personally that were very negative in

1   the media, and I wanted that cleared up as part of this

2   agreement.

3   Q.   Okay.   So in order for Kent Sorenson to jump over from

4   Bachmann over to Ron Paul, Drew Ivers was going to have to

5   apologize for attacking your position?

6   A.   That's correct.

7   Q.   Whose idea was that?

8   A.   Mine.

9   Q.   And did Kent Sorenson approve it?

10  A.   I don't know if he actually saw that or not.   I can't answer

11  that question.

12  Q.   Do you know if you discussed it with him before you sent the

13  proposal as part of his jumping ship?

14  A.   I don't recall.

15  Q.   Also, there appeared to be some restrictions on what Kent

16  Sorenson would be willing to say about Ron Paul; is that right?

17  A.   If I could reflect on the document, it would be easier to

18  answer that question.

19  Q.   Sure.   Could you pull that part up?   I think it's paragraph

20  3.

21          Yeah, there we go.

22  A.   Yes.

23  Q.   Okay.   And so as part of this, you were saying that Kent

24  Sorenson had to mildly disagree with the presidential campaign

25  that he was going to be working for; is that right?

1   A.   That's correct.

2   Q.   Now, when you got Jesse -- you didn't e-mail to Jesse

3   Benton, did you?

4   A.   No, I did not.

5   Q.   But you got a response from Jesse Benton?

6   A.   Yes, I did.

7   Q.   And did that part alert you?

8   A.   The response, yes.

9   Q.   And it was coming from the chairman of the campaign, right?

10  A.   I wasn't sure what his title was, but I knew he was one of

11  the top guys in the campaign, yes, ma'am.

12  Q.   Okay.  And it was a no?

13  A.   Yes.

14  Q.   Right?  There was never any negotiation about, oh, a hundred

15  thousand dollars is too much, let's do 25,000?

16  A.   That wasn't discussed.

17  Q.   And there wasn't any talk about let's pay him up front some

18  cash, was there?

19  A.   In that e-mail, no, there was nothing to that effect at all,

20  no.

21  Q.   And in any subsequent e-mail?

22  A.   No.

23  Q.   And 25,000 isn't even mentioned in this, is it?

24  A.   No, it's not.

25  Q.   Now, you talk about your dad in there?

1  A.  I referenced him, yes.

2  Q.  You actually go and talk to your dad about this, right?

3  A.  I did.

4  Q.  And it wasn't just you, he wanted you out of this, didn't

5  he?

6  A.  Yes.

7  Q.  Do you know if he knows -- only answer if you know.  Do you

8  know if he knows the regulations about PAC money?

9  A.  I don't know the answer to that question.

10 Q.  How long had you been working with getting Kent Sorenson

11 over to the Ron Paul Campaign?

12 A.  How long had I been doing it?

13 Q.  Talking about it.  You said you wanted these people to get

14 on the train together for quite awhile.

15 A.  I e-mailed them again in October and the last e-mail I

16 believe the date was November 14, so not a long period of time.

17 Q.  Not before then?

18 A.  There was a time I had been drafting that document before

19 the e-mail was sent, yes.

20 Q.  How about February of 2011, were you involved at all at that

21 point?

22 A.  I don't recall.

23 Q.  You don't recall whether or not you were involved with Kent

24 Sorenson wanting to be on the Ron Paul Campaign in February of

25 2011?

1   A.   I think he was still involved with the Legislature at that

2   time of the year.   I don't think he was on any campaign at that

3   time.   Now, I would have to see whether he was aware of any

4   conversations about what campaigns to be beyond the February

5   2011 time frame.

6   Q.   Okay.   You knew he was getting paid by Michelle Bachmann,

7   right?

8   A.   I knew he told me he was being paid by Michelle Bachmann,

9   yes, but I don't think it was during February of 2011, just to

10  be clear.

11  Q.   Do you know when you found that out?

12  A.   I think when I was putting this document together is when he

13  gave me that number.

14  Q.   And when you responded -- let's pull up your response, which

15  I believe is 13 already in evidence.

16           You say -- let's do the paragraph about I alone

17  initiated this communication.

18           That's not really true, is it?

19  A.   What I mean by that to be clear is that I proposed, I made

20  the proposal.   I drafted the document in question.

21  Q.   Okay.   But you talked to Kent Sorenson?

22  A.   Yes.   I got a dollar amount from Kent Sorenson in

23  particular.

24  Q.   And you were proposing it for Kent Sorenson, right?

25  A.   I'm not sure that's a fair question.   I know I was not doing

1  it for him.  I was doing it in conjunction with the numbers he

2  gave me during the campaign.

3  Q.  Why doesn't he just do it?

4  A.  I don't know how to answer your question.

5  Q.  Okay.  But you do it to get -- not to get yourself paid,

6  right?

7  A.  That's correct.

8  Q.  But to get him paid?

9  A.  That was part of it, yes, ma'am.

10         MS. CAMPBELL:  I don't have anything further, Your

11  Honor.

12         THE COURT:  Mr. Warrington.

13         MR. WARRINGTON:  Please, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. WARRINGTON:

16  Q.  Good afternoon, Mr. Dorr.

17  A.  Good afternoon.

18  Q.  Your brother, Chris, never did get a job with the Ron Paul

19  Campaign paying him $5,000 a month, did he?

20  A.  He did no, no.

21  Q.  The government admitted four exhibits, Government's

22  Exhibit 7, Government's Exhibit 10, Government's Exhibit 13 and

23  Government's Exhibit 23, those e-mails that you read with

24  Mr. Pilger.

25  A.  Yes.

1   Q.  Do you recall that?  None of those e-mails talks about

2   hiding anything from the FEC, does it?

3   A.  No.

4           MR. WARRINGTON:  Nothing further, Your Honor.

5           THE COURT:  Mr. Binnall, any questions?

6           MR. BINNALL:  Very briefly.

7                        CROSS-EXAMINATION

8   BY MR. BINNALL:

9   Q.  Good afternoon, Mr. Dorr.

10  A.  Hi.

11  Q.  Mr. Dorr, shortly before Mr. Sorenson switched his

12  endorsement to Dr. Paul, you had a conference call on which

13  Mr. Sorenson was on, correct?

14  A.  Yes, that's correct.

15  Q.  And that was about the idea of Mr. Sorenson possibly

16  switching his support to Dr. Paul, correct?

17  A.  Yes, it was.

18  Q.  And you were on that call?

19  A.  I was.

20  Q.  Mr. Sorenson was on that call?

21  A.  He was.

22  Q.  Dimitri Kesari was on that call?

23  A.  He was.

24  Q.  Your brother, Christopher Dorr, was on that call?

25  A.  He was.

1   Q.  And your brother, Paul Dorr, was on that call, correct?

2   A.  Yes, he was.

3           MR. BINNALL:  No further questions.

4           THE COURT:  Anything else, Mr. Pilger?

5           MR. PILGER:  Very briefly, Your Honor.

6                    REDIRECT EXAMINATION

7   BY MR. PILGER:

8   Q.  So as we talked about with the e-mails, you came to bow out

9   of the situation between Kent Sorenson and the Ron Paul

10  Campaign, right?

11  A.  I did.

12  Q.  And what month was that?

13  A.  November.

14  Q.  So having bowed out, if $25,000 came up later, would you

15  have any way of knowing?

16  A.  No, I would not.

17  Q.  And, lastly, Ms. Campbell made a point of talking to you at

18  some length about some -- whether you were aware of some legal

19  restriction on whether an authorized campaign committee could

20  give money to something like the 501C4 you were talking about.

21          Do you recall that?

22  A.  I assume she was referring to the PAC; but, yes, I recall

23  the conversation, yes.

24  Q.  And the PAC was to be a 501C4, right?

25  A.  No.  The PAC was an entity and then later on there was going

1  to be a 501C4.

2  Q.  Okay.  And the PAC, was that an issue advocacy PAC or was

3  that a PAC associated as the authorized committee of a campaign?

4        MR. WARRINGTON:  Objection.

5        THE COURT:  No.  Answer the question.

6  A.  The PAC was separate from both the intended C4 and any of

7  the candidate's committees that were involved in this situation.

8  BY MR. PILGER:

9  Q.  Fair enough.  The PAC that you wanted money for, was it an

10  issue advocacy PAC?

11  A.  Insofar as PACs can be.  It's my understanding that the

12  501C4s do the issue advocacy that PACs are authorized to do,

13  things like direct endorsements and give money, contributions to

14  candidates.

15  Q.  And was that PAC giving hard money contributions to

16  candidates on the federal level?

17  A.  No.

18  Q.  Okay.  So when Ms. Campbell talks about there being a legal

19  restriction on that hundred thousand dollars, you said you

20  weren't aware of whether that was legal or not, right?

21  A.  Correct.

22  Q.  And so if she is suggesting that it was somehow illegal, you

23  have no way to assess that, do you?

24  A.  Correct.

25        MR. PILGER:  I have no further questions.

1          THE COURT:  He just said he didn't know.  Do you have

2   any questions?

3          MS. CAMPBELL:  No.

4          THE COURT:  Do you?

5          MR. WARRINGTON:  No, Your Honor.

6          THE COURT:  Thank you.  You're excused.

7                                (Witness excused.)

8          THE COURT:  We're going to call it quits.  We're going

9   to stop a little early today.  We usually go to 5:00.

10  Especially if it's like this and we're trying to get somebody

11  off the witness stand, sometimes we'll even go to 5:10 or

12  something like that.

13         Come right at 9:00 -- ready to go at 9:00 in the

14  morning, and then I promise we'll go as quickly by 5:00 as

15  possible.  We have a lot of work to do, and I want to keep you

16  working all day.

17         All right.  So you're going to go home today and

18  you're going to tell your friends and family that you're on a

19  federal election matter in federal court, and the more you tell

20  them, the more they're going to probably be inclined to tell you

21  something you don't need to know.  So cut that off as quick as

22  possible and tell them that when the trial ends you'll tell them

23  everything they want to know.  But the more you talk to people

24  about this, the more likely it is you're going to get that kind

25  of outside information that we don't want.  And let me just tell

1  you point-blank, the only thing that I'm really aware of that

2  can impeach the integrity of a jury's verdict is if outside

3  influences, outside information that's not, you know, elicited

4  in the context of the confines of the court, it's when that

5  information is brought to bear on the jury that the integrity of

6  a verdict can be impeached.

7          So we don't want to go this long and have a problem

8  with people getting outside information.  So that's the long

9  story about why it is so very important not to do research, not

10 to call your cousin who's a campaign manager or anything like

11 that during the course of the trial.

12         Leave your notes and your copy of the instructions on

13 your chair.  I promise no one will read those.  But here is why

14 we have you leave them here.  Sometimes when they go home, they

15 get in the hands of people that don't need to see them and

16 sometimes you forget to bring them back to court.  So that's why

17 we ask you to leave them here.  I promise no one will read them.

18         Do not read any newspaper account.  Do not listen to

19 any radio or television broadcast that might be published about

20 this case.

21         Keep an open mind.  Wait until you hear all of the

22 evidence and the arguments and my instructions before even

23 beginning to decide who should win this case.

24         Thank you.

25         I excuse you now.  We'll be ready to go for you at

1  9 o'clock tomorrow morning.

2             See you.  Good night.

3             (In open court, out of the presence of the jury.)

4             THE COURT:  Please be seated.

5             Two things that we should visit about briefly before

6  we leave tonight.  First is that immediately prior to the

7  exercise of the peremptory challenges, I had a side-bar without

8  the presence of the court reporter.  I did that because I just

9  didn't believe we were going to get a challenge for cause.  I

10 thought that the responses were pretty benign.  I thought also

11 that the only matter to discuss at the side-bar is whether to

12 take a chance on the juror who had a May 4th medical

13 appointment, but at that conference Mr. Binnall challenged

14 Pauline Grubb, juror No. 15, for cause saying that her response

15 about the regulation of elections was directly on point with the

16 focal point of the trial.  I denied that challenge for cause.

17 She was -- a peremptory challenge was used to strike her.

18            Do you have any other record you want to make on that,

19 Mr. Binnall?

20            MR. BINNALL:  No, Your Honor.

21            THE COURT:  And then you had a matter you wanted to

22 take up before the end of the day?

23            MR. BINNALL:  Yes, Your Honor.

24            MR. WARRINGTON:  Your Honor, we also have a couple of

25 matters.

1          THE COURT:  Okay.

2          MR. BINNALL:  Your Honor, this one is a first for me.

3   Very recently I found out that some information was produced to

4   a co-defendant by the government to Mr. Benton in the form of a

5   CD.  I confirmed this morning that CD produced by the

6   government was unredacted text message communications between

7   myself and my client, information that's protected by the

8   attorney-client privilege and that was promised to me by the

9   government when I made the initial production would be redacted,

10  and that the trial team of the government would never see that,

11  not to mention our co-defendants shouldn't see it either.

12          My client's Sixth Amendment right to counsel has been

13  severely, severely degraded through all of this.  I'm moving for

14  dismissal of all the counts in the current indictment, and since

15  the government obviously had these unredacted messages in the

16  first trial that his conviction on the first one also be

17  redacted (sic) because there's no fixing this.  They had my

18  attorney-client communications basically, from what I've been

19  able to tell so far, all of my text message conversations with

20  my client all through 2013 and I think going into the beginning

21  of 2014.

22          This is very serious, Your Honor.  I've never had this

23  happen before.  I plan on making a written motion as well

24  depending on how the court wants me to go about this.  I wanted

25  to bring this to the court's attention as quickly as we could

1   have a moment outside the jury.  Obviously, I'm quite upset that

2   this happened.

3           THE COURT:  How did we get them?  Was it a subpoena

4   for text messages or what?

5           MR. BINNALL:  No, Your Honor.  They -- we voluntarily

6   produced in this case Mr. Kesari's phone and computer under the

7   understanding, and whether or not there was an agreement that

8   they use a taint team or not is -- they should have used a taint

9   team, and this is why you use a taint team; but they would not

10  look at and go through the process within the Department of

11  Justice to redact privileged communications between myself and

12  my client, not to mention other privileged communications that I

13  haven't even had a chance to look at, other communications.

14  Right now all I know is the attorney-client communications

15  which, of course, means that there's a Sixth Amendment

16  violation.

17          THE COURT:  Mr. Pilger?

18          MR. PILGER:  Mr. Cooney will argue.

19          MR. COONEY:  I'm sorry, would you like me to come to

20  the podium?

21          THE COURT:  You're fine.

22          MR. COONEY:  Actually this is the first that it's

23  being brought to the government's attention, so I'm not sure

24  exactly what it is we're talking about.  So without more

25  information about what was in the production, when it was

1   produced and things like that, I'm not prepared to respond.   But

2   what I can say is this, is that there's a protective order

3   governing discovery in this case, and one of the purposes of the

4   protective order, explicit purposes was to protect against

5   invasions of the privileges of any of these defendants with

6   respect to potentially attorney-client privileged

7   communications, and that is why the government insisted that

8   materials should not leave the possession of attorneys at any

9   time during the course of the case, and once the defendants

10  agreed not to assert any claims against privilege, we relented

11  on that and a revised protective order was put in a few weeks

12  ago.

13          So that's by way of background.  So to say with

14  respect to specific information and whatnot and the allegations

15  that Mr. Binnall has made and where they come from, I'm not

16  prepared to discuss the discovery, but I don't know what we're

17  talking about.

18          THE COURT:  The record is wholly inadequate for me to

19  make any sort of ruling at this point.  We'll make a record on

20  what was produced and how it was produced and go from there.

21          Mr. Warrington.

22          MR. BINNALL:  Your Honor, I think probably the best

23  way for me to do this as far as -- I obviously don't want to

24  broadcast these communications anymore.  I want to make it clear

25  we're not waiving anything.  I want to make it clear that we

1   want no one else to look at these communications that were

2   produced, and I would like to be able to make the production in

3   camera.

4           THE COURT:  Yes, I think that in camera production is

5   the right way to go.

6           Mr. Warrington.

7           MR. WARRINGTON:  Your Honor, I wasn't actually going

8   to address this, but since Mr. Cooney brought this up, he made a

9   representation to the court that I believe is just factually

10  inaccurate, maybe because Mr. Cooney wasn't involved in this

11  case since the beginning.  But there was a protective order in

12  this case that Judge Adams entered.  The reason that our clients

13  were not allowed to have access to certain material in this

14  case -- and there was a motion about this -- was because the

15  government believed that they were a bunch of leakers and they

16  were afraid that this information was going to get out to the

17  public by the purposeful acts of the defendants, okay.  We

18  thought that was nonsense, but Judge Adams issued an order that

19  said our clients couldn't look at certain documents outside of

20  our offices.

21          Now, Mr. Benton at the time was represented by

22  Mr. Howard.  Mr. Benton lives in Kentucky.  Mr. Howard was in

23  Washington, D.C.  I'm in Alexandria, Virginia.  Mr. Tate is in

24  Warrenton, Virginia, which is about 45 minutes to an hour away.

25  Mr. Kesari lives in Hamilton.  Mr. Binnall practices in

1   Alexandria, Virginia.  It's also about an hour away.  So it was

2   an extremely difficult thing to manage in our defense of our

3   clients.

4         This issue about a privilege waiver about this

5   information amongst the defendants was never raised when that

6   was argued.  That issue came up when we -- after the second

7   indictment was handed down, we raised the issue that, look, this

8   is burdensome, but there's already been a full trial on this

9   matter.  All of this information is in the public record.  A lot

10  of this stuff is filed on Pacer.  There's been news coverage

11  about it.

12        So we didn't think that the burden should be on our

13  clients again of not being able to review this information

14  outside of counsel's office, and the government came up with

15  this new theory that the reason they really wanted the

16  protective order before was so that the government wouldn't be

17  held responsible for any waiver of the privilege.  The

18  government wanted it itself not to be held for any waiver of the

19  privilege.

20        When the defense counsel got together and said, well,

21  we don't have a problem amongst ourselves, but we're not going

22  to waive -- if the government violates our privilege, we're not

23  waiving that.  So when Mr. Cooney stands up and says a

24  protective order governs that and this was a concern about the

25  protective order since it began, that's just flat wrong and,

1  frankly, I'm offended by this.

2           Since we've been involved in this case, as the court

3  knows, there's been tons of issues with our clients having their

4  rights trampled on by this prosecution team, and I'm not going

5  to sit here and just let this misrepresentation be made to the

6  court.  So that's what I have to say on that.

7           I'm also going to renew or ask for reconsideration on

8  our motion to dismiss.  Based on the court's ruling how the law

9  in this case is stated by the court, the overt acts that were

10  read to the jury don't conform to the law in this case.  If you

11  read the overt acts from the indictment, the overt acts give the

12  impression that paying Mr. -- paying ICT to ultimately pay

13  Mr. Sorenson, that in and of itself is a criminal act.  That's

14  inconsistent with the court's ruling in the motion to dismiss as

15  to what the government will be allowed to argue is illegal.  And

16  I think that improperly prejudices the jury because those overt

17  acts that haven't been changed, with the exception of the

18  February 7th allegation against Mr. Tate, just got read to the

19  jury.

20           THE COURT:  Overt acts are overt acts.  They don't

21  have to be crimes.  The jury will get instructions on what

22  becomes criminal later.

23           MR. WARRINGTON:  But I think, Your Honor, the way it's

24  set up, with the way it's being read to the jury, that's going

25  to be a conflict with what you've said the law in this case is.

1          THE COURT:  Okay.

2          MR. WARRINGTON:  And so I would move that we would --

3    that you would reconsider our motion to dismiss, and I would

4    also ask you to consider the Boustany matter under review and

5    the Ready for Hillary matter under review which we submitted as

6    supplemental authority.  And I'm not sure if you've had a chance

7    to read that.  The Boustany case is squarely on all fours with

8    the factual allegations in this case, and the Federal Election

9    Commission said no violation of the specific statute at issue

10   here under facts that are materially indistinguishable from the

11   facts in the Boustany matter, that they're materially

12   indistinguishable.  What was alleged there is that the

13   Republican Congressmen's Committee needed some help from a

14   Democratic party organization, a company called Ballot Access

15   PAC, and, of course, a Republican doesn't want anybody to know

16   that they're in cahoots with the Democratic Party organization.

17   So they paid another party who in turn paid Ballot Access PAC.

18   The allegation against the Boustany committee was that it used

19   this conduit arrangement to hide the ultimate payee, which was

20   Ballot Access, and that they were, in fact, ultimately paying

21   for Ballot Access's endorsement and for other things, okay,

22   which is exactly what the allegations are against these three

23   defendants here or at least this payment arrangement, and

24   reporting it as get out to vote work rather than mailers or

25   endorsement or some other thing.  And the FEC said no violation.

1          If the FEC can't find a violation of a civil matter on

2   those facts, I think it's clear from the case law that we cited

3   in our supplemental authority that there can't be criminal

4   violations appended with these facts.  So we would ask the court

5   to look at the Boustany matter, look also at the Ready for

6   Hillary matter because Commissioner Goodman's statement of

7   reasons why they found no violation in the Ready for Hillary

8   case I think really is on point where it says what the

9   commissioners that disagreed and wanted to find the violation

10  were trying to do was to graft on the statute that the court

11  recognized in Russell is very -- doesn't have all of the dicta

12  that was attributed to it before; that the statute in Russell

13  only goes so far.  And Commissioner Goodman was saying that

14  those commissioners who had voted for finding a violation were

15  trying to graft on a burden to the statute that actually is not

16  there.

17          And I think that is exactly what we're doing sitting

18  in this courtroom today, listening to testimony with these three

19  gentlemen at criminal jeopardy here based on at best an agency

20  gloss to a statute, and an agency gloss, the Citizens for

21  Responsibility on Ethics in Washington case that we cited in our

22  supplemental authority said that an agency gloss isn't law; it's

23  policy, and it can just as easy be changed as policy by the next

24  agency gloss.  So if you have a gloss that changes the policy

25  which is not the law and it can change and change and change,

1   there's no way a defendant could have fair notice of what's

2   prohibited.  And I think the court can just look at the matters

3   under review that we've cited since the first motion to dismiss

4   in this case and see that the law in this area doesn't prohibit

5   the conduct that's alleged here, and we would ask the court to

6   reconsider that.

7          The final thing I would also like the court to

8   reconsider, Mr. Pilger in his opening statement argued or stated

9   to the jury that the purpose of the FEC was to let the public

10  see what campaign spending -- what campaigns are spending their

11  money on.  He's talking to the jury about the purpose of the

12  FEC.  We would ask if we want to get in the purpose of what the

13  FEC does, the purpose of the law, then I think Mr. Mace's

14  testimony as a former two-time chairman of the commission is

15  pertinently relevant to that and would help educate the jury as

16  to what the actual law is.

17         THE COURT:  Thank you.

18         So it's been the government's theory from day one that

19  the false statement in this case to the FEC is the statement

20  that payments were made to ICT for audiovisual services when, in

21  fact, payments were made to Kent Sorenson to switch his

22  endorsement from Michelle Bachmann to Ron Paul.

23         When the government attempts to parse out -- or it's

24  the defendants that are attempting to parse out the two and

25  separate the two, but the government also in this case continues

1  to contend that each are separate violations, meaning the

2  identity of the payee and the purpose for the payee --

3          MR. WARRINGTON:  Your Honor, I'm sorry, I left the

4  podium.  Do you want me up there for questions?

5          THE COURT:  No.  I'm done for the day.  Thanks.

6          So the extent to which the government parses it out,

7  it makes it more difficult because then we have to get into this

8  issue about umbrella companies and paying sub vendors and that

9  sort of thing.  I intend to give an instruction on the mere fact

10  of an umbrella company or paying sub vendors alone is

11  insufficient to violate the law.

12          But, at its core, that position that the government

13  has taken that the false statement was there was a payment to

14  ICT for audiovisual services and not a payment to Kent Sorenson

15  for switching his endorsement is sufficient to cause the matter

16  to go to trial.  An indictment legally returned by a legally

17  constituted grand jury sufficient on its face is enough to call

18  for a trial on the merits.

19          The motion to dismiss is denied.

20          We'll make a further record on the production, but I

21  just don't know when it was produced, I don't know who got what,

22  I haven't seen it.  So I just can't do it on this kind of

23  record.

24          MR. BINNALL:  I understand that, Your Honor.

25          MS. CAMPBELL:  I'll be 30 seconds.  I still have a

1  pending motion to quash because the government subpoenaed my

2  expert witness to appear this morning, and he sat for an

3  hour-and-a-half before they said he could leave.

4          THE COURT:  He's in town here, isn't he?

5          MS. CAMPBELL:  Yes.

6          THE COURT:  We'll get to that if he gets to testify.

7  To me, I haven't seen the government's resistance yet.  That's

8  the problem.

9          MS. CAMPBELL:  The motion to quash?

10         THE COURT:  Well, no.  Or is it your resistance to

11 their motion relating to his testimony?  It just looked like the

12 exact same thing I just said no to a month ago.

13         MS. CAMPBELL:  I filed a -- they subpoenaed him, and I

14 filed a motion to quash the subpoena because it's not allowable

15 under the rules to subpoena --

16         THE COURT:  He was identified as an expert, and he as

17 an expert, if he's going to be an expert, they want the

18 information about his relationship to Kent Sorenson.  So we've

19 got motions going both ways.

20         MR. PILGER:  That's right, Your Honor.  If you decide

21 the first motion in our favor, then the second motion is moot.

22         THE COURT:  Right.

23         MS. CAMPBELL:  I don't think it is.  The rules don't

24 allow for them to issue subpoenas for personal appearance of an

25 unretained expert, of my expert.

1              THE COURT:  Let's get to the issue first of whether

2    this is more of the same and then deal with the second question

3    if he's permitted to testify.

4              MS. CAMPBELL:  Okay.

5              THE COURT:  Thanks.

6              We'll gather every morning at 8:30, those of you who

7    weren't in the first one, but you know the drill here, 8:30.

8    Tell Ms. Walling that you have matters to bring up.  You see

9    that, you know, we can handle most of the things that are likely

10   to happen during the day at that moment.  It also gives me time

11   to think about it before they happen so I have time to review

12   the documents or the videos.  So let her know at 8:30 tomorrow

13   morning if you need me.

14              Thank you.

15              (Recess at 5:10 p.m., until 8:30 a.m., Wednesday,

16   April 27, 2016.)

17

18

19

20

21

22

23

24

25