IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :      Criminal No. 4:15-103
                           :
     vs.                   :
                           :
JESSE R. BENTON,           :      TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and   :           VOLUME VI
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X



                              Second Floor Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Tuesday, May 3, 2016
                              8:30 a.m.



BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.



                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                     Room 189, U.S. Courthouse
                      123 East Walnut Street
                      Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                JOSEPH P. COONEY, ESQ.
                                  RICHARD C. PILGER, ESQ.
                                  Public Integrity Section
                                  Criminal Division
                                  U.S. Department of Justice
                                  1400 New York Avenue NW
                                  Suite 12100
                                  Washington, D.C.  20005

For Defendant Benton:             ANGELA L. CAMPBELL, JR., ESQ.
                                  Dickey & Campbell Law Firm
                                  301 East Walnut, Suite 1
                                  Des Moines, Iowa  50309

For Defendant Tate:               DAVID A. WARRINGTON, ESQ.
                                  LAURIN H. MILLS, ESQ.
                                  LeClair Ryan
                                  2318 Mill Road, Suite 1100
                                  Alexandria, Virginia  22314

For Defendant Kesari:             JESSE R. BINNALL, ESQ.
                                  Harvey & Binnall
                                  717 King Street
                                  Suite 300
                                  Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For the Government:** | | | | |
| Spencer Brooks (Resumed) | 1190 | 1193 Campbell 1201 Mills | 1204 | |
| **For Defendant Tate:** | | | | |
| David Polansky | 1208 | 129 | | |
| Andrew Parrish | 1221 | 1230 | 1234 | |
| **For Defendant Benton:** | | | | |
| Tonya Hester | 1235 | 1249 | 1256 | |
| John Baeza | 1258 Campbell 1265 Warrington | 1269 | 1279 Campbell 1279 Warrington | |
| **For Defendant Kesari:** | | | | |
| Nikolas Spanos | 1281 | 1285 Campbell 1288 Cooney | | |

I N D E X

| GOVERNMENT EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|

DEFENDANTS' EXHIBIT NUMBERS:

| | OFFERED | RECEIVED |
|---|---|---|
| B1 - Hester calendar of travel schedule | 1238 | 1238 |
| D4 - 6/21/15 Kesari/Spanos e-mail | 1284 | 1284 |
| T34 - Bachmann certificate of incorporation | 1212 | 1212 |

```
1              P R O C E E D I N G S

2              (In open court, out of the presence of the jury.)

3              THE COURT:  Please be seated.

4              There's some matters you wished to take up this

5  morning?

6              MR. PILGER:  So for the government there's one short

7  matter and one potentially longer.

8              In the instructions I think there's just a typo in the

9  objects of the conspiracy.  There's an "and" instead of an "or"

10 between the second and third object.

11             THE COURT:  All right.  Well, hold it, hold it.  In

12 the elements in the indictment it's supposed to be "and," but in

13 the elements it should be "or."

14             MR. WARRINGTON:  What is this, Your Honor?

15             MS. CAMPBELL:  I don't know that --

16             MR. BINNALL:  I believe if you actually look at the

17 sentence before it gets to the elements, it makes it clear that

18 it's in the disjunctive.

19             MR. PILGER:  I'm not sure we're all on the same page,

20 Your Honor.  Maybe I wasn't clear.  In the instructions laying

21 out what the government has to prove on the conspiracy, it's

22 disjunctive as to the objects.

23             THE COURT:  Yeah.  Bottom of the first page of

24 instruction 5, element 1 has three objects, and between two and

25 three it says "and," it should say "or."  That's pleaded in the
```

1    conjunctive, proof in the disjunctive.

2            And then while we're there, I found one little

3    problem -- not problem, but issue.  In the first element it says

4    "reached an agreement or came to an understanding."  That's the

5    classic language, and the further instructions about what an

6    agreement is also refer to an understanding.

7            All right.  What's your next thing?

8            MR. COONEY:  Sometime today we expect in the defense

9    case, I anticipate that Mr. Kesari is going to call Craig

10   Robinson, a publisher from the Iowa Republican, and my

11   understanding is he's going to authenticate articles from the

12   Iowa Republican web site, and I'm told that the articles are not

13   being offered for the truth of the matter asserted.  I don't

14   know what the purpose is, and I want to just flag this in

15   advance because we're going to be objecting if he's going to be

16   reading articles, and it just seems like this is the type of

17   thing we might want to take up outside the presence of the jury

18   because I don't know which articles are going to be introduced

19   and exactly for what purpose.

20           THE COURT:  Do I have copies of them?

21           MR. BINNALL:  Um, we can get those.  I don't have them

22   with me exactly right now, Your Honor.  I think this is probably

23   a nonissue.  The only purpose for any of these articles is to

24   set time frames, and I don't want any of the real text of the

25   articles coming in other than what's absolutely necessary to set

1    time frames.  So I can get the court -- Mr. Robinson will not be

2    here until after lunch, and I can get the court, if we do end up

3    calling him to put on any of this evidence as far as time lines,

4    anything that we will be putting in.

5                THE COURT:  Okay.

6                MR. BINNALL:  But we certainly don't offer anything

7    for the truth of the matter asserted.

8                THE COURT:  Other matters?

9                All right.  So --

10               MR. BINNALL:  Just real quickly as far as housekeeping

11   for the court.  The witness that we were planning to call in the

12   morning had flight trouble due to the weather on the East Coast

13   last night, so he's getting in a little later in the morning.  I

14   anticipate all of our witnesses now for Mr. Kesari are after

15   lunch.

16               THE COURT:  Do you have witnesses planned this

17   morning?

18               MS. CAMPBELL:  Yes, Your Honor.  I have two of them

19   here.

20               THE COURT:  Mr. Warrington?

21               MR. WARRINGTON:  We have one this morning and one a

22   little bit later.  I believe he's coming in at 11:00.

23               MR. MILLS:  I believe his was a late flight.

24               MR. BINNALL:  There was a lot of weather last night.

25               THE COURT:  Good.  I don't want to get out and have

1   four minutes of cross-examination and then take another half

2   hour out.  Would you please make your judgment for motion of

3   acquittal now, and you can supplement it later if you wish.

4           MS. CAMPBELL:  Yes, Your Honor.  Your Honor, we

5   actually did a written motion for judgment of acquittal.

6           THE COURT:  Thank you.

7           MS. CAMPBELL:  And we will be filing it.  I didn't

8   want to file it until the court wanted it.  Gary Dickey will

9   file it as soon as I text him a message to do it.  First off,

10  could I grab it real quick?  I didn't know we were doing it.

11          Perhaps if Mr. Tate is ready to go, we can follow-up.

12          MR. PILGER:  While that's happening, Your Honor, I

13  just want to alert you Special Agent Brooks, we talked about the

14  four text messages which we were all focused on at the end of

15  the day.  He does have one more phone record to do.  I doubt it

16  would affect these proceedings right now.  It's a phone record

17  of conversations on December 29th.  The government's proffer is

18  it would show --

19          THE COURT:  I read these text messages last night.  Do

20  you really think these four text messages are worth it in light

21  of the baggage that they potentially carry?

22          MR. PILGER:  One moment, Your Honor.

23          (Counsel conferring.)

24          THE COURT:  I don't even have the ability to rule on

25  Ms. Campbell's motion because I just don't have the information

1  presented to me to rule on that, and I just -- I looked at them

2  and I thought, who really cares at the end of this day on a

3  false reports case whether these defendants or any part of them

4  caused Kent Sorenson to resign?

5       MR. PILGER:  Respectfully, Your Honor, the text

6  messages are corroboration of Mr. Sorenson as to the

7  backtracking trip and trying to get that check from him and

8  being focused on him as a political matter rather than anything

9  else.  And the phone records I'm talking about are -- it's one

10  page of phone records.  It will take about a minute of testimony

11  from December 29, 2011, and it shows Dimitri Kesari in contact

12  with defendants Tate and Benton on the 29th in the morning

13  corroborating Mr. Sorenson.

14       THE COURT:  Yeah, that one doesn't mean anything to

15  me.  I'm just talking about texts.

16       Go ahead, Ms. Campbell.

17       MS. CAMPBELL:  Yes, Your Honor.  We would make a

18  motion for acquittal on each ground.  We will supplement it by a

19  written motion.

20       First off, Your Honor, as for each count, they're

21  going to have to show that there was the fact that the FEC

22  reports were actually false.  So for each count they have to

23  show something was false.  First off, as a matter of law,

24  they're not false.  The payments actually were paid to ICT.

25       As the court knows, there is nothing illegal about

1  paying through a vendor or sub vendor, nothing illegal about

2  paying through a paymaster and certainly nothing that has shown

3  that Mr. Benton knew that it was illegal to pay through the

4  paymaster; in fact, quite the opposite.

5          Also they're talking about the purpose of the payment.

6  The purpose of the payments were audiovisual.  Mr. Sorenson has

7  testified that the only work he did was not consulting as the

8  government would imply, but was making robo calls to

9  constituents, which is audio, making television statements and

10  making e-mail blasts, which are visual, and so they are all

11  technically true.  The FEC reports are all technically true.

12          So, as a matter of law, each of the counts have to be

13  entered -- have to be found to be not guilty.

14          Also, Your Honor, the statements themselves have to be

15  material for each count, and I incorporate for both the

16  conspiracy counts and for each of the substantive counts.  There

17  has to be some sort of evidence of materiality.  And, in fact,

18  we don't have any evidence of materiality anywhere in the

19  record.  We don't have evidence that the FEC would have done

20  something differently.  We don't have any evidence that they

21  would have published them, not published them, removed them.  We

22  have no evidence of that at all.  And, in fact, we have no

23  evidence that the FEC -- that these statements even met the

24  threshold, the secret threshold that is required for the FEC to

25  be taking any action whatsoever.

1    So we're lacking completely on materiality.  We're

2  also lacking on Mr. Benton has to know that they're material.

3  He has to be trying to cause the agency to do something.  He has

4  to be trying to create some sort of false entry in the FEC

5  record.  And we just -- frankly, we wouldn't be able to know

6  whether or not the FEC would be taking any action on them

7  because the standards are secret.

8    Finally, Your Honor, there's no evidence that

9  Mr. Benton reached an agreement with anybody, that he caused

10  these records independently himself.  He -- actually the

11  evidence shows the opposite, that he was not in agreement to

12  cause false FEC records.  The government relies solely on the

13  testimony of Kent Sorenson, which I would submit to the court

14  this is one of those rare instances where you can throw out an

15  entire person's testimony as a matter of law as being completely

16  unreliable.  Also it relies on Mr. Benton sending one message,

17  "yo handle," regarding whether or not to pay Mr. Sorenson in

18  February of 2012, which has nothing to do with ICT, nothing to

19  do with structuring the payments of ICT.  There's no evidence

20  that he knew Mr. Kesari had set up the payment structure through

21  ICT.  At this point when he said you handle, in fact the

22  evidence shows the opposite, that he would not have known that,

23  that he was not cc'd on those e-mails.  He didn't talk to

24  Mr. Izon or Mr. Kesari, Mr. Pavlo Kesari.  There's absolutely no

25  evidence he would have known about that structure, much less

1   approved it, much less caused it, much less intended to do it to

2   violate a FEC law.

3           Finally, there's just no evidence whatsoever that

4   he -- when he received that 72-page record, the government is

5   making some sort of argument by counting the number of entries,

6   that Mr. Benton would have reviewed it, known that ICT was Kent

7   Sorenson's, known that it was falsely paid, known that it was

8   going to go on the FEC records -- or go to the FEC records that

9   way, all from the 72-page report.

10          That's just a stretch, Your Honor.  There's just no

11  evidence that actually supports at that point in time Mr. Benton

12  would have even known what ICT was, that it was related to Kent

13  Sorenson, that it had been submitted to Deana Watts as an

14  audiovisual expense.  There's just completely lacking in any

15  sort of knowledge or intent to violate the FEC records, Your

16  Honor.

17          And so, for all of those reasons and all of the

18  reasons we would submit in our written motion, we would move for

19  judgment of acquittal on each count.

20          THE COURT:  Thank you.

21          Mr. Mills.

22          MR. MILLS:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. MILLS:  We have three arguments.  The first one is

25  just simply to renew our motion to dismiss.  The charges are

1  insufficient as a matter of law, and I won't say anything more

2  about that.

3          The second is materiality, and we draw the court's

4  attention to United States versus Litvak.  It was cited in our

5  jury instructions communications.  It's from the Second Circuit,

6  December of 2015.  We think the rationale is on all fours in

7  this case and that the burden is on the government to prove

8  materiality.  They have not come remotely close to that.  It has

9  to be material to the FEC.

10          The evidence is that -- well, one, it was like the FEC

11  witness basically took the Fifth on the issue and refused to

12  answer the questions, the most remarkable materiality testimony

13  I've ever seen, but there's --

14          THE COURT:  Hold it, hold it.  You expect, for

15  example, the IRS to come in and say something like, you know,

16  the truth is we just don't care about things under $500, and the

17  reason they don't, that that kind of thing is permitted to be

18  kept secret is so that people won't file claims that are less

19  than $500 fraudulently.  The standards for investigation in any

20  agency are appropriately kept secret because -- for the reason I

21  just identified.

22          MR. MILLS:  I agree with you on something like a

23  dollar threshold as to why that ought to be kept secret, but not

24  when it comes to a label issue.  We don't do secret law in this

25  country, and there's a list of adequate purposes they have, they

1  have a list of inadequate purposes.

2          THE COURT:  Examples of them.

3          MR. MILLS:  Examples of them.  And then we have a

4  secret list that's inside that -- and we don't know what those

5  are or how they react to it.  And, you know, we're going to make

6  the argument to the jury if you don't grant on the materiality

7  issue, how could they possibly decide -- the government has the

8  burden to prove it's material.  They have to put on an FEC

9  witness that says we would do something differently if they had

10  labeled this as something else and the government hasn't even

11  proffered what that something else might be.

12          THE COURT:  Well, because this isn't like a tax return

13  where they will pay out a refund based on what you say.  This is

14  simply a requirement that these expenditures be reported and

15  made available for public inspection.  There isn't anything

16  necessarily to do with them.

17          MR. MILLS:  Well, what they normally do -- and this is

18  in the regulations -- if they don't like the description, they

19  call you up and ask you about it and they ask you to change it,

20  and then they have a discussion with you; but they never did

21  that in this case.  And there's just no -- I don't know how the

22  jury is going to decide this issue because we're going to argue

23  like crazy that the one witness who couldn't put on some

24  evidence about it refused to testify about it.  They haven't

25  come close.  I don't know what their evidence of materiality is.

1   Would it have made a difference in an agency decision?  That's

2   the inquiry, and there's no evidence on that issue, period.  And

3   that's exactly what the Litvak case says.  And the government

4   yesterday tried to say it would be material because it could get

5   referred to prosecution where they made a decision to prosecute.

6   Litvak says that you can't consider that because that would be

7   true in any case; the mere decision to prosecute would make it

8   material, and that's what they attempted to argue to the jury

9   and we're going to ask for an additional jury instruction on

10  that based on Litvak because that is the one thing the court

11  says you can't consider in deciding whether something was

12  material.

13          So there's just zero evidence on it.  It's a failure

14  of proof and we're entitled to judgment as a matter of law

15  because of a failure of proof on a material issue on an

16  essential element of the case.

17          Our last argument is a sufficiency argument.  You

18  know, we started our opening statement, who is it, what is it

19  for, why do we keep paying them.  And that's the words of

20  someone who's supposedly been in a conspiracy for six months.

21  He didn't forget like it was argued in opening statement.  He

22  didn't know in February.  There's no evidence that Mr. Tate had

23  any idea how Kent Sorenson was getting paid, through an

24  intermediary, what the intermediary's name was.  He didn't know

25  anything.

1        The overt act, February 7th overt act that alleges

2   that John Tate approved a payment to ICT is demonstrably false.

3   Agent LoStracco testified that it doesn't say direct approval,

4   doesn't say applied, implied approval, doesn't say tacit

5   approval.  So there's no evidence of approval.  The only

6   evidence is "no idea.  Ask him."  That's not approval of

7   anything.

8        We move to February the 16th.  The invoice has already

9   been paid.  Fernando Cortes mistakenly puts the ICT invoice on

10  list of outstanding bills.  John Tate does not approve it and

11  says, I don't know what it is.  And Cortes never follows up, and

12  the reason is it's already been paid; but he says I don't know

13  what it is.

14       He has a couple of other approvals in April and May

15  when he's been lied to that Jesse has approved.  He's been told

16  Dimitri has approved and Jesse has approved and then he approves

17  on that within minutes of that.  There's no evidence he has any

18  idea what this is, how this is being paid, you know, Kent

19  Sorenson's connection to it.  There's no evidence of any of that.

20       And that takes us to June 25th, and he's asked to

21  approve this payment again in the quotes by Mr. Cortes.  And he

22  says, I don't know what this is, I'll find out.  And then we

23  have the equivocal response where he's told, "This is Jesse's

24  deal with Kent," and he approves it.

25       If you assume he got that message, it doesn't prove

1  anything.  It proves he knows of some connection between Kent

2  Sorenson and a company called Interactive Communication

3  Technology.  It could have been C & M Strategies.  He doesn't

4  know what Kent Sorenson's relationship is with Interactive

5  Communication Technology.  He doesn't know if it's his S Corp.

6  There's no evidence that Mr. Tate has any idea how this is being

7  reported to the FEC, and it just fails the sufficiency threshold

8  on everything.

9         Where is this agreement in this report?  Kent Sorenson

10  testified yesterday, I had the same kind of arrangement with

11  Bachmann, and then in January when I submit my invoice, I try to

12  duplicate it because I need to get around the Senate ethics

13  rules.  Mr. Tate is not involved in that.  The evidence is that

14  Mr. Kesari and Mr. Sorenson come up with this, but there's no

15  evidence that Mr. Benton or Mr. Tate are ever told of that.

16         And then Sonny Izon says yesterday that Mr. Kesari

17  told him that it was necessary because they needed to keep it

18  away from two members of the campaign.  I mean, it was

19  incredible testimony.  And there is nothing connecting Mr. Tate

20  to a scheme to misreport these things.  He doesn't even know

21  what ICT is.  There was no evidence he was ever informed they

22  were going to do this through an intermediary.  He doesn't know

23  Kent Sorenson's connection to ICT.  He's not on notice as to how

24  they're being reported.

25         The only notice the government has, February 22nd

1  Fernando Cortes sends Mr. Tate and Mr. Benton an e-mail with a

2  77-page attachment with over 3,000 entries on it, and one line

3  item says, invoices that were already paid, has Interactive --

4  it doesn't even list the whole name.  It says Interactive Commu

5  at the bottom of one of the pages.  And that's an allegation

6  that the government contends that Tate and Benton caused the

7  misfiling of these FEC reports.  It's a ridiculous contention,

8  Your Honor.  It's ridiculous.  They can't even prove they opened

9  the attachment, much less read it.  They didn't approve anything

10  by merely receiving it in their e-mail box, and that's it.

11  There's no case against John Tate.  The case stinks, it should

12  be dismissed.

13        Thank you.

14        THE COURT:  Thanks.

15        Mr. Binnall.

16        MR. BINNALL:  Thank you, Your Honor.

17        I actually have four different motions to make.  The

18  first is just an official request for Jencks material for the

19  government's witnesses, including Mr. Sorenson.  I think most

20  have been turned over but I'm not sure they all have, so I am

21  requesting the Jencks material at this point.

22        The second is on the rule 29 issue, Your Honor.  I

23  incorporate the arguments of Ms. Campbell and Mr. Mills to the

24  extent that they are appropriate to us, and I think the court at

25  this point is quite aware of our position as to whether or not

1   what this is is a crime even if everything that's alleged is

2   true.  And I, quite frankly, also admit that our factual

3   position as far as sufficiency goes, if the court disagrees with

4   us on whether there was a reporting requirement here, other than

5   what was made, our factual requirement -- or our factual

6   situation is different from defendants Tate and Benton.  But

7   what's the same is the willfulness requirement, and being that

8   the remaining counts against us all require that they prove

9   beyond a reasonable doubt that Mr. Kesari knew that he was

10  violating the law, they failed to introduce evidence there, Your

11  Honor.

12          And as to the law itself and what the court has told

13  us the court's position on what the law is, if you have to

14  report a -- or I'm sorry.  If you don't have to report an

15  umbrella vendor, general contractor, whatever it is that we want

16  to call it, as far as a passthrough goes, but it becomes a

17  problem only because of some purpose, then we get to the

18  position of punishing a mens rea without an act of mens rea, and

19  we think that's a problem here, especially here when we have

20  somewhat of a first of this kind prosecution, as far as we're

21  aware of, Your Honor.

22          And while we were all in here on Wednesday, something

23  remarkable happened in the Supreme Court as far as oral

24  arguments go on a case that is not identical because it's the

25  McDonnell case on services fraud, but still very much analogous.

1   And Justice Breyer said something that was remarkable, and it's

2   very analogous to this.

3          He said when talking about the problems at issue with

4   the on services he says, "Now, why do I think that's a problem?

5   Two very fundamental reasons.  And it's not because I'm in favor

6   of dishonest behavior.  I'm against it.  And we have just listed

7   some that is dishonest.  My problem is the criminal law as a

8   weapon to cure it.  And if the criminal law is the weapon that

9   goes as far as you want, there are two serious problems.  One,

10  political figures will not know what they're supposed to do and

11  what they're not supposed to do, and that's a general vagueness

12  problem.

13          "And the second is, I'd call it a separation of powers

14  problem.  The Department of Justice in the Executive Branch

15  becomes the ultimate arbiter of how public officials are

16  behaving in the United States, state, local, and national.  And

17  as you describe it, for better or for worse, it puts at risk

18  behavior that is common, particularly when the quid is a lunch

19  or baseball ticket, throughout this country.

20          "Now, suddenly, to give that kind of power to a

21  criminal prosecutor, who is virtually uncontrollable, is

22  dangerous in the separation of power sense.  So in my mind --

23  right in this case, nothing to do with this Petitioner, nothing

24  to do with him, but in this case, is as fundamental a real

25  separation of powers problem as I've seen.

1      "And I'm not quite certain what the words are.  They

2  won't be perfect.  They will find some dishonest conduct

3  unprosecuted.  They won't be perfect.  They will put some

4  politicians at risk.  But I'm searching for those words because,

5  as I said, this is a very basic separation of powers problem for

6  me."

7          It's no different than people who are in the process

8  of running for office, helping other people running for office,

9  as it is for people already in office that goes to our very

10  basic framework, and that's something from day one of this case

11  has bugged me.  It's bothered me because these gentlemen were

12  trying to fire their boss.

13          THE COURT:  Kate.

14          MR. BINNALL:  I'm sorry, these gentlemen were trying

15  to fire these gentlemen's boss.  They were on a campaign to try

16  and fire these gentlemen's boss, and all of a sudden they're in

17  the middle of going into the very intricacies of how that

18  campaign was happening.  And there's some danger there.  And

19  that is on some of the policy level I'll argue and something

20  that's analogous to what's happening in the McDonnell case,

21  something that I think we need to be aware of as a danger in

22  this case.

23          Your Honor, should I -- do you want me to move on to

24  the next motion I have?

25          The next motion I have -- and I can hand this up.  I'm

1  going to file it as well, and I have a copy for the

2  government -- is Mr. Kesari's motion of the failure of the

3  government to produce the notes of witness interviews.  And

4  there's some transcripts that start on page 2 that lay this all

5  together.

6          The basic framework was at the Friday before the last

7  trial, I saw Mr. Sorenson and we ended up asking him at that

8  trial if he had met with the government that day because we

9  didn't have notes.  Mr. Howard asked Mr. Sorenson if he had been

10 there.

11         Question:  "On Friday the 9th, do you remember who you

12 met with?"

13         Mr. Sorenson said:  "Yes, I met with the same people

14 that I've been meeting with."

15         "Were they taking notes?

16         "I don't recall.

17         "Were pads out?

18         "Yes.

19         "And were people writing on those pads as you spoke to

20 them?

21         I would assume so, yes."

22         Well, then I made a motion to the court that I thought

23 it was Brady, and the court pointed out the Jencks material as

24 well.  And the court asked very specifically:  "Are there other

25 notes, Mr. Kravis?"

1        Mr. Kravis:  "No.  Your Honor."

2        The court says, "So you can't produce what you don't

3   have, and if you've got some, he's in a lot of trouble right

4   now."

5        Well, now we go forward to Agent LoStracco's

6   testimony, Agent LoStracco's testimony from this past Friday

7   where I asked Agent LoStracco on cross-examination, "You met

8   with Mr. Sorenson on many occasions; isn't that correct?"

9        "Yes, that's correct.

10        "And during some of those occasions you took notes,

11   right?

12        "Yes.

13        "And during other of those sessions, you did not take

14   notes, right?"

15        Answer:  "I think I usually take at least some notes.

16   I don't recall any occasion where I didn't take notes; but if I

17   wasn't taking notes, somebody else was taking notes, meaning

18   another agent."

19        THE COURT:  What's the seminal case on when notes of

20   an agent become Jencks?  Is it Goldberg?

21        MR. BINNALL:  I believe it is Goldberg, Your Honor.

22        And it's Jencks, but it's also Brady because -- well,

23   I should say Giglio because it's impeachment.

24        THE COURT:  Well, it can be.

25        MR. BINNALL:  When you have someone like Mr. Sorenson

1   who every time he tells a story there are differences in it, if

2   you look at the notes from Mr. Sorenson from his interviews,

3   when you look at the grand jury testimony, when you look at his

4   trial testimony, every single time there's something new,

5   something less.  Mr. Benton could be heard on a speakerphone.

6   Actually, no, Mr. Benton couldn't be heard on a speakerphone.

7   You know, just one of many, many examples, that for them to meet

8   with him and Giglio not be an issue is just not possible.

9           As far as on the Jencks issue about whether or not

10  they've been adopted, the court asked them if there were notes,

11  and they said no.  We can't know to a certain extent if Jencks

12  is at issue without knowing what he said, without knowing

13  they've been adopted and they fall into the Jencks Act.  All we

14  know is that they represented to the court that they don't

15  exist, and then their case agent got up here and said that they

16  do.  That puts us in a situation where we can't police it.  We

17  have to just take their word for it.  In this case that's not

18  something that I'm willing to do.

19          THE COURT:  Yeah.  You can ask the witness the

20  questions that would establish, pursuant to Goldberg, that the

21  witness adopted the notes.  Did she show you the notes?  Did she

22  ask have I got it right?  Did she do those sorts of things?

23          MR. BINNALL:  I understand the court's position on

24  that.  I think Giglio is the bigger position here, but -- yeah,

25  that's our position on that.

1        Finally, Your Honor, we move to strike the overt act

2   LL from the superseding indictment.  It's on page 12 of the

3   superseding indictment and request you instruct the jury that

4   all evidence that goes to this should be ignored as well.

5        The last sentence -- well, I'll start it, "or alter a

6   $25,000 check that Kesari previously gave to Senator Sorenson on

7   or about December 26, 2012, which Senator Sorenson refused to

8   do."  There's absolutely no evidence that Mr. Kesari did

9   anything with Senator Sorenson on or about December 26th of the

10  year 2012, and so we move to strike that.

11       THE COURT:  Because he gave it to his wife?

12       MR. BINNALL:  No, because the only evidence that

13  anything like this happened was in 2011.

14       THE COURT:  Oh.

15       MR. BINNALL:  This is not the first time a year has

16  been wrong, but the government has to be held to their

17  indictment, and Mr. Kesari is entitled to notice for what he's

18  being charged with.  And, quite frankly, after they got it wrong

19  the first time, they should have been especially careful.

20       THE COURT:  Thank you.

21       Briefly from the government, we're holding up the jury

22  but it's important to get your response.

23       MR. COONEY:  Your Honor, I'm going to try and take

24  these as I heard them, and I am going to try and move as

25  efficiently as possible through matters, but I do hope that if I

1  miss anything that you have questions about that you won't

2  hesitate to interrupt me.

3          First let me just address discovery Jencks related

4  issues.  If there's notes of interviews, they've been turned

5  over in this case.  The government has met and exceeded its

6  discovery obligations in that respect.  The argument Mr. Binnall

7  is making with respect to Jencks and Giglio at this point is to

8  create a super rule that the government take notes in every

9  single interview.  There are some interviews where notes weren't

10  taken, there has been testimony about that; but we have met and

11  exceeded our obligations in that respect.  And in fact, if I'm

12  not mistaken, since a subpoena was actually served on Kent

13  Sorenson and his attorney in this case to disclose admitted

14  entries that would reveal dates of meetings, the government

15  actually took the unrequired step of simply providing a list of

16  every date on which we had a meeting with Kent Sorenson, and

17  since we've met with Kent Sorenson since that date, we've

18  provided something memorializing that the meeting happened.

19          Second, with respect to the way I heard it generally

20  from all three defendants on sufficiency is an argument about

21  whether the ICT invoices and specifically Government's Exhibits

22  145 through 148, whether they are false, it's a classic factual

23  question for the jury.  The jury is going to look at this.  ICT,

24  purpose of payment, audiovisual service, they're going to decide

25  based on all of the evidence in this case whether there's a

1  false statement.  Certainly the government has, through the

2  testimony of Kent Sorenson but also through all of the e-mails

3  leading up to December 28th and then following that with the

4  invoicing structure that was put in place, has marshalled

5  sufficient evidence to meet its rule 29 standard with respect to

6  whether those invoices are -- excuse me, whether those FEC

7  reports are false.

8          Second, with respect to causing the exact same issue,

9  it is a classic factual determination for the jury.  The

10 evidence with respect to Mr. Kesari is clear.  It's his

11 interactions with Kent Sorenson, Pavlo Kesari, and Sonny Izon.

12 And then the evidence with respect to Mr. Benton and Mr. Tate

13 for rule 29 purposes is clear as well.  It's the passing on of

14 those invoices by Mr. Kesari to them and their rapid approval of

15 them, invoices that were attached identifying ICT with e-mail

16 communications, one to Mr. Benton, "Kent's bill.  Pay?"  His

17 approval, "Yes, last time."  And then, of course, the June 25

18 e-mail that is the subject of so much dispute from Mr. Tate, but

19 the one that specifically states the purpose of the ICT invoice.

20 "This is the deal Jesse agreed to for Kent.  It was for six

21 months, last time," those two e-mails back and forth.  That's

22 sufficient for rule 29 purposes to prove causation, classic

23 factual question for the jury.

24          The third element that I heard argument about was

25 materiality.  Same argument, Your Honor, classic factual matter

1   for the jury to determine.  The evidence in the record on

2   materiality is clear.  First Mr. Pilger -- it was put into

3   evidence actually by Agent LoStracco last week, which were the

4   FEC forms themselves, Government's Exhibits 145 to 148, but

5   further testified about with Spencer Brooks yesterday where he

6   read the certification on truthfulness which cites to the very

7   statute that is at issue in this case in Count 3.  And, in fact,

8   as Mr. Pilger pointed out yesterday, we're going to be asking

9   for judicial notice at the close of our case from the court that

10  the statute cited at the bottom is actually the one that Count 3

11  is brought under.  But it requires truthfulness.  Whether the

12  statement is truthful is material to whether the report can and

13  should have been filed in compliance with FEC requirements based

14  on that certification right there.

15          Second, Your Honor, with respect to the purpose,

16  audiovisual services, the defendant on cross-examination,

17  Mr. Hartsock provided that form about adequate purposes,

18  inadequate purposes, what have you.  One of the inadequate

19  purposes is consulting.  What is put down in that section for

20  purposes of disbursement has every ability to affect the FEC's

21  decision about whether to publish, and in this case they gave a

22  false statement, an inadequate purpose to assure publication

23  without anybody asking any question whatsoever.

24          And, third and finally, all of the inferences this

25  case, Your Honor, is that the purpose of FEC reports is to

1   promote transparency.  There is -- I don't think there's any

2   argument under which a false purpose can be an adequate purpose

3   or any other purpose.  Whether it is true is material to having

4   completed the obligations of FEC reporting, and certainly

5   there's already been testimony in this case from Mr. Hartsock

6   that the FEC conducts audits and evaluations of what is in these

7   reports on an ongoing basis, and they can decide based on

8   information later on whether to remove publication, whether to

9   change publication, whether to go back and ask questions of the

10  campaign.  And whether a statement is true or false would be

11  material to those decisions.  And, in fact, as Agent LoStracco

12  herself testified, in her experience as an FBI agent, the FEC

13  will stand down on those audits or those investigations based on

14  an FBI investigation because what we're talking about here,

15  whether a statement is true or not, is material to any FEC form.

16          Your Honor, with respect to this last issue that just

17  came up, paragraph LL in the indictment, two things about this.

18  First is the use of the on or about language with respect to the

19  December 26, 2012, check.  To the extent that anything is

20  arguably wrong about that paragraph, it is simply the

21  identification of that date, so if anything is going to be

22  struck from that overt act, there is plenty of legal authority

23  that Your Honor need not strike the entire overt act.  You could

24  simply strike that language "on or about December 26, 2012."

25          But, second, it is merely a scrivener's error.

1    Scrivener's errors can be corrected.  I'm just looking at some

2    authority real quick that Mr. Pilger handed to me.  Indictments

3    may be amended without resubmission to the grand jury if the

4    defendant's rights are not affected and he is adequately

5    apprised of the charges against him so he is protected against

6    surprise at trial or another prosecution for the same offense.

7    United States v. Young Brothers Inc., 728 F.2d 682 at 693.

8    That's a Fifth Circuit case from 1984.

9            I would point out that it is abundantly clear on the

10   face of the indictment and based on the prior overt acts -- I

11   cannot pin cite the exact subparagraph, Your Honor, but there is

12   a subparagraph that on or about December 26, 2011, Mr. Kesari

13   provided a $25,000 check to Mr. Sorenson in return for his

14   endorsement.  He is adequately apprised of what the charges are

15   in this case and what the evidence is in this case.  This is

16   clearly a scrivener's error which can be amended and which does

17   not affect his substantial rights in any way whatsoever.

18           If I could have just one moment, Your Honor.

19           (Pause.)

20           I guess one last thing with respect to the general

21   sufficiency.  There was an argument about moving to willfulness

22   and whatnot with respect -- and just general sufficiency about

23   whether this was a false statement and whether this was a

24   scheme, that this is set up the exact same way as the Bachmann

25   Campaign was set up.

1          First, Your Honor, I don't think there's any authority

2   in the law for the possibility that something else could be

3   wrong, could actually be illegal that would excuse conduct in

4   another circumstance.  And as Agent Brooks I anticipate is going

5   to testify, that matter is still under investigation.

6          With that, Your Honor, I am prepared to submit on the

7   record; but, of course, if you have questions about any of these

8   matters, I'm happy to take them.

9          THE COURT:  Thank you.

10         Mr. Binnall, I don't know any authority to strike a

11  portion of the indictment because it turns out that it's wrong.

12  It seems to me that that's the function of trials is to

13  determine that.  But that said, the only part of LL that is

14  wrong is the language "on or about December 26, 2012."  Would

15  you want me to strike that portion of it?

16         MR. BINNALL:  Your Honor, what I would prefer, if

17  we're not going to get more, is the same jury instruction that

18  we had last time when the date issue came up that talks about

19  the government's burden, that it doesn't have to happen on the

20  exact date but close to the exact date and that that be made

21  applicable to paragraph LL.

22         THE COURT:  So you want me to strike that portion or

23  not?

24         MR. BINNALL:  If I'm --

25         THE COURT:  Because that's all I'm going to strike if

1   I'm going to strike something.  Do you want it stricken or not?

2   I will certainly give the "on or about" instruction.  I don't

3   know why that's not in here.  We always have that.

4           MR. BINNALL:  Then, Your Honor, no, I don't want that

5   struck.

6           THE COURT:  Thank you.

7           All right.  We will take ten minutes and start at

8   9:25.  The objection to Exhibit 134 is sustained.  It's just not

9   worth it, especially with the baggage that it carries.

10          We'll begin right at 9:25.

11          MR. PILGER:  Thank you, Your Honor.  I think that's

12  actually 154.

13          (Recess at 9:15 a.m., until 9:26 a.m.)

14          (In open court, in the presence of the jury.)

15          THE COURT:  Please be seated.

16          Members of the jury, good morning.  I apologize for

17  the delay getting started.  I hope that you've seen that I value

18  your time and so I didn't -- I don't like starting late.  I like

19  to start on time.  We worked hard last night.  We worked hard

20  this morning.  We just couldn't get it done by 9 o'clock in

21  order to start, but I appreciate your patience and understanding

22  in that regard.

23          Mr. Pilger, you may continue.

24          MR. PILGER:  May it please the court.

25

1    SPENCER BROOKS,

2  resumed his testimony as follows:

3    DIRECT EXAMINATION (Continued)

4  BY MR. PILGER:

5  Q.  Special Agent Brooks, you understand you're still under

6  oath?

7  A.  I do.

8  Q.  We talked briefly about some phone calls from Dimitri Kesari

9  on August 7th.

10    Do you recall that?

11  A.  I do.

12  Q.  And have you reviewed the subpoena that produced the records

13  that you were talking about?

14  A.  I have.

15  Q.  And have you reviewed the returns from the company of all of

16  the records that they've provided?

17  A.  Yes.

18  Q.  And given all of the records they've provided, were the

19  August 7th phone calls the first phone calls in the records for

20  Dimitri Kesari's phone in 2013?

21  A.  They were the first calls in August of 2013, yes.

22  Q.  Thank you.

23    Special Agent Brooks, there's been some testimony

24  concerning the Bachmann Campaign.  You are a case agent on this

25  case, correct?

1  A.  Yes.

2  Q.  Is there an open federal criminal investigation concerning

3  matters on the Bachmann Campaign --

4          MR. MILLS:  Objection.

5          THE COURT:  Don't answer that.  Go ahead and finish

6  your question.

7  BY MR. PILGER:

8  Q.  Is there still an open FBI investigation concerning

9  activities within the Bachmann Campaign?

10          THE COURT:  Don't answer that.

11          MR. MILLS:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  BY MR. PILGER:

14  Q.  Finally, Agent Brooks, turning your attention to

15  Government's Exhibit 183b, which is in evidence as a subset of

16  other records -- so while we're waiting for that to come up and,

17  again, to be clear, this is a record that's a subset of records

18  already in evidence -- what date is this page of records

19  concerning?

20  A.  The toll records are from December 29, 2011.

21  Q.  December 29th of 2011, right?

22  A.  Correct.

23  Q.  And whose phone is this?

24  A.  Dimitri Kesari.

25  Q.  And turning your attention to the middle, just remind the

1  jury, what does the green highlighting indicate?

2  A.  The green highlighting is a telephone call with John Tate

3  and --

4  Q.  And what's the red highlighting indicate?

5  A.  The red highlighting indicates a telephone with Jesse

6  Benton.

7  Q.  And tell the jury, please, on December 29, at what time is

8  the call concerning -- or with Mr. Tate happening?

9  A.  10:44 a.m.

10  Q.  Is that incoming or outgoing?

11  A.  It's an incoming call to Mr. Kesari.

12  Q.  And how long does that last?

13  A.  Sixteen minutes.

14  Q.  And then how soon thereafter does the call with Mr. Benton

15  happen?

16  A.  Based on the time it started and the time that the -- based

17  on the time that the phone call with Mr. Tate started and how

18  long it lasted, it looks like shortly thereafter or immediately

19  thereafter a phone call was then placed from Mr. Kesari to

20  Mr. Benton.

21  Q.  And how long did that last?

22  A.  Two minutes.

23  Q.  And those are both on the morning of December 29th, correct?

24  A.  That's correct.

25          MR. PILGER:  No further questions.

```
 1              THE COURT:  Ms. Campbell?

 2              MS. CAMPBELL:  Thank you, Your Honor.

 3                      CROSS-EXAMINATION

 4   BY MS. CAMPBELL:

 5   Q.  Good morning, Mr. Brooks.

 6   A.  Good morning.

 7   Q.  Let's go ahead and start then with Dimitri Kesari's records.

 8   If you could pull -- we need a side by side, though -- 183, page

 9   063 already in evidence.  If you could highlight all of the

10   records there, starting down here with the -- right before he

11   gets to Ankeny, if you could do that.  Yeah -- oh, not quite

12   that many probably.  Why don't you go about there probably and

13   move over.

14              And then if we do a side by side, let's put up Kent

15   Sorenson's records, 182.  Then if you could highlight his when

16   you get to Ankeny.  You don't need to go that far.  There you

17   go.  And move that up to the top then so we can compare them for

18   the agent.

19              Now, sir, did you ever cross compare these records?

20   A.  I did not.

21   Q.  And you're the case agent, right?

22   A.  I'm one of the case agents.

23   Q.  Let's highlight Dimitri Kesari on the phone at 11:00 a.m.

24   with Jesse Benton, two minutes, right?

25   A.  Yes.
```

1  Q.  Let's compare that to Kent Sorenson's phone, the one that

2  starts at 10:54 a.m. for 12 minutes.

3          Now, Agent, the point of December 29th is there's this

4  testimony out there about Mr. Sorenson saying that there's a

5  meeting where he's hearing Jesse Benton on the phone, right?

6  A.  Yes.

7  Q.  Okay.  But for this call Jesse Benton is on the phone with

8  Dimitri Kesari, but Kent Sorenson is on the phone at exactly the

9  same time, right?

10  A.  Yes.

11  Q.  So let's go to the next call that Dimitri has with Jesse

12  Benton, 11:18.  Now, that's one minute long, right, Agent?

13  A.  That's correct.

14  Q.  So let's go up then to the one that starts at 11:12 that

15  lasts for 11 minutes.

16          Again, when Jesse Benton is on the phone with Dimitri

17  Kesari, Kent Sorenson is on his phone, right?

18  A.  According to the records, yes.

19  Q.  And how about down here, 11:20, we've got a couple of

20  one-minute calls.  There's that one and the one above it

21  actually, 11:20, 11:22.  That's actually still covered by this

22  11:12 call by Kent Sorenson for 11 minutes, isn't it?

23  A.  Yes, it is.

24  Q.  So Jesse Benton is not on the phone with Dimitri Kesari at

25  any time during this time frame when Kent Sorenson is not also

1   on the phone with someone else, right?

2   A.   That's correct.

3   Q.   So let's highlight Dimitri Kesari's records.

4           And you can actually match up here they both have a

5   call at 11:07 a.m.  Do you see there?  They're talking to each

6   other, right?

7   A.   Yes.

8   Q.   So 11:07 we actually can at least surmise they're not even

9   in the same room with each other unless they're calling each

10  other from across the room, right?

11  A.   Correct.

12  Q.   Okay.  Now, Agent, yesterday you showed us an exhibit that I

13  think they called 183c, which is a subset of 183, so if you

14  could back out of that.

15          Do you recall this testimony is about the August 7,

16  2013, phone calls?

17  A.   Yes.

18  Q.   Can we blow up 183, page 171.  I don't need a side by side.

19  I just need the full one.  There you go.

20          And you're talking about these roaming calls, right?

21  A.   Yes.

22  Q.   And I haven't gone to the trouble of highlighting them with

23  colors; but if you could blow that up.

24          Those are on August 7, 2013, right?

25  A.   That's correct.

1  Q.  From Dimitri Kesari's phone, right?

2  A.  That's correct.

3  Q.  And you're one of the case agents, right?

4  A.  I am.

5  Q.  What happened on August 7, 2013, that would explain these

6  guys calling each other?

7  A.  I believe there was some press about -- but I'm not exactly

8  sure what it was about.

9  Q.  Well, sir, isn't it true that the Dennis Fusaro secretly

10 recorded phone call of Kent Sorenson got released on August 7th

11 of 2013?

12 A.  I believe that's correct.  I wasn't the case agent at that

13 time.

14 Q.  Okay.  Would it refresh your recollection to see an article

15 that released it?

16 A.  Sure.

17 Q.  I show you B31, the Iowa Republican.

18 A.  Yes, I see it.  It is dated August 7, 2013.

19 Q.  So on August 7, 2013, the Iowa Republican released an

20 article that included Dennis Fusaro's recorded phone call of

21 Kent Sorenson, right?

22 A.  Yes, that's correct.

23 Q.  Now, Mr. Kesari was in Europe, right?

24 A.  Yes.

25 Q.  Right when that was happening, right, on his way back?

1  A.  On his way back.

2  Q.  And you know from investigating this case that these guys

3  knew as early as August 6th that this article was coming, right?

4  A.  I don't know that fact, no.

5  Q.  Can you show the agent -- this is not in evidence --

6  Defendant's B10, I believe it is?

7          Do you recognize this e-mail, Agent?

8  A.  I've not seen it before, but I recognize it on the screen

9  here.

10  Q.  So you've never seen the e-mail on August 6, 2013, between

11  Dimitri Kesari, Jesse Benton talking about the Iowa Republican?

12  A.  No, I haven't.

13  Q.  So you don't recognize that at all?

14  A.  Do not.

15  Q.  You were just called in to testify about the calls on the

16  7th, right?

17  A.  Yes.

18  Q.  Not the context?

19  A.  Correct.

20  Q.  So let's look at then, you were asked to testify to the

21  notes of the expenses from Government's Exhibit 59, the 72,

22  73-page expense report.

23          Do you recall that?

24  A.  Yes.

25  Q.  We have it admitted as Tate Exhibit 18, if you could please

1  pull that up.  It's already in evidence.  Blow up the date there

2  for him.

3          Date and time, sir?  Do you know the date and time of

4  this expense report when it goes out?

5  A.  The date of the e-mail?

6  Q.  Yes.

7  A.  February 22, 2012, at 8:21 p.m.

8  Q.  And, Mr. Oeth, if you could please scroll down on this

9  e-mail so we know that this is the one that has the expenses on

10 it that we've been talking about all trial?

11         So this is the expense report -- you can keep

12 scrolling.

13         This is the expense report that you reviewed so that

14 you could testify how many line items were five figures, four

15 figures, six figures?

16         Do you remember that?

17 A.  That's correct.

18 Q.  And did you do that on paper?

19 A.  I did partially electronically and then I did part of it in

20 paper when I got to Iowa.

21 Q.  Okay.  And you had it on a computer?

22 A.  I had it on my phone.

23 Q.  Were you reviewing it when you made those notes?  Were you

24 reviewing it on paper?

25 A.  Part of it electronically on my phone and part of it on

1    paper.

2    Q.   How long did that take you?

3    A.   Two, two-and-a-half hours probably to do the counting.

4    Q.   And were you doing the counting during the trial?

5    A.   Yes.

6    Q.   And you said that was when you got to Iowa, right?

7    A.   I did part of it on the way here on the airplane and part of

8    it when I got here.

9    Q.   So you couldn't complete it on the plane on your phone; is

10   that right?

11   A.   I didn't have enough time on the plane.

12   Q.   And, in fact, it's kind of hard to review that on a phone,

13   isn't it?

14   A.   It is, but I was able to do the larger numbers first, so I

15   was able to do those and zoom in on the phone, which is why it

16   took me awhile.

17   Q.   Well, you were the case agent.  What was happening on

18   February 22, 2012?

19   A.   I don't know.

20   Q.   No idea?

21   A.   I don't know.

22   Q.   I mean, this is about a campaign, right?

23   A.   Correct.  Karen -- Agent LoStracco was the case agent and

24   did the whole investigation.  When she transferred, I took over

25   along with another agent, but she's remained involved, and so my

1    role is really just to do discovery and some things like that.

2    Q.   So you haven't investigated what debate was happening on the

3    evening of February 22, 2012 in the Republican Primary?

4    A.   I have not.

5              MR. PILGER:   Objection; relevance.

6              THE COURT:   Overruled.

7    A.   I have not.

8    BY MS. CAMPBELL:

9    Q.   Now, were you involved in any of the interviews of

10   Mr. Sorenson?

11   A.   No, I was not.

12   Q.   But you reviewed the recordings, didn't you?

13   A.   No, I have not.

14   Q.   Are there recordings?

15   A.   Of what?

16   Q.   Of all of the interviews that Mr. Sorenson did with agents.

17   A.   As far as I know, those interviews were not recorded.

18   Q.   There's an FBI policy that encourages reporting anytime when

19   you're interviewing a suspect, right?

20   A.   There is a fairly recent FBI policy that requires you to

21   record an interview when someone has been arrested and then it's

22   left open as an option that you can conduct other recordings of

23   other interviews if you would like.

24   Q.   Well, that's not exactly what it says; it's not if you like,

25   is it?

```
 1   A.  I don't know exactly what it says.  If you want to show it
 2   to me --
 3             MR. PILGER:  Objection; relevance.
 4             THE COURT:  What is the relevance of this?
 5             MS. CAMPBELL:  Your Honor, we've been talking about
 6   Mr. Sorenson and all of these different interviews and what he
 7   said at different times.  I am merely setting the foundation
 8   that they have a policy to record.
 9             THE COURT:  A policy for what?
10             MS. CAMPBELL:  They had a policy to record these
11   interviews, and they didn't.
12             MR. PILGER:  I think that might be better at side-bar
13   because I don't think this is the policy, and we object to this.
14             THE COURT:  The objection is sustained.
15   BY MS. CAMPBELL:
16   Q.  Sir, to your knowledge, there are no audio recordings of
17   Mr. Sorenson when he interviewed with the FBI, right?
18   A.  To my knowledge, that's correct.
19             MS. CAMPBELL:  I don't have anything further, Your
20   Honor.
21             THE COURT:  Mr. Mills.
22                         CROSS-EXAMINATION
23   BY MR. MILLS:
24   Q.  Good morning, Agent Brooks.
25   A.  Good morning.
```

1  Q.  I won't introduce myself because you already know me.

2  A.  Yes.

3  Q.  Let's go back to August 7, 2013.  You weren't on any of

4  those calls, were you?

5  A.  No, I was not.

6  Q.  So you have no idea what the parties to those calls said to

7  each other, do you?

8  A.  That's correct.

9  Q.  Then let's go to December the 29th of 2011.  You discussed

10 some calls that took place between the defendants on that date,

11 didn't you?

12 A.  Yes.

13 Q.  Okay.  Now, you're aware that John Tate was the campaign

14 manager for the Ron Paul Campaign, correct?

15 A.  Yes.

16 Q.  And you're aware that Jesse Benton was the campaign's

17 chairman, correct?

18 A.  That's correct.

19 Q.  And you're aware that Dimitri Kesari was the deputy campaign

20 manager, correct?

21 A.  Yes.

22 Q.  And you're aware that the Iowa caucuses were on January the

23 3rd of 2012, correct?

24 A.  Yes.

25 Q.  Do you think there's anything unusual about those three

1   individuals talking with each other on the phone five days

2   before the Iowa caucuses?

3   A.  I'm sure they talked often.

4   Q.  Now, you don't have any personal knowledge that John Tate

5   ever read a single FEC report filed by the Ron Paul Campaign, do

6   you?

7   A.  I do not have any personal knowledge of that.

8   Q.  And with regard to the February 22nd e-mail that you

9   analyzed, you don't have any personal knowledge that he ever

10  even opened that e-mail, do you?

11  A.  I do not.

12  Q.  You have no knowledge that he read it?

13  A.  I do not.

14  Q.  How many line items did it have?

15  A.  Somewhere in the neighborhood of 4,000, I think.

16  Q.  4,000 line items, which you spent several hours analyzing?

17  A.  Yes.

18  Q.  And then one last question.  You testified about a warning

19  that appears at the bottom of an FEC filing.  Do you see that?

20  Do you remember that?

21  A.  Yes.

22  Q.  Isn't it true that warning is limited to the treasurer of a

23  campaign?

24  A.  I'm not sure I know that.

25  Q.  And so you don't know that the treasurer is required to sign

1  FEC reports?

2  A.  I know that the treasurer signs those reports and the

3  warning is on that form.

4  Q.  And isn't it true none of the defendants signed any of the

5  Ron Paul Campaign's FEC reports?

6  A.  They were signed by the treasurer, right.

7              MR. MILLS:  Thank you.

8              THE COURT:  Mr. Binnall?

9              MR. BINNALL:  Nothing from me, Your Honor.

10             THE COURT:  Anything else, Mr. Pilger?

11             MR. PILGER:  So I think the door just got opened on

12  the MUR matter as to whether Mr. Tate ever read any FEC matters,

13  and I'll just leave it there in case you want a side-bar on it.

14             MR. MILLS:  Objection, Your Honor.

15             THE COURT:  No.

16             MR. PILGER:  Very well, Your Honor.

17                       REDIRECT EXAMINATION

18  BY MR. PILGER:

19  Q.  Agent Brooks, Ms. Campbell was asking you about what the

20  whole point of the phone records were.

21             Do you remember that?

22  A.  Yes.

23  Q.  And she got into some surmising, correct?

24             MS. CAMPBELL:  Objection; relevance.

25             THE COURT:  Overruled.

1          Answer the question.

2    BY R. PILGER:

3    Q.  She asked you questions about what one could surmise from

4    the telephone records, right?

5    A.  Yes.

6    Q.  Okay.  Do you have an understanding about the point of the

7    phone records concerning August 7th and 8th of 2013 with regard

8    to the media that you referenced?

9          MS. CAMPBELL:  Objection, Your Honor; calling for

10   speculation and it's irrelevant what he thinks.

11         MR. PILGER:  She asked him about it.

12         THE COURT:  Overruled.

13         Answer the question.

14   A.  I'm sorry, can you repeat the question?

15   BY MR. PILGER:

16   Q.  So, Agent Brooks, we'll go a little slowly.  Ms. Campbell

17   asked you about media reports in August of 2013, correct?

18   A.  Correct.

19   Q.  She asked you about telephone records near the time of the

20   media reports, correct?

21   A.  Yes.

22   Q.  And the media reports, without getting any further into what

23   they concerned that Ms. Campbell did, talked about payments to

24   Kent Sorenson; is that correct?

25   A.  Correct.

1   Q.  And so when she asks you to surmise the point of the

2   telephone calls, is it equally plausible that anything she said

3   that they were concerning the media reports about payments to

4   Kent Sorenson?

5   A.  Yes.

6   Q.  Thank you.

7        And then, Ms. Draughn, if we could get 183b back up on

8   the screen.  It's in evidence.

9        While we're waiting for that, Ms. Campbell asked you

10  questions that showed that various people were using phones on

11  the morning of December 29, 2011, correct?

12  A.  Correct.

13  Q.  And the records do reflect all of those calls that she

14  talked about, correct?

15  A.  Correct.

16  Q.  And so to the extent people were on the phone talking to

17  other people at the same time, that's reflected in the records,

18  right?

19  A.  That's correct.

20  Q.  But then she went to asking you about the call from

21  Mr. Sorenson at 11:06.  That's not on the screen.

22        Mr. Sorenson got a call at 11:06.  Bear with me a

23  second.

24        (Pause.)

25        Perhaps it is on the screen.  He got a call after

1   11 o'clock, several minutes after, with Dimitri Kesari, right?

2   A.  If you're asking me, I can't see, so --

3   Q.  So it's not highlighted.  You'll have to -- bear with me a

4   moment.

5          (Pause.)

6          I'll do it on the screen for you, Agent Brooks, so

7   I'll direct your attention to this call (indicating).  And I

8   misspoke.  It's at 11:07.

9          Do you see that?

10  A.  I do.

11  Q.  And do you see that's a call with Kent Sorenson?

12  A.  That's correct.

13  Q.  That is how many minutes after the call with Mr. Benton

14  ended?

15  A.  Approximately five minutes.

16  Q.  Okay.  And if we're surmising things and talking of

17  possibilities, is it entirely possible that Kent Sorenson has

18  left and is in a car somewhere else than with Mr. Kesari at that

19  point?

20  A.  It's certainly possible.

21  Q.  Perhaps headed for television events?

22  A.  That's certainly possible.

23          MR. PILGER:  Nothing further, Your Honor.

24          THE COURT:  Anything else?

25          Thank you, sir.  You're excused.

```
 1                            (Witness excused.)

 2            THE COURT:  Mr. Pilger.

 3            MR. PILGER:  The United States rests.

 4            THE COURT:  The government rests, meaning it has

 5   presented its presentation of evidence.  We'll insert in the

 6   record the record made before court this morning as if fully set

 7   forth at this point in the record.

 8            Call your first witness, Ms. Campbell.

 9            MS. CAMPBELL:  Your Honor, actually Mr. Tate is going

10   to call a witness first.

11            THE COURT:  Thank you.

12            MR. MILLS:  We call David Polyansky, Your Honor.

13            THE COURT:  Sir, if you'll come forward, and if you'll

14   approach this woman here, she'll administer your oath.

15            THE CLERK:  Please raise your right hand.

16         DAVID POLYANSKY, DEFENDANT TATE'S WITNESS, SWORN

17            THE CLERK:  Please be seated.

18                         DIRECT EXAMINATION

19   BY MR. MILLS:

20   Q.  Good morning, sir.

21   A.  Good morning.

22   Q.  Can you state and spell your full name for the record?

23   A.  Sure.  It's David Polyansky, D-A-V-I-D P-O-L-Y-A-N-S-K-Y.

24   Q.  And where do you currently live?

25   A.  Houston, Texas.
```

1  Q.  And how old are you, sir?

2  A.  I think I'm 45.

3  Q.  Okay.  And how are you currently employed?

4  A.  I'm a political consultant.  I own my own company.

5  Q.  Are you working on any particular campaigns right now?

6  A.  I am, yes, sir.

7  Q.  Which campaign is that?

8  A.  Well, we hold several.  I'm working for Senator Cruz's

9  Presidential Campaign currently.

10  Q.  Did you attend college?

11  A.  I did, yes, sir.

12  Q.  And what colleges have you attended?

13  A.  I attended the University of Miami, graduated from the

14  University of St. Thomas in Houston and completed law school at

15  the University of Houston Law Center.

16  Q.  Did you play any sports when you were at the University of

17  Miami?

18  A.  I was an aspiring football player and walk-on for a couple

19  of years.

20  Q.  Did there come a time when you joined the military?

21  A.  Yes, sir.

22  Q.  What branch did you serve?

23  A.  United States Marine Corps.

24  Q.  And how long were you in the Marine Corps?

25  A.  A total of six years.

1  Q.  And can you describe just generally your professional

2  experience since graduating from law school?

3  A.  I did practice law for a couple of years, maybe right at two

4  years.  In addition, I took a hiatus from the law practice for

5  another year in the Marine Corps, and outside of that it's been

6  mostly political campaigns or organizations associated with

7  political activities or issues.

8  Q.  Have you ever worked on other political -- other

9  presidential campaigns?

10  A.  Yes.

11  Q.  Other than Senator Cruz's?

12  A.  Yes, sir.

13  Q.  Which ones have you worked on?

14  A.  Most recently, Governor Walker's of this cycle, and prior to

15  that Michelle Bachmann and Mike Huckabee's prior to that.

16  Q.  Have you ever done any work for Iowa politicians?

17  A.  I have, yes, sir.

18  Q.  Which ones have you worked with?

19  A.  Joni Ernst last cycle, her U.S. Senate race.  That may be

20  it.  I'm sorry.  I may be drawing a blank.

21  Q.  Okay.  Let's direct your attention to the time that you

22  worked for Michelle Bachmann's campaign.  When did you go to

23  work for the Bachmann Campaign?

24  A.  About five years ago.  I couldn't tell you the exact time

25  frame.

1   Q.  And did you have a title in her campaign?

2   A.  I worked under Ed Rollins.  I was his deputy.  I can't

3   recall the exact title that I had at that time.

4   Q.  I'm going to be showing you a document that should be

5   appearing on your screen only.  It's not in evidence.  And it's

6   articles of incorporation and would ask you if you recall that.

7           Have you ever seen a document like this?

8   A.  I'm sure I have.  I just -- I don't hold a present

9   recollection of it.

10  Q.  I'm going to direct your attention to page 3 of the

11  document -- it should be on your screen right now -- and ask you

12  if that's your signature?

13  A.  It appears to be, yeah.

14  Q.  And what is this document?

15  A.  I would have to --

16          MR. PILGER:  Could we get it into evidence before

17  reading from it?

18          MR. MILLS:  I'm just trying to set the --

19  A.  I'm sorry.  Could you repeat that?

20  BY MR. MILLS:

21  Q.  What is this document?

22  A.  It appears to be a certificate of incorporation for the

23  Bachmann for President Campaign.

24  Q.  And can you tell what date the Bachmann Campaign got

25  incorporated?

1   A.  It appears to be June 13 of 2011.

2   Q.  Now, were you working for the Bachmann Campaign before or

3   after you incorporated it?

4           MR. PILGER:  I couldn't hear that question.  Before I

5   could what?

6           MR. MILLS:  Before or after he incorporated it.

7           MR. PILGER:  So if he offers the exhibit -- he's

8   testified to a lack of recollection.  We don't object to this

9   coming in if he wants to proceed that way.

10          MR. MILLS:  Move to admit.

11                              (Defendant's Exhibit T34 was

12                              offered in evidence.)

13          THE COURT:  Fine.  34 is received.

14                              (Defendant's Exhibit T34 was

15                              received in evidence.)

16  BY MR. MILLS:

17  Q.  Is June 13 about the time that you went to work for the

18  Bachmann Campaign?

19  A.  Yes, sir, I believe so.

20  Q.  And how long did you work for the Bachmann Campaign?

21  A.  Through the Iowa Straw Poll.  Sometime shortly thereafter I

22  think I departed.

23  Q.  And when did the Iowa Straw Poll take place?

24  A.  I believe it would have been August of '11 sometime.

25  Q.  Now, did there come a time when you worked for the Bachmann

1    Campaign that you met a man by the name of Kent Sorenson?

2    A.   Yes, sir.

3    Q.   Can you describe how you came to know Mr. Sorenson?

4    A.   Are you asking when I met him or how I came to know him?

5    I'm sorry.

6    Q.   When did you first meet him?

7    A.   I'm sure it was on one of my -- either my first or

8    subsequent trips to Iowa, but I don't remember.

9    Q.   What role did Mr. Sorenson have with the Bachmann Campaign?

10   A.   I can't recall if he held the title of state chairman, but

11   he also worked in our office.

12   Q.   Okay.  Did you sometimes have communication with

13   Mr. Sorenson as part of your duties?

14   A.   Yes, sir.

15   Q.   And do you know whether Mr. Sorenson was being paid for his

16   work on the Bachmann Campaign?

17   A.   He was, yes, sir.

18   Q.   And do you have any recollection of how much he was being

19   paid?

20   A.   I do not.

21   Q.   Do you have any understanding of the arrangement by which he

22   was being paid?

23   A.   In terms of -- I'm sorry, could you --

24          MR. PILGER:  Could we get a basis in personal

25   knowledge, Your Honor?

1  BY MR. MILLS:

2  Q.  Do you know a man by the name of Guy Short?

3  A.  Yes, sir.

4  Q.  And Guy Short had a company called C & M Communications; is

5  that right?

6  A.  I'm sure he does, but I don't recall.

7  Q.  Do you know whether Mr. Sorenson was being paid through

8  C & M Communications?

9          MR. PILGER:  How does he know that?

10          THE COURT:  Overruled.

11          Do you know if he was?

12          THE WITNESS:  I'm sorry, sir?

13          THE COURT:  Do you know if he was?

14          THE WITNESS:  If Mr. Short was being paid by --

15          THE COURT:  No; if Mr. Sorenson was being paid through

16  Mr. Short.

17  A.  That's my recollection, yes, sir.

18  BY MR. MILLS:

19  Q.  And did there come a time when you expressed any concerns

20  about that arrangement?

21  A.  I wouldn't say concerns.  I don't want to answer a question

22  I'm not being asked, so I'm trying to be --

23  Q.  Okay.  Did there come a time that you questioned that?

24  A.  Yes, sir.

25  Q.  And this next exhibit is not in evidence.

```
 1            And I'm going to put on the screen in front of you a

 2  document that appears to be an e-mail string dated July the 5th,

 3  2011.

 4            Do you see that?

 5  A.  Yes, I do.

 6  Q.  And you're at the top of the string, correct?

 7  A.  Yes.

 8  Q.  Okay.  And there's a message that you write to Guy Short --

 9            MR. PILGER:  Before we get into the content of this,

10  we will have an objection to this exhibit.

11            THE COURT:  Don't read from an exhibit until it's been

12  admitted.

13            MR. MILLS:  Okay.  And I'm going to take it one step

14  at a time because we talked --

15            THE COURT:  Don't tell us what the content is by your

16  questions.

17            MR. MILLS:  Understood.

18            THE COURT:  Okay.

19  BY MR. MILLS:

20  Q.  Mr. Polyansky, starting at the top of the exhibit, who is

21  that top e-mail from?

22  A.  It appears to be from me.

23  Q.  And who is it to?

24  A.  To Guy Short.

25  Q.  And what is the date?
```

1   A.  July 5, 2011.

2   Q.  And what is the subject line?

3          MR. PILGER:  Objection; hearsay.

4          THE COURT:  Sustained.

5   BY MR. MILLS:

6   Q.  Okay.  Does this refresh your recollection about a time you

7   expressed concern about the -- not concern but questioning

8   Mr. Sorenson's payment relationship?

9   A.  It does, sure.

10  Q.  And what was your concern?

11  A.  I don't want to give a long rolling answer, but I had

12  counsel look at every --

13          MR. PILGER:  Objection.  To the extent that he wants

14  to articulate what his substantive concern was, we don't object.

15  Instead if he wants to bring anyone else into this where hearsay

16  is involved, we do object to this answer.

17          THE COURT:  What's the objection?

18          MR. PILGER:  He's going to start talking about

19  counsel; hearsay.

20          MR. MILLS:  I asked him about what counsel said.

21          THE COURT:  This is hearsay.  Sustained.

22  BY MR. MILLS:

23  Q.  Let me put it this way.  Did you do anything to investigate

24  the propriety of Mr. Sorenson's, you know, payment arrangement?

25  A.  Yes.

```
 1   Q.  What did you do?
 2   A.  I -- it appears by --
 3              MR. PILGER:  So object to "appears by."  If he has
 4   independent recollection --
 5              MR. MILLS:  Yeah, I agree with that.
 6              Just what you recall.
 7   A.  That I directed the individuals or individual on this
 8   e-mail --
 9              MR. PILGER:  Objection; hearsay.
10              THE COURT:  Overruled.
11   A.  -- to make sure it was acceptable to, in this case, Bill.
12   BY MR. MILLS:
13   Q.  Who's Bill?
14   A.  Bill was William McKinley, campaign counsel for the campaign
15   at that time.
16   Q.  And at any time after -- on or after July the 5th, did you
17   ever have any concerns about the propriety of this relationship?
18   A.  I don't -- I don't remember the dates, but I did have
19   separate conversation with Bill who is referenced here.
20   Q.  Don't tell me what he said to you.  You had a discussion
21   with Mr. McKinley; is that correct?
22   A.  That's correct.
23   Q.  And after that discussion, did you have any concerns about
24   the propriety --
25              MR. PILGER:  Objection; backdoor hearsay.
```

```
 1              THE COURT:  Fact or hearsay?  I didn't understand
 2   that.
 3              MR. PILGER:  I'm sorry.
 4              THE COURT:  That's not an objection.  Is it hearsay or
 5   what?
 6              MR. PILGER:  It's hearsay and it's also irrelevant.
 7              THE COURT:  Thank you.
 8              Relevance sustained.
 9              MR. MILLS:  Thank you.
10              I have --
11   BY MR. MILLS:
12   Q.  When did you leave the Bachmann Campaign?
13   A.  I honestly don't remember.  Sometime after the Iowa Straw
14   Poll, so presumably late August or early September.
15   Q.  And at that time was Mr. Sorenson still working with the
16   campaign?
17   A.  I believe that is correct, yes.
18              MR. MILLS:  Thank you very much.
19              THE COURT:  Any other defendants have questions for
20   him?
21              MS. CAMPBELL:  No, Your Honor.
22              THE COURT:  Mr. Pilger?
23              MR. PILGER:  Yes, Your Honor, just briefly.
24
25
```

1    CROSS-EXAMINATION

2    BY MR. PILGER:

3    Q.  Good morning, Mr. Polyansky.

4    A.  Good morning.

5    Q.  I'm Richard Pilger.  I represent the government in this

6    case.

7           Now, Mr. Polyansky, to your knowledge, was Kent

8    Sorenson doing actual work for the Michelle Bachmann campaign in

9    Iowa?

10   A.  He was, yes, sir.

11   Q.  Was he doing a lot of work?

12   A.  I would say considerable heading into the straw poll.  I

13   can't speak to what he did after that or after I left, but yes.

14   Q.  Fair enough.  While you were here, though, what you saw is

15   that he did a lot of work?

16   A.  Yes, sir.

17   Q.  And is it your testimony that he -- "he" Kent Sorenson --

18   was Michelle Bachmann's state chair for Iowa?

19   A.  I believe that is correct.

20   Q.  Mr. Mills showed you an incorporation paper from June 13,

21   and you weren't too sure about remembering it or not, but we let

22   it into evidence.  But you do know that Michelle Bachmann was

23   active in the state of Iowa seeking the presidency before June

24   13th, correct?

25   A.  I believe that's the case, yes, sir.

1  Q.  And you told the jury that you work as a political

2  consultant, right?

3  A.  Yes, sir.

4  Q.  And that is a job within the United States?  That is a way

5  to make a living, correct?

6  A.  Yes, sir.

7  Q.  And consultants, political consultants, are they also known

8  as political operatives?

9  A.  Yes.

10  Q.  And political operatives, you said they can make a living.

11  They can make a living doing that year around if they're good?

12  A.  Sure, absolutely.

13  Q.  And do they make a better living if they win?

14  A.  Unfortunately, not enough; but that should be the way it is.

15  But it should make you more marketable, yes.

16  Q.  As a general matter, if you're a political consultant who

17  wins all the time, are you more marketable?

18  A.  Yes, sir.

19  Q.  And Mr. Mills was asking you about whether you were

20  concerned about the payments to Kent Sorenson.  Were you

21  concerned -- well, first, let me ask you, were you aware of an

22  FEC investigation concerning his payments?

23  A.  At that time --

24          MR. MILLS:  Objection.

25          THE COURT:  Sustained.

1    MR. PILGER:  No further questions.

2    THE COURT:  Anything else, Mr. Mills?

3    MR. MILLS:  Nothing, Your Honor.

4    THE COURT:  You're excused.

5                        (Witness excused.)

6    THE COURT:  Call your next witness, please.

7    MR. WARRINGTON:  The defense for Mr. Tate calls Andy

8  Parrish.

9    THE COURT:  Come forward, sir.  If you'll approach the

10  clerk here, she'll administer the oath.

11    THE CLERK:  Please raise your right hand.

12    ANDREW PAUL PARRISH, DEFENDANT TATE'S WITNESS, SWORN

13    THE CLERK:  Please be seated.

14    THE WITNESS:  Right here (indicating)?

15    THE COURT:  Yes, please.

16                    DIRECT EXAMINATION

17  BY MR. WARRINGTON:

18  Q.  Good morning, Mr. Parrish.  My name is David Warrington.  I

19  represent Mr. Tate.

20    Will you please state your name for the record.

21  A.  Andrew Paul Parrish.

22  Q.  Can you spell your last name?

23  A.  P-A-R-R-I-S-H.

24  Q.  And how old are you?

25  A.  Thirty-seven.

1  Q.  And where do you live?

2  A.  I live in Minnesota.

3  Q.  Are you currently employed?

4  A.  I am.

5  Q.  Can you summarize your educational background?

6  A.  I can.  I graduated from the University of Wisconsin, River

7  Falls.  I have a degree in political science and a minor in

8  international relations.

9  Q.  And can you summarize your work history since college?

10 A.  I can.  I worked for a state senator who was on the

11 elections committee, so I worked on elections.  Then Senator

12 Bachmann, her seat opened up to run for Congress.  I started off

13 as her political director for the primary, moved up to campaign

14 manager, then ran her campaign in 2006.  I did outreach after

15 that, briefly took a break to go do some lobbying.  Came back in

16 2009, ran her congressional race in 2009.  I was her chief of

17 staff at that point.  Then shortly after her election, I started

18 getting involved in what would be her presidential run.

19 Q.  And what kind of lobbying did you do when you took your

20 break?

21 A.  Lobbied for property tax deferral for senior citizens for

22 AARP.

23 Q.  Did you have any other experience outside of that?

24 A.  I currently work for a number of pro-life groups protecting

25 the pre-born children and work for life and marriage groups as a

1  consultant.

2  Q.  And you said you went to work for Michelle Bachmann in 2006.

3  Am I correct on that?

4  A.  It was 2005 for the primary, 2006 for the general election.

5  Q.  Did there come a time when you got involved in presidential

6  campaigns?

7  A.  Shortly after the 2010 election, we began discussing the

8  presidential one.

9  Q.  And what was your general role at the beginning of that

10  campaign?

11  A.  I was her chief of staff.  So in the very beginning it was

12  basically to set up operations through a political action

13  committee in case there were a presidential run.

14  Q.  And did there eventually become an official presidential

15  run?

16  A.  There was an official presidential run.

17  Q.  And how long did you work for her presidential campaign?

18  A.  From her official announcement, which was in June -- I can't

19  remember the exact date -- and then through September.  I think

20  I was sent home late September, early October.

21  Q.  And would that have been in 2011?

22  A.  Yes, sir.

23  Q.  And why did you leave?

24  A.  We -- I was told that we were out of money, and then I also

25  had a very sick baby that was born here in Iowa, and we needed

1   to get our baby up to Children's Hospital in Minneapolis.

2   Q.  When was that again?

3   A.  It was late September, I was home in October, so the

4   beginning of October.

5   Q.  So the campaign was out of money in October of 2011?

6   A.  That's what I was told.

7   Q.  Are you familiar with a man named Kent Sorenson?

8   A.  Yes, sir.

9   Q.  And when did you first meet Kent Sorenson?

10  A.  That would have been in early 2011, probably January in the

11  Congresswoman's first trip.

12  Q.  And how often were you in contact with Mr. Sorenson after

13  that first trip?

14  A.  It became regular, but not -- I can't put a number on it.  A

15  couple of times a week maybe.

16  Q.  Did there come a time when the campaign hired Mr. Sorenson?

17  A.  Yes.

18  Q.  Do you recall when that was?

19  A.  Everything would have officially happened when she announced

20  in June.

21  Q.  And what was Mr. Sorenson hired to do for the campaign?

22  A.  To be the state director.

23  Q.  And did he perform those services that he was hired for?

24  A.  Yes, sir.

25  Q.  Did he ever perform fundraising services for the campaign?

1  A.  Not more than any other staffer would collect $50 here or

2  there.

3  Q.  But he wasn't a fundraising consultant for the campaign?

4  A.  Correct.

5  Q.  What's your understanding of a fundraising consultant?

6  A.  A fundraising consultant basically manages the fundraising

7  operation, which would be your telemarketing, your online,

8  direct mail.

9  Q.  And in layman's terms, fundraising means what?

10           MR. PILGER:  Objection; relevance.

11           THE COURT:  Overruled.

12           Answer the question.

13  A.  Fundraising means soliciting money to fund the campaign.

14  BY MR. WARRINGTON:

15  Q.  Was Mr. Sorenson paid for his work on the Bachmann Campaign?

16  A.  Yes.

17  Q.  And do you recall how he was paid for his services to the

18  campaign?

19  A.  He was hired on by C & M Strategies, who was our fundraising

20  consultant for the campaign.

21  Q.  Okay.  So how that was -- who set that arrangement up?

22  A.  I did.

23  Q.  Did you and Mr. Sorenson ever have a discussion about the

24  Iowa Senate ethics rules?

25  A.  Yes.

 1  Q.  Can you tell us a little bit about that discussion?

 2  A.  They generally --

 3          MR. PILGER:  Objection; hearsay.

 4          THE COURT:  Why isn't that hearsay?

 5          MR. WARRINGTON:  I'll rephrase the question.

 6  BY MR. WARRINGTON:

 7  Q.  Did you understand that Mr. Sorenson had concerns about the

 8  Iowa Senate ethics rules?

 9  A.  Yes.

10  Q.  What is your understanding of what the Iowa Senate ethics

11  rules were with regard to Mr. Sorenson?

12  A.  The Iowa Senate ethics rules were that they could not work

13  directly for a campaign.

14  Q.  Did that cause you to set this arrangement up where

15  Mr. Sorenson was paid through C & M Strategies?

16  A.  Yes.

17  Q.  And can you tell us who C & M Strategies was?

18  A.  C & M Strategies was operated by Guy Short out of Colorado.

19  Q.  Who else did you discuss this arrangement with?

20  A.  Guy Short --

21          MR. PILGER:  Objection; hearsay.

22          THE COURT:  He said who else.  That's not hearsay.

23  Overruled.

24          Answer the question.

25  A.  Guy Short, Katie Bieber, our attorney from Patton Bonds, and

1  obviously Mr. Sorenson, and then we eventually took it to the

2  Congresswoman.

3  BY MR. WARRINGTON:

4  Q.  Was Mr. Sorenson intimately involved in these conversations?

5  A.  Yes, sir.

6  Q.  Was Mr. Sorenson on conversations where the propriety of

7  that arrangement was discussed?

8          MR. PILGER:  Objection; relevance.

9          THE COURT:  Sustained.

10  BY MR. WARRINGTON:

11  Q.  Was Mr. Polyansky on any of those conversations?

12  A.  Not the initial ones, no.

13  Q.  Was he on later conversations?

14  A.  Yes.

15  Q.  So was everybody in the campaign aware of the payment

16  arrangement with Mr. Sorenson?

17          MR. PILGER:  Objection; foundation and personal

18  knowledge as to everyone on the campaign.

19          THE COURT:  Sustained.

20  BY MR. WARRINGTON:

21  Q.  What was your understanding with regard to the knowledge of

22  other people?

23          MR. PILGER:  Objection; foundation on the personal

24  knowledge here.

25          THE COURT:  Sustained.

1  BY MR. WARRINGTON:

2  Q.  Did you think that the way the campaign was paying Kent

3  Sorenson violated the Iowa Senate ethics rules?

4  A.  No.

5  Q.  Did you think it violated any other rules?

6  A.  No.

7  Q.  Did you think it violated any other laws?

8  A.  No.

9  Q.  And what did you form your basis for that opinion on?

10 A.  Katie Bieber from Patton Bonds told me --

11         MR. PILGER:  Objection.

12         THE COURT:  Sustained.

13 BY MR. WARRINGTON:

14 Q.  Did you think the payment arrangement with Kent Sorenson and

15 C & M Strategies would create any problem with the FEC?

16 A.  No.

17         MR. PILGER:  Objection; relevance.

18         THE COURT:  Sustained.

19         MR. PILGER:  So I can keep objecting, Your Honor, but

20 this line --

21         THE COURT:  Go ahead.

22 BY MR. WARRINGTON:

23 Q.  Did there come a time when you talked to investigators from

24 the Iowa State Senate about Mr. Sorenson?

25 A.  Yes.

1    Q.  And who did you -- if you recall, who did you speak with?

2    A.  I don't remember the gentleman's name, but he was the

3    special investigator that the Senate had appointed.

4    Q.  And was his name Mark Weinhardt, would that refresh your

5    recollection?

6    A.  Sounds -- yeah, sounds right.

7    Q.  And in this arrangement with Mr. Sorenson, can you describe

8    sort of block by block how it would work, where the campaign

9    would -- who the campaign would pay, because you set this up?

10   A.  Correct.  We would pay C & M Strategies an extra $7,500 a

11   month, and they would in turn pay Mr. Sorenson.

12   Q.  Was that unusual as far as campaign operations go?

13   A.  Not at all.

14   Q.  Do you have any idea how C & M Strategies characterized its

15   services on its invoices?

16   A.  Only from what I saw in FEC reports.

17   Q.  Do you know how Mr. Sorenson characterized his -- let me ask

18   that again.  Let me ask that a different way.

19          Did you ever see Mr. Sorenson's invoices to C & M

20   Strategies?

21   A.  No.

22          MR. WARRINGTON:  I have nothing further, Your Honor.

23          THE COURT:  Any of the other defendants?

24          MS. CAMPBELL:  No, Your Honor.

25          MR. BINNALL:  No, Your Honor.

```
1              THE COURT:  Mr. Pilger.

2              MR. PILGER:  Briefly, Your Honor.  May it please the

3   court.

4                        CROSS-EXAMINATION

5   BY MR. PILGER:

6   Q.  Good morning, Mr. Parrish.

7   A.  Good morning.

8   Q.  I'm Richard Pilger.  I represent the government.

9              Now, you just said we would pay C & M extra.  Let's

10  clarify that "we."  Who paid C & M Strategies the extra?

11  A.  The campaign.

12  Q.  The campaign or Michelle PAC?

13  A.  I would have to look at an FEC report, but my understanding

14  was the campaign.

15  Q.  That was your understanding.  Do you know if that's true?

16  A.  If I were to have the FEC report, I could verify that for

17  you.  Do you have the FEC report?

18  Q.  You're up here testifying.  I'm just going to ask you

19  questions.  You tell me what you know.  If I have something I

20  want to show you, I'll show it to you.

21             MR. WARRINGTON:  Objection, Your Honor.

22             THE COURT:  Just ask a question, please.

23             MR. PILGER:  Yes.

24  BY MR. PILGER:

25  Q.  So you don't really know who paid C & M Strategies, do you?
```

1  A.  The arrangement that I set up was through the campaign.

2  Q.  And if it was through Michelle PAC, you don't know about

3  that?

4  A.  I have some knowledge of Michelle PAC.  I believe he was

5  initially paid from Michelle PAC while we were setting up what

6  could potentially be a presidential run.

7  Q.  Okay.  So now you're saying to this jury that Mr. Sorenson

8  was paid through Michelle PAC and C & M Strategies to begin

9  with?

10  A.  No.  May I clarify?  Oh, to begin with he was paid through

11  Michelle PAC because there was no presidential committee.  The

12  presidential campaign was not formed until she announced.

13  Q.  But you would agree with me that she was active in Iowa

14  before the official announcement, right?

15  A.  She had a PAC that spread conservative values, and Iowa was

16  one of the states she wanted to spread those.

17  Q.  That's not what I asked you.  She was personally active in

18  Iowa before that official announcement?  Would you answer that

19  question?

20  A.  Yes.

21  Q.  And, in fact, you were here with her the first time she met

22  Kent Sorenson, right?

23  A.  Yes.

24  Q.  And that was well before June of 2013, right?

25  A.  Yes.

1  Q.  And you testified you started working with her on the

2  presidential campaign shortly after her election, right?

3  A.  As her chief of staff and closest political advisor, her and

4  I had discussions about the presidential campaign.

5  Q.  I'm not saying there's anything wrong with that.  I just

6  want an answer to my question.

7          Did you start talking to her about the presidential

8  campaign shortly after her election?  Isn't that what you said

9  with Mr. Mills -- or Mr. Warrington?

10  A.  Yes.

11  Q.  And that election was in November of 2010, right?

12  A.  Yes.

13  Q.  So shortly after that would be still in 2010.  We're not

14  even into 2011, right?

15  A.  Well, I went deer hunting, took a month off.  I mean, I

16  would say it was in 2011.  Maybe 2010, maybe December 2010.

17  Q.  Okay.  So from the election in the first Tuesday in November

18  through all of the deer hunting and whatever else, when do you

19  think you got to talking about the presidential campaign with

20  Ms. Bachmann?

21  A.  I can't give you an exact date.

22  Q.  Is it early 2011?

23  A.  Yes.  We were here in January.

24  Q.  Okay.  Kent Sorenson, to the extent he was paid through

25  C & M Strategies -- are you aware of that?

1   A.   Yes.

2   Q.   -- he worked for Guy Short, correct?

3   A.   Correct.

4   Q.   And Guy Short was being paid by Michelle PAC, correct?

5   A.   Not once the presidential campaign started, he would have

6   been paid for by -- he was still a consultant to Michelle PAC,

7   but that was very minimal, I believe, but he was paid for his

8   work through the presidential campaign committee.

9   Q.   Bear with me a moment.

10          (Pause.)

11          Do you recall telling the FBI in June of 2013 that

12  Short stayed on as a consultant to Bachmann for President and

13  assisted with fundraising?

14  A.   Sounds reasonable.

15  Q.   Do you recall telling the FBI that?

16          MS. CAMPBELL:   Your Honor, at this point I'm going to

17  object based on relevance and also based on argumentative.

18          THE COURT:   Overruled.

19          Answer the question.

20  A.   I don't -- it was 2013.  I don't recall.  You have my

21  testimony in front of me -- or that I can see?

22  BY MR. PILGER:

23  Q.   I'll ask you the questions, sir.

24          THE COURT:   Ask a question.

25          Go ahead.

1  BY MR. PILGER:

2  Q.  And the question is, were you interviewed by the FBI in June

3  of 2013?

4  A.  Yes.

5  Q.  Were you interviewed concerning the financial arrangements

6  of the Bachmann Campaign?

7  A.  Yes.

8          MR. PILGER:  No further questions.

9          THE COURT:  Mr. Warrington, anything else?

10          MR. WARRINGTON:  Yes, Your Honor, briefly.

11                      REDIRECT EXAMINATION

12  BY MR. WARRINGTON:

13  Q.  Mr. Parrish, Mr. Pilger asked you a question and I think

14  stated that -- asked you whether Mr. Sorenson worked for Guy

15  Short; is that correct?

16  A.  Correct.

17  Q.  And I'm going to ask you if you remember the question?

18  A.  Yes.

19  Q.  What were Mr. Sorenson's duties working for Mr. Short?

20  A.  He was there to make sure we had as many votes as possible

21  and running operations within the office.

22  Q.  So were his duties as the Iowa State Chairman for Michelle

23  Bachmann?

24  A.  Yes.

25  Q.  So his duties were owed to the Michelle Bachmann Campaign,

1  not to Mr. Short?

2  A.  He worked -- yes.

3         MR. WARRINGTON:  Nothing further, Your Honor.

4         THE COURT:  Anything else, Mr. Pilger?

5         MR. PILGER:  No, Your Honor.

6         THE COURT:  Thank you, sir.

7         You're excused.

8                              (Witness excused.)

9         THE COURT:  Call your next witness, please.

10        MS. CAMPBELL:  We'll call Tonya Hester, Your Honor.

11        THE COURT:  Please come forward, ma'am.  If you would

12 approach the clerk, she'll administer your oath.

13        THE CLERK:  Please raise your right hand.

14        TONYA HESTER, DEFENDANT BENTON'S WITNESS, SWORN

15        THE CLERK:  Please be seated.

16                    DIRECT EXAMINATION

17 BY MS. CAMPBELL:

18 Q.  Good morning.

19 A.  Good morning.

20 Q.  Will you please state your name and spell the last name for

21 the record.

22 A.  It's Tonya Hester, H-E-S-T-E-R.

23 Q.  And, ma'am, where do you currently live?

24 A.  I live in Lake Jackson, Texas.

25 Q.  Where do you currently work?

1    A.  I'm an insurance broker for a marketing insurance agency in

2    Houston.

3    Q.  You're going to have to speak a little bit louder.

4    A.  Okay.

5    Q.  Do you know Jesse Benton?

6    A.  I do, I know Jesse.

7    Q.  How do you know Jesse Benton?

8    A.  He's a personal friend and I've worked for him.

9    Q.  When have you worked for him?

10   A.  I worked for him on the 2012 Ron Paul for President,

11   presidential campaign.

12   Q.  Do you -- what was your job title if you had one?

13   A.  I was executive assistant to Jesse and special assistant to

14   Dr. Paul.

15   Q.  And what did you do generally in your job?

16   A.  I planned travel, I planned lodging, set up media

17   interviews, just general correspondence of helping him stay

18   connected with all that was going on, and that was a lot.

19   Q.  How busy was the Ron Paul 2012 campaign?

20   A.  It was nonstop 24-hour a day.  I don't even know how to

21   describe how busy it was.  It was a whirlwind.  It was very

22   busy.

23   Q.  And had you worked on a campaign before?

24   A.  I had not.

25   Q.  And you said that you were an assistant to Mr. Benton?

1   A.   Uh-huh.

2   Q.   Is that "yes"?

3   A.   Yes.

4   Q.   What time frame were you an assistant to him?

5   A.   From around the spring of 2012 -- I'm sorry, 2010 through

6   spring of 2012.

7   Q.   And what specifically did you do for Mr. Benton?

8   A.   Specifically my main job was to take care of his travel

9   arrangements.

10  Q.   And that was a full-time job?

11  A.   It was a full-time job, yes.

12  Q.   Did they travel a lot?

13  A.   They traveled a lot.  90 percent of a month they were

14  traveling.

15  Q.   And did you book their flights?

16  A.   I booked all the flights.  I booked the flights for Jesse, I

17  booked the flights for Dr. Paul, also for the advance team that

18  traveled along with them.

19  Q.   And did you sometimes book on commercial airlines?

20  A.   I did.

21  Q.   And sometimes --

22  A.   Private.

23  Q.   What do you mean by "private"?

24  A.   Charter planes.

25  Q.   So sometimes you would book a charter plane for the

```
 1   campaign?

 2   A.  Yes, very often.

 3   Q.  And did you keep a travel schedule?

 4   A.  I did.

 5   Q.  If we could show Benton Exhibit 1?  It's not in evidence.

 6          Ma'am, on the screen in front of you, do you recognize

 7   that exhibit?

 8   A.  I recognize it.

 9   Q.  And what is it?

10   A.  It's the preliminary calendar that I used when we would plan

11   what we called -- whether it be road shows, when there were

12   multiple stops in a town or directly.  Generally these flights

13   all originated from Texas, so it was the travel from Texas to

14   whatever location we were campaigning in at that time.

15   Q.  And were you making notes contemporaneously on this

16   document?

17   A.  Yes.

18   Q.  Is this your writing?

19   A.  That's my handwriting, yes.

20          MS. CAMPBELL:  We would offer Benton's Exhibit 1.

21                              (Defendant's Exhibit B1 was

22                              offered in evidence.)

23          MR. COONEY:  No objection.

24          THE COURT:  Received.

25                              (Defendant's Exhibit B1 was
```

1    received in evidence.)

2  BY MS. CAMPBELL:

3  Q.  Now, ma'am -- if we could publish -- did there come a time

4  when you came to Iowa?

5  A.  Yes.

6  Q.  And was there a time in December of 2011 specifically, if we

7  could move to that date, where you -- the campaign came to Iowa?

8  A.  Yes.

9  Q.  We'll pull up December, if you will.

10          And so it actually looks like there's a couple of

11  trips to Iowa there; is that right?

12  A.  Yes.

13  Q.  And how would you mark Iowa?  What initials were you using?

14  A.  IA.

15  Q.  And so when you write IA on the calendar, that means Iowa?

16  A.  That means Iowa.

17  Q.  And this is Ron Paul and Jesse Benton's travel calendar?

18  A.  Yes.

19  Q.  Now, at some point did you actually travel with them?

20  A.  I did.

21  Q.  Did you always travel with them?

22  A.  Not always.

23  Q.  Just sometimes?

24  A.  Uh-huh; not often.

25  Q.  Did you come to Iowa on December, it looks like 28th?

1  A.  Yes.

2  Q.  Do you recall that trip?

3  A.  Yes.

4  Q.  And did you attend a veterans rally?

5  A.  I did.

6  Q.  Did you ever hear a conversation at that veterans rally

7  where Jesse Benton said to Kent Sorenson, you bled for us?

8  A.  No.

9          MR. COONEY:  Objection; foundation.

10          THE COURT:  Overruled.

11          Answer the question.

12  BY MS. CAMPBELL:

13  Q.  Did you hear that?

14  A.  No, I did not hear that.

15  Q.  How long have you known Jesse Benton?

16  A.  For many years.  Over ten years -- eight to ten years.

17  Q.  Are you good friends with his family?

18  A.  They're my best friends.

19  Q.  Is that a phrase you've ever heard him use?

20  A.  That doesn't sound like anything that Jesse would say.

21  Jesse is a very direct person.  That doesn't sound like anything

22  that Jesse would say.

23  Q.  So not only did you not hear him say it on December 29th,

24  it's not a phrase you've ever heard him say?

25  A.  I've never heard him say anything of the sort, no.

1  Q.  Now, at some point did -- how hard was Jesse Benton working?

2  A.  He wasn't hard to work with, but --

3  Q.  No.  How hard was he working?

4  A.  Oh, incredibly hard.  He was nonstop.

5  Q.  And did he get a lot of e-mails?

6  A.  He -- yes.

7  Q.  Did you ever review his e-mails?

8  A.  I did.

9  Q.  How could you do that if it's his e-mail?

10 A.  Occasionally if he was extremely busy, he -- his phone was

11 really his only source.  He didn't use his laptop often.  It was

12 his phone.  And if there was just something really important

13 that needed to come through or if we were looking for something

14 special, then there may be a time that he would have me scan

15 through and look for something for him.

16 Q.  And you said he was using a phone?

17 A.  Yes.

18 Q.  Was it an iPhone?

19 A.  It was.

20 Q.  I'm just going to demonstrate Benton Exhibit 20

21 (indicating).  Does this look like the size of iPhone he was

22 using?

23 A.  It does.

24 Q.  And this is what Jesse Benton was using most of the time to

25 review e-mail?

1   A.  All the time.

2   Q.  And he got a lot of e-mails; is that right?

3   A.  He did.

4   Q.  And sometimes you went through them?

5   A.  Yes.

6   Q.  And did I ask you at one point to review a portion of a log

7   of e-mails?

8   A.  Yes, you did.

9   Q.  And did you -- do you remember the dates that I asked you to

10  review?

11  A.  Uh-huh, December 25th through December 28th.

12  Q.  And that's already been referenced for the record as

13  Government's Exhibit 187.

14          And did I ask you to count the number of e-mails?

15  A.  Yes.

16  Q.  And did you do that?

17  A.  I did.

18  Q.  Do you recall off the top of your head what those results

19  were?

20  A.  I believe on the 28th it was somewhere close to 500 e-mails.

21  On the 27th I believe it was in the 300s.  Christmas Day

22  apparently was a little break because there were only 150 or so

23  on that day.  And then the 26th there was several hundred as

24  well.

25  Q.  Would it refresh your recollection to see the notes that you

1  wrote out?

2  A.  Yes.

3  Q.  And just approximately when you reviewed them, how many did

4  he get on Christmas Day?

5  A.  On Christmas Day there were 108 e-mails.

6  Q.  Okay.  And I had asked you to also, because you worked with

7  Jesse Benton, flag what you thought were junk e-mails; is that

8  right?

9  A.  Uh-huh.  I actually went up and reviewed that list of the

10  hundred e-mails I looked over and found that there were four

11  spam e-mails with junk.  I actually went into detail where they

12  were from, and some were even Toys R Us, which you can ask their

13  little girl and she wouldn't think that was junk, but for the

14  most part, that was really junk e-mail.

15  Q.  Do you think Google Alerts are junk?

16  A.  Oh, no.

17  Q.  Why not?

18  A.  Because it's so important to know exactly what's going on,

19  whether it be our side of the campaign or another candidate.  We

20  would have Google Alerts for different candidates to know what

21  was happening with their campaign as well.

22  Q.  So that's actually something that would be important to

23  Mr. Benton?

24  A.  Yes, yes.  We deliberately signed up for those.

25  Q.  All right.  And how about e-mails from, say, the Senate

1  Committee, would those be important?

2  A.  Yes, they are, especially if it's in the Republican Senate

3  Committee, from our side those would be important.

4  Q.  So you didn't flag those as junk?

5  A.  No, I did not.

6  Q.  So let's move to December 26th now that you have your notes.

7  Does that refresh your recollection as to how many e-mails

8  Mr. Benton got on December 26th?

9  A.  December 26th there were 273 e-mails, and I marked six of

10  those as junk.

11  Q.  How about December 27th?

12  A.  27th there were 479 e-mails.  I marked nine of those as junk

13  and one was questionable.  It was something that I didn't -- I

14  wasn't familiar with, so I wasn't sure.

15  Q.  Okay.  How about December 28th, the day of the rally?

16  A.  December 28th there were 591 e-mail, and two of those were

17  marked junk and one of them marked questionable.

18  Q.  And at the time you had access to his e-mail, right?

19  A.  Yes.

20  Q.  Now, did there come a point in time where this campaign and

21  this schedule played a -- impacted Jesse Benton's health?

22  A.  Two times that I can specifically remember.

23  Q.  Okay.  Let's talk about the first time.

24  A.  The first time was in December.  This would have been

25  December 2011.  He was hospitalized for pneumonia.

1  Q.  Okay.  And you knew that because you were his assistant?

2  A.  His assistant and his friend.  I actually took care of their

3  little girl.  They had a toddler at the time, and she stayed

4  with me while Jesse was in the hospital and his wife was with

5  him.

6  Q.  And I asked you to try to -- before you testified, to try

7  and refresh your own recollection with what the dates were; is

8  that right?

9  A.  You did, but I had some time stamps of my own that I was

10  familiar with what those times were.

11  Q.  And do you know generally what the times were?

12  A.  As far as the dates?

13  Q.  In December?

14  A.  Uh-huh.  They were -- actually I wrote them down when I went

15  back to check.  They were mid December, between the 14th and the

16  15th.  And, as a matter of fact, Jesse's wife was the matron of

17  honor in a wedding that weekend, and I specifically remember

18  wondering if Jesse was going to make it to the family wedding or

19  not because he had been in the hospital.

20  Q.  Okay.  And was there a second time when he went into the

21  hospital?

22  A.  There was, and this was towards the end of February, and

23  this was a pretty severe time he was hospitalized.  Jesse is

24  diabetic, and he had a severe diabetic ketosis, which he was

25  very, very sick, and he was out campaigning, and when he got

1  back to -- when he got back home to Lake Jackson, he went to the

2  emergency room at 4:00 in the morning, and he was hospitalized

3  for a few days.

4  Q.  And did I ask you to try to figure out what those dates

5  were?

6  A.  Yeah, and it was easy because he had been in Arizona at a

7  debate and I was trying to convince him to go on to the

8  emergency room from there, but he still flew back to Lake

9  Jackson, and the next morning is when he went to the emergency

10  room.

11  Q.  And do you recall when that debate was in Arizona?

12  A.  Uh-huh.  The debate I believe was on the 22nd of February

13  because I know that I had their daughter on the 23rd, and when I

14  put my time frame together it makes sense that Caroline was with

15  me on the 23rd and that was the date that he went into the

16  hospital, which was the day following the Arizona debate.

17  Q.  Okay.  And you are close enough friends with the Benton

18  family, both Jesse and Valerie, that they would ask you to take

19  care of their daughter?

20  A.  Yes.

21  Q.  And so she stayed with you during this time?

22  A.  She did.

23  Q.  While Jesse is in the hospital?

24  A.  Yes.

25  Q.  And you said you believed that the debate was February 22,

1    2012.  Are you sure?

2    A.  I know it was towards the end of February.

3    Q.  Would it refresh your recollection to see --

4    A.  Yes, and I have -- yes.

5            February 22, 2012.

6    Q.  Okay.  So now, ma'am, was the debate February 22, 2012?

7    A.  It was.

8    Q.  In Arizona.  And Mr. Benton was hospitalized on February

9    23rd?

10   A.  Yes.

11   Q.  With something that sounded kind of serious?

12   A.  It was.

13   Q.  And he was very sick?

14   A.  He was very sick.

15   Q.  Did he do work from inside the hospital?

16   A.  Yes.

17   Q.  Did anyone try to prevent him from doing work?

18   A.  Yes, absolutely.  I remember his wife physically taking his

19   phone from him.

20   Q.  Because he was so sick?

21   A.  Because he was so sick.

22   Q.  This phone (indicating) --

23   A.  That phone, yes.

24   Q.  -- that he was working on reading e-mails on?

25   A.  Yes, as he was attempting to, but his wife made him stop.

```
 1   Q.  Okay.  Could we demonstrate what we have as Tate's Exhibit
 2   18?
 3              MR. COONEY:  I don't think that's been admitted yet --
 4   or I'm sorry, it has been.
 5              MS. CAMPBELL:  Yes, you have another number.
 6              MR. COONEY:  Right.
 7              MS. CAMPBELL:  Can you blow up the date?
 8   BY MS. CAMPBELL:
 9   Q.  So February 22, 2012, 8:21 p.m.  Is that during the debate?
10   A.  That might have been during the debate or immediately after.
11   Q.  And if you could back out of that, blow up and sort of
12   scroll through this document.
13              Now, ma'am, you know Jesse Benton?
14   A.  Yes.
15   Q.  And can you see that document scrolling?
16   A.  I can.
17   Q.  To your knowledge of him, is he reviewing all of these line
18   items?
19   A.  No.
20   Q.  And, in fact, when it's sent to him, is he very sick?
21   A.  Yes, he's very sick.
22   Q.  And he was heading to the hospital?
23   A.  Either he was headed to the hospital or he was headed back
24   home to get to the hospital.  He would have been in air -- in
25   the air.
```

1  Q.  And he went to the hospital that next day?

2  A.  In the wee hours, very, very early the next morning.

3  Q.  Do you know how long he was in the hospital?

4  A.  I believe it was until the 25th.  I actually did -- I'm

5  sorry, I dropped these papers.

6           When I went back to double-check he was actually there

7  through the 28th.  He was there until the end of the month.

8  Q.  Okay.  Now, did Mr. Benton ever tell you to hide things from

9  the FEC?

10 A.  Absolutely not.

11          MS. CAMPBELL:  I don't have anything further, Your

12 Honor.

13          THE COURT:  Mr. Cooney.

14                      CROSS-EXAMINATION

15 BY MR. COONEY:

16 Q.  Good morning, ma'am.

17 A.  Good morning.

18 Q.  My name is J.P. Cooney.  I'm an attorney with the

19 government.

20          Did you have some notes up there that you were reading

21 from?

22 A.  I do.

23 Q.  Are those the notes that Ms. Campbell handed you a few

24 minutes ago?

25 A.  Uh-huh, yes.

1  Q.  Are there any other notes there?

2  A.  No.

3  Q.  All right.

4  A.  They're notes that I took myself.

5  Q.  To help you with your testimony?

6  A.  No.  When I was counting e-mails, yes.

7  Q.  Now, Jesse Benton is a really hard worker, isn't he?

8  A.  He is.

9  Q.  He's a driven individual?

10 A.  Yes.

11 Q.  When he commits himself to something, he's going to get it

12 done?

13 A.  He's a hard worker, yes.

14 Q.  He's going to do everything he can to get the job done when

15 he commits himself to it?

16 A.  Everything that's within his job description what he should

17 do, yes, I would agree with that.

18 Q.  In fact, he's going to drive himself all the way to getting

19 sick to trying to get the job done, isn't he?

20 A.  He works himself hard, and the fact that he was diabetic, he

21 probably wasn't able to handle as much as probably somebody else

22 could.

23 Q.  And he's a real competitive person?

24 A.  He's a competitive person, yes.

25 Q.  One of the things he was really committed to was the Ron

1   Paul Campaign, right?

2   A.   That was his career, yes.

3   Q.   He had a lot invested in that campaign?

4   A.   Yes.

5   Q.   He had a lot of work invested in that campaign?

6   A.   He did.

7   Q.   He had a lot of time invested in that campaign?

8   A.   Yes.

9   Q.   Had a lot of sweat equity invested in that campaign?

10  A.   Again, he's a hard worker, yes.

11  Q.   And he had all of those things invested in Ron Paul, too,

12  right?

13  A.   That and the fact that he's family to him as well, yes.

14  Q.   He wanted -- he was committed to Ron Paul himself, right?

15  A.   He was.

16  Q.   Jesse Benton believed in Ron Paul, right?

17  A.   He did.

18  Q.   And he wanted him to win the Iowa caucus?

19  A.   That was his whole purpose of his job.

20  Q.   His objective was to elect Ron Paul President of the United

21  States, right?

22  A.   Well, yes.  He was --

23  Q.   And that was something that he worked very hard to do?

24  A.   Yes.

25  Q.   And that he committed himself to do?

1  A.  Yes.  He wouldn't have had that position otherwise.  No one

2  would.

3  Q.  Now, we looked at -- you just testified about some e-mails

4  on December 25th, 26th, 27th and 28th; is that right?

5  A.  Yes.

6  Q.  And before we -- actually before I turn to that, too, that

7  calendar that you looked at a few minutes ago, what dates was

8  Jesse Benton in Iowa at the end of December?

9  A.  I would need to see the calendar again to know.

10  Q.  Certainly.  I'll approach.

11  A.  The last week only?

12  Q.  And what dates?

13  A.  Are you asking about the last week?

14  Q.  Yes, the last week.

15  A.  December 28th through December 30th.

16  Q.  So Jesse Benton was in Iowa on December 28th?

17  A.  Yes.

18  Q.  Jesse Benton was in Iowa on December 29?

19  A.  Yes.

20  Q.  Jesse Benton was in Iowa on December 30th, right?

21  A.  Correct.

22  Q.  And on December 28th you were at that veterans campaign

23  rally with Jesse Benton, right?

24  A.  Yes.

25  Q.  And Dimitri Kesari was at that rally, too?

1  A.  Yes.

2  Q.  And John Tate was at that rally as well?

3  A.  Yes.

4  Q.  Now, you looked at some e-mails that you counted up, and

5  those are what you took those notes on, right?

6  A.  Correct.

7  Q.  And you testified to all of the e-mails that you counted on

8  what dates again?  You can look at your notes.

9  A.  The 25th through the 28th of December.

10  Q.  How many e-mails did Jesse Benton send on December 25?

11  A.  I didn't go through those.  Those were sent and received.  I

12  didn't -- I didn't break that down.

13  Q.  How many e-mails did he send on December 26th?

14  A.  I don't quite understand what you're asking.  The e-mails

15  that I counted were the total number of e-mails coming in and

16  out on those dates.

17  Q.  You didn't count the sent e-mails, did you?

18  A.  If they were part of the total count of e-mails, yes.  Some

19  were sent and some were received.  So the number that I gave was

20  total combined sent and received.

21  Q.  You didn't break down the difference between sent e-mails

22  and received e-mails?

23  A.  I didn't, but I can if you need me to.

24  Q.  You just counted up the total number of e-mails?

25  A.  Correct.

1  Q.  And that's what Ms. Campbell asked you to do, right?

2  A.  Correct.

3  Q.  All right.  Now, you consider Jesse Benton a good campaign

4  manager, right?

5  A.  I do.

6  Q.  And somebody who had a lot of demands on his time, right?

7  A.  Yes.

8  Q.  And one thing that Jesse Benton was very good at was

9  prioritizing his time, right?

10 A.  Yes.

11 Q.  He knew what was important, right?

12 A.  He did.

13 Q.  And he knew what wasn't important, right?

14 A.  Yes.

15 Q.  And he focused his attention on the things that were

16 important to him, right?

17 A.  Well, he had to.

18 Q.  And he focused his attention on the things that were

19 important to the campaign?

20 A.  Correct.

21 Q.  And he focused himself on the e-mails that were important to

22 him?

23 A.  Yes.  That was the lifeline of everything.  That was our

24 main communication were e-mails.

25 Q.  That's what he had to do to run the campaign, right?

1  A.  He did.

2  Q.  He had to set priorities --

3  A.  He had other facets, too, I mean, so many layers of what he

4  had to do.

5  Q.  With all of the demands on his time, he had to set his

6  priorities, right?

7  A.  Yes.

8  Q.  He had follow his priorities?

9  A.  Yes.

10  Q.  And he had to address what was important to him in the

11  campaign, right?

12  A.  Yes.

13  Q.  And ignore the things that didn't matter?

14  A.  That's a hard question to answer if there were things that

15  didn't matter.  There was so much to decipher to know what did

16  or didn't matter.  I don't know if you understand exactly how

17  inundated he was.  I mean, he did everything -- he did his best

18  to get through everything, yes, if that's what you're asking me.

19  Q.  And to be successful, he had to focus on what was important?

20  "Yes" or "no"?

21  A.  Well, yes, that's with any career or any job, any position.

22          MR. COONEY:  No further questions.

23          THE COURT:  Ms. Campbell, anything else?

24          MS. CAMPBELL:  Just briefly.

25

1    REDIRECT EXAMINATION

2    BY MS. CAMPBELL:

3    Q.  Ma'am, the e-mail log that I gave you was something the

4    government recommended -- or referenced in court, right?

5    A.  Right.

6    Q.  That's not what Jesse Benton's inbox e-mail looked like, was

7    it?

8    A.  No.

9    Q.  It was a Gmail inbox?

10   A.  Yes.  There were stacked conversations.  The way Gmail works

11   you don't get a back and forth -- you don't get a separate

12   e-mail for each thing.  If it's a full conversation, they're

13   literally stacked within one e-mail.

14   Q.  So it's very difficult to actually count from the inbox

15   even, right?

16   A.  It was, and where the sequence was off I could tell it was

17   because there were several responses and replies within each

18   specific e-mail.

19   Q.  And the reason that you didn't count the sent is because no

20   one asked you to, right?

21   A.  Right.

22   Q.  You can, right?

23   A.  Yeah.  I could get through to tell what was coming and what

24   was going.  I wouldn't be able to tell the exact numbers

25   because, like I said, they were stacked, but I wasn't aware that

1  I needed to differentiate between sent and received.

2  Q.  Fair to say Jesse Benton is sending e-mails on

3  December 27th?

4  A.  Oh, I'm certain.

5  Q.  Many e-mails?

6  A.  Yes.

7  Q.  And December 28th?

8  A.  Yes.

9  Q.  And December 29th?

10  A.  Yes.

11  Q.  And if someone wanted you to count them, you could count

12  them?

13  A.  I could.

14  Q.  Or they could count them?

15  A.  Even better.

16          MS. CAMPBELL:  Nothing further, Your Honor.

17          THE COURT:  Thank you, ma'am.

18          You're excused.

19                              (Witness excused.)

20          THE COURT:  We're going to take our late mid-morning

21  recess.  We'll take it for 20 minutes and come back at 11:10.

22          See you then.

23          (Recess at 10:50 a.m., until 11:10 a.m.)

24          THE COURT:  Please be seated.

25          Ms. Campbell.

1           MS. CAMPBELL:  We call John Baeza, Your Honor.

2           THE COURT:  If you would approach, she'll administer

3   your oath.

4           JOHN BAEZA, DEFENDANT BENTON'S WITNESS, SWORN

5           THE CLERK:  Please be seated.

6                   DIRECT EXAMINATION

7   BY MS. CAMPBELL:

8   Q.  Good morning, sir.

9           Can you please state your name and spell your last

10  name.

11  A.  My name is John Baeza.  Last name is B-A-E-Z-A.

12  Q.  Sir, what city do you currently reside in?

13  A.  I'm sorry, ma'am?

14  Q.  What city do you currently reside in?

15  A.  I live in Brooksville, Florida.

16  Q.  What is -- briefly describe your educational background?

17  A.  My educational background?  I have a high school diploma.  I

18  have 78 college credits from the University of New York where I

19  was originally from.  I'm originally from New York as you might

20  be able to tell by the accent.

21  Q.  Where -- did you work in New York?

22  A.  Yes, I did, ma'am.

23  Q.  And can you tell us what you did in your career in New York?

24  A.  I worked for the New York City Police Department.  I worked

25  in Harlem on patrol and then again in Harlem in narcotics,

1  Manhattan north narcotics.  I then went to Manhattan north

2  narcotics major case, which is just a step up from narcotics,

3  bigger cases.  And then I transferred into the detective bureau

4  where I worked with the Manhattan special victims squad.

5  Q.  Okay.  And when did you retire?

6  A.  I retired May 9, 2000.

7  Q.  And that's from law enforcement, right?

8  A.  I'm sorry, ma'am?

9  Q.  You retired completely from law enforcement, correct?

10  A.  Correct.

11  Q.  What do you do now?

12  A.  Right now I'm a criminal case consultant.  I do consulting

13  on rapes, homicides, child abuse cases, and so forth.

14  Q.  In 2011 into 2012, how were you employed?

15  A.  I was employed by the Ron Paul Campaign as director of

16  security.

17  Q.  And what did you do as director of security?

18  A.  I was in charge of obviously protecting the candidate,

19  Congressman Paul, at the time, his family, and campaign staff

20  and campaign members.

21  Q.  Did you travel with Congressman Paul?

22  A.  Yes, I did.

23  Q.  Do you know Jesse Benton?

24  A.  Yes, I do.

25  Q.  How do you know Jesse Benton?

1  A.  Jesse Benton was my boss throughout the campaign.

2  Q.  And how would you describe his management style?

3  A.  Jesse's style was a -- what I would like to say, he was not

4  a micro manager.  I've been through many bosses, so he was one

5  of those bosses that was not a micro manager.  He would

6  delegate, and he was very busy.

7  Q.  Okay.  And when you were traveling with him, was he on his

8  phone a lot?

9  A.  Yes, yes, quite often.

10  Q.  Reading e-mails and texts?

11  A.  Yes.

12  Q.  And you were in charge of the security; is that right?

13  A.  Yes, I was.

14  Q.  At some point did you come to Iowa?

15  A.  Yes.

16  Q.  More than once?

17  A.  More than once, yes.

18  Q.  I want to direct your attention specifically to the end of

19  December 2011.

20          Do you recall coming to Iowa?

21  A.  Yes; summer 2011.

22  Q.  Okay.  And do you recall a date?

23  A.  No, I don't recall the dates.  They're mixed together, kind

24  of a blur sometimes.

25  Q.  Okay.  Do you recall going to a veterans event in

```
 1   Des Moines?

 2   A.   Yes.  Yes, I do recall it.

 3   Q.   And you were there personally?

 4   A.   Yes, I was.

 5   Q.   And Mr. Benton was there?

 6   A.   Yes, he was.

 7   Q.   And do you recall how that event was set up?

 8   A.   Yeah.  It was set up at the, I believe it was the Iowa State

 9   Fairgrounds, and it was in a large building with a tall ceiling,

10   and we had a stage that was set up and there were chairs, maybe

11   a hundred chairs or more, and I remember we came in through the

12   back door.  That's the setup so far.

13   Q.   Okay.  And then do you recall when the event started whether

14   there was an Iowa State Senator Kent Sorenson that came?

15   A.   Yes, I do recall that.

16   Q.   Okay.  Were you around in that general area when he arrived?

17   A.   Yeah.  I was in the general area, yes.

18   Q.   Sir, did you ever hear Jesse Benton say to Kent Sorenson,

19   you bled for us, anything like that?

20   A.   No.  No, I did not.

21   Q.   You know Jesse Benton, right?

22   A.   Yes, I do.

23   Q.   And you spent how many hours a day with him?

24   A.   Some 14 hours a day sometimes for months at a time.

25   Q.   You've heard him talk before?
```

1   A.   Yes, I have.

2   Q.   Is that the kind of phrasing he uses?

3   A.   No, no.  That would be unusual.

4   Q.   You haven't heard him say that before, bleeding for

5   somebody?

6   A.   No, I've never heard him say that before.

7   Q.   After the event at the campaign, the rally for the veterans,

8   did you go somewhere else Iowa, do you recall?

9   A.   Yeah, I know we did.  I don't know, I think it was maybe the

10  next day, I'm not even sure, but we had other events.

11  Q.   Okay.  And do you recall where that event was?

12  A.   One, I would have to refresh my memory.  If you have

13  something to refresh my memory, I would like that.

14  Q.   Sure.  I'm handing him B2.

15  A.   My glasses broke.  It's okay, I can see with it.  I have a

16  half a lens.  Sorry about that.

17  Q.   I think it's at the top there, sir.

18  A.   Yeah, I'm sorry.  Yeah, there was an event -- from

19  refreshing my memory, there was an event in Sioux City, and I

20  believe the event -- now this is going off my memory here.  I

21  believe the event was to two locations, one at the library and

22  there was another location.  And the reason I remember it is

23  because we had to figure out or I had to figure out what -- how

24  we were going to enter both locations where we would enter one,

25  come back out, get in the car and go to the other one, because

1  they were fairly close together.

2  Q.  And, sir, do you recall lots of conversations about Kent

3  Sorenson?

4  A.  No.

5  Q.  Was he in your knowledge a big deal at this point to these

6  guys?

7  A.  No.

8  Q.  Okay.  Now, was there a point in time that Mr. Benton got

9  sick?  Do you recall that?

10  A.  Yes.

11  Q.  And do you personally recall when that was?

12  A.  I don't recall the exact time, but I know that he got sick.

13  Q.  And how do you know that he got sick?

14  A.  Well, I was told by campaign staff that he was sick and in

15  the hospital or maybe in the emergency room.

16  Q.  Did you ever see him get sick?

17  A.  Physically?

18  Q.  Yes.

19  A.  Physically, yes, I've seen him get sick a couple of times,

20  throwing up after -- you know, sometimes we would ride on the

21  airplane, but it would be a smooth airplane ride, so --

22          MR. PILGER:  Objection as to specific time, relevance,

23  cumulative.

24          THE COURT:  Overruled.

25  A.  I guess at the time I thought it was unusual because, like I

1  said, it was a smooth ride, and I would see him throw up, I

2  don't know, maybe twice I can remember.

3  Q.  And do you remember what debate you were flying back from

4  during that?

5  A.  I'm sorry?  I apologize, I have hearing loss.

6  Q.  No problem.  Do you recall which debate you were flying back

7  on the plane when he got sick?

8  A.  Not off the top of my head.

9  Q.  You just know that he was throwing up on the plane, right?

10  A.  Yeah.  There was an event in Iowa and some other events

11  somewhere else, so they kind of mixed together a little bit of

12  15 months from hopping planes, and so forth.

13  Q.  And, sir, has Mr. Benton ever told you to lie to the FEC?

14  A.  I'm sorry?

15  Q.  Has Jesse Benton ever told you to lie to the Federal

16  Election Commission?

17  A.  No, no.

18  Q.  Has he ever told you to lie at all?

19  A.  No, no.

20          MS. CAMPBELL:  Nothing further.

21          THE COURT:  Mr. Cooney, Mr. -- or you have some, too?

22          MR. WARRINGTON:  I have some, Your Honor.

23          THE COURT:  Go ahead.

24          MR. PILGER:  Your Honor, just to be clear, is this

25  going to be conducted as direct?

```
 1              THE COURT:  Yes.
 2                        DIRECT EXAMINATION
 3   BY MR. WARRINGTON:
 4   Q.  Good morning, Mr. Baeza.
 5              How old are you?
 6   A.  Good.  Good morning.
 7   Q.  Do you know John Tate?
 8   A.  Yes, I know John Tate.
 9   Q.  How do you know John Tate?
10   A.  I know John Tate because he was one of my bosses on the Ron
11   Paul 2012 Campaign.
12   Q.  And during your work with the 2012 campaign, you were in
13   charge of security, were you?
14   A.  Yes, I was.
15   Q.  What -- can you tell us what that entailed?
16   A.  Yeah.  That was -- I was in charge of security for then
17   Congressman Paul, his family, campaign members, staffers.
18   Basically the entire operation I was in charge of security for.
19   Q.  It was a pretty hectic operation?
20   A.  Yes, it was.
21   Q.  And was there any time when campaign staff received death
22   threats?
23   A.  Yes.
24   Q.  Can you tell us about any death threats involving John Tate?
25   A.  Yes.  There was a death threat --
```

```
 1              MR. PILGER:  Objection; relevance.

 2              THE COURT:  What's the relevance of that?

 3              MR. WARRINGTON:  Relevance is it's hectic, it's

 4   stressful.

 5              THE COURT:  Sustained.

 6   BY MR. WARRINGTON:

 7   Q.  Did you travel around with Dr. Paul?

 8   A.  I traveled to rallies with Ron Paul, yes.

 9   Q.  And you traveled to debates with Dr. Paul?

10   A.  I'm sorry?

11   Q.  Did you travel to debates with Dr. Paul?

12   A.  Again, I'm --

13   Q.  Did you travel to debates with Dr. Paul?

14   A.  To.

15   Q.  To the debates?

16   A.  Yes, I traveled to debates.  I'm sorry, folks.  Hearing is

17   gone.

18   Q.  I'll try to speak up.

19              Were debates busy events for the entire campaign

20   staff?

21   A.  Yes.

22   Q.  Were they very important events for the campaign staff?

23   A.  Yes.

24   Q.  Was the activity for the campaign ramped up for the debates?

25   A.  Yes, always.
```

1   Q.  You said that John Tate was your boss in the campaign.  What

2   kind of boss -- how would you describe John Tate as a boss?

3   A.  I would describe John Tate as a laid back boss.  I would

4   describe him the same way I described Mr. Benton, that he was

5   not a micro manager, I mean, because I was on the ground, so I

6   would know if somebody was micromanaging me, and that was not

7   the case.  He was not a micro manager.  He was not having his

8   fingers in every little thing that was going on, at least in my

9   view, which was on the campaign trail with Congressman Paul.

10        So I felt that he was very good manager, I thought

11  that he delegated duties.  And, you know, I've seen quite a few

12  bosses over my time, and I thought that John was one of the

13  best.

14  Q.  If you had a problem on a campaign, who would you go to?

15  A.  I would go to Jesse Benton or John Tate.

16  Q.  And why would you go to John Tate?

17  A.  I would go to John Tate because I would know that John would

18  take care of whatever the problem was.  He would act fairly and

19  he would act honestly.

20  Q.  Would he ever act in a way that you -- or did he ever act in

21  a way that you thought was improper?

22  A.  Not once.

23        MR. PILGER:  Objection.  If he's going to give

24  character evidence, he should do it the right way.

25        THE COURT:  Overruled.

1    BY MR. WARRINGTON:

2    Q.  Now, you traveled with Dr. Paul.  Would it be unusual to see

3    Mr. Benton, Mr. Kesari, and Mr. Tate together at a Ron Paul

4    event?

5    A.  No, it wouldn't be unusual.

6    Q.  And when you say John Tate, did you see him on the phone a

7    lot?

8    A.  Yes.

9    Q.  And did he seem to be also on his phone doing e-mails, if

10   you know?

11   A.  Again, sir?  I'm sorry.

12   Q.  Did you see John Tate on his phone doing e-mails or texting?

13   A.  Yes, constantly.

14   Q.  Did John Tate ever ask you to do anything that you thought

15   was improper?

16   A.  No.

17   Q.  Did John Tate ever ask you to lie to the Federal Election

18   Commission?

19   A.  No.

20   Q.  Did John Tate ever ask you to lie to anybody?

21   A.  No.

22           MR. WARRINGTON:  Nothing further, Your Honor.

23           THE COURT:  Mr. Binnall, do you have any questions?

24           MR. BINNALL:  No questions, Your Honor.

25           THE COURT:  Mr. Pilger?

1     MR. PILGER:  Yes.  May it please the court.

2                    CROSS-EXAMINATION

3   BY MR. PILGER:

4   Q.  Good morning, Mr. Baeza.

5   A.  Good morning.

6   Q.  Good morning.

7   A.  Good morning, sir.

8   Q.  You're having trouble hearing, right?  Would it be more

9   helpful if I came over and talked to you from there?

10                  THE COURT:  No; just use the microphone.

11  A.  If you raise your voice, I can hear.  I'm sorry, it's the

12  left ear that's the problem.

13  BY MR. PILGER:

14  Q.  I'll try to talk louder.

15  A.  Yes, sir.

16  Q.  You've been asked several questions about whether people

17  asked you to lie to the FEC.  In your role with the Ron Paul

18  Campaign, did you have anything to do with the FEC?

19  A.  No.

20  Q.  So does it make sense for anyone to ever ask you to do

21  something with the FEC during that campaign?

22  A.  I don't decide on whether it makes sense for somebody to ask

23  me a question; but in the context you're asking me, I guess I

24  wouldn't expect anybody to ask me anything.

25  Q.  Fair enough.  Then your job was security, right?

1  A.  Yes, sir.

2  Q.  And you had a distinguished career, you told us about

3  working in policing, right?

4  A.  Just -- I don't know about distinguished, but yes, it was a

5  good career, a very good career.

6  Q.  I don't question that.  You worked at some impressive

7  jurisdictions, including in New York, right?

8  A.  Yes, I did.

9  Q.  And you gained skills for security work from having been in

10 those police positions; yes?

11 A.  Some of those skills, yes.

12 Q.  Did you ever work as a political operative?

13 A.  No.

14 Q.  Do you have any training or skills to work as a political

15 strategist?

16 A.  No.

17 Q.  Were you pulled into political strategy conversations by the

18 leadership of the Ron Paul Campaign to give your opinions?

19 A.  No.  I was never pulled into anything.  I mean, I was there

20 when things happened, but I wasn't pulled into anything, no.

21 Q.  So is it fair to say your job was security and not political

22 strategy?

23 A.  Yeah.  It's very fair to say that, uh-huh.

24 Q.  When you were with the candidate and the other people that

25 you mentioned, his staff and his family, who was your priority

1   to protect in those situations?

2   A.  Congressman Paul.

3   Q.  Now, you talked about the management style of Jesse Benton

4   and John Tate.

5           Do you remember that?

6   A.  Yes, I do, sir.

7   Q.  And neither one of them, to your knowledge, is a micro

8   manager; is that your testimony?

9   A.  To my knowledge, neither of them is a micro manager.

10  Q.  But you observed both of them at work on the campaign,

11  correct?

12  A.  That is correct.

13  Q.  And they worked hard during the campaign when you saw them,

14  right?

15  A.  I believe they worked hard, yes.

16  Q.  But they weren't micromanaging?

17  A.  No.  I didn't see any micromanaging.

18  Q.  So, to your knowledge, did they spend their time working on

19  the things that were important at their level?

20  A.  To my knowledge, yes.

21  Q.  And they were the bosses, right, Jesse Benton and John Tate?

22  A.  Yeah, they were bosses, uh-huh.

23  Q.  And as to Jesse Benton in particular, when he decided to

24  manage a particular issue, to your knowledge, would people

25  listen to him?

1   A.   Could you repeat that one more time?  I'm sorry.

2   Q.   Yeah, I'm sorry.  I looked down.

3        When Jesse Benton decided to manage something, did

4   people listen to him?

5   A.   When he decided -- when he made a decision or a bad

6   decision, yes, people respected him and followed, you know, his

7   direction in the campaign.  I know I did.

8   Q.   Was the state of Iowa important to the Ron Paul Campaign

9   from your knowledge of how much time and effort they spent in

10  the state of Iowa?

11  A.   Okay.  Well, again, I'm not a political strategist, but

12  being just a normal citizen and also being part of the Ron Paul

13  security team, I knew that Iowa was very, very important.

14  Q.   You talked about an event, and we're going to talk about

15  that, too.  But you were security not just at events but

16  generally, correct?

17  A.   I'm not sure what you mean by "generally."  I would agree

18  with you probably, but I don't know what you mean by generally.

19  But time specific?

20  Q.   I'll ask a better question.

21  A.   Okay.

22  Q.   Were you only security at events or were you also security

23  at other places, like the campaign headquarters and any other

24  places?

25  A.   I was -- thank you, sir.  Sorry to interrupt you.

1   Q.   No.

2   A.   I was security 24/7 for the campaign, for Dr. Paul, campaign

3   staff, family 24/7.

4   Q.   And with defense counsel you talked about how events could

5   be very hectic, right?

6   A.   That's correct, it could be.

7   Q.   But it's not just events.  Let talk about campaign

8   headquarters.  They're also a very hectic environment, right?

9   A.   I didn't work out of the headquarters.  I don't even

10  remember working -- I'm trying to think if I stepped foot into

11  headquarters or where the headquarters was because I was on the

12  road so much.  I'm not trying to evade the answer, but --

13  Q.   Fair enough.

14  A.   Maybe ask it a different way.

15  Q.   I'll try --

16  A.   Are you asking me -- personally I don't recall being in

17  campaign headquarters -- are you speaking about Iowa

18  headquarters or are you talking about the national headquarters?

19  Q.   I'll just ask about Iowa.  And if you don't know, you don't

20  know.

21  A.   No.  I believe I was in the Iowa headquarters if it was in

22  Ankeny, I believe that I was in there with Congressman Paul to,

23  you know, congratulate people, you know, and cheer them up.

24  Q.   Sure, sure.  And that's a hectic kind of place during the

25  election season, right?

1  A.  Again, every place is hectic during the election season to

2  be sure.

3  Q.  Fair enough.  People coming and going?

4  A.  Yeah, people coming and going.

5  Q.  Lots of people packed into a smaller space?

6  A.  Yes, that's correct.

7  Q.  Okay.  And you notice that because your job is security?

8  You have to notice that, right?

9  A.  I noticed it from the very beginning, from the very first

10  day that I worked by myself.

11  Q.  Now, let's talk about the event that defense counsel talked

12  to you about.

13        Ms. Draughn.  Could you pull up Exhibit 170c in

14  evidence.

15  A.  I'm sorry, you talking about this paperwork here?

16  Q.  No, I'm sorry.  Sir, I was talking to Ms. Draughn.  She's

17  the one that makes our computers work, and she's going to bring

18  up a photo for you.

19  A.  Okay.

20  Q.  Do you recognize this space?  I know you have the glasses

21  issue.  Tell me if you can see that.

22  A.  My broken glasses, so just give me a second, please, if you

23  don't mind.

24        I believe it looks like Congressman --

25  Q.  Well, let's just go slowly question by question.

1   A.   Okay.

2   Q.   Sir, is this the space that you were talking about with

3   defense counsel where Ron Paul attended an event?

4   A.   Yes.   This is the setup of the location.

5   Q.   And that's the fairgrounds here in Des Moines, right?

6   A.   Yes, and in that large building, uh-huh.

7   Q.   The one that you talked about with the high ceiling, right?

8   A.   I'm sorry?

9   Q.   The one you talked about with the high ceiling?

10   A.   The high ceiling, correct, yes.

11   Q.   And Ron Paul was here at this event, correct?

12   A.   Yes, that is correct.

13   Q.   So who was your priority to protect?

14   A.   My priority was to protect Ron Paul at all times.   That's

15   the No. 1 priority.

16   Q.   Okay.   You knew Jesse Benton was there, right?

17   A.   Yes.

18   Q.   Okay.   Now, did you hang on his arm and listen to every

19   conversation he had while you were there?

20   A.   At that event I don't recall, and I don't hang on his arm

21   unless -- if something happens where somebody has a discussion

22   and I'm there and I just happen to hear it, you know, then I

23   hear it.

24   Q.   Okay.   I want to just explore that answer a little bit.

25   When you're at an event with Ron Paul, are you going to spend

1   all of your time with Jesse Benton, next to him?

2   A.   No, no.  I'll spend my time close to Ron Paul.

3   Q.   Okay.  And as you can see in this photograph, there's a

4   stage; yes?

5   A.   Yes, correct.

6   Q.   And in front of the stage there's a portion of a crowd in

7   the photo, correct?

8   A.   That is correct.

9   Q.   Can you tell the jury, was there a big crowd that extended

10  outside of this photograph?

11  A.   Yes, there was a large crowd.  The crowd went further back.

12  I don't know how many seats we had there.  Maybe 200, 300 seats.

13  I could be wrong about the number of seating, but -- it didn't

14  fill the whole entire venue, but it filled, you know, maybe half

15  of it.

16  Q.   Fair enough.  And then behind the stage there's a quieter

17  area, correct?

18  A.   Yes.  We always try to keep the areas behind the stage as

19  secure as possible and with as few people as possible roaming

20  around.

21  Q.   Thank you.

22          And I just want to touch on that a little bit further.

23  So the back stage area is more secure than where the crowd is,

24  right?

25  A.   Yeah, uh-huh, correct.

1  Q.  And the back stage area is quieter, right?

2  A.  It would be, yeah, yes.

3  Q.  Okay.  And the crowd is where your focus on threats is going

4  to be less than the secured back stage area, right?

5  A.  Right.  Until I get up to that crowd area, then I have -- I

6  mean, I have -- obviously, crowd is going to be a factor anyway

7  because people are there.  I mean, somebody could come around to

8  get behind -- right behind the stage there, but generally people

9  are sitting in their seats.  Once we get -- or I get closer and

10  Congressman Paul gets closer to the stage, then the crowd

11  becomes -- you know, I have to keep my eyes on the crowd and all

12  around me, kind of behind me, in front of me, everywhere because

13  you just don't know, especially when you're working with -- I

14  will say when you're working by yourself and you're not -- you

15  don't have a team like, you know, Secret Service might have 125

16  people working an event like this, where, you know, we would

17  have one, so yeah.

18  Q.  And so at this event were you the only security at this

19  event?

20  A.  I believe so.

21  Q.  Okay.  And you testified just a few moments ago that the

22  back stage area was more secure.

23        Do you remember that?

24  A.  Uh-huh, yes.

25  Q.  And so the back stage area was -- it was closed off to the

1  general public, right?

2  A.  Yeah.  I -- I'm looking at the photo right now, and I'm

3  not -- yeah, it's closed off.  It's roped off.  You can see a

4  rope line there, and on the other side I think it was just, you

5  know, there was equipment, and so forth, that acted as a natural

6  barrier so that people wouldn't get behind it.

7  Q.  And is this normal procedure that you create a zone that you

8  can feel is safer to have your candidate and the other

9  protectees in?

10 A.  Yes.

11 Q.  And then can you focus your attention outward on the threat

12 that might be in the crowd?

13 A.  That would be correct.

14 Q.  And is it fair to say that you're more focused outward on

15 that crowd of people you don't know than the people behind the

16 stage?

17 A.  Yeah.  At that point, yes, I would say that's correct.

18 Q.  So if Jesse Benton had a conversation with somebody back

19 stage, it's entirely possible that you didn't hear it, correct?

20 A.  Of course.

21 Q.  And, again, you're security, not political strategy, right?

22 A.  That's right.

23         MR. PILGER:  No further questions.

24         THE COURT:  Anything else, Ms. Campbell?

25         MS. CAMPBELL:  Just briefly.

1    REDIRECT EXAMINATION

2    BY MS. CAMPBELL:

3    Q.  Sir, you were asked if Jesse Benton made a decision, whether

4    people followed the decision.

5            Do you remember that?

6    A.  Yes, I do.

7    Q.  And your response was that people respected him, right?

8    A.  Right.

9    Q.  Did you respect him?

10   A.  I respected him.

11   Q.  Do you still respect?

12   A.  I still respect him.

13           MS. CAMPBELL:  Nothing further.

14           THE COURT:  Anything else, Mr. Warrington?

15                    REDIRECT EXAMINATION

16   BY MR. WARRINGTON:

17   Q.  Mr. Baeza, Mr. Pilger asked you a question about the back

18   stage area of the Iowa rally.  Was it common to have areas where

19   all of the speakers were set off from the general public?

20   A.  Yes, it would be common to have an area for speakers or, you

21   know, whoever is going to go up on the stage.

22   Q.  And Ms. Campbell just asked you a question about whether

23   folks respect Mr. Benton.  Would you say the same thing for

24   Mr. Tate?

25   A.  Oh, yes, certainly I would.

1    MR. WARRINGTON:  Thank you.

2    THE COURT:  Thank you, sir.  You're excused.

3    THE WITNESS:  Okay.  Thank you.  Am I released, sir?

4    THE COURT:  Yes.

5    THE WITNESS:  Thank you.

6                              (Witness excused.)

7    THE COURT:  Somebody got a witness ready to go?

8    MS. CAMPBELL:  Your Honor, I believe the next witness

9    is landing right now.

10   THE COURT:  And I have a sentencing that begins at

11   12:15.  I could be a little bit late.  We're going to shoot for

12   1:15.  I might be late, but I don't think so.  We'll start at

13   1:15.

14   Thanks.

15   (Recess at 11:41 a.m., until 1:15 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    AFTERNOON SESSION  1:18 p.m.

 2              (In open court, in the presence of the jury.)

 3              THE COURT:  Please be seated.  Sorry I'm late.

 4              Call your next witness, please.

 5              MR. BINNALL:  Nikolas Spanos, Your Honor.

 6              THE COURT:  Is he in the courtroom?

 7              Please come forward, sir.  If you'll approach the

 8    clerk, she'll administer your oath.

 9              THE CLERK:  Please raise your right hand.

10         NIKOLAS SPANOS, DEFENDANT KESARI'S WITNESS, SWORN

11              THE CLERK:  Please be seated.

12                         DIRECT EXAMINATION

13    BY MR. BINNALL:

14    Q.  Good afternoon, sir.

15    A.  Good afternoon.

16    Q.  Would you please tell us your name.

17    A.  Nikolas Spanos.

18    Q.  How do you spell your first and last name?

19    A.  N-I-K-O-L-A-S S-P-A-N-O-S.

20    Q.  Thank you.

21              And where do you work, Mr. Spanos?

22    A.  Where do I work?

23    Q.  Yes.

24    A.  I work in New York.

25    Q.  Do you have a company?
```

1    A.   Yes.

2    Q.   And what's the name of that company?

3    A.   Public Appeal and Blockchain Tech Corp.

4    Q.   And for the company Public Appeal, through that company did

5    you ever do any work for the Ron Paul Campaign --

6    A.   Yes.

7    Q.   -- in 2012?

8    A.   Yes.

9    Q.   And what did you do for the Paul Campaign?

10   A.   Data, micro targeting, robo calls, live calls.

11   Q.   All right.  And, sir, did you ever come to Iowa before the

12   Iowa caucuses --

13   A.   Yes.

14   Q.   -- in 2012?

15   A.   Yes.

16   Q.   When you came to Iowa, did you ever come to know Kent

17   Sorenson?

18   A.   Met him, yeah.

19   Q.   And do you remember when he started supporting Dr. Paul in

20   late 2011?

21   A.   Yes.

22   Q.   At any point did you hear anything about Mr. Sorenson

23   getting paid?

24   A.   Nope.

25   Q.   At any point did anybody ever talk to you about hiding

1 | anything from the FEC?

2 | A.  No.

3 | Q.  All right.  Now, I want to talk to you about 2013.  In the

4 | year 2013, did you have any discussions with Dimitri Kesari

5 | about doing polling for someone running for the U.S. Senate?

6 | A.  Yep.  Probably a few, I think, a few, a couple of people

7 | running, I think.

8 | Q.  And was one of those people that you were considering doing

9 | some polling for for the U.S. Senate Kent Sorenson?

10 | A.  Yes.

11 | Q.  And did you and Mr. Kesari go through the process of

12 | drafting some questions for such a poll?

13 | A.  Yeah.  I think so, yeah.

14 | Q.  I'm going to put on the Elmo here an item that's marked for

15 | identification as D4 but is not in evidence.

16 |         Mr. Spanos, do you see that?

17 | A.  Yes.

18 | Q.  And is this an e-mail that Mr. Kesari sent to you on

19 | June 21, 2013?

20 | A.  Yeah.

21 | Q.  Okay.  And is the subject matter of this about the poll for

22 | Mr. Sorenson?

23 | A.  Yes.

24 | Q.  All right.  We offer --

25 | A.  U.S. Senate Poll?

1   Q.  Yes.

2   A.  Yes.

3           MR. BINNALL:  We offer Defendant's D4.

4                           (Defendant's Exhibit D4 was

5                           offered in evidence.)

6           MR. COONEY:  No objection.

7           THE COURT:  Received.

8                           (Defendant's Exhibit D4 was

9                           received in evidence.)

10  BY MR. BINNALL:

11  Q.  And, Mr. Spanos, on that does it say, it looks like Kent

12  Sorenson is going to run for the senate?

13  A.  I don't think it says it here, but yeah.

14  Q.  Okay.  On the second line, would you read that under --

15  A.  Oh, yeah, yeah, yeah, it says it, too.

16  Q.  Okay.  Now, Mr. Spanos, do you know if Mr. Kesari was

17  helping anybody else in the time period 2013, 2014 run for U.S.

18  Senate?

19  A.  I think so, yes, a few people.  I think -- oh, South

20  Carolina, Lee Bright.

21  Q.  I'm sorry, that was Lee Bright?

22  A.  Lee Bright from South Carolina.

23  Q.  And do you know who Jared Gamble is?

24  A.  Yes.

25  Q.  And did Mr. Gamble work closely with Mr. Kesari during the

1   campaign?

2   A.   Yes.

3   Q.   Was he essentially Mr. Kesari's right-hand man?

4   A.   Yeah.

5   Q.   And is Mr. Gamble still living?

6   A.   I think he passed away of meningitis.

7   Q.   And, sir, you flew in today?

8   A.   Yeah.  I tried flying in yesterday, and they had me on the

9   tarmac for a few hours, and then they sent me home, but they

10  sent my luggage somewhere else.

11  Q.   Okay.

12  A.   So I don't have my luggage today.

13           MR. BINNALL:  I don't have any other questions for you

14  at this point.

15           Thanks for coming, sir.

16           THE COURT:  Ms. Campbell, do you have anything?

17                    CROSS-EXAMINATION

18  BY MS. CAMPBELL:

19  Q.   Mr. Spanos, you said you work for a company called Public

20  Appeal?

21  A.   Yes.

22  Q.   What's the address of that company?

23  A.   157 Prince Street, New York 10012.

24  Q.   And I think you talked about some of the things you did for

25  the Ron Paul Campaign, and you said that you did robo calls?

1   A.   Yes.

2   Q.   Can you tell us what robo call means?

3   A.   Yes; those annoying things.  You know, we set up a poll and

4   then we call -- the machine calls people and asks them

5   questions, and then usually everybody hangs up, not everybody,

6   but a lot of people hang up.  We probably get maybe 5 percent, 8

7   percent.

8   Q.   And what --

9   A.   Who are you going to vote for?  If the election were held

10  today, who would you vote for, X, Y, Z?

11  Q.   Did you set those up for the Paul Campaign?

12  A.   Yeah.  I think we had 12, 13 phone banks around the country

13  with live kids, you know, volunteers.  Some of them had a

14  hundred people, a hundred kids, 200 kids, and they would call,

15  and we would take the data after and try to target deeper and

16  deeper so they would make less calls -- or have a better outcome

17  per call to find a supporter of, you know, Ron Paul's.

18  Q.   Okay.  And that was part of your business that you were

19  doing under the company Public Appeal?

20  A.   Yes.

21  Q.   And did you have employees also?

22  A.   I had 1099, you know, independent contractors that I paid.

23  Q.   So you paid independent contractors through your company,

24  Public Appeal?

25  A.   Yeah.

```
 1              MS. CAMPBELL:  We would like to publish what's
 2   previously been admitted now the redacted version of B28.
 3              If you could blow that up, please so we could see it.
 4   BY MS. CAMPBELL:
 5   Q.  And, sir, on B28, is that your company, Public Appeal,
 6   Incorporated?
 7   A.  Yes.
 8   Q.  And it has the address of 157 Prince Street?
 9   A.  Yeah.
10   Q.  That's your address?
11   A.  Yes.
12   Q.  And the purpose of the disbursement was listed as
13   audiovisual expenses?
14   A.  I don't know about audiovisual.  It's more -- that's what it
15   says there.  It's more like phone calls.  I don't know if it's
16   audiovisual.  I don't think it's audiovisual.  Audiovisual is
17   like, you know, that TV over there, so --
18   Q.  Did you ever do these reports, sir?
19   A.  No.
20   Q.  Did you ever know how it was being reported on these
21   reports, sir?
22   A.  No.
23   Q.  Did you just send an invoice in?
24   A.  Probably.  I don't know.
25   Q.  And they get paid by the campaign?
```

1  A.  Yep.

2            MS. CAMPBELL:  Nothing further, Your Honor.

3            THE COURT:  Mr. Warrington, Mr. Mills?

4            MR. WARRINGTON:  Nothing from us, Your Honor.

5            THE COURT:  Mr. Cooney.

6                        CROSS-EXAMINATION

7  BY MR. COONEY:

8  Q.  Good afternoon, sir.

9  A.  Good afternoon.

10 Q.  What kind of work did you do for the Ron Paul Campaign?

11 A.  I managed the data and the phone banks, and what I said

12 before, like robo calls.

13 Q.  Did you make a video for the Ron Paul Campaign about his

14 veteran service?

15 A.  A what?

16 Q.  About his veteran service?

17 A.  You know what, I think, yeah, we had a -- Dustin, Dustin

18 Reed made a video, yeah.

19 Q.  So you made a video or helped produce a video for the Ron

20 Paul Campaign about his veteran service?

21 A.  I didn't make the video.  I was only, you know -- I was -- I

22 don't make the video, but yeah, I think we made a video, yeah.

23 I don't know if we made the whole video, but I think -- I'll

24 tell you what happened.  Jesse had a whole big video team from

25 some other place, and to have us more involved and more

1  exposure, he allowed us, allowed Dustin and I, to show up.  And

2  Dustin -- I don't know if they used any footage from Dustin's

3  camera, but it was more like, you know, I appreciate the work

4  you're doing, come to this thing, come to this place where they

5  had a whole big production truck that had nothing to do with us,

6  like we're --

7  Q.  Now, your company, Public Appeal, provides services to

8  campaigns, right?

9  A.  Yeah.

10 Q.  And one of the services it provides is video production

11 services?

12 A.  Not really -- it never did before or after.  I don't think.

13 Q.  Mr. Spanos, I'm approaching you with Government's Exhibit

14 199.

15         Now, Mr. Spanos, you have a LinkedIn page, don't you?

16 A.  Yeah.

17 Q.  I'm sorry, is that a "yes"?

18 A.  Yes, yes.

19 Q.  Yes, you think so or you do?

20 A.  I do, I do.

21 Q.  Now, Mr. Spanos, I'm showing you page 1 of Government's

22 Exhibit 199.

23 A.  Yeah.

24 Q.  That's your photograph right there, right?

25 A.  When I was younger, yeah, before the medication.

```
1   Q.  A few years ago, right?

2   A.  Yeah.

3   Q.  And that's your name right there, Nick Spanos, right?

4   A.  Yes.  Shortened, yes.

5   Q.  All right.  Now, this is a snapshot of your LinkedIn page,

6   isn't it?

7   A.  Yes.

8   Q.  I'm going to move right here to page 2 of your LinkedIn

9   page.

10  A.  Yes.

11  Q.  See where I'm drawing your attention to CEO - Founder.

12          Do you see that?

13  A.  Yes.

14  Q.  Right under that, Public Appeal, right?

15  A.  Yes.

16  Q.  Your company; is that right?

17  A.  Yes.

18  Q.  All right, January 1997 to the present --

19  A.  Yes.

20  Q.  -- you've been the CEO and founder of Public Appeal, right?

21  A.  Yes.  Well, it wasn't -- yeah.  It wasn't around back then,

22  but it has --

23  Q.  This is your LinkedIn page, right?

24  A.  Yeah, but, you know, make it look good, look good to the

25  girls.
```

1  Q.  Right here, Mr. Spanos, underneath what Public Appeal does,

2  it says video production, doesn't it?

3  A.  Yes.

4  Q.  Now, Mr. Spanos, your company, Public Appeal, did work for

5  the Ron Paul Campaign, right?

6  A.  Yes.

7  Q.  And you submitted invoices to the Ron Paul Campaign for the

8  work that Public Appeal did, right?

9  A.  Probably, yeah -- no, I mean I did, but I don't know if I

10 wrote the invoice.  You said me, I submitted it.  Public Appeal

11 submitted the invoices.

12 Q.  Did you bring those invoices with you to court today?

13 A.  No.

14         MR. COONEY:  I don't have any more questions for you,

15 Mr. Spanos.

16         THE COURT:  Anybody else?

17         MS. CAMPBELL:  No, Your Honor.

18         MR. BINNALL:  No, Your Honor.

19         THE COURT:  Thank you, sir.  You're excused.

20                              (Witness excused.)

21         THE COURT:  Call your next witness, please.

22         MS. CAMPBELL:  Your Honor, defendant Benton rests.

23         THE COURT:  Defendant Benton rests, meaning defendant

24 Benton has presented his completion of evidence.

25         Mr. Warrington?

1        MR. WARRINGTON:  Your Honor, defendant Tate rests.

2        THE COURT:  Defendant Tate rests, meaning defendant

3   Tate has completed his presentation of evidence.

4        Mr. Binnall?

5        MR. BINNALL:  Defendant Kesari rests, Your Honor.

6        THE COURT:  All three defendants rest.  Very well.

7        Members of the jury, I didn't fully expect that, but

8   it's okay.  It's just that I don't have anything planned for the

9   rest of the day.  If I had -- if we had finished the evidence

10  this morning, we would have probably done the closing arguments

11  this afternoon, but I'm going to give the government as much as

12  like an hour and 15 minutes and the defendants each an hour to

13  do their closing argument, so we can't get them done today.

14  We're coming back tomorrow anyway, so we're going to do those

15  first thing in the morning.

16        Let's start at 8:30 tomorrow instead of 9:00.  We'll

17  start at 8:30.  It's going to be a long day, and so we'll start

18  at 8:30 in the morning with the closing arguments.  This will

19  give the lawyers the afternoon to make better presentations to

20  you.  And so, not thrilled about taking the afternoon off, but

21  we'll put it to good use and make sure tomorrow we're ready to

22  go for you at 8:30.

23        So, again, fight that natural tendency that everybody

24  might have to want to make up their mind.  There's still, like I

25  say, two important parts of the trial, closing arguments, you

1   will learn more about this case, remember things that you had

2   forgotten, and then I have instructions of the law.  And I'll

3   just tell you right out of the chute, as criminal cases go,

4   these are complicated, you know.  And so they're important and

5   they're more complicated than the typical ones, like in a bank

6   robbery or a drug case.

7             So we've got two important parts left, so we want to

8   not make up our mind until we've heard those and you've begun

9   your deliberations.

10            So I thank you, and we'll see you ready to go at 8:30.

11            (In open court, out of the presence of the jury.)

12            THE COURT:  Please be seated.

13            I assume since you didn't jump up, you don't have any

14  rebuttal evidence?

15            MR. COONEY:  That's a fair assumption, Your Honor, no

16  rebuttal.

17            THE COURT:  Very good.  Additional motions?

18            MR. PILGER:  The government has pending its motion for

19  judicial notice.  I think that's well handled in the

20  instructions, so we're asking you to inform them of the simple

21  numerical change of the codification of the Title 2 cite to the

22  Title 15 cite.

23            THE COURT:  Would you send me a one-sentence e-mail

24  asking me what you have me say?

25            MR. PILGER:  Yes, Your Honor.

1    MR. MILLS:  Your Honor, our point, it's completely

2  irrelevant because, one, it's limited to the treasurer of the

3  campaign.

4    THE COURT:  Well, but if the defendant caused the

5  treasurer to do that, it's not irrelevant.  The question is, why

6  would I give it in light of the fact that there's not a shred of

7  evidence that any of these three men ever saw that form?

8    MR. PILGER:  The evidence is, the government's theory,

9  that they caused the sending of the form.

10    THE COURT:  Yeah, but it didn't cause them to look at

11  the form.  So it seems to me that you're presenting that to

12  notice to anyone that saw it that this is serious stuff and it's

13  material to the government and that it can be punishable if you

14  lie about it.

15    MR. PILGER:  No, I take the court's point.  I'm

16  actually speaking to a different point.  This goes to

17  materiality.  So the fact that it says on the face of the form

18  that this has to be true and accurate and complete and is

19  subject to punishment, we think is fair and important evidence

20  on the issue of materiality as the defendants keep pointing out.

21  The court is completely right, that it does not come in as

22  evidence that these defendants saw it and were on notice from

23  that particular piece of evidence.

24    So I'll craft a suggestion that makes a fair point and

25  avoids the unfair point.

1   THE COURT:  Okay.  Other motions?

2   MR. MILLS:  Your Honor, I don't know where you are on

3   the jury instructions.  I can tell you team Tate was pleased

4   with the changes to the jury instructions; but in light of this

5   latest colloquy, we suggested one this weekend that came from

6   United States versus Litvak, which is the fact that the

7   government prosecuted or investigated the case is not evidence

8   of materiality because it's clear that's what they're going to

9   argue, and it's absolutely out of balance under Litvak.

10   MR. PILGER:  We're not going to argue that, Your

11   Honor.

12   THE COURT:  Okay.  Motions, Ms. Campbell?

13   MS. CAMPBELL:  Your Honor, first off, there were two

14   pieces of evidence that I would like to make offers of proof on,

15   and I would just ask the court's permission to offer Jeff Link's

16   deposition by affidavit for our record.

17   THE COURT:  Well, I've already ruled on it, and

18   anything that you expected to get in, if you didn't tell me

19   about it before, it's unfair to put it in now.  So submit an

20   affidavit if you want, but I want the record to be clear that I

21   ruled based on what you told me he said.

22   MS. CAMPBELL:  I know, but all I'm doing is connecting

23   that, that's what he would have said.

24   THE COURT:  Yeah.  I hope that if it's any different

25   than what you said that no one will ever listen to this again,

1    but I'm not going to stop you from filing anything you want.

2              MS. CAMPBELL:  Okay.  That's all I'm doing, Your

3    Honor, is that I think I need to put something on the record on

4    appeal.

5              THE COURT:  You know, I'm going to disagree with that,

6    but I'm going to let you file it anyway.

7              MS. CAMPBELL:  Okay.  And the second is you excluded

8    our talking about the FBI recording policy, and I was just going

9    to offer that so it was in the record.

10             THE COURT:  Yeah.  You want it in as an exhibit?

11             MS. CAMPBELL:  I hadn't marked it because it was

12   excluded before I marked it.  I'll do Benton 32.

13             THE COURT:  It's received as an offer of proof.

14             MS. CAMPBELL:  33, sorry; 33.

15             THE COURT:  That's all right.

16             Do you have motions?

17             MR. BINNALL:  Your Honor, we renew our motion for

18   acquittal under rule 29 at the close of the evidence using the

19   same arguments we made before and incorporate the motion for

20   reconsideration that I made earlier this week and incorporate

21   the motion for judgment of acquittal both during the trial and

22   after the trial from the October trial.

23             And as far as jury instructions go, Your Honor, we do

24   have and have seen the changes that the court has made.  For the

25   record, we still disagree with the court's statement of the law

1   as far as what actually constitutes a crime, and I think the

2   court is very aware of our position.  I'm just making the record

3   on that.  And we disagree with mens rea.  We've also previously

4   briefed and talked about on numerous occasions the process as it

5   amounts to Count 1, the conspiracy to cause a false record.  We

6   believe that should be knowingly and willfully.  And other than

7   that, we just incorporate our other arguments on jury

8   instructions.

9             THE COURT:  Mr. Warrington.

10            MR. WARRINGTON:  Your Honor, I just want to let the

11   court know that we have filed electronically our rule 29 papers,

12   as Mr. Mills indicated earlier this morning.  We filed that on

13   ECF.

14            THE COURT:  Okay.  Let me read that before I rule on

15   them.

16            MR. WARRINGTON:  We also have a offer of proof on the

17   testimony of David Mason, the expert that we had asked for.

18            THE COURT:  Have I seen it yet?

19            MR. WARRINGTON:  You have not seen it.

20            THE COURT:  Okay.  Same rule, file it with the court,

21   but I don't think it's fair to submit something to me now that I

22   didn't see before when I made my decision, but file it.

23            MR. WARRINGTON:  You made that ruling pretrial, so I

24   guess I renew our motion for Mr. Mason's testimony.

25            THE COURT:  Did it with whatever you folks gave me,

1    right.

2              MR. WARRINGTON:  Okay.  Should I submit this

3    physically to the court or through ECF?

4              THE COURT:  Either way.  It's up to you.

5              MS. CAMPBELL:  And, Your Honor, we're just renewing

6    our rule 29 motion also after the defendants' evidence, and we

7    also filed a written motion.

8              THE COURT:  Earlier today, Mr. Mills, you said we're

9    going to request an additional instruction.  You haven't so far.

10   In the next hour I'll take jury -- the final, anything anybody

11   wants to submit, but we have to cut it off at some point.

12             MR. MILLS:  Okay.  I'll put it in writing and get it

13   to you right away.

14             THE COURT:  Yes, even if it's handwritten at this

15   point and delivered to my office or e-mail, whatever you can do,

16   but I would like to get these finished early this afternoon.

17             Index to exhibits, are we going to have that for the

18   jury?  You know they're going to want it.  Will we have

19   something like that?

20             Thank you.

21             And exhibits that are only digital in nature, will

22   they be submitted in a format that can be played on a standard

23   laptop computer?

24             MR. COONEY:  Yes, they will.

25             THE COURT:  Okay.

1          MR. COONEY:  Yes.  I'm sorry, Your Honor, standard

2  laptop computer with a DVD or CD player.

3          THE COURT:  Yes.

4          MR. COONEY:  Right.

5          THE COURT:  It's hard to push those disks into an

6  iPad.

7          MR. COONEY:  Believe it not, mine doesn't have one.

8  That's why I said that.

9          THE COURT:  Yes, thank you.

10          That's it.  We'll look for any e-mails.  We'll put out

11  the -- we'll e-mail the final set of instructions so that you

12  can use it in any way you want in PowerPoints or on the Elmo or

13  anything you want tomorrow.

14          All right.  Thank you.

15          (Recess at 1:43 p.m., until 8:30 a.m., Wednesday,

16  May 4, 2016.)