# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3861

_____

United States of America

*Plaintiff - Appellee*

v.

Jesse R. Benton

*Defendant - Appellant*

_____

No. 16-3862

_____

United States of America

*Plaintiff - Appellee*

v.

John Frederick Tate, also known as John M. Tate

*Defendant - Appellant*

_____

No. 16-3864

_____

United States of America

*Plaintiff - Appellee*

v.

Dimitrios N. Kesari, also known as Dimitri Kesari

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 6, 2017
Filed: May 11, 2018

_____

Before WOLLMAN and LOKEN, Circuit Judges, and NELSON,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Jesse R. Benton, John Frederick Tate, and Dimitrios N. Kesari (Defendants) were convicted by a jury of causing false records, in violation of 18 U.S.C. §§ 2 and 1519 (Count 2); causing false campaign expenditure reports, in violation of the Federal Election Campaign Act (the Act), 52 U.S.C. §§ 30104(a)(1), (b)(5)(A), and 30109(d)(1)(A)(i) and 18 U.S.C. § 2 (Count 3); engaging in a false statements scheme, in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count 4); and conspiring to commit the offenses listed above, in violation of 18 U.S.C. § 371 (Count 1). Defendants appeal, arguing that the district court[2] erred in denying their motions to

_____

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

-2-

dismiss, for judgment of acquittal, and for a new trial; in instructing the jury; in issuing certain evidentiary rulings; in denying Tate's motion for severance; and in issuing a discovery ruling.  We affirm.

## I.  Background

Defendants were officials with Ron Paul's 2012 presidential campaign.  Benton served as campaign chairman, Tate served as campaign manager, and Kesari served as deputy campaign manager.  During the primary campaign for the Republican Party nomination, Defendants sought the endorsement of Iowa State Senator Kent Sorenson, who had previously endorsed rival Republican candidate Michelle Bachmann and was employed as Bachmann's Iowa campaign chairman, in which capacity he worked seventy to eighty hours a week and was paid $7,500 a month.

On October 29, 2011, Aaron Dorr, the brother of Sorenson's legislative aide, Chris Dorr, emailed Tate a proposal, which stated that Sorenson would need to be paid a salary of $8,000 a month to endorse Paul, Chris Dorr would need to be paid a salary of $5,000 a month, and a $100,000 donation would need to be made to a political action committee established by Sorenson.  Tate shared the proposal with Benton, among others, describing it as "insulting," "offensive," and "unethical," and stating that the Paul campaign could make a counter-proposal, simply refuse the proposal, or communicate the proposal to the press, which he believed "would destroy the Bachman[n] campaign, Kent, and possibly Aaron."  In reply, Benton sent an email on October 31 addressed to Sorenson and Aaron and Chris Dorr, stating that although he was pleased that Sorenson was considering supporting Paul, he was surprised by the proposal because it appeared to be "trying to sell Kent's endorsement for hundreds of thousands of dollars and other in-kind support for future political ventures," which "would be unethical and illegal."  Benton further stated that the Paul campaign "would be happy to employ [Sorenson] at fair market value," which the Bachmann campaign had set at $8,000 a month for Sorenson and $5,000 a month for

-3-

Chris Dorr, and that Sorenson should respond to this offer by November 2.  Later the same day, Kesari told Tate in an email that he and Sorenson had arranged to meet for dinner the following week.  Tate responded by saying that Kesari should not "firm up anything yet."

Aaron Dorr responded to Benton's counter-offer on November 2, stating that he alone was responsible for the earlier proposal and that Sorenson was unaware of its details.  He also stated that Sorenson would be unable to consider Benton's counter-offer until after November 8.  Benton replied that the offer for Sorenson and Chris Dorr to join the Paul campaign remained open but that it would require a response by November 7.

On November 13, Benton emailed Tate and Kesari that he was considering telling the press about Sorenson's endorsement proposal in light of a "cheap shot" from Bachmann toward Paul.  Tate replied that Benton should first contact Aaron Dorr regarding the possibility of Sorenson's endorsement.  Kesari suggested that he could meet with Sorenson and Sorenson's wife, but Tate stated that Benton should contact Aaron Dorr instead, which Benton agreed to do that night.  On November 15, after Dorr had failed to respond, Benton gave Kesari permission to meet with Sorenson and Sorenson's wife.  Tate told Kesari, "Make sure you talk to Jesse about how we want to do this and what you are supposed to say.  We need to be very careful."  Kesari agreed to do so.

On November 21, Kesari emailed Tate and Benton that he had spoken with Sorenson and his family over dinner the previous evening and learned that Sorenson wanted to defect to the Paul campaign but in a way that would cause the least harm to Bachmann.  Tate replied, "Seems to me, next step is to make him an offer (in person, not in writing) and give him a firm but polite deadline.  In my view we would want it to occur after Christmas, a few days before Caucus."  On December 23,

-4-

Benton sent an email to Tate and others stating, "Sorenson is endorsing [Paul] on Monday.  We have his statement already."

Sorenson requested a meeting with Kesari on December 26.  Kesari, Sorenson, and Sorenson's wife met at a restaurant to discuss Sorenson's endorsement of Paul. In Sorenson's absence, Kesari gave Sorenson's wife a $25,000 check made out to Grassroots Strategy, a corporation owned by Sorenson.  After the meeting, Kesari sent an email to campaign staffers saying, "The deal is done.  Please draft a press release and send to me and Jesse."  Attached to the email was Sorenson's draft statement endorsing Paul.

On December 27, however, Kesari sent an email to Tate, Benton, and others saying, "Hold the release.  Kent is getting cold feet.  He wants to meet with me in about 2 hours.  Any advice?  Damn I was afraid of this."  Tate asked, "Why is he getting cold feet?  What can we do, say to help him?  What time are you meeting him, and where?"  Benton replied, "I am not interested in this game any more.  Dimitri, pull the offer.  If we can't depend on him, I don't want him involved."  Benton then sent another email, saying, "In all seriousness, I am [not] sure what to do about this. The DMR [*Des Moines Register*] has his statement, I sent last night since Kent said [he] [was] [c]omfortable."  Benton told Tate and Kesari in subsequent emails that he was considering telling the press about Sorenson's request for payment if Sorenson did not uphold his agreement to endorse Paul.

According to Sorenson, he had a heated argument with Bachmann's campaign staff on December 28.  Later that day, he drove to a rally for Paul at the Iowa State Fairgrounds in Des Moines.  Sorenson met Kesari in the parking lot and asked if Kesari, Benton, and Tate were still "on board" with his endorsement of Paul; Kesari replied that they were.  Sorenson spoke with Benton and Kesari in the backstage area of one of the buildings at the Fairgrounds, where Tate was also present.  Sorenson testified that Benton told him something to the effect of, "[Y]ou bled for us, we'll

-5-

take care of you," which Sorenson understood to mean that he would be "financially taken care of and politically taken care of." Sorenson thereafter went on stage and publicly endorsed Paul. Shortly after Sorenson's endorsement, Kesari sent an email to Fernando Cortes, the Paul campaign's assistant controller, requesting a $25,000 wire transfer for the next morning. Copies of the email were sent to Benton and Tate and stated that Benton had approved the wire. Tate replied the following day that the wire was approved. The Paul campaign issued a press release announcing Sorenson's endorsement.

After Sorenson endorsed Paul, members of the Bachmann campaign began telling the press that the Paul campaign had paid Sorenson for his endorsement. Responding to media inquiries, Benton stated that Sorenson would not be paid by the Paul campaign, in one instance explicitly denying that Sorenson would be paid a salary by the campaign. Tate sent an email to Benton, saying, "We need to make sure anyone asked about this . . . is prepared to say the same thing. I would assume that is something like: The Ron Paul campaign has not and is not paying Kent for his endorsement. Kent decided to endorse Ron because blah blah blah. Short sweet and truthful."

On December 29, the Paul campaign issued a press release that included a statement from Sorenson that he "was never offered money from the Ron Paul campaign or anyone associated with them and certainly would never accept any." The statement further stated, "Financial reports come out in just days which will prove what I'm saying is true." Benton had approved this release before it was made public. In television interviews, Sorenson also denied being paid by the campaign. He had been urged by Kesari to support this denial by referring to the forthcoming financial reports and was told by Kesari not to cash the $25,000 check that Kesari had given to Sorenson's wife. Also on December 29, Cortes sent an email to Kesari, Benton, and Tate, with the subject line "25k wire," asking "Is this invoice still on for today? Please send when you get." Benton told Cortes to "[h]old for a couple days."

Tate agreed that the wire should be held, and Kesari stated, "We are holding till after the filing." Kesari also explained that he did not want the wire "showing up on this quarter filings." Later that day, Cortes sent Tate a list of outstanding invoices, which included "$25k - Dimitri's mystery wire." Tate responded, "Thanks. There will not be the 25k dimitri wire for now. Wipe it off the books."

Kesari then arranged to pay Sorenson through a third party. He asked his brother, Pavlo Kesari, if Pavlo could pay, via Pavlo's video production company, a graphic designer who had done work for the campaign. Pavlo replied that he could not do so, but referred Kesari to his friend Sonny Izon, who owned a video production company called Interactive Communications Technology (ICT). On January 24, 2012, Sorenson sent Kesari an invoice addressed to ICT from Grassroots Strategy Inc., the corporation owned by Sorenson, for "Consulting Services," consisting of $25,000 for "Retainer to provide services" and $8,000 for services provided during the month of January 2012. Kesari sent the invoice to Pavlo, saying, "Here is the invoice that needs to be taken care of. Send me an invoice for video services." Pavlo forwarded the invoice to Izon and added a $3,125 invoice for audio equipment that Pavlo had rented to the Paul campaign. On February 5, Izon sent Kesari an invoice charging the Paul campaign $38,125 for "Production Services."

After receiving the February 5 invoice, Kesari sent Tate an email asking "[d]id jesse get kent paid?" Tate replied, "No idea. Ask him." Kesari then emailed Benton, asking "Did you get kent paid? Or should I submit the payment and pay him?" Benton replied, "Yo[u] handle." Kesari forwarded the invoice to Cortes, saying "Please wire tomorrow morning[.] This is approved by jesse." On March 21, Izon sent Kesari an invoice charging the Paul campaign $8,850 for production services rendered in February. Kesari forwarded the invoice to Cortes, saying that it was "[a]pproved by jesse." Cortes forwarded the invoice to Tate, asking if the payment was approved, with Tate responding that it was. The same exchange took place regarding the invoice for services in March. After receiving the invoice for services

-7-

in April, Kesari forwarded it to Benton, asking "Kent's bill[.] Pay?" Kesari then forwarded the invoice to Cortes, saying that it was "[a]pproved by Jesse." After receiving the May invoice, Kesari forwarded it to Cortes, saying, "This should be the last one." Cortes forwarded the invoice to Tate, asking "[A]pproved? Dimitri said it is the last one." Tate approved the payment. After receiving the June invoice, Kesari forwarded it to Cortes, saying, "This is the last one." Cortes forwarded the invoice to Tate, saying, "According to dimitri [this is] the last one (again)[.] Approved? 8k." Tate told Cortes, "I will find out what it is." Tate emailed Kesari, asking, "What is this? What is it for, who is it? Why do we keep paying them? The last payment was supposedly the last." Kesari replied, "This [is] the last payment for kent Sorenson. The deal jesse agreed to with kent." Kesari sent Tate another email, saying, "I[t] was for 6 months." Tate then approved the payment.

Sorenson testified that he performed some services for the Paul campaign while being paid by it. He posed for photographs, made two television appearances, sent emails, and recorded a phone call on behalf of the campaign. He traveled to South Carolina and appeared at rallies in support of Paul, although he did not organize these rallies, as he had done while working for the Bachmann campaign. While in South Carolina he also met with state legislators and encouraged them to endorse Paul.

Based on the invoices, Cortes and other campaign staff prepared wire instructions for the payments to ICT, using a code designating the payments as "audio/visual expenses." The campaign used this information to report the payments to the Federal Election Commission (the Commission). The campaign reported the payments to ICT to the Commission as "audio/visual expenses," using the code assigned by Cortes.

In response to media reports regarding the $25,000 check that Kesari had given to Sorenson's wife, Sorenson sent Kesari a draft press release in August 2013, which stated that he had been offered the check but never cashed it and thus he "was never

paid." Kesari told Sorenson to hold the release until after Kesari had returned from a trip abroad. Upon arriving in Toronto, Kesari placed phone calls to Sorenson, Tate, and Benton. He placed several more phone calls to Sorenson, Tate, and Benton after returning to Virginia. Kesari traveled to meet with Sorenson at his home. Sorenson testified that upon arriving, Kesari lifted up his shirt and asked Sorenson to do the same, to prove that neither was wearing a wire. Kesari asked Sorenson to give him the check back or to alter it to show either a smaller amount or to show "Loan" as the check's purpose. Sorenson refused these requests.

Defendants were indicted by a federal grand jury on Counts 1 through 4 as described above. Benton was indicted on a count of making false statements to law enforcement, in violation of 18 U.S.C. §§ 2 and 1001(a)(2) (Count 5) and Kesari was indicted on a count of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3) (Count 6). The district court dismissed without prejudice Counts 1 through 4 against Benton and Tate because the government had presented information to the grand jury that Benton and Tate had proffered to the FBI, in violation of their proffer agreements. The jury convicted Kesari of Count 2, causing false records; acquitted Kesari of Count 6, obstruction of justice; and acquitted Benton of Count 5, making false statements to law enforcement. The jury was unable to reach a verdict on the remaining counts.

By way of a superseding indictment, a grand jury again charged Defendants with Counts 1 through 4, except Kesari. who was not indicted on Count 2. After a second trial, the jury convicted Defendants on all counts.

Appellate Case: 16-3861   Page: 9   Date Filed: 05/11/2018 Entry ID: 4660437

## II.  Discussion

### A. Statutory Construction and Sufficiency of the Evidence

Defendants argue that the district court erred in denying their motions for judgment of acquittal and for a new trial because the court misconstrued the relevant statutes and the evidence was insufficient to support Defendants' convictions.[3]  "The district court's statutory construction is a legal determination that we review de novo."  United States v. Mack, 343 F.3d 929, 933 (8th Cir. 2003).  "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."  United States v. Boesen, 491 F.3d 852, 855 (8th Cir. 2007) (quoting United States v. Cacioppo, 460 F.3d 1012, 1021 (8th Cir. 2006)).  "This court views the entire record in the light most favorable to the government, resolves all evidentiary conflicts accordingly, and accepts all reasonable inferences supporting the jury's verdict."  Id. at 856.  "We review the district court's denial of a motion for new trial for abuse of discretion."  United States v. Davis, 534 F.3d 903, 912 (8th Cir. 2008).[4]

---

[3]Benton also appeals from the denial of his motion to dismiss the indictment, a ruling that we review de novo.  United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008).

[4]We reject at the outset Benton's argument that the evidence was insufficient because the district court erred in relying on Sorenson's testimony.  In considering a motion for a new trial, "the district court may weigh the evidence and evaluate the credibility of the witnesses, but the 'authority to grant a new trial should be exercised sparingly and with caution.'"  Davis, 534 F.3d at 912 (quoting United States v. Sturdivant, 513 F.3d 795, 802 (8th Cir. 2008)).

-10-

1.  Federal Election Campaign Act

The Act requires the treasurer of a political campaign committee to file with the Commission a report disclosing "the name and address of each [] person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet a candidate or committee operating expense, together with the date, amount, and purpose of such operating expenditure." 52 U.S.C. § 30104(a)(1), (b)(5)(A).  Violations of the Act's reporting requirements committed "knowingly and willfully" and "aggregating $25,000 or more during a calendar year" may be punished by up to five years' imprisonment.  Id. § 30109(d)(1)(A)(i).

Defendants argue that the Act does not prohibit a campaign from paying a vendor, which in turn pays a sub-vendor, while reporting only the payment to the first vendor.  As the district court noted in its order denying Defendants' motions, this argument is unavailing because Defendants were not charged with violating the Act merely by failing to report Sorenson as the ultimate recipient of the campaign's payments to ICT.  Rather, the government "was properly permitted to argue that [the] combination of a payee used to disguise the true payee, together with a false statement of purpose, was sufficient to violate the statutes alleged in the indictment." D. Ct. Order of Oct. 24, 2016, at 4-5.

The district court's analysis does not conflict with the Commission's decisions. In Mondale for President, the Commission advised that a campaign may report expenditures to a corporation it hired to provide media consulting services without reporting the corporation's expenditures to its sub-vendors.  FEC Advisory Opinion 1983-25 (Mondale for President).  And in Kirk for Senate, the Commission concluded that a campaign had not violated the Act's reporting requirements by paying a vendor for media services, who in turn paid a sub-vendor that allegedly used some of the funds to pay the personal expenses of the candidate's girlfriend.  Kirk for Senate,

-11-

Matter Under Review (MUR) 6510 (FEC July 16, 2013).  In both matters, however, the Commission concluded that the vendors and sub-vendors had provided the services described by the campaign.  Indeed, in <u>Mondale</u>, the Commission noted that itemization of the vendor's payments to sub-vendors would not be required because the campaign would report "specific information describing the various purposes of each expenditure made" to the vendor, such as "media consulting fees, media photocopy expenses, media buys, media production, and other similar descriptive language that reflects the actual purpose of each" of the campaign's expenditures to the vendor.  Here, by contrast, the government presented evidence that Defendants caused false reports to the Commission that the payments to ICT were for "audio/visual expenses," when in reality ICT had provided no such services to the campaign and the payments were instead for Sorenson's endorsement.

The Commission found a violation of the Act's reporting requirements in a matter whose facts are similar to those here, <u>In the Matter of Jenkins for Senate 1996 and Woody Jenkins</u>, MUR 4872 (FEC Feb. 15, 2002).[5]  The campaign had contracted with a company called Impact Mail & Printing for computerized phone bank services. The campaign wanted to conceal its association with Impact Mail, however, and to that end it issued payments to its media firm, Courtney Communications, which then transmitted the payments to Impact Mail.  The campaign's reports to the Commission reflected disbursements to Courtney Communications and not to Impact Mail.  The Commission reasoned that because Courtney Communications "had no involvement whatsoever with the services provided by Impact Mail," and served only "as a conduit for payment to Impact Mail so as to conceal the transaction with Impact Mail," the campaign had violated the Act's reporting requirements.

---

[5]Defendants contend that this matter lacks persuasive value because the Commission's views were set forth in a conciliation agreement reached by the Commission and Respondents.  We note, however, that the conciliation agreement was accepted by majority vote of the Commissioners.

Defendants cite Boustany, Jr. MD for Congress, MUR 6698 (FEC Feb. 23, 2016), in support of their argument, but we do not find that case persuasive. The supplement to the complaint in that matter set forth allegations similar to those in this case, and in a three-to-three vote the Commission failed to find legal violations. Those Commissioners voting to take no action pointed to the campaign's descriptions of the disbursement's purpose as "[d]oor-to-door get-out-the-vote," and noted that while "a portion of the disbursement was ultimately used for another kind of [get-out-the-vote] activity," it would not be "a prudent use of Commission resources" to investigate such a "minor discrepancy." Here, by contrast, reporting the payments to ICT as "audio/visual expenses," when the actual purpose of the payments was for Sorenson's endorsement, can hardly be characterized as a "minor discrepancy."

We also reject Defendants' argument that the coding of the disbursements to ICT as "audio/visual expenses" did not render the reports false. That Sorenson performed some work for the campaign that might arguably be described as an audio/visual expense is beside the point. The government's theory was that the payments to Sorenson were for his endorsement and not for any audio/visual services, a theory bolstered by the fact that the payments were arranged before Sorenson performed any services. Based on Commission Branch Chief Michael Hartsock's trial testimony, Defendants contend that "a campaign is limited in the way that it can report disbursements and still comply with the Commission's facial review," that the Commission considers "audio/visual" to be an adequate expenditure purpose, and that it considers "political consulting" or "endorsement" to be inadequate purposes. Benton Br. 28-29. Hartsock's testimony, however, was that the Commission's lists of adequate and inadequate disbursement purposes are non-exhaustive, and he agreed that "while consulting is not an acceptable purpose, specifying the type of consulting services provided can help to ensure that the purpose is considered adequate." He also testified that "audio/visual" does not appear on either the list of adequate or the list of inadequate purposes. This testimony thus did not establish that "audio/visual" was an accurate description of the purpose for the disbursements to ICT, nor did it

-13-

establish that Defendants could not have accurately described the purpose for the disbursements in a manner that would have been accepted by the Commission.

Benton and Tate contend that the evidence was insufficient to support their convictions under the Act because it did not show that they were involved in preparing the false Commission reports. We disagree. The government presented evidence that Benton and Tate coordinated with Kesari to offer Sorenson money in return for endorsing Paul and that they approved a wire transfer to pay Sorenson after he had done so. After the Bachmann campaign claimed that Sorenson had been paid for his endorsement, Tate told Benton that everyone involved should be "prepared to say the same thing," namely, that Sorenson had not been paid for his endorsement. Benton told members of the media that Sorenson would not be paid by the Paul campaign. The Paul campaign issued a Benton-approved statement from Sorenson that Sorenson would not be paid by the campaign and that the campaign's forthcoming Commission reports would bear out this claim. Tate and Benton instructed Cortes to hold the previously-approved wire, which, Kesari explained, was intended to prevent it from appearing on that quarter's Commission report. Later, Tate told Cortes to "[w]ipe [the wire] off the books." Benton told Kesari to handle the payments to Sorenson. Kesari sent several invoices from ICT to Cortes, saying in nearly every case that the disbursements had been approved by Benton. Kesari told Benton that the April invoice was for "Kent's bill." Tate approved the invoices after Cortes forwarded them to him. Although Tate asked what the June invoice was for, he approved the invoice immediately after Kesari told him that it was for "[t]he deal jesse agreed to with kent." The jury was entitled to infer from these facts that Benton and Tate had knowingly and willfully caused Commission reports to be filed which falsely reported the payments to Sorenson for his endorsement as payments to ICT for audio/visual services.

We reject Defendants' arguments that the reporting requirements are so vague or confusing that we should either apply the rule of lenity or determine that criminal

-14-

enforcement is not appropriate in this case.  As set forth above, Defendants were not convicted for an unsuccessful, good-faith attempt to accurately report the disbursements to ICT, but for knowingly and willfully causing false reports to be filed with the Commission, a conviction that we conclude finds ample evidentiary support in the record.

## 2.  Causing False Records

Defendants challenge their convictions under 18 U.S.C. § 1519, which provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

Tate argues that applying § 1519 to false reports of campaign expenditures would render the Act superfluous.  "Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745, legislation designed to protect investors and restore trust in financial markets following the collapse of Enron Corporation." Yates v. United States, 135 S. Ct. 1074, 1079 (2015).  The Supreme Court has cautioned against "cut[ting] § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with obstructive intent."  Id.  We conclude that applying § 1519 in the context of this case does not pose such a risk.  In Yates, the Court held that § 1519 was not applicable to a fisherman's actions in throwing undersized fish overboard in order to evade punishment.  Id. at 1078-79.  The Court concluded that "[a] tangible object captured by § 1519 . . . must be one used to record or preserve information."  Id. at 1079.  The

-15-

production of false financial records by a political campaign falls within that framework. Accordingly, we join the Second Circuit in holding that a defendant may properly be convicted for violations of the Act and of § 1519. See United States v. Rowland, 826 F.3d 100 (2d Cir. 2016) (affirming convictions for violations of the Act and 18 U.S.C. §§ 371, 1001, and 1519), cert. denied, 137 S. Ct. 1330 (2017).

Tate also argues that Defendants' § 1519 convictions fail because the false reports alleged in this case do not implicate a "matter within the jurisdiction of" the Commission. Regarding the identical phrase used in 18 U.S.C. § 1001, the Supreme Court has stated that "[t]he most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department." United States v. Rodgers, 466 U.S. 475, 479 (1984). "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." Id. "Understood in this way, the phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body." Id.

We conclude that the filing of campaign-expenditure reports constitutes a matter within the Commission's jurisdiction under § 1519. As set forth above, the Act requires campaigns to submit these reports and establishes penalties for their falsity. The Commission is statutorily required to make these reports available for public inspection. 52 U.S.C. § 30111(a); 11 C.F.R. § 5.4(a). Accordingly, and in contrast to the situation that existed in United States v. Facchini, 874 F.2d 638 (9th Cir. 1989) (en banc), where the Department of Labor's authorization was only to monitor the administrative structure of the state's unemployment benefits program, here the false Commission reports did not constitute "[m]ere access to information," but rather "information received [that was] directly related to an authorized function" of the Commission. Id. at 642. We conclude that for the same reasons as described above regarding the violation of the Act, the evidence was sufficient for the jury to

-16-

find that Defendants knowingly falsified documents with the intent to impede the Commission's administration of that matter.

### 3. False Statements Scheme

Under 18 U.S.C. § 1001(a)(1), "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully [] falsifies, conceals, or covers up by any trick, scheme, or device a material fact" may be imprisoned for up to five years. Defendants argue that, even assuming that they caused false reports to be submitted to the Commission, the evidence was insufficient for the jury to convict them of violating § 1001(a)(1) because the false statements were not material. We disagree.

"A false statement is material if it has a natural tendency to influence or was capable of influencing the government agency or official to which it was addressed." United States v. Chmielewski, 218 F.3d 840, 842 (8th Cir. 2000); see also United States v. Gaudin, 515 U.S. 506, 509 (1995) ("The statement must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" (quoting Kungys v. United States, 485 U.S. 759, 770 (1988))). Defendants contend that this standard was not met in light of Hartsock's testimony that a completed report filed with the Commission is automatically posted on the Commission's website and is taken down only if a subsequent review determines that the report is incomplete. Defendants argue that the false statements of purpose were not material because they did not influence the Commission in light of the fact that accurate reports would have been published, just as the false reports were.

Perhaps so, but that does not foreclose the possibility that the Commission might have taken different action had the reports truthfully described the disbursements' purpose. To prove materiality, the Commission needed to show only

-17-

that the false reports were capable of influencing its decision and not that they succeeded in doing so.  United States v. Wintermute, 443 F.3d 993, 1001 (8th Cir. 2006).  We conclude that the false statements in the reports satisfied § 1001(a)(1)'s materiality requirements.

### 4.  Conspiracy

Under 18 U.S.C. § 371, "[i]f two or more persons conspire [] to commit any offense against the United States . . . or any agency thereof . . . and one or more of such persons do any act to effect the object of the conspiracy," each conspirator may be imprisoned for up to five years.  "Conspiracy is an . . . agreement to commit an unlawful act."  United States v. Pullman, 187 F.3d 816, 820 (8th Cir. 1999) (quoting Iannelli v. United States, 420 U.S. 770, 777  (1975)).  "Proof of a defendant's involvement in a conspiracy may of course be demonstrated by direct or circumstantial evidence."  United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

We conclude that the evidence was sufficient for the jury to convict Defendants of conspiracy.  The government presented evidence that Defendants coordinated with one another to conceal the payments to Sorenson by paying him through ICT and that Defendants knew that the purpose of those payments would ultimately be falsely reported to the Commission.  That same evidence was sufficient to permit the jury to find that Defendants entered into an agreement to take such action.

### B.  Multiplicity

Kesari argues that Counts 2, 3, and 4 were multiplicitous and thus violated his rights under the Fifth Amendment's Double Jeopardy Clause.  We review this claim de novo.  United States v. Emly, 747 F.3d 974, 977 (8th Cir. 2014).   Kesari argues that we must determine "whether Congress intended the facts underlying each count

-18-

to make up a separate unit of prosecution." Id. (quoting United States v. Chipps, 410 F.3d 438, 447 (8th Cir. 2005)). This test applies, however, only when multiple counts of an indictment charge the same statutory violation. Id. Here, each count charged a violation of a different statute. Accordingly, we apply the test derived from Blockburger v. United States, 284 U.S. 299 (1932), which provides that "if each offense requires proof of an element not required by the other, the crimes are not considered the same, and a double jeopardy challenge necessarily fails." United States v. Sandstrom, 594 F.3d 634, 654 (8th Cir. 2010) (quoting United States v. Gamboa, 439 F.3d 796, 809 (8th Cir. 2006)). Each of the three counts requires proof of an element the others do not: the Act requires a monetary threshold to be met; § 1519 requires an intent to impede, obstruct, or influence a federal matter; and § 1001 requires a showing of materiality.

## C.  Severance

Prior to the second trial, Tate moved to sever his trial from his codefendants so that Kesari could testify on his behalf. A hearing was held before a magistrate judge,[6] during which Kesari's counsel stated that if Tate's trial were severed, Kesari would testify that on December 28, the day Sorenson endorsed Paul, Tate was told that Sorenson had not been promised anything in return for endorsing Paul; that Kesari did not tell Tate about the $25,000 check he gave to Sorenson's wife; that Kesari had no recollection of telling Tate about the $25,000 wire; that no deal to pay Sorenson existed until January 2012; that Kesari never passed on to Tate any information about ICT or the method of paying Sorenson; and that Kesari does not recall telling Tate anything about payments to Sorenson, including how they would be reported to the Commission, other than in the emails offered into evidence. In opposition, the government offered some of Kesari's emails and an interview with the

---

[6]The Honorable Helen C. Adams, United States Magistrate Judge for the Southern District of Iowa.

-19-

FBI, in which Kesari stated that Paul and another campaign officer did not know about the deal to pay Sorenson but did not say the same about Tate. The district court adopted the magistrate judge's report and recommendation that the motion be denied in light of the equivocal nature of Kesari's testimony and the impeachment evidence available to the government.

"There is a preference in the federal system for joint trials of defendants who are indicted together." United States v. Anderson, 783 F.3d 727, 743 (8th Cir. 2015) (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)). "This preference is 'especially compelling when the defendants are charged as coconspirators.'" Id. (quoting United States v. Basile, 109 F.3d 1304, 1309 (8th Cir. 1997)). "It is settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court, and this court will not reverse in the absence of a clear showing of abuse of discretion." United States v. Starr, 584 F.2d 235, 238 (8th Cir. 1978) (quoting United States v. Rochon, 575 F.2d 191, 197 (8th Cir. 1978)). "[I]n view of the strong policies favoring joint trials where permissible, the defendant must show that the co-defendant's testimony would be substantially exculpatory. The defendant must show that the co-defendant's testimony would do more than 'merely tend to contradict a few details of the government's case against [him or her].'" United States v. DeLuna, 763 F.2d 897, 920 (8th Cir. 1985) (quoting United States v. Garcia, 647 F.2d 794, 796 (8th Cir. 1981)), abrogated on other grounds by United States v. Inadi, 475 U.S. 387 (1986). In deciding whether a co-defendant's testimony would be substantially exculpatory, the district court was entitled to take into account "the other trial evidence and the impeachment evidence available to the government." United States v. Oakie, 12 F.3d 1436, 1441 (8th Cir. 1993).

Kesari's proffered statements that Tate was told that Sorenson was promised nothing for his endorsement, that Kesari could not recall telling Tate about the $25,000 wire, that no deal to pay Sorenson existed until January 2012, and that Kesari

could not recall telling Tate about the payments to ICT or the method of paying Sorenson were contradicted by the record of emails between Benton, Tate, and Kesari.  Accordingly, although some of Kesari's statements were unequivocal, and even though Kesari's failure to exonerate Tate during his interview with the FBI may have had only weak impeachment value, we conclude that the district court did not abuse its discretion in denying the motion.

## D.  Jury Instructions

Defendants argue that the district court erred in instructing the jury.  "We review defense challenges to the district court's jury instructions for abuse of discretion."  United States v. Carlson, 810 F.3d 544, 554 (8th Cir. 2016).  "The test is 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'"  Id. (quoting United States v. Beckman, 222 F.3d 512, 520 (8th Cir. 2000)).  When review of jury instructions requires statutory interpretation, our review is *de novo*.  Id. at 551.

Benton requested that the district court instruct the jury that it is not illegal: 1) for a campaign to pay for an endorsement; 2) for a campaign to delay the timing of payments from one reporting period to another; 3) for a campaign not to report payments from vendors to sub-vendors; 4) for a campaign to make an expenditure to a limited liability company without identifying its members or employees; or 5) for a campaign to pay a vendor more than market value for services.  The district court instructed the jury on the first and third points.  The court did not abuse its discretion in denying the proposed instructions because none of the issues set forth therein related to the government's proffered theory of conviction.  See United States v. Wisecarver, 644 F.3d 764, 772 (8th Cir. 2011) ("A legally accurate but irrelevant jury instruction may be error to the extent it misleads the jury.").

Benton also requested that the district court instruct the jury that the term "willfully," which appears in both the Act and § 1001, should be defined as follows: "A person acts willfully if he acts voluntarily and intentionally to violate a known legal duty.  It means that the defendant had knowledge of what the law required and acted with the specific purpose to disobey the law."  Instead, the district court issued the following instruction:

> A person acts willfully if he acts knowingly, purposely, and with the intent to do something the law forbids.  That is, a person acts willfully when they act with the purpose to disobey or to disregard the law.  A person need not be aware of the specific law or rule that his conduct may be violating, but he must act with the intent to do something that he knows the law forbids.

Benton argues that the term "willfully" is vague because this court recognizes more than one definition of the term and thus he was entitled to have the district court give his proposed instruction because it was the more lenient of the two.  In Bryan v. United States, however, the Supreme Court approved nearly identical jury instructions, except with regard to "highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct."  524 U.S. 184, 194-95 (1998).  Because Benton has not shown that this case falls within such an exception, we find no abuse of discretion in the district court's denial of his proposed jury instruction.

Likewise, the district court did not abuse its discretion in refusing to give Benton's proposed "debatable law" instruction, which stated:

> One factor for you to consider in deciding whether the defendants "knowingly and willfully" broke the law is whether the requirements of the law were vague or highly debatable.  The more uncertain and debatable a law may be, the more difficult it may be to know whether certain conduct may violate the law.  Sometimes the applicability of a

law may be very clear in some instances, but not in others.  If the law is so uncertain or highly debatable that reasonable persons could disagree, then the defendants could not knowingly and willfully violate the law and you must find them not guilty.

The district court instead issued the following instruction:

Good-faith is a complete defense to Counts 1, 2, 3 and 4 in this case because good faith on the part of the defendants is inconsistent with willfulness as alleged in Counts 1, 3, and 4 and an intent to impede as alleged in Counts 1 and 2.  If the defendants acted in good faith, sincerely believing themselves to be exempt by the law from the conduct constituting any of the above charges, then the defendants did not intentionally violate a known legal duty, that is, the defendants did not act "willfully."  The burden of proof is not on the defendants to prove good-faith intent because the defendant does not need to prove anything. The government must establish beyond a reasonable doubt that the defendants acted willfully as charged.

The district court's instruction accurately set forth the law, and Benton did not show that the law was "vague or highly debatable" so as to warrant the issuance of his proposed instruction.  See United States v. Picardi, 739 F.3d 1118, 1126-27 (8th Cir. 2014) (holding that district court did not abuse its discretion in refusing to issue "debatable law" instruction because the issue of vagueness was reserved for the court).

Kesari argues that the district court erred in failing to instruct the jury that a conviction for violation of § 1519 required a finding that the defendant acted willfully.  Although Kesari concedes that the text of § 1519 includes no willfulness requirement, he contends that the relationship between the Act—which includes a willfulness requirement and authorizes comparatively lenient penalties—and § 1519—which includes no willfulness requirement yet authorizes comparatively harsh penalties—creates a "positive repugnancy" such that Congress must have

-23-

intended for § 1519 to include a heightened *mens rea* requirement of willfulness. United States v. Batchelder, 442 U.S. 114, 122 (1979). Batchelder undermines Kesari's argument, however, because there the Court held that without further evidence of inconsistency, two statutes authorizing different punishments for the same conduct may coexist. Id. Further, the Court considered whether a later-enacted, more lenient statute should be read to implicitly repeal an earlier-passed harsher one. Id.; see also United States v. Richardson, 8 F.3d 15, 17 (9th Cir. 1993) (per curiam) (holding that 18 U.S.C. § 1920 narrowed § 1001, which predated § 1920 by 40 years). Here, by contrast, Kesari makes a far less intuitive argument—that § 1519, which was enacted after the Act and which, according to Kesari, is broader than the Act, must have been intended to include an implicit heightened *mens rea* element to avoid broadening the liability for conduct punishable under the Act. We decline to read § 1519 as including such an implicit element, all the more so because the cases Kesari cites in support of his argument included a willfulness requirement. See Bryan, 524 U.S. at 188-90; Ratzlaf v. United States, 510 U.S. 135, 138-40 (1994); Cheek v. United States, 498 U.S. 192, 194 (1991); United States v. Curran, 20 F.3d 560, 569 (3d Cir. 1994). Accordingly, we conclude that the district court did not err in refusing to give Kesari's proposed instructions.

## E. Evidentiary Rulings

"We review evidentiary rulings for clear abuse of discretion, 'reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict.'" Anderson, 783 F.3d at 745 (quoting United States v. Henley, 766 F.3d 893, 914 (8th Cir. 2014)).

### 1. Exclusion of Defense Experts

Defendants argue that the district court erred in excluding the testimony of two expert witnesses, David Mason and Jeff Link. Mason, a campaign consultant and

former Commissioner and Commission Chairman, testified at the first trial in 2015. During direct examination, defense counsel asked several questions regarding general campaign-finance legal requirements, to which the district court sustained several relevance-based objections saying to defense counsel,

> This is not the subject matter that you represented would be his testimony. You were very specific about what you wanted this for. . . . It was represented as associated with the campaigns, how hectic the campaigns and things like that were. That was the representation, and the organizational structure of campaigns, not the difficulty complying with the law.

After defense counsel asked Mason if there was "any confusion about the compliance issues with vendors and sub vendors," the court sustained another objection and called counsel to a sidebar conference, during which the court stated,

> Confusion goes to the state of mind of another, whether it's one person or a whole bunch. This gets back to the exact same concern I had last week about whether the Mondale Campaign sought an advisory opinion. Until I find out that that's—that your client heard it and relied upon it and bases a good faith defense on that, it's not relevant. Confusion generally is not relevant.

The district court sustained a relevance objection when government counsel asked Mason on cross-examination if he had ever advised a campaign that it could report a disbursement to the Commission as an audiovisual expense when the disbursement was for something else. Government counsel then asked Mason a series of questions regarding the legality of paying sub-vendors through an "umbrella vendor," including whether the umbrella vendor would have to actually work with the sub-vendors. On redirect examination, defense counsel asked Mason about the rules regarding paying sub-vendors through an umbrella vendor and possible confusion surrounding those rules. The district court overruled the government's objections,

-25-

Appellate Case: 16-3861     Page: 25     Date Filed: 05/11/2018 Entry ID: 4660437

ruling that the government had opened the door to the issue through its line of questioning on cross-examination.  Mason continued to testify on this topic during the remainder of his testimony.

Prior to the beginning of the second trial, the district court granted the government's motion *in limine* to exclude Mason's testimony.  It did so because Mason's testimony at the first trial "did not provide helpful context regarding the inner workings of federal campaigns at all, and only arguably touched on any relevant standard of care by alluding to general confusion," and instead offered an impermissible legal conclusion that the Commission regulations were confusing and that payments to sub-vendors through an umbrella vendor did not violate these regulations.  See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible.").  The court accordingly excluded the evidence under Rule 403 of the Federal Rule of Evidence, finding that the "helpfulness of Mr. Mason's testimony to the jury's clear understanding of the general context of a political campaign and how a political campaign operates is outweighed by the danger of confusion of the issues and impermissible instruction on the law."  The court noted that it would instruct the jury that the use of an umbrella vendor to pay sub-vendors would not alone violate the Act and that Defendants were free to elicit testimony from other witnesses "regarding the hectic nature of political campaigns."

Benton served pretrial notice that he intended to call Link as an expert witness to testify regarding "the operating environment within federal candidate campaigns and the customs and practices and standards of care with respect to organizational structure;" "the customs and practices of federal candidate campaigns with respect to paying outside consultants through the use of corporations . . . and other similar entities;" and "the customs and practices of federal candidate campaigns with respect to the use of vendors who subcontract for services intended for the benefit of the

-26-

federal candidate campaign." The government filed a motion *in limine* to exclude Link's testimony, which the court orally granted during trial.

Tate contends that the district court abused its discretion in excluding the experts' testimony because the impermissible legal testimony that the district court was concerned about was elicited by the government. The record shows, however, that the testimony was elicited by both sides. As the district court noted, testimony about the "hectic nature" and operational structure of the Paul campaign was available from other witnesses with direct knowledge thereof, and so the court acted well within its discretion in excluding the proposed testimony.

### 2. Admission of the $25,000 Check

Benton argues that the district court abused its discretion in admitting evidence of the $25,000 check because it was not relevant to the theory of conviction and that any tangential relevance was outweighed by the danger of unfair prejudice. We disagree. The check was relevant to show that the purpose of the payments to Sorenson was to purchase his endorsement, rather than for "audio/visual expenses," as was reported to the Commission. Any potential prejudice resulting from admission of this evidence was mitigated by the district court's instruction that paying for an endorsement alone is not illegal.

### 3. Admission of Cortes Email

Kesari argues that the district court abused its discretion in admitting an email sent from Cortes to other campaign staff. The email stated that "Dennis is not a good guy . . . but neither is Dimitri IMO- but then again I don't know it all so I leave it to you." The email also included several attachments, including the ICT invoices; one attachment bore a lewd title. Cortes opined, "The last attachment is an email (sorry for the lewdness) I got about a month ago- not sure who its from- my two guesses-

-27-

Dennis or Dimitri using dummy accounts."  The district court did not abuse its discretion in admitting this evidence.  In any event, any prejudice to Kesari was so slight as to render any error harmless.  United States v. Falls, 117 F.3d 1075, 1077 (8th Cir. 1997).

## F.  Impeachment Evidence

Kesari argues that the government withheld favorable information derived from an October 9, 2015, interview between Sorenson and agents of the FBI, in violation of the Jencks Act, 18 U.S.C. § 3500(b), and Giglio v. United States, 405 U.S. 150, 154-55 (1972).

Kesari did not establish a violation of the Jencks Act because he has not shown that notes of this meeting exist.  The Jencks Act requires a court to order the government, upon request by the defendant, to produce any statement in the government's possession which relates to the matter on which a witness called by the government has testified on direct examination.  18 U.S.C. § 3500(b).  In response to subpoenas issued by Defendants, the government stated that Sorenson had met with FBI agents on October 9 and that no notes were taken at the meeting.  Kesari argues that trial testimony established that notes were taken at the meeting, but that testimony was equivocal.  During the first trial, Sorenson was asked if people at the meeting were taking notes, and he responded, "I don't recall."  Then, when asked, "Were [note] pads out?" Sorenson said, "Yes."  When asked "And were people writing on those pads as you spoke to them?" he replied, "I would assume so, yes."  During the second trial, FBI Special Agent Karen LoStracco, who attended the October 9 meeting along with two other agents, testified, "I think I usually take at least some notes.  I don't recall an occasion where I didn't take notes.  If I wasn't taking notes, somebody else was taking notes, meaning another agent."  In the absence of any probative evidence that notes were taken at the October 9 meeting, no Jencks Act violation was established.

Kesari argues that even if no tangible notes exist, <u>Giglio</u> nonetheless entitled him to impeachment evidence from the meeting.   As Kesari offers only the speculative claim that the October 9 meeting must have produced impeachment evidence in light of Sorenson's penchant for dishonesty, he has not shown that any impeachment evidence existed and thus has established no <u>Giglio</u> violation.

The judgments are affirmed.

_____

-29-